**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | Case No.:  12 Civ. 4828 (KPF)(JCF) |
| Plaintiff, | ECF Case |
| -against- | |
| THE ESTATE OF MARILYN MONROE, LLC; BIOWORLD MERCHANDISING, and DOES 1 THROUGH 10, | |
| Defendants. | |
| THE ESTATE OF MARILYN MONROE, LLC, | |
| Defendant/Counter-Plaintiff, | |
| -against- | |
| A.V.E.L.A., INC., and LEO VALENCIA, | |
| Counter-Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT/COUNTER-PLAINTIFF THE ESTATE OF MARILYN MONROE, LLC'S MOTION FOR SANCTIONS FOR DISCOVERY MISCONDUCT AND TO COMPEL DISCOVERY**

## Table of Contents

Page

I.     FACTS AND PROCEDURAL BACKGROUND.................................................................. 1

    A.     Introduction.................................................................................................... 1

    B.     Relevant Background to Counter-Defendants' Discovery Abuses........................ 2

        1.     "AVELA'S" Operations ............................................................. 2

        2.     Initiation of the Lawsuit............................................................. 4

    C.     The Discovery Abuses ..................................................................................... 5

        1.     Counter-Defendants' Concealment of Documents Regarding AVELA'S Claimed Rights .......................................................... 5

        2.     Counter-Defendants' Concealment of Licensees.................................... 8

        3.     Falsified Financial Records......................................................... 11

            a.)     Valencia Is Purposefully Understating the Gross Revenues Associated With His Business In Order To Undermine The Estate's Potential Monetary Remedies ........................................ 11

            b.)     Valencia Is Also Concealing Financial Information to Obstruct The Estate's Ability to Investigate His Reports of Inflated Elements of Cost or Deduction..................................... 13

        4.     Valencia's Withholding of Financial Records Is Also Aimed To Obstruct The Estate's Ability To Investigate Alter Ego Issues .............. 16

II.     ARGUMENT ............................................................................................................ 17

    A.     Rule 37(c) Remedies Are Warranted ................................................................. 17

    B.     Rule 37(a) Remedies Are Warranted ................................................................. 22

    C.     The Court Also Should Exercise Its Inherent Power To Sanction....................... 23

III.     CONCLUSION......................................................................................................... 24

# TABLE OF AUTHORITIES

CASES

Bruce Lee Enterprises, LLC v. ECKO Complex, LLC et al.,
  10-cv-02333 (S.D.N.Y.).............................................................................................4

Chambers v. NASCO, Inc.,
  501 U.S. 32 (1991)...................................................................................................23

Fendi Adele S.R.L. v. Filene's Basement, Inc.,
  No. 06 Civ. 244 2009 WL 855955 (S.D.N.Y. Mar. 24, 2009) ...............................24

Fifty-Six Hope Road Music Ltd. et al. v. A.V.E.L.A. Inc. et al.,
  08-cv-00105 (D. Nev.)...............................................................................................4

Fifty-Six Hope Road Music Ltd. v. Fame Jeans et al.,
  07-cv-00194 (D. Nev.)...............................................................................................4

Fleischer Studios, Inc. v. AVELA, Inc.,
  06-cv-06229 (C.D. Cal.) ............................................................................................4

Genger et al. v. Sharon,
  No. 10 Civ. 4506 (SAS), 2012 WL 3854883 (S.D.N.Y. Sept. 5, 2012)............17, 21

Gotlin, et al. v. Lederman, et al.,
  No. 04-CV-3736(ILG), 2009 WL 2843380 (E.D.N.Y. Sep. 1, 2009) ....................20

In re Methyl Butyl Either (MTBE) Prods. Liab. Litig,
  269 F.R.D. 360 (S.D.N.Y. 2010) ..............................................................................22

In re September 11th Liab. Ins. Coverage Cases,
  243 F.R.D. 114 (S.D.N.Y. 2007) ..............................................................................19

Karaha Bodas Co., LLC v. Minyak,
  No. 21 MC 98(TPG), 2007 WL 1284903 (S.D.N.Y. Apr. 30, 2007) .....................20

King Features Syndicate, Inc. v. A.V.E.L.A. Inc.,
  06-cv-06464 (S.D.N.Y.).............................................................................................4

Lodge v. United Homes, LLC et al.,
  787 F. Supp. 2d 247 (E.D.N.Y. 2011) ......................................................................21

Residential Funding Corp. v. DeGeorge Fin. Corp.,
  306 F.3d 99 (2d Cir.2002)...................................................................................19, 24

Susan Nicholson Hofheinz v. A V E L A, Inc.,
  12-cv-06546 (C.D. Cal.) ............................................................................................4

*Toho Co. Ltd. v. A V E L A, Inc.*,
    06-cv-01385 (C.D. Cal.) ............................................................................................4

*Underdog Trucking, L.L.C. v. Verizon Servs. Corp.*,
    273 F.R.D. 372 (S.D.N.Y. 2011) ...........................................................................23

*Update Art, Inc. v. Modiin Publ'g Ltd.*,
    843 F.2d 67 (2d. Cir. 1988)....................................................................................21

*Warner Bros. Entertainment, Inc. v. Dave Grossman Creations, Inc. et al.*,
    06-cv-00546 (E.D. Mo.)............................................................................................4

## STATUTES

15 U.S.C. § 1117...........................................................................................................11

## OTHER AUTHORITIES

Fed. R. Civ. P. 26................................................................................... 5, 17 - 19

Fed. R. Civ. P. 37 ..................................................................................... paasim

## PRELIMINARY STATEMENT

This is not only a motion to compel vital discovery, but also a motion wherein discovery sanctions are sought, and warranted. Had Plaintiff/Counter-Defendants, A.V.E.L.A., Inc. ("AVELA") and Leo Valencia ("Valencia") (collectively "Counter-Defendants"), simply refused to produce documents and testimony responsive to the requests made by Defendant/Counter-Plaintiff, The Estate of Marilyn Monroe ("The Estate"), The Estate would have compelled the production of relevant discovery. However, Counter-Defendants opted for a more circuitous route to discovery obstruction, by showing some base level of cooperation to avoid a motion to compel, but then proceeding to provide false testimony during depositions, produce manufactured self-serving documents and most recently, claiming that documents once promised to be produced are now "unable" to be located.

