UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
A.V.E.L.A., INC.,                                     :
                                                      :
                         Plaintiff,                   :
                                                      :
            v.                                        :        12 Civ. 4828 (KPF)
                                                      :
THE ESTATE OF MARILYN MONROE,                         :        OPINION AND ORDER
LLC, *et al.*,                                        :        _____
                                                      :
                         Defendants.                  :
                                                      :
------------------------------------------------------X
                                                      :
THE ESTATE OF MARILYN MONROE, LLC,                    :
                                                      :
                         Counterclaimant,             :
                                                      :
            v.                                        :
                                                      :
A.V.E.L.A., INC.,                                     :
                                                      :
                         Counter-Defendant,           :
                                                      :
LEO VALENCIA, IPL, INC.,                              :
X ONE X MOVIE ARCHIVES INC.,                          :
V. INTERNATIONAL FINE ARTS                            :
PUBLISHING, INC.,                                     :
                                                      :
                         Third-Party                  :
                         Defendants.                  :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 18, 2015

KATHERINE POLK FAILLA, District Judge:

        This litigation is but another skirmish in a long-running war over the

intellectual property rights inhering in deceased celebrities — here, Marilyn

Monroe.  Plaintiff A.V.E.L.A., Inc. ("AVELA") preemptively filed a complaint

against the Estate of Marilyn Monroe, LLC (the "Monroe Estate") and its licensee, Bioworld Merchandising, Inc. ("Bioworld"), seeking a declaratory judgment concerning federal and state intellectual property rights in Ms. Monroe.  AVELA also asserted a claim against the Monroe Estate and Bioworld for tortious interference with a contract.

In response to the AVELA complaint, the Monroe Estate and Bioworld filed counterclaims against AVELA and third-party claims against Leo Valencia, AVELA's purported owner.  Thereafter, upon obtaining leave from the Court, the Monroe Estate filed the First Amended Counterclaim against AVELA and Valencia, as well as other reputed Valencia entities IPL, Inc. ("IPL"), X One X Movie Archives Inc. ("X One X"), and V. International Fine Arts Publishing, Inc. ("V. International") (with AVELA and Valencia, the "Counter-Defendants").  The First Amended Counterclaim alleges seven causes of action, including: (i) false association and unfair competition in violation of 15 U.S.C. § 1125(a); (ii) trademark infringement in violation of 15 U.S.C. § 1114; (iii) trademark dilution in violation of 15 U.S.C. § 1125(c) and New York General Business Law § 360-l; (iv) common law unfair competition; (v) deceptive business practices proscribed by New York General Business Law § 349; (vi) tortious interference with existing contractual relationships; and (vii) intentional interference with prospective economic advantage.

Counter-Defendants X One X and V. International (collectively, the "Movants") have moved to dismiss all seven causes of action against them in the First Amended Counterclaim.  In addition, V. International has moved to

dismiss any claim of liability premised on the theory that it was an alter ego of Valencia and/or AVELA.  For the reasons set forth in this Opinion, the motions to dismiss are granted with respect to the Monroe Estate's deceptive business practices cause of action.  Further, any claim for alter-ego liability against V. International is dismissed.  The motions are denied in all other respects.

**BACKGROUND**[1]

**A.     Factual Background**

**1.     Marilyn Monroe and the Monroe Estate**

Marilyn Monroe was an actress, singer, and model who remains an enduring American cultural icon more than 50 years after her death; indeed, it is a measure of her continuing fame that the Court could have dispensed with this description.  (FAC ¶ 12).  The Monroe Estate is a brand development and licensing company that maintains an exclusive portfolio of intellectual property rights related to Monroe.  (*Id.* at ¶ 13).  Specifically, the Monroe Estate owns a number of federal trademark registrations that are purportedly valid and subsisting in full force incorporating the words "Marilyn" or "Marilyn Monroe." (*Id.* at ¶¶ 16-17).  The U.S. Trademark Registration Numbers for these marks

---

[1]    The facts contained in this Opinion are drawn from the First Amended Counterclaim ("FAC") (Dkt. #133), and are taken as true for purposes of the pending motion to dismiss. *See Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).

For convenience, X One X's brief in support of its motion to dismiss (Dkt. #194) will be referred to as "X1X Br."; the Monroe Estate's opposition (Dkt. #201) as "Pl. Opp."; and X One X's reply brief (Dkt. #203) as "X1X Reply."  V. International's brief in support of its motion to dismiss (Dkt. #198) will be referred to as "VI Br."; the Monroe Estate's opposition (Dkt. #200) as "Pl. VI Opp."; and V. International's reply (Dkt. #206) as "VI Reply."

3

are 1,509,758 (the "'758 Mark"), 1,889,730 (the "'730 Mark"), 2,180,950 (the "'950 Mark"), 2,223,599 (the "'599 Mark"), 2,985,935 (the "'935 Mark"), 4,040,943 (the "'943 Mark"), 4,419,275 (the "'275 Mark"), and 4,336,364 (the "'364 Mark").  (*Id.* at ¶ 16).  According to the Monroe Estate, the '758, '730, '950, and '599 Marks have been registered for a sufficiently long period of time to have become statutorily incontestable (collectively the "Incontestable Marks").  (*Id.* at ¶ 17).

Aside from the registered marks, the Monroe Estate has applied for a number of trademarks and service marks incorporating the words "Marilyn Monroe" or the design of a lip print.  (FAC ¶ 16).  The Monroe Estate also claims substantial common law rights in the "Marilyn," "Marilyn Monroe," and lip print design marks (together with the registered marks, the "MONROE Marks").  (*Id.*).  Separately, the Monroe Estate asserts that it is "the exclusive owner of those rights in and to Marilyn Monroe's identity, persona, name and likeness arising under common law and/or statute[.]"  (*Id.* at ¶ 18).[2]  The First Amended Counterclaim collectively refers to the MONROE Marks and the Monroe Estate's interests in Monroe's identity, persona, name, and likeness as the "Marilyn Monroe Intellectual Property," a convention the Court adopts for purposes of this Opinion.

The Monroe Estate alleges that, along with its predecessors, it has invested substantial efforts in acquiring, enforcing, promoting, and advertising

---

[2]    The Monroe Estate also claims exclusive ownership over the www.marilynmonroe.com domain name and related website.  (FAC ¶ 18).

the Marilyn Monroe Intellectual Property.  (FAC ¶ 19).  It further alleges that these efforts have borne success:  As a result of Monroe's celebrity status, the significant sales of licensed products, and substantial publicity, it is alleged that the Marilyn Monroe Intellectual Property is not only famous, but also highly distinctive throughout the United States.  (*Id.* at ¶ 21).  This distinctiveness is evidenced by the secondary meaning that the Marilyn Monroe Intellectual Property has achieved in the marketplace.  (*Id.* at ¶ 19).

For decades, the Monroe Estate, along with its predecessors, has monetized its interests in the Marilyn Monroe Intellectual Property by licensing these rights to third parties for use in connection with various goods and services.  (FAC ¶ 20).  The licenses extend to products like clothing, accessories, perfume, posters, wine, collectibles, and other novelty items.  (*Id.*).

### 2.   The Counter-Defendants

#### a.   Valencia, AVELA, IPL, and X One X

Leo Valencia is in the business of licensing images and other indicia of celebrities, including Marilyn Monroe, to entities for use in connection with merchandise such as apparel and glassware.  (FAC ¶ 22).  Valencia purportedly conducts business through a collection of entities, including AVELA, IPL, and X One X.  (*Id.* at ¶¶ 23-24).  The Monroe Estate claims that these companies are alter egos of Valencia, rather than truly independent businesses.  (*Id.* at ¶ 24). In support of this contention, the Monroe Estate asserts not only that AVELA, IPL, and X One X are undercapitalized, but also that Valencia is their sole shareholder, director, and employee.  (*Id.* at ¶ 25).  Valencia also purportedly

disregards corporate formalities with respect to AVELA, IPL, and X One X by, for example, failing to maintain separate books and records for each company. (*Id.* at ¶ 26).  Instead, Valencia blends the records of various entities on a single computer and utilizes a single cell phone to operate his businesses.  (*Id.*). Corporate formalities are further disregarded as the assets of AVELA, IPL, X One X, and Valencia are freely comingled.  (*Id.* at ¶ 27).  Ultimately, the Monroe Estate alleges that AVELA, IPL, and X One X are sham companies designed to dissipate any liability that Valencia incurs in connection with his licensing operations.  (*Id.* at ¶¶ 23-24).

