the images X One X licenses are illegal and to otherwise further the attempted monopolization of products bearing the image, likeness and/or name of Marilyn Monroe. The ABG parties' claims and threats in this regard are a sham, and are asserted in bad faith to further their monopolistic ambitions.

35. Continued registration of the Contested Marks will damage X One X's business by preventing it and other legitimate competitors from lawfully licensing artistic works utilizing Marilyn Monroe's name and/or image and from creating products from those works for sale to consumers.

36. Additionally, under 15 U.S.C. § 1052(a) the some or all of the Contested Marks unlawfully and falsely suggest a connection between EMMLLC and Marilyn Monroe.

**FIRST CAUSE OF ACTION**
**Cancellation of Trademark Registrations under 15 U.S.C. §§ 1052(f), 1064(3), 1119**
**[Lack of Distinctiveness]**
**(Against EMMLLC Only)**

37. X One X repeats and realleges each and every allegation of paragraphs 1-36, above, as if fully set forth herein.

38. X One X seeks cancellation of the Contested Marks on grounds that they lack distinctiveness.

39. The Contested Marks are generic terms that identify a deceased person. They lack distinctiveness in that they do not identify the source or origin of any product. At most, the Contested marks remind consumers of the famous historical figure Marilyn Monroe, but do not signify any connection at all in the minds of consumers or the relevant public between the ABG Parties and the iconic celebrity.

40. The Contested Marks have not acquired distinctiveness through substantially exclusive and continuous use because countless non-parties have used Marilyn Monroe's name

and/or image in commerce both before and since the ABG Parties use of the Contested Marks in commerce. As a result, the general and relevant public does not identify the Contested Marks with a source or origin or identify them with either EMMLLC or ABG.

41. X One X has been and will continue to be damaged if the registrations of the Contested Marks are not cancelled, as these purported marks form the basis for EMMLLC's meritless claims of false association, infringement, dilution, unfair competition, and intentional interference with prospective economic advantage. Continued registration of the Contested Marks will additionally damage X One X's business by preventing it and other legitimate competitors from lawfully licensing artistic works utilizing Marilyn Monroe's image, likeness and/or name and from creating products from those works for sale to consumers.

42. Based on the facts alleged hereinabove, the Contested Marks lack distinctiveness and should be cancelled pursuant to 28 U.S.C. §§ 2201-2202, 15 U.S.C. 1052(f), 1064(3), and 1119. X One X seeks cancellation of the following registrations in the following classes: Reg. Nos. 1509758 for all classes; 1889730 for all classes; 2180950 for all classes; 2223599 for all classes; 2985935 for all classes; 4040943 for all classes; 4336364 for all classes; 4419275 for all classes; 4487208 for all classes; 4487210 for all classes; 4511420 for all classes; and 4743834 for all classes.

### SECOND CAUSE OF ACTION
**Cancellation of Trademark Registrations under 15 U.S.C §§ 1052(e), 1064(3), 1119**
**[Functionality]**
**(Against EMMLLC Only)**

43. X One X repeats and realleges each and every allegation of paragraphs 1-42, above, as if fully set forth herein.

44. The appearance of Marilyn Monroe's name, likeness and/or stylized signature in the Contested Marks is purely functional; Monroe's name/or stylized signature, as well as

29

Monroe's image, at most may provide some aesthetic appeal to consumers and serve as a product feature. Marilyn Monroe's name as used to describe the famous actress is part of the public domain. Marilyn Monroe's name, likeness and/or stylized signature does not indicate source or origin, but rather is at most an appealing ornamental design on the products themselves and a means by the consuming public (and/or X One X) of free expression. As such, the Contested Marks are not eligible for trademark protection.

45.     Prodlucts bearing Marilyn Monrote's name, image, likeness and/or stylized signature are sold under countless brand names by countless entities independent of the ABG Parties or their predecessors.

46.     If not cancelled, the ABG Parties will continue to utilize the Contested Marks to prevent or interfere with X One X's licensing of any artistic works that incorporate an image of Marilyn Monroe or reference Monroe in an aesthetic design. The ABG Parties seek to prevent every use of Marilyn Monroe's image, likeness or name by X One X. This result would significantly disadvantage X One X by effectively preventing X One X from competing with numerous entities licensing or selling products bearing Monroe's image, likeness, and/or name.

47.     X One X has been and will continue to be damaged if the registrations of the Contested Marks are not cancelled, as these purported marks form the basis for EMMLLC's meritless claims of false association, infringement, dilution, unfair competition, and intentional interference with prospective economic advantage.

48.     Based on the facts alleged hereinabove, the Contested Marks are purely functional and should be cancelled pursuant to 28 U.S.C. §§ 2201 and 2202 and 15 U.S.C. §§ 1052(e), 1119 and 1064(3). X One X seeks cancellation of the following registrations in the following classes: Reg. Nos. 1509758 for all classes; 1889730 for all classes; 2180950 for all classes;

2223599 for all classes; 2985935 for all classes; 4040943 for all classes; 4336364 for all classes; 4419275 for all classes; 4487208 for all classes; 4487210 for all classes; 4511420 for all classes; and 4743834 for all classes.

### THIRD CAUSE OF ACTION
### Third Ground for Trademark Cancellation under 15 U.S.C §§ 1064(3), 1119
### [Fraud]
### (Against EMMLLC Only)

49. X One X repeats and realleges each and every allegation of paragraphs 1-48, above, as if fully set forth herein.

50. On information and belief, in applying for the Contested Marks to the United States Patent and Trademark Office ("USPTO"), the ABG Parties and their predecessors averred under oath that "no other person, firm, or corporation, or association has the right to use the Contested Marks in commerce, either in the identical form thereof or in such near resemblance thereto as may be likely when used in connection with the goods or service of such other person, to cause confusion or to cause mistake, or to deceive."

51. The above-quoted statement was knowingly false in that, at the time of filing their respective applications, the ABG Parties and their predecessors were fully aware that numerous other entities have used identical or substantially similar marks in commerce since the time of Monroe's death and continuing to the present day, that registering the Contested Marks would necessarily cause confusion, mistake or deceive consumers, and that the Contested Marks are not distinctive of the ABG Parties or their predecessors in commerce.

52. X One X is informed and believes and based thereon alleges that the ABG Parties and their predecessors, when applying for trademark registration and prior to issuance of various registrations, falsely and fraudulently claimed use of the various Marilyn Monroe marks for

goods and/or services where no such trademark use had yet been made, thereby resulting in the false and fraudulent issuance of trademark registrations.

53. The ABG Parties and their predecessors deliberately included false representations as to their purported rights to use the Contested Marks with the express intent of inducing the USPTO to grant registration of the Contested Marks.

54. In reasonable reliance upon the false representations of the ABG Parties and their predecessors, the USPTO granted registration of the Contested Marks.

55. X One X has been and will continue to be damaged if the registrations of the Contested Marks are not cancelled, as these purported marks form the basis for EMMLLC's meritless claims of false association, infringement, dilution, unfair competition, and intentional interference with prospective economic advantage.

56. Based on the facts alleged hereinabove, the Contested Marks are subject to cancellation for fraud pursuant to 28 U.S.C. §§ 2201 and 2202 and under 15 U.S.C §§ 1064(3) and 1119. X One X seeks cancellation of the following registrations in the following classes: Reg. Nos. 1509758 for all classes; 1889730 for all classes; 2180950 for all classes; 2223599 for all classes; 2985935 for all classes; 4040943 for all classes; 4336364 for all classes; 4419275 for all classes; 4487208 for all classes; 4487210 for all classes; 4511420 for all classes; and 4743834 for all classes.

### FOURTH CAUSE OF ACTION
**Attempted Monopolization of Trade or Commerce in Violation of the Sherman Act under 15 U.S.C. § 2**
**(Against All Counterclaim Defendants)**

57. X One X repeats and realleges each and every allegation of paragraphs 1-56, above, as if fully set forth herein.

58. On information and belief, all of the following actions were undertaken in

furtherance of the conspiracy among all Counterclaim Defendants to monopolize the market of products that bear Monroe's image, likeness and/or name

59.  The ABG Parties have asserted a putative right of publicity not recognized by controlling law in furtherance of their unlawful attempt to monopolize the market of products bearing the image, likeness and/or name of Marilyn Monroe. The ABG Parties falsely and continuously claim to own "Rights of Publicity and Persona Rights" in Marilyn Monroe to prevent other merchants from lawfully selling Marilyn Monroe-related products. They persist in this fictional right by misleadingly and falsely indicating that EMMLLC is actually Marilyn Monroe's estate or its representatives. The ABG Parties' actions have been undertaken despite, and in contradiction to, judicial precedent establishing that they may not assert postmortem rights of publicity regarding Marilyn Monroe.

60.  Marilyn Monroe's image, likeness and name are so unique that there is no practical substitute for either Monroe's image, likeness or name on a product. Fans of Monroe or consumers purchasing products with Marilyn Monroe's image, likeness and/or name have no adequate substitute products for those that bear Monroe's image, likeness and/or name. These consumers' purchase of Marilyn Monroe-related products is a highly selective and subjective choice. Monroe reinvented the concept of "celebrity" and remains an icon of unparalleled caliber. Monroe's image, likeness and/or name have distinct customers and distinct uses.

61.  Products bearing Marilyn Monroe's image, likeness and/or name are marketed and/or advertised as products related to Marilyn Monroe; for example, a t-shirt is advertised as a "Marilyn Monroe t-shirt" or "Marilyn Monroe poster" rather than merely a "t-shirt." Generally, products are not advertised in a trademark sense, such as MARILYN MONROE® brand t-shirt, or MARILYN MONROE™ brand posters. Regardless of the brand (i.e., trademark) that

Marilyn Monroe related-products are sold under (and such products are sold under countless brand names by countless companies), in the vast majority of instances, the image, likeness and/or name of Marilyn Monroe is not being used as a trademark, but rather as an ornamental design on the products themselves (or as a means of advertising and/or marketing goods and services by using Marilyn Monroe's image, likeness and/or name in a non-trademark manner).

62.   ABG claims to be the exclusive licensor of products bearing Marilyn Monroe's image, likeness and name and seeks to prevent any use of Marilyn Monroe's image, likeness and name on all products in the market absent its consent. Salter and ABG's attempted monopolization of the market of Marilyn Monroe-related products prevents any other entity from lawfully using Marilyn Monroe's image, likeness or name in commerce and unlawfully discourages registered copyright holders and those who want to use public domain images of Marilyn Monroe.

63.   As Salter has stated, Salter and ABG's aim is to control the use of Marilyn Monroe's image, likeness and name in commerce and to consolidate all Marilyn Monroe-related products under ABG's own "roof." Towards this end, the ABG Parties have sent of dozens cease and desist letters intended to prevent merchants from lawfully selling Marilyn Monroe-related products, including merchants X One X licenses images to. ABG uses sham "threatening lawyer's letters" as part of its business strategy.

64.   ABG sends sham cease and desist letters regardless of whether entities utilize any purported trademarks owned by EMMLLC, but rather ABG threatens sham legal action over any use of any image of Marilyn Monroe, or use of her name, on any goods or in connection with any services. ABG sends cease and desist letters where neither ABG nor EMMLLC owns valid trademark rights in the disputed products. These unlawful threats of sham litigation have the

effect of deterring lawful competition in the marketplace and have undermined and interfered with X One X's ability to license its Marilyn Monroe images (as well as X One X's licensees' ability to market products bearing an image of Marilyn Monroe).

65. ABG, at Salter's authorization, deceptively and falsely purports that EMMLLC is the Estate of Marilyn Monroe and/or related to the late Marilyn Monroe herself in order to position itself as: 1) the rightful owner of sweeping intellectual property rights in Marilyn Monroe; and 2) the owner of the nonexistent purported "exclusive right" to utilize Marilyn Monroe's image, likeness and name in commerce. ABG and Slater then coerce retailers and licensees not to purchase Marilyn Monroe-related products from competing entities.

66. On information and belief, ABG manages the website www.marilynmonroe.com, which purports to be a fan website for Marilyn Monroe's fans but directs visitors to purchase products licensed by the ABG Parties. ABG sends baseless cease and desist letters in an attempt to prevent other individuals and entities from registering or maintaining websites related to Marilyn Monroe in an effort to direct Marilyn Monroe fans to purchase products licensed by the ABG Parties.

67. ABG has attempted to prevent lawful copyright owners, including X One X, from competing in the market of Marilyn-Monroe related products. ABG requires photographers and artists who own copyrights in images of Marilyn Monroe to pay ABG licensing fees to continue to compete in the market of Marilyn Monroe-related products. ABG subsequently gains control as a licensor over these copyright owners and their use of images of Monroe despite litigation determining that copyright owners may lawfully sell and use Monroe's image without approval from the ABG Parties' predecessors and that Monroe's persona is within the public domain. (See the Monroe Litigation.)

68. ABG either threatens sham litigation and/or abuses the litigation process in EMMLLC's name to unlawfully enforce its attempted monopoly over Marilyn Monroe-related products, including naming X One X a Counter-Defendant in the instant litigation. This litigation, including the counterclaim against X One X (and the other counter-defendants) is a sham filed in bad faith in order to achieve the ABG Parties' unlawful goal of monopolizing the market for goods and services that use the image, likeness and/or name of Marilyn Monroe.

69. X One X has been directly injured by ABG and Salter, who have falsely advised licensees of X One X's images that the ABG Parties own exclusive rights to Marilyn Monroe's image and that X One X and X One X's owner, Leo Valencia, do not own rights in X One X-licensed images of Monroe, resulting in lost licensing opportunities for X One X. ABG and Salter have unlawfully coerced licensees and retailers not to license from X One X or do business with X One X or other competing entities.

70. On information and belief, ABG has sought to create a vertical scheme with its affiliate Leonard Green & Partners. ABG is partially owned by Leonard Green & Partners, L.P. Under this arrangement, ABG assures licensees that their ABG-licensed Marilyn Monroe-related products will sell exclusively in retailers owned by Leonard Green & Partners. The effect and intent of these vertical arrangements is to further the ABG Parties' attempted monopolization and preclude any other lawful competitor, including X One X, from licensing or selling its Marilyn Monroe-related products in the retailers owned by the Leonard Green & Partners. Additionally, Leonard Green & Partners continues to acquire retail chains with the intent to keep lawful competitors from licensing or selling Marilyn Monroe-related products in such retailers. These vertical arrangements, coupled with the other false, deceptive and illegal acts alleged herein as committed by Counterclaim Defendants, were done in furtherance of the Counterclaim