UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

A.V.E.L.A., INC.,

                           Plaintiff,

           v.

THE ESTATE OF MARILYN MONROE, LLC, *et al.*,

                       Defendants.

       12 Civ. 4828 (KPF)

------------------------------------------------------------X

       OPINION AND ORDER

THE ESTATE OF MARILYN MONROE, LLC,

                   Counterclaimant,

           v.

A.V.E.L.A., INC.,

                 Counter-Defendant,

LEO VALENCIA, IPL, INC.,
X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

              Third-Party Defendants.

------------------------------------------------------------X

X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

                Counterclaimants,

           v.

THE ESTATE OF MARILYN MONROE, LLC,
AUTHENTIC BRANDS GROUP, LLC, JAMES
SALTER, LEONARD GREEN & PARTNERS, L.P.

              Counter-Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   March 13, 2017

KATHERINE POLK FAILLA, District Judge:

This Opinion is the latest installment of a multi-party, multi-claim, and multi-year intellectual-property dispute.  What began in 2012 as a declaratory-judgment action has transmogrified into a sprawling conflict raising issues of trademark, antitrust, and state business law.  And at the center of this controversy is one of the most iconic entertainers of the twentieth century: Marilyn Monroe.

In *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196 (S.D.N.Y. 2015) ("*AVELA I*"), this Court granted in part the motions of X One X Movie Archives Inc. ("X One X") and V. International Fine Arts Publishing, Inc. ("V. International") to dismiss the First Amended Counterclaim (the "FAC") of the Estate of Marilyn Monroe, LLC (the "Monroe Estate").  In the wake of *AVELA I*, X One X and V. International filed separate answers to the FAC, and brought counterclaims of their own against the Monroe Estate, Authentic Brands Group LLC ("ABG"), James Salter ("Salter") (together, the "Estate Movants"), and Leonard Green & Partners, L.P. ("LGP").[1]

Now, the shoe is on the other foot.  Pending before the Court are two motions to dismiss X One X's and V. International's counterclaims:  one filed by the Estate Movants, and another filed by LGP.  Both motions urge this

---

[1]     As this Opinion's caption makes plain, the parties' roles have changed throughout the course of this labyrinthine litigation.  The initial Complaint named the Monroe Estate as a Defendant.  (Dkt. #1).  For the purposes of *AVELA I.*, the Monroe Estate was a Counterclaimant, while V. International and X One X were Third-Party Defendants. (Dkt. #215).  And with regard to the instant Opinion, V. International and X One X are both Counterclaimants, while the Estate Movants and LGP are all Counter-Defendants. (Dkt. #219, 257).  The Court provides a more thorough account of this case's post-*AVELA I* procedural history *infra*.

Court to dismiss X One X's and V. International's counterclaims in their entirety.

This, the Court will not do.  To be clear, X One X and V. International assert many legal conclusions, but few factual allegations.  And for that reason, the Court will dismiss several of their counterclaims.  But some of X One X's and V. International's counterclaims raise fact-intensive issues that the Court cannot resolve at this stage.  Others are supported by just enough factual allegations to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Accordingly, and for the reasons set forth below, LGP's motion to dismiss is granted, and the Estate Movants' motion to dismiss is granted in part and denied in part.  The Court grants the requests of X One X and V. International for leave to replead; however, the Court expects each to consider this Opinion carefully in deciding whether and what to replead.

## BACKGROUND[2]

The facts and history of this case are set forth in *AVELA I.  See* 131 F. Supp. 3d at 200-03.  V. International and X One X, however, offer their own

---

[2]    This case draws on facts from the Answer of [V. International] to First Amended Counterclaim, and Related Counterclaims ("V Int'l Countercl." (Dkt. #219)), and from the Answer of [X One X] to First Amended Counterclaim, and Related (Amended) Counterclaims ("X One X Am. Countercl." (Dkt. #257)).  For the purpose of adjudicating the Estate Movants' and LGP's motions to dismiss, the Court accepts as true the well-pleaded allegations in these counterclaims.  *See, e.g., Growblox Scis., Inc.* v. *GCM Admin. Servs., LLC*, No. 14 Civ. 2280 (ER), 2016 WL 1275050, at *6 (S.D.N.Y. Mar. 31, 2016).  For ease of reference, the Court refers to the Estate Movants' opening brief as "Estate Br." (Dkt. #251); to V. International's and X One X's briefs in opposition to the Estate Movants' motion to dismiss as "V. Int'l Estate Opp." (Dkt. #258) and "X One X Estate Opp." (Dkt. #260), respectively; and to the Estate Movants' reply as "Estate Reply" (Dkt. #267).  Similarly, the Court will refer to LGP's opening brief as "LGP Br." (Dkt. #270), to X One X's opposition as "X One X LGP Opp." (Dkt. #273), and to LGP's reply as "LGP Reply" (Dkt. #274).

narrative of this case's operative events.[3]  The Court will summarize that narrative here, then recount how this case's procedural history has developed since *AVELA I.*

## A.   Factual Background

### 1.   The Parties

V. International is a California corporation that "operates as a licensing agent for A.V.E.L.A."  (V. Int'l Countercl. ¶ 1).  X One X is a Nevada corporation that performs a similar function:  It "creat[es] new artistic works," "obtains copyrights" for those works, then "licenses these artistic works to third parties."  (X One X Am. Countercl. ¶ 1).

The Monroe Estate "is a Delaware limited liability company [('LLC')] with its principal place of business" in New York.  (V. Int'l Countercl. ¶ 2; X One X Am. Countercl. ¶ 2).  V. International and X One X allege that the Monroe Estate is in fact an alter ego of ABG, another Delaware LLC "with its principal place of business" in New York.  (V. Int'l Countercl. ¶¶ 2-3; X One X Am. Countercl. ¶¶ 2-3).  To this end, V. International and X One X allege that ABG and the Monroe Estate operate out of the same address, "share the same" management, and that "[w]ritten communications sent on behalf of [the Monroe Estate] are printed on ABG letterhead," with the ultimate effect that the Monroe Estate "functions as a mere facade or instrumentality for ABG."  (V. Int'l

---

[3]    Although X One X and V. International have filed separate counterclaims, they rely on essentially the same facts.  (*Compare* V. Int'l Countercl. ¶¶ 10-32, *with* X One X Am. Countercl. ¶¶ 11-36).  Nonetheless, for clarity's sake, in this Opinion the Court will cite to the factual allegations in both parties' counterclaims.

Countercl. ¶ 10; X One X Am. Countercl. ¶ 11).  Salter is ABG's and the Monroe Estate's Chief Executive Officer.  (V. Int'l Countercl. ¶ 4; X One X Am. Countercl. ¶ 4).  Finally, LGP is a Delaware private-equity firm with its principal place of business in California; it owns several chain retail stores.  (X One X Am. Countercl. ¶ 5).

### 2.    The Estate Movants' and LGP's Alleged Misconduct

At root, this is a dispute over 12 registered word- and design-trademarks involving Monroe (the "Contested Marks").  (V. Int'l Countercl. ¶ 25; X One X Am. Countercl. ¶ 28).[4]  Although neither V. International nor X One X indicates as much in their counterclaims, the Court adds that at least eight of the Contested Marks use the words "Marilyn" or "Marilyn Monroe."  *AVELA I*, 131 F. Supp. 3d at 201.

The Monroe Estate and MM-ABG LLC, "a subordinate entity" of the Monroe Estate, own the Contested Marks.  (V. Int'l Countercl. ¶¶ 19, 25; X One X Am. Countercl. ¶¶ 22, 28).  All of the Contested Marks were registered after Marilyn Monroe's death in 1962.  (V. Int'l Countercl. ¶¶ 15, 17, 20, 23-25; X One X Am. Countercl. ¶¶ 18, 20, 23, 26-28).

It is the shared contention of X One X and V. International that, despite owning the Contested Marks, the Estate Movants do not hold "exclusive rights to intellectual property related to Marilyn Monroe."  (V. Int'l Countercl. ¶ 26; X One X Am. Countercl. ¶ 29).  During her lifetime, Monroe was photographed

---

[4]     The Contested Marks' Registration Numbers are: 1509758, 1889730, 2180950, 2223599, 2985935, 4040943, 4336364, 4419275, 4487208, 4487210, 4511420, and 4743834.  (V. Int'l Countercl. ¶ 25; X One X Am. Countercl. ¶ 28)

frequently, and today many individuals and entities claim "to own copyrights in images of" her.  (V. Int'l Countercl. ¶ 27; X One X Am. Countercl. ¶ 30).  And trademarks involving Monroe abound:  There are trademarks and copyrights in films in which Monroe starred, characters Monroe portrayed, and Monroe's name.  (V. Int'l Countercl. ¶ 28; X One X Am. Countercl. ¶ 31).

X One X and V. International further contend that the Estate Movants act, improperly, as if they alone may lay claim to intellectual property in Monroe.  Indeed, even the Monroe Estate's full name — "Estate of Marilyn Monroe, LLC" — is alleged to be a misleading contrivance, given that this entity is *not* in fact Monroe's estate.  (V. Int'l Countercl. ¶¶ 21, 29; X One X Am. Countercl. ¶¶ 24, 33).  And central to the Estate Movants' efforts at deception are the Contested Marks, which are merely "strategic litigation tools" that ABG (through the Monroe Estate) uses to assert dominion over "Monroe's image, likeness, and name in commerce."  (V. Int'l Countercl. ¶ 29; X One X Am. Countercl. ¶ 33).  The Contested Marks, too, erroneously and unlawfully suggest an actual connection between the Monroe Estate and Monroe herself. (V. Int'l Countercl. ¶ 32; X One X Am. Countercl. ¶ 36).

The Estate Movants' ultimate goal, V. International and X One X allege, is "to gain a monopoly over every use of Marilyn Monroe's image, likeness and/or name in commerce."  (V. Int'l Countercl. ¶ 30; X One X Am. Countercl. ¶ 34).  In furtherance of this goal, the Estate Movants, misusing the Contested Marks, threaten to file and file lawsuits against entities such as X One X and V. International's licensees.  (V. Int'l Countercl. ¶ 30; X One X Am. Countercl.

6

¶ 34). And in conjunction with LGP, ABG has endeavored "to create a vertical scheme" by "assur[ing] [its] licensees that their ABG-licensed Marilyn Monroe-related products will sell exclusively in retailers owned by [LGP]." (X One X Am. Countercl. ¶ 70).

The Estate Movants also stifle competition in ways that do not involve legal process. X One X alleges that Salter denounced its owner, Leo Valencia, as a "bootlegger" at a trade show, then proclaimed that he "own[ed] Marilyn Monroe." (X One X Am. Countercl. ¶ 32). Salter has also discouraged retailers from working with X One X, and "has publicly and privately threatened to shut down X One X and Valencia's licensing of artwork featuring Marilyn Monroe's image." (*Id.*).

Again, the crux of V. International's and X One X's counterclaims is the Contested Marks. They allege that the Contested Marks' "[c]ontinued registration" will facilitate the Estate Movants' and LGP's monopolistic efforts and, in the process, damage V. International's and X One X's business. (V. International Countercl. ¶ 31; X One X Am. Countercl. ¶ 35).

**B.    Procedural Background**

**1.    Motion Practice After *AVELA I***

On September 18, 2015, the Court issued *AVELA I*, which recounts this case's procedural history through that date. *AVELA I*, 131 F. Supp. 3d at 203. *AVELA I* denied the bulk of V. International's and X One X's motions to dismiss the FAC. *Id.* at 219.

On October 30, 2015, X One X and V. International filed separate answers to the FAC and brought counterclaims of their own.  (Dkt. #219, 223).  V. International brought counterclaims against all three of the Estate Movants.  (Dkt. #219, ¶¶ 2-4).  X One X named the Estate Movants and LGP as counter-defendants.  (Dkt. #223, ¶¶ 2-5).

Here is where the procedural history underlying the instant Opinion becomes complicated.  On November 20, 2015, the Monroe Estate filed a letter announcing its intention to move to dismiss all of X One X's and V. International's counterclaims.  (Dkt. #231).  And on February 11, 2016, the Court issued an endorsement setting a briefing schedule for the Estate Movants' motion to dismiss.  (Dkt. #243).[5]

Pursuant to the February 11, 2016 endorsement, the Estate Movants filed their motion to dismiss on March 4, 2016.  (Dkt. #250).  Three days later, LGP submitted a letter indicating that it, too, wished to move to dismiss X One X's counterclaims.  (Dkt. #253).

The Court held a pre-motion conference on LGP's proposed motion to dismiss on March 22, 2016.  (Dkt. #263).  During the conference, counsel for X

---

[5]     The February 10, 2016 endorsement also set page limits for opening (35 pages), opposition (35 pages), and reply (15 pages) briefs.  (Dkt. #243, at 2).  The Estate Movants argue that X One X and V. International disobeyed the Court's endorsement, because X One X filed a 35-page opposition brief, and V. International filed a 12-page opposition brief.  (Estate Reply 1 n.1).  The Estate Movants also fault V. International for incorporating by reference large portions of X One X's brief.  (*Id.*).  It was the Court's expectation that X One X and V. International would file a joint 35-page opposition brief or, alternately, separate briefs with a collective page count of 35.  But the February 10, 2016 endorsement did not *explicitly* forbid V. International and X One X from submitting the opposition briefs they did.  X One X and V. International, then, violated the spirit, but not the letter, of the February 10, 2016 endorsement.  If and when the Court issues future endorsements in this case, it will expect X One X and V. International to honor them faithfully.

One X stated that he wanted to amend X One X's counterclaims in light of arguments that LGP's counsel had raised. (*Id.* at 16-18). The Estate Movants' counsel raised a concern: that amended counterclaims from X One X could effectively moot the Estate Movants' then-pending motion to dismiss. (*Id.* at 22-23). As an accommodation, the Court — believing that X One X's amendments would have little effect on its counterclaims vis-à-vis the Estate Movants — offered to "work with" the Estate Movants to set a potential surreply schedule. (*Id.* at 23).

One week after the pre-motion conference, X One X filed a letter attaching a redlined version of its amended counterclaims (Dkt. #256), then filed a final version of the same on March 31, 2016 (Dkt. #257). The following day — April 1, 2016 — X One X and V. International filed separate briefs opposing the Estate Movants' motion to dismiss. (Dkt. #258, 260). That same day, the Court issued a scheduling order setting a briefing schedule for LGP's motion to dismiss. (Dkt. #259).

On April 4, 2016, the Estate Movants filed a letter requesting (i) an extension of time to file their reply brief and (ii) five additional pages for the brief, which would "obviate any need for" new briefing on X One X's amended counterclaims. (Dkt. #261). The Court issued an endorsement granting both of the Estate Movants' requests that same day. (Dkt. #262).

Briefing on the Estate Movants' motion to dismiss concluded when the Estate Movants filed their reply on April 15, 2016. (Dkt. #267). Briefing on LGP's motion to dismiss began on May 2, 2016, when LGP filed its opening

brief. (Dkt. #270). X One X responded on June 1, 2016 (Dkt. #273), and all briefing for this Opinion concluded when LGP filed its reply on June 15, 2016 (Dkt. #274).

### 2. V. International's and X One X's Counterclaims

Lest they be lost in the thicket of these parallel briefing schedules, the operative counterclaims are V. International's October 30, 2015 counterclaims (Dkt. #219), and X One X's March 31, 2016 amended counterclaims (Dkt. #257). Both parties bring seven counterclaims. Broadly speaking, the counterclaims fall into three categories: (i) trademark claims, (ii) antitrust claims, and (iii) state-law claims.

V. International brings seven counterclaims against the Estate Movants, although it fails to specify the parties against whom it brings each counterclaim:

(i) Counterclaim One — Trademark Cancellation, Lack of Distinctiveness: V. International seeks to cancel the Contested Marks on the ground of "lack of distinctiveness." (V. Int'l Countercl. ¶¶ 33-38).

(ii) Counterclaim Two — Trademark Cancellation, Functionality: V. International argues that the Contested Marks should be cancelled because they are functional. (*Id.* at ¶¶ 39-44).

(iii) Counterclaim Three — Trademark Cancellation, Fraud: V. International argues that the Estate Movants committed fraud on the United States Patent and Trade Office ("USPTO") when they applied for the Contested Marks. (*Id.* at ¶¶ 45-52).

(iv) Counterclaim Four — Attempted Monopolization: V. International contends that the Estate Movants have violated Section Two of the Sherman Act, 15 U.S.C. § 2. (*Id.* at ¶¶ 53-70).

(v)     <u>Counterclaim Five — New York General Business Law Section 349</u>:  V. International alleges that the Estate Movants have committed deceptive acts and practices in violation of New York law.  (*Id.* at ¶¶ 71-78).

(vi)     <u>Counterclaim Six — Tortious Interference with Existing Contractual Relationships Under New York Law</u>:  The Estate Movants, V. International claims, disrupted two contracts that created licensing arrangements for V. International.  (*Id.* at ¶¶ 79-86).

(vii)     <u>Counterclaim Seven — Intentional Interference with Prospective Economic Advantage Under New York Law</u>:  Finally, V. International alleges that the Estate Movants interfered with a prospective licensing agreement into which V. International planned to enter.  (*Id.* at ¶¶ 87-94).

X One X brings seven very similar counterclaims against the Estate Movants and LGP; the Court will note where they differ in substance from V. International's counterclaims.  Unlike V. International, X One X specifies the parties against whom it brings its counterclaims:

(i)     <u>Counterclaim One — Trademark Cancellation, Lack of Distinctiveness</u> (against the Monroe Estate).  (X One X Am. Countercl. ¶¶ 37-42).

(ii)     <u>Counterclaim Two — Trademark Cancellation, Functionality</u> (against the Monroe Estate).  (*Id.* at ¶¶ 43-48)

(iii)     <u>Counterclaim Three — Trademark Cancellation, Fraud</u> (against the Monroe Estate).  (*Id.* at ¶¶ 49-56).

(iv)     <u>Counterclaim Four — Attempted Monopolization</u> (against the Estate Movants and LGP):  X One X adds a slight gloss to V. International's Sherman Act counterclaim.  X One X alleges that the Estate Movants and LGP have conspired to monopolize the Monroe market.  (*Id.* at ¶ 58).  X One X also alleges that ABG and LGP have attempted to create a vertical scheme pursuant to which ABG funnels its licensees' products into stores that LGP owns.  (*Id.* at ¶ 70).

11

(v)     <u>Counterclaim Five — New York General Business Law Section 349</u> (against the Estate Movants and LGP).  (*Id.* at ¶¶ 76-83).

(vi)    <u>Counterclaim Six — Attempted Monopolization Under the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. §§ 598A.010-598A.280</u> (against the Estate Movants and LGP):  The Nevada Unfair Trade Practices Act (the "NUPTA") mirrors the Sherman Act.  In this counterclaim, X One X repackages its antirust argument from Counterclaim Four.  (*Id.* at ¶¶ 84-91).

(vii)   <u>Counterclaim Seven — Unfair Competition Under Nevada Law</u> (against the Estate Movants and LGP):  Finally, X One X alleges that the Estate Movants' and LGP's collective misconduct violated Nevada common law.  (*Id.* at ¶¶ 92-95).

## DISCUSSION

## A.     Motions to Dismiss Counterclaims Under Rule 12(b)(6)

"A motion to dismiss a counterclaim for failure to state a claim is evaluated using the same standard as a motion to dismiss a complaint." *AVELA I*, 131 F. Supp. 3d at 203.  "On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive."  *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"[A]lthough a court" adjudicating a Rule 12(b)(6) motion "must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to save a complaint from dismissal. *Iqbal*, 556 U.S. at 678. In sum, "[a] motion to dismiss should be granted 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Nielsen* v. *AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).

## B.    The Estate Movants' and LGP's Motions to Dismiss

Before the Court are fourteen counterclaims, seven briefs, and six parties. To be sure, there is plenty of overlap between V. International's and X One X's counterclaims and, by extension, the Estate Movants' and LGP's motions to dismiss. But the sheer number of counterclaims at issue, and the unorthodox briefing schedule occasioned by X One X's decision to amend its counterclaims, both work to make this Opinion a complex one.

The chief flaw in X One X's and V. International's counterclaims is that they contain few well-pleaded factual allegations. Because of these pleading deficiencies, the Court will grant the Estate Movants' motion to dismiss insofar as it seeks dismissal of: (i) V. International's and X One X's Third

Counterclaims (fraud on the USPTO); (ii) V. International's and X One X's Fourth Counterclaims (attempted monopolization under the Sherman Act); (iii) V. International's and X One X's Fifth Counterclaims (Section 349 of the New York General Business Law); (iv) V. International's Sixth Counterclaim (New York tortious interference with contract); (v) X One X's Sixth Counterclaim (attempted monopolization under the NUPTA); and (vi) X One X's Seventh Counterclaim (Nevada unfair competition).

The Court grants LGP's motion in full.  Again, V. International brings no counterclaims against LGP.  X One X does, and the Court will dismiss all of X One X's counterclaims that name LGP as a defendant:  (i) X One X's Fourth Counterclaim (attempted monopolization under the Sherman Act); (ii) X One X's Fifth Counterclaim (Section 349); (vi) X One X's Sixth Counterclaim (attempted monopolization under the NUPTA); and (vii) X One X's Seventh Counterclaim (Nevada unfair competition).  However, as explained further *infra*, the dismissals are without prejudice, and X One X and V. International are given leave to replead.

Resolution of the motions to dismiss leaves the following counterclaims intact:  (i) V. International's and X One X's First Counterclaims (trademark cancellation for "lack of distinctiveness"); (ii) V. International's and X One X's Second Counterclaims (trademark cancellation for functionality); and (iii) V. International's Seventh Counterclaim (intentional interference with prospective economic advantage).  These counterclaims either rely on fact-specific causes of action or are substantiated by factual allegations sufficient to pass

14

Rule 12(b)(6)'s muster.  In turn, the Court cannot dismiss these counterclaims at this stage.

The rest of this Opinion proceeds as follows.  The Court will begin by addressing V. International's counterclaims:  It will consider V. International's theory that the Monroe Estate is ABG's alter ego, then analyze sequentially all seven of V. International's counterclaims.  The Court will then perform a similar analysis of X One X's counterclaims.  Finally, the Court will explain why it is denying without prejudice X One X's and V. International's counterclaims.

### 1.   V. International's Counterclaims

#### a.   V. International Has Not Established That the Monroe Estate Is ABG's Alter Ego

##### i.   Applicable Law

"New York's choice of law rules provide that the law of the state of incorporation determines when the corporate form will be disregarded and liability will be imposed on shareholders."  *VFS Fin., Inc.* v. *Falcon Fifty LLC*, 17 F. Supp. 3d 372, 381 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).  Because the Monroe Estate is a Delaware LLC (V. Int'l Countercl. ¶ 2; X One X Am. Countercl. ¶ 2), the Court will look to Delaware law to address V. International's argument that the Monroe Estate is ABG's alter ego.

"Under Delaware law," an LLC "provides '[ ]limited liability akin to the corporate form.'"  *De Sole* v. *Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 665 (S.D.N.Y. 2015) (footnote omitted) (quoting *NetJets Aviation, Inc.* v. *LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir. 2008)).  Accordingly, "the members

of an LLC generally are not liable for the debts of the entity, and a plaintiff seeking to persuade a Delaware court to disregard [an LLC's] corporate structure faces 'a difficult task[.]'" *NetJets*, 537 F.3d at 176 (quoting *Harco Nat'l Ins. Co.* v. *Green Farms, Inc.,* Civ. A. No. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989)); *see also Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401-02 (S.D.N.Y. 2013) (because "Delaware courts especially take the corporate form very seriously and will disregard it only in the exceptional case[,]" a plaintiff arguing that a court should disregard the corporate form "faces a heavy burden" (internal quotation marks and citation omitted)).

However, Delaware law permits a Court to disregard these protections and pierce an LLC's veil in one of two circumstances:  (i) "where there is fraud" or (ii) "where [the LLC] is in fact a mere instrumentality or alter ego of its owner." *NetJets*, 537 F.3d at 176 (internal quotation mark omitted) (quoting *Geyer* v. *Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).  A plaintiff arguing that an LLC is the alter ego of another entity must make two showings: (i) that "the entities in question operated as a single economic entity," and (ii) that "there [is] an overall element of injustice or unfairness." *Id.* at 177.

Factors relevant to this first, "single economic entity" showing include:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

16

*Knoedler Gallery*, 139 F. Supp. 3d at 665 (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995)); *see also NetJets*, 537 F.3d at 178 (principles relevant to piercing veil of Delaware corporations "are generally applicable as well where one of the entities in question is an LLC rather than a corporation," but "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required").

To make the second, "injustice or unfairness" showing, a plaintiff must establish that the LLC "effectively … exist[s] as a sham or shell through which the parent … perpetrates injustice." *Knoedler Gallery*, 139 F. Supp. 3d at 665 (internal quotation mark omitted) (quoting *Nat'l Gear*, 975 F. Supp. 2d at 406). The "injustice or unfairness" must be "the result of an abuse of the corporate form" and "must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit." *Id.* (internal quotation marks and citation omitted).

### ii.    Analysis

V. International argues that the Court should hold ABG liable for the Monroe Estate's wrongdoing because the Monroe Estate is ABG's alter ego. Because V. International has alleged virtually no facts to substantiate this claim, the Court rejects its alter-ego theory of liability against the Monroe Estate and ABG.

To establish that the Monroe Estate is ABG's alter ego, V. International must allege plausibly (i) that the Monroe Estate and ABG "operate[ ] as a single economic entity" and (ii) that "there [is] an overall element of injustice or

unfairness." *NetJets*, 537 F.3d at 177.  V. International has made neither showing.

To start, V. International has not established that ABG and the Monroe Estate function as the same entity within the meaning of Delaware law.  By V. International's account, the two entities share senior employees, offices, and letterhead.  (V. Int'l Countercl. ¶ 10).  Those allegations, as the Estate Movants argue (Estate Br. 7-8), do not speak to any of the factors Delaware courts consider when deciding whether an LLC is an alter ego of another entity.  *See Knoedler Gallery*, 139 F. Supp. 3d at 665 (quoting *Atex*, 68 F.3d at 1458). V. International does allege that the Monroe Estate "is a mere corporate shell over which ABG maintains ownership" and that it "functions as a mere facade or instrumentality for ABG."  (V. Int'l Countercl. ¶ 10).  But those are not factual allegations; they are legal conclusions.  And the Court need not accept them when analyzing whether V. International has alleged plausibly that the Monroe Estate is ABG's alter ego.  *Iqbal*, 556 U.S. at 678.

Nor has V. International shown "an overall element of injustice or unfairness" inherent in the relationship between ABG and the Monroe Estate. Affording the Monroe Estate limited liability, V. International argues, "would not promote justice in that it may permit ABG to insulate itself from liability for injuries it caused V[.] International to suffer as a result of its improper conduct."  (V. Int'l Countercl. ¶ 11).  What V. International does *not* allege is that respecting the Monroe Estate's LLC form would promote an injustice separate and apart from the causes of action V. International brings in its

counterclaims.  Cf. *Knoedler Gallery*, 139 F. Supp. 3d at 665 (internal

quotation marks and citation omitted).  Here again, V. International has not

alleged facts relevant to this Court's alter-ego analysis.

The Court recognizes that alter-ego theories of liability "are generally fact

intensive." *Credit Suisse Sec. (USA) LLC* v. *W. Coast Opportunity Fund, LLC*,

Civ. A. No. 4380 (VCN), 2009 WL 2356881, at *3 n.23 (Del. Ch. July 30, 2009).

And for that reason, whether an LLC's form should be disregarded is a question

"generally submitted to the jury." *Overton* v. *Art Fin. Partners LLC*, 166 F.

Supp. 3d 388, 404 (S.D.N.Y. 2016) (internal quotation mark and citation

omitted).  But V. International has fallen far short of alleging plausibly that the

Monroe Estate is ABG's alter ego:  Its factual allegations on this score are scant

and irrelevant.  In consequence, the Court rejects V. International's claim that

the Monroe Estate is ABG's alter ego.

> **b.     V. International Counterclaim One: Fact Issues Preclude
> the Court from Dismissing V. International's Claim That
> the Contested Marks Should Be Cancelled for Lack of
> Distinctiveness**

> **i.      Applicable Law**

V. International's First, Second, and Third Counterclaims all call for the

Court to cancel the Contested Marks on various grounds.  Here, the Court

considers a few general principles relevant to these three counterclaims, then

specifically addresses the rationale V. International advances in Counterclaim

One — that the Contested Marks "lack distinctiveness."

"Under the Lanham Act, registration of a trademark constitutes prima

facie evidence of the trademark's validity, and the registrant's ownership and

exclusive right to use the mark." *Schutte Bagclosures Inc.* v. *Kwik Lok Corp.*, 193 F. Supp. 3d 245, 257 (S.D.N.Y. 2016) (citing 15 U.S.C. §§ 1057(b), 1115(a)).  Once a registered trademark is in use "for five consecutive years," it becomes "incontestable."  *Id.*; 15 U.S.C. § 1065.  And registration of an incontestable mark is "*conclusive* evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b) (emphasis added).

But even an incontestable trademark can be cancelled for one of the limited reasons enumerated in Section 14 of the Lanham Act, 15 U.S.C. § 1064(3).  *See Patsy's Italian Rest., Inc.* v. *Banas*, 658 F.3d 254, 266 (2d Cir. 2011).  Indeed, a trademark may be cancelled "[a]t any time if" it falls into one of the categories listed in § 1064(3).  As relevant to V. International's Counterclaim One, a court can cancel an incontestable trademark if it "becomes the generic name for less than all of the goods or services, or a portion thereof, for which it is registered."  15 U.S.C. § 1064(3).

"Generic marks … 'consist[ ] of words that identify the type or species of goods or services to which they apply, [and that] are totally lacking in distinctive quality.'"  *KatiRoll Co.* v. *Kati Junction, Inc.*, No. 14 Civ. 1750 (SAS), 2015 WL 5671881, at *3 (S.D.N.Y. Sept. 25, 2015) (quoting *TCPIP Holding Co.* v. *Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)).  "Generic marks tend to be nouns that refer to an entire class of products."  *Thoip* v. *Walt Disney Co.*, 736 F. Supp. 2d 689, 703 (S.D.N.Y. 2010).  Examples of generic marks include:

"Shampoo," "automobile," and "[a]spirin."  *Classic Liquor Importers, Ltd.* v.
*Spirits Int'l B.V.*, — F. Supp. 3d —, No. 15 Civ. 6503 (JSR), 2016 WL 4419457,
at *6 (S.D.N.Y. Aug. 19, 2016); *KatiRoll*, 2015 WL 5671881, at *3.  Because
generic trademarks "are not at all distinctive," they "are not protectable under
any circumstances."  *Star Indus., Inc.* v. *Bacardi & Co.*, 412 F.3d 373, 385 (2d
Cir. 2005); *accord Genesee Brewing Co.* v. *Stroh Brewing Co.*, 124 F.3d 137,
143 (2d Cir. 1997) ("Generic marks are never entitled to trademark
protection.").

### ii.    Analysis

V. International argues that the Court should cancel all of the Contested
Marks because "they lack distinctiveness."[6]  Although V. International has
adduced few facts to suggest that the Contested Marks should be cancelled on
this ground, this issue is sufficiently fact-intensive that it cannot be decided on
a motion to dismiss.

The Estate Movants' argument to dismiss Counterclaim One has two
parts.  The first is definitional:  "Lack of distinctiveness" is not a stated ground
for cancelling an incontestable trademark under 15 U.S.C. § 1064(3).  (Estate
Br. 20).  And five of the twelve Contested Marks, the Estate Movants contend,

---

[6]    As discussed *supra*, V. International does not specify the parties against whom it
asserts any of its counterclaims.  And in turn, the Court is not sure if V. International
intended to assert Counterclaims One, Two, and Three against the Monroe Estate
(which owns the Contested Marks) or all of the Estate Movants (which includes ABG
and Salter, who do not own the Contested Marks).  (*See* Estate Br. 20 n.6; V. Int'l
Countercl. ¶ 25 (identifying the Monroe Estate as the Contested Marks' owner)).  X One
X's amended counterclaims, however, appear to resolve this ambiguity.  X One X brings
its three trademark counterclaims against the Monroe Estate alone.  (X One X Am.
Countercl. ¶¶ 37-56).  The Court assumes that V. International intended to do the
same.

are incontestable, such that the *only* grounds on which they can be cancelled are those that are listed in § 1064(3). (*Id.*). V. International — really, X One X, in an argument V. International joins — does not dispute that these marks are incontestable. (X One X Estate Opp. 25). But it insists that by using the term "lack of distinctiveness," it meant to argue that the Contested Marks are generic, which *is* one of § 1064(3)'s grounds for cancelling an incontestable mark. (*Id.* at 23-24). While the Court would have preferred more precision, it notes that V. International does refer to the Contested Marks as "generic" in Counterclaim One. (V. Int'l Countercl. ¶ 35). Accordingly, the Court reads Counterclaim One as an argument that the Contested Marks are generic.

That conclusion saps much of the strength from the second part of the Estate Movants' argument. In Counterclaim One, V. International argues that the Contested Marks "lack distinctiveness" (i.e., are generic) because "they do not identify the source or origin of any product," such that "[a]t most, the Contested Marks remind consumers of the famous historical figure Marilyn Monroe, but do not signify any connection at all in the minds of consumers or the relevant public between [the Estate Movants] and the iconic celebrity." (V. Int'l Countercl. ¶ 35). The Estate Movants read these allegations as an attempt by V. International to establish a *per se* "rule that names of identifiable individuals are … non-distinctive, contrary to existing law." (Estate Br. 21). That reading does not engage with the crux of Counterclaim One — that the Contested Marks are generic.

22

The Estate Movants argue (in a footnote to their brief) that the Contested Marks are not generic because V. International has not, and cannot, allege that the Contested Marks "have become the generic term for a genus of product." (Estate Br. 21 n.7). V. International contends that it has made this showing. It argues that the allegations in Counterclaim One support the inference that "products bearing Monroe's image and/or name are a genus of products." (X One X Estate Opp. 24). And "when used in connection with goods or services," V. International argues, "the words 'Marilyn Monroe' … merely serve to identify types of products that bear some indicia of Marilyn Monroe." (*Id.*). But none of these allegations (or inferences supporting them) appears in V. International's Counterclaim One. And the allegations that *are* in Counterclaim One speak rather obliquely to the factors courts consider when assessing whether a trademark is generic.

The Estate Movants' biggest hurdle is legal: "The question of whether a mark is, or has become, generic is generally one of fact." *Tiffany & Co.* v. *Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 482 (S.D.N.Y. 2014); *accord Manning Int'l Inc.* v. *Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 436 (S.D.N.Y. 2001). V. International alleges that "[t]he Contested Marks are generic" and "do not identify the source or origin of any product." (V. Int'l Countercl. ¶ 35). Whether the Contested Marks are *in fact* generic is a determination best left for another day, with a more robust record in place.

To be clear, the Court harbors serious doubts that V. International will be able to establish that the Contested Marks are generic. Reaching that

conclusion at this stage, however, would be premature.  For that reason, the Court denies the Estate Movants' motion to dismiss insofar as it seeks dismissal of V. International's Counterclaim One.

> **c.    V. International Counterclaim Two: Fact Issues Preclude the Court from Dismissing V. International's Claim That the Contested Marks Should Be Cancelled Because They Are Functional**

> **i.    Applicable Law**

15 U.S.C. § 1064(3) provides that a trademark may be cancelled "[a]t any time if" it "is functional."  *See Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 218-19 (2d Cir. 2012) ("[A]spects of a product that are 'functional' generally 'cannot serve as a trademark.'" (quoting *Qualitex Co.* v. *Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995))).

There are two types of trademark functionality:  "[i] "'traditional' or 'utilitarian' functionality, and [ii] 'aesthetic' functionality."  *Christian Louboutin*, 696 F.3d at 219.  "[A] product feature is considered to be 'functional' in a utilitarian sense if it is [i] 'essential to the use or purpose of the article,' or if it [ii] 'affects the cost or quality of the article.'"  *Id.* (footnote omitted) (quoting *Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)).  In contrast, "when the aesthetic design of a product is *itself* the mark for which protection is sought," courts will deem "a mark … aesthetically functional, and therefore ineligible for protection under the Lanham Act, [if] protection of the mark *significantly* undermines competitors' ability to compete in the relevant market."  *Id.* at 219-20, 222.

ii.    **Analysis**

Without identifying whether the Contested Marks are functional in a "utilitarian" or "aesthetic" sense, V. International alleges that "[t]he appearance of Marilyn Monroe's name and/or stylized signature in the Contested Marks is purely functional." (V. Int'l Countercl. ¶ 40). The allegations in Counterclaim Two align most closely with an aesthetic-functionality theory, given that V. International alleges that the Contested Marks "at most may provide some aesthetic appeal to consumers." (*Id*.). Like Counterclaim One, Counterclaim Two is weak, but raises an issue that is too fact-specific to resolve at this stage.

Here, too, the Estate Movants argue that V. International is trying to set a bright-line rule. This time, they claim that V. International is attempting to establish that a "famous name" that "provides aesthetic [or utilitarian?] appeal to consumers" cannot be trademarked. (Estate Br. 25). In so arguing, the Estate Movants over-read Counterclaim Two: V. International alleges that "[t]he appearance of Marilyn Monroe's name and/or stylized signature in the Contested Marks is purely functional" because they "at most may provide some aesthetic appeal to consumers and serve as a product feature." (V. Int'l Countercl. ¶ 40). That cabins the scope of V. International's functionality claim to trademarks related to Marilyn Monroe.

The allegations in Counterclaim Two, however, undercut V. International's aesthetic-functionality argument. V. International alleges, for instance, that "countless entities" sell "[p]roducts bearing Marilyn Monroe's name, image, likeness and/or stylized signature." (V. Int'l Countercl. ¶ 41).

That allegation gives little reason for the Court to conclude that protecting the Contested Marks would "*significantly* undermine competitors[ ]" of the Estate Movants from competing with the Estate Movants.  *Christian Louboutin*, 696 F.3d at 222.  V. International's conclusory assertion that the Estate Movants are stifling competition by stopping V. International from using Monroe's "image, likeness, or name" does not fix this flaw in Counterclaim Two.  (V. Int'l Countercl. ¶ 42).

In any case, whether a trademark is functional "is a question of fact."  *In re Becton, Dickinson & Co.*, 675 F.3d 1368, 1372 (Fed. Cir. 2012); *Fun-Damental Too, Ltd.* v. *Gemmy Indus. Corp.*, 111 F.3d 993, 1002 (2d Cir. 1997); *see also Christian Louboutin*, 696 F.3d at 222 ("[T]he aesthetic functionality analysis is highly fact-specific.").  Like V. International's argument that the Contested Marks are generic, its claim that they are functional turns on materials outside the pleadings.  For this reason, the Court cannot dismiss V. International's Counterclaim Two at this stage.

### d.   V. International Counterclaim Three: V. International Has Not Alleged with Particularity That the Monroe Estate Committed Fraud on the USPTO

#### i.   Applicable Law

Under 15 U.S.C. § 1064(3), any trademark can be cancelled if "its registration was obtained fraudulently."  "The party seeking cancellation on the basis of fraud must establish [i] that the registrant misrepresented a material fact, [ii] that the registrant knew or should have known that its representation was false, [iii] that the registrant intended to induce the [USPTO] to act in

reliance thereon, [iv] that the [USPTO] reasonably relied on the misrepresentation, and [v] that damages proximately resulted from that reliance." *Privado Mktg. Grp. LLC* v. *Eleftheria Rest Corp.,* No. 13 Civ. 3137 (ER), 2014 WL 3377107, at *6 (S.D.N.Y. July 7, 2014) (citing *Banas*, 658 F.3d at 270-71). That party must also satisfy the pleading requirements of Rule 9(b). *See Kash N' Gold, Ltd.* v. *Samhill Corp.*, No. 90 Civ. 1097 (MJL), 1990 WL 196089, at *1-3 (S.D.N.Y. Nov. 29, 1990).

"A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). Evidence that a registrant made "a false statement" to the USPTO "is not sufficient to cancel a mark." *Quality Serv. Grp.* v. *LJMJR Corp.,* 831 F. Supp. 2d 705, 710 (S.D.N.Y. 2011) (quoting *L.D. Kichler Co.* v. *Davoil Inc.,* 192 F.3d 1349, 1351 (Fed. Cir. 1999)). Nor is proof that the registrant made "an error or inadvertent misstatement." *Id.* Rather, a party claiming that a trademark was procured by fraud must establish that the registrant acted "with intent to deceive" and made "a misstatement of a material fact," i.e., a fact "that would have affected the [USPTO's] action on the application[]" in question." *Id.* (internal quotation mark omitted) (quoting *Orient Express Trading Co.* v. *Federated Dep't Stores, Inc.,* 842 F.2d 650, 653 (2d Cir. 1988)); *accord De Beers LV Trademark Ltd.* v. *DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 266 (S.D.N.Y. 2006) ("Fraud in procuring a trademark occurs when 'an applicant knowingly makes false, material

representations of fact in connection with an application.'" (quoting *L.D. Kichler,* 192 F.3d at 1351)).

In sum, a party alleging that a trademark registrant committed fraud on the USPTO must "present proof that leaves nothing to speculation, conjecture, or surmise.'" *De Beers*, 440 F. Supp. 2d at 267 (internal quotation mark omitted) (quoting *Marshall Field and Co.* v. *Mrs. Fields Cookies,* 1992 WL 421449, at *9 (T.T.A.B. 1992)).  "Should there be any doubt, it must be resolved against the party making the claim."  *Id.* (internal quotation mark omitted) (quoting *Marshall Field*, 1992 WL 421449, at *9).

### ii.    Analysis

As its final ground for cancelling the Contested Marks, V. International alleges that the Estate Movants obtained them by fraud.  Because V. International's allegations fall far short of the high bar it must meet to substantiate this claim, the Court dismisses Counterclaim Three.

V. International's procurement-by-fraud claim reduces to five conclusory contentions.  First, "[o]n information and belief," when the Estate Movants applied for the Contested Marks, they told the USPTO "that no other person" or entity "ha[d] the right to use the" Contested Marks (or reasonable facsimiles of them).  (V. Int'l Countercl. ¶ 46 (internal quotation mark omitted)).  Second, these statements were false, because at the time the Estate Movants registered the Contested Marks there existed many trademarks similar to the Contested Marks.  (*Id.* at ¶ 47).  Third, the Estate Movants knew these statements were false.  (*Id.* at ¶ 49).  Fourth, the USPTO relied on the Estate Movants' false

28

statements when it registered the Contested Marks.  (*Id.* at ¶ 50).  And finally, on information and belief, the Estate Movants "and their predecessors, when applying for trademark registration[s] and prior to issuance of various registrations, falsely and fraudulently claimed use of the various Marilyn Monroe marks for goods and/or services where no such trademark use had yet been made."  (*Id.* at ¶ 48).

These allegations are insufficient to withstand Rule 8 scrutiny, let alone Rule 9(b).  Counterclaim Three reads like a rehearsed recitation of the elements of a trademark-fraud claim, unsupported by factual allegations.  And that recitation leaves several questions unanswered:  When did the Estate Movants make these misstatements?  Were they material?  What were the misstatements?  Far from "leav[ing] nothing to speculation, conjecture, or surmise," *De Beers*, 440 F. Supp. 2d at 267 (internal quotation mark omitted) (quoting *Marshall Field,* 1992 WL 421449, at *9), the allegations in Counterclaim Three raise more questions than they answer.

In sum, V. International has not met its "heavy burden" of proving with particularity that the Estate Movants fraudulently procured the Contested Marks.  *Bose Corp.*, 580 F.3d at 1243.  The Court accordingly dismisses Counterclaim Three.

e.   **V. International Counterclaim Four: V. International Has Not Alleged Plausibly That the Estate Movants Attempted Monopolization Under Section Two of the Sherman Act**

i.   **Applicable Law**

Section Two of the Sherman Act, 15 U.S.C. § 2, forbids attempted monopolization.  To make out a Section Two claim, a plaintiff must prove three things: "[i] that the defendant has engaged in predatory or anticompetitive conduct with [ii] a specific intent to monopolize and [iii] a dangerous probability of achieving monopoly power."  *Bayer Schering Pharma AG* v. *Sandoz, Inc.*, 813 F. Supp. 2d 569, 578 (S.D.N.Y. 2011) (quoting *Spectrum Sports, Inc.* v. *McQuillan,* 506 U.S. 447, 456 (1993)).  A Section Two plaintiff must also allege causation — i.e., "that anticompetitive conduct occurring in connection with obtaining or retaining a monopoly position is proximately related to [plaintiff's] injuries."  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 381 (S.D.N.Y. 2016).

"[T]he primary indicator" that an antitrust defendant has a dangerous probability of achieving a monopoly "is sufficient market share by the defendant."  *AD/SAT, Div. of Skylight, Inc.* v. *Associated Press*, 181 F.3d 216, 226 (2d Cir. 1999) (internal quotation marks omitted) (quoting *Twin Labs., Inc.* v. *Weider Health & Fitness*, 900 F.2d 566, 570 (2d Cir. 1990)).  And in order to determine a defendant's market share, it is first necessary to determine what market that defendant has attempted to monopolize.  *Id.*

Thus, "[i]n order to survive a motion to dismiss, a claim under Section[ ] … 2 of the Sherman Act must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized."

30

*Linzer Prod. Corp.* v. *Sekar*, 499 F. Supp. 2d 540, 553 (S.D.N.Y. 2007) (citation omitted); *see also Concord Assocs., L.P.* v. *Entm't Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) ("[W]ithout a definition of [a product and geographic market] there is no way to measure the defendant's ability to lessen or destroy competition." (quoting *Xerox Corp.* v. *Media Sciences Int'l, Inc.,* 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007))).

"A relevant product market consists of 'products that have reasonable interchangeability for the purposes for which they are produced — price, use and qualities considered.'" *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 454 (S.D.N.Y. 2015) (quoting *United States* v. *E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404 (1956)). "Products are considered reasonably interchangeable if consumers treat them as acceptable substitutes." *Id.* "When the proposed relevant market is defined without 'reference to the rule of reasonable interchangeability and cross-elasticity of demand,' or 'clearly does not encompass all interchangeable substitute products ... the relevant market is legally insufficient and a motion to dismiss may be granted.'" *Spinelli* v. *Nat'l Football League*, 96 F. Supp. 3d 81, 111 (S.D.N.Y. 2015) (quoting *Sekar,* 499 F. Supp. 2d at 554).

A Section Two plaintiff must also establish "the boundaries of a relevant geographic market." *In re Zinc*, 155 F. Supp. 3d at 378. "The geographic market encompasses the geographic area in which purchasers of the product can practicably turn for alternative sources of the product." *Id.*

"Although market definition is a deeply fact-intensive inquiry not ordinarily subject to dismissal at the pleadings stage, … there is no absolute rule against dismissal where the plaintiff has failed to articulate a plausible explanation as to why a market should be limited in a particular way[.]" *Concord Assocs.*, 817 F.3d at 53 (internal quotation marks and citation omitted). "Thus, in order to survive a motion to dismiss, it is appropriate for a district court to assess whether the [plaintiff's] complaint asserts sufficient facts to allege plausibly the existence of both a product and geographic market." *Id.*

### ii. Analysis

In Counterclaim Four, V. International alleges that the Estate Movants "have unlawfully attempted to monopolize the market of products bearing the image, likeness and/or name of Marilyn Monroe by asserting a putative right of publicity not recognized by controlling law." (V. Int'l Countercl. ¶ 54). Because V. International's Section Two claim is deficient in many respects — chief among them, V. International's failure to define a relevant product or geographic market — the Court dismisses Counterclaim Four.[7]

---

[7]     These deficiencies obviate the need for the Court to consider whether the Estate Movants' trademark-litigation efforts are entitled to *Noerr-Pennington* immunity. *See United Mine Workers of Am.* v. *Pennington,* 381 U.S. 657, 669-70 (1965); *E. R.R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U.S. 127, 136 (1961). Nonetheless, the Court pauses to make a clarifying point. The Estate Movants note correctly that *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), sets forth a two-prong test for determining whether litigation efforts are a "sham" and therefore outside of *Noerr-Pennington*'s protections. (Estate Br. 11-12 (discussing *Prof'l Real Estate*, 508 U.S. at 60)). But the *Professional Real Estate* test is only relevant "to determining whether a single action" — like one prior lawsuit — "constitutes sham petitioning." *Primetime 24 Joint Venture* v. *Nat'l Broad., Co.*, 219 F.3d 92, 101 (2d Cir. 2000) (internal quotation marks and citation omitted). "In cases in which the defendant is accused of bringing a whole series of legal

To understand why V. International has failed to state a Section Two claim, it makes more sense to consider what it has *not* alleged than what it has.  The most obvious flaw in Counterclaim Four is that V. International has not defined a relevant market.  V. International alleges that "Monroe's image, likeness[,] and name are so unique that there is no practical substitute for either Monroe's image, likeness[,] or name on a product."  (V. Int'l Countercl. ¶ 55).  As far as the Court can tell, the market that the Estate Movants are allegedly attempting to monopolize is:  merchandise bearing Monroe's name, image, or likeness.  (*See id.* at ¶¶ 56-58).  And by V. International's account, this market cannot be defined with regard to substitute products, because this Monroe merchandise lacks substitutes.  At best, then, V. International appears to be defining a product market based on "a single brand" — an approach that "[c]ourts in this district have consistently" rejected.  *Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010).

---

proceedings," courts in this Circuit ask a different, "prospective" question to determine whether those proceedings were a sham:  "Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?"  *Id.* (internal quotation marks and citation omitted).

Here, this distinction matters.  In Counterclaim Four, V. International suggests that the Estate Movants have sent *many* cease-and-desist letters, and threatened *many* lawsuits, in order to further their monopolistic efforts.  (V. Int'l Countercl. ¶¶ 59, 63, 69).  Put another way, V. International appears to take issue not only with the Monroe Estate's assertion of counterclaims in this case, but with the Estate Movants' litigation efforts in many cases.  To be clear, the Court takes no position on whether V. International's allegations in this regard are true.  But because those allegations suggest (implausibly) that the Estate Movants have engaged in a *series* of sham litigation efforts, the *Professional Real Estate* test does not speak to them.

Nor has V. International defined a geographic market.  Indeed, there is no mention of *any* geographic boundary to the market that the Estate Movants are allegedly attempting to monopolize.

And even if V. International had defined a relevant market, Counterclaim Four does not suggest "a dangerous probability" that the Estate Movants will achieve a monopoly.  To the contrary, V. International alleges "that Marilyn Monroe related[ ] products are sold ... under countless brand names by countless companies[.]"  (V. Int'l Countercl. ¶ 56).  Although V. International may believe that the Estate Movants are attempting to monopolize a market, Counterclaim Four suggests that they are a long way from fruition.

In sum, V. International has not met Section Two's threshold requirement of defining a product and geographic market.  In any case, nothing in Counterclaim Four suggests that the Estate Movants are close to achieving monopoly power.  The Court dismisses Counterclaim Four.

**f.   V. International Counterclaim Five: V. International Has Not Alleged Plausibly That the Estate Movants Violated New York General Business Law § 349**

**i.   Applicable Law**

Section 349 of New York's General Business Law renders unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in" the State of New York. N.Y. Gen. Bus. Law § 349(a).  "To state a *prima facie* claim under [Section 349], a plaintiff must allege that the defendant [i] engaged in consumer-oriented conduct; [ii] that the conduct was materially misleading; and [iii] that the

34

plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292 (S.D.N.Y. 2015).

This first requirement — that to be actionable under Section 349, conduct must be aimed at consumers — cabins the statute. "Whether a representation or an omission, [a] deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances" in order to violate Section 349. *Grgurev* v. *Licul*, No. 15 Civ. 9805 (GHW), 2017 WL 377937, at *17 (S.D.N.Y. Jan. 26, 2017) (quoting *Stutman* v. *Chem. Bank*, 95 N.Y.2d 24, 29 (2000)). "Accordingly, [c]ourts routinely reject ... attempts to fashion Section 349 ... claims from garden variety disputes between competitors." *Perfect Pearl Co.* v. *Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 542 (S.D.N.Y. 2012) (internal quotation marks and citation omitted). To be sure, "[c]ompetitors, as well as consumers, have standing to sue under § 349," but only if they allege "harm to the 'public at large.'" *Licul*, 2017 WL 377937, at *17 (quoting *Tiny Tot Sports, Inc.* v. *Sporty Baby, LLC*, No. 04 Civ. 4487 (DLC), 2005 WL 2044944, at *5 (S.D.N.Y. Aug. 24, 2005)). And "[w]here a plaintiff makes only conclusory allegations of impact on consumers at large, a [ ] § 349 claim must be dismissed." *Miller* v. *HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500 (RWS), 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015).

Another precept flows from Section 349's consumer focus. "[A] party's claim that consumers will be confused, on its own, does not meet the threshold for liability under" Section 349. *RCA Trademark Mgmt. S.A.S.* v. *VOXX Int'l Corp.*, No. 14 Civ. 6294 (LTS), 2015 WL 5008762, at *5 (S.D.N.Y. Aug. 24,

2015) (internal quotation marks and citation omitted).  In turn, "[t]he majority view" among courts in this Circuit "is that trademark infringement claims are not cognizable under … § 349 unless there is specific and substantial injury to the public interest over and above … ordinary trademark infringement." *AVELA I*, 131 F. Supp. 3d at 217 (internal quotation marks and citation omitted).  That is because "the public harm that results from trademark infringement" — i.e., "general consumer confusion" — "is too insubstantial to satisfy the pleading requirements of § 349." *Perfect Pearl*, 887 F. Supp. 3d at 542 (internal quotation marks and citation omitted); *SMJ Grp., Inc.* v. *417 Lafayette Rest. LLC*, No. 06 Civ. 1774 (GEL), 2006 WL 2516519, at *4 (S.D.N.Y. Aug. 30, 2006) ("[T]he sort of harm necessary to establish consumer injury [under Section 349] includes harms such as potential danger to the public health or safety." (internal quotation marks and citation omitted)).

### ii.      Analysis

V. International alleges that the Estate Movants have committed a raft of deceptive acts in an effort to dominate the market in Monroe memorabilia. What V. International does *not* allege is that this alleged misconduct is either targeted at, or has harmed, consumers.  For this reason, Counterclaim Five fails to state a claim under Section 349.

Counterclaim Five alleges that the Estate Movants falsely purport to be Monroe's estate in order to exercise hegemony over intellectual property in Monroe.  (V. Int'l Countercl. ¶¶ 72-76).  But apart from two mentions of "consumers" — one in Paragraph 73, and another in Paragraph 76 —

Counterclaim Five does not attempt to explain why this alleged misconduct harms consumers.  To the contrary, the thrust of Counterclaim Five is that the Estate Movants' deceptions harm *V. International*.  (*Id.* at ¶¶ 75, 77-78).  The allegations in Counterclaim Five thus do not establish one of Section 349's threshold elements:  consumer harm.

Further, V. International appears to allege that the primary objective of the Estate Movants is to trick "merchants and other legitimately[ ] operating entities" into believing that the Estate Movants own all intellectual-property rights in Monroe.  (V. Int'l Countercl. ¶¶ 73-75).  Put another way, the Estate Movants are trying to confuse retailers and licensees.  Even if this alleged misconduct were targeted at consumers, it would amount to the kind of general confusion that falls outside of Section 349's scope.  *See Perfect Pearl*, 887 F. Supp. 3d at 542.

In sum, Counterclaim Five fails to state a claim for relief under Section 349.  The Court accordingly dismisses Counterclaim Five.

> ### g.   V. International Counterclaim Six: V. International Has Failed to Allege a Plausible Claim for Tortious Interference with Existing Contractual Relationships Under New York Law
>
> #### i.   Analysis

"Under New York law, the elements of tortious interference with contract are [i] 'the existence of a valid contract between the plaintiff and a third party'; [ii] the 'defendant's knowledge of the contract'; [iii] the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; [iv] 'actual breach of the contract'; and [v] 'damages resulting therefrom.'" *Kirch*

v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co.* v. *Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)).

### ii.    Applicable Law

V. International's claim for tortious interference of contract fails for a simple reason:  V. International does not allege that a contract was breached as a result of the Estate Movants' misconduct.  *See First Hill Partners, LLC* v. *BlueCrest Capital Mgmt. Ltd.*, 52 F. Supp. 3d 625, 635 (S.D.N.Y. 2014) (to sustain a tortious-interference-with-contract claim under New York law, plaintiff must establish "an actual breach of contract").

V. International alleges that between 2005 and 2014, A.V.E.L.A. had a contract with "'Freeze', a division of Central Mills, Inc."  (V. Int'l Countercl. ¶ 80).  V. International served "as a licensing agent between [A.V.E.L.A.] and Freeze in exchange for a commission fee."  (*Id.*).  V. International also alleges the existence of a similar contract between A.V.E.L.A. "and Silver Buffalo, LLC." (*Id.*).

The Estate Movants, V. International alleges, "intentionally and knowingly interfered with" both of these contracts.  (V. Int'l Countercl. ¶ 82). And V. International alleges that the Estate Movants "have disrupted the business relationships between V[.] International and Freeze and Silver Buffalo."  (*Id.* at ¶ 83).  What Counterclaim Six does not allege, however, is that either Silver Buffalo or Freeze breached their contracts with A.V.E.L.A.

V. International insists that it is reasonable to infer from Counterclaim Six that Freeze and Silver Buffalo breached their contracts.  (V. Int'l Estate

Opp. 6).  But whether either contract was breached is a simple question of fact that Counterclaim Six, as written, inexplicably sidesteps.  And because a contract breach is an essential element of a tortious-interference claim under New York law, the Court dismisses Counterclaim Six.

### h.   V. International Counterclaim Seven: V. International Has Alleged Plausibly That the Estate Movants Intentionally Interfered with V. International's Prospective Economic Advantage

#### i.   Applicable Law

"To state a claim for intentional interference with prospective economic advantage" under New York law, "a party must allege that: '(i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.'" *AVELA I*, 131 F. Supp. 3d at 217 (quoting *Lombard* v. *Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002)).  A plaintiff must also establish causation by demonstrating "that she 'would have entered into an economic relationship but for the defendant's wrongful conduct.'" *Tucker* v. *Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014) (quoting *Memnon* v. *Clifford Chance US, LLP,* 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009)).

There are two important differences between the New York torts of international interference with prospective economic advantage (Counterclaim Five) and tortious interference with existing contractual relationships (Counterclaim Six).  First, a prospective-economic-advantage plaintiff need not demonstrate that the defendant's conduct prevented the plaintiff from

consummating a contract. *AVELA I*, 131 F. Supp. 3d at 217.  Rather, "to state a claim for intentional interference with prospective economic advantage, a plaintiff need only identify interference with a specific business relationship." *Id.*

The second distinction concerns the defendant's mental state.  "In the case of tortious interference with contract, a plaintiff may recover if the plaintiff can demonstrate that the 'defendant's deliberate interference result[ed] in a breach of [the] contract.'" *Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*, — F. Supp. 3d —, No. 15 Civ. 4244 (JGK), 2016 WL 4747281, at *21 (S.D.N.Y. Sept. 12, 2016), *as amended*, (Sept. 16, 2016), *reconsideration denied*, 2016 WL 6652733 (S.D.N.Y. Nov. 10, 2016) (quoting *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 189 (2004)).  But "[i]n the case of tortious interference with prospective economic advantage, ... the 'plaintiff must show more culpable conduct on the part of the defendant.'" *Id.* (quoting *Carvel*, 3 N.Y.3d at 190).  To state a prospective-economic-advantage claim, a plaintiff must show that "the defendant's conduct ... amount[s] to a crime or an independent tort," or that the defendant has "engage[d] in conduct for the sole purpose of inflicting intentional harm on" the plaintiff." *Carvel*, 3 N.Y.3d at 190 (internal quotation marks and citation omitted); *see also Sidney Frank Importing Co.* v. *Beam Inc.*, 998 F. Supp. 2d 193, 211-12 (S.D.N.Y. 2014) (mental-state requirement for prospective-economic-advantage claim "is more exacting" than that for a contract-interference claim "because courts must balance a plaintiff's expectation in establishing a contractual relationship against the competing

40

interest of the interferer … and the broader interest of fostering healthy competition" (internal quotation marks and citations omitted)).

> ii.        **Analysis**

Finally, in Counterclaim Seven, V. International alleges that the Estate Movants "disrupt[ed] V. International's business relations and prospective economic advantage with Duke Imports, Inc. arising from licensing artwork featuring Marilyn Monroe's image." (V. Int'l Countercl. ¶ 90). The allegations in Counterclaim Seven are thin, but just substantial enough to state a claim for tortious interference with prospective economic advantage.

V. International has adduced facts to establish all four elements of a prospective-economic-advantage claim. First, V. International alleges that in 2014 and 2015 (and maybe before), it had a business relationship with Duke Imports, Inc. (V. Int'l Countercl ¶ 90). Second, the Estate Movants allegedly interfered with that relationship "by, among other things, diverting customers away from licensing artwork from V[.] International." (*Id.* at ¶ 91). Third, the Estate Movants' interference was "intentional, willful, and malicious." (*Id.* at ¶ 94). And finally, V. International alleges that it has suffered damages as a result of the Estate Movants' misconduct. (*Id.* at ¶ 93). At this stage, these allegations plausibly establish that the Estate Movants intentionally interfered with V. International's prospective economic advantage.

> **2.    X One X's Counterclaims**

To review, many of X One X's counterclaims are carbon copies of the counterclaims V. International brings. X One X's Counterclaims One (generic-

trademark cancellation), Two (trademark functionality), Three (trademark fraud), and Five (Section 349) are identical to V. International's versions of the same.

There are two salient differences between the two parties' counterclaims. The first is that X One X names LGP as a counter-defendant in Counterclaims Four (Sherman Act), Five (Section 349), Six (NUPTA), and Seven (Nevada common-law unfair competition). The second difference is that X One X, a Nevada corporation, seeks recovery under Nevada law in its Counterclaims Six and Seven.

Below, the Court addresses all seven of X One X's counterclaims, but will engage substantively only with those counterclaims that differ from V. International's. [8]

### a.    X One X Counterclaim One: Fact Issues Preclude the Court from Dismissing X One X's Claim That the Contested Marks Should Be Cancelled for Lack of Distinctiveness

Like V. International's generic-trademark claim, X One X's claim that the Contested Marks are generic raises fact issues that the Court cannot resolve at this stage.

---

[8]    X One X also alleges that the Monroe Estate is ABG's alter ego. (X One X Am. Countercl. ¶¶ 11-14). The Court rejects this theory for the same reasons it rejected V. International's identical argument.

### b. X One X Counterclaim Two: Fact Issues Preclude the Court from Dismissing X One X's Claim That the Contested Marks Should Be Cancelled Because They Are Functional

Similarly, the Court cannot resolve X One X's claim that the Contested Marks are functional on the present record.

### c. X One X Counterclaim Three: X One X Has Not Alleged With Particularity that the Monroe Estate Committed Fraud on the USPTO

Like V. International, X One X has not stated a cognizable trademark-fraud claim.

### d. X One X Counterclaim Four: X One X Has Not Alleged Plausibly That the Estate Movants and LGP Attempted Monopolization Under Section Two of the Sherman Act

X One X's Counterclaim Four differs from V. International's version in one important respect:  X One X alleges that LGP has attempted to create a monopoly, and that it conspired with the Estate Movants in support of this goal.  But like V. International, X One X has not stated a Sherman Act claim.

To start, X One X's Counterclaim Four fails for the same reasons as V. International's.  X One X has not defined a relevant product or geographic market.  Further, X One X provides no reason for the Court to conclude that the Estate Movants or LGP are "dangerously close" to achieving a monopoly.  For these reasons alone, X One X has not alleged plausibly that the Estate Movants or LGP have attempted monopolization under Section Two of the Sherman Act.

Turning to LGP's involvement in this case, nothing in X One X's Counterclaim Four suggests that LGP is *directly* liable under Section Two.

Although X One X brings Counterclaim Four against LGP, it alleges almost no facts suggesting that LGP "has engaged in predatory or anticompetitive conduct." *Sandoz*, 813 F. Supp. 2d at 578 (quoting *McQuillan*, 506 U.S. at 456). Indeed, Counterclaim Four contains only two direct allegations against LGP: (i) X One X alleges that "[o]n information and belief, ABG has sought to create a vertical scheme with [LGP]," which is a "partial[ ] owne[r]" of ABG; and (ii) X One X alleges that LGP "continues to acquire retail chains with the intent to keep lawful competitors from licensing or selling Marilyn Monroe-related products in such retailers." (V. Int'l Countercl. ¶ 70). But at most, those allegations suggest that X One X and ABG have entered into an exclusive dealing arrangement. And "exclusive dealing is not uniformly anticompetitive[;] … in order to plead exclusionary conduct through an exclusive dealing policy, [a plaintiff] 'must allege as a threshold matter … a substantial foreclosure of competition' in the relevant market." *Sell It Soc., LLC* v. *Acumen Brands, Inc.*, No. 14 Civ. 3491 (RMB), 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) (quoting *Media Sciences Int'l*, 511 F. Supp. 2d at 389). X One X has not defined a relevant market, let alone alleged plausibly that any entity has substantially foreclosed competition within it. In turn, X One X has not established LGP's direct liability for a Section Two violation.

Nor has X One X alleged plausibly that LGP conspired with the Estate Movants. "A conspiracy claim under Section 2 must allege '[i] concerted action, [ii] overt acts in furtherance of the conspiracy, and [iii] specific intent to monopolize.'" *In re Zinc*, 155 F. Supp. 3d at 382 (quoting *Elecs. Commc'ns*

*Corp.* v. *Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 246 (2d Cir. 1997)).

X One X seems to support its conspiracy-to-monopolize claim with several

scattershot, conclusory references to a "conspiracy to monopolize the market

for Marilyn Monroe memorabilia."  (X One X Am. Countercl. ¶¶ 70, 83, 91, 94;

*see also* ¶ 58).  Those are legal conclusions, not factual allegations, and they do

not substantiate X One X's conspiracy claim.

In sum, X One X has failed to allege plausibly that the Estate Movants or

LGP violated Section Two of the Sherman Act.

> **e.      X One X Counterclaim Five: X One X Has Not Alleged Plausibly That the Estate Movants and LGP Violated New York General Business Law § 349**

X One X's Section 349 claim fails for the same reasons as V.

International's, and the Court dismisses it accordingly.

> **f.      X One X Counterclaim Six: X One X Does Not Allege Plausibly That the Estate Movants and LGP Violated the NUPTA**

> ### i.      Applicable Law

The NUPTA contains Nevada's analogue to the Sherman Act.  *See*

*Boulware* v. *State of Nev., Dep't of Human Res.*, 960 F.2d 793, 800 (9th Cir.

1992) (noting that "the [NUPTA] … tracks the provisions of the Sherman Act").

Under the statute, "[m]onopolization of trade or commerce in [Nevada],

including, without limitation, attempting to monopolize or otherwise combining

or conspiring to monopolize trade or commerce in [Nevada]," is unlawful.  Nev.

Rev. Stat. Ann. § 598A.060(e).

An antitrust claim that fails under the Sherman Act also fails under the NUPTA. *See Jensen Enterps. Inc.* v. *Oldcastle Precast Inc.*, No. C 06-247 SI, 2009 WL 440492, at *5 n.7 (N.D. Cal. Feb. 23, 2009) ("The requirements for maintaining an antitrust suit under … Nevada law mirror the federal requirements."), *aff'd,* 375 F. App'x 730 (9th Cir. 2010) (memorandum decision) The NUPTA provides that its "provisions … shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." Nev. Rev. Stat. Ann. § 598A.050. The NUPTA thus "appear[s] to require [Nevada] courts to reconcile entirely [Nevada] antitrust law with federal antitrust precedents." *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 (YGR), 2014 WL 4955377, at *9 (N.D. Cal. Oct. 2, 2014); *see also Sheet Metal Workers Local 441 Health & Welfare Plan* v. *GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 398 (E.D. Pa. 2010) (NUPTA's legislative history evinces intent to incorporate "language existent in the Clayton and Sherman Acts at the federal level" (citation omitted)).

### ii.     Analysis

The reason why X One X's Counterclaim Six fails is straightforward enough: X One X has not alleged plausibly that the Estate Movants or LGP have attempted monopolization under Section Two of the Sherman Act. (*Cf.* X One X LGP Opp. 21 ("For each of the reasons discussed above in connection with X One X's Sherman Act claim, X One X states a valid cause of action against LGP for violation of the Nevada Unfair Trade Practices Act[.]")). That

means that X One X has not stated a claim for relief under the Sherman Act *or* the NUPTA.  The Court thus dismisses Counterclaim Six.

#### g.     **X One X Counterclaim Seven: X One X Has Not Alleged Plausibly That the Estate Movants and LGP Have Engaged in Unfair Competition Under Nevada Common Law**

##### i.     **Applicable Law**

The contours of Nevada's unfair-competition doctrine are murky.  As far as this Court can tell, the one principle on which multiple courts have agreed is that in Nevada, "the tort of unfair competition is extremely flexible."  *Golden Nugget, Inc.* v. *Am. Stock Exch., Inc.*, 828 F.2d 586, 591 (9th Cir. 1987); *see, e.g.*, *id.* ("[C]ourts are given wide discretion to determine whether conduct is 'unfair'"); *LT Int'l Ltd.* v. *Shuffle Master, Inc.*, 8 F. Supp. 3d 1238, 1247 (D. Nev. 2014); *Custom Teleconnect, Inc.* v. *Int'l Tele-Servs., Inc.*, 254 F. Supp. 2d 1173, 1182 (D. Nev. 2003).

Although the Court has found limited authority analyzing unfair competition in Nevada, courts have equated Nevada unfair competition to a few different doctrines.  One is trademark infringement.  *See Tahoe eCommerce, LLC* v. *Rana*, No. 3:11-CV-00725-RCJ, 2014 WL 60360, at *3 (D. Nev. Jan. 6, 2014).  Other cases appear to analogize unfair competition to common-law misappropriation.  *Capital Credit All., Inc.* v. *Lowpay, Inc.*, No. 2:07-CV-1537-RLH-LRL, 2008 WL 2513692, at *1-2 (D. Nev. Feb. 25, 2008).  *But see Hutchison* v. *KFC Corp.*, 809 F. Supp. 68, 71-72 (D. Nev. 1992) (explaining that Nevada's Uniform Trade Secrets Act displaced common-law tort of unfair competition, at least where underlying theory of unjust-enrichment claim

concerns misappropriation of trade secrets); *Frantz* v. *Johnson*, 999 P.2d 351, 357-58 (Nev. 2000) (citing *Hutchison* and stating that "[t]he plain language of [the Nevada Uniform Trade Secrets Act] precludes a plaintiff from bringing a tort or restitutionary action based upon misappropriation of a trade secret beyond that provided by the [statute]." (internal quotation marks omitted)). Complicating matters, at least one court has rejected the premise that in Nevada, "unfair competition … always involves the passing off of goods as if from another." *Custom Teleconnect*, 254 F. Supp. 2d at 1182.

### ii.      Analysis

The preceding introduction to the law of unfair competition in Nevada should make plain that a healthy amount of ambiguity inheres in the doctrine. The Estate Movants and LGP argue that unfair competition is equivalent to either trademark infringement or misappropriation, and that X One X has not alleged facts sufficient to state a claim under either of those theories.  (Estate Br. 34-35; LGP Br. 23).  X One X argues for a far broader definition of unfair competition:  that any "deceptive conduct" is actionable unfair competition under Nevada Law.  (X One X LGP Opp. 23).  Even accepting X One X's very broad definition of this tort, X One X has failed to state a claim for relief.

X One X alleges that the Estate Movants (but not LGP) have engaged in "deceptive practices."  (X One X Am. Countercl. ¶ 94).  It does not specify what those deceptive practices are.  But X One X seems to allege that these "deceptive practices" facilitated the "unlawful restraints on competition" and "conspiracy … to unlawfully monopolize the market for Marilyn Monroe

memorabilia." (*Id.*).  X One X adds that the Estate Movants have endeavored "to deceive the public into believing that they are the only lawful source of products and services depicting (or alluding to) Marilyn Monroe." (*Id.*; *accord id.* at ¶¶ 83, 91).  These conclusory, unsupported allegations do not establish plausibly that the Estate Movants or LGP have committed deception of any stripe.  Thus, even if the Court were to endorse X One X's definition of unfair competition in Nevada, Counterclaim Seven would fail.

### 3. The Court Dismisses V. International's and X One X's Counterclaims Without Prejudice

The one remaining question is whether X One X's and V. International's counterclaims should be dismissed with or without prejudice.  The Court is doubtful that either V. International or X One X will be able to amend their dismissed counterclaims such that they can survive future dispositive motions.  However, the Court will nonetheless grant V. International and X One X this opportunity.

Federal Rule of Civil Procedure 15(a)(1) allows a party to "amend its pleading once as a matter of course within ... 21 days after serving it, or ... if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a).  But once these periods have expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Rule 15(a)(2) goes on:  "The court should freely give leave when justice so requires."

The Second Circuit has explained that "the 'permissive standard' of Rule 15 'is consistent with [its] strong preference for resolving disputes on the merits.'" *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams* v. *Citigroup Inc.,* 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).  And accordingly, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block* v. *First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir. 1993)).

Consistent with this liberal amendment policy, the Court will allow X One X and V. International to amend their counterclaims.  There is no indication that either V. International or X One X has requested leave to amend in bad faith.  And although this litigation has been pending for a long time, the Court does not believe that allowing V. International and X One X to replead will prejudice the Estate Movants or LGP.

But before closing, a caveat is in order.  In its opposition to LGP's motion to dismiss, X One X writes that it "has not yet had the opportunity to conduct discovery against any party in this action, and certainly not against LGP."  (X One X LGP Opp. 6).  This is technically correct, but its underlying premise is a fiction the Court will not entertain.  A.V.E.L.A., X One X, and V. International share the same counsel of record.  And as this Court observed in *AVELA I*, there has been "extensive fact discovery" in this action.  131 F. Supp. 3d at

203.  X One X's suggestion that it has learned no facts that might tend to substantiate its (or V. International's) counterclaims strains credulity.

### CONCLUSION

For the reasons set forth above, LGP's motion to dismiss is GRANTED, and the Estate Movants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  The Court DISMISSES WITHOUT PREJUDICE the following counterclaims:

(i)     V. International's Counterclaims Three, Four, Five, and Six; and

(ii)    X One X's Counterclaims Three, Four, Five, Six, and Seven.

Should V. International and/or X One X wish to amend their counterclaims, those amendments are due **on or before April 3, 2017**.

On October 14, 2016, the Court issued an order staying discovery pending the resolution of the instant motions to dismiss.  (Dkt. #278).  That stay is hereby LIFTED.  The parties are ORDERED to file a joint letter advising the Court of the status of discovery **on or before April 10, 2017**.

The Clerk of Court is ORDERED to terminate Docket Entries 250 and 269.

SO ORDERED.

Dated:     March 13, 2017
          New York, New York

                                     _____
                                      KATHERINE POLK FAILLA
                                 United States District Judge