UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 5, 2018

------------------------------------------------------------X

A.V.E.L.A., INC.,

                                    Plaintiff,

            v.

THE ESTATE OF MARILYN MONROE, LLC, *et al.*,

                                    Defendants.

------------------------------------------------------------X

THE ESTATE OF MARILYN MONROE, LLC,

                                    Counterclaimant,

            v.

A.V.E.L.A., INC.,

                                    Counter-Defendant,

LEO VALENCIA, IPL, INC.,
X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

                                    Third-Party Defendants.

------------------------------------------------------------X

X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

                                    Counterclaimants,

            v.

THE ESTATE OF MARILYN MONROE, LLC,
AUTHENTIC BRANDS GROUP, LLC,
JAMES SALTER,

                                    Counter-Defendants.

------------------------------------------------------------X

12 Civ. 4828 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

This Opinion is yet another installment in a sprawling, multi-party dispute over the intellectual property rights associated with Marilyn Monroe, one of the 20th century's most iconic figures. It is also the latest in what is now a trilogy of decisions that this Court has issued adjudicating the parties' motions to dismiss.

In *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196 (S.D.N.Y. 2015) ("*AVELA I*"), this Court granted in part and denied in part the motions of X One X Movie Archives Inc. ("X One X") and V. International Fine Arts Publishing, Inc. ("V. International" and together with X One X, the "Counter-Plaintiffs") to dismiss the First Amended Counterclaim of the Estate of Marilyn Monroe, LLC ("Monroe Estate"). After the Court issued *AVELA I*, Counter-Plaintiffs filed answers to the First Amended Counterclaim. They also brought claims of their own against the Monroe Estate, Authentic Brands Group LLC ("ABG"), James Salter ("Salter," and together with the Monroe Estate and ABG, the "Estate Movants"), and Leonard Green & Partners, L.P. ("LGP").

The Estate Movants and LPG then moved to dismiss X One X's and V. International's counterclaims. In *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461 (S.D.N.Y. 2017) ("*AVELA II*"), the Court dismissed without prejudice Counter-Plaintiffs' claims for (i) fraud on the United States Patent and Trade Office, (ii) attempted monopolization, (iii) violations of New York General Business Law § 349 ("Section 349"), (iv) tortious interference with

contract, and (v) alter-ego liability as to ABG, as well as (vi) V. International's claim for intentional interference with prospective economic advantage.

Counter-Plaintiffs have since filed amended counterclaims. Pending before the Court is the Estate Movants' motion to dismiss several of Counter-Plaintiffs' amended counterclaims. In particular, the Estate Movants seek dismissal of (i) Counter-Plaintiffs' renewed alter-ego claim, (ii) Counter-Plaintiffs' renewed Section 349 claims, (iii) V. International's renewed claim of tortious interference with contract, and (iv) Counter-Plaintiffs' trademark-cancellation claims as to ABG.

In *AVELA II*, this Court expressed skepticism that any amended counterclaims would survive future dispositive motions and advised Counter-Plaintiffs "to consider this Opinion carefully in deciding whether and what to replead." 241 F. Supp. 3d at 468. Counter-Plaintiffs have not done so: As in *AVELA II*, they advance many legal conclusions but few — and insufficient — factual allegations. Accordingly, the Court grants in full the Estate Movants' motion to dismiss, this time with prejudice.

## BACKGROUND[1]

The Court discusses the underlying facts in this case only to the extent necessary to resolve the instant motion and to provide relevant context, as the

---

[1]     This section draws on facts from the Answer of V. International Fine Arts Publishing, Inc. to First Amended Counterclaim, and V. International Fine Arts Publishing, Inc. First Amended Counterclaims ("V Intl. FAC" (Dkt. #282)), and from the Answer of X One X Movie Archive, Inc. to First Amended Counterclaim, and Related Second Amended Counterclaims ("X One X SAC" (Dkt. #284)). The Court also draws on facts from documents referenced or incorporated within the V Intl. FAC and X One X SAC. *See DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court

Court twice previously engaged in more exhaustive factual recitations. *See AVELA II*, 241 F. Supp. 3d at 468-70; *AVELA I*, 131 F. Supp. 3d at 200-02.

## A. Factual Background

### 1. The Parties

V. International is "a corporation duly organized and existing under the laws of the State of California with its principal place of business … [in] Carlsbad, California[.]" (V Intl. FAC ¶ 1). It "operates as a licensing agent for A.V.E.L.A., Inc." (*Id.*). X One X is a Nevada corporation that "creat[es] new artistic works in print, graphic[,] and lithographic mediums … [;] obtains copyrights registered with the United States Copyright Office … [;] and licenses these artistic works to third parties." (X One X SAC ¶ 1).

The Monroe Estate is a Delaware limited liability company ("LLC") with its principal place of business in New York City. (V. Intl. FAC ¶ 2; X One X SAC ¶ 2). Counter-Plaintiffs allege, as they did in *AVELA II*, that the Monroe Estate is in fact an alter ego of ABG, another Delaware LLC with its principal place of business in New York. (V. Intl. FAC ¶¶ 2-3; X One X SAC ¶¶ 2-3).

---

may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint … [as well as documents that are] integral to the complaint." (internal quotation marks and citations omitted)). For the purpose of adjudicating the Estate Movants' motion to dismiss, the Court accepts as true the well-pleaded allegations in Counter-Plaintiffs' counterclaims. *See, e.g.*, *Growblox Scis., Inc.* v. *GCM Admin. Servs., LLC*, No. 14 Civ. 2280 (ER), 2016 WL 1275050, at *6 (S.D.N.Y. Mar. 31, 2016). For ease of reference, the Court refers to the Estate Movants' memorandum of law in support of their motion to dismiss as "Estate Movants' Br." (Dkt. #291); V. International's and X One X's briefs in opposition to the Estate Movants' motion to dismiss, respectively, as "V. Intl. Opp." (Dkt. #295) and "X One X Opp." (Dkt. #296); and the Estate Movants' reply in further support of their motion to dismiss as "Estate Movants' Reply" (Dkt. #297).

Salter is ABG's and the Monroe Estate's Chief Executive Officer. (V. Intl. FAC ¶ 4; X One X SAC ¶ 4).

### 2. The Estate Movants' Alleged Misconduct

As in *AVELA I* and *AVELA II*, the present dispute centers on registered word and design trademarks involving Marilyn Monroe. In their amended pleadings, Counter-Plaintiffs allege misconduct as to 15 trademarks (the "Contested Marks"). (V. Intl. FAC ¶ 29; X One X SAC ¶ 30). Counter-Plaintiffs allege that the Monroe Estate "purports to be the owner of the Contested Marks and … uses its name to falsely and fraudulently imply that it is the estate of Marilyn Monroe … in order to further its illegal scheme to monopolize any and all uses of Marilyn Monroe's name, image[,] and/or likeness[.]" (V. Intl. FAC ¶ 22; X One X SAC ¶ 23). The Monroe Estate also allegedly seeks "to prevent members of the public … from: [i] using, licensing[,] and marketing public domain images of Marilyn Monroe; and [ii] using copyrighted images of Marilyn Monroe owned by anyone other than [ABG and the Monroe Estate]." (*Id.*).

Counter-Plaintiffs further claim that, despite ABG's and the Monroe Estate's representations to the contrary, they "do not have exclusive rights to intellectual property related to Marilyn Monroe." (V. Intl. FAC ¶ 30; X One X SAC ¶ 31). That is because "many photographs of the long-deceased Monroe are within the public domain" (V. Intl. FAC ¶ 31; X One X SAC ¶ 32), and "dozens … of photographers and/or entities purport to own copyrights in images of Monroe" (*id.*). Additionally, "[o]ther entities own trademark and

copyright rights in Monroe's films and characters[, and] in the name 'Marilyn' and even in 'Norma Jeane [*sic*].'" (V. Intl. FAC ¶ 32; X One X SAC ¶ 33).

In Counter-Plaintiffs' view, the Contested Marks "are, in essence, strategic litigation tools by which ABG, under the misleading name 'Estate of Marilyn Monroe, LLC,' purports to exercise exclusive ownership of the right to exploit Marilyn Monroe's image, likeness[,] and name[.]" (V. Intl. FAC ¶ 34; X One X SAC ¶ 36). In an attempt to gain control over the use of Marilyn Monroe's image and name, ABG and the Monroe Estate allegedly "threaten and intimidate other entities ... to discourage and prevent their lawful use of Marilyn Monroe's image [and] name[.]" (V. Intl. FAC ¶ 35; X One X SAC ¶ 37).

The Estate Movants have sent "dozens [of] cease and desist letters intended to prevent merchants and individuals from lawfully selling Marilyn Monroe-related products or using any indicia of Marilyn Monroe[.]" (V. Intl. FAC ¶ 37; X One X SAC ¶ 39). These "unsubstantiated threats of sham litigation ... deter[] lawful competition in the marketplace [and] ... interfere[] with [Counter-Plaintiffs'] ability to license [their] Marilyn Monroe images[.]" (V. Intl. FAC ¶ 38; X One X SAC ¶ 40). Counter-Plaintiffs contend that "[c]ontinued registration of the Contested Marks will damage [Counter-Plaintiffs'] business by preventing [them] and other legitimate competitors from lawfully licensing artistic works utilizing Marilyn Monroe's [image, likeness, and name] and from creating products from those works for sale to consumers." (V. Intl. FAC ¶ 47; X One X SAC ¶ 49).

**B.      Procedural Developments After *AVELA II***

On March 13, 2017, the Court issued *AVELA II*, which recounts the case's procedural history through that date.  *See* 241 F. Supp. 3d at 203.  In *AVELA II*, this Court rejected Counter-Plaintiffs' alter-ego theory; denied the motion to dismiss Counter-Plaintiffs' trademark cancellation claims as to the Monroe Estate and claim for intentional interference with prospective economic advantage; and granted, without prejudice, the motion to dismiss the Section 349, attempted monopolization, fraud, and tortious-interference-with-contract claims.  The Court granted Counter-Plaintiffs leave to amend their pleadings.  In doing so, it advised them "to consider this Opinion carefully in deciding whether and what to replead."  *AVELA II*, 241 F. Supp. 3d at 468.

V. International filed the following amended counterclaims:

(i)    Trademark Cancellation, Lack of Distinctiveness (against the Monroe Estate and ABG):  V. International seeks to cancel the Contested Marks on the ground of "lack of distinctiveness."  (V. Intl FAC ¶¶ 49-54).

(ii)   Trademark Cancellation, Functionality (against the Monroe Estate and ABG): V. International argues that the Contested Marks should be cancelled because they are purely functional.  (*Id.* at ¶¶ 55-60).

(iii)  New York General Business Law Section 349 (against the Estate Movants):  V. International alleges that the Estate Movants have committed deceptive acts and practices in violation of New York law.  (*Id.* at ¶¶ 61-74).

(iv)   Tortious Interference with Contract (against the Estate Movants):  The Estate Movants, V. International claims, disrupted two contracts that created licensing arrangements for V. International.  (*Id.* at ¶¶ 75-84).

(v)    Intentional Interference with Prospective Economic Advantage (against the Estate Movants):

V. International alleges that the Estate Movants interfered with a licensing agreement into which V. International planned to enter. (*Id.* at ¶¶ 85-92).

X One X filed just three amended counterclaims, substantially identical to the first three of V. International's amended counterclaims listed above. (*See* X One X SAC ¶¶ 51-75). Both X One X and V. International replead their alter-ego allegations. (V. Intl. FAC ¶¶ 10-12; X One X SAC ¶¶ 10-13).

On May 30, 2017, the Estate Movants moved to dismiss (i) the Counter-Plaintiffs' theory of alter-ego liability, (ii) their trademark-cancellation claims as to ABG, (iii) their Section 349 claims, and (iv) V. International's tortious-interference-with-contract claim. On June 29, 2017, V. International and X One X filed their opposition papers. (Dkt. #295, 296). On July 13, 2017, the Estate Movants filed a reply in further support of their motion to dismiss. (Dkt. #297).

## DISCUSSION

### A. Motions to Dismiss Counterclaims Under Rule 12(b)(6)

"A motion to dismiss a counterclaim for failure to state a claim is evaluated using the same standard as a motion to dismiss a complaint." *AVELA II*, 241 F. Supp. 3d at 473. "On a motion under Rule 12(b)(6) to dismiss a complaint for failure to state a claim, the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive." *Doe* v. *Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). And "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

"[A]lthough a court" adjudicating a Rule 12(b)(6) motion "must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions[.]" *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to save a complaint from dismissal. *Iqbal*, 556 U.S. at 678. Nor must a court "accept as truth … pleadings … that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (collecting cases). In sum, "[a] motion to dismiss should be granted 'where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Nielsen* v. *AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679).

**B.    The Estate Movants' Motion to Dismiss**

Before the Court are eight counterclaims — three by X One X, and five by V. International. X One X's counterclaims are substantially identical to those

filed by V. International. Accordingly, the Court analyzes both parties' counterclaims together. In *AVELA II*, this Court remarked that "[t]he chief flaw in [Counter-Plaintiffs'] counterclaims is that they contain few well-pleaded factual allegations." 241 F. Supp. 3d at 473. The amended pleadings suffer from the same flaw and, for that reason, must be dismissed.

### 1. Dismissal of Counter-Plaintiffs' Alter-Ego Allegations Is Warranted

#### a. Applicable Law

In *AVELA II*, this Court conducted a choice-of-law analysis and held that Delaware law governs Counter-Plaintiffs' alter-ego claim. *See* 241 F. Supp. 3d at 474 ("Because the Monroe Estate is a Delaware LLC, the Court will look to Delaware law to address V. International's argument that the Monroe Estate is ABG's alter ego." (internal citations omitted)). As the Court then noted, "a plaintiff seeking to persuade a Delaware court to disregard [an LLC's] corporate structure faces 'a difficult task[.]'" *Id.* (quoting *NetJets Aviation, Inc. v. LHC Commc'ns* (hereinafter, "*NetJets*"), 537 F.3d 168, 176 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 401-02 (S.D.N.Y. 2013) (Because "Delaware courts especially take the corporate form very seriously and will disregard it only in the exceptional case[,]" a plaintiff arguing that a court should disregard the corporate form "faces a heavy burden." (internal quotation marks and citation omitted))).

Under Delaware law, a Court may pierce the corporate veil only "where there is fraud" or "where [the LLC] is in fact a mere instrumentality or alter ego

of its owner." *NetJets*, 537 F.3d at 176 (quoting *Geyer* v. *Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992)).  To establish that an LLC is the alter ego of another entity, a party must establish that:  (i) "the entities in question operated as a single economic entity," and (ii) "there [is] an overall element of injustice or unfairness." *Id.* at 177.

> Factors relevant to the first, single-economic-entity showing include

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995) (internal quotation marks and citations omitted); *see also NetJets*, 537 F.3d at 178 (observing that principles relevant to piercing veil of Delaware corporations "are generally applicable as well where one of the entities in question is an LLC rather than a corporation," but that "somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required").

To make the second, injustice-or-unfairness showing, a plaintiff must establish that the LLC "effectively … exist[s] as a sham or shell through which the parent company perpetrates injustice." *Nat'l Gear & Piston, Inc.*, 975 F. Supp. 2d at 406.  The injustice or unfairness must be "a result of an abuse of the corporate form" and "must consist of more than merely the [tort or breach

of contract] that is the basis of the plaintiff's lawsuit[.]"  *Id.* (internal quotation marks and citation omitted).

### b.  Analysis

Counter-Plaintiffs allege — as they did in their prior pleadings — that the Court should hold that the Monroe Estate is ABG's alter ego.  In *AVELA II*, this Court noted that Counter-Plaintiffs "alleged virtually no facts to substantiate this claim"; the Court therefore "reject[ed their] alter-ego theory of liability[.]" 241 F. Supp. 3d at 475.  Here, too, Counter-Plaintiffs have failed adequately to allege, as they must, that the Monroe Estate and ABG "operate[ ] as a single economic entity" and that "there [is] an overall element of injustice or unfairness."  *NetJets*, 537 F.3d at 177.

While Counter-Plaintiffs have added considerable verbiage to their pleadings, they have not remedied the deficiencies identified by the Court in its earlier opinion.  Broadly speaking, the new allegations are that:  (i) ABG and the Monroe Estate share the same telephone system and number; (ii) ABG is the Monroe Estate's sole manager; (iii) ABG and the Monroe Estate share legal and finance departments; (iv) the Monroe Estate's contracts direct licensees to submit financial statements and other mail to ABG; (v) the Monroe Estate purports to own certain trademarks in Marilyn Monroe's name when in fact the Monroe Estate's address on the trademark registration is listed "care of" ABG; (vi) ABG and the Monroe Estate claim to own and operate the same website; (vii) the Monroe Estate's licensees have remitted royalties to ABG; and

(viii) ABG pays the Monroe Estate's overhead and expenses. (V. Intl. FAC ¶ 10; X One X SAC ¶ 10).

These new allegations add little to Counter-Plaintiffs' previous pleadings. Some of the new allegations are sufficiently similar to the previous pleadings as to have only the slightest effect. The allegation that ABG and the Monroe Estate share legal and finance departments, for example, echoes the earlier claim that the companies share a General Counsel and other officers and managers; and the allegation that ABG and the Monroe Estate share the same telephone system, telephone number, and website echoes the earlier claim that the companies share the same address and office space. (*See* Dkt. #223 ¶ 11). More to the point, these new allegations do not show that ABG and the Monroe Estate operated as a single entity. It "is well-established that … subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent[.]" *In re BHS & B Holdings LLC*, 420 B.R. 112, 138 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). Similarly, allegations of shared office space or a shared website are insufficient to find that corporate entities are a single economic entity. *Unterberg* v. *ExxonMobil Oil Corp.*, 203 F. Supp. 3d 324, 329 (S.D.N.Y. 2016) (holding that the mere fact that "a parent and subsidiary hold themselves out as being … controlled and managed from the parent's offices" is "not enough" to pierce the corporate veil (internal citation omitted)).

The other allegations similarly fall short.  Counter-Plaintiffs' contention that the Monroe Estate's licensees have remitted royalties to ABG and that ABG pays the Monroe Estate's overhead and expenses do not establish "an actual commingling of assets."  *Harco Nat'l Ins. Co.* v. *Green Farms, Inc.*, Civ. A. No. 1131 (MAH), 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989).  The claim that the Monroe Estate directs licensees to send correspondence to ABG fails to show that the two companies operate as a single entity, particularly given that the Monroe Estate shares an address with ABG, which as mentioned above is of little consequence to the single-entity analysis.  And, even if true, the suggestion that ABG is the Monroe Estate's sole manager offers little evidence that the two companies operate as a single entity.  Nowhere do Counter-Plaintiffs allege that the Monroe Estate was inadequately capitalized or insolvent, or that ABG siphoned the Monroe Estate's funds.  Nor do the factual allegations suggest that the Monroe Estate "functioned as a facade for [ABG.]" *Fletcher*, 68 F.3d at 1458.

The two cases on which Counter-Plaintiffs rely are inapposite.  In *De Sole* v. *Knoedler Gallery, LLC*, the Court's finding of a mingling of operations hinged in large part on the existence of money transfers between the entities, executed without written agreements and recorded in the "balance sheet as 'interdivisional receivables.'"  139 F. Supp. 3d 618, 666-67 (S.D.N.Y. 2015). That the transactions were performed "without observing the formalities and procedures typical of an arm's-length transaction is persuasive evidence that the two entities are 'one and the same.'"  *Id.*  The court was further persuaded

by the fact that one entity "siphoned approximately $23.9 million from [the other]." *Id.* And in *Soroof Trading Development Company Ltd.* v. *GE Fuel Cell Systems LLC*, there was evidence that the alter ego "had no cash assets at the time of dissolution," which was the result of "intentional and improper undercapitalization." 842 F. Supp. 2d 502, 521-22 (S.D.N.Y. 2012). Here, by contrast, there are no allegations interest-free loans, "interdivisional" transactions, siphoned funds, or intentional under-capitalization. For that reason, neither *Knoedler Gallery* nor *Soroof Trading* is factually analogous to the case at bar.

Counter-Plaintiffs also have failed to show "an overall element of injustice or unfairness" in the relationship between ABG and the Monroe Estate. Counter-Plaintiffs' amended allegations are substantially similar to their original pleadings on this count. The only relevant difference is that the amended pleadings contain conclusory allegations of harm to consumers. Failure to pierce the LLC veil, Counter-Plaintiffs now claim, would be unjust because "it may permit ABG to continue to deceive the public and consumers by perpetuating ABG's false claims that [the Monroe Estate] is actually Monroe's estate" and "would also permit ABG to continue to send countless individuals and entities cease and desist letters and institute sham litigation[.]" (V. Intl. FAC ¶ 11; X One X SAC ¶ 11).

Without more, those allegations fail to establish the requisite injustice or unfairness. Counter-Plaintiffs do not allege with any detail or specificity that respecting the Monroe Estate's LLC form "would promote an injustice separate

and apart from the causes of action [Counter-Plaintiffs] bring[] in [their] counterclaims." *AVELA II*, 241 F. Supp. 3d at 476 (citing *Knoedler Gallery, LLC*, 139 F. Supp. 3d at 665). To be sure, they speculate that they and the public have been harmed "through limited choices, potentially higher prices, and … restrictions on the use of any indicia of Marilyn Monroe." (V. Intl. FAC ¶ 74; X One X SAC 75). Yet those speculative harms are largely duplicative of those that Counter-Plaintiffs themselves claim to have suffered. Counter-Plaintiffs have not adequately alleged, as they must do at this stage, that the corporation has committed an injustice beyond the harm caused to Counter-Plaintiffs. For these reasons, Counter-Plaintiffs have again fallen short of their obligation to plead adequately that the Monroe Estate is "a sham and exist[s] for no other purpose than as a vehicle for fraud." *Carotek, Inc.* v. *Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313, 350 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).

The Court recognizes, as it did in *AVELA II*, that alter-ego theories of liability "are generally fact intensive." *Credit Suisse Sec. (USA) LLC* v. *W. Coast Opportunity Fund, LLC*, Civ. A. No. 4380 (VCN), 2009 WL 2356881, at *3 n.23 (Del. Ch. July 30, 2009). "And for that reason, whether an LLC's form should be disregarded is a question 'generally submitted to the jury.'" *AVELA II*, 241 F. Supp. 3d at 476 (quoting *Overton* v. *Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 404 (S.D.N.Y. 2016)). But Counter-Plaintiffs have again fallen well short of alleging plausibly that the Monroe Estate is ABG's alter ego. The Court therefore rejects Counter-Plaintiffs' alter-ego claims once more.

## 2. Counter-Plaintiffs' Trademark-Cancellation Claims as to ABG Fail

### a. Applicable Law

Counter-Plaintiffs call for the Court to cancel the Contested Marks as to ABG on two grounds: lack of distinctiveness and functionality. In *AVELA II*, this Court recited at length the law governing trademark cancellation on each of those grounds. 241 F. Supp. 3d at 476-79.[2] For that reason, and because the present motion raises an antecedent issue — whether ABG is a proper defendant for cancellation of the Contested Marks — the Court does not here discuss the substantive law relevant to trademark cancellation, but instead focuses on the law relevant to the antecedent proper-party question.

The issue before the Court is whether an entity other than the trademark registrant and owner may properly be sued for trademark cancellation. The Second Circuit has yet to address that question. To be sure, the Second Circuit has held that trademark infringement claims under the Lanham Act may only be brought by the owner of the trademark. *See Fed. Treas. Enterp. Sojuzplodoimport* v. *Spirits Int'l N.V.*, 623 F.3d 61, 69 (2d Cir. 2010) ("[O]wnership of the relevant trademark is one of the 'necessary elements ... of trademark infringement under the Lanham Act.'" (quoting *Island Software & Comput. Serv., Inc.* v. *Microsoft Corp.*, 413 F.3d 257, 259-60 (2d Cir. 2005)));

---

[2]     In *AVELA II*, the Court adjudicated a motion to dismiss Counter-Plaintiffs' trademark-cancellation claims as to the Monroe Estate. It found that the issues raised were sufficiently fact-intensive that they could not be decided on a motion to dismiss. *AVELA II*, 241 F. Supp. 3d at 477, 479. In their amended pleadings, Counter-Plaintiffs have asserted the same trademark-cancellation claims, but this time against both the Monroe Estate and ABG.

*accord Fed. Treas. Enterp. Sojuzplodoimport* v. *Spirits Intern. B.V.*, No. 04 Civ. 8510 (GBD), 2011 WL 4005321, at *8 (S.D.N.Y. Sept. 1, 2011) (collecting cases). But the Court has not addressed whether a party other than the trademark owner may be named in a trademark-cancellation claim. And the Lanham Act does not provide a ready answer: Neither 15 U.S.C. § 1119, which provides for concurrent jurisdiction of the federal courts and the Trademark Trial and Appeal Board over cancellation of trademarks, nor 15 U.S.C. § 1064, which identifies the party who may bring a trademark-cancellation action, explicitly addresses the question.

Courts in this and other districts that have addressed the issue have held that trademark-cancellation claims may only be brought against the trademark owner. In *Informix Software, Inc.* v. *Oracle Corp.*, a software company sued the owner of a trademark and the licensee of the trademark for, *inter alia*, cancellation of trademark. 927 F. Supp. 1283, 1284 (N.D. Cal. 1996). In deciding whether the trademark-cancellation claim could be brought against the licensee, the court noted that 15 U.S.C. § 1119 "provides that the Court may rectify the trademark register with respect to 'the registrations of any party to the action,'" and found that the statutory language "suggests that a complaint for trademark cancellation should proceed against the party who currently owns the trademark." *Id.* at 1286 (quoting 15 U.S.C. § 1119).

The district court in *Informix* further held that, though "an exclusive licensee stands in the shoes of the trademark owner[,]" the Lanham Act "imposes a duty upon the licensor … to supervise a licensee's use of its

trademark … [and] specif[ies] that a registrant's trademark may be cancelled if the registrant fails to control its licensee's use of the licensed mark." 927 F. Supp. at 1286. "This duty imposed by statute also strongly suggests that the ultimate responsibility for the validity of a trademark lies with the licensor, not with the licensee." *Id.* Ultimately, the court held that "the owner of the trademark is the only proper defendant." *Id.* Other courts have held similarly. *See, e.g.*, *Hokto Kinoko Co.* v. *Concord Farms, Inc.*, 810 F. Supp. 2d 1013, 1034 (C.D. Cal. 2011) ("[A] complaint for trademark cancellation in federal court must proceed against the party who currently owns the trademark[.]"), *aff'd*, 738 F.3d 1085 (9th Cir. 2013); *Van Well Nursery, Inc.* v. *Mony Life Ins. Co.*, 421 F. Supp. 2d 1321, 1332 (E.D. Wash. 2006); *Iowa Health Sys.* v. *Trinity Health Corp.*, 177 F. Supp. 2d 897, 911 (N.D. Iowa 2001); *cf. Sojuzplodoimport*, 2011 WL 4005321, at *8 n.17 (noting without analysis that for a trademark-cancellation claim, "the relief sought cannot be obtained from these non-registrant/owner defendants").

This Court finds persuasive the reasoning adopted by these other courts. Counter-Plaintiffs have identified no basis, either in law or in logic, to allow them to bring a trademark-cancellation claim against anyone other than the trademark's registrant/owner. This Court believes that no such basis exists. Accordingly, this Court holds that Counter-Plaintiffs may only bring their trademark-cancellation claim against the trademark owner.

### b. Analysis

The question, then, is whether Counter-Plaintiffs have sufficiently alleged that ABG is the owner of the Contested Marks. X One X claims that it has "alleged sufficient facts indicating [that] ABG controls the nature and quality of the 'official' Monroe products at issue sold under the Contested Marks." (X One X Opp. 9).[3] It points to allegations in the amended pleadings that (i) "[t]he Contested Marks are, in essence, strategic litigation tools by which ABG ... purport[s] to exercise exclusive ownership of the right to exploit Marilyn Monroe's image, likeness[,] and name" (*id.* (quoting X One X SAC ¶ 36)); (ii) "ABG claims to be the exclusive licensor of products bearing Marilyn Monroe's image, likeness[,] and name" (*id.* (quoting X One X SAC ¶ 38)); and (iii) ABG is the true owner of trademark registration numbers 4527088, 4743834, and 4336364. (*Id.* (citing X One X SAC ¶¶ 26, 28, 30)). It further asserts, without citing any case law, that "[t]he entity which controls the nature and quality of the goods sold under a mark is the owner of that mark." (*Id.*). Though that test may apply where prior ownership cannot be established or in the licensing context, *see, e.g.*, *In re Wella A.G.*, 787 F.2d 1549, 1554 (Fed. Cir. 1986); *Dawn Donut Co.* v. *Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959); *Liebowitz* v. *Elsevier Science Ltd.*, 927 F. Supp. 688, 696 (S.D.N.Y. 1996), it has no bearing here.

---

[3]     V. International "joins in, and incorporates by reference, the arguments raised [by] X One X[.]" (V. Intl. Opp. 4).

It is well-settled that the trademark registrant is considered the trademark owner. Under the Latham Act, it is the "owner of a trademark" who "may request registration of its trademark on the principal register." 15 U.S.C. § 1051. As the Supreme Court has recently explained, federal registration "confers important legal rights and benefits *on trademark owners* who register their marks." *Matal* v. *Tam*, 137 S. Ct. 1744, 1753 (2017) (emphasis added) (internal quotation marks and citation omitted).

Here, there is little doubt that the trademark owner is the Monroe Estate, not ABG. The trademark registrations themselves belie Counter-Plaintiffs' assertion to the contrary: They indisputably list the Monroe Estate as the owner.[4] The only reference to ABG is in the Monroe Estate's street address, which is listed as: "100 West 33rd Street, Suite 1007, c/o Authentic Brands Group, LLC, New York, NY 10001." (Dkt. #292-1, Ex. 1, 2). The mere fact that the Monroe Estate's address references ABG does not, and could not, establish that ABG owns the trademarks. It establishes only that the Monroe Estate — the entity named on the trademark registration — lists its address in "care of" ABG, presumably because it shares office space with ABG. That fact alone

---

[4] On a motion to dismiss, the Court takes as true all of the non-movant's well-pleaded factual allegations. However, the Court may also properly consider documents that are incorporated by reference or that are integral to the complaint. *DiFolco*, 622 F.3d at 111. The trademark registrations are integral to the Counter-Plaintiffs' amended complaints, and are referenced therein. (*See* V. Intl. FAC ¶ 29; X One X SAC ¶ 30). This Court may therefore consider those documents. And where, as here, documents properly considered on a motion to dismiss contradict the pleadings, the Court need not accept those pleadings as true. *See In re Livent, Inc. Noteholders Secs. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) ("a court need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted … by documents upon which its pleadings rely, or by facts of which the court may take judicial notice" (quoting *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995))).

cannot reasonably be understood to suggest that ABG is the trademark owner.

Accordingly, the Monroe Estate is the only party against whom

Counter-Plaintiffs may bring their trademark-cancellation claims; the Court

therefore dismisses those claims as to ABG.

### 3. Counter-Plaintiffs Have Not Plausibly Alleged That the Estate Movants Violated New York General Business Law § 349

#### a. Applicable Law

In their amended pleadings, Counter-Plaintiffs reassert a claim against

the Estate Movants under Section 349 of New York's General Business Law,

which protects against "[d]eceptive acts or practices in the conduct of any

business, trade[,] or commerce or in the furnishing of any service in" the State

of New York. N.Y. Gen. Bus. Law § 349(a). "To state a *prima facie* claim under

[Section 349], a plaintiff must allege that the defendant [i] engaged in

consumer-oriented conduct; [ii] that the conduct was materially misleading;

and [iii] that the plaintiff suffered injury as a result of the allegedly deceptive

act or practice." *Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 292

(S.D.N.Y. 2015).

As this Court noted in *AVELA II*, the consumer-orientation requirement

"cabins the statute." 241 F. Supp. 3d at 483. "[C]ourts routinely reject ...

attempts to fashion Section 349 ... claims from garden variety disputes

between competitors." *Perfect Pearl Co.* v. *Majestic Pearl & Stone, Inc.*, 887 F.

Supp. 2d 519, 542 (S.D.N.Y. 2012) (internal quotation marks and citation

omitted). Though "[c]ompetitors also have standing to sue [under

Section 349]," *Grgurev* v. *Licul*, 229 F. Supp. 3d 267, 292 (S.D.N.Y. 2017)

(internal quotation marks and citations omitted), a plaintiff must advance allegations that go beyond "conclusory allegations of impact on consumers at large," *Miller* v. *HSBC Bank U.S.A., N.A.*, No. 13 Civ. 7500 (RWS), 2015 WL 585589, at *8 (S.D.N.Y. Feb. 11, 2015).  And "a party's claim that consumers will be confused, on its own, does not meet the threshold for liability under [Section 349]."  *RCA Trademark Mgmt. S.A.S.* v. *VOXX Int'l Corp.*, No. 14 Civ. 6294 (LTS), 2015 WL 5008762, at *5 (S.D.N.Y. Aug. 24, 2015) (internal quotation marks and citation omitted).  Instead, there must be "specific and substantial injury to the public interest over and above … ordinary trademark infringement."  *AVELA II*, 241 F. Supp. 3d at 484 (internal quotation marks and citation omitted).

### b.    Analysis

In *AVELA II*, this Court found that Counter-Plaintiffs had failed to state a claim under Section 349 because they had not adequately alleged that the misconduct targeted or harmed consumers.  Counter-Plaintiffs' renewed Section 349 claim suffers from the same fatal flaw.  The renewed claim is based on allegations that "ABG intentionally chose the name [the Monroe Estate] for its purported subsidiary to make consumers and the public believe that [the Monroe Estate] is the actual estate of the late Marilyn Monroe and/or that [ABG and the Monroe Estate] have a relationship with the estate" (V. Intl. FAC ¶ 63; X One X SAC ¶ 65); that "ABG has deceived the public by falsely claiming … that [the Monroe Estate] is the exclusive owner of rights to all intellectual property relating to Monroe" (V. Intl. FAC ¶ 64; X One X SAC ¶ 66);

that "ABG sends baseless cease and desist letters to merchants and other legitimately-operating entities purporting to be the estate of Marilyn Monroe, in an effort to deceive those entities into either entering into license agreements with [ABG and the Monroe Estate] or to cease selling lawfully made products" (V. Intl. FAC ¶ 65; X One X SAC ¶ 67); and that ABG "has prevented the public from creating and maintaining community fan pages for Monroe" (V. Intl. FAC ¶ 67; X One X SAC ¶ 69).

These factual allegations regarding consumer-related harm, though more detailed than in Counter-Plaintiffs' prior pleadings, are no more sufficient to state a claim under Section 349. The allegations regarding the cease-and-desist letters involve harm to merchants like Counter-Plaintiffs, rather than harm directly to consumers. And most of the other allegations of public harm are suggestive of little more than consumer confusion, which courts in this Circuit have found to be insufficient to meet the threshold for Section 349 liability. *See, e.g.*, *RCA Trademark Mgmt. SAS*, 2015 WL 5008762, at *5; *Perfect Pearl Co.*, 887 F. Supp. 3d at 542. The only allegation that is neither focused on consumer confusion nor derivative of harm to merchants — that ABG has created obstacles for online community fan pages for Monroe — does not rise to the level of harm required to state a Section 349 claim. *See, e.g.*, *Perfect Pearl Co.*, 887 F. Supp. 2d at 542-43.

Most importantly, the gravamen of Counter-Plaintiffs' allegations continues to be the harm that Counter-Plaintiffs themselves (and other businesses similarly situated) suffered. This is evidenced by the fact that (i) the

24

relief they seek is aimed at protecting Counter-Plaintiffs' commercial interests rather than the public interest, and (ii) the alleged public harms are derivative of the harms that Counter-Plaintiffs themselves have allegedly suffered. The allegations of harm as to Counter-Plaintiffs far outstrip those relating to any public harm. For these reasons, Counter-Plaintiffs' Section 349 claim fails as a matter of law.

Counter-Plaintiffs' effort to resist that conclusion misses the mark. Counter-Plaintiffs rely primarily on *In re Houbigant Inc.*, 914 F. Supp. 964, 983-84 (S.D.N.Y. 1995), to support their assertion that, "[w]here a defendant is part of an unlawful scheme to deceive consumers … with the intent to cause confusion and mistake, a defendant's false advertising can be found to involve a public harm." (X One X Opp. 11). That reliance is misplaced, both because *In re Houbigant* — unlike the instant case — involved a potential public-safety concern due to the sale of counterfeit goods, and because the court never addressed whether the alleged harm extended beyond consumer confusion. 914 F. Supp. at 971-72, 983. As such, *In re Houbigant* cannot bear the weight that Counter-Plaintiffs place on it. Nor do Counter-Plaintiffs' other assertions, which Counter-Plaintiffs fail to ground in relevant case law or other authority, alter this Court's conclusion that the Section 349 claim fails for the reasons outlined above.

4. **V. International Has Failed to Allege a Plausible Claim for Tortious Interference with Contract Under New York Law**

   a. **Applicable Law**

Finally, the Estate Movants move to dismiss V. International's renewed tortious-interference-with-contract claim, the prior iteration of which this Court dismissed without prejudice in *AVELA II*. Under New York law, the elements of tortious interference with contract are: "[i] 'the existence of a valid contract between the plaintiff and a third party'; [ii] the 'defendant's knowledge of the contract'; [iii] the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; [iv] 'actual breach of the contract'; and [v] 'damages resulting therefrom.'" *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co.* v. *Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)).

   b. **Analysis**

V. International alleges that the Estate Movants tortiously interfered with two contracts: one between A.V.E.L.A., Inc. ("AVELA") and Freeze, a division of Central Mills, Inc.; and another between AVELA and Silver Buffalo, LLC. It claims that the contract with Freeze was in force from June 16, 2005, to 2014; the contract with Silver Buffalo, between June 11, 2006, and 2014. (V. Intl. FAC ¶ 76). Under both contracts, V. International operated as a licensing agent in exchange for a commission fee. (*Id.*). V. International alleges that the Estate Movants "knew or should have known of the existence of such contract[s] and the business relationship[s] between V[.] International and Freeze … and Silver Buffalo." (*Id.* at ¶ 77). Armed with that putative

knowledge, the Estate Movants allegedly "disrupted the business relationships ... by ... making knowingly false representations related to V[.] International's licensing business, by initiating litigation against V[.] International on the basis of alter ego allegations which they knew were false, and ... by threatening Freeze and Silver Buffalo." (*Id.* at ¶ 79). "As a result of [the Estate Movants'] actions, Freeze and Silver Buffalo ceased licensing artwork ... [and] breached their contracts and business relationships with AVELA and V[.] International." (*Id.* at ¶¶ 80-81).

V. International's amended pleadings fail as a matter of law for at least two reasons. *First*, the allegations as to the Estate Movants' knowledge of the contracts are insufficient to support a claim. General allegations that a party "knew or should have known" about the contract in question fall short. *See, e.g., Ferring B.V.* v. *Allergan, Inc.*, 4 F. Supp. 3d 612, 626-27 (S.D.N.Y. 2014) (dismissing claim with prejudice because "Plaintiffs' proposed allegations are inconsistent with the pleading of 'actual knowledge'"); *Roche Diagnostics GmbH* v. *Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013) ("[C]onstructive knowledge is inadequate to demonstrate [party's] knowledge for purposes of tortious interference."); *Medtech Products Inc.* v. *Ranir, LLC*, 596 F. Supp. 2d 778, 814 (S.D.N.Y. 2008) ("[T]he allegations that DenTek 'knew or should have known' about the contracts ... is mere speculation unsupported by the specific allegations of actual knowledge necessary to survive a motion to dismiss a claim of tortious interference with contractual relations."); *Ahluwalia* v. *St. George's Univ., LLC*, 63 F. Supp. 3d 251, 266 (E.D.N.Y. 2014) (holding

that plaintiff failed to adequately plead the elements of the tort where it did not plead "that [defendant] had actual knowledge of any contract between the [p]laintiff and [the] third party"); *Yong Ki Hong* v. *KBS Am., Inc.*, 951 F. Supp. 2d 402, 422 (E.D.N.Y. 2013) ("'[A]lthough a defendant need not be aware of all the details of a contract, it must have actual knowledge of the specific contract' that is the subject of the claim." (internal citation omitted)).  Here, Counter-Plaintiffs have failed to allege that the Estate Movants had knowledge of the contracts at issue.

*Second*, V. International has failed to plead the alleged breach with sufficient particularity to survive a motion to dismiss.  Under New York law, it is insufficient, for purposes of stating a viable claim for tortious interference with contract, to allege in conclusory terms that a contract existed and was breached.  *See, e.g.*, *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (finding allegation that a contract counterparty "walked away" from a project insufficient to establish that terms of a contract were violated); *Leadsinger, Inc.* v. *Cole*, 05 Civ. 5606 (HBP), 2006 WL 2320544, at *11-12 (S.D.N.Y. Aug. 10, 2006) (dismissing claim for tortious interference where party failed to adequately allege the specific breach); *Masefield AG* v. *Colonial Oil Indus.*, No. 05 Civ. 2231 (PKL), 2006 WL 346178, at *4-6 (S.D.N.Y. Feb. 15, 2006) (dismissing counterclaim where defendant "alleged no specific action on the part of [Plaintiff] to cause [third party] to breach the Contract"); *Pitcock* v. *Kasowitz, Benson, Torres & Friedman, LLP*, 915 N.Y.S.2d 239, 241 (1st Dep't 2011) ("[P]laintiff has failed to state [a claim for tortious interference with

contract because he] has not alleged, in non[-]conclusory language, the essential terms of the parties' contract, including the specific provisions upon which liability is predicated[.]"); *Bennett* v. *State Farm Fire and Cas. Co.*, 26 N.Y.S.3d 554, 555 (2d Dep't 2016) (noting that a party must "plead the terms of the alleged underlying contract ... and any specific breach thereof").

V. International's pleadings regarding the alleged breaches are conclusory and lack the specificity required under New York law. The relevant pleadings are captured in two sentences: "As a result of the Counterclaim Defendants' actions, Freeze and Silver Buffalo ceased licensing artwork from AVELA through V[.] International" (*id.* at ¶ 80); and, "[a]s a result of the Counterclaim Defendants' actions, Freeze and Silver Buffalo breached their contracts and business relationships with AVELA and V[.] International" (*id.* at ¶ 81). Counter-Plaintiffs fail to allege which terms of the contracts were breached when Freeze and Silver Buffalo ceased to license artwork from them, or even to state clearly that Freeze's and Silver Buffalo's decisions to cease licensing artwork constituted a breach at all. For that reason, and because Counter-Plaintiffs have failed to plead that the Estate Movants had actual knowledge of either contract, dismissal of the claim for tortious interference with contract is warranted.

### 5. The Court Dismisses Counter-Plaintiffs' Counterclaims with Prejudice

The sole remaining question is whether this Court should dismiss the counterclaims with prejudice. Rule 15(a)(1) allows a party to "amend its pleading once as a matter of course within ... 21 days after serving it, or ... if

the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading[.]"  Fed. R. Civ. P. 15(a)(1).  But once that period has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Rule 15(a)(2) further states:  "The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).

The Second Circuit has explained that "the 'permissive standard' of Rule 15 'is consistent with [its] strong preference for resolving disputes on the merits.'"  *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (quoting *Williams* v. *Citigroup Inc.,* 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).  Consistent with that, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith."  *AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block* v. *First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir. 1993)).

But Rule 15's permissive standard applies with less force when, as here, the Court has already provided notice of the deficiencies in the pleadings and granted leave to amend.  *See, e.g., Denny* v. *Barber*, 576 F.2d 465, 471 (2d Cir. 1978) (dismissing with prejudice where plaintiff received notice of deficiencies at time of first amendment and was therefore not entitled to a "third go-around"); *Treppel* v. *Biovail Corp.*, No. 03 Civ. 3002 (PKL), 2005 WL 2086339, at *12 (S.D.N.Y. Aug. 30, 2005) (dismissing action with prejudice where "plaintiff has already had two bites at the apple and they have proven

fruitless"); *Rosza* v. *May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 132 (S.D.N.Y. 2002) (dismissing action with prejudice where plaintiff failed in his "second effort to state a claim").

In *AVELA II*, this Court expressed doubt as to whether "V. International or X One X w[ould] be able to amend their dismissed counterclaims such that they can survive future dispositive motions." 241 F. Supp. 3d at 490. Counter-Plaintiffs have proven that this Court's doubts were warranted. At this juncture, the Court has even graver doubts than before as to Counter-Plaintiffs' ability to cure the deficiencies in their pleadings. The Court does not believe that a third bite at the apple would yield a result different from the previous two. Nothing in the Counter-Plaintiffs' original or amended pleadings suggests that they will be able adequately to plead that (i) the Monroe Estate operates as ABG's alter ego, (ii) ABG owns the Contested Marks, (iii) the public was harmed in a manner that supports a Section 349 claim, or (iv) the Estate Movants had knowledge of the contracts with Freeze and Silver Buffalo. Accordingly, the Court will not grant further leave to amend.

## CONCLUSION

For the reasons set forth above, the Estate Movants' partial motion to dismiss is GRANTED. The Clerk of Court is directed to terminate Docket Entry 290. The parties are hereby ORDERED to file a joint letter on or before **March 19, 2018**, advising the Court of the parties' present intent to file cross-motions for summary judgment, which were originally due on December 8, 2017, but were adjourned *sine die* pending the issuance of this Opinion. To

the extent the parties still wish to file said motions, they are to include in their joint letter a proposed briefing schedule.

SO ORDERED.

Dated:     March 5, 2018
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge