# Exhibit O

# EXPERT REPORT OF HAL PORET IN MATTER OF
# A.V.E.L.A. INC. V. THE ESTATE OF MARILYN MONROE, LLC ET AL.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

# STUDY TO DETERMINE WHETHER THERE IS A
# LIKELIHOOD OF CONSUMER CONFUSION REGARDING THE
# SOURCE OR APPROVAL OF A.V.E.L.A. T-SHIRTS
# BEARING THE LIKENESS OF MARILYN MONROE

REPORT PREPARED FOR:

DLA Piper LLP

Counsel for Estate of Marilyn Monroe, LLC

PREPARED BY:

Hal Poret

ORC International

315 Park Avenue South

14th Floor

New York, NY   10010

December 2013

## *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE ----------------------------------------------- 1
STUDY AUTHORSHIP AND RESPONSIBILITY------------------------------ 2
STUDY DESIGN------------------------------------------------------------------- 3
SUMMARY OF FINDINGS---------------------------------------------------------- 13
METHODOLOGY

    THE RELEVANT UNIVERSE OF INTEREST ------------------------- 14
    SAMPLING PLAN------------------------------------------------------- 15
    DOUBLE-BLIND INTERVIEWING --------------------------------- 19
    INTERVIEWING PROCEDURES------------------------------------- 19
    RESPONDENT VERIFICATION------------------------------------- 20
    CHECK-IN PROCEDURES-------------------------------------------- 21
    DATA PROCESSING --------------------------------------------------- 21
    INTERVIEWING PERIOD---------------------------------------------- 21
DETAILED FINDINGS ------------------------------------------------------------ 22

APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRES
APPENDIX C:   FIELD INSTRUCTIONS
APPENDIX D:   VALIDATION QUESTIONNAIRE/LETTER
APPENDIX E:   MATERIALS REVIEWED/FEES CHARGED
APPENDIX F:   PHOTOS OF T-SHIRTS SHOWN TO RESPONDENTS
                 (provided electronically)
APPENDIX G:   DATA FILE (provided electronically)
APPENDIX H:   SCREENSHOTS (provided electronically)

## *BACKGROUND AND PURPOSE*

A.V.E.L.A. Inc ("AVELA") markets products, including t-shirts, bearing the likeness of Marilyn Monroe.  The Estate of Marilyn Monroe has requested that AVELA cease and desist marketing such products and AVELA filed a declaratory judgment action regarding the controversy.  In AVELA's Complaint, AVELA alleges that the Estate of Marilyn Monroe and the other defendants (collectively "Monroe") have no enforceable rights in the name or likeness of Marilyn Monroe.

Monroe has counterclaimed, including claims of federal trademark infringement and unfair competition under Section 43(a) of the Lanham Act.  Monroe alleges, among other things, that there is a likelihood that consumers will be confused into mistakenly believing that AVELA products bearing the likeness of Marilyn Monroe originate from or are put out with the permission or approval of Monroe.

DLA Piper, on behalf of Monroe, asked me to design and conduct a survey to determine whether there is a likelihood that consumers will be confused into mistakenly believing that an AVELA t-shirt bearing the likeness of Marilyn Monroe originates from or is put out with the permission or approval of Monroe.  This report details the methodology, execution and results of the survey.

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by ORC International under the supervision of Hal L. Poret, Senior Vice President.

I have personally designed, supervised, and implemented approximately 600 surveys regarding the perceptions and opinions of consumers.  Over 150 of these surveys have involved consumer perception with respect to trademarks.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

Hal Poret

Dated:  December 23, 2013

## STUDY DESIGN

405 qualified respondents[1] participated in this mall-intercept study conducted in 16 markets around the continental U.S.

### TEST GROUP

201 respondents were assigned to participate in a Test Group in which they were shown and questioned about the following AVELA t-shirt with an image of Marilyn Monroe:



---

[1] See Relevant Universe and Sampling sections below for more specific information on the respondents who participated in the survey.

The survey used the well-accepted "Eveready" format for measuring likelihood of confusion.

The survey instructions and questions were generally consistent with a previous survey conducted on behalf of AVELA in a different litigation between Bruce Lee Enterprises and AVELA concerning AVELA's use of the likeness of Bruce Lee on products.  AVELA commissioned a survey in which respondents were shown and questioned about a shirt bearing the likeness of Bruce Lee to determine if there was a likelihood of consumer confusion.  To avoid unnecessary controversy over the wording of survey instructions and questions, my survey largely adopted the wording of the previous AVELA survey.[2]

Once qualified and taken to a private interviewing area, all Test Group respondents were shown the AVELA t-shirt bearing the image of Marilyn Monroe.  The t-shirt was placed on the table in front of the respondent.  Respondents were then instructed:

> Please look at this t-shirt the way you normally do when you are shopping for clothes, either for yourself, or for someone else.
>
> Take as long as you would like, and then tell me when you are finished.

Respondents were then permitted to take as much time as they needed to look at the t-shirt. They were permitted to pick it up and look at it. Once the respondent indicated they were finished examining the t-shirt the interviewer placed the t-shirt face-up on the table in front of the respondent and left it there for the remainder of the interview.

Respondents were then instructed:

---

[2] The main substantive difference is that my survey omitted a question that was included in the AVELA Bruce Lee survey concerning whether the shirt is "endorsed" by anyone.  My omission of a question that could have led to additional confused responses was conservative as it only gave respondents less opportunity to express various forms of confusion.

Now, I would like to ask you a few questions about this t-shirt.

Before I begin I would like to assure you that there are no right or wrong answers.

If you do not know the answer to a question or do not have an opinion, please say so.

Please do not guess.

Then respondents were asked:

Who do you think made or put out this particular t-shirt?

Respondents who gave a response other than "don't know" or "no opinion" were then asked:

What makes you think this?

Respondents who gave a response other than "don't know" or "no opinion" were then probed with:

Any other reasons?

Next, all respondents were asked:

Next, I am going to read you a question that has three answer choices.

Please allow me to read the whole question before answering.

After I am done, if you want me to read the question again, just ask me.

Now, with respect to the <u>makers</u> of this particular t-shirt, do you think…?

1. That they <u>did</u> receive permission or approval from someone to make or put out this particular t-shirt.

2. That they did <u>not</u> receive permission or approval from someone to make or put out this particular t-shirt.
3. Or, do you have no opinion?

The order of the first two choices was randomized.

Respondents who indicated they thought that the makers of the t-shirt did receive permission or approval from someone to make or put out this particular t-shirt were then asked:

> Who do you think gave their permission or approval for this particular t-shirt to be made or put out?

Respondents who gave a response other than "don't know" or "no opinion" were then asked:

> What makes you think this?

Respondents who gave a response other than "don't know" or "no opinion" were then probed with:

> Any other reasons?

Respondents who initially answered that the makers of the t-shirt did receive permission or approval but then answered that they don't know or have no opinion about who gave permission were instead asked:

> What made you answer that you think the makers of this particular t-shirt did receive permission or approval from someone to make or put out the t-shirt? Please be as specific as possible.

This concluded the main survey for Test Group respondents.

CONTROL GROUPS

The other 204 respondents participated in one of two Control Groups. The purpose of the Control Groups are to measure survey noise – i.e., the tendency of respondents to name Marilyn Monroe in response to the survey questions for reasons that may not indicate genuine consumer confusion, such as guessing or other issues.

CONTROL GROUP 1

102 respondents were assigned to participate in Control Group 1. Respondents in Control Group 1 were shown the following control t-shirt, which is equivalent to the AVELA Marilyn Monroe t-shirt with the exception that the image of Marilyn Monroe was replaced with an image of another, non-famous woman:



Respondents in Control Group 1 participated in the exact same survey as described above, with the sole exception that they saw the above Control t-shirt instead of the AVELA Marilyn Monroe t-shirt. Control Group 1 was consistent with the Control Group used by AVELA in the Bruce Lee litigation.  In that survey, a Control Group was shown an alternate version of the AVELA Bruce Lee shirt in which the image of Bruce Lee was replaced by an image of another man.  AVELA submitted this as a valid Control Group along with its survey in federal court.  As AVELA's expert explained in that case, removing only the allegedly infringing element (Marilyn Monroe's image in this instance) and leaving the other elements constant allows the survey to control for the specific impact of the Monroe image on consumers' beliefs about the t-shirt.  Showing the altered shirt controls for the tendency of consumers to guess or name Marilyn Monroe for reasons unrelated to the specific use of her image.

<u>CONTROL GROUP 2</u>

In order to be extremely conservative in estimating the likelihood of confusion, the survey also included another type of Control Group.  Control Group 2 was included in order to ensure that any mentions of Marilyn Monroe represent genuine consumer confusion as to source/permission/approval and that the survey is not merely inducing respondents to name any famous figure that is shown on a product as the source or authorizer of the product.

In order to accomplish this, 102 respondents in Control Group 2 were shown the following t-shirt bearing an image of one of the most famous figures in American History: Ben Franklin.



Ben Franklin is one of the most famous people in American history.  His image appears on the $100 bill and is featured on many consumer products, including books, t-shirts, hats, costumes, posters, pens, novelty and gift items, and other products.[3]  Accordingly, Ben Franklin's image should be highly recognized by consumers.  Showing respondents a t-shirt bearing Ben Franklin's image and asking the same questions is an effective control to determine the extent to which a survey will induce consumers to name a famous person shown on the shirt as the maker or source of permission/approval, even when it would not be expected that actual consumers would believe that person to be the source of the product (or have given approval).

Respondents in Control Group 2 participated in the exact same survey as the Test Group, with the sole exception that they saw the Ben Franklin Control t-shirt instead of the Marilyn Monroe t-shirt.  This allows us to compare whether the percentage of respondents who

---

[3]For example, see the following webpages featuring products bearing Ben Franklin's image:
 http://www.cafepress.com/+ben-franklin+gifts
http://www.zazzle.com/benjamin+franklin+gifts
http://www.spreadshirt.com/benjamin+franklin+t-shirts

answer that the AVELA shirt comes from or is approved by Marilyn Monroe meaningfully exceeds the percentage who answer that the Control Group 2 shirt comes from or is approved by Ben Franklin.  This permits us to determine whether any rate of mentioning Marilyn Monroe represents genuine likelihood of confusion as opposed to typical survey noise.

See Appendix B for the complete text of the main questionnaire.

## *SUMMARY OF KEY FINDINGS*

1) The total confusion level among the Test Group respondents shown the Monroe t-shirt is 25.4%.

2) The level of noise measured in Control Group 1 was 2%.  Subtracting the result from Control Group 1 from the Test Group result yields a net level of confusion of 23.4%

3) No respondents in Control Group 2 directly answered that Ben Franklin or his representatives are the source of the shirt or gave permission or approval.  However, 4.9% of respondents in Control Group 2 gave answers that may indicate a belief that someone who owns the rights to Ben Franklin's image put out or approved the shirt. If these responses were counted as noise, subtracting the Control Group 2 result from the Test Group result would yield a net level of confusion of 20.5%.

4) Regardless of whether the net confusion level is viewed to be 20.5% or 23.4%, it is my opinion that there is a significant level of confusion among consumers as to the source or approval of the t-shirt featuring the image of Marilyn Monroe.

See Detailed Findings section below for detail on the answers of respondents.

## *METHODOLOGY*

### THE RELEVANT UNIVERSE OF INTEREST

The relevant universe for this survey is men and women 16 years or older who think they will personally purchase a graphic or screened t-shirt in the next six months.  It is my understanding that AVELA has taken the position that the relevant t-shirt is a unisex shirt. Accordingly, it was appropriate to survey both males and females.  In addition, the t-shirt could be purchased by a male for a female.  As noted earlier, to avoid unnecessary controversy over question wording, the same screening question was used as in the previous survey AVELA conducted in the Bruce Lee matter.

The survey also excluded persons employed in fields which would give them special knowledge or insight about this subject, namely those working in advertising or market research; in the entertainment or publishing business; for a company that makes or sells clothing; or for a company that is a licensor, licensee, or other provider of pictures or images. Similarly, persons who had an immediate household member so employed were excluded from participation.  Screening out people with special knowledge is a generally accepted procedure.  In accordance with standard practice, respondents who had participated in a mall-intercept survey, other than a political poll, in the past 3 months were also excluded. The screening questions regarding these exclusions were also modeled on the parallel questions from AVELA's survey in the Bruce Lee matter.

The only main difference between the screening questions in this survey and the AVELA survey in the Bruce Lee matter is that my survey did not require that respondents shop at one specific store, as was done in the Bruce Lee survey (Urban Outfitters).  Limiting the survey to respondents who shop at any particular store would not have been appropriate in this instance, as the allegedly infringing t-shirt is sold on the internet and multiple locations, and AVELA does not limit its customers to selling its products at any particular location.

The actual wording of the screening questions used is shown in Appendix B.

**<u>SAMPLING PLAN</u>**

The sampling procedure employed, which utilized shopping malls as a means of identifying relevant consumers, has been widely used and relied upon by market researchers, and many business decisions of consequence are made based on studies that employ such plans. Properly designed and executed studies of this type have been accepted in numerous court decisions.

A multi-stage sampling plan was executed in interviewing facilities located in shopping malls in each of the four principal U.S. Census regions.  The three stages of the sampling plan for this study were:

> SAMPLING UNIT
> 1.  Census regions
> 2.  Metropolitan Areas/Shopping malls
> 3.  Respondents within shopping malls

1.  <u>Census Region Selection</u>

In accordance with generally accepted standards, the study was conducted in three to five markets within each of the four U.S. census regions -- Northeast, South, Midwest and West -- thus obtaining a cross section of residents from all parts of the country.

2.  <u>Metropolitan Area/Shopping Mall Selection</u>

The criteria for selecting a specific shopping mall testing facility to be used in the study included:  1) that an experienced interviewing organization existed within the mall; 2) that this organization had a permanent office within the shopping center created specifically to conduct interviews with consumers; and 3) that their workload

was such that they could complete their portion of the assignment within the desired schedule.

Using these criteria, the following malls were selected as interviewing sites:

| Region | Market | Mall |
|---|---|---|
| Northeast | Buffalo, NY | Eastern Hills Mall |
| | West Nyack, NY | Palisades Center |
| | Philadelphia | Neshaminy Mall |
| | | |
| South | Dallas, TX | Vista Ridge Mall |
| | Baltimore | White Marsch Mall |
| | Fort Lauderdale | Broward Mall |
| | Jacksonville | The Avenue Mall |
| | Spartanburg, SC | Westgate Mall |
| | | |
| Midwest | Chicago, IL | Spring Hill Mall |
| | Detroit | Macomb Mall |
| | Indianapolis | Castleton Square Mall |
| | St. Louis | St. Louis Mills Mall |
| | | |
| West | Denver | Colorado Mills Mall |
| | Las Vegas | Galleria Mall |
| | Los Angeles | Ontario Mills |
| | Phoenix | Arrowhead Mall |

3.    <u>Respondent Selection</u>

Hard quotas were assigned for age and gender group.  The following percentages were used for the purpose of assigning hard quotas in each Test and Control Group:

| Hard Quota Assignments By Age & Gender | | |
|---|---|---|
| Ages | Male | Female |
| 16 – 17 | 3% | 3% |
| 18 – 24 | 12% | 12% |
| 25 – 34 | 15% | 15% |
| 35 – 44 | 10% | 10% |
| 45+ | 10% | 10% |

As noted above, it is my understanding that Avela's testimony in this matter is that the t-shirt is a unisex shirt and is purchased by both males and females. Accordingly, both males and females were included in the survey. As discussed in more detail below, there was a significant rate of likelihood of confusion among both males and females. Accordingly, the precise breakdown of males versus females did not impact the overall conclusion. The data could be re-weighted in any proportion between males and females and the conclusion would not change.

It is also my understanding that Avela's testimony is that the t-shirt tested in the survey is at least sometimes considered to be a "junior" product and that the target population for purchasing the t-shirt likely skews younger than the overall population of clothing consumers. Accordingly, the above quotas were designed to over-represent the 16-17, 18-24, and 25-34 age groups as compared to their presence in the overall U.S. population. Respondents age 35-44 and age 45 and up were also included in the survey because some consumers in those age ranges are prospective purchasers of the t-shirt. As discussed in more detail below, significant confusion was found in all of the age groups surveyed. Accordingly, the precise breakdown of the sample by age did not meaningfully impact the results. The results could be re-weighted by any age distribution and the conclusion would be the same.

The proportion of interviews was carefully balanced across malls and regions so that the following proportion of interviews were conducted in each region for each Group:

| Completed Interviews Per Group For Each Market/Region | Marilyn Monroe Test Group | | Non-Famous Woman Control Group 1 | | Benjamin Franklin Control Group 2 | | Total | |
|---|---|---|---|---|---|---|---|---|
| | *N* | *%* | *N* | *%* | *N* | *%* | *N* | *%* |
| **NE Markets** | **39** | **20%** | **19** | **19%** | **19** | **19%** | **77** | **19%** |
| Buffalo | 14 | 7% | 6 | 6% | 7 | 7% | 27 | 7% |
| New York | 14 | 7% | 8 | 8% | 5 | 5% | 27 | 7% |
| Philadelphia | 11 | 6% | 5 | 6% | 7 | 8% | 23 | 6% |
| **Southern Markets** | **59** | **29%** | **30** | **30%** | **31** | **30%** | **120** | **30%** |
| Baltimore | 11 | 5% | 7 | 7% | 6 | 6% | 24 | 6% |
| Dallas | 12 | 6% | 6 | 7% | 5 | 5% | 23 | 6% |
| Fort Lauderdale | 11 | 6% | 6 | 6% | 6 | 6% | 23 | 6% |
| Jacksonville | 12 | 6% | 7 | 7% | 6 | 6% | 25 | 6% |
| Spartanburg, SC | 13 | 6% | 4 | 4% | 8 | 8% | 25 | 6% |
| **MidWest Markets** | **51** | **25%** | **27** | **26%** | **26** | **25%** | **104** | **26%** |
| Chicago | 12 | 6% | 6 | 6% | 7 | 8% | 25 | 7% |
| Detroit | 14 | 7% | 7 | 7% | 6 | 6% | 27 | 7% |
| Indianapolis | 13 | 6% | 7 | 7% | 6 | 6% | 26 | 6% |
| St, Louis | 12 | 6% | 7 | 7% | 7 | 6% | 26 | 6% |
| **West Markets** | **52** | **25%** | **26** | **25%** | **26** | **25%** | **104** | **25%** |
| Denver | 14 | 7% | 5 | 5% | 7 | 7% | 26 | 6% |
| Las Vegas | 13 | 6% | 6 | 6% | 7 | 7% | 26 | 6% |
| Los Angeles | 12 | 6% | 8 | 8% | 6 | 6% | 26 | 6% |
| Phoenix | 13 | 6% | 7 | 7% | 6 | 6% | 26 | 6% |
| Total | 201 | 100% | 102 | 100% | 102 | 100% | 405 | 100% |

No one mall conducted more than 27 interviews in total.

Additionally, age and gender quota assignments were distributed across malls and regions so that each quota group would be completed across a variety of malls and regions.

**DOUBLE-BLIND INTERVIEWING**

It is important to point out that the study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the interviewers were similarly "blind" with respect to the study's purpose and sponsorship.  Without such knowledge, there is little likelihood that some interviewer(s) might ascertain what responses would be desirable from the sponsor's perspective, and thereby be in a position either to exert an influence on the respondents in this regard, or to modify their recording of a respondent's answers so as to be "helpful".

## INTERVIEWING PROCEDURES

Screenings for eligibility were conducted on the mall premises in each designated shopping mall.  Once qualified, respondents were escorted into the interviewing facility that was operated by the interviewing organization.  Throughout the assignment, tight control and supervision was maintained over all aspects of the interviewing.

ORC International prepared customized, detailed interviewer and supervisor instructions for this assignment.  Copies of these instructions are found in Appendix C of this report.

Before beginning work on this study each interviewer was required to:

- Read the interviewer instructions.
- Attend a personal briefing.  At this briefing, interviewing procedures were outlined and discussed in detail, question by question.
- Complete one or more practice interviews.

Additionally, a representative from each interviewing facility was required to contact an ORC representative with periodic detailed progress reports.  This allowed ORC International to closely monitor and supervise the progress of the study.

The main survey was programmed and hosted by Carbonview Research, Inc., a reputable research solutions company that specializes in survey design, technology solutions and programming for custom market research.   My staff and I thoroughly tested the programmed survey prior to any interviews being conducted.


## RESPONDENT VERIFICATION

In addition to on-the-spot verification where both respondent and interviewer signed their respective names onto a "certification" page, telephone follow-up validation calls were attempted by an independent company who specializes in this type of work to verify that the interview did in fact take place and that only qualified respondents were interviewed.

A listing of each respondent's name and phone number was sent to Outfielders of Eastchester, NY, an independent telephone interviewing service, for verification.

This independent validating service was given the responsibility of attempting to recontact respondents by phone to confirm that:

- Such a person actually existed.
- He/she met the universe requirements for this study.
- He/she was actually interviewed for this study.

A total of 405 interviews were completed of which 405 provided telephone numbers. Outfielders attempted 100% validation and successfully contacted 267, which represents a level of validation (66%) far exceeding the customary industry practice, which is to validate 15-20%.  This validation procedure resulted in no discrepancies.

A copy of the validation questionnaire is included in Appendix D of this report.

## CHECK-IN PROCEDURES

When completed screeners had been numbered in, they were checked to ensure that respondents' answers to screening questions indicated that they met all eligibility requirements and that the screening themselves were complete.

## DATA PROCESSING

For the main survey, interviewers entered respondents' answers directly into the survey programed by Carbonview Research, Inc. Data was then provided electronically to ORC International in an excel file on an ongoing basis throughout the field process.  The data set showing each respondent's answers to all questions will be provided in electronic form.

## INTERVIEWING PERIOD

Interviewing was conducted from December 3, 2013 through December 15, 2013.

## *DETAILED FINDINGS*

---

**Test Group: Marilyn Monroe T-Shirt**

In total 25.4% (51 out of 201 total) Test Group respondents gave responses that I classified as indicating confusion – i.e., that they believed Marilyn Monroe or the people who represent her put out or approve the shirt with the image of Marilyn Monroe.

18.4% (37 out of 201) of respondents specifically answered that the shirt comes from or is approved by Monroe or Monroe's representatives, such as her estate, her lawyers or her family.

The following tables display the open-ended responses[4] that were coded as indicating Monroe or her representatives:

| respid | Q100 : Who do you think made or put out this particular t-shirt? |
|--------|------------------------------------------------------------------|
| 55     | marilyn monroe                                                   |
| 129    | MARYLYN MINRORR                                                  |
| 437    | marilyn monroe foundation                                        |
| 455    | Marlin monroe                                                    |
| 572    | who evers own the rights to estate                               |

---

[4] All responses are reproduced verbatim, including mis-spellings or other grammatical errors.

| respid | Q160: Who do you think gave their permission or approval for this particular t-shirt to be made or put out? |
|---|---|
| 58 | im assuming marilyn manroe has an attorney that gave permission |
| 71 | marylin monroes lawyers |
| 84 | With Marylin's estate. |
| 102 | the family of marilyn monroe |
| 128 | the people who own marylin monroe |
| 131 | Because they are using the maryln Monore trade mark so they would have to use premision to use her face. |
| 144 | Maybe the movie company that Marylin Monroe worked for |
| 147 | Owner of the rights to marilyn monroe |
| 244 | relatives of marilyn monroe |
| 255 | the company that represents Marilyn monroe |
| 308 | marilyn's managers |
| 322 | Maryln Monroe is on the shirt |
| 332 | Whoever owns Marylin Monroes estate and likeness. |
| 347 | A REP FROM THE ARTIST. MAYBE SOMEONE THAT HAS MARILYN MONROE RIGHTS |
| 348 | Marlyn Monroes estate |
| 364 | the copyright of maryland monroe |
| 366 | I guess the family of Marilyn Monroe |
| 367 | Marilyn's family |
| 406 | the artist on it marilyn monroe |
| 420 | marilyn monroe |
| 427 | Her family |
| 445 | WHOEVER THE ESTATE OF MARYLAND MONROE |
| 453 | The Marylin Monroe Estate . |
| 461 | Somebody in charge of the Marilyn Monroe franchise |
| 483 | Whoever is in charge of Marilyn Monroe image  rights. |
| 492 | it looks like marlyn manroo |
| 493 | Whoever still owns the rights to the picture of Marilyn Munroe. |
| 500 | Marilyn Monroe |
| 501 | The Marilyn Monroe estate. |
| 512 | marlyn monroe estate because her face is on it. |
| 518 | whoever run maryland monroes assets |
| 575 | Whoever is the owner of marylin monroe's namesake. |

An additional 3.5% of respondents (7 out of 201) answered that they believe the shirt comes from "her" or "her" representatives without explicitly naming Monroe. Although these respondents used only the pronoun "her" and did not explicitly name Marilyn Monroe, it is likely that they are referring to Marilyn Monroe since her image is on the shirt.  The following table displays the open-ended responses that were coded as indicating "her" representatives:

| respid | Q160: Who do you think gave their permission or approval for this particular t-shirt to be made or put out? |
|---|---|
| 287 | her heirs |
| 312 | her lawyers |
| 325 | someone from her estate |
| 370 | her family |
| 432 | Her company |
| 454 | Her state |
| 568 | her estate |

Another 3.5% (7 out of 201) of respondents in the Test Group initially answered that the shirt is approved by someone and answered that they "don't know" who, but when asked why they think the shirt is approved by someone, referred to Marilyn Monroe in their explanation. The following table displays the open-ended responses of these respondents:

| respid | Q175: What made you answer that you think the makers of this particular t-shirt did receive permission or approval from someone to make or put out the t-shirt? |
|---|---|
| 174 | Cause it has a picture of Marily Monroe on it |
| 233 | Because it is a image of Marylin Monroe and someone probably already right to print her image so they would have to get permission from them. |
| 282 | it has marilyn monroe on it |
| 306 | I think it would be required to use a known person's picture. |
| 331 | Just because it looks like it might be Marilyn Monroe, and I would about guess they would have to have permission from someone really. |
| 333 | She is so popular so i think that you would need approval before using her photos for the t-shirts or any other products |
| 441 | Because i know the family should recieve royalties |

These answers likely indicate that respondents believe the approval is from someone who is related to or represents Monroe's rights, but that the respondents are merely unsure of who that is.

The following table summarizes the total confusion among the three categories of Test Group respondents discussed above:

| Respondents Who Believe Monroe Approved The Shirt | | |
|---|---|---|
| *Codes* | *N=201* | |
| | *Count* | *Percent* |
| Monroe or Monroe's representatives | 37 | 18.4% |
| "Her" or "her" representatives | 7 | 3.5% |
| T-shirt is approved by unspecified person/entity, and Monroe named in follow-up question asking why respondent believes it is approved. | 7 | 3.5% |
| **Total Monroe Mentions** | **51** | **25.4%** |

In addition to the 25.4% of respondents indicated above, another 12 respondents gave answers that refer in general to approval or copyrights or trademarks and <u>could</u> suggest a belief that the shirt is approved by Monroe's estate.  In order to be conservative, these responses which are somewhat unclear and general are not included in the 25.4% confusion level.

**Test Group Results by Age and Gender**

The level of confusion among Test Group respondents was equivalent among males and females, as shown in the following table:

| Level of Confusion by Gender | Males | Females |
|---|---|---|
| *Base* | *101* | *100* |
| Level of confusion | 25.7% | 25.0% |

Additionally, significant confusion was found in all of the age groups surveyed.

| Level of Confusion by Age | 16-24 | 25-34 | 35 and older |
|---|---|---|---|
| *Base* | *61* | *61* | *79* |
| Level of confusion | 29.5% | 19.7% | 26.6% |

Accordingly, the survey could be re-weighted according to any distribution of age and gender and the result would still show significant confusion.

**Control Group 1: Non-Famous Woman T-Shirt**

Out of 102 respondents in Control Group 1 in which respondents saw a t-shirt similar to the Monroe t-shirt, but with an image of a non-famous woman instead of Monroe, 2.0% (2 out of 102) gave responses indicating that they believe the shirt is put out or approved by Monroe or her estate.

The following tables illustrate the responses from these two respondents that make up a noise level of 2.0% for Control Group 1:

| respid | Q100 : Who do you think made or put out this particular t-shirt? |
|---|---|
| 57 | MARILYN MONROE |

| respid | Q160: Who do you think gave their permission or approval for this particular t-shirt to be made or put out? |
|---|---|
| 66 | maybe the company who approves marylan monroe |

If these results from Control Group 1 were used to measure noise, this would result in a net confusion level of 23.4%, as indicated in the following table:

| Net Confusion Level Resulting From Control Group 1 | % |
|---|---|
| Test Group Confusion | 25.4% |
| Control Group 1 Noise | 2.0% |
| **Net Confusion** | **23.4%** |

**Control Group 2: Ben Franklin T-Shirt**

No one in Control Group 2 (in which respondents saw a t-shirt with the image of Ben Franklin) gave answers indicating that Ben Franklin or his representatives either put out or approved the t-shirt.

4.9% (5 out of 102) of respondents in Control Group 2 gave answers that might indicate a belief that approval was given by someone who is in some way connected to Ben Franklin. The following tables illustrate the responses for these 6 respondents:

| respid | Q160: Who do you think gave their permission or approval for this particular t-shirt to be made or put out? |
|---|---|
| 61 | the person who trademarked ben franklins face |
| 145 | The Franklin Mint |

| respid | Q165 : What makes you think this? |
|---|---|
| 574 | it has benjamin franklin on it |

| respid | Q175: What made you answer that you think the makers of this particular t-shirt <u>did</u> receive permission or approval from someone to make or put out the t-shirt? |
|---|---|
| 194 | i dont think they would use him without some kind of permission |
| 523 | because you cant just put someones picture on a shirt with out permission |

If these results from Control Group 2 were used to measure noise, this would result in a net confusion level of 19.5%, as indicated in the following table:

| Net Confusion Level Resulting From Control Group 2 | % |
|---|---|
| Test Group Confusion | 25.4% |
| Control Group 2 Noise | 4.9% |
| **Net Confusion** | **20.5%** |

**APPENDIX A**

**CURRICULUM VITAE OF STUDY'S AUTHOR**

### Hal L. Poret
*(hal.inc42@gmail.com; 914-772-5087)*

## Education

| | |
|---|---|
| 1998 | Harvard Law School, J.D., *cum laude* |

- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

| | |
|---|---|
| 1995 | S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude* |

- Statistics
- Taught calculus/precalculus/statistics

| | |
|---|---|
| 1993 | Union College, B.S. in Mathematics with honors, *magna cum laude* |

- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

## Employment

2004 -  Senior Vice President, ORC International

- Designed, supervised, and analyzed over 600 consumer surveys, including Trademark, Trade Dress, Advertising Perception, Fraud/Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 50 U.S. District Court litigations and proceedings in front of TTAB, NAD and the FTC.
- Review and comment on third party surveys

2003 – 2004  Internet Sports Advantage

- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003  Attorney, Foley Hoag & Eliot, Boston, MA

- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.
- Advised clients in the selection, adoption, use, licensing, and protection of trademarks/trade dress; represented clients in trademark/trade dress litigations, administrative proceedings before the Trademark Trial and Appeal Board and United States Patent and Trademark Office, and domain name proceedings under the Uniform Domain-Name Dispute-Resolution Policy.

*Testimony at Trial or by Deposition*

(Party who retained me shown in bold)

| 2013 | In re: NCAA Student-Athlete Litigation **(Deposition)** | USDC Northern District of CA |
|---|---|---|
| 2013 | **Jackson Family Wines** v. Diageo (Deposition) | USDC Northern District of CA |
| 2013 | Bubbles, Inc. v. **Sibu, LLC.** (Deposition) | USDC Eastern District of VA |
| 2013 | Clorox v. **Industrias Dalen** (Deposition) | USDC Northern District of CA |
| 2013 | Globefill v. **Elements Spirits** (Deposition and trial) | USDC Central District of CA |
| 2013 | Active Ride Shop v. **Old Navy** (Deposition and trial) | USDC Central District of CA |
| 2013 | **Macy's Inc**. v. Strategic Marks LLC. (Deposition) | Northern District of CA |
| 2013 | Karoun Dairies, Inc. v. **Karoun Dairies, Inc.** (Deposition) | Southern District of CA |
| 2013 | **Kraft Foods** v. Cracker Barrel Old Country (Deposition and Trial) | Southern District of NY |
| 2013 | **Bayer Healthcare** v. Sergeants Pet Care USDC (Deposition) | Southern District of NY |
| 2013 | JJI International v. **The Bazar Group, Inc.** (Deposition) | USDC District of RI |
| 2013 | **Fage Dairy USA** v. General Mills (Deposition) | Northern District of NY |
| 2013 | Gameshow Network v. **Cablevision** (Deposition) | F.C.C. |

| 2013 | Telebrands v. **Meyer Marketing** (Deposition) | USDC Eastern District of CA |
|------|---|---|
| 2012 | Marketquest v. **BIC** (Deposition) | USDC Southern District of CA |
| 2012 | **Hornady** v. DoubleTap (Deposition) | USDC District of Utah |
| 2012 | **Briggs/Kohler** Opposition to Honda (Deposition) | TTAB |
| 2012 | **Apple** v. Samsung (Deposition and Trial) | USDC Northern District of CA |
| 2012 | Forest River v. **Heartland** (Deposition) | USDC Northern District of IN |
| 2012 | SPD v. **Church & Dwight** (Deposition) | USDC District of NJ |
| 2012 | Brighton Collectibles v. **Texas Leather** (Deposition) | USDC Southern District of CA |
| 2012 | **Cytosport** v. Vital Pharmaceuticals (Deposition) | USDC Eastern District of CA |
| 2012 | Authors Guild v. **Google** (Deposition) | USDC Southern District of NY |
| 2012 | Clear Choice v. **Real Choice** (Opposition testimony) | TTAB |
| 2011 | **Borghese** v. Perlier et al. (Deposition) | USDC Southern District of NY |
| 2011 | My Favorite Company v. **Wal-Mart** (Deposition) | USDC Central District of CA |
| 2011 | **PepsiCo** v. Pirincci (Opposition testimony) | TTAB |
| 2011 | **GAP Inc.** v. G.A.P. Adventures | USDC Southern District of NY |

(Trial)

| | | |
|---|---|---|
| 2011 | **Merck Eprova** v. Brookstone<br>(Deposition and trial) | USDC Southern District of NY |
| 2011 | Wella, Inc. v. **Willagirl LLC**<br>(Deposition) | USDC Southern District of NY |
| 2011 | Bauer Bros. v. **Nike**<br>(Deposition) | USDC Southern District of CA |
| 2011 | **Aviva Sports** v. Manley<br>(Deposition) | USDC District of Minnesota |
| 2011 | **American Express** v. Black Card LLC<br>(Deposition) | USDC Southern District of NY |
| 2011 | Gosmile v. **Dr. Levine**<br>(Preliminary Injunction Trial) | USDC Southern District of NY |
| 2010 | **Nat'l Western Life** v. Western Nat'l Life<br>(Deposition) | USDC Western District of TX |
| 2010 | **3M** v. Mohan<br>(Trial) | USDC District of Minnesota |
| 2010 | Active Network v. **EA Sports**<br>(Preliminary Injunction declaration) | USDC Central District of CA |
| 2010 | **FIJI Water Co.** v. FIJI Mineral USA<br>(Deposition) | USDC Central District of CA |
| 2010 | Hansen Beverage v. **CytoSport**<br>(Deposition) | USDC Central District of CA |
| 2010 | People's United Bank v. **PeoplesBank**<br>(Deposition and Preliminary Injunction trial) | USDC District of CT |
| 2010 | **Don Henley** v. Charles Devore<br>(Deposition) | USDC Central District of CA |
| 2010 | Pegasus v. **Allscripts**<br>(Deposition and Mediation) | USDC Middle District of FL |

| 2010 | **Jelmar, Inc.** v. Zep Commercial (Deposition) | USDC Northern District of IL |

| 2010 | **Dollar Bank** v. Emigrant Bank (Deposition) | USDC Western District of PA |

| 2009 | **LG Electronics** v. Whirlpool (Deposition) | USDC District of DE |

| 2009 | **Farberware** v. Meyer Marketing (Deposition and trial) | USDC Southern District of NY |

| 2009 | **NEC** v. Ampad (Deposition) | USDC Southern District of NY |

| 2009 | **GAP Inc.** v. G.A.P. Adventures (Deposition) | USDC Southern District of NY |

| 2009 | **Lumber Liquidators** v. Stone Mntn (Deposition and trial) | USDC Eastern District of VA |

| 2009 | **CytoSport** v. Vital Pharmaceuticals (Deposition) | USDC Eastern District of CA |

| 2009 | REDC v. **NHA** (Deposition) | USDC Southern District of CA |

| 2008 | 1800Contacts v. **Lens.com** (Deposition) | USDC District of UT |

| 2008 | Tokidoki v. **Fortune Dynamic** (Deposition and trial) | USDC Central District of CA |

| 2008 | Brighton Collectibles v. **Dynasty** (Deposition) | USDC Southern District of CA |

*Presentations*

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May 9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference, Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

<u>Potential Errors to Avoid In Designing a Trademark Dilution Survey</u> (American Intellectual Property Association paper, April 2007)

<u>Consumer Surveys in Trademark and Advertising Cases</u> (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

<u>Use of Survey Research and Expert Testimony in Trademark Litigation</u>, (International Trademark Association Annual Conference, May 2006)

<u>Survey Research as Evidence in Trademark/Trade Dress Disputes</u> (multiple presentations) (2006)

<u>Using Surveys to Measure Secondary Meaning of Trade Dress</u>, Legal Education Seminar, Boston, April 2006


***Publications/Papers***
<u>Cutting Edge Developments in Trademark Surveys</u> (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

<u>Hot Topics and Recent Developments in Trademark Surveys</u> (paper for May 2013 DRI Intellectual Property Conference)

<u>Surveys in Trademark and Advertising Litigation</u> (2013 National CLE Conference, Snowmass Colorado, January 2013)

<u>Trademark Litigation Online Consumer Surveys</u> (Practical Law Company Intellectual Property and Technology, May 2012)

<u>Hot Topics in Advertising Law 2012</u> (Contributor to Practising Law Institute publication)

<u>A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys</u>, 100 TMR 756 (May-June 2010)

<u>Recent Trends in Trademark Surveys</u> (paper for Virginia State Bar Intellectual Property conference, October 2009)

<u>Trademark Dilution Revision Act breathes new life into dilution surveys</u> (In Brief PLI website, June 2009)

<u>The Mark</u> (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)

### *Commentary*

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

### *Professional Memberships/Affiliations*

Council of American Survey Research Organizations

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

# APPENDIX B

# QUESTIONNAIRES

**ORC**International

JOB #D61-0113

315 Park Avenue South, 14th Floor
New York, NY  10010

December 2013

**T - S H I R T   S U R V E Y**
**- S C R E E N E R —**

| MARKET: | MALE: | FEMALE: | COLOR/Cell Assignment |
|---|---|---|---|
| Baltimore ............................ 1 | 16-17 ...........1 | 16-17 ...........1 | Pink ............... 1 |
| Buffalo ................................. 2 | 18-24 ...........2 | 18-24 ...........2 | Yellow  .......... 2 |
| Chicago ................................ 3 | 25-34  .........3 | 25-34  .........3 | Green   .......... 3 |
| Dallas .................................. 4 | 35-44 ...........4 | 35-44 ...........4 | |
| Denver ................................. 5 | 45+ .............5 | 45+ .............5 | |
| Detroit ................................. 6 | | | |
| Fort Lauderdale .................. 7 | | | |
| Indianapolis ........................ 8 | | | |
| Jacksonville ........................ 9 | | | |
| Las Vegas ........................... 10 | | | |
| Los Angeles ........................ 11 | | | |
| New York ............................ 12 | | | |
| Philadelphia ....................... 13 | | | |
| Phoenix ............................... 14 | | | |
| Spartanburg, SC ................. 15 | | | |
| St. Louis .............................. 16 | | | |

INTERVIEWER I.D.:   1   2   3   4   5   6   7   8   9   10

**SIGHT SCREEN FOR MALES/FEMALES 16 years or over.**

Hello, I'm _____ from ORC International, a market research firm.  We're conducting a survey and I'd like to ask you a few brief questions.  We are not selling anything and want only your opinions.

A.     Record Gender:

Male ........................ 1          Female...................... 2

| Over Quota A: | Gender |
|---|---|

**MALES**

| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |

**FEMALES**

| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |

B.      In which of the following ranges does your age fall?



Under 16 years........................................ X  →  *Terminate.  Circle in box below, erase and re-use screener.*

16 – 17 ................................................. 1
18 - 24 ................................................. 2  →  *Check age and gender quotas.  If needed, Continue.  If over quota, terminate circle in appropriate box below, erase and re-use screener*
25 - 34 ................................................. 3
35 - 44 ................................................. 4
45 + ..................................................... 5

*(Do not read)*  →  Refused ................................................. X  →  *Terminate.  Circle in box below, erase and re-use screener.*

| Terminate Q. B:  Under 16 years old/Refused |
|---|
| 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 |

| Over Quota B:  Age | | |
|---|---|---|

**MALES**

| 16 - 17 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 18 - 24 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 25 - 34 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 35 - 44 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 45+ | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |

**FEMALES**

| 16 - 17 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 18 - 24 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 25 - 34 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 35 - 44 | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |
| 45+ | 01 02 03 04 05 06 07 08 09 10 11 12 13 14 15 16 17 18 19 20 | |

C.      During the next six months, which of the following types of clothing, if any, do you think you, personally, will buy, either for yourself or for someone else?  *(Read list and circle all "yes" responses.)*

| | |
|---|---|
| Khaki pants ..................................................... | 1 |
| A V-neck sweater ............................................. | 2 |
| Plaid shorts ..................................................... | 3 |
| A graphic or screened t-shirt .......................... | 4 |
| Leather flip flops ............................................. | 5 |

---

*Respondent must select boxed response (a graphic or screened t-shirt).*
*Otherwise, terminate. Circle in appropriate box below.  Erase and re-use screener.*

**Terminate C:  No plans to buy "a graphic or screened t-shirt"**

**MALES**

| | |
|---|---|
| 16 - 17 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 18 - 24 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 25 - 34 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 35 - 44 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 45+ | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

**FEMALES**

| | |
|---|---|
| 16 - 17 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 18 - 24 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 25 - 34 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 35 - 44 | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |
| 45+ | 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

D.      Do you or does any member of your immediate household work … *(Read list and circle "yes" or "no" for each.)*

| | YES | | NO |
|---|---|---|---|
| In advertising or market research........................................ | 1 | ............... | 1 |
| At this mall ......................................................................... | 2 | ............... | 2 |
| In the entertainment or publishing business........................ | 3 | ............... | 3 |
| For a company that makes or sells clothing ........................ | 4 | ............... | 4 |
| For a company that is a licensor, licensee, or other provider of pictures or images ............................................................... | 5 | ............... | 5 |

| Terminate if yes to any.  Circle in box below.  Erase and re-use screener. |
|---|
| **Terminate Q. D:  Occupation** |
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

E.      Do you usually wear eyeglasses or contacts when shopping for clothing?

Yes............................ 1  → *(Ask  F)*
No.............................. 2  → *(Skip to G)*

F.      Do you have them with you?

Yes............................ 1  → *(Ask G)*
No.............................. 2  → *(Terminate, circle in box below, erase and re-use screener)*

| **Terminate F:  No eyeglasses/contacts** |
|---|
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

G.       Have you been interviewed for a survey in a research facility in a mall within the past three months, other than a political poll?

Yes............................ 1  → *(Terminate, circle in box below, erase and re-use screener)*
No.............................. 2  → *(Ask H)*

| **Terminate G:  Has been interviewed in the past 3 months** |
|---|
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

H.       Do you know anyone who has participated in this survey or did anyone tell you about this survey before now?

Yes............................ 1  → *(Terminate, circle in box below, erase and re-use screener)*
No.............................. 2  → *(Ask I)*

| **Terminate H:  Knows about survey** |
|---|
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

I.       Do you live in this area or are you visiting from somewhere else?

        Lives in this area .........       1  →  *(Ask J)*

        Visiting from somewhere

        else.............................       2  →  *(Terminate, circle in box below, erase and re-use screener)*

| *Terminate I:  Visiting From Somewhere Else* |
|---|
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

J.       *(Invite qualified respondent to interviewing facility.  If respondent wears glasses or contacts, make sure they have them on.  Go to programmed main questionnaire.  If qualified but refused, terminate. Circle in box below.  Erase and re-use screener.)*

        Willing to participate ........................................................ 1
        Not willing to participate ................................................... 2

| *Terminate J:  Qualified/Refused* |
|---|
| 01  02  03  04  05  06  07  08  09  10  11  12  13  14  15  16  17  18  19  20 |

K.       *(Check with your supervisor for a Cell assignment for this respondent. After respondent has been assigned to a Cell then circle the correct Cell on the front of this screener.)*

**ORC**International                                              JOB D61-0113

315 Park Avenue South, 14th Floor
New York, NY  10010                                              December 2013

### T - S H I R T   S U R V E Y
### - M A I N   Q U E S T I O N N A I R E   F O R   P R O G R A M M I N G  –

**PROGRAMMING INSTRUCTION: PLEASE PROGRAM ANY TEXT WITH ITS OWN QUESTION NUMBER ON ITS OWN SCREEN. DO NOT COMBINE TEXT WITH DIFFERENT QUESTION NUMBERS ONTO ONE SCREEN.**
**PROGRAMMING INSTRUCTION: INSERT SCREENER QUESTIONS HERE AND THEN START THE MAIN SURVEY.**

40.     **INTERVIEWER INSTRUCTION:  Before bringing the respondent into the interviewing area, please complete the next two screens to be sure you are using the correct product for this interview.**

**[FOR INTERVIEWER ONLY – DO NOT ASK RESPONDENT]**
45.     What color Cell assignment was given to this respondent at question K on the screener?
        1........Pink
        2........Yellow
        3........Green

50.     **INTERVIEWER INSTRUCTION:**
        1.  **IF 45=1, INSTRUCT, "For this interview you will be showing respondent the t-shirt with the <u>pink</u> dot.  Please be sure that no other t-shirt is visible."**
        2.  **IF 45=2, INSTRUCT, "For this interview you will be showing respondent the t-shirt with the <u>yellow</u> dot.  Please be sure that no other t-shirt is visible."**
        3.  **IF 45=3, INSTRUCT, "For this interview you will be showing respondent the t-shirt with the <u>green</u> dot.  Please be sure that no other t-shirt is visible."**

**Please record the color of the dot on the t-shirt that you are using for this interview.**
        1........Pink
        2........Yellow
        3........Green

        **[PROGRAMMING: Must select the color dot that matches the color selected in Q45. If the <u>in</u>correct color is selected then instruct interviewer to get the t-shirt with the correct color dot and then ask them to enter that dot color in order to continue.]**

65.     **INTERVIEWER INSTRUCTION: When you have the t-shirt ready with the correct color dot, bring respondent into the interviewing area.  Prior to showing the t-shirt to the respondent, say:**
In a moment, I am going to show you a t-shirt, and will then ask you a few questions

**ASK ALL RESPONDENTS**
70.     **INTERVIEWER INSTRUCTION: Hand t-shirt to respondent and say:**
Please look at this t-shirt the way you normally do when you are shopping for clothes, either for yourself, or for someone else.
Take as long as you would like, and then tell me when you are finished.
**INTERVIEWER INSTRUCTION: Allow respondent as much time as they need to look at the t-shirt.  When respondent indicates being finished, take back the t-shirt and <u>place it face up on the table in front of respondent for the remainder of the interview</u>.  Then advance to the next screen.**

80.     Now, I would like to ask you a few questions about this t-shirt.

Before I begin I would like to assure you that there are no right or wrong answers.

If you do not know the answer to a question or do not have an opinion, please say so.

Please do not guess.

**ASK ALL RESPONDENTS**
100.    Who do you think made or put out this particular t-shirt?  *(record response verbatim or select don't know/no opinion option)*

**100=text entered**
105.    What makes you think this?  *(record response verbatim or select don't know/no opinion option)*

**105=text entered**
110.    Any other reasons?  *(record response verbatim or select "no other reasons" option)*

**ASK ALL RESPONDENTS**
150.    Next, I am going to read you a question that has three answer choices.

Please allow me to read the whole question before answering.

After I am done, if you want me to read the question again, just ask me.

Now, with respect to the <u>makers</u> of this particular t-shirt, do you think…?
**(READ CATEGORIES AND SELECT <u>ONE</u> RESPONSE)**

[RANDOMIZE ORDER OF FIRST 2 RESPONSES.  "NO OPINION" IS ALWAYS LAST.]

**1.** That they <u>did</u> receive permission or approval from someone to make or put out this particular t-shirt.

**2.** That they did <u>not</u> receive permission or approval from someone to make or put out this particular t-shirt.

**3.** Or, do you have no opinion?

<u>ASK IF Q150=1</u>
160.   Who do you think gave their permission or approval for this particular t-shirt to be made or put out?  **(RECORD VERBATIM OR SELECT DON'T KNOW/NO OPINION OPTION)**

<u>160=text entered</u>
165.   What makes you think this?  *(record response verbatim or select don't know/no opinion option)*

<u>165=text entered</u>
170.   Any other reasons?  *(record response verbatim or select "no other reasons" option)*

<u>160=Don't know/no opinion</u>
175.   What made you answer that you think the makers of this particular t-shirt <u>did</u> receive permission or approval from someone to make or put out the t-shirt.  Please be as specific as possible.  **(RECORD VERBATIM)**

<u>ALL RESPONDENTS</u>
180.   **[PLACE T-SHIRT OUT OF SIGHT]**

| CERTIFICATION PAGE: PINK/YELLOW/GREEN |
| --- |

It's very important that we are able to validate that you, yourself have taken this survey.

So, please provide us with your contact information for a ONE-time call for VALIDATION purposes ONLY.

I acknowledge that I was interviewed on this date. During this interview I was shown a t-shirt and was asked some questions about it.

Please type in your full name and address below:


First Name:  _____

Last Name:  _____

Street Address:  _____

City:  _____

State:  _____

Zip Code:  _____


For validation purpose, please provide your phone number.

Phone Number:  _____

**PROGRAMMER** – What is indicated below please put on a separate screen.


**Here is the respondent computer ID #: _____**

**[INTERVIEWER INSTRUCTION: Transfer this number onto the paper certification page and complete the certification with the respondent.**

**THANK YOU.**

**PROGRAMMER: COUNT INTERVIEW AS COMPLETE ONCE THE COMPUTER ID# IS DISPLAYED ON SCREEN.**

# APPENDIX C

# FIELD INSTRUCTIONS

**ORC**International

Job #D61-0113
T-Shirt Survey
December, 2013

Dear Supervisor:

The following materials are needed for the "T-Shirt Survey":

- Screeners (white)
- Main Questionnaires (on computer)
- Certification Pages
- Exhibits (3 T-Shirts)
  - Cell 1 – T-shirt with pink dotted tag
  - Cell 2 – T-shirt with yellow dotted tag
  - Cell 3 – T-shirt with green dotted tag
- Interviewer Id List
- Interviewer's Instructions
- Quota Control Tally Sheet
- Progress Report Sheets
- Validation Listing Sheet

## OVERVIEW

This is a three cell test to be conducted in an enclosed mall facility.  In each of the three cells (pink, yellow and green) each respondent will be shown a t-shirt and asked questions about it.

You will be sight screening in the mall for males and females **16** *years of age and older.*
Qualified respondents will then be escorted back to the interviewing area to be shown one of three t-shirts and asked questions about it.

## INTERVIEWER NUMBERS

Interviewers are to be assigned interviewer numbers.  A separate sheet should be provided to us with the interviewer numbers and corresponding names.  These interviewer numbers must be recorded by the interviewer in the box on the front of the screener.

You should have only experienced interviewers working on the job.  No more than about 20% – 30% of your interviews should be conducted by one interviewer.

## STAFF

All interviewers while screening and interviewing on this study are not to be screening or interviewing on any other study.

## BRIEFING

Field supervisors must have read and examined all materials to be completely prepared for the study. The field supervisor must be present at the briefing and be present for all days of interviewing on the study. In addition, the supervisor must observe at least 15% or 1 or 2 interviews, whichever is greater per interviewer.  The supervisor is to sign the Certification Page for every interview they have observed.  A field kit of all paper materials must be supplied for each participant at the briefing.

**Each interviewer is to read his/her Interviewer Instructions and sign them. Also, a personal briefing is required.**  If possible, one briefing should be conducted.  All interviewers must do at least one Practice Interview on the computer.

## PLEASE STRESS THE FOLLOWING:
1. Showing the exhibits (t-shirts) when instructed on the questionnaire.
2. Prior to bringing the respondent into the interviewing area making sure that all non-relevant products are to be out of sight.
3. For the pink cell the respondent will be shown the t-shirt with a pink dotted ring.
4. For the yellow cell the respondent will be shown the t-shirt with the yellow dotted ring.
5. For the green cell the respondent will be shown the t-shirt with the green dotted ring.
6. Never making reference to the exhibit by name nor discussing/explaining it or anything else.
7. Leave the t-shirt face up and in the view of the respondent throughout the interview.
8. Recording response verbatim.
9. ALL PRODUCTS MUST BE KEPT IN A SECURE LOCATION AT ALL TIMES.

## QUALITY CONTROL PROCEDURES

**ANY WORK RECEIVED BY OUR OFFICE, WHICH HAS NOT BEEN SUBJECT TO THE FOLLOWING PROCEDURES, WILL BE SUBJECT TO A PAYMENT ADJUSTMENT.**

Strict quality control is a primary Supervisor responsibility.  ORC requires that the following quality controls be strictly followed:

- This study must be screened by itself, <u>not</u> along with any other projects.

- No more than one respondent per shopping group should be screened.

- Friends, relatives or acquaintances must NOT be interviewed.

- Except for the interviewer no one else is to be in the interviewing room with the respondent.

- Anyone accompanying the respondent must wait for the respondent in the waiting room.

- Be sure the respondent does not see the **t-shirt** before it is indicated to be shown.

- Do not allow any respondents to see any t-shirt at any time other than the <u>one</u> t-shirt they are being interviewed about.

- Interviewing should not be conducted with anyone who has a hearing, visual or Spanish language problem.

## SECURITY INSTRUCTIONS

- All materials related to this study are the property of ORC and our client.

- You are responsible for all materials being used on this study; all materials are to be kept out of sight of anyone not directly involved in the study.

- No one representing ORC or our client is to be admitted to the facility or have access to the materials without your first calling ORC to confirm. Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.

## EDITING

All work should be edited soon after completion in order to spot errors and quickly bring them to an interviewer's attention.

In editing check for:
- <u>Completeness including market</u> on the front of each screener of each completed interview
- **Following proper skip patterns exactly.**
- Certification page filled out by interviewer and respondent
- **Transfer the respondent ID from the computer to match up with the signed certification page.**

If an interviewer appears not to be following instructions exactly, please alert him/her to that as soon as possible and take remedial action if needed.

## VALIDATION

- List only <u>ONE</u> interviewer's work on a validation sheet.

- Fill out all required respondent information, interviewer name, city and quota group.

- Be sure about indicating <u>correct</u> area code for every respondent.

- Write listings in <u>black ink ONLY</u>.

- You are not to phone validate, since we will be independently validating 100% of every interviewer's work.

- You must, however, monitor or do on-site validation for at least 10% of each interviewer's work and note validated work on Validation Listing Form.

---

- <u>Handling "No Phone" or "Refused Phone"</u>

  The Supervisor must attempt to do a telephone lookup for all respondents who do not give a phone number.  If a number is <u>not</u> found, indicate that you have attempted a look-up by writing "L.U.".

---

## PROGRESS REPORTS

Enclosed are Progress Report Sheets for your convenience.  Accurate cumulative reports are to be received by us each day the study continues.  We are to <u>RECEIVE</u> them by <u>10:00 AM OUR TIME</u>.

- **FAX # 646-365-6140 (Preferred).  Do <u>not</u> use a cover sheet, just fill in all the required information on the Progress Report Sheet.  Be sure to write <u>your city</u> and <u>contact</u> name on each sheet of the report.**


  **RETURNING WORK**
- Completed respondent signed certification pages are to be stapled to the screener and bundled together by interviewer with that interviewer's Validation Sheet on the top of the pile.

- Return completed Interviewers Id sheet.

- Bundle together all Screeners that contain a record of termination.  Mark each screener "For Tallies Only".  Label this bundle "Screener -- Tallies Only".

- Enclose Master/Final Progress Report Forms.

-
Remember to insure packages:
  - Completed Screener and signed Certification Pages for $500.00.
  - Exhibits --- ONLY RETURN WHEN INSTRUCTED BY ORC INTERNATIONAL


## SHIPMENT/CHARGES

- All shipments are to be sent Federal Express Priority Overnight to ORC, and charged to our Federal Express Account #3305-1825-1 unless otherwise specified

- Insure packages for $500.00

- Indicate Job #3689374 (D61-0113) on airbill for all shipments

---

- <u>Important</u>
Since ORC does not want to incur additional shipping charges, make sure that all items specified above are included with your completed questionnaires, unless otherwise specified.  If you "forget" we will have to deduct the additional shipping charges from your bill.

---

**<u>BILLING</u>**

Submit all bills under separate cover to my attention in the New York office.

Thank you for your help with this survey.

Sincerely,

Nelly Valentin<br>Field Director

ORC International                                        Job #D61-0113
315 Park Avenue South                                   T-Shirt Survey
New York, New York 10010                                December, 2013
                    **INTERVIEWER INSTRUCTIONS**

INTERVIEWER'S NAME:  _____  DATE:  _____

BRIEFING SUPERVISOR:  _____

**MATERIALS**
- Screeners (white)
- Main Questionnaires (on computer)
- Certification Pages
- Exhibits (1 of 3 t-shirts with  a tag color dotted pink, yellow or green)
- Interviewer Id List
- Interviewer's Instructions
- Quota Control Tally Sheet
- Progress Report Sheets
- Validation Listing Sheet

**OVERVIEW**
This is a three cell test to be conducted in an enclosed mall facility.  In each of the three cells (pink, yellow and green) each respondent will be shown a t-shirt and asked questions about it.

You will be sight screening in the mall for males and females **16** *years of age and older.*
Qualified respondents will then be escorted back to the interviewing area to be shown one of three t-shirts and asked questions about it. Do not allow any respondent to see more than the one shirt they are being interviewed about.

   **QUOTA ASSIGNMENT**

Your supervisor will give you a quota assignment by cell, gender and age.

**DO YOU HAVE A QUOTA FOR COMPLETED MAIN QUESTIONNAIRES?**

Yes, you do.  You have a quota for completed interviews.

You are to do exactly the number of interviews assigned by gender and age within each cell.

IMPORTANT:

Because you have a hard/exact quota by gender and age within cell, only completed main interviews count toward your quota.  You will keep track of terminates for incidence purpose only. It is <u>imperative</u> that when terminating a respondent you circle the next available number in the appropriate gender and age for that terminated respondent. This is the only way you will be able to accurately keep track of incidence rate.

## <u>ELIGIBILITY</u>

An eligible respondent is a male or female who meets the following requirements:

- Respondent must be 16+ years of age and needed for your screening quota (Q.B).

- Respondent is likely to personally purchase a graphic or screened t-shirt in the next 6 months (Q.C)

- Respondent must pass occupational security (Q. D).

- Respondent must have glasses/contact lenses with them if worn when shopping for clothing (Q. E/F)

- Respondent have not participated in a survey in a research facility in the past 3 months (Q.G)

- Respondent does not know of anyone who has participated in the current survey or aware of the survey prior to current survey (Q.H)

- Respondent lives in the area of where the survey is being conducted (Q.I)

- Respondent must be willing to participate (Q.J)

## <u>QUALITY ASSURANCE IN SCREENING</u>

- Do not interview friends, relatives or acquaintances.

- When screening for this study you must <u>not</u> screen for any other study at the same time.

- Only one potential respondent in a group of people may be screened.

- Only one potential respondent is to be in the interviewing room at the time of the interview.

- Anyone accompanying the respondent must wait for the respondent in the waiting room.

- Be sure the respondent does not see the **exhibit** before it is indicated to be shown.

- Do not proceed to interview anyone who has a hearing, visual or Spanish language problem.

<u>**MAIN QUESTIONNAIRE**</u>

**GENERAL GUIDELINES**

- Read introductions and <u>all</u> questions exactly as written.
- Always give respondents enough time to answer.
- Mark answers clearly.
- When questionnaire calls for you to show the **exhibit** under no circumstances are you to discuss the exhibit with the respondent. Read the questions referring to the exhibit verbatim as written, always referring to the exhibit AND SAYING WHAT THE QUESTIONNAIRE STATES.

**OPEN ENDED RESPONSES**

- Read open-ended questions slowly and ask respondent to slow down if you cannot write quickly enough. <u>**WE NEED EXACT VERBATIM RESPONSES BUT YOU SHOULD BE SURE TO PROBE IF A THOUGHT IS NOT CLEAR OR COULD BE INTERPRETED DIFFERENT WAYS**</u>.  Capture comments exactly as respondent states them -- <u>**never summarize or paraphrase.**</u>

- Capture comments in the words of the respondent.  <u>Do not say</u> "he/she said…" or "he/she felt…" rather; just write down exactly what the respondent says.

- If respondent says, "I have already answered the question", or "same", do not write this – instead, ask them to repeat their answer and write it verbatim.

- Give respondent sufficient time to think and answer a question before continuing.

- Never reword the questions.  Simply repeat the question if the respondent indicates that he/she does not understand.  **DO NOT** attempt to explain any questions.

- Answers to the open-end questions are important to this study and will be carefully read.

- However, if respondents gives you a vague or one-word answer, probe for specifics, for example, ask: "What do you mean by …?"

- Do not probe with additional "what else?" questions beyond what is shown on the questionnaire.

<u>**SCREENER QUESTION BY QUESTION INSTRUCTIONS**</u>

<u>SCREENER</u>:

Be sure you are familiar with the circle screener method of termination.  If you are not, ask your supervisor to explain it to you.  For any answers which disqualify the respondent, you are to circle the next available number in the termination box, erase and re-use screener.  Do <u>NOT</u> erase any of the

circles around the numbers in the termination boxes.  If all the numbers in a termination box have been circled before you contact a qualified, willing respondent, you are to return the screener to your supervisor.  Write in your name, circle your city and mark clearly on the top of the screener "FOR TALLIES ONLY".

**Sight screen for appropriate gender and age groups as needed.  Randomly approach males and females 16+ years of age and ask questions on screener exactly as indicated.**


<u>**SCREENER**</u>:

Circle your market.

Circle your Interviewer Id.

Circle respondent's gender.


Q.B:    If 16 years of age or older, check open age quotas.  If needed, continue.  Otherwise, terminate. If under 16 or refused age, terminate.

Q.C:    Read the list.  Circle all "yes" responses.  If "a graphic or screened t-shirt" selected continue. Otherwise terminate.

Q.D:    Read the list.  Record "yes" or "no", for each occupation.  If "yes" to any occupation terminate. Otherwise continue.

Q.E:    If "yes" ask Q. F.  If "no" skip to Q.G.

Q.F:    If "yes" continue.  If "no" terminate.

Q.G:    If "no" continue.  If "yes" terminate.

Q.H:    If "no" continue.  If "yes" terminate.

Q.I:    If "lives in this area" continue.  Otherwise, terminate.

Q.J/K: Invite the respondent to participate, continue with the main questionnaire.  If the respondent refuses, terminate.  Check with your supervisor for a color cell assignment.  After the respondent has been assigned to a color cell, circle the correct color cell on the front page of the screener.

## <u>MAIN QUESTIONNAIRE QUESTION BY QUESTION INSTRUCTIONS</u>

The questionnaire is straightforward and must be administered exactly as written.

If respondent wears glasses or contact lenses, that is they said "yes" to Q.E in the screener, make sure that he/she is wearing them before continuing.

Prior to bringing the respondent into the room, make sure all non-relevant products are out of respondents' view. Do NOT allow respondents at an point to see any t-shirt other than the one for their assigned color cell.

For the Pink Cell the respondents will be shown the following item:
- o **T-Shirt** with a pink dot.

For the Yellow Cell the respondents will be shown the following item:
- o **T-Shirt** with a yellow dot.

For the Green Cell the respondents will be shown the following item:
- o **T-Shirt** with a green dot.

Initially, allow the respondent as much time as needed to look at the t-shirt. When the respondent indicates being finished, take back the t-shirt and **place it unfolded and face up on the table in front of the respondent for the remainder of the interview.**

---

**SECURITY:**
- You are responsible for all materials being used on this study.  Stimuli must be locked up when not working on this study.
- All materials are to be kept <u>out of sight</u> of anyone not directly involved in the study
- All materials related to this study are the property of ORC International and our client.
- No one representing ORC International or our client is to be admitted to the facility or have access to the materials without your first calling ORC International to confirm.  Further, no one is to be permitted access to the facility or materials without showing satisfactory identification.

---

## <u>UPON COMPLETION OF INTERVIEW:</u>

1. *Fill out all respondent information on the front page of the screener*

2. Fill out all respondent information on certification page. You and the respondent must read, sign and date certification page.

3. Be sure to transfer the respondent ID from the computer to match up with the signed certification page.

4. Staple the screener to the sign Certification page and give it to your supervisor.

5.  Only if a supervisor observed the interview, he/she must also sign the certification page

6.  Thank respondent.

**APPENDIX D**

**VALIDATION QUESTIONNAIRE/LETTER**

ORC International                          Job #D61-0113
315 Park Avenue South                      T-Shirt Survey
New York, NY  10010                        December, 2013

### *V A L I D A T I O N   Q U E S T I O N N A I R E*

- ASK TO SPEAK TO THE PERSON WHOSE NAME IS LISTED ON VALIDATION SHEET
- CORRECT ANSWERS ARE CIRCLED
- PROBE WHERE INDICATED

Hello (Miss/Mrs./Ms.) _____, I'm from ORC International in New York. Recently a study was done in your area and we're calling to thank you for your participation and to confirm a few points.

1. Recently, did you take part in a survey at the mall where you were shown a t-shirt and were asked some questions about it?

YES.................... 1

NO ..................... 2     *(Before terminating, be sure no one else in household was interviewed)*

2. Which of the following includes your age?

Under 16 years ................... 1
16 - 17................................. 2
18 - 24................................. 3
25 - 34................................. 4     *(Check against validation listing)*
35 - 44................................. 5
45+..................................... 6

3. During the next six months, which of the following types of clothing, if any, do you think you, personally, will buy, either for yourself or for someone else?      (Read the list)

Khaki pants.......................... 1
A V-neck sweater ............... 2
Plaid shorts.......................... 3
A graphic or screened t-shirt     4   -> Must mention to qualify
Leather flip flops ................. 5
None of                              7
these………………………

Thank respondent.

**Outfielders, Inc.**
140 New Street
Mamaroneck, NY 10543
914-777-1137

December 18, 2013

Ms. Nelly Valentín
ORC International
315 Park Avenue South
New York, NY 10010

Dear Nelly,

The validation results of your T-shirt Survey #D61-0113 are as follows:

Out of the listed 405 respondent names, 405 had telephone numbers.  Of these, 267 were successfully contacted (66%).  Of those not reached, a minimum of three attempts were made on different days of the week and at different times of the day.

Of those contacted, there were no discrepancies found in interviewing procedures.  All results of this phase of the study were reported to ORC International.

If you have any questions regarding this study, please call me.

Sincerely,

*Frances M. Tavolila*

Frances Murray Tavolila

# APPENDIX E

## MATERIALS REVIEWED/FEES CHARGED

In the course of designing the survey I reviewed the following materials:

(1) Complaint
(2) Answer and Counterclaims
(3) Protective Order
(4) Deposition of Liza Acuna
(5) Excerpts of Deposition of David Brown (pp. 106-111, 137-152, 158-162)
(6) Declaration of Bruce Isaacson from case of Bruce Lee Enterprises v. AVELA and exhibits
(7) AVELA Exhibit 44 (Marilyn Monroe Radio Days t-shirt webpage)

I also conducted internet searches for the Avela Monroe shirt and reviewed the results.

The fee charged for the survey and preparation of this report was $50,000.  Any additional time in connection with this matter will be billed at my ordinary rate of $500 per hour.

**APPENDICES F – H (to be provided electronically):**

**F) PHOTOS OF T-SHIRT SHOWN TO RESPONDENTS**
**G) DATA FILE**
**H) SURVEY SCREENSHOTS**