**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | Case No: 12 Civ. 4828 (ALC) (JCF) |
| Plaintiff, | ECF Case |
| v. | |
| THE ESTATE OF MARILYN MONROE, LLC, And DOES 1 THROUGH 10, | **MEMORANDUM OF LAW IN SUPPORT OF V INTERNATIONAL FINE ARTS PUBLISHING, INC.'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56** |
| Defendants. | |

THE ESTATE OF MARILYN MONROE, LLC

       Counterclaimant,

v.

A.V.E.L.A., INC.,

       Counter-Defendant, and

LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V INTERNATIONAL FINE ARTS PUBLISHING, INC.

       Third-Party Defendants.

X ONE X MOVIE ARCHIVES INC., V INTERNATIONAL FINE ARTS PUBLISHING, INC.,

       Counterclaimants,

**v.**

THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC JAMES SALTER,

       Counter-Defendants.

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS .................................................................................. 2

   A.   Movant's Business ...................................................................................... 2

   B.   Events Leading Up to EMMLLC's Formation .......................................... 3

III.   PROCEDURAL HISTORY ............................................................................... 4

IV.   LEGAL STANDARD ......................................................................................... 5

V.   ARGUMENT ....................................................................................................... 6

   A.   EMMLLC's Trademark Claims Fail as a Matter of Law ........................... 6

     1.   EMMLLC's § 43(a) Claim Fails Because "Persona" Trademark Rights in Monroe Do Not Exist ........................................................................................................... 6

     2.   EMMLLC's § 43(a) Claim Also Fails Because Even if § 43(a) Rights in Monroe Could Exist, EMMLLC Does Not Own These Rights ..................................... 15

     3.   EMMLLC's § 32 Claim Fails Because Marks in "MARLIYN MONROE" Do Not Extend Protect to All Images of Monroe .......................................................... 21

   B.   Movants Do Not Infringe EMMLLC's Purported Marks ......................... 22

   C.   There is No Impact on Consumer Purchasing Decisions ......................... 23

   D.   EMMLLC's New York Unfair Competition Claim Fails ......................... 23

   E.   EMMLLC's Trademark Dilution Claim Fails .......................................... 23

   F.   EMMLLC's Interference Claims Fail ....................................................... 24

   G.   Affirmative Defenses Protect AVELA's Use of Monroe Artwork ............ 24

VI.   CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*Abraham Zion Corp. v. Lebow,* 761 F.2d 93 (2d Cir. 1985)........................................................ 12

*Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y. 1985)................................................... 7

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................... 5, 6

*Astaire v. McKenzie,* No. 10 CIV. 4305 (MGC), 2010 WL 2331524 (S.D.N.Y. June 9, 2010)... 18

*Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351, 2014 WL 5493242  (S.D.N.Y. Oct. 30, 2014)
.................................................................................................................................. 16, 20

*Bondar v. LASplash Cosmetics*, No. 12 CIV. 1417 SAS, 2012 WL 6150859 (S.D.N.Y. Dec. 11,
2012) .............................................................................................................................. 16

*Branca v. Mann*, No. CV 11-00584 DDP PJWX, 2012 WL 3263610 (C.D. Cal. Aug. 10, 2012)19

*Brooks ex rel. Estate of Bell v. The Topps Co.*, No. 06 CIV. 2359, 2007 WL 4547585 (S.D.N.Y.
Dec. 21, 2007).................................................................................................................. 19

*Bruce Lee Enters., LLC v. A. V.E.L.A., Inc.,* No. 10–CV–2333 (KMW), 2013 WL 822173
(S.D.N.Y. Mar. 6, 2013) ............................................................................................ 16, 19

*Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428 (T.T.A.B. 1985) .................................................... 22

*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474 (2d Cir.1996).............................................. 6

*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000) ............................. 10, 19, 23

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002)...................................................... 11

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217 (S.D.N.Y. 2004).......... 14

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................ 5

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206 (2d Cir. 2012)
.................................................................................................................................. 13

*Clairol Inc. v. Gillette Co.*, 389 F.2d 264 (2d Cir. 1968) ............................................................. 9

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979)........ 9

*Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 CIV. 5105 NRB, 2013 WL 5355010, (S.D.N.Y. Sept. 25, 2013) .................................................................................... 19

*Estate of Barre v. Carter*, 272 F. Supp. 3d 906, 944 (E.D. La. 2017) ......................................... 19

*Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F.Supp.2d 186 (E.D.N.Y.2011) ......................................................................................................... 23

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003) ................................................. 9, 24

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) ...................................................... 19

*Ferrer v. Maychick*, 69 F. Supp. 2d 495 (S.D.N.Y. 1999) ........................................................... 19

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) ..................... 19

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313 (2d Dist. 2010) ... 24

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141 (S.D.N.Y. 2011) ........... 14

*Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088 (9th Cir. 2004) ......................... 12

*Hart v. World Wrestling Entm't, Inc.*, No. 3:10CV0975 SRU, 2012 WL 1233022 (D. Conn. Apr. 10, 2012) ......................................................................................................................... 19

*Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, 878 F. Supp. 2d 1021 (C.D. Cal. 2012) ......... 19

*In re Gernon's Estate*, 35 Misc.2d 12, 226 N.Y.S.2d 940 (1962) ................................................ 15

*In re Sloppy Joe's Int'l, Inc.*, 43 U.S.P.Q.2d 1350, 1997 WL 424966 (T.T.A.B. 1997) .............. 22

*ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135 (2nd Cir. 2007) ........................................................... 8

*Jackson v. Odenat*, 9 F. Supp. 3d 342 (S.D.N.Y. 2014) ............................................................. 21

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F.Supp.2d 340 (E.D.N.Y. 2007) 13

*Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341 (S.D.N.Y. 2014) ........................................................... 23

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016) .... 14

*Merriam–Webster, Inc. v. Random House, Inc.*, 35 F.3d 65 (2d Cir. 1994) ................................... 9

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal. 2008) ................................................................................................................................. 1

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012). 1, 2, 4, 7, 17

*Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77 (1981) ................. 20

*Parks v. LaFace Records*, 329 F.3d 437 (6th Cir. 2003) ................................................................. 6

*Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990) ............................................ 6, 12, 18, 21

*Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438 (2d Cir. 1980) ............................. 6

*Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129 (S.D.N.Y.1972) ...................... 13

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008). 1, 7, 15, 17

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05 CIV. 3939 (CM), 2008 WL 4127830 (S.D.N.Y. Sept. 2, 2008) ........................................................................................ 17

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05 CIV. 3939 (CM), 2008 WL 4298548 (S.D.N.Y. Sept. 11, 2008)  ……………………………………………………    17

*Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ..................................................................... 10

*Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208 (2d Cir. 1985)................................................. 13

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)........................................................ 12

*Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976) ...................................... 9

*Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N.Y. 1983) ....................... 10

## STATUTES

15 U.S.C. § 1052.......................................................................................................................... 22

15 U.S.C. § 1114....................................................................................................................... 6, 21

15 U.S.C. § 1117.......................................................................................................................... 25

15 U.S.C. § 1125............................................................................................................................ 6

**RULES**

Federal Rule of Civil Procedure 56 ............................................................................. 5

**TREATISES**

5 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2001) ......................... 10, 18

Movant V International Fine Arts Publishing, Inc. ("V International") respectfully submits the following in support of its Motion, pursuant to Federal Rule of Civil Procedure 56, for an order dismissing The Estate of Marilyn Monroe, LLC ("EMMLLC")'s First Amended Counterclaims and for further relief as the Court deems just and proper, including, but not limited to, an Order declaring that EMMLLC does not own rights in Marilyn Monroe's image, name, persona and likeness under 15 U.S.C. § 1125(a). Additionally, in the interests of avoiding duplicative arguments, V International also joins in A.V.E.L.A., Inc. ("AVELA"), X One X Movie Archives, Inc. ("X One X") and Leo Valencia's summary motion if any issues coincide.

## I.  INTRODUCTION

As established in this memorandum, EMMLLC has no rights in Monroe's persona, name, image and likeness under 15 U.S.C. § 1125(a) and as a result all claims and causes of action against Movant must fail. Marilyn Monroe was one of the most famous women of the twentieth century. Monroe was never, however, a trademark indicating a source of products. Despite its intentionally deceptive name, "The Estate of Marilyn Monroe, LLC" is not Monroe's actual estate and does not own exclusive rights to Monroe's image, persona, name, or likeness. This matter is = another attempt by a corporation with no connection to Monroe to exclusively profit off of the long-deceased actress based on fictional rights.[1] EMMLLC claims to own sweeping intellectual property rights in Marilyn Monroe based on the Lanham Act, but such purported rights legally cannot exist. EMMLLC cannot pull these rights from nothing.  EMMLLC argues, with no legal basis, that trademark rights somehow retroactively can exist in Monroe's persona,

---

[1] *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012) (confirming that Monroe's right of publicity did not survive her because Monroe died domiciled in the State of New York, which does not recognize postmortem rights of publicity); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal. 2008) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008) (determining post mortem rights in Marilyn Monroe's persona, identity or likeness did not exist and any such rights terminated upon Monroe's death).

name and likeness, despite the fact that Monroe did not own or pass down any such rights. Monroe did not authorize EMMLLC (an entity created decades after Monroe's death) or anyone for that matter, to license or police her intellectual property rights. EMMLLC also seeks to perpetuate its con that it is Monroe's "estate" and somehow exclusively owns purported "trademark" rights to every use of Monroe's image and name in commerce, despite the undisputed facts that: (1) EMMLLC is not Monroe's estate, heirs, or family; (2) countless entities and individuals have sold products and/or licensed artwork bearing Monroe's image in the five decades since Monroe's death; and (3) EMMLLC has not presented evidence of secondary meaning. The Ninth Circuit noted, "We observe that the lengthy dispute over the exploitation of Marilyn Monroe's persona has ended in exactly the way that Monroe herself predicted more that fifty years ago: 'I knew I belonged to the Public and to the world, not because I was talented or even beautiful but because I had never belonged to anything or anyone else.'" *Greene*, 692 F.3d at 1000. EMMLLC now attempts to again dredge up Monroe's "persona" rights, this time under the guise of the Lanham Act—despite the fact that it has no legal basis to do so. EMMLLC has no valid rights in Monroe's name, image, persona, or likeness under 15 U.S.C. § 1125(a). Movants do not use EMMLLC's registered trademarks. There is no evidence of likelihood of confusion. EMMLLC must prove its case and has failed to do so— instead, it attempts to coast on its misleading name and on the hope that no one will question its incomprehensible and unsubstantiated claims that it is Monroe's estate (it is not) and it owns rights in her image and persona (it does not). EMMLLC's claims fail as a matter of law.

## II.   STATEMENT OF FACTS

### A.   Movant's Business

V International is an artwork-licensing agent. V International's clients, including AVELA, create, own, and license various catalogs of artwork. (SOF ¶ 47.) V International facilitates the licensing of its clients' artwork to various manufacturers, distributors, and retailers in exchange for a commission fee. (SOF ¶¶ 46, 47.)

Leo Valencia, AVELA's owner, has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Marilyn Monroe, since the 1980s. (SOF ¶ 45.) AVELA's artwork uses novel elements and contemporary designs to modernize old Hollywood memorabilia and appeal to a new generation of consumers. (SOF ¶ 56.) These images transform old photographs of Monroe through extensive graphic design and restoration processes to create completely new artwork and reinvent and modernize Monroe. (SOF ¶ 55.)

**B.      Events Leading Up to EMMLLC's Formation**

Marilyn Monroe died on August 5, 1962. (SOF ¶ 9.) Monroe's will bequeathed her personal effects and small sums of money to various friends and family members. (SOF ¶ 11.) Monroe's will was silent as to any intellectual property rights. (SOF ¶ 12.) Monroe left a trust to be paid out to her mother and a Mrs. Michael Chekhov with any remaining income to be paid to Dr. Marianne Kris for the furtherance of Dr. Kris' psychiatric institutions. (SOF ¶ 13.) Monroe left the "rest, residue and remainder" of her estate as follows: (a) the lesser of $40,000 or 25% of the total remainder of her estate to a May Reis; (b) 25% of the balance of her estate to her psychiatrist, Dr. Marianne Kris, to be used for the furtherance of Dr. Kris' psychiatric institutions; and (c) the remaining balance to Lee Strasberg, her acting coach. (SOF ¶ 14.) Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe, sold any Monroe-related products, or policed any purported rights in Monroe in the 2 decades following Monroe's death. (SOF ¶ 16.)

Lee Strasberg died in 1982 and his will was silent as to any Monroe intellectual property rights. (SOF ¶¶ 28, 28.) Dr. Marianne Kris died in 1980 and purportedly bequeathed her property, including a 25% interest in the assets of Monroe's residuary estate to the "Anna Freud Center." *See Greene*, 692 F.3d at 987. (SOF ¶ 30.)

In 2001, Monroe's estate closed. (SOF ¶ 31.) In December 2010, Authentic Brands Group, LLC ("ABG") acquired certain assets from an entity called Marilyn Monroe LLC. (SOF ¶ 63.) For some reason, EMMLLC has refused to turn over the documents evidencing this acquisition to Movant's Counsel and as a result Movant is unable to attach this evidence to the instant Motion.  (SOF ¶ 65.) ABG then formed a subsidiary and named it "The Estate of Marilyn Monroe, LLC." (SOF ¶ 64.) On July 25, 2013, a representative of the Anna Freud Center signed a document retroactively assigned Center's 25% share of Monroe's residuary estate to the entity "RALS-MM LLC f/k/a Marilyn Monroe, LLC" effective as of June 19, 2001. (SOF ¶ 66.)

## III.   PROCEDURAL HISTORY

On June 2, 2011, EMMLLC sent AVELA and AVELA's licensee, Silver Buffalo, LLC, a letter claiming EMMLLC was the exclusive owner of trademarks in Monroe's name and other statutory and common law rights in Monroe and demanding that AVELA cease licensing or selling any products bearing Monroe's name, likeness, image or persona. (Dkt. 1 Exhibit 1.)

On June 20, 2012, AVELA filed its Complaint alleging that EMMLLC's purported exclusive rights in Monroe's persona, name, and image did not exist. (Dkt. 1.) AVELA's Complaint sought declaratory relief determining, *inter alia*, that AVELA did not infringe EMMLLC's purported rights to Monroe's persona. (*Id.*)

On August 31, 2012, EMMLLC filed its Answer and Counterclaims against AVELA and AVELA's owner, Leo Valencia, alleging claims for false association, unfair competition, and

trademark infringement under common law and the Lanham Act based upon AVELA's purported use of EMMLLC's "Marilyn Monroe Intellectual Property." (Dkt. 5.) EMMLLC defined this "Marilyn Monroe Intellectual Property" to include registered trademarks in Monroe's name and signature, as well as "rights in and to Marilyn Monroe's identity, persona, name and likeness arising under common law and/or statute including, without limitation, 15 U.S.C. § 1125(a) of the Lanham Act . . . " (*Id.* at ¶¶ 13, 15.)

On February 4, 2014, EMMLLC moved to add V International to the ongoing litigation. (Dkts. 72 and 73.) On October 30, 2015, V International filed its Answer and Counterclaims against EMMLLC, ABG, and Jamie Salter, EMMLLC and ABG's CEO, bringing the following causes of action: (1) claims for cancellation of EMMLLC's registered trademarks on the grounds of functionality and that the trademarks are generic; and (2) claims for intentional interference with prospective economic advantage. (Dkt. 282.)

## IV.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment, "if the movant shows that there is no genuine dispute as to any material fact and if the movant is entitled to judgment as a matter of law." A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue in order to survive the motion. *Id.* at 324. "The mere existence of *some* alleged factual dispute between the parties or a mere scintilla of evidence in support of a party's position will not defeat an otherwise

properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Mere conclusive allegations or denials are insufficient to preclude the granting of a summary judgment motion. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980) "[S]ummary judgment in a trademark action may be appropriate ... where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996).

## V.    ARGUMENT

### A.    EMMLLC's Trademark Claims Fail as a Matter of Law

None of EMMLLC's claims can survive if EMMLLC has no interest in Monroe. EMMLLC's Lanham Act claims fail as a matter of law. EMMLLC's 15 U.S.C. § 1125 claim (hereinafter, "Section 43(a)") fails where EMMLLC's purported "persona" rights in Monroe do not exist and EMMLLC would not own such rights even if they did exist. EMMLLC's 15 U.S.C. § 1114 claim (hereinafter, "Section 32") fails where EMMLLC's registered marks in "Monroe's stylized signature and name do not encompass AVELA's use of Monroe's image.

To prevail on a trademark infringement claim, a plaintiff must establish that: (1) the symbols in which its trademark right is asserted are valid, legally protectable trademarks; (2) it owns the trademarks; and (3) defendant's use of similar marks is likely to create confusion as to origin or sponsorship. *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581–82 (2d Cir. 1990).

### 1.    EMMLLC's § 43(a) Claim Fails Because "Persona" Trademark Rights in Monroe Do Not Exist

EMMLLC cannot to bring its claims under § 43(a). Courts have recognized "trademark-like" rights in certain celebrities' personas, names, images, and likenesses. *See, e.g., Parks v. LaFace Records*, 329 F.3d 437, 445 (6th Cir. 2003). Movants do not dispute that courts have recognized these "trademark-like" rights for living celebrities or that courts have recognized

these rights for certain deceased celebrities. What Movants contest, and what is established as a matter of law here, is that there are no such § 43(a) "trademark-like" rights in Marilyn Monroe.

a)    § 43(a) "Persona" Rights Did Not Exist at the Time of Monroe's Death

EMMLLC cannot own a trademark in Marilyn Monroe's persona, image, or likeness under § 43(a) because such a right did not exist until decades after Monroe's death.

As a general rule, a celebrity cannot pass down an intellectual property right that celebrity could not have possessed during his or her lifetime. *See Greene*, 692 F.3d at 1000. This Court has already found that Marilyn Monroe cannot have passed down an intellectual property right that did not exist at her death. *See Shaw*, 486 F.Supp.2d at 316. In *Shaw*, the entity "Marilyn Monroe, LLC," attempted to argue Monroe passed down a right of publicity through her will's residuary clause. *Id.* This Court found that argument unavailing because Monroe could not have overlooked a right that did not come into being until after her death:

> MMLLC makes much of Ms. Monroe's purported intent to include in her residuary estate all property 'to which [she] shall be in any way entitled.' In the absence of any other evidence concerning Ms. Monroe's intent, this boilerplate language is much too slender a reed on which to hang a devise of postmortem publicity rights that did not come into being until 22 years after her death.

*Id.* at 316, 318. MMLLC's argument was "doubly doomed because *the law in effect at the time of Ms. Monroe's death* did not recognize descendible postmortem publicity rights and **did not allow for distribution under a will of property not owned by the testator at the time of her death**." *Id.* at 317 (emphasis added). "[A] testator is presumed, as a matter of law, to know that he cannot dispose of property … he does not own at the time of his death." *Id.* at 318.

Trademark-like § 43(a) rights in a celebrity's "persona," image, name, and likeness were first recognized two decades after Monroe's death. *See*, *e.g.*, *Allen v. National Video, Inc.*, 610 F.Supp. 612, 627 (S.D.N.Y. 1985). EMMLLC argues Monroe passed down § 43(a) rights

7

through the residuary clause in her will where Monroe passes down all property "to which [she] shall be in any way entitled." (SOF ¶ 85.) This argument fails for the exact same reason it failed in *Shaw*: § 43(a) rights in a celebrity were not recognized under the law in effect at the time of Monroe's death, much less such rights in a deceased celebrity. Additionally, EMMLLC has not presented any evidence concerning Monroe's intent as to trademark rights (SOF ¶¶ 81-84.), and her boilerplate residuary clause is much too slender a reed on which to hang a devise of postmortem 43(a) rights that did not come into being until decades after her death. Under clear precedent from this Court, Monroe could not have passed down § 43(a) rights as a matter of law where such rights did not even exist at the time of Monroe's death and thus, EMMLLC cannot rightly claim Monroe somehow passed these rights to EMMLLC.

EMMLLC cannot own § 43(a) rights in Monroe's name, image, likeness, and persona. EMMLLC's § 43(a) claim fails as a matter of law.

### b) EMMLLC's Purported Rights under § 43(a) do not Exist Because Monroe's "Persona" Has No Secondary Meaning

EMMLLC's § 43(a) claim also fails as a matter of law where it cannot establish secondary meaning in Monroe. Decades of fractured use of Monroe's name, image, likeness, and persona prevent Monroe from serving a source-identifying function and EMMLLC from claiming exclusive rights to these purported "marks." No reasonable juror could conclude that Monroe's image primarily identifies the unrelated entity "EMMLLC" rather than Monroe.

Preliminary to making a showing of trademark infringement under § 43(a), "a plaintiff must demonstrate its own right to use the mark or dress in question" and that it owns a valid and protectable trademark distinctive as to the source of the good or service at issue. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2nd Cir. 2007). Trademark analysis considers the public's belief as to whether or not the mark's owner approved the use of a trademark. *Dallas Cowboys*

*Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979). Whether or not a

plaintiff has a valid mark that is entitled to protection depends on whether it is inherently

distinctive or, if merely descriptive, has acquired "secondary meaning." *Merriam–Webster, Inc.*

*v. Random House, Inc.,* 35 F.3d 65, 70 (2d Cir. 1994). Secondary meaning is necessary to

demonstrate association of a purported trademark with a single producer. *See Clairol Inc. v.*

*Gillette Co*., 389 F.2d 264, 269 (2d Cir. 1968). To establish secondary meaning, at the very least,

the public must be aware that the product comes from a single source. *Union Carbide Corp. v.*

*Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir. 1976) (superseded by statute on other grounds).

A purported § 43(a) mark in a celebrity's image or likeness is not protectable unless it is

proven to distinguish the owner's goods (i.e. to identify one source). *ETW Corp. v. Jireh Pub.,*

*Inc.*, 332 F.3d 915, 922 (6th Cir. 2003). The Sixth Circuit rejected a § 43(a) claim asserting

rights in any and all images of Tiger Woods as untenable:

> ETW asks us, in effect, to constitute Woods himself as a walking, talking trademark.
> Images and likenesses of Woods are not protectable as a trademark because they do not
> perform the trademark function of designation. They do not distinguish and identify the
> source of goods. They cannot function as a trademark because there are undoubtedly
> thousands of images and likenesses of Woods taken by countless photographers, and
> drawn, sketched, or painted by numerous artists, which have been published in many
> forms of media, and sold and distributed throughout the world. No reasonable person
> could believe that merely because these photographs or paintings contain Woods's
> likeness or image, they all originated with Woods.

*ETW*, 332 F.3d at 922. Monroe's image and likeness do not identify any one source and are not

protectable under § 43(a).

### (1)    Monroe's Name, Image, Likeness and Persona have been Copyrighted and Extensively Used by Many Firms Since Her Death

Even if § 43(a) rights in Monroe existed at the time of her death, a fact which Movant does not concede, EMMLLC cannot own these rights because of decades of fractured use of Monroe's name, image, and persona.

When a mark is copyrighted and extensively used by many firms, there can be no secondary meaning in it. *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 923–25 (S.D.N.Y. 1983). Additionally, "The Lanham Act explicitly anticipates that the source-identification function of a mark may be destroyed by widespread and uncontested use of the mark by those other than the mark holder." *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1217 (C.D. Cal. 2000) ("*Cairns I*") (Princess Diana's image lost any significance as a mark identifying the source of a product because extensive unauthorized use of her name and image on commercial articles, both before her death and in the three years after her death, weakened trademark-like rights in her name and image.)

Finally, if a trademark holder ceases using a mark with intent not to resume its use, the mark is deemed abandoned, falls into the public domain, and is free for all to use. 5 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2001) (hereinafter "McCarthy") Twenty-one years of non-use, coupled with the intent not to resume use within the reasonably foreseeable future, easily surpasses the non-use requirement for finding abandonment. *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989). Two years of non-use creates a rebuttable presumption of abandonment. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980).

Monroe did not use her image or name on merchandise during her lifetime. (SOF ¶ 23.) EMMLLC has presented no evidence that Monroe policed the use of, or prevented anyone from using, her image, persona, likeness, or name during her lifetime. (SOF ¶ 24.) EMMLLC has

presented no evidence that anyone made trademark use of Monroe's image, persona, likeness, or name from 1962-1983, had any intention of using such "marks" from 1962-1983, or contested the use of such "marks" from 1962-1982. The undisputed facts demonstrate prima facie abandonment. Additionally, EMMLLC has presented no evidence its "predecessors" sent cease and desist letters contesting the use of Monroe's image, persona, likeness, or name from 1983 to 2011.[2] (SOF ¶ 41.) Monroe's image, name, likeness, and persona, to the extent such "marks" even existed, were abandoned and fell into the public domain in the two decades after her death, at which point third parties had the right to use, and did in fact use, her persona in commerce.

In fact, countless third parties have made widespread use of Marilyn Monroe's "persona" in commerce from the 1950s to 1983 (SOF ¶ 33.), and from 1983 to the present (SOF ¶ 34.). Movie studios, photographers, artists, and countless entities and members of the public have sold products bearing indicia of Marilyn Monroe following her death. (SOF ¶¶ 33, 34, 36, 38.) This flood of un-endorsed memorabilia for decades prevents any possible likelihood of confusion here. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002) ("*Cairns II*"). Dozens (if not hundreds) of photographers and/or entities own copyrights in images of Monroe. (SOF ¶ 35.) Many photographers sell and license their photographs of Monroe. (SOF ¶ 36.) Monroe appeared on many magazine covers during her lifetime, and these publications continue to own rights to and license these images. (SOF ¶¶ 37, 48.) Other entities own or have owned trademark and copyright rights in Monroe's films and characters. (SOF ¶ 39.) Various entities and individuals own registered trademarks related to Monroe. (SOF ¶ 40.)

Other entities used Marilyn Monroe's name, signature, and image on products decades before EMMLLC or its "predecessors." (SOF ¶¶ 33, 34.) It is irrelevant that EMMLLC and/or its predecessors later registered trademarks in Monroe's name and signature or that EMMLLC

---

[2] EMMLLC has not turned over any cease and desist letters from 1926 to 2011. (SOF ¶ 41.)

and/or its predecessors later licensed Monroe's name, persona, likeness, and image (based first on nonexistent rights of publicity and now based on nonexistent § 43(a) rights). *See Grupo Gigante SA De CV v. Dallo & Co.*, *Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004)[3]. EMMLLC has failed to present any evidence regarding the status of any trademark rights in the two decades after Monroe's death, or what Monroe merchandise was offered to the public, and by whom, from 1962-1983. EMMLLC cannot resurrect trademark rights in Monroe.

Monroe's image and name have undisputedly been copyrighted and extensively used by countless third parties for decades and do not serve a source-identifying function. As a matter of law, there can be no secondary meaning in Monroe and thus EMMLLC cannot purport to own valid trademark rights under § 43(a) in Monroe's name, image, likeness and persona.

### (2)      There is No Secondary Meaning in Monroe

EMMLLC cannot establish inherent distinctiveness or secondary meaning in its purported "marks" in Monroe's name, image, likeness, and persona as a matter of law.

A mark is "inherently distinctive" if its "intrinsic nature serves to identify a particular source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). If a mark is not inherently distinctive, it must achieve secondary meaning among the relevant consumer market. *Id.* at 769. A photograph and/or name of a human being "is not inherently 'distinctive' in the trademark sense of tending to indicate origin." *Pirone*, 894 F.2d at 583.

Secondary meaning attaches when "'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business.'" *Pirone,* 894 F.2d at 583 (quoting *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985)). Courts analyze six factors to determine

---

[3] "Trademark rights are acquired by the party that first uses a mark in connection with the sale of goods. ...Under the principle of first in time equals first in right, priority ordinarily comes with earlier use of a mark in commerce. It is not enough to have invented the mark first or even to have registered it first."

secondary meaning: [i] advertising expenditures, [ii] consumer studies linking the mark to a source, [iii] unsolicited media coverage of the product, [iv] sales success, [v] attempts to plagiarize the mark, and, [vi] length and exclusivity of the mark's use. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012). Summary judgment may be proper in cases "where the proponent of the alleged trademark has failed to raise a material issue of fact on the question of secondary meaning." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.,* 478 F.Supp.2d 340, 344 (E.D.N.Y. 2007) (collecting cases). "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985) (citing *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972)). A plaintiff must prove that its mark acquired secondary meaning *by the time the allegedly infringing product came on the market*. *Id.* (emphasis added).

Marilyn Monroe is famous. EMMLLC and its products are not. EMMLLC purported marks in Monroe's name, persona, image and likeness are not entitled to protection because they are not inherently distinctive and have not acquired secondary meaning. EMMLLC also has not presented any evidence it acquired secondary meaning by identifying any particular image of Monroe with EMMLLC. (SOF ¶ 90.) AVELA's products with Monroe artwork have been in the marketplace since 1985. (SOF ¶ 45.) EMMLLC has not presented any evidence that any entity or individual made any trademark use of Monroe's name or image until 1983. (SOF ¶¶ 19, 42.) EMMLLC cannot meet its burden of proving that its purported marks acquired secondary meaning between 1983 and 1985. Further, as discussed below, EMMLLC cannot establish that its purported marks in Monroe acquired secondary meaning between 1983 and the present.

EMMLLC has not submitted any evidence of advertising expenditures from 1962-2013.[4] (SOF ¶ 43.) EMMLLC has not presented any consumer studies linking its purported marks to a source. (SOF ¶ 68.) EMMLLC failed to turn over a single article evidencing EMMLLC, EMMLLC's predecessor, or its "Marilyn Monroe" products prior to AVELA's sales of products bearing Monroe artwork.[5] (SOF ¶¶ 45, 69.) Only sales achieved before the allegedly infringing product came on the market bear on the analysis of sales success. *LVL*, 209 F. Supp. 3d at 660. EMMLLC has not submitted any numerical evidence regarding sales success prior to AVELA's sales of products. (SOF ¶ 44.) Each of these factors weighs against secondary meaning.

The relevant question regarding "attempts to plagiarize the mark" is "whether the copying was done deliberately, so as to benefit from [the mark holder's] name and good will." *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004). AVELA does not use the name "Marilyn Monroe" or Monroe's stylized signature. (SOF ¶¶ 53, 54.) AVELA clearly identifies its own brand, Radio Days, on its products. (SOF ¶ 61.) AVELA uses Monroe artwork as product content, not as an identification of source. AVELA does not imply Monroe or EMMLLC endorsed its products. EMMLLC has not presented any evidence that consumers have any awareness of EMMLLC or its products. EMMLLC cannot credibly argue that it has built up any good will with consumers or that AVELA's Monroe artwork has any impact on consumer purchasing decisions.

"Length and exclusivity of the mark's use" also weigh against secondary meaning where Monroe's name and image have not been used exclusively by EMMLLC or its predecessors, as

---

[4] Regarding advertising expenditures, the court "should consider not only the total amount of the plaintiff's expenditures, but also whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 655 (S.D.N.Y. 2016).

[5] Articles solicited by a plaintiff as part of its promotional strategy do not support a finding of unsolicited media coverage. *See Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011).

discussed above. Monroe's image has generated significant unlicensed sales where it was used by various entitles and not policed for decades (SOF ¶¶ 22, 33, 34, 41.), lessening any capacity of Monroe to identify or distinguish goods or services.

Overall, not one factor supports a finding of secondary meaning.

### 2.     EMMLLC's § 43(a) Claim Also Fails Because Even if § 43(a) Rights in Monroe Could Exist, EMMLLC Does Not Own These Rights

#### a)     Trademark Rights Were Not Part of Monroe's Estate

EMMLLC does not own rights under § 43(a) in Monroe because Monroe did not pass down any intellectual property rights. A testator cannot dispose of property she does not own at the time of her death. *Shaw*, 486 F. Supp. 2d at 318; *In re Gernon's Estate*, 35 Misc.2d 12, 226 N.Y.S.2d 940 (1962). Monroe's will is silent as to any intellectual property rights. (SOF ¶ 12.) Monroe did not register any trademarks during her lifetime (SOF ¶ 10.); no registered trademarks could have been passed down by Monroe and no registered trademarks were part of her estate. (SOF ¶ 15.) Monroe did not make trademark use of her persona, image, name and likeness in connection with goods or services (SOF ¶¶ 17, 23.); Monroe did not pass down any § 43(a) rights and such rights could not have been part of her estate. Any trademarks related to Monroe that were later registered or used bear no actual connection to the late actress. It is legally impossible for Monroe to have devised EMMLLC's purported marks in Monroe under § 43(a) and these rights cannot be resuscitated by an unrelated entity decades after her death.[6]

Furthermore, the Central District of California has already issued a declaration that EMMLLC's predecessor did *not* own any rights of "association, sponsorship, and/or endorsement, in and to the name and likeness of Marilyn Monroe." (SOF ¶ 32.) Additionally,

---

[6] It is also legally impossible EMMLLC to argue that Lee Strasberg also somehow passed down such rights (where § 43(a) "persona" rights did not exist in a deceased celebrity at Strasberg's death, Strasberg's will does not mention any intellectual property rights, and he did not exercise or police any Monroe-related rights (SOF ¶¶ 16-18, 28.)).

when Monroe's estate was appraised in 1964, the executor of Monroe's estate did not list any

intellectual property rights as assets of her estate. (SOF ¶ 15.)

> **b)**      **EMMLLC Lacks Standing to Assert Monroe's § 43(a) Rights**

EMMLLC's § 43(a) claim also fails as a matter of law because it does not have standing

to assert Monroe's "persona" rights. Only celebrities have standing to assert a § 43(a) false

endorsement claim. *See Bondar v. LASplash Cosmetics*, No. 12 CIV. 1417 SAS, 2012 WL

6150859, at *7 (S.D.N.Y. Dec. 11, 2012).

This Court has determined that a § 43(a) false endorsement claim brought on behalf of a

celebrity may only be brought by a party that has asserted it owns that celebrity's right of

publicity. *Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351, 2014 WL 5493242, at *4 (S.D.N.Y.

Oct. 30, 2014). The Court dismissed a § 43(a) claim for the use of a model's photos as a matter

of law because the plaintiff did not own the model's publicity rights:

> "As a celebrity's right of publicity is transferable in some states (along with the
> commercial interests that accompany that right), claims for false endorsement have
> occasionally been brought by those who purportedly own a celebrity's right of publicity
> rather than the celebrity him/herself. *See, e.g., Bruce Lee Enters., LLC v. A. V.E.L.A.,
> Inc.,* No. 10–CV–2333 (KMW), 2013 WL 822173, at *19 (S.D.N.Y. Mar. 6, 2013)
> (entertaining a false endorsement claim brought by company that purported to own Bruce
> Lee's right of publicity). Here, however, [plaintiff] does not claim to own [the celebrity's]
> right of publicity. … As "[f]ederal courts as a general rule allow litigants to assert only
> their own legal rights and interests, and not the legal rights and interests of third parties,"
> … any claim [plaintiff] seeks to make in this regard must be and is dismissed.

*Id.* (internal citations omitted). As the parties and this Court are well aware, EMMLLC is

judicially estopped from asserting any right of publicity in Monroe.[7] Therefore, under the

reasoning of *Avalos*, EMMLLC does not have standing to bring its § 43(a) claim. *Id.* EMMLLC

may only assert its own legal rights and interests, not those of Monroe.

---

[7] *See Shaw*, 486 F. Supp. 2d 309; see also *Greene*, 692 F.3d at 1000. Despite these rulings, EMMLLC still continues
to claim it owns Monroe's right of publicity on products and in advertising. (SOF ¶¶ 71, 72.) It appears nothing can
stop EMMLLC from asserting rights it does not have.

Additionally, EMMLLC cannot own § 43(a) rights in Monroe because her persona entered the public domain upon her death. Monroe was domiciled in New York at the time of her death; New York does not recognize a post-mortem right of publicity. *Shaw*, 486 F. Supp. 2d at 314. Monroe's right of publicity carries the "immeasurable value of the name, likeness, and persona of Marilyn Monroe." *Greene*, 692 F.3d at 999-1000. Monroe's name, likeness, and persona entered the public domain pursuant to New York law upon her death.

In *Shaw*, the heirs of a photographer Sam Shaw sought to sell his copyrighted photographs of Marilyn Monroe in connection with the sale of t-shirts:

> This particular dispute arises out of (1) the alleged sale of a T-shirt at a Target retail store … which bore a picture of Marilyn Monroe and the inscription of the "Shaw Family Archives" on the inside neck label and tag, and (2) the alleged maintenance of a website by SFA and Bradford through which customers could purchase licenses for the use of Ms. Monroe's picture, image and likeness on various commercial products.

*Shaw*, No. 05 CIV. 3939 (CM), 2008 WL 4127830, at *2 (S.D.N.Y. Sept. 2, 2008). EMMLLC's predecessors sought to restrict the rights of Shaw's heirs and other third parties to sell and license Monroe-related items--this Court rejected their ability to do so:

> Of course, Consolidated Plaintiffs cannot "license" anyone to use photographs of Monroe that have fallen into the public domain. Anyone can use a public domain photograph, without obtaining permission, unless the person depicted therein has some other basis to restrict use of the picture. The only such basis of which this Court is aware is the so-called "right of publicity." Now that two courts have ruled that any such right, if it ever existed, died with Monroe, Consolidated Plaintiffs have nothing whatever to license in connection with any photograph that Shaw took of Monroe-unless, of course, they own a copyright in some Shaw photograph.

*Id.*, 2008 WL 4298548, at *3 (S.D.N.Y. Sept. 11, 2008). This Court found that Shaw (and others) could freely license their photographs for use on products and EMMLLC's predecessors had no right to restrict the use of public domain or copyrighted images of Monroe. *Id.* Surely this Court would have cited § 43(a) rights as a basis for EMMLLC's predecessors to restrict uses of Monroe's image if they had been able to assert such rights.

Similarly, here, Movant should be entitled to serve as a licensing agent for AVELA's Monroe artwork, particularly where: (i) Monroe's persona and image entered the public domain upon her death; (ii) EMMLLC does not own any copyrights or registered trademark in AVELA's artwork (SOF ¶ 73.); (iii) AVELA owns copyrights in its artwork that is developed using formerly public domain images of Monroe (SOF ¶ 60.); and (iv) EMMLLC does not own Monroe's right of publicity or any other basis to restrict AVELA's rights to license its images according to this Court. EMMLLC is judicially estopped from asserting a right of publicity (SOF ¶ 70.), and must instead attempt to assert ownership of "persona" rights in Monroe under § 43(a). However, EMMLLC's § 43(a) claim fails as a matter of law because Monroe's persona has been in the public domain since her death.

### c)       EMMLLC is not Monroe's Family, Heirs, or Estate

Even if § 43(a) rights in Monroe existed at her death, EMMLLC cannot own these rights because EMMLLC is not Monroe's family, heirs, or actual estate. There is no precedent supporting the notion that EMMLLC is entitled to conjure up § 43(a) rights in Monroe. Any such rights given to EMMLLC would be novel in this regard and requires establishing new law.

The viability of a false endorsement claim on behalf of a *deceased* celebrity is questionable. *See* McCarthy § 28:15 (expressing doubt consumers would believe a dead celebrity endorsed a product).[8] However, assuming that such a claim is viable, EMMLLC is not the proper party to bring such a claim. Every other § 43(a) claim brought on behalf of a deceased celebrity (in this Circuit and others) has been brought by that celebrity's family, direct heirs, or actual estate. *See Pirone*, 894 F.2d at 584 (Babe Ruth's heirs—his daughters—brought a § 43(a) claim); *see also Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 CIV. 5105 NRB, 2013 WL

---

[8] *See also Astaire v. McKenzie,* No. 10 CIV. 4305 (MGC), 2010 WL 2331524 (S.D.N.Y. June 9, 2010); *Pirone,* 894 F.2d at 584-85.

5355010, at *1 (S.D.N.Y. Sept. 25, 2013) (Bette Davis's adopted son brought a § 43(a) claim as the co-executor of her estate); *Astaire*, 2010 WL 2331524, at *1 (Fred Astaire's widow brought a §43(a) claim); *Bruce Lee*, 2013 WL 822173, at *22 (finding a genuine issue of material of fact existed on a § 43(a) claim brought by an entity wholly owned and set up by Bruce Lee's wife and daughter); *Brooks ex rel. Estate of Bell v. The Topps Co.*, No. 06 CIV. 2359, 2007 WL 4547585, at *1 (S.D.N.Y. Dec. 21, 2007) (James Brooks' daughter brought a § 43(a) claim); *Ferrer v. Maychick*, 69 F. Supp. 2d 495, 98 (S.D.N.Y. 1999) (Audrey Hepburn's son brought a § 43(a) claim).[9] No court has ever permitted an unaffiliated entity to bring a § 43(a) "persona" claim on behalf of a deceased celebrity. EMMLLC cannot claim § 43(a) rights in Monroe given the facts at hand. Monroe did not assign any intellectual property rights to EMMLLC. (SOF ¶ 81.) Monroe did not authorize EMMLLC to license or police her intellectual property rights. (SOF ¶¶ 82, 83.) No beneficiaries of Monroe authorized EMMLLC to license or police Monroe's intellectual property rights, to the extent such rights could even exist. (SOF ¶ 84.) EMMLLC has failed demonstrate how such a right moved from Monroe to EMMLLC. EMMLLC is undisputedly not Monroe's heirs, family, or actual estate. (SOF ¶¶ 77-80.) As a matter of law, no authority supports EMMLLC's claim that it somehow can assert Monroe's §43(a) rights.

### (1)  Confirming EMMLLC§ 43(a) "Persona" Rights Would Create New Law Overextending the Lanham Act

---

[9] *See also Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1024 (3d Cir. 2008) (John Facenda's son brought a §43(a) claim as the executor of Facenda's actual estate); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1068 (9th Cir. 2015) (Bob Marley's children brought a §43(a) claim); *Branca v. Mann*, No. CV 11-00584 DDP PJWX, 2012 WL 3263610, at *5 (C.D. Cal. Aug. 10, 2012) (Michael Jackson's actual estate brought a §43(a) claim); *Cairns I*, 107 F. Supp. 2d at 1213 (the executors of Princess Diana's actual estate and the trustees of her memorial fund brought a §43(a) claim); *Estate of Barre v. Carter*, 272 F. Supp. 3d 906, 944 (E.D. La. 2017) (the decedent's estate brought a §43(a) claim); *Hebrew Univ. of Jerusalem v. Gen. Motors LLC*, 878 F. Supp. 2d 1021 (C.D. Cal. 2012) (Albert Einstein's memorial fund brought a §43(a) claim); *Hart v. World Wrestling Entm't, Inc.*, No. 3:10CV0975 SRU, 2012 WL 1233022, at *1 (D. Conn. Apr. 10, 2012) (the decedent's wife brought a 43(a) claim).

If this Court were to determine that EMMLLC owns § 43(a) "persona" rights in Monroe as a matter of law, this Court would create new law drastically extending the reach of the Lanham Act. There is currently no authority recognizing how § 43(a) "persona" rights are descendible as to EMMLLC.[10] If this Court affirms EMMLLC's § 43(a) "persona" rights in Monroe, it would effectively be creating authority that an entity that is not a celebrities' beneficiary, actual estate, family, or assignee can claim § 43(a) rights decades after that celebrity's death and hold rights in perpetuity to that celebrity's name, image, likeness, and persona (even where he/she passed away before such rights even existed, never passed down any intellectual property rights, and the celebrity cannot serve as a source identifier.) No court in the history of American jurisprudence has ever recognized the § 43(a) rights that EMMLLC seeks to establish here. The duty of the court is to interpret the law, not to create it. *See Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981) (federal courts "are courts of limited jurisdiction that have not been vested with open-ended lawmaking powers.")

Here, EMMLLC seeks to impermissibly control every indicia of Marilyn Monroe in commerce: "…as the owner of the Estate of Marilyn Monroe, we have a right to oversee all uses of the Marilyn Monroe name, image and likeness in any commercial manner." (SOF ¶ 89.) The use of an image of any long-deceased celebrity in commerce could similarly result in liability under § 43(a). Anyone who claims to hold an interest in an unrelated deceased celebrity would be able to claim they own "persona" rights, incorporate as "The Estate of [insert celebrity]", and hold in perpetuity rights originally granted through case law to living celebrities with a finite lifespan, and then sue based upon any use of that celebrity's image and name in commerce. This

---

[10] *Avalos*, 2014 WL 5493242, at *4 found that an entity must own a celebrity's right of publicity in order to have standing to assert §43(a) rights in that celebrity, but did not consider a deceased celebrity's rights.

precedent would create new law and open this Circuit up to meritless claims from anyone claiming to hold § 43(a) rights in a deceased celebrity.

EMMLLC was formed five decades after Monroe's death and has no actual connection to Monroe or indication from Monroe or her beneficiaries that it may control Monroe's purported intellectual property rights. This Court should decline to extend § 43(a) rights to EMMLLC.

### 3.     EMMLLC's § 32 Claim Fails Because Marks in "MARLIYN MONROE" Do Not Extend Protect to All Images of Monroe

EMMLLC's § 32 claim cannot survive summary judgment. A § 32 plaintiff must show that the defendant used in commerce, a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in connection with the sale of goods in a way that is likely to cause confusion. 15 U.S.C. § 1114(1)(a). A trademark in a celebrity's name does not extend to protect any and all images of a person or a celebrity's persona under § 32. *Pirone*, 894 F.2d at 583; *Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014). In *Pirone*, the Second Circuit rejected a § 32 claim on summary judgment because the plaintiff's registered trademarks in Babe Ruth's name did not extend to protect the images of Ruth at issue and the plaintiff did not own a trademark in any of the particular Ruth photographs the defendant used. *Id.* The defendant used Ruth's name and image to identify the baseball player, and such a use "is not a trademark use and not an infringement." *Id.* The court reasoned that, "[E]ven if [plaintiff] could show that it has established a trademark in a particular pictorial representation of Ruth, such a trademark would not cover all photos taken of Ruth during his career." *Id.*

Here, EMMLLC has only proffered evidence of AVELA's use of Monroe's image in AVELA'S artwork. (SOF ¶ 59.) EMMLLC cannot extend its purported trademark in Monroe's "persona" to serve as a trademark for purposes of § 32. Similarly, EMMLLC's registered word marks in Monroe's name do not prohibit AVELA's use of Monroe's image. EMMLLC's § 32

claim applies strictly to its registered trademarks in "MARILYN MONROE," "MARILYN," and Monroe's stylized signature. EMMLLC has not presented any evidence that AVELA used these registered marks on products. (SOF ¶¶ 53, 54.) Rather, AVELA uses its own brand mark to clearly identify its brand on all product labels, hangtags, advertising, and packaging.  (SOF ¶ 61.)

AVELA occasionally uses the name "Marilyn" on its artwork as an ornamental feature to describe the famous actress. (SOF ¶ 57.) However, EMMLLC's registered word mark "MARILYN" is limited to two classes of goods: US Class 47 (wines) and US Class 49 (Distilled alcoholic liquors). (SOF ¶ 88.) AVELA does not license art for use in connection with any alcoholic beverage. (SOF ¶ 58.)

Furthermore, EMMLLC's registered trademarks are invalid where they unlawfully and falsely suggest a connection between EMMLLC and Monroe. The Lanham Act bars registration of a mark that "may disparage or falsely suggest a connection with persons, living or dead." 15 U.S.C. § 1052(a). EMMLLC's registered marks utilize Monroe's name, would be recognized as her name, and Monroe's name is famous; furthermore, Marilyn Monroe has no connection to EMMLLC or EMMLLC's activities. *See Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428, 429 (T.T.A.B. 1985). Monroe has no financial or ownership interest in EMMLLC's goods and/or services. (SOF ¶ 25.) *See In re Sloppy Joe's Int'l, Inc.*, 43 U.S.P.Q.2d 1350, 1997 WL 424966, *3 (T.T.A.B. 1997). Monroe died decades before EMMLLC or any of its "predecessors" were formed or registered or used any trademarks. (SOF ¶¶ 9, 42.) Monroe has no connection with EMMLLC's goods or services.

EMMLLC's § 32 claim fails where it is based upon AVELA's use of Monroe's image, where Movants do not use EMMLLC's registered marks, and where EMMLLC's registered marks are invalid because they falsely suggest a connection with Monroe.

## B.     Movants Do Not Infringe EMMLLC's Purported Marks

V International joins in AVELA, X One X, and Leo Valencia's arguments in their summary motion regarding likelihood of confusion. Even if EMMLLC's trademarks were valid, there is no likelihood of confusion or possible infringement in this case.

### C.     There is No Impact on Consumer Purchasing Decisions

V International joins in AVELA, X One X, and Valencia's arguments in their summary motion regarding consumer purchasing decisions. Even if this Court could possibly find any likelihood of confusion, EMMLLC's trademark claims should fail because AVELA's products do not impact consumers' purchasing decisions.

### D.     EMMLLC's New York Unfair Competition Claim Fails

For each of the reasons EMMLLC's Lanham Act claims fail, EMMLLC's claim for unfair competition under New York law also fails as a matter of law. *See Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) (The elements necessary to prevail on trademark infringement and unfair competition causes of action mirror those of Lanham Act claims.)

### E.     EMMLLC's Trademark Dilution Claim Fails

On a claim for trademark dilution, the plaintiff must establish: "[i] its mark is famous; [ii] the defendant's use of the mark is made in commerce; [iii] the defendant used the mark after the mark was famous; and [iv] the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F.Supp.2d 186, 193 (E.D.N.Y.2011). In *Cairns I*, the court held a finding of secondary meaning was absurd and would mean that the words "Diana, Princess of Wales" would primarily identify the plaintiff's activities rather than Princess Diana. *Cairns I*, 107 F. Supp. 2d at 1222. (finding in favor of defendants' on their summary judgment motion on a claim for dilution). Additionally, the law firm representing Diana's actual estate was liable for malicious prosecution

23

for bringing trademark dilution and false advertising claims that had no plausible basis. *Franklin*

*Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2d Dist. 2010).

There is no secondary meaning here as discussed above; it is absurd to argue that an

image of Marilyn Monroe primarily identifies the random entity "EMMLLC" rather than

Monroe. EMMLLC has not produced any evidence at all that AVELA's artwork is likely to

dilute the quality of EMMLLC's "marks." *See ETW Corp.*, 332 F.3d at 954 ("Because [Tiger]

Woods's likeness does not function as a trademark which is subject to protection under the

Lanham Act, it follows that a dilution claim does not lie.") Additionally, AVELA does not use

EMMLLC's registered marks. (SOF ¶¶ 53, 54.) This claim fails as a matter of law.

## F.   EMMLLC's Interference Claims Fail

EMMLLC's has no valid rights in its purported "Marilyn Monroe Intellectual Property."

As a result, EMMLLC's claims for tortious interference with existing contractual relationships

and intentional interference with prospective economic advantage also fail as a matter of law

where they are premised on EMMLLC's nonexistent rights in Monroe.

## G.   Affirmative Defenses Protect AVELA's Use of Marilyn Monroe Artwork

Even if this Court could find infringement, affirmative defenses apply. V International

joins in AVELA, X One X, and Valencia's arguments in their summary motion regarding the

affirmative defenses of laches, copyright, first amendment, and fair use.

## VI.   CONCLUSION

This whole matter is decided when it is determined that EMMLLC has no "persona"

interest in Marilyn Monroe.  V. International requests that this Court dismiss all EMMLLC's

First Amended Counterclaims and for further relief as the Court deems just and proper,

including, but not limited to, a Order declaring that EMMLLC does not own rights in Marilyn

Monroe's image, name, persona and likeness pursuant to 15 U.S.C. § 1125(a) and is not

Monroe's actual estate. Movant requests the opportunity to be heard in court on these papers.

Movant further requests attorneys' fees pursuant to 15 U.S.C. § 1117(a) ("The court in

exceptional cases may award reasonable attorney fees to the prevailing party.").


Dated: May 31, 2018

Respectfully Submitted,

By:_____

Gregory J. Goodheart, Esq.
Alison Pringle, Esq.
GOODHEART LAW OFFICES
*Attorneys for V International Fine*
*Arts Publishing, Inc.*

### CERTIFICATE OF SERVICE

I, Gregory J. Goodheart, hereby certify that on May 31, 2018, I caused copies of

**MOVANT V INTERNATIONAL FINE ARTS PUBLISHING, INC'S NOTICE OF MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT, AND THE DECLARATION OF GREGORY J. GOODHEART IN SUPPORT OF MOVANT'S MOTION FOR SUMMARY JUDGMENT, ALONG WITH ALL ATTACHED EXHIBITS**, to be served via email upon the following individuals:


Gina L. Durham (*pro hac vice*)
DLA PIPER LLP (US)
P.O. Box 64807
Chicago, Illinois 60664-0807
Telephone: (415) 368-4000
Facsimile: (415) 659-7333
Gina.durham@dlapiper.com

Tamar Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Tamar.duvdevani@dlapiper.com

*Attorneys for Counter-Plaintiff The Estate of Marilyn Monroe, LLC*

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed on this 31st day of May, 2018.


_____

Gregory Goodheart