**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | Case No: 12 Civ. 4828 (ALC) (JCF) |
| Plaintiff, | ECF Case |
| v. | |
| THE ESTATE OF MARILYN MONROE, LLC, And DOES 1 THROUGH 10, | **MEMORANDUM OF LAW IN SUPPORT OF MOVANTS' MOTION FOR SUMMARY JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56** |
| Defendants. | |

THE ESTATE OF MARILYN MONROE, LLC

      Counterclaimant,

v.

A.V.E.L.A., INC.,

      Counter-Defendant, and

LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V INTERNATIONAL FINE ARTS PUBLISHING, INC.

      Third-Party Defendants.

X ONE X MOVIE ARCHIVES INC., V INTERNATIONAL FINE ARTS PUBLISHING, INC.,

      Counterclaimants,

**v.**

THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC JAMES SALTER,

      Counter-Defendants.

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

    A.  Movants .............................................................................................................2

    B.  Events Leading up to EMMLLC's Formation ..............................................2

III.  PROCEDURAL HISTORY ....................................................................................3

IV.  LEGAL STANDARD ..............................................................................................4

V.  ARGUMENT ...........................................................................................................5

    A.  EMMLLC's Trademark Claims Fail as a Matter of Law ............................5

    B.  Movants Do Not Infringe EMMLLC's Purported Marks ...........................6

        1.  There is No False Endorsement ................................................................6

        2.  There is No Likelihood of Confusion .......................................................9

        A.  AVELA's Expert Found No Likelihood of Confusion ..........................13

        B.  EMMLLC's Expert Cannot Establish a Likelihood of Confusion .........14

    C.  There is No Impact on Consumer Purchasing Decisions ............................16

    D.  EMMLLC's New York Unfair Competition Claim Fails ............................18

    E.  EMMLLC's Trademark Dilution Claim Fails .............................................18

    F.  Affirmative Defenses Protect AVELA's Use of Marilyn Monroe Artwork ..............19

        1.  Laches Bars Recovery by EMMLLC .....................................................19

        2.  Copyright Law ..........................................................................................21

        3.  First Amendment ......................................................................................22

        4.  Fair Use .....................................................................................................23

VI.  CONCLUSION ......................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Accord Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999 (2d Cir.1983)......................12

*Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 875 F. Supp. 1022 (S.D.N.Y. 1995).......21

*American Book v. Yeshiva University Development Foundation, Inc.*, 297 N.Y.S.2d 156 (Sup. Ct. 1969).................................................................................................................................21

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...............................................................4, 5

*Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384 (2d Cir. 1995) ...............................................10

*Astaire v. McKenzie,* No. 10 CIV. 4305 (MGC), 2010 WL 2331524 (S.D.N.Y. June 9, 2010) .....7

*Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188 (S.D.N.Y.) .................................24

*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474 (2d Cir.1996) ...............................................5

*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212 C.D. Cal. 2000) .........6, 7, 8, 9, 10, 15, 16, 18

*Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013 (C.D. Cal. 1998).......................................7, 16

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) ...................................................6, 24

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)...............................................................................5

*Clairol Inc. v. Gillette Co.*, 389 F.2d 264 (2d Cir.1968) .................................................................5

*Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797 (Cal. 2001)......................................22

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)...............................17, 21

*Elements Spirits, Inc. v. Iconic Brands, Inc.*, No. CV 15-02692 DDP AGRX, 2015 WL 3649295, (C.D. Cal. June 11, 2015) .................................................................................................22

*Eppendorf-Netheler-Hinz GmbH v. Enterton Co.,* 89 F. Supp. 2d 483 (S.D.N.Y. 2000) .............19

*Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F.Supp.2d 186 (E.D.N.Y.2011) ...............................................................................................................18

*ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915 (6th Cir.2003) .......................................................24

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003) ........................................................23

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313 (2d Dist. 2010) ...18

*Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991
   F.2d 1072 (2d Cir. 1993) ..............................................................................................................11

*Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412 (S.D.N.Y. 2012) ........................................17

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999 ....................................................20

*International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir.1980).........24

*JA Apparel Corp. v. Abboud*, 682 F.Supp.2d 294 (S.D.N.Y.2010)...............................................23

*Jackson v. Odenat*, 9 F. Supp. 3d 342 (S.D.N.Y. 2014).................................................................10

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 203, 2006 WL 1012939 (S.N.D.Y April
   19, 2006).......................................................................................................................................22

*Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341 (S.D.N.Y. 2014) ............................................................18

*Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619 (6th Cir. 2000) ............................................22

*Lang v. Ret. Living Pub. Co.*, 949 F.2d 576 (2d Cir. 1991) ..........................................................17

*Laws v. Sony Music Entertainment*, 448 F. 3d 1134 (9th Cir. 2006) ............................................21

*Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089 (D. Ariz. 2006) .........................9

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612 (S.D.N.Y. 2016) ....11

*Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, 2002 WL 1560789 (S.D.N.Y. July 15,
   2002 ..............................................................................................................................................19

*McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2nd Cir.1979......................................11

*Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal.
   2008)................................................................................................................................................1

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012) ..............1

*Mondo, Inc. v. Sirco Int'l Corp.*, 97 CIV. 3121 MBM, 1998 WL 849401 (S.D.N.Y. Dec. 7, 1998)
   ......................................................................................................................................................12

*Naked Cowboy v. CBS*, 844 F. Supp. 2d 510 (S.D.N.Y. 2012)......................................................24

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.,* 590 F.Supp.2d 500 (S.D.N.Y.2008) ...................17

*Pirone v. MacMillan, Inc.*, 894 F.2d 579 (2d Cir. 1990)..................................................7, 8, 16, 24

*Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158 (2d Cir.2004)...............................10

*Polaroid Corp. v. Polarad Elecs.* Corp., 287 F.2d 492 (2nd Cir. 1961) .......................................10

*Pom Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228 (2014) ...................................................17

*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir.1987) ................13

*Presley's Estate v. Russen*, 513 F. Supp. 1339 (D.N.J. 1981) .........................................................8

*RBC Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362 (2d Cir. 2010) ........................20

*Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) ........................................................................23

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008) ......1

*Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989) ........................................................................6

*SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425 (S.D.N.Y. 2007) ..13, 15

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).............................21

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ...........................12

*Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739 (2d Cir. 1998)..........................................11

*THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168 (S.D.N.Y. 2011) ...............................................11

*TriStar Pictures, Inc. v. Del Taco, Inc.*, 59 U.S.P.Q. 1091 (C.D.Cal. 1999) ...............................21

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992) ........................................................22

*Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.,* 683 F.3d 1266 (11th Cir. 2012) .........................21

*Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N.Y. 1983)..........................5

## Statutes

15 U.S.C. § 1114 ..............................................................................................................................5

15 U.S.C. § 1115 ....................................................................................................23

15 U.S.C. § 1117 ....................................................................................................25

15 U.S.C. § 1125 ......................................................................................................5

17 U.S.C. §§ 106-107 ............................................................................................21

**Rules**

Federal Rule of Civil Procedure 56 ..........................................................................4

**Treatises**

5 McCarthy on Trademarks and Unfair Competition  (4th ed. 2001) .....................7, 18

Movants X One X Movie Archives, Inc. ("X One X"), A.V.E.L.A., Inc. ("AVELA") and Leo Valencia (collectively, "Movants") respectfully submit the following in submit of their Motion, pursuant to Federal Rule of Civil Procedure 56, for an order dismissing The Estate of Marilyn Monroe, LLC ("EMMLLC")'s First Amended Counterclaims in full and for further relief as the Court deems just and proper. Additionally, Movants also join in V International Fine Arts Publishing, Inc.'s summary motion to the extent that any issues coincide.

## I.   INTRODUCTION

Marilyn Monroe was an acclaimed actress, model, and singer. Monroe was never, however, a trademark indicating a source of products. Despite its deceptive name, "The Estate of Marilyn Monroe, LLC" is not Monroe's estate and it does not own exclusive rights to Monroe's image, persona, name, and likeness. This case is yet another attempt by a corporation with no connection to Monroe to exclusively profit off of the long-deceased actress based on fictional rights.[1] This time, EMMLLC claims to own sweeping intellectual property rights in Marilyn Monroe based on the Lanham Act but such rights cannot possibly exist. Monroe did not own, exercise, police, or pass down any such rights. Monroe did not authorize EMMLLC, or anyone for that matter, to license or police her intellectual property rights. EMMLLC is not Monroe's estate, heirs, or family. Countless entities and individuals have sold products and/or licensed artwork bearing Monroe's image in the five decades since Monroe's death. EMMLLC has no valid rights in Monroe's name, image, persona, and likeness under 15 U.S.C. § 1125(a). Additionally, there is no evidence of any likelihood of confusion here. AVELA's expert

---

[1] *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012) (confirming that Monroe's right of publicity did not survive her because Monroe died domiciled in the State of New York, which does not recognize postmortem rights of publicity); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal. 2008) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008) (determining post mortem rights in Marilyn Monroe's persona, identity or likeness did not exist and any such rights terminated upon Monroe's death).

determined that there is "literally no confusion at all" regarding AVELA's products with Monroe artwork. There is also no evidence AVELA's products impacted consumers' purchasing decisions in any way. Various affirmative defenses apply and bar any recovery by EMMLLC. EMMLLC's claims fail as a matter of law.

## II.     STATEMENT OF FACTS

### A.     Movants

Leo Valencia has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Marilyn Monroe, since the 1980s. (SOF ¶ 50.) Valencia, an avid art collector and enthusiast of vintage film and television memorabilia, is AVELA's owner. (SOF ¶¶ 5, 49.) AVELA creates and licenses new derivative artistic works in print, graphic, and lithographic media based off of materials previously in the public domain. (SOF ¶¶ 47-48.) AVELA's artwork uses novel elements and contemporary designs to modernize old Hollywood memorabilia and appeal to a new generation of consumers. (SOF ¶ 55.) Beginning in the 1980s, Valencia began to acquire, restore, and revitalize old movie posters, promotional materials, and vintage artwork. (SOF ¶ 49.) Valencia added his own creative flair to the restored works and built AVELA's business licensing this artwork. (SOF ¶ 50.) As demand for Valencia's artwork and AVELA's licensing business grew, Valencia created X One X to manage and acquire various catalogs of vintage artwork. (SOF ¶ 66.) AVELA's images transform old photographs of Monroe through extensive graphic design to create completely new artwork and reinvent and modernize Monroe. (SOF ¶¶ 54, 56.) These images are continuously renovated to keep up with current trends. (SOF ¶ 57.) Substantial work has gone into this artwork over the decades. (SOF ¶ 56.) AVELA and X One X hold valid copyrights for these artistic works. (SOF ¶¶ 64-65.)

### B.     Events Leading up to EMMLLC's Formation

Marilyn Monroe died on August 5, 1962. (SOF ¶ 8.) Monroe's will bequeathed her personal effects and small sums of money to various friends and family members. (SOF ¶ 10.) Monroe's will was silent as to any intellectual property rights. (SOF ¶ 11.) Monroe left the "rest, residue and remainder" of her estate as follows: (a) the lesser of $40,000 or 25% of the total remainder of her estate to a May Reis; (b) 25% of the balance of her estate to her psychiatrist, Dr. Marianne Kris, to be used for the furtherance of Dr. Kris' psychiatric institutions; and (c) the remaining balance to Lee Strasberg, her acting coach. (SOF ¶ 13.) Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe, sold any Monroe-related products, or policed any purported rights in Monroe in the two decades following her death. (SOF ¶¶ 15-21.)

Lee Strasberg died in 1982 and his will was silent as to any Monroe intellectual property rights. (SOF ¶ 26.) In 2001, Monroe's estate closed. (SOF ¶ 30.) In December 2010, Authentic Brands Group, LLC ("ABG") acquired the assets of an entity called Marilyn Monroe LLC. (SOF ¶ 78.) EMMLLC has refused to turn over the documents to Movants' counsel evidencing this acquisition and as a result Movants are unable to attach this evidence to the instant Motion. (SOF ¶ 80.) ABG then formed a subsidiary called "The Estate of Marilyn Monroe, LLC." (SOF ¶ 79.)

## III.   PROCEDURAL HISTORY

On June 2, 2011, EMMLLC sent AVELA and AVELA's licensee, Silver Buffalo, LLC, a letter claiming EMMLLC was the exclusive owner of trademarks in Monroe's name and other statutory and common law rights in Monroe and demanding that AVELA cease licensing or selling any products bearing Monroe's name, likeness, image or persona. (Dkt. 1 Exhibit 1.)

On June 20, 2012, AVELA filed a Complaint against EMMLLC alleging that EMMLLC's purported exclusive rights in Monroe's persona, name, and image did not exist. (Dkt. 1.) AVELA's Complaint stated a claim for tortious interference of contract against

EMMLLC and sought declaratory relief determining that AVELA did not infringe EMMLLC's purported rights to Monroe's persona, that any purported EMMLLC-owned "persona" rights did not supersede AVELA's copyrights in Monroe artwork, and that AVELA did not interfere with EMMLLC's existing contractual relationships or prospective economic advantage. (*Id.*)

On August 31, 2012, EMMLLC filed its Answer and Counterclaims against AVELA and AVELA's owner, Leo Valencia, alleging claims for false association, unfair competition, and trademark infringement under common law and the Lanham Act based upon AVELA's purported use of EMMLLC's "Marilyn Monroe Intellectual Property," defined to include registered trademarks in Monroe's name and signature, as well as "rights in and to Marilyn Monroe's identity, persona, name and likeness arising under common law and/or statute including, without limitation, 15 U.S.C. § 1125(a) of the Lanham Act . . . " (Dkt. 5 at ¶¶ 13, 15.)

On February 4, 2014, EMMLLC moved to add X One X to the ongoing litigation. (Dkts. 72 and 73.) On October 30, 2015, X One X filed its Answer and Counterclaims bringing causes of action for cancellation of EMMLLC's registered trademarks. (Dkt. 223.)

## IV.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court may grant summary judgment, "if the movant shows that there is no genuine dispute as to any material fact and if the movant is entitled to judgment as a matter of law." A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Only disputes over facts that might affect the outcome of the suit may preclude the entry of summary judgment, and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

The moving party bears the initial burden of demonstrating that there is no genuine issue

of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue in order to survive the motion. *Id.* at 324. "The mere existence of *some* alleged factual dispute between the parties or a mere scintilla of evidence in support of a party's position will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. "[S]ummary judgment in a trademark action may be appropriate ... where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir. 1996) .

## V.   ARGUMENT

### A.   EMMLLC's Trademark Claims Fail as a Matter of Law

EMMLLC's trademark claims fail as a matter of law for each of the reasons discussed in V International's Memorandum in Support of its Motion for Summary Judgment. EMMLLC's claim under 15 U.S.C. § 1125 (hereinafter, "Section 43(a)") fails where EMMLLC's purported "persona" rights in Monroe do not exist and EMMLLC would not own such rights even if they did exist. EMMLLC's claim under 15 U.S.C. § 1114 (hereinafter, "Section 32") also fails where EMMLLC's registered marks in Monroe's name do not prohibit AVELA's use of Monroe's image and Movants do not use any of EMMLLC's registered marks. To the extent that any trademark rights in Monroe could even exist, which Movants do not concede, such rights have long fallen into the public domain.

Secondary meaning is necessary to demonstrate association of a purported mark with a single producer. *See Clairol Inc. v. Gillette Co*., 389 F.2d 264, 269 (2d Cir.1968). When a mark is copyrighted and extensively used by many firms, there can be no secondary meaning in it. *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 923–25 (S.D.N.Y. 1983). The

source-identification function of a mark "may be destroyed by widespread and uncontested use of the mark by those other than the mark holder." *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1217 (C.D. Cal. 2000) ("*Cairns II*"). Twenty-one years of non-use, coupled with the intent not to resume use within the reasonably foreseeable future, establishes that a trademark has been abandoned. *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989).

Monroe did not register trademarks or use her image or name on merchandise during her lifetime. (SOF ¶¶ 9, 22.) Monroe did not police the use of, or prevent anyone from using, her image, persona, likeness, or name during her lifetime. (SOF ¶ 23.) No one made trademark use of Monroe's image, persona, likeness, or name from 1962-1983 or policed Monroe's rights from 1962-1982. (SOF ¶¶ 15-21.) Monroe's image, name, likeness, and persona, to the extent such "marks" even existed, were abandoned and fell into the public domain in the two decades after her death, at which point third parties had the right to use her persona in commerce. In fact, countless third parties have made widespread use of Monroe's "persona" in commerce from the 1950s to 1983 (SOF ¶ 32.), and from 1983 to the present (SOF ¶ 3.) A flood of un-endorsed memorabilia for decades prevents any possible likelihood of confusion. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002) ("*Cairns III*"). Monroe's image and name do not serve a source-identifying function. As a matter of law, there can be no secondary meaning in Monroe or likelihood of confusion regarding the use of her image.

**B.          Movants Do Not Infringe EMMLLC's Purported Marks**

Even if EMMLLC's trademarks were valid, there is no infringement, false endorsement, or likelihood of confusion here.

**1.          There is No False Endorsement**

Even if EMMLLC somehow could own Monroe's rights under § 43(a), it is extremely

unlikely consumers would believe Monroe endorsed AVELA's products fifty years after her death. Where a celebrity is deceased, likelihood of confusion becomes less viable. *See Astaire v. McKenzie,* No. 10 CIV. 4305 (MGC), 2010 WL 2331524 (S.D.N.Y. June 9, 2010); *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584-85 (2d Cir. 1990).

Whether or not a deceased celebrity's identity triggers a § 43(a) claim depends largely upon whether or not that celebrity's name or image achieved any trademark significance during his/her lifetime such that "consumers who know that that person is deceased possibly think that this product was endorsed by the person while alive … " 5 McCarthy on Trademarks and Unfair Competition § 28:15 (4th ed. 2001). One can prevail on a false endorsement claim on behalf of a dead celebrity where the defendant used *more than a mere depiction of the celebrity* in the case of false association with an estate, or where advertising falsely suggests the celebrity endorsed the product before her death. *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1032 (C.D. Cal. 1998) (emphasis added) ("*Cairns I*"). Princess Diana's *actual* estate failed to survive summary judgment on its § 43(a) claim brought just *three years* after Diana's death where the defendant's use of Diana's mere image on products did not imply plaintiffs' endorsement or "implicate the source-identification purpose of trademark protection." *Cairns II,* 107 F. Supp. 2d at 1216. The "most important factor" arguing against false endorsement by Diana's estate was the extensive unauthorized use of Diana's name and image on commercial articles before and after her death and the resulting lack of association between Princess Diana and the plaintiff. *Id.* at 1221.

EMMLLC has presented only evidence of AVELA's mere use of Monroe's image in its artwork. (SOF ¶¶ 61, 106.) AVELA does not falsely suggest that Marilyn Monroe somehow endorsed its products. (SOF ¶¶ 52, 53, 67.) No reasonable juror could conclude that persons would be deceived into believing that the deceased Monroe endorsed a t-shirt. Additionally,

there cannot be any false endorsement regarding EMMLLC where it is not the proper party to bring such a claim on behalf of Monroe. EMMLLC is not Monroe's heirs, beneficiary, family, or actual estate. (SOF ¶¶ 90-95.) EMMLLC has not presented any evidence any consumer is aware of EMMLLC or its products. (SOF ¶ 83.) AVELA's products could not possibly cause confusion regarding the entity EMMLLC.

To the extent that EMMLLC may argue sales of Monroe memorabilia by EMMLLC have somehow retroactively created trademark rights in Monroe's image, this argument is unavailing. *Cairns II*, 107 F. Supp. 2d at 1217 ("Plaintiffs' entry into the marketplace for Princess Diana memorabilia at this late date cannot change the fact that Princess Diana did nothing to prevent others from using her image while she was alive.") Monroe's image cannot signify any endorsement where Monroe did not oppose unauthorized uses of her image and her persona and image were not policed for decades. (SOF ¶ 83.)  Extensive unauthorized uses of Monroe's image after her death further obliterate EMMLLC's § 43(a) claim. (SOF ¶¶ 32, 33.)

The Second Circuit affirmed summary judgment against Babe Ruth's actual estate on its § 43(a) claim because Ruth's image was used as *content* on a product and not an indication of *sponsorship,* indicating that, in this Circuit, false endorsement claims are not viable where the content on a product does not involve "a specific arbitrary symbol that had been used over time and had become associated in the public mind with the plaintiffs." *Pirone*, 894 F.2d at 585. Though the court noted the photographs of Babe Ruth were among many featured in a calendar, it found that the photos did not indicate sponsorship because they did not constitute a specific symbol that had become associated with the plaintiffs. *Id.*[2] This same rationale should apply

---

[2] In contrast, Elvis Presley's likeness and image could not generally serve as a mark indicating sponsorship but a particular image of Presley in a distinctive pose ("dressed in one of his characteristic jumpsuits with a microphone in his hand and apparently singing") was protectable where it had become closely associated with and identifiable of the entertainment provided by Presley. *Presley's Estate v. Russen*, 513 F. Supp. 1339, 1345 (D.N.J. 1981).

here, despite the fact that AVELA's products generally only feature one artistic image, because AVELA's products do not utilize any specific arbitrary symbol or image that has been used over time and become associated in the public mind with EMMLLC. (SOF ¶¶ 61, 106.)

Courts have found that use of a celebrity's image on a product "is vastly different from the *advertising use* of celebrities' likenesses in selling ... cars, Doritos, and VCRs" that might directly imply an endorsement. *Cairns II,* 107 F.Supp.2d at 1215. The use of a plaintiff's likeness directly on apparel does not as clearly communicate endorsement and *at most*, raises only a possibility, as opposed to a likelihood, that consumers would be confused. *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1099–100 (D. Ariz. 2006) (citing *Cairns* at 1216).

AVELA's t-shirts do not contain the word mark "MARILYN MONROE," Monroe's stylized signature, or any indication that Monroe or EMMLLC endorsed the product. (SOF ¶¶ 52-53.)  AVELA does not permit its licensees "to use its artwork as a trademark, to identify the source of the merchandise." (SOF ¶¶ 70-72.) AVELA uses artwork with Monroe's image as ornamental product content, not as an indication of sponsorship. If the facts here can constitute false endorsement, it is difficult to conceive of any use of Monroe on a product that would not result in liability under the Lanham Act. AVELA does not use any specific arbitrary symbol that has become associated in the public mind with EMMLLC. (SOF ¶ 106.) AVELA uses its own trademarks to identify and distinguish its products. (SOF ¶¶ 67, 69.) There have been extensive unauthorized uses of Monroe's name and image since her death. (SOF ¶¶ 32-33.) EMMLLC is not Monroe's heir, family, or actual estate. (SOF ¶¶ 90-95.) There is no secondary meaning in Monroe's image. EMMLLC's § 43(a) claim fails as a matter of law.

### 2.    There is No Likelihood of Confusion

Even if EMMLLC could own § 43(a) rights in Monroe, even if Movants used

EMMLLC's registered trademarks, and even if EMMLLC could somehow demonstrate secondary meaning in its purported marks in Monroe's name and image (though Movants do not concede any of these points), EMMLLC cannot establish a likelihood of confusion under either § 43(a) or § 32. If a mark is entitled to protection, then the inquiry turns to likelihood of confusion. *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995). Courts in this Circuit use the factors enumerated in *Polaroid Corp. v. Polarad Elecs*. Corp., 287 F.2d 492, 495 (2nd Cir. 1961) to examine likelihood of confusion: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith in adopting its own mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers. *Id.* at 391. The court "should not treat any single factor as dispositive; nor should [it] treat the inquiry as a mechanical process by which the party with the greatest number of factors wins." *Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158, 162 (2d Cir.2004). "Instead, the court should focus on the ultimate question of whether consumers are likely to be confused." *Id.* Courts adjust these factors when dealing with false endorsement claims. *Jackson v. Odenat*, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014). "In a celebrity endorsement case, the 'mark' is the plaintiff's persona and the 'strength of the mark' refers to the level of recognition that the plaintiff has among the consumers to whom the advertisements are directed." *Id.* Where the plaintiff is not the celebrity herself, an additional factor becomes relevant: the strength of association between the mark and the plaintiff. *Cairns II*, 107 F.Supp.2d at 1217.

## 1.   The Strength of the Mark

In assessing this factor, courts consider both the inherent distinctiveness and the distinctiveness a mark has acquired in the marketplace, *i.e.,* secondary meaning. *Streetwise*

*Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir. 1998). The inventiveness of the mark and the extent of third-party use are particularly relevant. *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 667-68 (S.D.N.Y. 2016). The "strength" of a mark refers a mark's tendency to "identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2nd Cir.1979). The inquiry here should not be whether or not Monroe is recognizable but whether or not Monroe's image serves as an indication of source or affiliation with EMMLLC. EMMLLC has not presented any evidence that consumers recognize EMMLLC or its products. (SOF ¶¶ 83, 121.) Marilyn Monroe is a recognizable famous actress; this does not mean that her image is recognizable as a source or potential endorsement of goods or services. Monroe's name and image have not achieved secondary meaning and are not distinctive. Monroe's name and image do not identify EMMLLC's goods as emanating from EMMLLC as a single, though possibly anonymous, source. This factor should weigh against a likelihood of confusion.

## 2.  The Degree of Similarity Between the Two Marks

"In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993). There is no similarity whatsoever between the two marks here. AVELA uses its own "RADIO DAYS" mark on its hangtags and neck labels and only uses Monroe's image for its ornamental design. (SOF ¶¶ 61, 67, 69, 71.) This factor should weigh against a likelihood of confusion. *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 185 (S.D.N.Y. 2011) ("When considering a hang tag and neck label on a t-shirt, at least where the junior and senior marks are not identical, the presence of a trade name … militates against a finding of confusion.").

11

### 3.   The proximity of the products

The products are sold in the same and/or similar venues.

### 4.   The Likelihood that the Prior Owner Will "Bridge the Gap"

There is no gap to bridge here where the parties operate in the same or similar markets.

### 5.   Actual Confusion

EMMLLC has failed to present evidence of a single case of actual confusion despite the fact that AVELA has been marketing its products for over 25 years. This factor alone can and should establish the lack of any likelihood of confusion. *See Accord Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983) (lack of evidence of actual confusion over three-year period, "is a strong indicator that the likelihood of confusion is minimal"). In *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 117 (2d Cir. 2009), lack of actual confusion was probative where Starbucks' own witness, a Director of Brand Management, testified Starbucks had no knowledge of any consumer ever actually becoming confused that a "Charbucks" product was a Starbucks product. The co-existence of the two marks for eleven years without a single customer actually becoming confused was a powerful indication that there was no likelihood of confusion. *Id.*

Lack of actual confusion over approximately 25 years here establishes that there is no significant likelihood of confusion.[3] Movants are unaware of any actual confusion between AVELA's products and EMMLLC or its products. (SOF ¶ 75.) More importantly, *EMMLLC is similarly unaware of any such actual confusion*. (SOF ¶ 107.) Like in *Starbucks*, EMMLLC's own brand manager, Katie Jones (and EMMLLC's person most knowledgeable about instances of actual confusion) testified that EMMLLC was unaware of ***any*** specific instance of actual confusion by consumers between AVELA's goods and

---

[3] *Mondo, Inc. v. Sirco Int'l Corp.*, 97 CIV. 3121 MBM, 1998 WL 849401 (S.D.N.Y. Dec. 7, 1998) (the lack of confusion when the parties have been in competition for over 10 years is "especially significant").

EMMLLC or EMMLLC's goods. (SOF ¶ 107.) Valencia and/or AVELA have been selling their products with Monroe artwork since approximately 1985. (SOF ¶¶ 50-51.) The co-existence of AVELA's products and EMMLLC's (and/or its predecessors' purported products) purported products for three decades with no report of a single customer becoming confused serves as a powerful indication that there is no likelihood of confusion.

Additionally, in *SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 440-41 (S.D.N.Y. 2007), a plaintiff failed to raise a genuine issue of material fact as to actual confusion where it did not offer any evidence demonstrating any potential or actual effect on customers' purchasing decisions. As discussed below, EMMLLC has not offered any evidence demonstrating any potential or actual effect on customers' purchasing decisions. There is no genuine issue of material fact as to actual confusion. This factor weighs against a likelihood of confusion.

EMMLLC cannot demonstrate actual confusion and may not recover money damages in connection with its § 43(a) claim. *See PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 271 (2d Cir.1987) (to establish entitlement to damages for violation of § 43(a), "[Plaintiffs] must establish actual confusion or deception resulting from the violation.") There is no evidence of deception here or that Movants knowingly adopted EMMLLC's marks (they do not use EMMLLC's registered marks and EMMLLC does not own a trademark in any particular image of Monroe) to take advantage of EMMLLC's "goodwill" (particularly where no consumers have any awareness at all of EMMLLC or its products). AVELA does not hold itself out to be EMMLLC or to be affiliated with EMMLLC.

### A.  AVELA's Expert Found No Likelihood of Confusion

AVELA's expert, Mr. Howard Marylander, conducted a study to measure whether consumers are likely to believe that Monroe or her heirs, estate, or any other related entity make or are associated with AVELA's shirts. (SOF ¶ 108.) Mr. Marylander found there was "literally no confusion at all" as to source or association for AVELA's shirts. (SOF ¶¶ 109, 119.)

Mr. Marylander used proper controls, marketplace approximations, and methodology. The Survey's statistical tests were conducted at a 95% confidence level. (SOF ¶ 118.) Even assuming EMMLLC were Monroe's actual estate or heirs (which it is not), Mr. Marylander determined a net confusion level of 0%. (SOF ¶ 109.) AVELA's Survey demonstrates there is absolutely no likelihood of confusion.

### B.  EMMLLC's Expert Cannot Establish a Likelihood of Confusion

EMMLLC has proffered the expert testimony of Hal Poret, a survey expert who concluded that there is a likelihood that consumers will be confused into mistakenly believing that AVELA products bearing Monroe's likeness originate from or are put out with the permission or approval of Monroe. (SOF ¶ 120.) For each of the reasons discussed in Movants' Motion to Exclude EMMLLC's Expert Testimony on Likelihood of Confusion, Mr. Poret's testimony and his Survey do not establish any likelihood of confusion and the Court should not afford them any weight. (Dkt. 331.) EMMLLC's Survey provides no benefit to the analysis of likelihood of confusion regarding EMMLLC or Monroe. Mr. Poret admitted that the conclusion of his Survey "is not so specific as to the Estate of Marilyn Monroe, LLC." (SOF ¶ 121.) There is no evidence that there is any consumer awareness whatsoever of EMMLLC or its products/services—thus, consumers cannot be "confused" into believing that AVELA's products originated from or are sponsored by EMMLLC. Mr. Poret's Survey also runs contrary to common sense--if there is truly a substantial likelihood of confusion here, common sense suggests that EMMLLC would be aware of a significant number of instances of actual confusion in the 25 years Valencia and/or AVELA have been selling their products, but none exist. Because Mr. Poret's methodology is flawed, unreliable and runs contrary to common sense, his Survey and testimony should be disregarded. There is simply no evidence on which EMMLLC can establish likelihood of confusion or base its trademark claims.

14

### 6.   The Defendant's Good Faith in Adopting its Mark

There is strong evidence that Movants acted in good faith.  "The selection of a mark or trade dress that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." *SLY Magazine*, 529 F. Supp. 2d at 441. AVELA uses its own mark, "RADIO DAYS," to identify its products. (SOF ¶¶ 67, 69.) EMMLLC has no registered trademark or copyright in AVELA's images. (SOF ¶ 88.) EMMLLC has produced no evidence Movants intended to confuse consumers into believing EMMLLC endorsed AVELA's products. AVELA's counsel has previously informed AVELA that may lawfully license Monroe artwork. (SOF ¶ 76.) This factor weighs against a likelihood of confusion.

### 7.   The Quality of the Defendant's Product

There is no evidence that the quality of AVELA's products is different than that of EMMLLC's products. EMMLLC has not presented any evidence that the quality of AVELA's products damages EMMLLC's reputation in any way. (SOF ¶ 83.) This factor favors Movants.

### 8.   The Sophistication of the Buyers

Here, there is no evidence one way or the other regarding this factor.

### 9.   The Strength of Association between the Mark and EMMLLC

There is no evidence consumers associate Monroe's name or image with EMMLLC. (SOF ¶¶ 83, 121, 139.) Pervasive unauthorized use of a celebrity's persona weakens any perception that the use of that celebrity's persona signifies any endorsement at all. *Cairns II*, 107 F. Supp. 2d at 1217. In *Cairns*, the court examined whether or not Princess Diana was "associated in the public mind" with the plaintiff's products and found that Princess Diana's image was only weakly associated with the plaintiffs (Diana's actual estate) because her image had not served a trademark function during her life or after her death and Princess Diana "did

nothing to prevent others from using her image while she was alive." *Cairns I* at 1039. A § 43(a) claim may fail even if a deceased celebrity made trademark use of his image during his lifetime where images of a celebrity do not constitute a specific arbitrary symbol used over time that has become associated in the public mind with the plaintiff. *Pirone*, 894 F.2d at 581.

EMMLLC's claim to § 43(a) rights in Monroe is weak at best because Monroe did not use or police the use of her name, image, likeness, and persona as trademarks during her lifetime. (SOF ¶ 23.) No one policed Monroe's name or image for decades after her death. (SOF ¶¶ 21, 41.) There has been extensive unauthorized use of Monroe's name and image for decades (SOF ¶¶ 32, 33), severely weakening any possible association between Monroe and Plaintiff EMMLLC. EMMLLC has not provided any evidence of any association in the public mind between EMMLLC and Monroe (SOF ¶ 83.), let alone a specific arbitrary symbol of Monroe used over time that has become associated in the public mind with EMMLLC. This factor weighs against a likelihood of confusion.

### 10. The *Polaroid* Factors Weigh in Favor of Movants

Viewed as whole, there is no likelihood of confusion here whatsoever. There is no evidence that the consuming public would likely be confused into believing AVELA's products came from EMMLLC. Given the complete lack of association between Monroe's image and EMMLLC, any possible similarity and/or strength of the marks here, or relatedness of the goods, is irrelevant to likelihood of confusion. *See Cairns II*, 107 F. Supp. 2d at 1221. There is no genuine issue of material fact as to likelihood of confusion. EMMLLC's Lanham Act claims fail as a matter of law.

### C.    There is No Impact on Consumer Purchasing Decisions

EMMLLC's trademark claims also fail because EMMLLC presents no evidence Movants misled consumers or impacted consumers' purchasing decisions. "[T]he Lanham Act only

protects against confusion that affects purchasing decisions." *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012). To evidence confusion in the marketplace, confusion must have affected the potential customer's determination to purchase a product. *O'Keefe v. Ogilvy & Mather Worldwide, Inc.,* 590 F.Supp.2d 500, 524 (S.D.N.Y.2008). Trademark law protects only against mistaken purchasing decisions, not against confusion generally. *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991). § 43(a)'s purpose is to prevent consumers from being misled or tricked into making purchases. *Pom Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228, 2233 (2014). "The [Lanham Act] should not be stretched to cover matters that are typically of no consequence to purchasers." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 32-33 (2003).

Consumers are not likely to be tricked into buying a t-shirt with Monroe artwork; EMMLLC has not presented any evidence that consumers actually care whether or not EMMLLC approved AVELA's t-shirts. (SOF ¶ 138.) No consumers were misled. (SOF ¶ 107.) Consumers received what they bargained for: a t-shirt with Monroe artwork. EMMLLC's expert survey did not address consumers' purchasing intentions. (SOF ¶ 138.) EMMLLC's Survey asked respondents, "Who do you think gave their permission or approval for this particular T-shirt to be made or put out?" and garnered such responses as "Marilyn Monroe," "the family of Marilyn Monroe," and "Marilyn Monroe is on the shirt." (SOF ¶ 126.) The Survey also asked the follow up question of why respondents thought approval was given and garnered responses such as "because she's famous" and "it has Marilyn Monroe on it." (SOF ¶ 128.) These responses merely demonstrate that respondents recognized Monroe, the famous actress, and may have had the (incorrect) lay legal opinion that Monroe, or someone connected with her, had to approve the t-shirts; this amounts to an (incorrect) legal conclusion, not evidence of confusion as to origin,

approval or sponsorship.[4] EMMLLC's Survey only contained two responses that even arguably may have affected purchasing decisions: "Because i [sic] know the family should recieve [sic] royalties" and "That would be the right thing to do before printing a t shirt with her on it."[5] (*Id.*) These lone responses do not establish any impact on consumer purchasing decisions sufficient to confer liability or damages under the Lanham Act.

### D.    EMMLLC's New York Unfair Competition Claim Fails

For each of the reasons EMMLLC's Lanham Act claims fail, EMMLLC's claim for unfair competition under New York law also fails as a matter of law. *See Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014) (The elements necessary to prevail on trademark infringement and unfair competition causes of action mirror those of Lanham Act claims.)

### E.    EMMLLC's Trademark Dilution Claim Fails

On a claim for trademark dilution, the plaintiff must establish: "[i] its mark is famous; [ii] the defendant's use of the mark is made in commerce; [iii] the defendant used the mark after the mark was famous; and [iv] the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *Estate of Ellington ex rel. Ellington v. Harbrew Imports Ltd.*, 812 F.Supp.2d 186, 193 (E.D.N.Y.2011). In *Cairns II*, the court held a finding of secondary meaning was absurd and would mean that the words "Diana, Princess of Wales" would primarily identify the plaintiff's activities rather than Princess Diana. *Cairns*, 107 F. Supp. 2d at 1222.[6]

There is no secondary meaning here as discussed above and in connection with V International's Summary Motion; it is absurd to argue that an image of Marilyn Monroe

---

[4] *See* McCarthy § 10:43 (91.2% of consumers in a survey agreed with the statement: "No product can bear the name of an entertainer, cartoon character, or some other famous person unless permission is given for its use by the owner of the name or character.").

[5] Furthermore, the response that Monroe's family should receive royalties does not establish confusion in EMMLLC's favor because it is undisputed that EMMLLC it is not Monroe's family. (SOF ¶ 90.)

[6] Additionally, the law firm representing Diana's actual estate was liable for malicious prosecution for bringing trademark dilution and false advertising claims that had no plausible basis. *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2d Dist. 2010).

primarily identifies the random entity "EMMLLC" rather than Monroe. EMMLLC has not produced any evidence that AVELA's artwork is likely to dilute the quality of EMMLLC's "marks." (SOF ¶ 138.) This claim fails as a matter of law.

### F.  Affirmative Defenses Protect AVELA's Use of Marilyn Monroe Artwork

Even if this Court could find infringement, affirmative defenses apply and bar recovery by EMMLLC.

### 1.  Laches Bars Recovery by EMMLLC

The doctrine of laches bars EMMLLC from recovering on its claims as a matter of law. AVELA and Valencia have been licensing Monroe's image since the 1980s. Despite having knowledge of this, EMMLLC and its predecessors did not bring any legal action until 2012.

The equitable doctrine of "laches" is designed to prevent the injustice of allowing someone to build their business for well over two decades, and then take all their profits and shut them down. Laches may bar injunctive relief and damages on trademark infringement and unfair competition claims where the alleged infringer's conduct began prior to the applicable statute of limitations. *Eppendorf-Netheler-Hinz GmbH v. Enterton Co.,* 89 F. Supp. 2d 483, 485-86 (S.D.N.Y. 2000). Generally, for this defense a defendant must show that: (1) the plaintiff had knowledge of the allegedly infringing activities;[7] (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant would be prejudiced if the plaintiff belatedly asserted its rights to the mark." *Id.* There is a presumption of laches if a plaintiff fails to raise a claim within the applicable statute of limitations, which in most Lanham Act cases is six years. *Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, 2002 WL 1560789 (S.D.N.Y. July 15, 2002); *RBC*

---

[7] *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir. 1964) ("Although the defense of laches generally includes proof of actual knowledge by the party claimed to be barred, as in [*Polaroid*, 287 F.2d 492], this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for ignorance is offered.")

*Nice Bearings, Inc. v. Peer Bearing Co.*, 410 F. App'x 362, 364-65 (2d Cir. 2010) ("when the suit is brought after the statutory time has elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case."). A delay is unreasonable and prejudices a defendant where a plaintiff permits the defendant to invest significant time and money developing its products unchecked for over ten years. *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999).

Leo Valencia acquired various public domain images of Monroe, restored and enhanced them, and began licensing these enhanced images beginning in 1985. (SOF ¶¶ 49-51.) Mr. Valencia has devoted substantial time, energy and financial resources over the decades to creating commercially usable art content that the public would find sufficiently expressive as to want it to purchase it on products.[8] (SOF ¶¶ 54-57, 63.) This artwork is copyrighted. (SOF ¶¶ 64-65.) Valencia has been licensing and promoting these (and other) images for decades. (SOF ¶¶ 49-51, 58.)

Additionally, EMMLLC and its predecessors have known about AVELA's products for years. Dave Grossman Creations, a previous licensee of AVELA, sold products bearing AVELA's Marilyn Monroe artwork. (SOF ¶ 77.) When CMG Worldwide, EMMLLC's predecessor, learned of Dave Grossman's products in February 2006, it threatened the assertion of intellectual property rights in Monroe. (SOF ¶ 46.) CMG and later EMMLLC then fell silent regarding AVELA's images for the next six years. EMMLLC filed its Counterclaims on August 31, 2012 after the six-year statute of limitations had already passed. (Dkt. 5.)

EMMLLC filed its Counterclaims more than 25 years after Mr. Valencia began enhancing public domain images of Marilyn Monroe and then licensing his new artwork. It is

---

[8] The original images often have defects that need to be corrected before they can have any real commercial value. The images are repaired, scanned, photo shopped, converted into digital format, and extracted into illustrator files to use for artistic purposes. The files are then layered with additional artwork, reconfigured, and have effects added such as backgrounds and design elements. (SOF ¶ 56.)

EMMLLC's burden to establish why it is equitable to allow EMMLLC's trademark claims after decades of silence and inaction.[9] It would be fundamentally unfair to strip Mr. Valencia (and AVELA) of their profits or to prevent them from continuing to use the enhanced Monroe artwork after allowing him to spend decades developing contacts and building his business. EMMLLC did not create the artwork AVELA licenses – Valencia did. EMMLLC did not license these enhanced images or convince retailers to carry them – AVELA and its licensees did. Laches should bar EMMLLC's claims as a matter of law.

## 2.      Copyright Law

EMMLLC's purported trademark in Monroe's "image" conflicts with Movants' valid copyrights in the Monroe images AVELA licenses. The Copyright Act's purpose is to grant a copyright holder exclusive rights to use and authorize uses of his copyrighted images, subject to fair use and trademark laws. 17 U.S.C. § 106-107*; Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 432-33 (1984). The right to copy at will once a copyright has expired, without attribution, passes to the public. *Dastar*, 539 U.S. at 33. "It is hard to imagine how a copyright would remain meaningful if its licensees were potentially subject to suit from any performer anytime the copyrighted material was used." *Laws v. Sony Music Entertainment*, 448 F. 3d 1134, 1145 (9th Cir. 2006). A copyright does not provide "an automatic defense to any trademark." *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.,* 683 F.3d 1266, 1280 (11th Cir. 2012). Trademarks and copyrights are different types of intellectual property, protected for different policy reasons, and give rise to different rights and limitations. *TriStar Pictures, Inc. v. Del Taco, Inc.*, 59 U.S.P.Q. 1091, 1093 (C.D.Cal. 1999). However, a "mark" must still actually achieve

---

[9] EMMLLC may claim that it is only a recently organized entity. However, in asserting the trademark rights it purportedly acquired, it must step into the shoes of its predecessor and justify why both it and any predecessors were justified in remaining silent for decades. *See Allstate Ins. Co. v. Administratia Asigurarilor de Stat*, 875 F. Supp. 1022, 1028 (S.D.N.Y. 1995); *See also American Book v. Yeshiva University Development Foundation, Inc.*, 297 N.Y.S.2d 156, 163 (Sup. Ct. 1969) (a purported "successor-in-interest" stands in shoes of predecessor-in-interest).

trademark significance to be afforded protections under trademark law. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

X One X and AVELA hold valid copyright protections in their Monroe artwork. (SOF ¶¶ 64-65.) Monroe's image has not achieved trademark significance as discussed above. There is no secondary meaning in Monroe's image or brand familiarity regarding EMMLLC or its products. The entirety of EMMLLC's purported "mark" (i.e. Monroe's image) is contained within a copyrighted medium: AVELA's artwork. EMMLLC has no valid trademark in Monroe's image or any specific image of Monroe. (SOF ¶ 106.)  EMMLLC should not be permitted to use trademark law to circumvent the copyright protections afforded to X One X and AVELA's Monroe artwork. *See Elements Spirits, Inc. v. Iconic Brands, Inc.*, No. CV 15-02692 DDP AGRX, 2015 WL 3649295, at *5 (C.D. Cal. June 11, 2015).

### 3.    First Amendment

Trademark law should be subjected to constitutional scrutiny where the defendant raises a First Amendment challenge. *See, e.g.*, *Landham v. Lewis Galoob Toys, Inc.*, 227 F.3d 619, 626 (6th Cir. 2000) (the courts have constructed a careful balance between the First Amendment and intellectual property laws.) "Courts have held that T-shirts are like "personal billboards," which "carry phrases that convey meanings that can range from entirely personal to political to humorous." *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 203, 2006 WL 1012939 at *17-18 (S.N.D.Y April 19, 2006); *see also Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797, 802 (Cal. 2001) (finding posters and t-shirts "expressive works and not an advertisement for or endorsement of a product"). "Through their pervasive presence in the media, sports and entertainment celebrities have come to symbolize certain ideas and values in our society and have become a valuable means of expression in our culture." *ETW Corp. v. Jireh*

22

*Pub., Inc.*, 332 F.3d 915, 937–38 (6th Cir. 2003). The balancing test from *Rogers v. Grimaldi*

weighs the "public interest in avoiding confusion "against the "public interest in free

expression"… the proper balance will not support application of the Lanham Act unless the mark

has: (1) "no artistic relevance" to the underlying work and (2) if there is artistic relevance, use of

the mark in the accused work "explicitly misleads as to the source or the content of the work."

875 F.2d 994, 999 (2d Cir. 1989);.

   AVELA's Monroe artwork has expressive artistic relevance, and is not an advertisement

for or endorsement of a product. AVELA and/or Valencia add significant creative components to

their Monroe artwork. (SOF ¶¶ 54-56, 61.) There is no likelihood of confusion here. EMMLLC

has not provided any evidence that AVELA's use of Monroe's artwork explicitly misleads

consumers to believe the products are created by or with the approval of EMMLLC. AVELA

uses its own trademarks to designate its products' source. (SOF ¶¶ 67-69.) At most, EMMLLC's

survey evidence, even if its validity is assumed, indicates that some members of the public would

draw the incorrect inference that Monroe had some connection with AVELA's t-shirts. (SOF ¶¶

126-28.) *See ETW*, 332 F.3d at 937 (The risk of such a misunderstanding, absent any explicit

indication on the face of the product that the celebrity was the source, is "so outweighed by the

interest in artistic expression as to preclude application of the [Lanham] Act.")

### 4.      Fair Use

   A defendant will not be liable for trademark infringement if he makes "fair use" of a

name, term, or device. 15 U.S.C. § 1115(b)(4). Use qualifies as "fair" if "a term is used (1)

descriptively, (2) other than as a mark, and (3) in good faith." *JA Apparel Corp. v. Abboud,* 682

F.Supp.2d 294, 309–10 (S.D.N.Y.2010). "If it cannot be proven that the unauthorized use serves

to identify the source of the defendant's product, such use is not protectable as a

trademark." *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 515 (S.D.N.Y. 2012) (citing *ETW,* 332 F.3d at 922). In this Circuit,

> [M]arks that are exploited only for their functional value and not to confuse the public receive no protection under unfair competition laws. Functionality in this context means that consumers desire the mark for its intrinsic value and not as a designation of origin. … When a mark without copyright protection is exploited for its intrinsic functional value, Congress has implicitly determined that society's interest in free competition overrides the owner's interest in reaping monopoly rewards.

*Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188, 1195 (S.D.N.Y.), *supplemented sub nom. Bi-Rite v. Button Master*, 578 F. Supp. 59 (S.D.N.Y. 1983) (finding use of performers' likenesses on novelty items was not actionable under **§** 43(a) (internal citations omitted). Trademark law does not prevent copying of "functional" features of a product which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity endorsed a product. *International Order of Job's Daughters v. Lindeburg & Co.,* 633 F.2d 912, 917 (9th Cir.1980). Registering a proper noun as a trademark does not "reduce it to the exclusive possession of the registrant … This rule applies with greater force in the context of historical sports heroes." *Pirone*, 894 F.2d at 583–84 (internal citation omitted).

At most, AVELA has made fair use of Monroe's image and the name "Marilyn." AVELA uses artwork with Monroe's image and first name ornamentally as product content rather than as an indication of source. (SOF ¶¶ 59, 61, 71.) There is no substitute for the use of Monroe's *likeness* on Monroe artwork. *See Cairns III*, 292 F.3d at 1153. Monroe's physical appearance is not readily identifiable without the use of her likeness. *See id.* AVELA does not use any "distinctive lettering" or particular image of Monroe intimately associated with EMMLLC. (SOF ¶¶ 70, 106.) *See id. at* 1154. AVELA's specialty artwork constitutes a functional product feature, not an assurance that any particular entity endorsed the product. Monroe's image is fairly used to inform the consumer what the product is – a product with

Monroe artwork. AVELA's products also clearly identify AVELA as the source. (SOF ¶ 67.) EMMLLC has not presented any evidence that consumers care whether or not EMMLLC endorsed AVELA's products. (SOF ¶ 138.) There is no evidence consumers want an "EMMLLC"-marked product rather than appealing Monroe artwork on a product. Monroe's image does not identify any source and EMMLLC has not established that it has built any goodwill or awareness among consumers. (SOF ¶ 83.)

## VI.   CONCLUSION

Movants request that this Court dismiss EMMLLC's First Amended Counterclaims and further request the opportunity to be heard in court on this matter. Movant further requests attorneys' fees pursuant to 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party.").

Dated: May 31, 2018

Respectfully Submitted,

By: Duane M. Harley

Duane M. Harley
D. Harley, PC
Attorney for *A.V.E.L.A., Inc., Leo Valencia
and X One X Movie Archives, Inc.*

## CERTIFICATE OF SERVICE

I, Duane M. Harley, hereby certify that on May 31, 2018, I caused copies of

**MOVANTS A.V.E.L.A., INC., X ONE X MOVIE ARCHIVE, INC, AND LEO VALENCIA'S NOTICE OF MOTION FOR SUMMARY JUDGMENT, MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT, AND THE DECLARATION OF DUANE M. HARLEY IN SUPPORT OF MOVANTS' MOTION FOR SUMMARY JUDGMENT, ALONG WITH ALL ATTACHED EXHIBITS** to be served via email upon the following individuals:

> Gina L. Durham (*pro hac vice*)
> DLA PIPER LLP (US)
> P.O. Box 64807
> Chicago, Illinois 60664-0807
> Telephone: (415) 368-4000
> Facsimile: (415) 659-7333
> Gina.durham@dlapiper.com

> Tamar Duvdevani
> DLA PIPER LLP (US)
> 1251 Avenue of the Americas
> New York, New York 10020-1104
> Telephone: (212) 335-4500
> Facsimile: (212) 335-4501
> Tamar.duvdevani@dlapiper.com

*Attorneys for Defendant/Counter-Plaintiff The Estate of Marilyn Monroe, LLC*

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed in New York, New York on this 31st day of May, 2018.


/s/ Duane M. Harley