**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | Case No: 12 Civ. 4828 (KPF) (JCF) |
| Plaintiff, | ECF Case |
| v. | |
| THE ESTATE OF MARILYN MONROE, LLC, And DOES 1 THROUGH 10, | **JOINT OPPOSITION TO THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES SALTER'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

THE ESTATE OF MARILYN MONROE, LLC

Counterclaimant,

v.

A.V.E.L.A., INC.,

Counter-Defendant, and

LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V INTERNATIONAL FINE ARTS PUBLISHING, INC.

Third-Party Defendants.

X ONE X MOVIE ARCHIVES INC.,
V INTERNATIONAL FINE ARTS PUBLISHING, INC.,

Counterclaimants,

**v.**

THE ESTATE OF MARILYN MONROE, LLC,
AUTHENTIC BRANDS GROUP, LLC
JAMES SALTER,

Counter-Defendants.

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

I.    STATEMENT OF FACTS ................................................................................. 1

   A.   Respondents' Business .............................................................................. 2

   B.   Events Leading up to EMMLLC's Formation ................................................. 2

II.   LEGAL STANDARD ......................................................................................... 3

III.  MOVANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED ....... 3

   A.   Summary Judgment Should Be Denied on EMMLLC's Claims for False Association
   and Unfair Competition Under 15 U.S.C. § 1125(a)(1) ....................................... 3

     1.   EMMLLC Has Not Established That it Owns Valid Rights in Monroe's Persona,
     Name, Image, or Likeness Under 15 U.S.C. § 1125(a) ....................................... 3

     2.   Fractured Ownership ........................................................................ 9

     3.   EMMLLC Does Not Establish "Misleading" Use of Monroe's Persona ................. 9

     4.   EMMLLC Has Not Established Likelihood of Confusion ....................................... 11

     5.   Summary Judgment Must be Denied on EMMLLC's Trademark Claims Because
     It Has Not Established Any Impact on Purchasing Decisions ................................. 19

     6.   The MSJ Must be Denied on EMMLLC's Unfair Competition Claim ..................... 20

   B.   Summary Judgment Must Be Denied on EMMLLC's Claims for Trademark
   Infringement Under 15 U.S.C. § 1114 and Common Law ................................... 20

   C.   Summary Judgment Should Be Denied on EMMLLC's Dilution Claim ................. 22

   D.   EMMLLC Is Not Entitled to a Permanent Injunction or Damages .......................... 23

     1.   EMMLLC is Not Entitled to a Permanent Injunction ....................................... 23

     2.   There is No Actual Confusion or Impact on Purchasing Decisions ........................ 24

     3.   EMMLLC Is Not Entitled to AVELA's Profits As a Matter of Law ..................... 25

   E.   EMMLLC Has Not Established Alter Ego Liability ....................................... 25

      1.   **X One X, AVELA, and Mr. Valencia** ................................................................ 26

      2.   **IPL** .......................................................................................................................... 27

  F.  **Summary Judgment Should Be Denied Against XOX and Mr. Valencia** .................. 28

  G.  **Summary Judgment Should Be Denied Against VIFAP** ............................................ 28

  H.  **Summary Judgment Should Be Denied as to the Interference Claims** ...................... 28

      1.   **AVELA's Tortious Interference Claim** ................................................................ 29

      2.   **VIFA's Intentional Interference Claim** ............................................................... 29

  I.  **The MSJ Must Be Denied as to the Trademark Cancellation Claims** ........................ 30

      1.   **A Reasonable Jury Could Find EMMLLC's Marks are Generic** ........................... 30

      2.   **A Reasonable Jury Could Find EMMLLC's Marks are Functional** ...................... 31

  J.  **Affirmative Defenses Bar Summary Judgment** ......................................................... 32

      1.   **Laches** .................................................................................................................... 32

      2.   **Fair Use, Aesthetic Functionality, First Amendment, and Copyright** .................. 33

      3.   **Unclean Hands** ..................................................................................................... 34

      4.   **Lack of Standing/Fractured Ownership** ............................................................... 34

      5.   **No Valid Trademarks/Cancellation of Trademarks** .............................................. 35

IV.  **CONCLUSION** ................................................................................................................ 35

# TABLE OF AUTHORITIES

## CASES

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196  (S.D.N.Y. 2015)…..34

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461  (S.D.N.Y. 2017) …..31

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)……………….....30

*Abraham Zion Corp. v. Lebow,* 761 F.2d 93 (2d Cir.1985)…………………………………..6

*Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324 (S.D.N.Y. 2013). ……………….22

*Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y. 1985)…………………………….4, 10

*Astaire*, 2010 WL 2331524, at *1………………………………………………………………..8

*Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351, 2014 WL 5493242,  (S.D.N.Y. Oct. 30, 2014)………………………………………………………………………………………..7

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, No. 10 CV 2333 KMW, 2013 WL 822173,(S.D.N.Y. Mar. 6, 2013) ……………………………………………………………..9

*Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428 (T.T.A.B. 1985). ………………………….....35

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14 (2d Cir. 1985)……………..16

*Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474  (2d Cir.1996)……………………………3

*Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212  (C.D. Cal. 2000) (“*Cairns II*”)……………………………………………………………………………...5, 10, 11, 19,22

*Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013  (C.D. Cal. 1998) (“*Cairns I*”)……………..9

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139  (9th Cir. 2002) (“*Cairns III*”)…………………..6

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217 (S.D.N.Y. 2004)……..7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)……………………………………………….3

*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206,(2d Cir. 2012)………………………………………………………………………………..6, 31, 32

*Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797 (Cal. 2001)………………………34

*DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30 (E.D.N.Y. 1994)……..………23

*Estate of Lennon by Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287 (S.D.N.Y. 1996)…...34

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003)…………………………….5, 22, 33

*Ferrer v. Maychick*, 69 F. Supp. 2d 495 (S.D.N.Y. 1999)…………………………………….8

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015)……………..9

*Fletcher* v. *Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995)……………………………………………..27

*Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402(2d Cir.1997). ………………33

*Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313 (2d Dist. 2010)…22

*George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635 (S.D.N.Y. 2014)……………...22

*Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, (2dCir.1993)………………………………………………………………..14

*Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412  (S.D.N.Y. 2012), opinion clarified (Feb. 21, 2012)………………………………………………………………………………14

*Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208 (S.D.N.Y. 2001)………………………30

*In re Sloppy Joe's Int'l, Inc.*, 43 U.S.P.Q.2d 1350, 1997 WL 424966  (T.T.A.B. 1997)………...35

*International Order of Job's Daughters v. Lindeburg and Company*, 727 F.2d 1087, 220 USPQ 1017  (Fed. Cir. 1984)………………………………………………………32

*ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135  (2nd Cir. 2007)……………………………………3

*Jackson v. Odenat*, 9 F. Supp. 3d 342 (S.D.N.Y. 2014)…………………………....15, 18, 21

*Knitwaves Inc. v. Lollytogs Ltd.,* 71 F.3d 996 (2d Cir.1995)…………………………………33

*Lang v. Ret. Living Pub. Co.*, 949 F.2d 576 (2d Cir. 1991)…………………………………………..20

*Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089 (D. Ariz. 2006)……………...10

*LFC Mktg. Grp. v. Loomis*, 8 P.3d 841 (Nev. 2000)…………………………….……..…………..27

*Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 807, 963 P.2d 488 (1998)…………………..…………...26

*Luxeyard, Inc. v. Kay Holdings, Inc.*, No. 3:15-CV-0357-LRH-WGC,

2016 WL 4941997 (D. Nev. Sept. 15, 2016)………………………………………………………26

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612

(S.D.N.Y. 2016)……………………………………………………………………………7, 13

*Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, 2002 WL 1560789

(S.D.N.Y. July 15, 2002)……………………………………………………………….……..33

*McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126 (2nd Cir. 1979)………………………13

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012)………..8

*Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95 (2d Cir. 1989)…………………30

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys.*, 975 F. Supp. 2d 392 (S.D.N.Y. 2013). …......27

*Nova Cas. Co. v. Liberty Mut. Ins. Co.*, 540 F. Supp. 2d 476 (S.D.N.Y. 2008)…………………..3

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.,* 590 F.Supp.2d 500 (S.D.N.Y.2008). …………...20

*Overton* v. *Art Fin. Partners LLC*, 166 F. Supp. 3d 388  (S.D.N.Y. 2016). ……………………27

*Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254 (2d Cir. 2011)………………………………30

*Pirone v. MacMillan, Inc.*, 894 F.2d 579  (2d Cir. 1990)…………………………………6, 8, 10, 12

*Plus Products v. Plus Discount Foods, Inc.,* 722 F.2d 999 (2d Cir.1983) ………….………...16

*Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 601, 747 P.2d 884 (1987)……….….………. .26

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)……………….….……11

*PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266 (2d Cir.1987)………….24

*Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129 (S.D.N.Y.1972)………………6

*Savin Corp. v. Savin Grp.*, 391 F.3d 439 (2d Cir. 2004) ……………………………………16

*Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211 (2d Cir. 2003)…………..29

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008)…..4

*Shaw*, No. 05 CIV. 3939 (CM), 2008 WL 4127830, (S.D.N.Y. Sept. 2, 2008) ………………...8

*Silverman v. CBS Inc.*, 870 F.2d 40 (2d Cir. 1989)……………………………………………5

*SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425

(S.D.N.Y. 2007)………………………………………………………………………17, 18, 25

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009)……………...16, 18

*Stoller v. Sutech U.S.A., Inc.*, 199 F. App'x 954(Fed. Cir. 2006)………………………………32

*Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739 (2d Cir.1998). …………………………13

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010) ………………......14, 16, 19

*Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208 (2d Cir.1985) ………………………………6

*Tiffany & Co. v. Costco Wholesale Corp*., 994 F. Supp. 2d 474 (S.D.N.Y. 2014)……………..30

*Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583 (S.D.N.Y. 2014)……………………29

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)…………………………………….6

*Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976)………………………...5

*Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911 (S.D.N.Y. 1983)……………...5

*Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513 (S.D.N.Y. 2008)………………23

*White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395 (9th Cir. 1992),

as amended (Aug. 19, 1992)……………………………………………………………….…13

## **STATUTES**

15 U.S.C. § 1052(a)………………………………………………………………………..35

15 U.S.C. § 1064(3)……………………………………………………………………..30, 31

15 U.S.C. § 1114 (herein, "Section 32")………………………………………....20, 21, 22

15 U.S.C. § 1117(a)………………………………………………………………….25

15 U.S.C. § 1125 (herein, "Section 43(a)")…………………………3, 4, 5, 7, 8, 9, 10, 11, 34, 35

## <u>TREATISES</u>

Gregory J. Battersby and Charles W. Grimes, The Law of Merchandise

and Character Licensing, § 6:17………………………………………………………..28

5 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2001)……..5, 16, 18, 30, 33

William H. Stoddard, Jr., Making Sense of Nevada's Alter Ego Doctrine,

Nev. Law, Dec. 2012, ……………………………………………………………… …26

A.V.E.L.A., Inc. ("AVELA"), X One X Movie Archives, Inc. ("XOX"), Leo Valencia, and V International Fine Arts Publishing, Inc. ("VIFA") (collectively, "Respondents") respectfully submit the following in opposition to the Estate of Marilyn Monroe, LLC ("EMMLLC"), Authentic Brands Group, LLC ("ABG"), and James Salter (collectively, "Movants")'s Memorandum of Law in Support of their Motion for Summary Judgment ("MSJ"). (Dkt. 335.)

## I.    INTRODUCTION

Movants' MSJ must be denied. It is rife with factual disputes on material issues and mischaracterizations of evidence. The MSJ contends EMMLLC owns rights in Monroe's "persona" without any legal basis. Beyond Movants' smoke and mirrors lie no facts or evidence to support their MSJ. The MSJ is premised on the legally improper claim that EMMLLC owns exclusive rights in Monroe's name, image, and persona. Movants have not established ownership of these rights, and in fact, VIFA has established the opposite is true. (*See* Dkt. 362.)

Marilyn Monroe was, and is, very famous. This does not automatically mean, however, that Marilyn Monroe is a famous *brand* in a trademark sense, that EMMLLC is famous, or that there is secondary meaning in Monroe's name or image.  EMMLLC still has yet to prove how its marks or its products are well known, as opposed to its confounding continued reliance on the claim that Monroe was famous so EMMLLC must be too. EMMLLC does not, and cannot, prove that *consumers* have any awareness at all of EMMLLC or its "brand." Additionally, AVELA's expert found 0% likelihood of confusion between AVELA's products and the entity EMMLLC.

AVELA seeks damages as EMMLLC wrongfully and without legitimate "persona" or image rights seeks to stop AVELA from licensing the Monroe artwork AVELA has lawfully licensed for decades and invested substantial time, energy, and resources into developing.

## I.    STATEMENT OF FACTS

1

## A.   Respondents' Business

AVELA's owner, Leo Valencia, has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Monroe, since the 1980s. (SOF ¶ 263.) AVELA creates new derivative artistic works based off of retro-themed materials previously in the public domain. (SOF ¶ 265.) Mr. Valencia adds his own creative flair to restored works and built AVELA's business licensing this artwork. (SOF ¶ 266.) Valencia created the entity XOX to manage and acquire catalogs of vintage artwork. (SOF ¶ 267.) AVELA's images transform old Monroe photographs through extensive graphic design and restoration processes to create completely new artwork and reinvent and modernize Monroe. (SOF ¶ 268.) Mr. Valencia's designs are highly desirable for their "vintage feel," evidenced by his decades in the licensing business. (SOF ¶ 269.) AVELA licenses its artwork under its own brand name RADIO DAYS. (SOF ¶ 270.) [1] VIFA is a licensing agent. (SOF ¶ 271.) VIFA does not license, manufacture, sell, approve, or advertise any products or own or license any artwork. (SOF ¶¶ 272- 74.)

## B.   Events Leading up to EMMLLC's Formation

Marilyn Monroe's will was silent as to any intellectual property rights. (SOF ¶ 276.) Monroe left the "rest, residue and remainder" of her estate as follows: 25% of the balance of her estate to her psychiatrist, Dr. Marianne Kris; and the remaining balance to Lee Strasberg. (SOF ¶ 27.) [2] Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe, sold any Monroe-related products, or policed any purported rights in Monroe in the decades following Monroe's death. (SOF ¶¶ 280-82.) In 2001, Monroe's estate closed. (SOF ¶ 284.) In December

---

[1] Contrary to Movants' mischaracterization of evidence, AVELA licenses its Monroe artwork under its own brand names, not under a "Marilyn Monroe" brand name. (SOF ¶¶ 195, 197, 270.)
[2] All references to the Statement of Facts shall refer to Respondents' Response to Movants' Rule 56.1 Statement filed in connection with this Opposition.

2010, "ABG" purportedly acquired the assets of an entity called Marilyn Monroe LLC. (SOF ¶ 24.) ABG formed a subsidiary and named it "The Estate of Marilyn Monroe." (SOF ¶ 285.)

## II.    LEGAL STANDARD

On summary judgment, all ambiguities and reasonable inferences are resolved against the movant. *Nova Cas. Co. v. Liberty Mut. Ins. Co.*, 540 F. Supp. 2d 476, 481 (S.D.N.Y. 2008). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment in a trademark action is not appropriate unless the undisputed evidence leads only to one conclusion as to likelihood of confusion. *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 478 (2d Cir.1996).

## III.   MOVANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED

### A.    Summary Judgment Should Be Denied on EMMLLC's Claims for False Association and Unfair Competition Under 15 U.S.C. § 1125(a)(1)

#### 1.    EMMLLC Has Not Established That it Owns Valid Rights in Monroe's Persona, Name, Image, or Likeness Under 15 U.S.C. § 1125(a)

The law does not support summary judgment in Movants' favor on the undisputed facts. EMMLLC's claim to rights in Monroe's "persona" under 15 U.S.C. § 1125 (herein, "Section 43(a)") fails where such rights do not exist. EMMLLC essentially argues its purported rights in Monroe's "persona" must exist because it bought them. (*See* SOF ¶¶ 24, 337.) This does not create a legal basis for EMMLLC's purported exclusive rights to Monroe persona in commerce. A § 43(a) plaintiff must demonstrate its own right to use the mark in question" and that it owns a valid and protectable mark distinctive as to the source of the goods at issue. *ITC Ltd. v. Punchgini, Inc*., 482 F.3d 135, 154 (2nd Cir. 2007).

##### a)    Monroe Did Not Pass Down § 43(a) Rights

The MSJ does not establish how EMMLLC owns § 43(a) "trademark-like" rights in Monroe's persona, name, image, or likeness where such rights did not exist until decades after

Monroe's death. *See*, *e.g.*, *Allen v. National Video, Inc.*, 610 F.Supp. 612, 627 (S.D.N.Y. 1985). Monroe cannot have passed down an intellectual property right that did not exist at the time of her death. *See Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309, 316 (S.D.N.Y. 2008). This Court rejected Marilyn Monroe, LLC's attempt to assert postmortem publicity rights in Monroe through her will's "boilerplate" residuary clause where such rights were not recognized until 22 years after her death and there was no evidence of Monroe's intent as to intellectual property rights. *Id.* at 316, 318. Similarly, Monroe cannot have passed down § 43(a) rights in her "persona." There is no evidence concerning Monroe's intent as to trademark rights (SOF ¶¶ 25, 32, 275.), and her boilerplate residuary clause does not convey postmortem 43(a) rights that did not come into being until decades after her death.

Monroe's will is silent as to any intellectual property rights. (SOF ¶ 276.) Monroe did not register any trademarks during her lifetime or make trademark use of her persona, image, name or likeness in connection with goods or services (SOF ¶¶ 277-279.) No trademark rights were part of her estate. Any trademarks that were later registered or used bear no actual connection to the late actress. It is legally impossible for Monroe to have devised § 43(a) marks in her "persona." The Central District of California has also issued a declaration that EMMLLC's predecessor did *not* own any rights of "association, sponsorship, and/or endorsement, in and to the name and likeness of Marilyn Monroe." (SOF ¶ 291.) The false claim that EMMLLC owns § 43(a) rights in Monroe as a matter of law renders all of its claims legally untenable.

### b)    EMMLLC Has Not Established Secondary Meaning

EMMLLC's purported § 43(a) rights in Monroe also do not exist because EMMLLC has not established secondary meaning. Decades of fractured use of Monroe's name, image, likeness, and persona prevent Monroe from serving a source-identifying function.

To establish secondary meaning, the public must be aware that a product comes from a single source. *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 380 (7th Cir. 1976) (superseded by statute on other grounds). A § 43(a) mark in a celebrity's image or likeness is not protectable unless it is proven to distinguish the owner's goods (i.e. to identify one source). *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 922 (6th Cir. 2003) (rejecting a § 43(a) claim asserting rights in all images of Tiger Woods as untenable.) When a mark is copyrighted and extensively used by many firms, there can be no secondary meaning in it. *Universal City Studios, Inc. v. Nintendo Co.,* 578 F.Supp. 911, 923–25 (S.D.N.Y. 1983). The source-identification function of a mark may be destroyed by widespread and uncontested use of the mark. *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1217 (C.D. Cal. 2000) ("*Cairns II*") (Princess Diana's name and image lost any significance as a mark because of extensive unauthorized use of her name and image on commercial articles, both before and in the three years after her death.) If a trademark holder ceases using a mark with intent not to resume its use, the mark is deemed abandoned, falls into the public domain, and is free for all to use. 5 McCarthy on Trademarks and Unfair Competition § 17:1 (4th ed. 2001) (hereinafter "McCarthy").

Monroe did not use or police the use of her image or name on merchandise during her lifetime. (SOF ¶ 279.) Nobody made trademark use of Monroe's image, persona, or name from 1962-1983, had any intention of using such "marks" from 1962-1983, or contested the use of such "marks" from 1962-1983. (SOF ¶ 280-82.) Monroe's image, name, and persona, to the extent such "marks" could have even existed, were abandoned and fell into the public domain.[3]

Countless third parties have made widespread use of Monroe's "persona" in commerce and on products from the 1950s to the present. (SOF ¶ 292.) This flood of un-endorsed

---

[3] Twenty-one years of non-use easily surpasses the non-use requirement for finding abandonment. *Silverman v. CBS Inc.*, 870 F.2d 40, 46 (2d Cir. 1989).

memorabilia for decades prevents any possible likelihood of confusion here. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002) ("*Cairns III*"). Countless third parties own or have owned copyrights and registered trademarks related to Monroe. (SOF ¶¶ 293-95.) Other entities used Monroe's name, signature, and image on products decades before EMMLLC or its "predecessors."[4] (SOF ¶ 292.) Monroe's name and image have been copyrighted and extensively used by many entities for decades and do not serve a source-identifying function.

EMMLLC has not established inherent distinctiveness or secondary meaning in its purported "marks" in Monroe as a matter of law. If a mark is not inherently distinctive, it must achieve secondary meaning among the relevant consumer market. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992). A photograph and/or name of a human being is not inherently 'distinctive. *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 583 (2d Cir. 1990). Secondary meaning attaches when "'the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business.'" *Id.* (quoting *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 104 (2d Cir.1985))."[P]roof of secondary meaning entails vigorous evidentiary requirements." *Thompson Med. Co. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985)(citing *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972)). A plaintiff must prove that its mark acquired secondary meaning by the time the allegedly infringing product came on the market. *Id.*

Not one factor supports a finding of secondary meaning here. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 226 (2d Cir. 2012). EMMLLC's purported marks in Monroe are not inherently distinctive and have not acquired secondary meaning. EMMLLC has not provided any evidence of secondary meaning prior to the time

---

[4] While Respondents do not concede that the use of Monroe's image, name, or signature as content on a product is trademark use, Movants argue that such a use of Monroe is trademark use. Even if this position were correct, dozens of other entities have made such purported "trademark" use of Monroe in the decades since her death.

AVELA's products came into the marketplace or even prior to this litigation. EMMLLC is well aware that AVELA's products have been in the marketplace prior to 2010; EMMLLC seeks damages for here from as early as 2008. (SOF ¶ 261.) The MSJ presents no evidence of advertising expenditures prior to 2012.[5]  (SOF ¶ 42.) EMMLLC does not present any consumer studies linking its purported marks to a source. The MSJ does not present media coverage of EMMLLC, EMMLLC's predecessor, or their "Marilyn Monroe" products. EMMLLC has not submitted any evidence regarding sales success prior to 2011. (SOF ¶ 43.)

AVELA does not seek to benefit from EMMLLC's name or goodwill.[6] (SOF ¶ 297-99.) AVELA identifies its own brand as the source of its products. (SOF ¶ 270.) AVELA does not claim Monroe or EMMLLC endorsed its products. EMMLLC has not demonstrated consumers have any awareness of EMMLLC and cannot credibly argue that it has built up any good will with consumers or that AVELA's products have any impact on purchasing decisions.

 "Length and exclusivity of the mark's use" also weighs against secondary meaning where Monroe's name and image have been used by various entities for decades, as discussed above, lessening any capacity of Monroe to identify or distinguish goods or services.

### c)      EMMLLC Cannot Assert Monroe's "Persona" Rights

EMMLLC's § 43(a) claim also fails as a matter of law because it does not have standing to assert Monroe's "persona" rights. This Court has determined that a § 43(a) false endorsement claim brought on behalf of a celebrity may only be brought by a party that owns that celebrity's right of publicity. *Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351, 2014 WL 5493242, at *4

---

[5] There is also no evidence these advertising expenditures direct consumers to Monroe as an indication of source. Regarding advertising expenditures, the court "should consider not only the total amount of the plaintiff's expenditures, but also whether the plaintiff's advertising specifically directed consumers to the mark as an indication of source." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 655 (S.D.N.Y. 2016).
[6] The relevant question regarding "attempts to plagiarize the mark" is "whether the copying was done deliberately, so as to benefit from [the mark holder's] name and good will." *See Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 243 (S.D.N.Y. 2004).

(S.D.N.Y. Oct. 30, 2014). As the parties and this Court are well aware, EMMLLC is judicially estopped from asserting any right of publicity in Monroe.[7] Under the reasoning of *Avalos*, EMMLLC does not have standing to bring its § 43(a) claim. Despite these rulings, EMMLLC still continues to claim it owns Monroe's right of publicity. (SOF ¶ 288.) It appears nothing can stop EMMLLC from asserting rights it does not have.

In *Shaw*, the photographer Sam Shaw's heirs sought to sell his copyrighted photographs of Monroe in connection with the sale of t-shirts exactly like the t-shirts at issue here. *Shaw*, No. 05 CIV. 3939 (CM), 2008 WL 4127830, at *2 (S.D.N.Y. Sept. 2, 2008) (SOF ¶ 300.) EMMLLC's predecessors sought to restrict the rights of Shaw's heirs to sell and license Monroe-related items--this Court rejected their ability to do so and found EMMLLC's predecessors had "nothing whatsoever" to license in connection with Monroe images. *Id.*, 2008 WL 4298548, at *3 (S.D.N.Y. Sept. 11, 2008). This Court found that Shaw's heirs could freely license their Monroe images for use on products and EMMLLC's predecessors had no basis to restrict anyone's right to use public domain or copyrighted images of Monroe. *Id.* EMMLLC does not have any basis to restrict AVELA's rights to license its images according to this Court.

Even if § 43(a) rights in Monroe somehow existed at her death[8], EMMLLC does not own these rights. There is no precedent supporting the notion that an unaffiliated entity may bring a § 43(a) "persona" claim on behalf of a deceased celebrity. Any such rights given to EMMLLC would be novel in this regard and require that this Court establish new law. Every other § 43(a) claim brought on behalf of a deceased celebrity (in this Circuit and others) has been brought by that celebrity's family or direct heirs. *See*, *e.g.*, *Pirone*, 894 F.2d at 584; *Astaire*, 2010 WL 2331524, at *1; *Ferrer v. Maychick*, 69 F. Supp. 2d 495, 98 (S.D.N.Y. 1999). Monroe did not

---

[7] *See Shaw*, 486 F. Supp. 2d 309; *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012).

[8] A contention vehemently opposed by Respondents and completely unsupported by current law.

assign any intellectual property rights to EMMLLC (or anyone) or authorize EMMLLC (or anyone) to license or police her rights. (SOF ¶¶ 275-76.) EMMLLC fails to demonstrate how such a right moved from Monroe to EMMLLC. EMMLLC is undisputedly not Monroe's heirs or family. (SOF ¶¶ 306-08.) EMMLLC cannot assert Monroe's § 43(a) rights as a matter of law.

### 2.     Fractured Ownership

Even if this Court could accept that intellectual property rights somehow transferred through Monroe's will[9], any purported rights in Monroe have been fractured for decades where other third parties retained 25% of Monroe's residuary for decades until July 25, 2013, well after the initiation of the instant litigation. (SOF ¶ 290.) EMMLLC purported rights in Monroe are further fractured where Anna Strasberg still retains certain rights to Monroe in commerce. (SOF ¶¶ 286-87.) EMMLLC does not exclusively own Monroe's name, image, persona, or likeness.

### 3.     EMMLLC Does Not Establish "Misleading" Use of Monroe's Persona

The MSJ fails to provide specific facts supporting summary judgment regarding AVELA's purported misleading use of Monroe's "persona."

### a)     Monroe's Image on Products

A false endorsement claim on behalf of a dead celebrity is viable where the defendant used more than a mere depiction of the celebrity in the case of false association with an estate, or "theoretically" where advertising falsely suggested that the celebrity endorsed the product before his or her death. *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1032 (C.D. Cal. 1998) ("*Cairns I*").[10] The use of a celebrity's image on a product is vastly different from the *advertising*

---

[9] A contention Respondents do not concede.

[10] Other cases are distinguishable from the facts at hand. *See Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, No. 10 CV 2333 KMW, 2013 WL 822173, at *21 (S.D.N.Y. Mar. 6, 2013) (the use of Bruce Lee's image on a t-shirt and Lee's name on hangtags was *not* enough to establish that consumers would believe Bruce Lee or his estate endorsed AVELA's products and denying summary judgment in favor of Lee's actual estate); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1071 (9th Cir. 2015) (distinguishing *Cairns* where Marley sold merchandise bearing his image during his lifetime, making an association between Marley's image on a product and

*use* of celebrities' likenesses that might directly imply an endorsement. *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1215 (C.D. Cal. 2000) ("*Cairns II*"). The use of a plaintiff's likeness directly on apparel does not as clearly communicate endorsement and *at most*, raises only a possibility, as opposed to a likelihood, of consumer confusion. *Lemon v. Harlem Globetrotters Int'l, Inc.*, 437 F. Supp. 2d 1089, 1099–100 (D. Ariz. 2006) (citing *Cairns II* at 1216). Similarly, the Second Circuit affirmed summary judgment against Babe Ruth's actual estate on its § 43(a) claim because Ruth's image was used as *content* on a product and not an indication of *sponsorship,* indicating that, in this Circuit, false endorsement claims are not viable where the content on a product does not involve "a specific arbitrary symbol that had been used over time and had become associated in the public mind with the plaintiffs." *Pirone*, 894 F.2d at 585.[11]

EMMLLC does not own trademarks rights in any particular image of Monroe. Movants do not establish AVELA uses EMMLLC's registered trademarks. (*See* SOF ¶¶ 214, 297-299.) AVELA does not designate its merchandise as "official" EMMLLC or Monroe merchandise. EMMLLC has not established that consumers care whether or not EMMLLC approved AVELA's products (SOF ¶ 303. Movants do not explain how AVELA's products could suggest EMMLLC endorsed them where EMMLLC did not exist until decades after AVELA's products had already been in the marketplace, consumers have no awareness of EMMLLC, and AVELA licenses its artwork under its own brand. (*See* Dkt. 355; SOF ¶¶ 197, 263, 270, 285, 331.)

Movants argue the mere use of Monroe's image on a product is misleading. This argument is untenable under the law and summary judgment must be denied. Under Movants' rationale, no one could ever use an image of Monroe commercially without EMMLLC's

---

his children's company more likely); *Allen*, 610 F.Supp. at 629–30 (considering the use of Woody Allen's image on an ad for a product, not as product content).

[11] Though the court noted the photographs of Babe Ruth were among many featured in a calendar, this was not the determinative factor in the false endorsement analysis where the court found they did not indicate sponsorship because they did not constitute a specific symbol that had become associated with the plaintiffs. *Id.*

approval---this is well beyond anything the law currently recognizes. A reasonable jury could conclude that consumers would not be deceived into believing the long-deceased Monroe or EMMLLC (the entity falsely purporting to be Monroe's estate) endorsed AVELA's t-shirts.

### b) The Name "Marilyn" on a Product

Whether AVELA's use of "Marilyn" on some artwork is misleading is a question of fact. As for AVELA's purported use of "Marilyn" in a "signature-like font," Movants cite to testimony regarding a single t-shirt that purportedly incorporates part of Monroe's signature. (SOF ¶ 214.) There is no evidence this t-shirt was ever sold, that AVELA actually approved this shirt, or that AVELA ever sold approved any product using any portion of Monroe's signature. AVELA does not allow its licensees to use Monroe's signature on its products. (SOF ¶ 299.) Movants have not established Respondents made any false or misleading representation of fact.

### 4. EMMLLC Has Not Established Likelihood of Confusion

EMMLLC has no valid § 43(a) persona, name, image, or likeness interest in Monroe and any argument premised on these rights is moot. Nonetheless, Movants' likelihood of confusion argument still fails on its own merits. Movants have not established any consumers believe EMMLLC approved AVELA products or that there is any link in the public mind between EMMLLC and a t-shirt with Monroe's image. *See* Dkt. 355. The factors delineated in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) do not favor EMMLLC.

### a) Strength of Association Between the Mark and the Plaintiff

Where the plaintiff is not the celebrity herself, a critical additional factor becomes relevant: the strength of association between the plaintiff and the mark. *Cairns II*, 107 F.Supp.2d at 1217 (Princess Diana's image was only weakly associated *in the public mind* with Diana's actual estate because her image had not served a trademark function during her life or after her

11

death and Diana "did nothing to prevent others from using her image while she was alive.")[12]

Monroe did not make trademark use or police the use of her name, image, likeness, and persona. (SOF ¶¶ 277-79.) No one policed Monroe's name or image for decades after her death. (SOF ¶ 282.) There has been extensive unauthorized use of Monroe's name and image for decades (SOF ¶¶ 277-79.), severely weakening any possible association between Monroe and EMMLLC. EMMLLC has not demonstrated it has any association in the public mind with Monroe (SOF ¶¶ 292-95.), let alone that a specific arbitrary symbol of Monroe is associated in the public mind with EMMLLC. This factor does not weigh in favor of likelihood of confusion.

### b)    Strength of the "Mark"

Respondents dispute each "fact" regarding the strength of EMMLLC's "marks" and EMMLLC's purported "longstanding and exclusive ownership" of rights in Monroe's persona, particularly where: Anna Strasberg retains certain rights to Monroe's persona, Monroe did not pass down any such rights, countless entities have used Monroe's persona in commerce for decades, and EMMLLC was not created until 2010 and has not provided any evidence of promotion or enforcement of Monroe's persona rights before 2011. (SOF ¶¶ 42, 276-78, 282, 285, 287, 292-96.) There is no evidence consumers connect Monroe to any particular source; Mr. Poret admitted his report does not establish confusion as to EMMLLC. (SOF ¶¶ 303, 331.)

Movants argue their licensees acknowledge their purported rights, but this is likely because Movants claim to own Monroe's nonexistent right of publicity to this day (SOF ¶ 288, Movants deceptively named their company "The Estate of Marilyn Monroe" to misleadingly claim that it is Monroe's actual estate, when it is not, and Movants have invented a "trademark"

---

[12] A § 43(a) claim may also fail even if a deceased celebrity made trademark use of his image during his lifetime where images of a celebrity do not constitute a specific arbitrary symbol used over time that has become associated in the public mind with the plaintiff. *Pirone*, 894 F.2d at 581.

in Monroe's persona that cannot legally exist. The fact that EMMLLC's licensees bought into Movants' con does not create a legal basis for ownership of trademarks rights. Additionally, *the consuming public's* beliefs regarding Monroe as a source of products is relevant, not recognition by EMMLLC's licensees. *See White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992), as amended (Aug. 19, 1992). In short, the emperor has no clothes, and just because licensees may want to protect against potential lawsuits (founded on EMMLLC's fictional rights) does not give EMMLLC the rights it claims in Monroe's "persona".

Monroe is not a famous "brand." Movants implausibly conflate the ideas that Marilyn Monroe is well known, so Monroe must be a well-known trademark owned by EMMLLC. There is no indication Monroe's image or persona function as an indicator of source or endorsement. (SOF ¶¶ 218-34.) AVELA's expert did not concede Monroe is a well-known brand. (SOF ¶ 221.)

Courts consider both the inherent distinctiveness and the distinctiveness a mark has acquired in the marketplace, *i.e.,* secondary meaning. *Streetwise Maps, Inc. v. VanDam, Inc.,* 159 F.3d 739, 743 (2d Cir.1998). The extent of third-party use is particularly relevant to this inquiry. *LVL XIII Brands*, 209 F. Supp. 3d at 667–68. The "strength" of a mark refers a mark's tendency to "identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2nd Cir. 1979). The inquiry here should not be whether or not Monroe is recognizable, but whether or not Monroe's image serves as an indication of source or affiliation with EMMLLC. EMMLLC has not presented, nor can it present, any evidence *consumers* recognize products bearing Monroe's image as emanating from EMMLLC as a single source. (SOF ¶¶ 292, 303.)

### c)      Similarity of the "Marks"

13

Movants are well aware that AVELA's products have been in the marketplace since before EMMLLC or its products existed, since EMMLLC seeks damages beginning in 2008. (SOF ¶ 261.) Even though AVELA's products predate EMMLLC's products, EMMLLC nonetheless claims that it is *AVELA's* products that copy *EMMLLC's* subsequently created products. A reasonably jury would find that EMMLLC's products actually copy AVELA's products in an attempt to hijack the licensing business AVELA has built for decades. A motion for summary judgment cannot resolve competing reasonable inferences. *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 426 (S.D.N.Y. 2012), opinion clarified (Feb. 21, 2012).

AVELA's products do not use Monroe's signature or the mark "MARILYN MONROE." but instead use AVELA's own brand mark on its hang tags and neck labels (SOF ¶¶ 195, 197, 202, 214, 270, 297-299). This factor does not weigh in favor of a likelihood of confusion. *See THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 185 (S.D.N.Y. 2011) ("When considering a hang tag and neck label on a t-shirt, at least where the junior and senior marks are not identical, the presence of a trade name will tend to militate against a finding of confusion.)

In assessing similarity, courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1078 (2d Cir. 1993). It is a question of fact whether or not the products here are similar where they utilize entirely different artwork, backgrounds, colors, design elements, and source identifiers. (SOF ¶¶ 270, 302, 338-352.) *See*, *e.g.*:

| EMMLLC's Product | Date | AVELA's Product | Date |
|---|---|---|---|

| | | | |
|---|---|---|---|
|  | Product date unknown, but EMMLLC was formed in December 2010). |  | Image created 10/22/2010 |

Disputed "Similarity": These images are not remotely similar. In EMMLLC's photo, Monroe is laughing, wearing a printed top, and in front of a zebra-print background. In AVELA's photo, Monroe is not smiling, has jewelry, and is staring at the camera with her arms folded.

#### d)    Proximity/Competitiveness of the Products

Movants argue that Respondents have "set themselves up in direct competition with the Estate," even though AVELA's products have been in the marketplace before EMMLLC existed. The facts support the inference that *EMMLLC has actually sought to compete with AVELA's* prior-established success. (SOF ¶¶ 194-208, 263, 285.) This factor does not favor EMMLLC.

#### e)    Evidence That the Senior User May "Bridge the Gap"

With false endorsement claims, courts often do not consider "bridging the gap." *Jackson*, 9 F. Supp. 3d at 356. This factor does not favor either side.

#### f)    Evidence of Actual Consumer Confusion

Evidence of actual consumer confusion is nowhere to be found in the record. EMMLLC cited solely to testimony from Katie Jones regarding Monroe products generally. (SOF ¶¶ 244, 311.) Ms. Jones testified that EMMLLC gets products where people are confused whether they are from EMMLLC but that EMMLLC was unaware whether any of those products were AVELA's. (SOF ¶ 309.) EMMLLC did not testify or provide evidence that *any* of the products causing confusion were AVELA products. *Id.* Movants cite testimony that "Mighty Fine" manufactured a t-shirt featuring Monroe with tattoos. (SOF ¶ 244.) Various entities license and manufacture t-shirts depicting Monroe with tattoos. (SOF ¶ 310.) Movants do not establish that the product Ms. Jones mentions is an AVELA product or that any consumer was confused about

15

Mighty Fine's t-shirt. (SOF ¶¶ 244, 309.) Regardless, even if this Court could possibly find Ms.

Jones' testimony evidences actual confusion, this evidence is inadmissible hearsay and one

consumer complaint in the twenty-five years AVELA has been licensing Monroe artwork is *de*

*minimis*. *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004) (a single anecdote of

confusion over the entire course of competition is *de minimis*)).[13]

The lack of actual confusion here strongly indicates there is no likelihood of confusion. *See Plus*

*Products v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1006 (2d Cir.1983) (a lack of evidence of actual

confusion over a three-year period is a strong indicator likelihood of confusion is minimal); *see also* In

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) (lack of actual

confusion was a powerful indicator of no likelihood of confusion where Starbucks had no knowledge of

any consumer ever actually confusing the defendant's product with a Starbucks product in eleven years).

### (1)     EMMLLC's Survey

Hal Poret's confusion survey is rife with faulty execution, methodology, and analysis.

*See* Dkt. 355. Mr. Poret's Survey provides no benefit to the analysis of likelihood of confusion;

Mr. Poret admitted that the conclusion of his Survey is not specific to EMLLLC. (SOF ¶ 303.)

The Survey's omission of hangtags (SOF ¶ 305) constitutes a failure to approximate marketplace

conditions because tags and labels on shirts provide important source information. *See THOIP v.*

*Walt Disney Co.*, 690 F. Supp. 2d 218, 239 (S.D.N.Y. 2010). Mr. Poret failed to accurately

categorize responses and improperly counted respondents as confused who thought Monroe's

family, "foundation," attorney, or other unrelated entities put out or approved the t-shirts where

---

[13] *See also C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) (finding two letters
from consumers insignificant when contrasted to "hundreds of thousands of magazines sold over the years");
*McCarthy* § 23:14. "Evidence of the number of instances of actual confusion must be placed against the background
of the number of opportunities for confusion before one can make an informed decision as to the weight to be given
the evidence."

EMMLLC is not any of these entities. *See* Dkt. 355 at 16-17. Net confusion should have been 0%. *Id.* at 18. If admitted, EMMLLC's survey should be granted little weight.

### (2)   AVELA's Survey

Even if this Court allows Mr. Poret's Survey any weight, there is a genuine dispute of material fact where AVELA's expert, Mr. Howard Marylander, found "literally no confusion at all" as to source or association for AVELA's shirts, even assuming EMMLLC was Monroe's actual estate or heirs (which it is not). (SOF ¶ 312.) Mr. Marylander used proper controls, marketplace approximations, and methodology. The Survey's statistical tests were conducted at a 95% confidence level. *Id.* Mr. Marylander considered t-shirts with the name "Marilyn" on them. (SOF ¶ 313.) He also properly utilized hang tags on the t-shirts, as AVELA requires its licensees to display AVELA's brand on labels and packaging, and AVELA's t-shirts for sale have in fact utilized tags prominently displaying AVELA's "RADIO DAYS" mark. (SOF ¶ 270.) Mr. Marylander utilized a control shirt with a blond woman and the name "Nichole." (SOF ¶ 254.) Movants fail to cite any case law supporting their claim that this control was somehow improper. These are, at very least, questions of fact regarding the quality and veracity of the surveys.

### (3)   There is No Effect on Purchasing Decisions

Evidence must demonstrate confusion that has a potential or actual effect on customers' purchasing decisions in order to constitute actual confusion. *SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 440-41 (S.D.N.Y. 2007). EMMLLC has not established AVELA's products had any effect on purchasing decisions. Mr. Poret's Survey did not address consumers' purchasing intentions. (SOF ¶ 303.) This factor does not weigh in favor of likelihood of confusion.

### g)   Evidence that the Imitative Mark Was Adopted in Bad Faith

The selection of a mark or trade dress that reflects the product's characteristics and reliance on the advice of counsel are factors that support a finding of good faith. *SLY Magazine*, 529 F. Supp. 2d at 441. There is a considerable difference between an intent to copy and an intent to deceive." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117–18 (2d Cir. 2009) (citing McCarthy § 23.113) AVELA uses its own mark, "RADIO DAYS," to identify its products. (SOF ¶ 270.) EMMLLC has not established bad faith or that Respondents intended to confuse consumers. (SOF ¶¶ 312, 314.) Movants do not argue they own any trademark in "MARILYN" for any particular font or the mark "MARILYN" for apparel. Movants do not establish AVELA uses any portion of Monroe's actual signature. (*See* SOF ¶ 214.) The undisputed facts indicate AVELA uses Monroe's image, and sometimes the name "Marilyn" as decorative product content, not as an indication of endorsement or source. There is no evidence EMMLLC has built any goodwill with consumers. (SOF ¶¶ 303, 331.) EMMLLC did not exist until decades after AVELA had been licensing its artwork. There also cannot be any bad faith where EMMLLC purported rights in Monroe under § 43 do not exist and EMMLLC's registered marks are invalid, as discussed herein. Movants cannot possibly implicate bad faith to every AVELA product produced over the past 25 years. This factor does not favor EMMLLC.

### h)      Respective Quality of the Products

With false endorsement claims, courts often do not consider the quality of the products. *Jackson*, 9 F. Supp. 3d at 356. Even if this Court considers this factor, it does not favor Movants. There is no actual evidence of consumers complaining to EMMLLC about *AVELA's* products. (SOF ¶¶ 309, 310.) Movants make much of their self-aggrandizing claim that they are the "guardian" of Monroe's legacy, despite the undisputed fact that Monroe did not ask or authorize them, or anyone for that matter, to do so. (SOF ¶¶ 25, 275-75.) Movants do not establish any evidence regarding how Monroe would have wanted her "persona" to be used. Monroe smoked

cigarettes. (SOF ¶ 316.) Monroe posed for nude photos that were used in the first issue of

Playboy and then merchandized on products--an unauthorized use of Monroe's likeness on

products to which Monroe did not object. (SOF ¶¶ 317-18.) Who is to say what images Monroe

would approve if she were alive today? Furthermore, artwork with an image of someone with

tattoos or smoking does not relate to the quality of a t-shirt. Arguing that such artwork

diminishes a product's quality is merely a judgment that people who have tattoos or smoke are

inferior. It is for the fact finder to decide if having tattoos or smoking makes Monroe artwork

inferior. Proper use of Monroe's "persona" would be, at best, a question of fact.

### i) Sophistication of Consumers in the Relevant Market

There is no indication this factor should favor Movants. *In the case law Movants cite*, this

Court found this factor was *neutral* where relatively inexpensive t-shirts were involved. *Thoip v.*

*Walt Disney Co.*, 736 F. Supp. 2d 689, 715 (S.D.N.Y. 2010). This factor is neutral.

### j) Balancing the Factors

There is no association between EMMLLC's Monroe-related "marks" and EMMLLC.

Given the complete lack of association between Monroe's image and EMMLLC, any possible

similarity or strength of the marks here, or relatedness of the goods, is irrelevant to likelihood of

confusion. *See Cairns II*, 107 F. Supp. 2d at 1221. EMMLLC's *marks* are not strong or

distinctive. There is no similarity between EMMLLC's Monroe-marks and AVELA's pre-

existing "RADIO DAYS" branded-products. There is no evidence of actual confusion. There is

no bad faith. EMMLLC has not established likelihood of confusion as a matter of law.

### 5. Summary Judgment Must be Denied on EMMLLC's Trademark Claims Because It Has Not Established Any Impact on Purchasing Decisions

EMMLLC's trademark claims fail because there is no evidence AVELA impacted

consumers' purchasing decisions. To evidence confusion in the marketplace, confusion must

have affected the potential customer's determination to purchase a product. *O'Keefe v. Ogilvy & Mather Worldwide, Inc.,* 590 F.Supp.2d 500, 524 (S.D.N.Y.2008). Trademark law protects only against mistaken purchasing decisions, not against confusion generally. *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991). EMMLLC's Survey does not address consumers' purchasing intentions: "Q. Did your survey test whether or not consumers are buying shirts for the brand as opposed to picture on the shirt? …A. No, it did not address anyone's reason for buying a shirt." (SOF ¶ 303.) EMMLLC does not demonstrate that consumers were tricked into buying products or that consumers actually care if EMMLLC approved AVELA's t-shirts.

### 6. The MSJ Must be Denied on EMMLLC's Unfair Competition Claim

For each of the reasons summary judgment must be denied on EMMLLC's trademark claims, summary judgment is also improper as to EMMLLC's unfair competition claim. Movants have not established bad faith nor established secondary meaning, that consumers associate Monroe with EMMLLC's products, or that EMMLLC has built up any goodwill with consumers. AVELA is not a "newcomer" that has suddenly swooped in and used EMMLLC's "marks"; EMMLLC was not established until decades after AVELA's licensing business began and AVELA uses its own marks to distinguish its products. (SOF ¶¶ 263, 270.)

### B. Summary Judgment Must Be Denied on EMMLLC's Claims for Trademark Infringement Under 15 U.S.C. § 1114 and Common Law

EMMLLC has no trademark rights in Monroe's image or persona, its registered trademarks are invalid, and any argument premised on these rights is moot. EMMLLC's 15 U.S.C. § 1114 (herein, "Section 32") claim nonetheless fails on its merits. A § 32 plaintiff must show that the defendant used a "reproduction, counterfeit, copy, or colorable imitation of a registered mark" in connection with the sale of goods in a way that is likely to cause confusion. 15 U.S.C. § 1114(1)(a). A trademark in a celebrity's name does not extend to protect any and all

20

images of a person or a celebrity's persona under § 32. *Pirone*, 894 F.2d at 583; *Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014). In *Pirone*, the Second Circuit rejected a § 32 claim on summary judgment because the plaintiff's registered trademarks in Babe Ruth's name did not extend to protect the images of Ruth at issue and the plaintiff did not own a trademark in any of the particular Ruth photographs the defendant used. *Id.* Use of a celebrity's name and image to identify the celebrity "is not a trademark use and not an infringement." *Id.*

EMMLLC's registered marks in Monroe's name and signature do not prohibit AVELA's use of Monroe's image. EMMLLC cannot extend its purported trademarks in Monroe's "persona" or image to serve as trademarks for purposes of § 32.  EMMLLC's § 32 claim applies strictly to its registered trademarks in Monroe's name and stylized signature; EMMLLC has not established that AVELA made trademark use of these marks. (SOF ¶ 214.) AVELA has used the name "Marilyn" on some of its artwork as an ornamental feature to describe the actress. (SOF ¶ 264.) EMMLLC's registered word mark "MARILYN" is limited to wine. (SOF ¶ 71.) Movants do not argue their "MARILYN" mark is registered for any particular font. EMMLLC has not established that AVELA uses "Marilyn" as an indication of source or that Monroe is famous as a brand indicating a source of goods and services; it merely cites to testimony that Monroe is an iconic actress and that AVELA's Monroe artwork is popular. (SOF ¶¶ 218-234.) EMMLLC does not offer any support for its claim that using the name "Marilyn" as product content on Monroe artwork is "functionally equivalent" to using EMMLLC's registered marks in a source-identifying manner. EMMLLC's survey does not evaluate AVELA's use of Monroe's name or Monroe's signature on artwork.[14] (SOF ¶ 304.) EMMLLC offers no other evidence upon which it can demonstrate likelihood of confusion as to AVELA's purported use of its registered marks.

---

[14] In contrast, AVELA's expert utilized the name "Marilyn" on artwork in his survey and found 0% likelihood of confusion. (SOF ¶ 313.)

Summary judgment must be denied on EMMLLC's § 32 claim where it is based upon AVELA's use of Monroe's image, Respondents do not use EMMLLC's registered marks, and EMMLLC has not established likelihood of confusion as to these marks and questions of fact remain.

### C.     Summary Judgment Should Be Denied on EMMLLC's Dilution Claim

Movants fail to establish grounds for summary judgment in connection with a federal dilution claim where they fail to establish that their marks are famous or secondary meaning in Monroe. *See Cairns II,* 107 F. Supp. 2d at 1222 (a finding of secondary meaning was absurd where it would mean the words "Diana, Princess of Wales" primarily identified the plaintiff's activities rather than Princess Diana). [15] The MSJ also fails to identify sufficient facts to support a New York dilution claim. Under New York law, the plaintiff must establish a distinctive mark capable of being diluted and a likelihood of dilution. *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 342 (S.D.N.Y. 2013). New York only recognizes a dilution claim where the marks at issue are substantially similar. *George Nelson Found. v. Modernica, Inc.*, 12 F. Supp. 3d 635, 651 (S.D.N.Y. 2014).

EMMLLC's purported marks are not distinctive. There is no secondary meaning or source identification here as discussed above; it is absurd to argue that an image of Marilyn Monroe primarily identifies the random entity "EMMLLC" rather than Monroe. EMMLLC does not establish that AVELA's artwork is likely to dilute the quality of EMMLLC's "marks." *See ETW Corp.*, 332 F.3d at 954 ("Because [Tiger] Woods's likeness does not function as a trademark which is subject to protection under the Lanham Act, it follows that a dilution claim does not lie.") The marks are not similar here. (SOF ¶¶ 270, 302.) There is no evidence of a

---

[15] Additionally, the law firm representing Diana's actual estate was liable for malicious prosecution for bringing trademark dilution and false advertising claims that had no plausible basis. *Franklin Mint Co. v. Manatt, Phelps & Phillips, LLP*, 184 Cal. App. 4th 313, 333 (2d Dist. 2010).

predatory intent where AVELA has been licensing its Monroe artwork since the 1980s. Movants do not establish how AVELA's use of the name "Marilyn" as decorative content on some of its products is "functionally identical" to EMMLLC's trademark in "MARILYN" for alcoholic beverages. EMMLLC does not argue the USPTO reviewed evidence of secondary meaning at the time of registration.[16] To the extent that EMMLLC's New York dilution claim is based on its purported "marks" in Monroe's image, persona, and likeness, the law and facts do not support summary judgment in EMMLLC's favor. EMMLLC has not established these purported marks exist, that they are distinctive, or any secondary meaning in these marks, as discussed above.

### D.   EMMLLC Is Not Entitled to a Permanent Injunction or Damages

#### 1.   EMMLLC is Not Entitled to a Permanent Injunction

Genuine issues of material fact remain as to EMMLLC's claim for a permanent injunction. EMMLLC has not established that it will suffer an irreparable injury, remedies available at law are inadequate, an equitable remedy is warranted on a balance of hardships, or the public interest would not be disserved by an injunction. *See Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 551 (S.D.N.Y. 2008). Movants fail to provide any specific facts demonstrating that EMMLLC has suffered "irreparable harm." *See* SOF ¶ 257 (failing to cite any evidence); Clarke Decl. ¶¶ 34-47 (making the conclusory statement that "This product tarnishes the Marilyn Monroe brand" without any supporting evidence). EMMLLC presents no evidence it received complaints from consumers about AVELA's products or the products cited in SOF ¶ 258. EMMLLC presents no evidence consumers associate the products cited in SOF ¶ 258 with EMMLLC or that these products caused any consumers to make different purchasing decisions. Additionally, whether or not AVELA artwork is negative and "harms" EMMLLC's "brand" is a

---

[16] Incontestability does not demonstrate secondary meaning where the USPTO did not review secondary meaning evidence at the time of a mark's registration. *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 42-43 (E.D.N.Y. 1994).

disputed question of fact for the jury to decide. *See* Clarke Decl. ¶ 39 (claiming artwork with a tattooed-Marilyn is a "degenerate" portrayal of her); *see also* Clarke Decl. ¶ 46 (claiming Monroe "did not smoke cigarettes in her lifetime" and that artwork with Monroe smoking "tarnishes" EMMLLC's "brand," even though Monroe did smoke (SOF ¶ 258)). EMMLLC has not established why remedies available at law are inadequate to compensate for its purported injury. EMMLLC has not established a "high" probability of confusion here.[17]

A balance of the hardships favors Respondents where EMMLLC has no rights to Monroe's persona under § 43(a) and no interest in AVELA's use of Monroe's image. AVELA has a legitimate interest in its copyrighted Monroe artwork. (SOF ¶¶ 151, 198.) AVELA and the public have a legitimate interest in creating and wearing artwork. Respondents would certainly suffer a hardship where they would be enjoined from licensing the Monroe artwork they have invested substantial time and energy into obtaining, restoring, creating, and licensing over the decades. (SOF ¶¶ 263-268.) The public interest would also be most disserved by giving a corporate entity, with no relationship to Monroe, exclusive rights to her persona in perpetuity and by EMMLLC's claim that any commercial usage of Monroe from now forward will have to be approved by EMMLLC. Lastly, the new law this Court would need to create to allow EMMLLC these persona rights would surely affect every deceased celebrity (going back decades) and allow made up corporate entities to control every use of them in perpetuity.

## 2. There is No Actual Confusion or Impact on Purchasing Decisions

To establish damages for a violation of § 43(a), a plaintiff must establish actual confusion or deception resulting from the violation. *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 271 (2d Cir.1987). Unless a plaintiff can establish that consumers made mistaken purchasing

---

[17] Respondents dispute EMMLLC's likelihood of confusion evidence and expert report, and AVELA's expert has established zero confusion. (SOF ¶ 312.)

decisions, there is no reason to believe that any confusion "could inflict commercial injury in the form of either diversion of sales, damage to goodwill, or loss of control over reputation." *SLY Magazine*, 529 F. Supp. 2d at 441. As discussed above, EMMLLC cannot demonstrate actual confusion and may not recover money damages in connection with its § 43(a) claim. EMMLLC does not establish that AVELA deceived any consumers. EMMLLC does not establish AVELA's use of Monroe's image or "Marilyn" had any impact on consumer purchasing decisions. EMMLLC's claim for damages must be denied.

### 3.   EMMLLC Is Not Entitled to AVELA's Profits As a Matter of Law

EMMLLC has not established that its marks are valid or likelihood of confusion as a matter of law. EMMLLC argues it is entitled to AVELA's profits from as early as 2008, despite the fact that AVELA has been selling products long before EMMLLC even existed. (SOF ¶ 261, 263.) EMMLLC has not established secondary meaning prior to 2012, as discussed above. A determination of damages is to be pursued subject to the principles of equity. *See* 15 U.S.C. § 1117(a). As discussed in AVELA's expert report of Fernando Torres, Mr. Green's report uses unsupported, misleading, and unreliable methodology and does not accurately establish EMMLLC's damages. (SOF ¶ 319.) Mr. Green's assumption that EMMLLC owns rights in Monroe's image or persona was flawed and Mr. Green failed to make any connection between AVELA's royalties and any purported infringement. (SOF ¶ 320.) Mr. Green failed to consider a proper apportionment of AVELA's profits and deductible expenses. *Id.* Mr. Torres determined the only profits that could possibly be attributed to any infringement amounted to $880.[18] (SOF ¶ 321.) Genuine disputes of material fact remain as to EMMLLC's purported damages.

### E.   EMMLLC Has Not Established Alter Ego Liability

---

[18] Mr. Torres determined the only revenue that could possibly be found to be infringing was for products bearing the name "Marilyn" in a cursive font.  Respondents do not concede that such products infringe EMMLLC's purported trademarks, but even if this Court could possibly find infringement based on such products, EMMLLC's damages are *de minimis.*

### 1.    X One X, AVELA, and Mr. Valencia

Movants have not established Mr. Valencia and X One X or AVELA are alter egos.

Under Nevada law, "the corporate cloak is not lightly thrown aside." *Lorenz v. Beltio,*

*Ltd.,* 114 Nev. 795, 807, 963 P.2d 488, 498 (1998). For application of the alter ego doctrine:

> (1) the corporation must be influenced and governed by the person asserted to be the alter
> ego; (2) there must be such unity of interest[19] and ownership that one is inseparable from
> the other; and (3) the facts must be such that adherence to the corporate fiction of a
> separate entity would, under the circumstances, sanction fraud or promote injustice.

*Polaris Indus. Corp. v. Kaplan*, 103 Nev. 598, 601, 747 P.2d 884, 886 (1987). It is insufficient to

merely establish the first two requirements, which are commonly found in small, closely held

corporations. William H. Stoddard, Jr., Making Sense of Nevada's Alter Ego Doctrine, Nev.

Law, Dec. 2012, at 7. A plaintiff must establish facts tying the first two elements to a fraud or

injustice upon the plaintiff. *Luxeyard, Inc. v. Kay Holdings, Inc.*, No. 3:15-CV-0357-LRH-WGC,

2016 WL 4941997, at *9 (D. Nev. Sept. 15, 2016).

### a)    AVELA

Movants establish the following undisputed facts:

> Leo Valencia is AVELA's President and sole employee; AVELA does not maintain a
> general ledger and is behind on taxes; AVELA keeps its receipts at Mr. Valencia's home;
> Mr. Valencia has used personal credits cards to pay AVELA's expenses[20]; Mr. Valencia
> prepares AVELA's financial statements; and Mr. Valencia uses a cell phone for business.

(SOF ¶¶ 102, 106-113). These facts do not establish that AVELA is an alter ego of Mr. Valencia

as a matter of law or any connection between the alter ego factors and EMMLLC's purported

---

[19] In determining whether a unity of interest exists, courts look to factors like co-mingling of funds,
undercapitalization, unauthorized diversion of funds, the existence of separate bank accounts, whether dividends
were paid to shareholders, treatment of corporate assets as the individual's own, and failure to observe corporate
formalities. *Polaris*, 103 Nev. at 601.
[20] Movants do not establish that an injustice resulted from AVELA's payment of Mr. Valencia's personal charges.
*See Polaris*, 103 Nev. at 602.

injury. Movants do not allege facts that Valencia sanctioned a fraud or promoted an injustice to Movants.  Whether facts exist sufficient to find alter ego liability is a question of fact.[21]

### b)   XOX

Movants do not establish alter ego liability regarding XOX as a matter of law. The facts presented do not address any of the relevant alter ego factors or establish any connection between these factors and EMMLLC's purported injury. (*See* SOF ¶¶ 125-127, 150, 152-153.)

### 2.   IPL

Movants have not established IPL is an alter ego of AVELA or Mr. Valencia. A plaintiff arguing an alter ego claim under Delaware law faces a heavy burden. *Nat'l Gear & Piston, Inc. v. Cummins Power Sys.*, 975 F. Supp. 2d 392, 401-02 (S.D.N.Y. 2013). Whether a corporation's form should be disregarded is a generally a question for the jury. *Overton* v. *Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 404 (S.D.N.Y. 2016). As to the requirement of an overall element of injustice or unfairness, this injustice must consist of more than the mere tort or breach of contract that is the basis of the plaintiff's lawsuit. *Nat'l Gear*, 975 F. Supp. at 406. Movants provide no evidence probative of the relevant Delaware factors.[22] Movants establish that: IPL has purportedly worked with Silver Buffalo and Freeze, entities AVELA also worked with; and Valencia has signed checks on behalf of IPL (SOF ¶¶ 146, 176, 203.) This evidence does not come remotely close to an evidentiary showing that IPL is an alter ego of AVELA or Mr.

---

[21] Movants must prove each element by a preponderance of the evidence. *LFC Mktg. Grp. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000).

[22] Factors relevant to whether or not two entities operate as a single economic entity include: "whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder." *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995) (internal quotation marks and citations omitted).

Valencia.[23] Moreover, Movants fail to address how recognizing IPL's separate form would promote an injustice separate from the subject matter of EMMLLC's claims.

### F.     Summary Judgment Should Be Denied Against XOX and Mr. Valencia

Movants establish the undisputed facts that XOX owns copyrights, including copyrights in Monroe artwork, and licenses this artwork to AVELA in return for a fee. (SOF ¶¶ 126, 151-152, 198-200.) These facts do not establish liability on behalf of XOX in connection with any of EMMLLC's claims. Similarly, Movants do not establish any undisputed facts to confer liability on Mr. Valencia outside of his role as the President of AVELA.

### G.     Summary Judgment Should Be Denied Against VIFAP

This Court has already determined that V International is not an alter ego of any of the other Respondents. (Dkt. 215 at 41-42.) EMMLLC has not presented any undisputed facts that would support summary judgment against V International. Movants establish the following:

(i) VIFA is a licensing agent for vintage artwork;
(ii) VIFA acts as an agent for AVELA and works with AVELA's licensees;
(iii) VIFA attends trade shows on behalf of AVELA as its licensing agent;
(iv) VIFA negotiates license agreements on behalf of AVELA, filters through licensing leads, and maintains client relationships for AVELA in its capacity as a licensing agent;
(v) VIFA forwards product concepts to AVELA for AVELA to review and approve; and
(vi) VIFA follows up with AVELA's licensees to make sure they pay royalties.

(SOF ¶¶ 133, 134, 136, 137, 154-157, 158.) VIFA rightly earns a commission for its agent duties. (SOF ¶ 159.)[24] These facts do not establish liability against VIFA on any relevant legal theory. Relevant testimony establishes that AVELA approves all products and provides licensees with artwork. (SOF ¶¶ 157, 169.) Movants' MSJ as to VIFA must be denied.

### H.     Summary Judgment Should Be Denied as to the Interference Claims

---

[23] Movants do not establish that Mr. Valencia is a Director of IPL, set up IPL, entered into any agreements in IPL's name, or ever "instructed his licensees to cease all royalty payments to AVELA and instead remit such payments to IPL." (SOF ¶¶ 142-145, 173-178.)

[24] *See* Gregory J. Battersby and Charles W. Grimes, The Law of Merchandise and Character Licensing, § 6:17 (The average commission for a licensing agent is in the 30 to 40 percent range).

### 1.      AVELA's Tortious Interference Claim

Movants cite to SOF ¶¶ 180-193 as purported evidence in support of summary judgment, however, evidence of other litigation is not relevant here, would be unduly prejudicial, and has no bearing on whether or not EMMLLC interfered with AVELA's business. Whether or not EMMLLC induced or caused Silver Buffalo not to perform its contractual obligations to AVELA and whether or not Silver Buffalo breached its contract are questions of fact. Mr. Valencia and Ms. Acuna testified that Mr. Salter's actions caused damages to AVELA. (SOF ¶ 236.) Ms. Acuna testified the Silver Buffalo agreement ended as a result of Movants' actions (SOF ¶ 237.)

### 2.      VIFA's Intentional Interference Claim

Genuine issues of material fact remain as to VIFA's intentional interference claim. Evidence indicates Movants engaged in wrongful conduct to interfere with VIFA's business and injured VIFA's business relationship. *See Tucker v. Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014). Ms. Acuna testified she had contractual discussions and negotiations with Duke Imports beginning in 2013 and it took three years to enter into an agreement as a result of Movants' interference. (SOF ¶ 238.) A reasonable jury could infer VIFA had business dealings with Duke. Ms. Acuna testified that ABG and Mr. Salter "intimidated and threatened" Duke and threatened to eliminate Duke's livelihood. (SOF ¶ 240.) Whether or not this pressure satisfies the wrongful means standard is a fact-intensive inquiry dependent upon consideration of the circumstances, Movants' objectives, the extent of the threat, and other factors. *See Scutti Enterprises, LLC. v. Park Place Entm't Corp.*, 322 F.3d 211, 216 (2d Cir. 2003).

Evidence further indicates that Movants have interfered with VIFA's business by purporting to own fictional rights to Monroe's persona, misrepresenting that it is Monroe's estate and that EMMLLC's trademarks have any connection to Monroe, fraudulently claiming that

EMMLLC owns Monroe's right of publicity, and misrepresenting that AVELA's products are unlawful.[25] (SOF ¶ 324.) Whether or not Movants utilized wrongful means and/or acted solely to injure VIFA a question of fact. A reasonable jury could conclude ABG and Mr. Salter's interference deprived VIFA of commissions on at least $14,048 in royalties. (SOF ¶ 241.)

## I.      The MSJ Must Be Denied as to the Trademark Cancellation Claims

Trademarks, including incontestable marks, can be cancelled pursuant to 15 U.S.C. § 1064(3). *See Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 266 (2d Cir. 2011).

### 1.      A Reasonable Jury Could Find EMMLLC's Marks are Generic

A court can cancel an incontestable mark if it "becomes the generic name for less than all of the goods or services, or a portion thereof, for which it is registered." 15 U.S.C. § 1064(3). "The question of whether a mark is, or has become, generic is generally one of fact." *Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 482 (S.D.N.Y. 2014). A term is generic if it merely refers to what a product is and the majority of the buying public associates the term with a type of product, rather than the source of the product. *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 212-13 (S.D.N.Y. 2001); *Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989) (in the public's perception, "Murphy bed" connotes a type of bed, not a bed manufactured by the Murphy Co). The use and understanding of a term in the context of purchasing decisions determines the primary significance of a designation. McCarthy § 12:9 at 12–19 *213 (citation omitted). "Generic terms … may be adjectives that designate a distinctive characteristic of a genus of products." *Id.* at 213. A court may partially cancel a registered trademark if only one use of the trademarked term has become generic. *Abercrombie*

---

[25] Ms. Acuna further testified James Salter interfered with various other VIFA business relations, that business for Marilyn Monroe artwork licensing has decreased as a result of ABG and/or EMMLLC's interference, and that ABG directed authorities to seize AVELA's Monroe products from retail stores, causing financial losses. (SOF ¶ 326.)

*& Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-10 (2d Cir. 1976) (In the public mind, "Safari" was a generic term as used for Safari hats, but not when used to refer to boots or shoes).

To the public, the primary significance of the terms "MARILYN MONROE," or "MARILYN," when used in connection with t-shirts with an image of Monroe on them, merely refer to what the product is--a t-shirt with a picture of Monroe on it. Monroe's name is generic in this context because it describes a type of good—apparel that bears indicia of Monroe.[26] (SOF ¶ 327.) Monroe's name in this context does not mean anything other than to refer to what the product is. These marks are not at all distinctive of EMMLLC. "Marilyn Monroe" is a public domain generic term used to describe the actress, not a brand name or source identifier. If a customer walks into a store and asks for a "Marilyn Monroe t-shirt," it is likely they want a t-shirt with a picture of Monroe on it, not a t-shirt manufactured or endorsed by the legal fiction which is EMMLLC. (SOF ¶ 328-31.) Genuine issues of material fact remain that the "MARILYN MONROE" and "MARILYN" marks are generic as used on products that bear Monroe's image. Evidence suggests the consumer public understands these terms to refer to a genus of product, as opposed to the specific product of any one producer.

### 2.    A Reasonable Jury Could Find EMMLLC's Marks are Functional

A trademark may be cancelled at any time under 15 U.S.C. § 1064(3) if it is functional. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 218-19 (2d Cir. 2012). Whether a trademark is functional "is a question of fact." *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 479 (S.D.N.Y. 2017) (citing, *inter alia*, *Christian Louboutin*, 696 F.3d at 222 ("[T]he aesthetic functionality analysis is highly fact-specific.") Aesthetic functionality applies if "the aesthetic design of a product is itself the mark for which

---

[26] In the alternative, at a minimum, "Marilyn Monroe" is merely descriptive of t-shirts that have a picture of Monroe on them, the phrase has not acquired secondary meaning, and cannot serve as a trademark. EMMLLC has not shown that the term's primary significance in the public's mind is EMMLLC, rather than the famous actress.

protection is sought," and the mark is ineligible for protection if it would "significantly undermine competitors' ability to compete in the relevant market." *Id.* at 219-20, 222.

In *Job's Daughters,* the Job's Daughters organization's name and emblem were found to be merely "functional aesthetic components of the product, not trademarks," and subject to cancellation primarily as a result of the widespread merchandising of jewelry featuring Job's Daughters name and emblem. *International Order of Job's Daughters v. Lindeburg and Company*, 727 F.2d 1087, 220 USPQ 1017, 1018-19 (Fed. Cir. 1984).[27]

Marilyn Monroe's name as used as content on a t-shirt in connection with Monroe's image is functional, ornamental, and merely part of the product's design. Consumers desire t-shirts with Marilyn Monroe's name or image on it because of the artwork or design on the product itself, not because the phrase "Marilyn Monroe" or "Marilyn" indicates the source or affiliation of the shirts. (SOF ¶¶ 269, 327-28.) Monroe's name as used on the front of a t-shirt with Monroe's image is merely an element of design that identifies the actress, and constitutes artistic expression independent of any tendency to suggest the product originated with EMMLLC. Respondents are at a disadvantage where Movants specifically target AVELA and its licensees using EMMLLC's registered marks as a basis for its false claim that it has exclusive rights to use Monroe in commerce. (SOF ¶¶ 324, 329-30.) EMMLLC uses its word marks in Monroe's name to preclude AVELA from selling its products to the segment of the market that want apparel bearing desirable Monroe artwork irrespective of sponsorship or brand affiliation.

### J.     Affirmative Defenses Bar Summary Judgment

Various affirmative defenses preclude an entry of summary judgment in Movants' favor.

### 1.     Laches

---

[27] The cases Movants cite do not explicitly prohibit cancellation on the basis of aesthetic functionality for word marks. *See Christian Louboutin*, 696 F.3d at 220; *Stoller v. Sutech U.S.A., Inc.*, 199 F. App'x 954, 958 (Fed. Cir. 2006).

As discussed in connection with AVELA, X One X, and Mr. Valencia's dispositive motion (Dkt. 370 at 19-21), laches bars EMMLLC from recovery. There is a presumption of laches if a plaintiff fails to raise a claim within the applicable statute of limitations, which in most Lanham Act cases is six years. *Manganaro Foods, Inc. v. Manganaro's Hero-Boy, Inc.*, 2002 WL 1560789 (S.D.N.Y. July 15, 2002). Mr. Valencia has built his business by licensing Monroe (and other) artwork since approximately 1985. (SOF ¶ 263.) EMMLLC's predecessor threatened the assertion of intellectual property rights in Monroe regarding AVELA's products in February 2006. (SOF ¶¶ 332-34.) EMMLLC filed its Counterclaims on August 31, 2012. (Dkt. 5.) EMMLLC failed to file timely claims.

## 2. Fair Use, Aesthetic Functionality, First Amendment, and Copyright

As discussed in connection with AVELA, XOX, and Mr. Valencia's summary motion, the doctrine of aesthetic functionality, the doctrine of fair use, the First Amendment, and the Copyright Act all protect AVELA's use of Monroe artwork. (Dkt. 370 at 21-25.) Under the doctrine of aesthetic functionality, an ornamental feature is denied trademark protection. *Forschner Group, Inc. v. Arrow Trading Co., Inc.*, 124 F.3d 402, 409–20 (2d Cir.1997). A feature is ornamental if it is purely aesthetic and serves no source-identifying purpose. *Knitwaves Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1009 (2d Cir.1995). Non-source identifying artwork on t-shirts is unprotectable under trademark law. McCarthy § 7:80 at 7-253 n.46. Monroe's image on a t-shirt is purely ornamental and does not serve any source-identifying purpose. AVELA's use of Monroe artwork is also protected under the doctrine of fair use where Monroe's name and image describe the famous actress and EMMLLC cannot exclude every competitive use of Monroe's name or image where they are used in a non-trademark manner. The First Amendment further protects AVELA's artwork. *See ETW Corp.*, 332 F.3d at 937–38 (6th Cir. 2003); *see also*

33

*Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797, 802 (Cal. 2001) (finding posters and

t-shirts "expressive works and not an advertisement for or endorsement of a product"). AVELA

and XOX's copyrights also prevent EMMLLC from using the Lanham Act as an end run around

copyright law. At the least, whether AVELA's copyrights preclude EMMLLC's claims is a

question of fact. *See A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196,

207 (S.D.N.Y. 2015) ("whatever broad rules have been discerned at the junction of trademark

and copyright law, their application in specific cases has been fact-intensive").

### 3. Unclean Hands

"Unclean hands" is recognized as a defense to a Lanham Act infringement suit where a

party "is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the

matter at issue to the detriment of the other party." *Estate of Lennon by Lennon v. Screen

Creations, Ltd.*, 939 F. Supp. 287, 293 (S.D.N.Y. 1996) (internal citations and quotation marks

omitted). EMMLLC has made false and fraudulent claims to expansive intellectual property

rights it does not own for years, to Respondents' detriment. (*See, e.g.*, SOF ¶ 324.) EMMLLC

continues to claim it owns a right of publicity in Monroe on its products and advertising,

conveying the false impression that it can control any use of Monroe through right of publicity

laws. (SOF ¶ 288.) EMMLLC claims it owns rights in Monroe's name, image, and persona under

§ 43(a) but it is legally impossible for such rights to exist. EMMLLC's registered marks falsely

suggest a connection with the deceased Monroe. (SOF ¶¶ 275-78, 289.) EMMLLC misleadingly

calls itself "The Estate of Marilyn Monroe" when it is not to covey the false impression that it is

entitled to assert Monroe's intellectual property rights. (SOF ¶¶ 284-85, 308.)

### 4. Lack of Standing/Fractured Ownership

As discussed above, EMMLLC lacks standing to assert rights in Monroe under § 43(a). Additionally, decades of fractured ownership and third party use prevent Monroe's name, likeness, image, and/or persona from performing a source-identifying function.

### 5.    No Valid Trademarks/Cancellation of Trademarks

As discussed above, EMMLLC has no valid trademarks in Monroe's name, likeness, image, and/or persona under § 43(a) as a matter of law. Additionally, EMMLLC's registered trademarks are invalid where they unlawfully suggest a connection with Monroe. The Lanham Act bars registration of a mark that falsely suggests a connection with a deceased person. 15 U.S.C. § 1052(a). Monroe has no connection to EMMLLC or EMMLLC's activities. (SOF ¶¶ 275-78, 289.) *See Buffett v. Chi-Chi's, Inc.*, 226 U.S.P.Q. 428, 429 (T.T.A.B. 1985). Monroe has no financial or ownership interest in EMMLLC's goods and/or services. *Id.*; *See In re Sloppy Joe's Int'l, Inc.*, 43 U.S.P.Q.2d 1350, 1997 WL 424966, *3 (T.T.A.B. 1997). Monroe died decades before EMMLLC or any of its "predecessors" were formed or registered or used any trademarks. Monroe has no connection with EMMLLC's goods or services.

## IV.    CONCLUSION

For each of the reasons discussed above, the MSJ must be denied.

Dated: June 29, 2018
Respectfully Submitted,
By:_____          By: /s/ Duane Harley
Gregory J. Goodheart                 Duane Harley
Alison M. Pringle
GOODHEART LAW OFFICES                D HARLEY, P.C.
*Attorneys for V International*       *Attorneys for A.V.E.L.A., Inc.,*
*Fine Arts Publishing, Inc.*          *X One X Movie Archive, Inc., and*
                                      *Leo Valencia*

35

## CERTIFICATE OF SERVICE

I, Gregory J. Goodheart, hereby certify that on June 29, 2018, I caused copies of

**RESPONDENTS A.V.E.L.A., INC., X ONE X MOVIE ARCHIVES, INC., LEO VALENCIA, AND V INTERNATIONAL FINE ARTS PUBLISHING, INC'S MEMORANDUM IN OPPOSITION TO THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES SALTER'S MOTION FOR SUMMARY JUDGMENT, AND THE DECLARATION OF GREGORY J. GOODHEART IN SUPPORT OF RESPONDENTS' OPPOSITION, ALONG WITH ALL ATTACHED EXHIBITS**, to be served via email upon the following individuals:

Gina L. Durham (*pro hac vice*)
DLA PIPER LLP (US)
P.O. Box 64807
Chicago, Illinois 60664-0807
Telephone: (415) 368-4000
Facsimile: (415) 659-7333
Gina.durham@dlapiper.com

Tamar Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Tamar.duvdevani@dlapiper.com

*Attorneys for Defendant/Counter-Plaintiff The Estate of Marilyn Monroe, LLC*

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed in West Hills, CA on this 29th day of June, 2018.

_____