Counter-Defendants' conduct has forced The Estate to seek from third parties discovery it should have received from Counter-Defendants, which has impeded The Estate's ability to adequately prepare its case. Because The Estate has every expectation that Counter-Defendants will continue to mislead and conceal, compelling Counter-Defendants to produce additional information or testimony will not be sufficient to rectify the prejudice caused to The Estate. The Estate thus requests that the Court order production of discovery as well as sanctions specifically tailored to address Counter-Defendants' conduct, as well as attorney's fees.

## I.     FACTS AND PROCEDURAL BACKGROUND

### A.     *Introduction*

This case involves a dispute over the right to license others to sell Marilyn Monroe products. The Estate is the successor-in-interest of rights flowing from Ms. Monroe's Last Will and Testament, and is the owner of intellectual property rights including the trademarks

MARILYN MONROE, MARILYN, variants thereof, and other indicia of Marilyn Monroe, such as her signature and lip print. Counter-Defendants have set themselves up in direct competition with The Estate. AVELA has alleged that it obtains valid and enforceable copyrights in artistic works featuring Marilyn Monroe, which it licenses to others (typically for use on shirts, glassware, pins, and other consumer products). (Compl. ¶¶ 1, 44.) In so claiming that it is the rightful licensor of the foregoing Marilyn Monroe works, AVELA also claims that The Estate is not a rightful licensor of intellectual property rights related to Marilyn Monroe. (Compl. ¶ 19.)

On June 20, 2012, AVELA commenced this action for declaratory judgment against The Estate, seeking a declaration of non-infringement for its licensing activities relating to Marilyn Monroe, and asserting that The Estate and one of The Estate's licensees tortiously interfered with AVELA's licensing business. The Estate has countersued, alleging that AVELA and its principal, Valencia, through their licensing activities, have violated The Estate's intellectual property rights. (*See* Dkt. 5.). The Estate counterclaims that AVELA is merely an alter ego of Valencia, and The Estate seeks monetary damages and injunctive relief enjoining the Marilyn Monroe licensing activities of Valencia and AVELA. *Id.*

**B.** **_Relevant Background to Counter-Defendants' Discovery Abuses_**

1. _AVELA'S Operations_

Counter-Defendants initiated this lawsuit in the name of AVELA, Inc., a corporation allegedly organized under the laws of Nevada with a principal place of business in Nevada. (Compl. ¶1.) However, discovery to date suggests that AVELA, Inc. is an alter ego of its sole officer, director and employee, Valencia. (Ex. G, Deposition of Leo Valencia, Vol. I ("Valencia I Dep."), 9:25-10:9; 44:14-25.[1]) Valencia appears to operate his Marilyn Monroe licensing

---

[1]     All Exhibits referenced herein are annexed to the December 19, 2013 Declaration of Gina L. Durham ("Durham Decl.").

business through a network of commonly controlled entities seemingly constructed to dissipate the liability of any given entity associated with the licensing business.

For example, AVELA purportedly serves as a licensing agent of copyrights owned by XoneX. Movie Archives, Inc. ("XoneX"). (Ex. G, Valencia I Dep., 19:14-20:21.) Valencia claims that AVELA pays fees to XoneX for the right to license XoneX's allegedly copyrighted images of Marilyn Monroe. (*Id*.) But, like AVELA, XoneX's sole owner, officer and employee is Valencia, and Valencia conceded that this arrangement is one in which one Valencia entity pays another Valencia entity. (Ex. G, Valencia Dep. Vol 1, 20:8-22:25.) Another entity, V International ("V"), allegedly organized by Valencia's sometimes girlfriend, Liza Acuna, purportedly acts as a licensing agent for AVELA. (Ex. E, Deposition of Liza Acuna, Vol. I ("Acuna I Dep."), 10:6-14; Ex. G, Valencia I Dep., 61:6-12.) AVELA claims to pay a staggering ████ of all of its licensing revenues to V for its alleged agency services. (Ex. G, Valencia I Dep., 61:6-12; Ex. E, Acuna I Dep., 21:8-14.) Valencia's network of "agent" entities conveniently leaves AVELA devoid of profits from its licensing business, and, thus, with little risk of suffering a meaningful judgment as a result of initiating this dispute with The Estate. Recent third party discovery has revealed yet another Valencia entity, called IPL, Inc., which also appears to do business as "Radio Days," through which Counter-Defendants are entering into additional license agreements, presumably to shield AVELA and Valencia from liability in this action. (Ex. Q, Deposition of Patricia Timsawat ("Timsawat Dep."), 9:19-20, 54:20-55:9; Ex. U, Deposition of Eric Silver ("Silver Dep."), 223:14-225:15.)

## 2. Initiation of the Lawsuit

This declaratory judgment lawsuit did not begin immediately following the sending of a cease and desist letter by the defendant, as is often the case in intellectual property disputes.[2] Rather, Counter-Defendants forced initiation of this lawsuit last year predicated on an alleged act of tortious interference by The Estate and one of its licensees, Bioworld, involving Counter-Defendants' licensee, Silver Buffalo. (Compl. ¶ 12.) As will be the subject of a forthcoming summary judgment motion, the recent deposition of Silver Buffalo confirms that the tortious interference allegations that AVELA claimed as a predicate to this action are completely without merit.[3] Despite AVELA initiating this litigation, AVELA and Valencia have demonstrated a complete disregard for the judicial process through the discovery abuses described herein.

AVELA, a serial litigant in intellectual property licensing disputes, is well aware of the categories of discovery relevant to this case. AVELA has been or is involved in no less than seven lawsuits involving intellectual property disputes. *See, e.g., Bruce Lee Enterprises, LLC v. ECKO Complex, LLC et al.*, 10-cv-02333 (S.D.N.Y.); *King Features Syndicate, Inc. v. A.V.E.L.A. Inc.*, 06-cv-06464 (S.D.N.Y.); *Fleischer Studios, Inc. v. AVELA, Inc.*, 06-cv-06229 (C.D. Cal.); *Toho Co. Ltd. v. A V E L A, Inc.*, 06-cv-01385 (C.D. Cal.); *Warner Bros. Entertainment, Inc. v. Dave Grossman Creations, Inc. et al.*, 06-cv-00546 (E.D. Mo.); *Fifty-Six Hope Road Music Ltd. v. Fame Jeans et al.*, 07-cv-00194 (D. Nev.); *Fifty-Six Hope Road Music Ltd. et al. v. A.V.E.L.A. Inc. et al.*, 08-cv-00105 (D. Nev.); *Susan Nicholson Hofheinz v. A V E L*

---

[2] The Estate did, at one time, send a cease and desist letter to Silver Buffalo, who was later confirmed to be a licensee of AVELA, but this was almost a year before AVELA initiated the lawsuit.

[3] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

*A, Inc.*, 12-cv-06546 (C.D. Cal.) However, rather than using their familiarity with the judicial system to comply with discovery, Counter-Defendants appear to be utilizing their knowledge to game the system.

### C.    *The Discovery Abuses*

The following propounded categories of discovery are vitally important to The Estate's ability to respond to AVELA's claim for declaratory relief and to prepare its countersuit against Valencia and AVELA:

(1) the basis for AVELA's claimed rights in the content that AVELA licenses to its licensees;

(2) identification of Counter-Defendants' licensees;

(3) complete financial records of Counter-Defendants, including revenues earned from licensing activities and costs relating thereto; and

(4) information regarding Valencia's formation of AVELA and other entities, including observation of corporate formalities, segregation of financials and related alter ego matters.

The foregoing are subject to Plaintiff's Rule 26(a) obligations and have been the subject of express written discovery requests and deposition inquiries by The Estate. (Ex. B, Plaintiff A.V.E.L.A., Inc.'s Response to Defendant's First Set of Requests for Documents and Ex. N, Cross-Defendant Leo Valencia's Responses to Defendant The Estate of Marilyn Monroe, LLC's First Set of Requests for Production of Documents to Cross-Defendant Leo Valencia.) As discussed below, Counter-Defendants' witnesses have concealed documents and/or given conflicting or false testimony on all of the above topics.

### 1.    *Counter-Defendants' Concealment of Documents Regarding AVELA'S Claimed Rights*

At the crux of AVELA's claims is the assertion that The Estate is wrongfully interfering with AVELA's Marilyn Monroe licensing business. Counter-Defendants have maintained

throughout this litigation the existence specific documents, namely, artist files, to support their claims that they own artwork which they can rightfully license to others without interference by The Estate. Now, Counter-Defendants claim that such documents cannot be produced because they cannot be located. This abrupt change in position suggests that Counter-Defendants are concealing the referenced documents either to preclude The Estate from investigating the rights that AVELA claims to license or because such documents never existed, despite representations to the contrary. However, rather than admit that these documents never existed or admit that they exist but refuse to produce, so The Estate could move to compel them, Counter-Defendants now claim they *cannot locate* them.

If the documents never existed, the legitimacy of the business Counter-Defendants claim requires declaratory relief from this Court due to alleged interference by The Estate is suspect. If the documents do exist, Counter-Defendants should have produced them subject to their 26(a)(1) disclosures when Counter-Defendants agreed to produce "documents regarding the acquisition and ownership of artwork featuring Marilyn Monroe." (Ex. A, Plaintiff A.V.E.L.A., Inc.'s 26(a) Disclousres [sic].) At a minimum, the documents should have been supplemented before or promptly after Valencia's deposition wherein Valencia testified repeatedly to their existence. (Ex. G, Valencia I Dep., 31:21, 32:15, 36:8-25, 37:1-9, 39:18-20.) The Estate has on multiple occasions requested and noted the absence of these documents to Counter-Defendants' attorneys, but was under the impression that they would be produced in time to resume Valencia's deposition on December 12, 2013. (Ex. B, Plaintiff A.V.E.L.A., Inc.'s Response to Defendant's First Set of Requests for Documents and Ex. O, Letter to Erach F. Screwvala, Esq. and Melissa W. Woo, Esq., dated November 4, 2013.) On December 4, 2013, however, The Estate received an email from Counter-Defendants' counsel stating simply:

"*AVELA is unable to locate its artist files*"

(Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.).[4]

Additionally, AVELA produced copies of four copyright registration certificates, purportedly covering artistic works featuring Marilyn Monroe. The Estate asked AVELA to produce copies of the copyright deposit materials to ascertain which works are allegedly protected by copyright. (Ex. C, email from Nicole Chaudhari to Melissa Woo, dated September 10, 2013.) On September 10, 2013, counsel for Counter-Defendants agreed to produce the deposit materials, but never did. (Ex. D, email from Melissa Woo to Nicole Chaudhari, dated September 10, 2013.) Further, in response to The Estate's request to AVELA that it produce printouts from its websites that display the images of Marilyn Monroe that AVELA licenses third parties, AVELA responded that a "reasonable search and inquiry was completed and no responsive documents were located." (Ex. B, Plaintiff A.V.E.L.A., Inc.'s Response to Defendant's First Set of Requests for Documents (*see* Response to Request No. 46).) Yet, in response to a subpoena from The Estate, Mighty Fine, one of AVELA's licensees, produced printouts from AVELA's website containing a number of images of Marilyn Monroe that AVELA offers to third party licensees. (Ex. Q, Timsawat Dep., 94:14-24 and Exhibit 124.)

Absent production of the artist files, the deposit materials submitted in connection with the copyright applications, and documents sufficient to identify the images of Marilyn Monroe that AVELA offers to license to third parties, The Estate cannot investigate what AVELA might own and whether Counter-Defendants could legitimately license anything to its licensees.

---

[4] Following receipt of Ms. Woo's email of December 4, 2013, The Estate cancelled the planned resumption of Mr. Valencia's deposition and prepared the instant motion.

2.      *Counter-Defendants' Concealment of Licensees*

In order to establish the scope of the infringing activity alleged by The Estate in its counterclaims, The Estate is entitled to discover all of the licensees to whom Counter-Defendants have licensed the right to sell Marilyn Monroe products. Without full disclosure of Counter-Defendants' licensees and the royalties its receives from those entities, The Estate is unable to measure its monetary damages nor appropriately frame the injunctive relief to fully enjoin Counter-Defendants' behavior.

In a flagrant example of Counter-Defendants' attempt to conceal the extent of its licensing business and shield itself from additional damages, they attempted to hide from The Estate the existence of one their largest Marilyn Monroe licensees, Mighty Fine.

In her September 13, 2013 deposition, Ms. Acuna identified Mighty Fine as a licensee of AVELA who sold goods with Marilyn Monroe images. (Ex. E, Acuna I Dep., 102:20-103:5.) However, two weeks later in her September 26, 2013 Rule 30(b)(6) deposition, wherein Acuna was designated as the person most knowledgeable on "AVELA's past current and prospective agreements, licenses, sublicenses and contracts related to the Marilyn Monroe intellectual property and/or the AVELA licensed products", Ms. Acuna suddenly changed her testimony:

> *Q. You previously mentioned that Mighty Fine is another licensee that sells Marilyn Monroe products; is that correct?*
>
> *A. No. I had said that I didn't know for sure, and I did look into that, and they do not have a Marilyn Monroe -- or a licensing agreement to sell Marilyn Monroe.*

(Ex. F, Deposition of Liza Acuna, Vol. II ("Acuna II Dep."), 102:3-18.)

In his October 1, 2013 deposition, Valencia sought to further conceal the existence of Mighty Fine as a licensee, testifying as follows:

████████████████████████████

████████████████████████████

(Ex. H, Deposition of Leo Valencia, Vol. II ("Valencia II Dep."), 130:25-131:2.)  However, when subsequently subpoenaed by The Estate, Mighty Fine not only produced its license agreement with Counter-Defendants that authorizes it to produce products with Marilyn Monroe images, its representative testified that Mighty Fine is, in fact, producing Marilyn Monroe products, is providing regular royalty reports to Counter-Defendants, and is paying royalties for the Marilyn Monroe products.[5]  (Ex. Q, Timsawat Dep., 100:4-111:23.)  Counter-Defendants concealed all of the foregoing from The Estate, producing royalty information for only a handful of licensees.  (Durham Decl. ¶ 13.)  Yet Mighty Fine's representative testified that Mighty Fine has sold nearly ███████ units of Marilyn Monroe products and booked over ██████████ in revenue for Marilyn Monroe products *in just the past year*.  (Ex. Q, Timsawat Dep., 109:4-12.)  Mighty Fine also testified that it plans to ship another ████████ units of Marilyn Monroe product to retailers in the coming year.  (*Id.* at 111:9-19.)  There can be no doubt that Counter-Defendants' hope in attempting to conceal Mighty Fine's existence as a licensee was to preclude them from injunctive relief sought by The Estate and to avoid the possibility of The Estate collecting a monetary remedy through disgorgement of Counter-Defendants' profits relating to the Marilyn Monroe licensing business Counter-Defendants have with Mighty Fine.

The Estate has reason to believe that Mighty Fine is not the only licensee that Counter-Defendants are concealing from it in this litigation.  Specifically, The Estate believes, based on its own investigation, that Valencia has multiple licensees that are not based in the United States, but that are licensed to sell Marilyn Monroe products, and likely are not restricted in where they can sell the products, meaning that such products could very well be sold into the United States.

---

[5] ████████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████. (Ex. Q, Timsawat Dep., 55:7-9.)

For example, based on The Estate's internet investigation, it appears that entities called Poetic Gem, Urban Species, and Saborn Trading are all licensees of AVELA that offer Marilyn Monroe merchandise for sale. (Exs. X-Z.)  These licensees were never disclosed by Counter-Defendants, nor have the respective license agreements been produced.  (Durham Decl. ¶ 30.)  Further, given the general lack of territorial restrictions on AVELA's "U.S." licensees, The Estate has evidence that the foreign licensees may also be selling infringing product into the U.S.  (Ex. U, Silver Dep., 110:5-22; Ex. Q, Timsawat Dep., 76:25-77:7; Ex. T, Deposition of Judith Albright, 68:23-69:10; Ex. M, Deposition of Nick Croce, 75:12-15, 81:25-82:2; and Ex. P, Deposition of David Brown, 97:20-23,106:13-18.)

During his deposition, Valencia repeatedly refused to answer questions regarding international licensees claiming that such testimony was not relevant.  (*See generally* Ex. H, Valencia II Dep., 171:24-183:5.)  For example:

> *Q.  Have you excluded from production royalty statements from licensees who sell your products abroad because you've made a determination that its outside the scope of this lawsuit?*
>
> *A.  Again, it's not relevant*
>
> *Q.  Answer the question.*
>
> *A.  Again, it's not relevant.*

(Ex. H, Valencia II Dep., 181:10-16.)  In response to The Estate's meet and confer requests to determine if such international licenses exist, Counter-Defendants' counsel sent a response stating:

> *"AVELA does not have any documents identifying international licensees, etc."*

(Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.)

Again, rather than identifying that documents exist and making a record of their refusal to produce them, which would position The Estate to compel their production, Counter-Defendants' apparent intention is to obscure whether such documents exist at all.

      3.    *Falsified Financial Records*

Disclosure of Counter-Defendants' financial records is vital to The Estate's damages case. Such records also have critical relevance to the alter ego claims made by The Estate. Valencia has obstructed, misled and concealed information regarding his financials in order to thwart The Estate's discovery into these relevant topics. The most troubling of Counter-Defendants' discovery abuses in this regard are discussed below.

      a.)    <u>Valencia Is Purposefully Understating the Gross Revenues Associated With His Business In Order To Undermine The Estate's Potential Monetary Remedies.</u>

Under The Estate's Lanham Act claims, The Estate is entitled to recover Counter-Defendants' profits as a measure of damages, and according to the statute, "in assessing profits the plaintiff [The Estate] shall be required to prove defendant's sales only; defendant [Valencia/AVELA] must prove all elements of cost or deduction claimed." *See* 15 U.S.C. § 1117. Valencia has obstructed The Estate's ability to establish the full measure of Counter-Defendants' sales by concealing the scope of its licensing business. As discussed above, Counter-Defendants attempted to hide one of its largest Marilyn Monroe licensees from The Estate, and The Estate suspects that it is hiding others.

Valencia also appears to have falsified his own financial records to conceal the scope of Counter-Defendants' sales. For example:

- Valencia produced his own summary of "Income Related to Marilyn Monroe Sales" (Ex. I, AVELA002484.) This summary was produced only after Mr. Valencia was deposed for two days, thus allowing Valencia to avoid cross-

examination on the summary.  (Durham Decl., ¶¶ 8-10.)  Valencia must have assumed in preparing the summary that The Estate would not learn that he was concealing a portion of its licensing business from The Estate.  The summary of "Income Related to Marilyn Monroe Sales" prepared by Valencia <u>does not</u> include the significant portion of Mighty Fine sales noted above, but instead aggregates the sales of only a handful of licensees that Valencia has selected to disclose to The Estate.  (Durham Decl., ¶ 10.)

- In order to further conceal the true scope of his sales, Valencia has failed to produce any audited financials or other official financial documents, opting instead to provide his own handcrafted "Balance Sheets" that are largely devoid of detail.  (*See* Ex. J, AVELA002408-2412.)  The Estate is left without the ability to verify the accuracy or completeness of the information Valencia chose to include in the "Balance Sheets."  Indeed, in a December 4, 2013 email to The Estate, counsel stated: "As to invoices, receipts, checks, bank statements, credit card statements, AVELA is unable to locate these documents in its files."  (Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.)  Even if The Estate wanted to compare the scant information disclosed in the "Balance Sheets" to income Valencia and AVELA are required to report to the government for tax purposes, it could not do so.  Valencia testified that neither he, personally, nor AVELA, has filed a tax return since 2005 or 2006.  (Ex. G, Valencia I Dep., 140:22-25; 141:11-14.)

[REDACTED]

**b.)** <u>Valencia Is Also Concealing Financial Information to Obstruct The Estate's Ability to Investigate His Reports of Inflated Elements of Cost or Deduction.</u>

[REDACTED]

. (*See* Ex. J, AVELA002408-2412.)

As if the foregoing were not enough, Valencia has taken additional steps to suppress and/or manufacture evidence probative of costs or deductions that Counter-Defendants apparently intend to claim against The Estate's potential disgorgement of profits award. Specifically, Valencia claimed at numerous points during his deposition that he keeps a box of receipts that allegedly support his claimed expenses and cost deductions. (*See* Ex. G, Valencia I Dep. 143:8-13, 144:9-145:15; Ex. F, Valencia II Dep., 150:11-151:5, 209:15-210:09.) However, in Ms. Woo's email to The Estate's counsel on December 4, 2013, she now claims:

> *"As to invoices, receipts, checks, bank statements, credit card statements, AVELA is unable to locate these documents in its files."*

(Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.) This is despite the fact that two months prior, Mr. Valencia testified that he was using exactly these documents to create the "Summary of Net Income Related to Marilyn Monroe Sales." (*See* Ex. H, Valencia II Dep.,

13

147:3-151:5.)  As a result, The Estate is deprived of its right to verify the authenticity of any of the elements of cost or deduction to be claimed by Counter-Defendants.

One of the largest elements of costs Valencia claims to have are the so-called agency fees AVELA pays to V.  Valencia has produced documents that he represents are copies of invoices issued to him by V, as well as copies of checks which purportedly reflect his payments to V on the invoices. This evidence appears to be manufactured.  When questioned about the authenticity of the so-called checks, which bear *no financial institution's name, no routing number, no bank account number*, *and no check number*, Valencia insisted that they were checks that he wrote but excuses their unusual appearance by claiming they were "redacted."  The testimony given by Valencia is as follows:





(Ex. H, Valencia II Dep., 152:10-154:13 and Ex. K, AVELA002414-2446.)

Even assuming some level of redaction (which seems unlikely, given that the documents were not marked as redacted), the documents claimed by Mr. Valencia to be checks look nothing like real checks. Of course, The Estate cannot verify whether Valencia wrote any of the checks

he claims to have written because he now claims to be "unable to locate" any bank statements. (Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.)

It also appears that some V invoices may have been manufactured after the fact to substantiate alleged payments from AVELA to V.  For example, AVELA claims that a payment was made to V in the amount of ██████ on December 21, 2009, yet the invoices reflecting this payment obligation were not generated until January 20, 2010 (Invoice 26-████) and February 26, 2010 (Invoice 27-████).  (Ex. L, AVELA002420 and AVELA002464-2465.)

4.    *Valencia's Withholding of Financial Records Is Also Aimed To Obstruct The Estate's Ability To Investigate Alter Ego Issues.*

Mr. Valencia's gamesmanship with respect to his financial disclosures is likely not only intended to minimize the appearance of sales and maximize the expenses associated with the infringing products, but is likely also a play to undermine The Estate's alter ego allegations.  A lack of independence in terms of financial accounting is a typical area of inquiry for alter ego claims.  Valencia has conveniently failed to produce any verifiable financial documents that would provide transparency into the handling of funds for his business operations.  As noted above, he has provided only his own handcrafted balance sheets, recently claiming in response to The Estate's repeated requests for source documents, that invoices, receipts, checks, bank statements, and credit card statements cannot be located.  (Ex. V, email from Melissa Woo, dated Wednesday, Dec. 4, 2013.)[6]  Valencia has not even provided enough information to allow The Estate to seek third party discovery from any banks to determine how Mr. Valencia is actually moving money around with respect to his business.

---

[6] Ms. Woo reiterated her client's stance in an email to The Estate's counsel on December 6, 2013, assuring counsel that "[d]espite his inability to locate additional documents, I have requested that Mr. Valencia continue to search his files for the additional documents.  In the event Mr. Valencia[sic] search turns up additional documents, I will produce them to you."  (*See* Ex. W, email from Melissa Woo, dated December 10, 2013.)

In fact, Mr. Valencia and Ms. Acuna appear so determined to conceal the true nature of their activities (and to avoid the risk of collection of judgment by a prevailing party) that they even appear to have provided false testimony about their home and business addresses during their depositions  Specifically, a private investigator retained by The Estate has confirmed that the home address provided by Ms. Acuna does not exist, and the business address provided by Ms. Acuna, where she claims to rent office space for herself and Mr. Valencia is actually only a postal annex that does not contain any rental office space.  (*Cf.* Ex. E, Acuna I Dep., 9:22-24 to Declaration of Gordon Schmidt ("Schmidt Decl."), ¶¶ 2-3.)  Mr. Valencia claims to run his business out of his home, but testified to a street address at which no house resides.  (*Cf.* Ex. G, Valencia I Dep., 11:9-25 to *Schmidt Decl.*, ¶ 4.)

## II.    <u>ARGUMENT</u>

The Estate respectfully requests that this Court enter an order: (1) for sanctions pursuant to Federal Rule of Civil Procedure 37(c), (2) compelling further discovery pursuant to Federal Rule of Civil Procedure 37(a), and (3) imposing any additional sanctions the Court deems appropriate under its inherent power to sanction litigants who abuse the judicial process.

### A.    *Rule 37(c) Remedies Are Warranted.*

For certain of the discovery abuses described above, The Estate seeks sanctions pursuant to Federal Rule of Civil Procedure 37(c), including preclusion of evidence and attorney's fees. Rule 37(c)(1) mandates that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Fed. R. Civ. P. 37(c)(1); see also Genger et al. v. Sharon,* No. 10 Civ. 4506 (SAS), 2012 WL 3854883, at *6 (S.D.N.Y. Sept. 5, 2012) *(ordering that the defendant is*

*precluded from making certain arguments and testifying regarding the existence of a particular document due to defendant's failure to disclose properly same during discovery).* The rule further provides that, "[i]n addition to or instead of this [preclusion] sanction, the court, on motion and after giving an opportunity to be heard," may impose other sanctions such as "payment of the reasonable expenses, including attorney's fees, caused by the failure" to disclose or supplement an earlier response, "inform the jury of the party's failure," or "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)."

Because of the particularly egregious discovery conduct regarding: (1) Counter-Defendants' failure to disclose any artist files for their business, and (2) Counter-Defendants' failure to produce any legitimate source documents for the costs or deductions they intend to assert against The Estate's profits calculation, The Estate respectfully requests that the jury be informed of Counter-Defendants' failure to provide verifiable evidence on these points and the Court issue a preclusion order with respect to these matters. Specifically, The Estate requests an order:

(1) Precluding Counter-Defendants from introducing any evidence which may suggest that they have documentation to support their claim of intellectual property ownership in Marilyn Monroe images, and also precluding Counter-Defendants from introducing or relying upon any copyright certificates for works incorporating Marilyn Monroe images (because the validity of the copyright claims in such certificates cannot be verified absent the artist files, which Counter-Defendants claim they cannot locate); and

(2) Precluding Counter-Defendants from introducing any evidence of elements of cost or deduction with respect to The Estate's calculation of a disgorgement of profits remedy.

The party requesting sanctions under Fed. R. Civ. P. 37 bears the burden of showing that the opposing party failed to timely disclose information required by Fed. R. Civ. P. 26. To meet

this burden, "the moving party must show: (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.". *In re September 11th Liab. Ins. Coverage Cases,* 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 107 (2d Cir.2002). The Estate has satisfied its burden to obtain the foregoing Rule 37 sanctions by establishing that AVELA and Valencia breached their discovery obligations, with a culpable state of mind, and that the missing evidence is relevant.

In satisfying the first element of its burden under Rule 37, The Estate has documented above how Valencia and AVELA breached their discovery obligations by representing in Rule 26(a)(1) disclosures and in sworn testimony during deposition that they would produce information relevant to support their claims and defenses. However, AVELA now claims, belatedly, that it is unable to locate such information. This pattern of activity occurred with respect to the artist files Valencia claimed to have to support his alleged rights in images of Marilyn Monroe which he claims he can rightfully license to others. It also occurred with respect to the elements of cost and deduction that Valencia will no doubt seek to use to counteract The Estate's profit disgorgement remedy.

On the second element, despite the fact that only ordinary negligence must be proven, the record clearly establishes the bad faith nature of Counter-Defendants' conduct by virtue of the falsified testimony and manufactured documents discussed above. *See In re September 11th Cases,* 243 F.R.D. at 125 ("The 'culpable state of mind' element is satisfied by a showing that 'a party has breached a discovery obligation ... through bad faith or gross negligence [or] ordinary

negligence.') (quoting *Residential Funding,* 306 F.3d at 113). *See, e.g., Karaha Bodas Co., LLC v. Minyak*, No. 21 MC 98(TPG), 2007 WL 1284903 (S.D.N.Y. Apr. 30, 2007) (imposing sanctions in the amount of $500,000 against defendant due to the false deposition testimony given by one of the defendant's officials). Moreover, Counter-Defendants cannot legitimately claim that any of the above conduct was excusable error given the fact that they are essentially professional litigants, having engaged in repeated litigation with intellectual property rights holders.

As to the third element, the missing evidence is relevant to The Estate's action because Counter-Defendants' artists files, or lack thereof, is probative of AVELA's claimed licensing rights which it promotes in competition to The Estate. The missing documentation to support Counter-Defendants' costs and expenses is relevant to whether Counter-Defendants are able to legitimately satisfy their burden under the Lanham Act to prove up the elements of cost or deduction they intends to claim against The Estate's accounting of profits. *Gotlin, et al. v. Lederman, et al.*, No. 04-CV-3736(ILG), 2009 WL 2843380, at *6 (E.D.N.Y. Sep. 1, 2009) (stating "[a] continuance is always theoretically possible . . . Nevertheless, in light of the ample opportunity afforded Behrins to produce these documents, a continuance is neither deserved nor warranted . . . 'To allow additional time now would be unfair not only to [defendant], but the Court . . . .'") (internal citations omitted).

In sum, the discovery breaches are relevant because they allow Counter-Defendants to manufacture a situation wherein they bear no risk in the litigation they have initiated, while unfairly impeding the ability of The Estate to develop its case. In essence, Valencia seems to believe that The Estate and a jury should simply *take his word for it* that he owns the rights he says he does and that he runs a licensing business that lacks profits for disgorgement by The

Estate. These would be astoundingly convenient truths for Valencia in this litigation. To allow Valencia to put forth evidence on these topics despite the fact that he has not been able to substantiate the truth of these matters in discovery would be to reward Valencia's duplicitous litigation tactics. *See Genger et al. v. Sharon*, No. 10 Civ. 4506 (SAS), 2012 WL 3854883, at *4 (S.D.N.Y. Sept. 5, 2012) (stating "[t]he purpose of disciplinary sanctions pursuant to Rule 37 are threefold. 'First, they ensure that a party will not benefit from its own failure to comply…..) (citing *Update Art, Inc. v. Modiin Publ'g Ltd.*, 843 F.2d 67, 71 (2d. Cir. 1988). The ability to collect truthful information during the discovery process is of vital importance to the sanctity of the justice system. Counter-Defendants have flaunted their disregard for the sanctity of the system when they concealed some documents, manufactured others and offered witnesses who provided perjured deposition testimony. These discovery failures are inexcusable. *See Lodge v. United Homes, LLC et al.*, 787 F. Supp. 2d 247, 263 (E.D.N.Y. 2011) (Stating that defendants' "repeated and egregious disregard for the their continuing disclosure and discovery obligations, the multiple instances of misrepresentations and misconduct, and the duration of the offending conduct warrant the sanction of preclusion in this case."). Thus, the preclusion sanctions requested above as well as an award of The Estate's attorney's fees associated with the bringing of this motion are well warranted.

Alternatively, should the Court decide to allow Counter-Defendants to produce additional documents, including the back-up documentation that they currently claim is not able to be located, The Estate should be awarded additional time to depose Valencia on such documentation[7] and Valencia should be required to reimburse The Estate's reasonable expenses

---

[7] Valencia's counsel concedes that The Estate is entitled to two more hours on the record with Valencia, however, The Estate believes additional time is required to address the issues discussed in this motion.

and attorney's fees incurred to conduct additional deposition(s) to assess the validity of any additional evidence provided. And, also as alternative relief, the Estate would request an order compelling Valencia to produce true and accurate copies of all material deposited with the Copyright Office for each of the copyright registrations that include Marilyn Monroe images and copies of all Marilyn Monroe images in his possession, custody or control, whether offered to licensees or not.

### B. *Rule 37(a) Remedies Are Warranted.*

If a party fails to produce requested documents or items in discovery, the opposing party can move to compel disclosure or discovery. Fed. R. Civ. P. 37(a); *see also In re Methyl Butyl Either (MTBE) Prods. Liab. Litig,* 269 F.R.D. 360, 363 (S.D.N.Y. 2010). For purposes of subdivision (a), an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond. Fed. R. Civ. P. 37(a)(4).

Based on the evasive, conflicting and incomplete testimony and documentation produced with regard to identification of licensees and licensee revenue, The Estate respectfully requests on order compelling the following:

(1) Valencia must disclose a full list of licensees with whom he does business regardless of the name he uses to conduct that business, whether it be AVELA, V, IPL, Radio Days, XoneX or some other entity name, and regardless of where such licensee is located in the world, as well as all license agreements, including all drafts of licenses which are currently being negotiated, associated with each licensee;

(2) In order to assist The Estate in verifying that the list of licensees is accurate and complete and that all relevant royalty reports and correspondence with the licensees have been produced, the Court should order Valencia to disclose the true and correct address of any premises where he, V, IPL, Radio Days, XoneX and employees thereof, keep computers, and

allow for an independent e-discovery consultant to access those premises for the proposes of inspecting the computers used by those at the premises. Valencia should be ordered to pay the reasonable expenses required to retain the e-discovery consultant;

(3)     Valencia must also disclose the names and addresses of any financial institutions which he uses to transact his business, as well as the name in which accounts are held at the identified institutions. Valencia should be ordered to reimburse The Estate's reasonable expenses required to issue subpoenas to and take discovery from these institutions regarding Mr. Valencia's accounts;

(4)     The Estate should be allowed an extension of time to disclose any proposed expert testimony on Counter-Defendants' financial information and The Estates' damages calculations until after Counter-Defendants have complied with the Court's order on this motion; and

(5)     Finally, the Court should award The Estate reasonable costs, including attorney's fees, incurred in making this motion to compel. *See* Fed. R. Civ. P. 37(a)(5); *Underdog Trucking, L.L.C. v. Verizon Servs. Corp.*, 273 F.R.D. 372, 378-79 (S.D.N.Y. 2011) (omitting citations) ("Rule 37 establishes a rebuttal presumption in favor of sanctions," and the movant need not show or prove bad faith.").

### C.     *The Court Also Should Exercise Its Inherent Power To Sanction*

Given the extent to which Counter-Defendants have abused the judicial process, the Court should exercise its inherent power to sanction the litigants in this matter. In addition to the rule-based authority under Rule 37, federal courts have the inherent power to sanction litigants to prevent abuse of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991). Sanctions are appropriate in response to the willful disobedience of a court order, but "even in the absence of such an order the court may impose sanctions for discovery misconduct as an

23

assertion of its inherent powers." *Fendi Adele S.R.L. v. Filene's Basement, Inc.*, No. 06 Civ. 244 2009 WL 855955, at *5 (S.D.N.Y. Mar. 24, 2009); *see also Residential Funding Corp*, 306 F.3d at 107 ("Where, as here, the nature of the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction… .).

In this respect, The Estate requests that the Court order Valencia to:

(1)    reimburse The Estate for the attorney's fees and expenses it incurred in subpoenaing and deposing Valencia licensee, Mighty Fine, after both Valencia and Ms. Acuna attempted to dissuade The Estate from believing that Mighty Fine was a licensee; and

(2)    Order that Valencia, AVELA, XoneX, V, IPL, Inc., and Radio Days[8] shall be deemed alter egos, for purposes of complying with any injunctive relief or monetary judgments awarded in this case without the need for The Estate to establish further evidence of the alter ego status of these companies. In other words, Valencia's evasiveness with respect to discovery on The Estate's alter ego allegations should be deemed admissions of the same.

The Estate also requests that the Court order any other sanctions it deems just to ensure that Counter-Defendants are not rewarded for their gross discovery abuses and are deterred from continuing to engage in such conduct throughout the remainder of this case.

## III.    CONCLUSION

Counter-Defendants have impeded The Estate's ability to conduct discovery by providing misinformation about the facts of this case. They have engaged in tactics designed to shift all of the risk of the litigation on to The Estate, and insulate themselves from the risk of judgment. Thus, The Estate respectfully that this Court enter an order: for the sanctions described above,

---

[8] The Estate intends to submit a motion to amend its counterclaim imminently so that Valencia, AVELA, XoneX, V, IPL, Inc., and Radio Days are formally identified as alter egos.

compelling further discovery requested above and imposing any additional sanctions the Court

deems appropriate under its inherent power to sanction litigants who abuse the judicial process.

Respectfully submitted,

Dated: December 19, 2013

/s/ Tamar Duvdevani
Tamar Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
tamar.duvdevani@dlapiper.com


Gina L. Durham (*pro hac vice*)
Nicole A. Chaudhari (*pro hac vice*)
DLA PIPER LLP (US)
P.O. Box 64807
Chicago, Illinois 60664-0807
Telephone: (312 )368-4000
Facsimile: (415) 659-7333
gina.durham@dlapiper.com
nicole.chaudhari@dlapiper.com

*Attorneys for Defendant/Counter-Plaintiff  The
Estate of Marilyn Monroe, LLC*