### b.    V. International

According to the First Amended Counterclaim, V. International purports to serve as licensing agent for Valencia, but is in fact a vehicle to provide administrative support to Valencia and his alter egos.  (FAC ¶¶ 29-30).  To this end, it is further alleged that: (i) V. International employees use email addresses bearing AVELA domain names; and (ii) prior counsel of record for AVELA and Valencia operated from the V. International payroll.  (*Id.* at ¶¶ 30-31).  Even Valencia's licensees believe that V. International's employees work for Valencia or one of his other companies.  (*Id.* at ¶ 30).  In the face of this evidence, Valencia purportedly doctored financial documents in order to create an appearance of independence between himself and V. International.  (*Id.* at ¶ 32).  The Monroe Estate contends that, taken together, these allegations demonstrate that V. International is another, albeit slightly more populous, alter ego of Valencia.  (*Id.* at ¶ 33).

6

### 3.    The Alleged Infringement

The First Amended Counterclaim asserts that the Counter-Defendants hold no rights in any of the Marilyn Monroe Intellectual Property.  (FAC ¶ 35). Nevertheless, they continue to license, design, manufacture, and distribute merchandise that incorporates the Marilyn Monroe Intellectual Property.  (*Id.* at ¶¶ 34, 40).  This merchandise is either identical or substantially similar to the products licensed, manufactured, or distributed by the Monroe Estate.  (*Id.* at ¶ 36).  Accordingly, the Counter-Defendants' products compete with the Monroe Estate and its licensees' merchandise in the marketplace.  (*Id.* at ¶ 46).

On June 2, 2011, the Monroe Estate sent a cease and desist letter to AVELA requesting that the latter company refrain from infringing the Marilyn Monroe Intellectual Property.  (FAC ¶ 37).  Despite receiving this letter, the Counter-Defendants continued their ostensibly infringing activities.  (*Id.* at ¶ 38).  For example, AVELA marketed merchandise that infringed the Marilyn Monroe Intellectual Property at a licensing trade show in Las Vegas, Nevada on June 14, 2011.  (*Id.*).  Following the trade show, AVELA sent a letter dated June 16, 2011, to the Monroe Estate formally refusing to terminate its activities.  (*Id.* at ¶ 39).  The Counter-Defendants' unauthorized activities are also alleged to have interfered with the Monroe Estate's business relationships with its licensee Bioworld and with retailers such as Spencer's.  (*Id.* at ¶ 51).

### B.    Procedural Background

On June 20, 2012, the instant action was commenced when AVELA filed a complaint seeking a declaratory judgment that its products bearing the image

7

of Marilyn Monroe did not infringe the Monroe Estate's intellectual property. (Dkt. #1).  On August 31, 2012, the Monroe Estate filed an answer and counterclaims against AVELA and third-party defendant Valencia.  (Dkt. #5). AVELA filed an answer to the counterclaims on September 26, 2012 (Dkt. #8), and Valencia filed an answer on September 11, 2013 (Dkt. #39).  During this period, the parties engaged in extensive fact discovery.  (*See* Dkt. #40, 44).

On February 4, 2014, the Monroe Estate sought leave to file the First Amended Counterclaim, the pleading that is the subject of the instant motions to dismiss.  (Dkt. #72).  Over the objections of Valencia and AVELA, Magistrate Judge James C. Francis IV granted the Monroe Estate's motion, thereby adding IPL, X One X, and V. International as third-party defendants to the action. (Dkt. #131).  As noted, the First Amended Counterclaim asserts causes of action for: (i) false association and unfair competition in violation of 15 U.S.C. § 1125(a) (Count I); (ii) trademark infringement in violation of 15 U.S.C. § 1114 and the common law (Count II); (iii) trademark dilution in violation of 15 U.S.C. § 1125(c) and New York General Business Law § 360-l (Count III); (iv) common law unfair competition (Count IV); (v) deceptive business practices in violation of New York General Business Law § 349 (Count V); (vi) tortious interference with existing contractual relationships (Count VI); and (vii) intentional interference with prospective economic advantage (Count VII).

AVELA and Valencia filed an answer to the First Amended Counterclaim on September 22, 2014.  (Dkt. #168).  On December 4, 2014, X One X moved to dismiss the claims in the First Amended Counterclaim pursuant to Federal

Rule of Civil Procedure 12(b)(6).  (Dkt. #193).  V. International filed a similar motion on December 5, 2014.  (Dkt. #198).[3]  The briefing on the motions to dismiss was fully submitted on January 20, 2015.  (Dkt. #206).[4]

## DISCUSSION

### A.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

A motion to dismiss a counterclaim for failure to state a claim is evaluated using the same standard as a motion to dismiss a complaint.  *See Crye Precision LLC* v. *Duro Textiles, LLC*, No. 15 Civ. 1681 (DLC), 2015 WL 3751658, at *9 (S.D.N.Y. June 16, 2015); *Orientview Techs. LLC* v. *Seven For All Mankind, LLC*, No. 13 Civ. 0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013).  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

---

[3]    X One X's motion to dismiss incorporates by reference the arguments V. International raised with respect to Count III of the First Amended Counterclaim.  (X1X Br. 15).  V. International's motion to dismiss incorporates by reference the arguments raised by X One X with respect to Counts I-II and IV-VII.  (VI Br. 5-6).

[4]    The Court notes that on December 19, 2014, the parties stipulated to the dismissal of the tortious interference with existing contractual relationships claim as against AVELA, Valencia, X One X, and V. International.  (Dkt. #199).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a plaintiff's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 663.

**B.**     **The Monroe Estate Has Adequately Alleged a False Association and Unfair Competition Claim Under 15 U.S.C. § 1125(a)**

   **1.     Applicable Law**

A celebrity may assert a claim for false endorsement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), where a party uses the celebrity's "persona without permission to suggest false endorsement or association." *Bruce Lee Enterprises, LLC* v. *A.V.E.L.A., Inc.* ("*Bruce Lee II*"), No. 10 Civ. 2333 (KMW), 2013 WL 822173, at *19 (S.D.N.Y. Mar. 6, 2013); *see also Beastie Boys* v. *Monster Energy Co.*, 66 F. Supp. 3d 424, 448-49 (S.D.N.Y. 2014) (discussing the contours of false endorsement claims); *Burck* v. *Mars, Inc.*, 571 F. Supp. 2d 446, 454 (S.D.N.Y. 2008) (recognizing that § 1125(a) is an "appropriate vehicle for the assertion of claims of falsely implying the endorsement of a product or service by a real person").  To state a claim for false endorsement, the plaintiff must allege that the defendant "'[i] made a false or misleading representation of

fact; [ii] in commerce; [iii] in connection with goods or services; [iv] that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services.'" *Beastie Boys*, 66 F. Supp. 3d at 448 (quoting *Burck*, 571 F. Supp. 2d at 455).

### 2.   Analysis

The Movants advance four primary arguments in support of their motion to dismiss Count I of the First Amended Counterclaim.  First, they assert that the Monroe Estate's false endorsement claim is in actuality an effort to plead a non-cognizable cause of action for post-mortem right of publicity.  (X1X Br. 5). Second, they claim that Count I fails to allege that the Monroe Estate owns "any right to prosecute false endorsement claims on behalf of Ms. Monroe, her heirs or her actual estate[.]"  (*Id.* at 9).  Third, the Movants contend that the Monroe Estate fails to plead any false or misleading representation of fact, a necessary element of a false endorsement claim.  (*Id.* at 7).  Finally, they aver that federal trademark law does not recognize false endorsement claims premised on the persona of a deceased celebrity.  (*Id.* at 8).  As set forth more fully below, these arguments fail.

### a.   Count I Does Not Allege a Right of Publicity Claim

The Movants assert that Count I "is a thinly veiled attempt to assert a right that does not exist — a right of publicity in Marilyn Monroe."  (X1X Br. 5). This argument fails, however, because it disregards the distinction between right of publicity and false endorsement claims, ignores the allegations in the First Amended Counterclaim, and is contrary to existing case law.

The right of publicity in New York is derived from Sections 50 and 51 of the state's Civil Rights Law.  *See Abakporo* v. *Sahara Reporters*, No. 10 Civ. 3256 (RJD) (VVP), 2011 WL 4460547, at *5 (E.D.N.Y. Sept. 26, 2011); *Burck*, 571 F. Supp. 2d at 450.  To state a right of publicity claim in New York, the plaintiff must prove that the defendant "[i] used his name, portrait, picture, or voice, [ii] for advertising or trade purposes, [iii] without his written consent." *Burck*, 571 F. Supp. 2d at 451 (citing *Allen* v. *Nat'l Video, Inc.*, 610 F. Supp. 612, 621 (S.D.N.Y. 1985)); *see also Jackson* v. *Odenat,* 9 F. Supp. 3d 342, 353 (S.D.N.Y. 2014).  As discussed above, the elements of a false endorsement claim under the Lanham Act require the defendant to "'[i] ma[k]e a false or misleading representation of fact; [ii] in commerce; [iii] in connection with goods or services; [iv] that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services.'" *Beastie Boys*, 66 F. Supp. 3d at 448 (quoting *Burck*, 571 F. Supp. 2d at 455).  The key distinction between a right of publicity and a false endorsement claim is that the latter requires a showing of consumer confusion.  *See Rogers* v. *Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989) (noting that because "the right of publicity, unlike the Lanham Act, has no likelihood of confusion requirement, it is potentially more expansive than the Lanham Act"); *Fifty-Six Hope Rd. Music, Ltd.* v. *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1072-73 (9th Cir. 2015) (noting that, unlike state publicity claims, § 1125(a) requires a likelihood of confusion).

As an initial matter, the First Amended Counterclaim clearly delineates Count I as a claim arising under 15 U.S.C. § 1125(a), rather than New York's

right of publicity.  (FAC ¶¶ 52-60).  In constructing its argument to the contrary, X One X cites several allegations out of context and ignores critical portions of the First Amended Counterclaim.  (X1X Br. 5-6).  For example, the First Amended Counterclaim alleges that:

> Counter-Defendants' actions have caused, and continue to be likely to cause confusion, mistake or deception as to the source or origin of the Counter-Defendants' and/or their licensees' goods or services and/or falsely suggest a sponsorship, connection, license, or association between the Counter-Defendants and/or their licensees and Marilyn Monroe and/or the Monroe Estate.

(FAC ¶ 44).  Facially, this paragraph alleges consumer confusion, the key difference between a right of publicity claim and false endorsement claim.

The Movants also implicitly suggest that false endorsement claims premised on a celebrity's persona are tantamount to non-cognizable right of publicity claims.  (X1X Br. 6).  However, this argument ignores existing case law recognizing that Section 43(a) of the Lanham Act provides celebrities with a mechanism for asserting false endorsement claims.  *See e.g., Bruce Lee Enters., LLC* v. *A.V.E.L.A., Inc.* ("*Bruce Lee I*"), No. 10 Civ. 2333 (LTS), 2011 WL 1327137, at *5 (S.D.N.Y. Mar. 31, 2011) (collecting cases); *Fifty-Six Hope Rd. Music, Ltd.*, 778 F.3d at 1072-73 (recognizing that celebrity false endorsement claims are distinct from right of publicity claims).  To be sure, these cases are not precedential; however, the Court believes their reasoning to be persuasive and will adopt it here.

### b.   The Monroe Estate Can Assert a False Endorsement Claim

Next, the Movants argue that the false endorsement claim must be dismissed because the Monroe Estate has "failed to allege [any] facts from which, if true, the Court may infer that it owns any right to prosecute false endorsement claims on behalf of Ms. Monroe, her heirs or her actual estate[.]" (X1X Br. 9).  According to X One X, this deficiency is not remediated by what the Movants have termed the Monroe Estate's conclusory and implausible assertion that it is "the exclusive owner of those rights in and to Marlin Monroe's identity, persona, name, and likeness[.]"  (X1X Reply 1).  Instead, the Movants maintain that the Monroe Estate was required to allege a "chain of title from which it could be inferred that it has standing to prosecute a false endorsement claim[.]"  (X1X Br. 10).

The Court is unpersuaded by the Movants' arguments.  As the Movants concede, the First Amended Counterclaim recites that the Monroe Estate is "the exclusive owner of those rights in and to Marilyn Monroe's identity, persona, name and likeness[.]"  (FAC ¶ 18).  This is a factual allegation that not only must be accepted as true, but sufficiently establishes that the Monroe Estate owns the necessary interest to prosecute a false endorsement claim. *See Erickson Beamon Ltd.* v. *CMG Worldwide, Inc.*, No. 12 Civ. 5105 (NRB), 2014 WL 3950897, at *8 (S.D.N.Y. Aug. 13, 2014) ("As an initial matter, defendants maintain that they own all intellectual property affiliated with Bette Davis; based on this averment, it is plausible that defendants own the exclusive right to use the 'Bette Davis' name in commerce.").

14

Although the briefing on this point is somewhat opaque, X One X appears to argue that the Monroe Estate's assertion that it is "the exclusive owner of those rights in and to Marilyn Monroe's identity, persona, name and likeness" is insufficient, as a matter of law, to allege a protectable interest under § 1125(a).  (X1X Br. 10-11).  This argument is based on *Estate of Marilyn Monroe, LLC,* v. *Monroe's Palm Beach, LLC*, No. 13 Civ. 80700 (KLR) (S.D. Fla. Oct. 28, 2013), an unreported decision from the Southern District of Florida.  (X1X Br. 11).  In that case, the plaintiff (which happens to be the Defendant/Counterclaimant here) alleged that it owned "those rights in and to Marilyn Monroe's identity, persona, name, and likeness arising under common law and/or statute including, without limitation, 15 U.S.C. § 1125(a) of the Lanham Act[.]"  *Monroe's Palm Beach, LLC*, No. 13 Civ. 80700, slip op. at 4. The court held that this allegation insufficiently alleged that the plaintiff actually owned any trademark rights to Monroe's identity, persona, name, and likeness.  *Id.*  As a result, the plaintiff was found to have failed to state a claim under § 1125(a).  *Id.* at 5.

In this District, courts recognize that celebrities hold a "trademark-like interest in their name, likeness, and persona that may be vindicated through a false endorsement claim" under Section 43(a).  *See, e.g.*, *Bondar* v. *LASplash Cosmetics*, No. 12 Civ. 1417 (SAS), 2012 WL 6150859, at *5 (S.D.N.Y. Dec. 11, 2012); *Albert Furst von Thurn und Taxis* v. *Karl Prince von Thurn und Taxis*, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, at *11 n.7 (S.D.N.Y. Aug. 8, 2006). Here, the Monroe Estate has alleged that it owns the rights to Monroe's name,

likeness, and persona.  (FAC ¶ 18).  In this District, these are considered
"trademark-like interests" that are protected under the Lanham Act.
Accordingly, unlike in *Monroe's Palm Beach, LLC*, the Monroe Estate has
adequately alleged that it owns trademark interests in Monroe that it can
vindicate under § 1125(a).  *See Erickson Beamon Ltd.*, 2014 WL 3950897, at *8.

The Movants next argue that to the extent the First Amended
Counterclaim actually alleges that the Monroe Estate owns the rights to
Monroe's identity, persona, name, and likeness, such assertions are simply
implausible.  (X1X Reply 1-2).  This argument is premised on the notion that
the "countless copyrighted images of Monroe not owned" by the Monroe Estate
render implausible any claims of ownership in Monroe's identity, persona,
name, and likeness.  (*Id.*).  The Movants' conflation of the distinct disciplines of
copyright and trademark law, however, is fatally flawed.  *See* 1 MCCARTHY ON
TRADEMARKS AND UNFAIR COMPETITION § 6:14 (4th ed.) ("Thus, the scope of rights
in copyrights and trademarks is defined quite differently.").  That is, courts
have made clear that "[t]rademark law is concerned with protection of the
symbols, elements or devices used to identify a product in the marketplace and
to prevent confusion as to its source."  *EMI Catalogue P'ship* v. *Hill, Holliday,
Connors, Cosmopulos Inc.*, 228 F.3d 56, 63 (2d Cir. 2000).  On the other hand,
"copyright law protects the artist's right in an abstract design or other creative
work."  *Id.*  A copyright ultimately provides its holder with the "right to exclude
others from using his property[.]"  *Authors Guild* v. *Google, Inc.*, 770 F. Supp.
2d 666, 681 (S.D.N.Y. 2011).

The body of law addressing the coexistence of, and conflicts between, trademark and copyright law is inchoate.  *See, e.g.*, *Elements Spirits, Inc.* v. *Iconic Brands, Inc.*, No. 15 Civ. 02692 (DDP) (AGRX), 2015 WL 3649295, at *4 (C.D. Cal. June 11, 2015) ("The universe of cases that deal with conflicts between trademarks and copyrights is small and not fully developed.").  Courts considering the issue have generally held, however, that a copyright does not provide "an automatic defense to any trademark."  *Univ. of Ala. Bd. of Trs.* v. *New Life Art, Inc.*, 683 F.3d 1266, 1280 (11th Cir. 2012).  To conclude otherwise, these courts have found, would permit parties to circumvent trademark law easily by simply "drawing another's trademark and then placing that drawing on various products with impunity."  *Id.*  Accordingly, these courts have concluded that "a valid copyright does not entitle the copyright holder to infringe another's trade dress rights."  *Nova Wines, Inc.* v. *Adler Fels Winery LLC*, 467 F. Supp. 2d 965, 983 (N.D. Cal. 2006).  Conversely, trademark laws cannot be used as tools to circumvent the protections afforded by valid copyrights.  *See Elements Spirits, Inc.*, 2015 WL 3649295, at *5 ("Just as one may not draw another's trademark, copyright the drawing, and thereby evade trademark law, one also may not appropriate another's copyrighted work as one's trademark, place it into use so as to create secondary meaning and customer brand familiarity, and thereby evade copyright law.").

As the preceding analysis illustrates, the interplay between trademarks and copyrights is at once complex and ill-defined.  Moreover, whatever broad rules have been discerned at the junction of trademark and copyright law, their

17

application in specific cases has been fact-intensive.  In other words, the
existence of a copyright does not automatically invalidate a trademark, just as
the existence of a trademark does not automatically vitiate a copyright.
Accordingly, the Court cannot conclude, as a matter of law, that the existence
of the copyrights cited by the Movants precludes the Monroe Estate's
ownership and vindication of trademark interests in Monroe's name, likeness,
and persona.

Finally, the Court rejects the Movants' efforts to enshrine a more
exacting pleading standard than is required by the Federal Rules of Civil
Procedure, namely, a standard that would require the Monroe Estate to allege a
"chain of title from which it could be inferred that it has standing to prosecute
a false endorsement claim[.]"  (X1X Br. 10).  X One X has proffered no legal
authority for this requirement, and the Court has found none.  *See Keiler* v.
*Harlequin Enters. Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) ("[T]o survive a motion
under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate
factual allegations, but only allegations sufficient to raise an entitlement to
relief above the speculative level.").

### c.   The Monroe Estate Has Alleged a False or Misleading Representation of Fact

The Movants next argue that the Monroe Estate has failed to allege any
false or misleading representations of fact, a necessary element of a false
endorsement claim.  (X1X Br. 7).  The argument, however, is predicated on X
One X's factual assertion that it does not sell, license, or distribute products
with Marilyn Monroe's image.  (*Id.*).  Alternatively, the Movants claim that

merely selling a product bearing Monroe's image does not constitute a false or misleading representation of fact. (*Id.*; X1X Reply 5).

These arguments also fail, at least in this setting. First, X One X's contention that it does not sell, license, or distribute products bearing Monroe's image is contradicted by the allegations in the First Amended Counterclaim (FAC ¶¶ 34, 36); it thus raises a question of fact that cannot be resolved on a motion to dismiss. Second, the Movants' argument in the alternative runs contrary to a number of decisions holding that the use of an image on a product can support a claim for false endorsement. *See Fifty-Six Hope Rd. Music, Ltd.*, 778 F.3d at 1072; *Bruce Lee II*, 2013 WL 822173, at *19; *see also Allen*, 610 F. Supp. at 628.

### d. False Endorsement Claims Based on a Deceased Celebrity are Cognizable

More fundamentally, X One X and V. International assert that Count I should be dismissed because the viability of a false endorsement claim on behalf of a deceased celebrity is "questionable." (X1X Br. 8). This argument is largely premised on two cases, *Astaire* v. *McKenzie,* No. 10 Civ. 4305 (MGC), 2010 WL 2331524, at *1 (S.D.N.Y. June 9, 2010), and *Pirone* v. *MacMillan, Inc.*, 894 F.2d 579, 585 (2d Cir. 1990). (X1X Br. 8). A careful review of those cases, however, demonstrates that they cannot bear the weight imposed on them by the Movants.

Preliminarily, this Court rejects the Movants' contention that there is a blanket prohibition against false endorsement claims involving deceased celebrities. *See, e.g.*, *Bruce Lee II*, 2013 WL 822173, at *20 n.17 (rejecting

19

argument that false endorsement claims for deceased celebrities are categorically barred). *Astaire* and *Pirone* do not counsel to the contrary.  In *Astaire*, the plaintiff, Fred Astaire's widow, filed suit to prevent the defendants from presenting the "Fred and Adele Astaire Awards." *Astaire*, 2010 WL 2331524, at *1.  The court rejected the plaintiff's application for a temporary restraining order because she failed to show "that consumers will be deceived into believing that the late Fred Astaire endorsed defendants' awards[.]" *Id.* Thus, in *Astaire* the fact that the celebrity was deceased was considered by the court in the context of the issue of consumer confusion, rather than the underlying right to file a false endorsement claim.  The court in that case did not purport to consider the broader issue of whether § 1125(a) "cover[s] claims brought by celebrities' estates or successors-in-interest based on celebrity persona." *Fifty-Six Hope Rd. Music, Ltd.*, 778 F.3d at 1073 (rejecting argument that such claims were not covered under the Lanham Act).

In *Pirone*, the plaintiffs, owners of intellectual property rights relating to Babe Ruth, filed suit against defendant for incorporating images of Ruth into a baseball themed calendar. *Pirone*, 894 F.2d at 581.  In affirming summary judgement for the defendant, the Second Circuit held that the plaintiffs' Section 43(a) claim foundered on the critical issue of likelihood of confusion. *Id.* at 584.  The Second Circuit reasoned that given the defendant's inclusion of a number of famous baseball players, an ordinarily prudent purchaser would not be misled into believing that Babe Ruth sponsored the calendar at issue. *Id.* at 585.  Contrary to the Movants' argument, however, the Court's analysis did not

address whether a false endorsement claim involving a deceased celebrity was cognizable under Section 43(a).  Rather, the deceased celebrity issue was only addressed in the context of a right of publicity claim under New York law.  *Id.* at 585-86.  And, as noted, *Pirone* occurred at the summary judgment stage.  These inapposite decisions do not, therefore, alter this Court's analysis set forth above.

**C.   The Monroe Estate Has Adequately Alleged a Claim for Unfair Competition Under New York Law**

**1.   Applicable Law**

The elements of an unfair competition claim in New York largely mirror those under the Lanham Act.  *See Kaplan, Inc.* v. *Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) ("The elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims." (quoting *ESPN, Inc.* v. *Quiksilver, Inc.*, 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008))).  However, a party asserting a claim for unfair competition under New York law must also allege bad faith on the part of the defendant.  *See Erickson Beamon Ltd.*, 2014 WL 3950897, at *9 (citing *Empresa Cubana del Tabaco* v. *Culbro Corp.*, 399 F.3d 462, 485 (2d Cir. 2005)).

**2.   Analysis**

X One X's briefing appears to concede that the Monroe Estate sufficiently alleges the bad faith required to state an unfair competition claim under New York law.  Instead, the Movants focus their efforts on rehashing the same arguments they advanced in support of their motion to dismiss the Monroe Estate's § 1125(a) claim.  (X1X Br. 12).  For the reasons stated in the preceding

section, these arguments also fail with respect to the Monroe Estate's state-law unfair competition claim.  Accordingly, the motions to dismiss Count IV are denied.

### D. The Monroe Estate Has Adequately Alleged Trademark Infringement Under Both 15 U.S.C. § 1114 and the Common Law

#### 1.  Applicable Law

Claims for trademark infringement under Section 32 of the Lanham Act are analyzed "'under a familiar two-prong test.  The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.'"  *Tiffany (NJ) Inc.* v. *eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (quoting *Savin Corp.* v. *Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004)).  The elements for trademark infringement under New York law mirror those for the Lanham Act, and as a result these claims can be analyzed together.  *See Smith* v. *Mikki More, LLC*, 59 F. Supp. 3d 595, 616 (S.D.N.Y. 2014).

#### 2.  Analysis

X One X argues that Count II should be dismissed because the Monroe Estate does not allege, in anything other than conclusory terms, that the Movants actually used any marks that were "identical or similar" to the protected MONROE Marks.  (X1X Br. 13).  It further asserts that the First Amended Counterclaim's efforts to provide factual enhancement for the trademark infringement claim founder on the fair use doctrine.  (*Id.* at 14).  Finally, X One X claims that the "Marilyn" mark was limited to a single class of

goods, alcoholic beverages, and that the First Amended Counterclaim fails to allege that the protected marks were used in connection with these particular goods. (*Id*.). The Court is unpersuaded by these arguments.

The First Amended Counterclaim sufficiently alleges that the Movants used the MONROE Marks. Specifically, the Monroe Estate avers that: (i) it owns trademark registrations and common law rights in a number of marks incorporating the words Marilyn or Marilyn Monroe (FAC ¶ 16); (ii) the Counter-Defendants (including the Movants) have no rights in the Marilyn Monroe Intellectual Property, defined to include the trademarked MONROE Marks (*id*. at ¶¶ 18, 35); (iii) the Counter-Defendants have used the Marilyn Monroe Intellectual Property in connection with the sale of merchandise such as apparel and glassware (*id*. at ¶¶ 34, 40, 48); and (iv) this merchandise is identical or substantially similar to the "merchandise licensed, manufactured, distributed, marketed, and sold by the Monroe Estate" (*id*. at ¶ 36). On a motion to dismiss, these allegations are sufficient to raise an entitlement to relief above the speculative level.

Ignoring these allegations, the Movants focus instead on a smattering of allegations and pictures in the First Amended Counterclaim pertaining to a June 14, 2011 trade show in Las Vegas. (X1X Br. 13-14).[5] Specifically, the Movants claim that the photographs from the trade show only illustrate one

---

[5]     The Court notes that the Monroe Estate alleges that the images from the Las Vegas trade show are attached to the First Amended Counterclaim. However, these images were not in fact attached to Docket Entry 133. Nevertheless, the images can be found at Docket Entry 74-1.

piece of merchandise implicating the Monroe Estate's trademarks, an image of Monroe coupled with the word Marilyn. (*Id.*). According to X One X, the use of the word Marilyn is descriptive, and thus the fair use doctrine precludes the Monroe Estate's trademark infringement claim. (*Id.* at 14). However, this argument is misdirected, as the invocation of the fair use doctrine necessarily raises questions of fact that cannot be resolved on a motion to dismiss. *See Kelly-Brown* v. *Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) ("Because fair use is an affirmative defense, it often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss.").

Finally, the Movants argue that the trademark infringement claims should be dismissed because the "Marilyn" mark is "limited to a single class of goods and services: Class 33 alcoholic beverages." (X1X Br. 14). However, the fact that the "Marilyn" mark is limited to alcoholic beverages does not provide a sufficient basis for dismissing Count II. The First Amended Counterclaim plausibly alleges that aside from the "Marilyn" mark, the Movants have also infringed a number of the Monroe Estate's other federally registered trademarks that protect services or goods unrelated to alcohol. (FAC ¶ 16). For all of these reasons, the motions to dismiss the trademark infringement claims are denied.

### E. The Monroe Estate Has Adequately Alleged a Claim for Trademark Dilution Under 15 U.S.C. § 1125(c) and General Business Law § 360-l

#### 1. Applicable Law

Federal trademark law also permits the owner of a "famous mark that is distinctive" to enjoin a person from using a "mark or trade name in commerce

that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark."  15 U.S.C. § 1125(c); *see Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.* ("*Starbucks II*")*,* 736 F.3d 198, 205 (2d Cir. 2013).  Two types of trademark dilution are recognized:  Dilution by blurring occurs when there is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Courts consider six non-exhaustive factors when analyzing a dilution by blurring claim.  *See Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.* ("*Starbucks I*"), 588 F.3d 97, 105 (2d Cir. 2009).  These factors are:

> (i)    The degree of similarity between the mark or trade name and the famous mark.
>
> (ii)   The degree of inherent or acquired distinctiveness of the famous mark.
>
> (iii)  The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
>
> (iv)   The degree of recognition of the famous mark.
>
> (v)    Whether the user of the mark or trade name intended to create an association with the famous mark.
>
> (vi)   Any actual association between the mark or trade name and the famous mark.

15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

Dilution by tarnishment, by contrast, is defined as an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark."  15 U.S.C. § 1125(c)(2)(C).  The Second Circuit has explained that "'a trademark may be tarnished when it is

linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods.'" *Starbucks I*, 588 F.3d at 110 (quoting *Hormel Foods Corp.* v. *Jim Henson Prods., Inc.*, 73 F.3d 497, 507 (2d Cir. 1996)).  Dilution by tarnishment can also occur where the "mark loses its ability to serve as a 'wholesome identifier' of plaintiff's product.'" *Starbucks I*, 588 F.3d at 110 (quoting *Hormel Foods Corp.*, 73 F.3d at 507).

In sum, to state a claim for trademark dilution under the Lanham Act, the plaintiff must allege: "[i] its mark is famous; [ii] the defendant's use of the mark is made in commerce; [iii] the defendant used the mark after the mark was famous; and [iv] the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *Estate of Ellington ex rel. Ellington* v. *Harbrew Imports Ltd.*, 812 F. Supp. 2d 186, 193 (E.D.N.Y. 2011); *see also Schutte Bagclosures Inc.* v. *Kwik Lok Corp.*, 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) (four elements of dilution claim are "[i] the mark is famous, [ii] the defendant is making use of the mark in commerce, [iii] the defendant's use of the mark began after the mark became famous, and [iv] the likelihood of dilution").

New York law also recognizes a claim for trademark dilution.  *See* N.Y. GEN. BUS. LAW § 360-l.  To state a claim for dilution under New York law, the plaintiff must plead the existence of "[i] a distinctive mark capable of being diluted, and [ii] a likelihood of dilution." *Akiro LLC* v. *House of Cheatham, Inc.*,

946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013) (internal quotation marks omitted).

Notably, unlike federal law, New York "does not require a mark to be famous

for protection against dilution to apply." *Starbucks I*, 588 F.3d at 114.

Moreover, New York law does not recognize a dilution claim unless the marks

at issue are substantially similar. *George Nelson Found.* v. *Modernica, Inc.*, 12

F. Supp. 3d 635, 651 (S.D.N.Y. 2014); *Akiro LLC*, 946 F. Supp. 2d at 342.

### 2. Analysis

The Movants, through V. International, advance three primary reasons

for dismissing the Monroe Estate's dilution claims. First, V. International

argues that the MONROE Marks are not distinctive, and therefore are not

protected by the federal dilution statute. (VI Br. 9-10). Second, it claims that

the MONROE Marks are not sufficiently famous to fall within the ambit of the

federal dilution statute. (*Id.* at 14). Finally, and relatedly, it asserts that the

First Amended Counterclaim fails to allege that the MONROE Marks are truly

distinctive as required by General Business Law § 360-l. (VI Reply 6). As

explained below, the Court rejects these arguments.

### a. The Monroe Estate Adequately Alleges Distinctiveness

V. International asserts that that the MONROE Marks are descriptive

and have not acquired the requisite secondary meaning to qualify as

"distinctive" under 15 U.S.C. § 1125(c). (VI Br. 9). By way of background, a

mark's distinctiveness, and the concomitant protection it is afforded, is

measured on a scale consisting of four categories. *See TCPIP Holding Co.* v.

*Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001). "The scale, progressing

from least to most distinctive, is described in terms of marks that are:
(i) generic; (ii) descriptive; (iii) suggestive; and (iv) arbitrary or fanciful." *Id.* In
this setting, a generic mark is not distinctive and never entitled to protection.
*See Star Indus., Inc.* v. *Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005). A
descriptive mark is not inherently distinctive, but is protectable if it has
acquired secondary meaning. *Id.* Suggestive marks, along with arbitrary or
fanciful marks, are inherently distinctive. *Id.*

Secondary meaning can attach to a descriptive mark where "the name
and the business have become synonymous in the mind of the public,
submerging the primary meaning of the term in favor of its meaning as a word
identifying that business." *Time, Inc.* v. *Petersen Pub. Co. L.L.C.*, 173 F.3d 113,
117 (2d Cir. 1999) (internal quotation marks omitted). In the Second Circuit,
courts analyze six factors to determine whether a mark has acquired secondary
meaning: "[i] advertising expenditures, [ii] consumer studies linking the mark
to a source, [iii] unsolicited media coverage of the product, [iv] sales success,
[v] attempts to plagiarize the mark, and, [vi] length and exclusivity of the
mark's use." *Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*,
696 F.3d 206, 226 (2d Cir. 2012) (internal quotation marks omitted). To
establish secondary meaning, a party does not have to prove every factor and
no single factor is dispositive. *See Arrow Fastener Co.* v. *Stanley Works*, 59
F.3d 384, 393 (2d Cir. 1995); *GTFM, Inc.* v. *Solid Clothing, Inc.*, 215 F. Supp. 2d
273, 294 (S.D.N.Y. 2002); *Tri-Star Pictures, Inc.* v. *Unger*, 14 F. Supp. 2d 339,
348 (S.D.N.Y. 1998).

28

As is evident from the preceding two paragraphs, determining whether a descriptive mark has acquired secondary meaning is a fact-intensive inquiry. *See Gross* v. *Bare Escentuals Beauty, Inc.*, 632 F. Supp. 2d 283, 291 (S.D.N.Y. 2008) ("determining secondary meaning is a fact-intensive inquiry"); *Rockland Exposition, Inc.* v. *All. of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 316 (S.D.N.Y. 2012) ("Whether a mark has acquired secondary meaning is a factual determination, proof of which entails vigorous evidentiary requirements." (internal quotation marks omitted)).  Of course, fact-intensive inquiries are "ill-suited for resolution at the motion to dismiss stage."  *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012). Accordingly, the question of whether a descriptive mark has acquired the secondary meaning necessary to be distinctive generally should not — and here cannot — be resolved on a motion to dismiss.  *See Kaplan, Inc.*, 16 F. Supp. 3d at 348-49 (holding that issue of whether mark had obtained secondary meaning was a question of fact that could not be determined on a motion to dismiss); *CourtAlert.com, Inc.* v. *e-Law, LLC*, No. 12 Civ. 2473 (DAB), 2013 WL 4754819, at *6 (S.D.N.Y. Aug. 26, 2013) (determining whether mark had secondary meaning presented a question of fact that could not be decided on a motion to dismiss); *In re Conn. Mobilecom, Inc.*, No. 02 Civ. 02519 (WHP), 2003 WL 23021959, at *10 (S.D.N.Y. Dec. 23, 2003) ("the issue of whether a trade name has acquired secondary meaning is a question of fact and therefore not appropriately decided on a motion to dismiss").  On this basis alone, the Court rejects the Movants' challenges to the distinctiveness *vel non* of the marks.

29

Even were the Court to consider the secondary meaning factors, they would counsel in favor of denial of the motions to dismiss.  The First Amended Counterclaim alleges that the Monroe Estate has expended "significant sums of money … advertising the Marilyn Monroe Intellectual Property."  (FAC ¶ 19).  While the Monroe Estate has not identified any consumer studies linking the mark to a source, it has alleged "significant publicity related to … the Marilyn Monroe Intellectual Property."  (*Id.* at ¶ 21).  As for sales success, the First Amended Counterclaim alleges "significant sales of licensed merchandise and services."  (*Id.*).  The Monroe Estate also avers that the Movants, with "knowledge of the Monroe Estate's rights" (*id.* at ¶ 40), nevertheless "licensed, manufactured, distributed, bought and/or sold Infringing Merchandise with the bad faith intent to profit from the … registered Marilyn Marks" (*id.* at ¶ 48).  *See Cartier, Inc.* v. *Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004) (for the attempt to plagiarize factor, "[t]he relevant question therefore is whether the copying was done deliberately, so as to benefit from [the mark holder's] name and good will"); *accord Gameologist Grp., LLC* v. *Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011).  Finally, with respect to the length and exclusivity of the mark's use, the First Amended Counterclaim alleges that the "Marilyn and Marilyn Monroe trademarks, and variants thereof, have been continuously and pervasively" used since as early as 1983.  (FAC ¶ 15).  As a whole, these allegations plausibly establish secondary meaning (and, by extension, distinctiveness) for purposes of a motion to dismiss.

Particularly in the context of a motion to dismiss, the Monroe Estate's alleged ownership of eight federal trademark registrations further buttresses the argument that the MONROE Marks are distinctive for purposes of a trademark dilution claim.  (Pl. Opp. 14).  As noted earlier, a "mark is entitled to protection when it is inherently distinctive; if the mark is 'merely descriptive,' 15 U.S.C. § 1052(e), it qualifies for protection only if it has acquired secondary meaning, i.e., if it 'has become distinctive of the ... goods in commerce,' *id.* § 1052(f)."  *Time, Inc.*, 173 F.3d at 117.  Therefore, to qualify for a trademark registration a mark must be either: (i) inherently distinctive, or (ii) distinctive by virtue of having acquired a secondary meaning.  *See Star Indus., Inc.* 412 F.3d at 381; *Perfect Pearl Co.* v. *Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 534 (S.D.N.Y. 2012).

"Registration by the [Patent and Trademark Office] without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive." *Lane Capital Mgmt., Inc.* v. *Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d Cir. 1999).  This presumption can "be overcome by showing that a registered mark is generic or is descriptive without secondary meaning."  *Juicy Couture, Inc.* v. *Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 499 (S.D.N.Y. 2013).  In the Second Circuit, when there is an "absence of evidence that the Patent and Trademark Office registered [a descriptive] mark because of its secondary meaning, 15 U.S.C. § 1052(f), registration does not shift the burden of proving a lack of secondary meaning onto the defendant."  *20th Century Wear, Inc.* v. *Sanmark-Stardust*

31

*Inc.*, 747 F.2d 81, 89 n.8 (2d Cir. 1984).  Accordingly, in these situations, the Lanham Act does not create a rebuttable presumption that a descriptive mark has obtained secondary meaning solely by virtue of its registration.  *Id.*; *cf. Arrow Fastener Co.*, 59 F.3d at 393 ("The USPTO's decision to register the mark — which it initially deemed descriptive — under 15 U.S.C. § 1052(f), after Arrow submitted evidence of secondary meaning, creates a rebuttable presumption that the mark enjoys secondary meaning.").

On the other hand, a registered trademark that is incontestable "enjoys a conclusive presumption of distinctiveness." *Savin Corp.*, 391 F.3d at 457.  And once a mark has obtained incontestable status, "secondary meaning is conclusively presumed." *PAJ, Inc.* v. *Barons Gold Mfg. Corp.*, No. 02 Civ. 1465 (VM) (KNF), 2002 WL 1792069, at *2 (S.D.N.Y. Aug. 2, 2002); *see also KP Permanent Make-Up, Inc.* v. *Lasting Impression I, Inc.*, 408 F.3d 596, 606 (9th Cir. 2005) ("Thus, Lasting's incontestable registration is conclusive evidence that the mark is non-descriptive or has acquired secondary meaning[.]"); *24 Hour Fitness USA, Inc.* v. *24/7 Tribeca Fitness, LLC,* 277 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) ("As noted above, Plaintiff's mark is incontestably protectable by virtue of its longstanding registration, the demonstration of secondary meaning that is ordinarily requisite to protection of a descriptive mark therefore is not required."); *but cf. DeClemente* v. *Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 42-43 (E.D.N.Y. 1994) (finding that incontestability does not conclusively demonstrate secondary meaning, where the Patent and Trademark

Office did not review evidence of a descriptive mark's secondary meaning at the time of registration).

The Movants argue that the presumption of distinctiveness afforded by trademark registration, and even the presumption of incontestability, do not apply here because they have "demonstrat[ed] that the[] marks were descriptive and [have] not acquired secondary meaning." (VI Reply 1). This argument, whether applied to the registered trademarks or the Incontestable Marks, raises issues relating to each mark's secondary meaning. As explained above, such issues of fact cannot be resolved on a motion to dismiss. *See Kaplan, Inc.*, 16 F. Supp. 3d at 348. The Court also notes that it need not conclusively determine what effect the incontestable status of certain MONROE Marks has on the distinctiveness issue. At this stage in the litigation, the allegation of incontestability is sufficient to allege plausibly the distinctiveness required by the dilution statute. *See Airwair Int'l Ltd.* v. *Vans, Inc.*, No. 12 Civ. 05060 (EJD), 2013 WL 3786309, at *7 (N.D. Cal. July 17, 2013) (concluding, on a motion to dismiss, that "Airwair's allegation of the incontestability of its marks on the Principal Register establishes their distinctiveness").

Finally, V. International cites a series of cases from the Central District of California in arguing that the Monroe Estate fails to establish the secondary meaning required to plead the distinctiveness element of a dilution claim. (VI Br. 11-14). In *Cairns* v. *Franklin Mint Company*, 24 F. Supp. 2d 1013, 1021 (C.D. Cal. 1998), the plaintiffs, executors of the Estate of Princess Diana (the "Estate") and trustees of the Diana Princess of Wales Memorial Fund (the

"Fund"), filed suit against entities that produced and advertised merchandise depicting Princess Diana. The Estate filed applications for federal trademark registrations with priority dates that were less than one month after Princess Diana's death. *Id.* The plaintiffs' complaint alleged, in part, that the defendants' sales of Princess Diana merchandise constituted federal trademark dilution in violation of 15 U.S.C. § 1125(c). *Id.* at 1022. In ruling on the defendants' motion to dismiss, the court analyzed whether the complaint adequately alleged that Princess Diana's name had obtained the secondary meaning necessary to support a dilution claim. *Id.* at 1035-36. The court ultimately held that the question of "whether Princess Diana's name ha[d] acquired secondary meaning indicative of the source of her charitable works [was] best resolved on a motion for summary judgment." *Id.* at 1036. Accordingly, the court denied the defendants' motion to dismiss. *Id.*

After losing the motion to dismiss, the defendants filed a motion for summary judgment on the dilution claim. *Cairns* v. *Franklin Mint Co.*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000). In granting the motion, the court held that "a finding of secondary meaning in this case would mean that the words 'Diana, Princess of Wales' would no longer primarily identi[f]y the individual, Princess Diana, but instead identify plaintiffs' charitable activities. This is an absurd contention to say the least. 'Diana, Princess of Wales' has not, and the Court suspects, will never, acquire a secondary meaning limited to charitable works." *Id.* at 1222.

While these cases raise thought-provoking issues concerning the metes and bounds of secondary meaning, they do not alter the Court's conclusion that such issues may not be resolved at the motion to dismiss stage. Indeed, the district court in *Cairns* denied the defendants' motion to dismiss — a motion that was premised, in part, on the fact that the marks at issue had not obtained the requisite secondary meaning. Second, unlike the marks in *Cairns*, which had only been in use for approximately a year before the suit was filed, the marks in this case have been in use since 1983. (FAC ¶ 15). In consequence, the Monroe Estate's marks have been afforded an even greater opportunity to obtain secondary meaning. Furthermore, several of the marks in this case are registered and several have obtained incontestable status. (*Id.* at ¶¶ 16-17). As discussed above, these registrations create questions of fact concerning secondary meaning that cannot be resolved on a motion to dismiss.

### b.   The Monroe Estate Has Adequately Alleged That the Marks Are Sufficiently Famous

V. International further asserts that the dilution claim fails because the MONROE Marks are not sufficiently famous to qualify for protection. (VI Br. 14). A mark is famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). The Lanham Act identifies four factors that a court may consider in determining whether a mark is famous. *See id.* § 1125(c)(2)(A)(i)-(iv); *Rolex Watch U.S.A., Inc.* v. *Rolex Deli Corp.*, No. 11 Civ. 9321 (BSJ), 2012 WL 5177517, at *3 n.6 (S.D.N.Y. Oct. 18, 2012). These factors include:

> (i)   The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>
> (ii)   The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>
> (iii)   The extent of actual recognition of the mark.
>
> (iv)   Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Here, the Monroe Estate alleges that: (i) the MONROE Marks have been used "continuously and pervasively ... in connection with a wide range of goods and services" (FAC ¶ 15); (ii) it has "expended substantial efforts and significant sums of money ... promoting and advertising" the MONROE Marks "throughout the United States and internationally" (*id.* at ¶ 19); (iii) there is "significant publicity" related to the MONROE Marks (*id.* at ¶ 21); (iv) there are "significant sales of licensed merchandise and services" (*id.*); (v) products bearing the MONROE Marks are sold throughout the United States and internationally (*id.* at ¶ 20); (vi) the MONROE Marks have obtained "widespread secondary meaning in the marketplace" (*id.* at ¶ 19); and (vii) the MONROE Marks are registered (*id.* at ¶ 16). Taken together, these allegations sufficiently allege that the MONROE Marks are famous. *See Erickson Beamon Ltd.*, 2014 WL 3950897, at *10 (dilution claim sufficiently pleaded where defendant alleged that Bette Davis is widely recognized, had an acclaimed career, and enjoyed more than a fleeting moment of fame).

36

### c.   The Monroe Estate Has Adequately Alleged That the Marks Are Truly Distinctive

V. International claims that the First Amended Counterclaim fails to sufficiently allege that the MONROE Marks are truly distinctive as required by New York General Business Law § 360-l.  (VI Reply 6).  While a party must show that it possesses a "truly distinctive" trademark to prevail under § 360-l, the mark need not be famous to satisfy this requirement.  *GMA Accessories, Inc.* v. *Croscill, Inc.*, No. 06 Civ. 6236 (GEL), 2008 WL 591803, at *11 (S.D.N.Y. Mar. 3, 2008).  As discussed above, the First Amended Counterclaim sufficiently alleges that the MONROE Marks are famous under the federal dilution statute.  Since the Monroe Estate satisfied that more exacting standard, it has sufficiently pleaded that the MONROE Marks are "truly distinctive" under New York law.  *George Nelson Found.*, 12 F. Supp. 3d at 651 ("Since Plaintiff has met the more rigorous standard for fame under the Lanham Act, this discussion focuses on dilution by blurring.").

## F.   The Monroe Estate Has Not Adequately Alleged a Cause of Action for Deceptive Business Practices Under General Business Law § 349

### 1.   Applicable Law

New York law prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state[.]" N.Y. GEN. BUS. LAW § 349.  A cause of action under § 349 has three elements: (i) "the challenged act or practice was consumer-oriented;" (ii) "it was misleading in a material way;" and (iii) "the plaintiff suffered injury as a result

of the deceptive act." *Crawford* v. *Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (internal quotation marks omitted).

### 2.    Analysis

In the Second Circuit, courts are divided over whether trademark infringement claims are viable under § 349.  The majority view is that "'trademark infringement claims are not cognizable under … § 349 unless there is specific and substantial injury to the public interest over and above the ordinary trademark infringement.'"  *Van Praagh* v. *Gratton*, 993 F. Supp. 2d 293, 305 (E.D.N.Y. 2014) (quoting *Perfect Pearl Co.*, 887 F. Supp. 2d at 543); *see also Kaplan, Inc.,* 16 F. Supp. 3d at 352; *MyPlayCity, Inc.* v. *Conduit Ltd.,* No. 10 Civ. 1615 (CM), 2012 WL 1107648, at *15 (S.D.N.Y. Mar. 30, 2012). These courts reason that "the public harm that results from trademark infringement is too insubstantial to satisfy the pleading requirements of § 349." *Perfect Pearl Co.*, 887 F. Supp. 2d at 542 (internal quotation marks omitted).

Here, the Monroe Estate contends that it has sufficiently pleaded a § 349 claim because "Defendants' actions are likely to cause confusion, mistake or deception as to source or origin of the goods or services or falsely suggest sponsorship or association between [the Movants] and the Estate or Marilyn Monroe."  (Pl. Opp. 17).  The Movants' alleged deceptive acts or practices, however, "are precisely the acts that constitute the alleged trademark infringement," and therefore the § 349 claim fails as a matter of law.  *Kaplan, Inc.* 16 F. Supp. 3d at 352-53.

38

**G.     The Monroe Estate Has Adequately Alleged a Claim for Intentional Interference with Prospective Economic Advantage**

### 1.     Applicable Law

To state a claim for intentional interference with prospective economic advantage a party must allege that: "(i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Lombard* v. *Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002). "Further, the plaintiff must establish that it 'would have entered into an economic relationship [with the third party] but for the defendant's wrongful conduct.'" *CHoldings B.V.* v. *Asiarim Corp.*, 992 F. Supp. 2d 223, 246 (S.D.N.Y. 2013) (quoting *Premium Mortg. Corp.* v. *Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009)) (alterations in *CHoldings*).

### 2.     Analysis

X One X argues that the First Amended Counterclaim fails to allege that the Monroe Estate "would have consummated any specific contract but for the interference of any of the defendants." (X1X Br. 19). The Court is not unsympathetic to this argument, and notes more generally that the Monroe Estate's allegations lie perilously close to the line of not stating a claim. Nevertheless, courts in this District have held that to state a claim for intentional interference with prospective economic advantage, a plaintiff need only identify interference with a specific business relationship. *See Johnson & Johnson* v. *Am. Nat. Red Cross*, 528 F. Supp. 2d 462, 465 (S.D.N.Y. 2008);

*Gianni Versace, S.p.A.* v. *Versace*, No. 01 Civ. 9645 (PKL) (THK), 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003).  Here, the First Amended Counterclaim alleges that the Counter-Defendants interfered with the Monroe Estate's relationship with two specific companies, Bioworld and Spencer's.  (FAC ¶ 51). While this claim may not survive a motion for summary judgment, on a motion to dismiss the allegations in the First Amended Counterclaim are sufficient to state a claim.

**H.   The Monroe Estate Has Not Adequately Alleged Alter-Ego Liability**

**1.   Applicable Law**

Generally, in New York, "the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders." *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks omitted).  According to the First Amended Counterclaim, V. International is incorporated in California.  (FAC ¶ 6). Accordingly, the alter-ego issue is governed by California law.

In California, alter-ego liability may be imposed where two conditions are satisfied.  *See In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010).  The first condition assesses whether "'there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased.'"  *Id.* (quoting *Wood* v. *Elling Corp.*, 572 P.2d 755, 761 n.9 (Cal. 1977)).  The second condition analyzes whether the "'adherence to the fiction of the separate existence of the corporation would ... sanction a fraud or promote injustice.'"  *Id.* (quoting *Wood*, 572 P.2d at 761 n.9).  The alter-ego

doctrine can only be invoked when the moving party has demonstrated both a unity of interest and an injustice.  *See Oceans II, Inc.* v. *Skinnervision, Inc.*, No. 12 Civ. 06867 (CAS) (EX), 2015 WL 4484208, at *4 (C.D. Cal. July 20, 2015) ("Even where there is a sufficient unity of interest, the alter ego doctrine cannot be invoked without evidence of misconduct or an injustice flowing from recognition of the separate corporate entity.").  Finally, in interpreting California law, the Ninth Circuit has held that "ownership in a corporation is a necessary element for the application of the alter ego doctrine[.]"  *S.E.C.* v. *Hickey*, 322 F.3d 1123, 1129 (9th Cir. 2003); *see also Kremen* v. *Cohen,* No. 13-16101, 2015 WL 4438191, at *1 (9th Cir. July 21, 2015) (citing *Hickey* with approval); *Berster Technologies, LLC* v. *Christmas*, No. 11 Civ. 1541 (KJM), 2011 WL 5307834, at *7 (E.D. Cal. Nov. 3, 2011) ("Ownership is a prerequisite to alter ego liability.").[6]

###     2.    Analysis

The Monroe Estate alleges that V. International is an alter ego of "Valencia and/or AVELA."  (FAC ¶ 29).  However, in support of this claim, the Monroe Estate has not alleged that Valencia or AVELA actually maintained an ownership interest in V. International.  The absence of an ownership allegation is notable because the First Amended Counterclaim does allege that Valencia is the "sole shareholder" of AVELA, IPL, and X One X.  Moreover, the Monroe

---

[6]     The Court notes that at least one judge has questioned the continuing vitality of this rule.  *See Leatt Corp.* v. *Innovative Safety Tech., LLC,* No. 09 Civ. 1301 (IEG) (POR), 2010 WL 2803947, at *4 n.2 (S.D. Cal. July 15, 2010) (noting that the court was bound to follow the rule outlined in *Hickey* despite questions about the rule's ongoing viability).

Estate cannot mask the ownership deficiency by relying on the conclusory legal assertion that V. International is an alter ego of Valencia and/or AVELA.  In sum, the First Amended Counterclaim fails to allege adequately that Valencia and/or AVELA are alter egos of V. International.  *See Hickey*, 322 F.3d at 1128-29.  Accordingly, the Court dismisses the alter-ego claim, but will allow the Monroe Estate an opportunity to amend the relevant counterclaim.

**CONCLUSION**

For the foregoing reasons, the Movants' motions are GRANTED in part and DENIED in part.  The Movants' motions to dismiss the Monroe Estate's claim for deceptive business practices under General Business Law § 349 are granted.  V. International's motion to dismiss the Monroe Estate's claims for alter-ego liability is also granted without prejudice to the filing of an amended counterclaim.  The Movants' motions to dismiss are denied with respect to all other claims.  The parties are directed to participate in a telephone conference with the Court on **Tuesday, September 29, 2015, at 10:00 a.m.** to discuss next steps in the case.  The parties shall call Chambers at (212) 805-0290 with all parties on the line.

The Clerk of Court is directed to terminate Docket Entry 193.

SO ORDERED.

Dated:     September 18, 2015
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge