**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., <br><br> Plaintiff, <br><br> -against- <br><br> THE ESTATE OF MARILYN MONROE LLC; and DOES 1 THROUGH 10, <br><br> Defendants | **SEPARATE STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** <br><br> Case No.: 12 Civ. 4828 (KPF)(JCF) <br> ECF Case <br><br> **REDACTED PUBLIC VERSION** |
| THE ESTATE OF MARILYN MONROE LLC, <br><br><br> Defendant/Counter-Plaintiff, <br><br><br> -against- <br><br> A.V.E.L.A., INC., LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V. INTERNATIONAL FINE ARTS PUBLISHING, INC., <br><br> Counter-Defendants | |
| V. INTERNATIONAL FINE ARTS PUBLISHING, INC. <br><br> Counter-Defendant/Counter-Plaintiff <br><br> -against- <br><br> THE ESTATE OF MARILYN MONROE, LLC, <br><br> Defendant/Counter-Plaintiff | |

And

AUTHENTIC BRANDS GROUP, LLC, and
JAMES SALTER

Third Party Defendants

X ONE X MOVIE ARCHIVE, INC.

Third Party Plaintiff/Counter-
Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE,
LLC,

Counter-Defendant

and

AUTHENTIC BRANDS GROUP, LLC,
JAMES SALTER, and LEONARD GREEN &
PARTNERS, L.P.

Third Party Defendants

X One X Movie Archives, Inc. ("X One X"), A.V.E.L.A., Inc. ("AVELA"), Leo

Valencia, and V International Fine Arts Publishing, Inc. ("V International") (collectively,

"Respondents") submit this Separate Statement of *Disputed* Material Facts in support of their

Opposition to the Estate of Marilyn Monroe LLC ("EMMLLC" or, to use EMMLLC's self-

proclaimed shorthand name, the "Estate"), Authentic Brands Group LLC ("ABG"), and James

Salter ("Mr. Salter") (collectively, the "Movants")'s Motion for Summary Judgment.

| MOVANTS' ALLEGED UNDISPUTED MATERIAL | RESPONSE/ FACTS SHOWING A DISPUTE | SUPPORTING EVIDENCE |
|---|---|---|

| FACTS | | |
|---|---|---|
| **PROCEDURAL HISTORY** | | |
| 1. This action commenced on June 20, 2012 when A.V.E.L.A. Inc. ("AVELA") filed a complaint seeking declaratory judgment affirming that its products bearing the image and name of Marilyn Monroe did not infringe the Estate's intellectual property. (Dkt. No. 1). | 1. Respondents do not dispute that AVELA filed its complaint but dispute that AVELA's products bear Marilyn Monroe's full name. | |
| 2. On August 31, 2012, the Estate filed an answer and counterclaims against AVELA and Leo Valencia ("Valencia"), (Dkt. No. 5), AVELA filed an answer to the counterclaims on September 26, 2012 (Dkt. No. 8), and Valencia filed an answer on September 11, 2013 (Dkt. No. 39). | 2. Undisputed. | |
| 3. On January 17, 2014, AVELA and Bioworld Merchandising, Inc. ("Bioworld"), entered a stipulation, with prejudice, of voluntary dismissal the action against Bioworld only. (Dkt. No. 59). after Eric Silver, the President of Silver Buffalo, a licensee of AVELA, testified that he did not believe he had ever told Leo Valencia that the Estate had ever threatened any of Silver Buffalo's retailers and that he could not recall any conversations with Mr. Valencia regarding the Estate's licensee Bioworld Merchandising. Declaration of Gina L. Durham in Support of the Estate of Marilyn Monroe LL, Authentic Brands Group, LLC, and James Salter's Motion for Summary Judgment ("Durham Decl."), Ex. M ("Eric Silver Depo.") at 55:8-11; 253:23-254:2. | 3. Undisputed. Respondents note that page 55 of Eric Silver's Deposition is not included in Exhibit M. | |
| 4. On January 24, 2014, the Court granted Attorney Melissa W. Woo's motion to withdraw as counsel for AVELA and Leo Valencia. (Dkt. No. 65). | 4. Undisputed. | |
| 5. On February 2, 2014, the Court | 5. Undisputed. Respondents note | |

| | | |
|---|---|---|
| granted the Estate's motion for sanctions, (i) granting additional time to depose Leo Valencia, (ii) extending the deadline to disclose expert testimony, (iii) requiring the AVELA and Leo Valencia to pay the costs and fees associated with litigating the Motion to for Sanctions and Motion to Compel, and (iv) ordering the AVELA and Leo Valencia to produce additional financial information it previously withheld - including a complete list of financial institutions at which AVELA or Leo Valencia maintained an account, the underlying financial documentation supporting their balance and profit and loss statements, including legible copies of checks from AVELA to V. International Fine Arts Publishing, Inc. ("VIFA") - as well as documentation supporting their claims of intellectual property ownership in Marilyn Monroe images. (Dkt. No. 79). | that all cited discovery has since been produced. | |
| 6. On February 4, 2014, the Estate sought leave to file its First Amended Counterclaim (Dkt. No. 72), and over Valencia's and AVELA's objections, the Estate's motion was granted, thereby adding IPL, Inc. ("IPL"), X One X Movie Archives Inc. ("XOX"), and VIFA to the action - AVELA, IPL, XOX, and VIFA, and herein referred to as the "AVELA Parties." (Dkt. No. 131). | 6. Undisputed. | |
| 7. On March 10, 2014, the Court granted Attorney Philip R. Berwish's and Attorney Erach F. Screwvala's motions to withdraw as counsel for the AVELA Parties. (Dkt. No. 94) | 7. Undisputed. | |
| 8. On July 29, 2014, the Estate filed its First Amended Counterclaim (Dkt. No. 133) | 8. Undisputed. | |
| 9. Subsequently, the Estate formally served the Amended Counterclaim on IPL on August 15, 2014 and August 20 2014. (Dkt No. 148). | 9. Respondents do not dispute that EMMLLC filed proof of service on IPL. | |

| | | |
|---|---|---|
| 10. After IPL's failure to respond, the Estate sought an entry of default against IPL on September 23, 2014. (Dkt. 169). | 10. Undisputed. | |
| 11. Meanwhile, AVELA and Valencia proceeded to file answers to the First Amended Counterclaim on September 22, 2014. (Dkt. No. 168). | 11. Undisputed. | |
| 12. On December 4 and 5, 2014, VIFA and XOX moved to dismiss all of the claims in the First Amended Counterclaim. (Dkt. Nos. 193, 198). | 12. Undisputed. | |
| 13. Then, on December 31, 2014, the Court dismissed with prejudice the Estate's Sixth Cause of Action in the Counterclaim—Tortious Interference with Existing Contractual Relationship—as against AVELA, Leo Valencia, XOX, and VIFA. (Dkt. No. 199). | 13. Undisputed | |
| 14. On September 18, 2015, the Court granted XOX's motion to dismiss the Estate's claim for deceptive business practices as well as VIFA's motion to dismiss the Estate's claim for alter-ego liability. XOX's and VIFA's remaining motions to dismiss were denied. In dismissing XOX's and VIFA's motion to dismiss the Estate's claim of False Association under 15 U.S.C. § 1125(a), the Court noted that motion conflated right publicity with false endorsement. (Dkt. No. 215). | 14. Undisputed. | |
| 15. XOX and VIFA filed answers and counterclaims to the First Amended Counterclaim on October 30, 2015. (Dkt. Nos. 219, 223). | 15. Undisputed. | |
| 16. XOX filed an amended answer to the First Amended Counterclaim on March 31, 2016. (Dkt. No. 257). | 16. Undisputed. | |
| 17. On March 13, 2017, the Court granted the Estate's motion to dismiss VIFA's fourth, fifth, and sixth counterclaims and XOX's third, fourth, fifth, sixth and seventh counterclaims, without prejudice. (Dkt. No. 279). | 17. Undisputed. | |
| 18. In response, on March 27, 2017, | 18. Disputed. Dkt Nos. 280 and | Dkt. Nos. 280, |

| | | |
|---|---|---|
| the Estate filed answers to XOX's and VIFA's counterclaims. (Dkt. Nos. 280, 281). | 281 reflect that EMMLLC, ABG, and Salter filed answers. | 281. |
| 19. On April 3 and April 4, 2017, respectively, VIFA and XOX, filed their First Amended Counterclaims against the Estate. (Dkt. Nos. 282, 284). | 19. Undisputed. | |
| 20. On August 31, 2017, the Court granted Attorney Michel R. Adele's motion to withdraw as counsel of Record for AVELA, XOX, and Leo Valencia. (Dkt. No. 308). | 20. Undisputed | |
| 21. And on March 5, 2018, the Court granted the Estate's partial motion to dismiss, which dismissed the following claims asserted by VIFA and XOX against the Estate Movant: (i) alter ego (ii) violations of New York General Business Law § 349; (iii) trademark cancellation; as well as (iv) VIFA's claim of tortious interference with contract between VIFA and Freeze and Silver Buffalo respectively. (Dkt. No. 325). | 21. Disputed. The Court did not dismiss VIFA and XOX's claims for trademark cancellation against EMMLLC. | Dkt. 325 at 22. |
| 22. The Estate Movants now move for summary judgment on the following claims: (1) Counts I, II, III, IV, VII of the Estate's First Amended Complaint (Dkt. No. 133) ; (2) Counts II, III, V, and VI of AVELA's Complaint (Dkt. No. 1) ; (3) Counts I, II, and V of the First Amended Counterclaims of VIFA (Dkt. No. 282); and (4) Counts I and II of the Second Amended Counterclaims of XOX (Dkt. No. 284). | 22. Undisputed. | |
| **FACTS: THE "ESTATE"** | | |
| 23. The Estate is a brand development, marketing, and entertainment company that maintains an exclusive portfolio of intellectual property rights related to Marilyn Monroe. See Durham Decl., Ex. I ("Jamie Salter Depo. 11/8/2013") at 4:24 to 17:20. | 23. Disputed. EMMLLC's purported common law intellectual property rights in Monroe do not exist. EMMLLC's registered marks in Monroe are invalid. Countless other entities hold and have held trademarks related to Monroe. Anna Strasberg retains certain intellectual property rights related to Monroe. The evidence cited also | Goodheart Decl. ¶ 4, Exhibit B, Nick Woodhouse Depo. at 49:22-54:5; *see also* Dkt. 371 Exhibits D-G. |

| | amounts to a legal conclusion inappropriate for inclusion in a statement of facts. | |
|---|---|---|
| 24. The Estate, formerly named MM-ABG, LLC, a wholly-owned subsidiary of ABG, acquired a controlling interest of Marilyn Monroe LLC, including her name, likeness, voice, and rights of publicity in an Asset Purchase Agreement dated December 30, 2010 from Marilyn Monroe LLC. Declaration of Kevin Clarke in Support of the Estate of Marilyn Monroe LLC, Authentic Brands Group, LLC and James Salter's Motion for Summary Judgment ("Clarke Decl.") at ¶ 4. | 24. Disputed. The evidence cited does not support the fact asserted. Monroe's right of publicity never existed and EMMLLC could not have acquired such a right. EMMLLC could not have acquired Monroe's "name, likeness, and voice" because such rights in Monroe do not exist. Respondents further object that the evidence cited lacks foundation and amounts to mere opinion testimony from one of EMMLLC's own employees. | |
| 25. The Estate is the guardian of Marilyn Monroe's legacy and her persona, which requires the Estate to ensure that Marilyn Monroe's image and likeness is only used on products and in connection with services that capture her essence - namely, products and services that promote femininity and sophistication. See Durham Decl., Ex. H ("Katie Jones Depo. 11/8/2013") at 7:5-9; 18:13-22; Durham Decl., Ex. V ("Katie Jones Depo. 7/19/2017") 29:4-11, 29:19 to 30:1. | 25. Disputed. The evidence cited does not support the facts stated. Monroe did not authorize EMMLLC, or anyone for that matter, to be the "guardian" of her legacy or persona. None of Monroe's beneficiaries authorized EMMLLC, or anyone for that matter, to be the "guardian" of her legacy or persona. EMMLLC cites no evidence indicating Monroe required EMMLLC, or anyone for that matter, to ensure her image and likeness were used in any particular way, let alone in ways that "capture her essence." | Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8. |
| 26. Marilyn Monroe is a brand, as opposed to Norma Jean, the woman behind the name/brand. See Durham Decl., Ex. BB ("Jamie Salter Depo. 8/23/2017") at 22:2-8. | 26. Disputed. The evidence cited does not support the facts stated. This amounts to a nonsensical legal conclusion inappropriate for inclusion in a statement of undisputed facts. | |
| **Chain of Title of Intellectual Property Rights Related to Marilyn Monroe** | | |
| 27. In her will, Marilyn Monroe bequeathed 75% of "the rest, residue and remainder of [her] estate, both real and personal" to Lee Strasberg, her close friend and long-time acting teacher, which passed to Mr. Strasberg at Ms. Monroe's death in 1962. Clarke Decl., Ex. A, Declaration of Anna | 27. Undisputed, though Respondents dispute that Monroe bequeathed any intellectual property rights. | |

| | | |
|---|---|---|
| Strasberg ("Strasberg Decl.") at ¶ 3. | | |
| 28. These assets later passed to Anna Strasberg at Mr. Strasberg's death in 1982. Strasberg Decl. at ¶¶ 5, 7. | 28. Disputed. The evidence cited does not support the fact asserted. Respondents dispute that any such assets included any intellectual property rights. The declaration from Ms. Strasberg lacks foundation, does not establish that Lee Strasberg's will passed down any intellectual property rights, and does not establish that Marilyn Monroe passed down any intellectual property rights to Mr. Strasberg. Neither Monroe nor Lee Strasberg's will mention any intellectual property rights. Dkt. 339-1, Exhibit A to Clarke Decl., at 6-21. | Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights). |
| 29. The remaining 25% "rest, residue and remainder" was bequeathed in her Will to Marianna Kris, the late actress's psychiatrist who passed her portion to the Anna Freud Centre when she died in 1980. See Strasberg Decl., Ex. A at p. 3 Clarke Decl. at ¶8. | 29. Disputed. The evidence cited does not support the fact asserted. Respondents dispute that any such assets included any intellectual property rights. The declaration from Ms. Strasberg lacks foundation, does not establish that Marilyn Monroe passed down any intellectual property rights to Marianne Kris, and does not establish that Marianne Kris passed down any intellectual property rights to the Anna Freud Centre. | Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights). |
| 30. In 1989, the New York Surrogate Court appointed Anna Strasberg as Administratrix of the Monroe Estate, which remained open until 2001. Strasberg Decl. at ¶8. | 30. Undisputed. | |
| 31. In June 2001, the Surrogate Court authorized Anna Strasberg to transfer all remaining assets of the Estate of the late actress to Marilyn Monroe LLC, a Delaware limited liability company formed to hold and manage the intellectual property assets of the late actress. Strasberg Decl. at ¶8. | 31. Disputed. The evidence cited does not support the fact cited. The document Ms. Strasberg cites does not make any mention of intellectual property rights, there is no evidence the Surrogate Court authorized Marilyn Monroe LLC to hold and manage Monroe's intellectual property rights. See Exhibit A to Clarke Decl. at 3, 23-26. | Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights). |

| The "Estate's" Business | | |
|---|---|---|
| 32. The Estate strives to promote Marilyn Monroe as she would have marketed herself when she was alive. See Jamie Salter Depo. 8/23/2017 at 89:1-24. | 32. Disputed. The evidence cited does not support the fact asserted. There is no evidence cited as to Monroe's intent as to intellectual property rights, or that Monroe authorized EMMLLC, anyone, to market her in any manner. The evidence cited does not establish that Monroe ever served as a trademark indicating a source of goods or services. | Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8. |
| 33. To do so, the Estate maintains the exclusive right to use Marilyn Monroe's name, image, and likeness. See Durham Decl., Ex. G ("Kevin Clarke Depo.") at 46:23 to 47:13. | 33. Disputed. The evidence cited does not support the fact asserted. Anna Strasberg retains rights in Monroe's name, image, and likeness. Other third parties own rights to use Monroe's name, image, and likeness. Countless entities have used Monroe's name, image and likeness in commerce from the 1950s to the present. Monroe did not pass down any intellectual property rights or authorize EMMLLC or anyone to use her name, image, and likeness. Monroe did not make trademark use of her name, image, and likeness during her lifetime. EMMLLC is not Monroe's heirs, family, or actual estate. Rights under 15 U.S.C. §1125 did not exist until decades after Monroe's death. Respondents dispute this evidence to the extent that it is premised on a legal conclusion. Respondents further object that the evidence cited lacks foundation and amounts to mere opinion testimony from one of EMMLLC's own employees. | Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8; Goodheart Decl. ¶ 4, Exhibit B, Nick Woodhouse Depo. at 49:22-54:5; Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights); Exhibit C at 15 (EMMLLC's predecessors did not own any rights of publicity, association, sponsorship and/or endorsement in Monroe; *see also* Dkt. 371 Exhibits D-G. |
| 34. When licensing the right to use a celebrity image like Marilyn Monroe, the use of that image provides an implicit endorsement of the product by that celebrity. Therefore, the Estate must ensure that the product or service | 34. Disputed. The evidence cited does not support the fact asserted and amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. The evidence cited does not establish | Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8; See also Durham Decl. Exhibit P |

| | | |
|---|---|---|
| endorsed corresponds with Marilyn Monroe's public image. See Kevin Clarke Depo. at 45:9 to 46:3; see also Jamie Salter Depo. 8/23/2017 at 89:1-24. | Monroe gave EMMLLC, or anyone for that matter, any guidelines for how she wanted her name or image used. | (AVELA's expert found 0% likelihood of confusion regarding AVELA's use of Monroe's image. |
| 35. The Estate requires licensees to send proposed products for approval before manufacture and sale in order to ensure that the proposed product follows the Estate's guidelines for using the Marilyn Monroe name and/or her image. See Jamie Salter Depo. 11/8/2013 at 22:21 to 23:11. | 35. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness. The evidence cited does not establish Monroe gave EMMLLC, or anyone for that matter, any guidelines for how she wanted her name or image used. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 36. To further protect the Marilyn Monroe brand, the Estate performs various quality control checks, which include going into stores to see how its licensees' products are placed and marketed. See Kate Jones Depo. 11/8/13 at 88:10-21, 90:5-17, 93:10-16; Durham Decl., Ex. T ("Katie Jones Depo. 4/29/14") at 85:7 to 86:23, 88:5-17, 89:5-11. | 36. Disputed. The evidence cited does not support the fact asserted. This testimony does not establish that "Marilyn Monroe" is a valid "brand" and purports to assert a legal conclusion inappropriate for inclusion in a statement of undisputed facts. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 37. Upon learning of unauthorized use or improper use of the Marilyn Monroe brand, the Estate sends correspondence to the relevant company/individual demanding they cease such use. Clarke Decl. at ¶11; see also Katie Jones Depo. 11/8/2013 at 104:4 to 110:12. | 37. Respondents dispute that "Marilyn Monroe" is a valid brand. Respondents further dispute that EMMLLC holds any rights to police Monroe's intellectual property rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 38. The Estate targets a wide market—including individuals ranging in age from 13 to 75 years old and consumers who shop at Walmart as well as those who purchase designer Dolce & Gabbana products. See Katie Jones Depo. 11/8/13 at 72:11-73:2; see also Katie Jones Depo. 4/29/14 at 118:23 to 120:22; see also Jamie Salter Depo. 8/23/2017 at 54:9-17. | 38. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 39. In doing so, the Estate has executed licensing deals with many well-known companies throughout the | 39. Respondents dispute that EMMLLC has valid rights in Monroe's name, image, or likeness | See evidence cited in SOF ¶ 33 demonstrating no |

| | | |
|---|---|---|
| years, including Chanel, Sexy Hair Concepts, Christian Dior, Nike, Macy's, Uniqlo, Dolce & Gabbana, Max Factor, Li & Fung, Citibank, Amazon, Calvin Klein, Mars, Inc., Apple, Salvatore Ferragamo, Judith Leiber, the Metropolitan Museum of Art, Jeep, New Era, America's Next Top Model, Chrysler, Three Olives Vodka, Burton, Comic Relief, and Coca-Cola for the use of Marilyn Monroe's name, image, and likeness. See Kevin Clarke Depo. at 46:4-22; see also Katie Jones Depo. 11/8/13 at 55:4-6, 70:7-11, 71:16-22; Katie Jones Depo. 4/29/14 at 49:19 to 50:14, 70:3-16; Katie Jones Depo. 7/19/17 at 176:24 to 177:20; Jamie Salter Depo. 8/23/2017 at 55:11-17; Durham Decl., Ex. CC at ABG0004568-70. | and the evidence cited does not establish any such rights. Furthermore, EMMLLC's license agreements are premised on nonexistent and invalid rights. | valid rights in Monroe's name or image, or likeness. |
| 40. The Estate's licensees sell into various retail channels including Forever 21, Wet Seal, Target, Vandor, Neiman Marcus, H & M, Macy's, Forever 21, Bergdorf Goodman, Saks Fifth Avenue, Dillard's, Nordstrom and Spencer's Gifts. See Katie Jones Depo. 4/29/14 at 56:24 to 57:2, 57:21-22, 59:6-12; Durham Decl., Ex. CC at ABG0004570. | 40. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. Furthermore, EMMLLC's license agreements are premised on nonexistent and invalid rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 41. Through the aforementioned license agreements, the Estate has authorized the use of Marilyn Monroe's name and likeness in the connection with the following products and services: Diaries Mugs Women's footwear Unisex flip-flops Unisex slippers Rugs Floor mats Café and restaurant services Jewelry Clocks Rubber/silicone bracelets Broaches | 41. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. Furthermore, EMMLLC's license agreements are premised on nonexistent and invalid rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |

| | | |
|---|---|---|
| Charms<br>Diamond substitute jewelry<br>Gemstone jewelry<br>Thread jewelry<br>Watches<br>Jewelry boxes<br>Contests/sweepstakes<br>Electronic game services<br>At-home shopping television show<br>Casino gambling<br>Luggage<br>Handbags<br>Wallets<br>Key cases<br>Bathrobes<br>Bathing suits<br>Belts<br>Hats<br>Boots<br>Intimate women's apparel<br>Gloves<br>Corsets<br>Dressing Gowns<br>Jackets<br>Leggings<br>Pajamas<br>Pants<br>Petticoats<br>Scarves<br>Shirts<br>Skirts<br>Socks<br>Suits<br>Sweaters<br>T-shirts<br>Vests<br>Eyewear<br>Gift bags<br>Towels<br>Porcelain dolls<br>Wine<br>Figurines<br>Stamps<br>Perfume<br>Posters<br>Greeting cards<br><br>*See* Katie Jones Depo. 11/8/2013 at | | |

| | | |
|---|---|---|
| 41:19 to 55:19. | | |
| 42. The Estate's licensees' invest heavily in advertising the Marilyn Monroe brand. The Estate has signed $8 million worth of contracts for Marilyn Monroe and its licensees have spent over $100 million on advertising. See Kevin Clarke Depo. at 41:17 to 42:19. | 42. Respondents dispute the evidence to the extent that it does not establish any such advertising directs consumers to Monroe as an indication of source. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. Respondents dispute that "Marilyn Monroe" is a valid brand. Furthermore, EMMLLC's license agreements are premised on nonexistent and invalid rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 43. The Estate's licensees generated several millions of dollars in revenue between 2011 and 2013 from their use of the Estate's Marilyn Monroe properties. See Kevin Clarke Depo. at 115:2 to 116:10. | 43. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. EMMLLC's license agreements are premised on nonexistent and invalid rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 44. As part of its marketing efforts, the Estate attends licensing trade shows including Licensing Show, Magic, and Toy Fair, to promote its Marilyn Monroe catalog of rights. See Katie Jones Depo. 4/29/14 at 98:19-24. | 44. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 45. The Estate also operates social media accounts to promote the Marilyn Monroe brand including Facebook, Twitter, Instagram, and Pinterest accounts each having thousands of followers. See Durham Decl., Ex. CC at ABG0004571. | 45. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. Respondents also dispute that "Marilyn Monroe" is a valid brand. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 46. Furthermore, the Estate offers a free mobile application available for download on the Apple App Store, called "Marilyn Moments." Durham Decl., Ex. CC at ABG004574. | 46. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited does not establish any such rights. | See evidence cited in SOF ¶ 33 demonstrating no valid rights in Monroe's name or image, or likeness. |
| 47. The Estate also owns and operates the domain name <www.marilynmonroe.com> Clarke Decl. at ¶12. | 47. Respondents dispute that EMMLLC has valid rights in Monroe's name or image, or likeness and the evidence cited | See evidence cited in SOF ¶ 33 demonstrating no valid rights in |

|  | does not establish any such rights. Furthermore, this domain name is premised on nonexistent and invalid rights and falsely suggests a connection between Marilyn Monroe and EMMLLC. | Monroe's name or image, or likeness. |
|---|---|---|
| **The Trademarks** | | |
| 48. The Estate owns and controls 12 separate U.S. trademark registrations and 5 U.S. pending trademark applications related to Marilyn Monroe, and a schedule of which is annexed to the Clarke Decl. as Exhibit B (the "MONROE Marks"). Clarke Decl. at ¶13. | 48. Disputed. Respondents do not dispute that these trademark applications and registrations exist, but dispute that such trademarks are valid where the marks are subject to cancellation where they are generic, functional, and falsely suggest a connection with the deceased Marilyn Monroe. Monroe's did not register any trademarks and no trademarks were part of her estate. | Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8; Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights); Goodheart Decl. Exhibit K |
| 49. Among the MONROE Marks is Registration No. 1,509,758 for the Marilyn Monroe signature design mark in International Classes 3, 14, 16, and 25. | 49. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 50. That 1,509,758 mark has a first use in commerce date of January 1983 for Class 25, November 1983 for Classes 3 and 14, and December 1983 for Class 16. | 50. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 51. The 1,509,758 mark covers "perfume," in Class 3, "watches" in Class 14, "posters and greeting cards" in Class 16, and "panties and dresses" in Class 25. | 51. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 52. A true and correct copy of the registration certificate for the 1,509,758 mark is annexed as Exhibit C to the Clarke Decl.. Clarke Decl. at ¶14. | 52. Undisputed. | |
| 53. Another of the MONROE Marks | 53. Respondents do not dispute that | See evidence |

| | | |
|---|---|---|
| is Registration No. 1,889,730 for the Marilyn Monroe signature design mark in International Classes 9, 16, 21, 24, 28, 33, 35. | this mark exists but dispute that this is a valid mark. | cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 54. That 1,889,730 mark has a first use in commerce date of April 1, 1986 for Class 35, November 16, 2987 for Class 33, December 1988 for Class 24, September 1989 for Class 9, June 1989 for Class 16, June 15, 1990 for Class 21, and July 1990 for Class 28. | 54. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 55. The 1,889,730 mark covers "eyewear, namely eyeglasses, sunglasses, and frames therefor," in Class 9, "gift bags and calendars" in Class 16, "collector plates" in Class 21, "towels" in Class 24, "porcelain dolls" in Class 28, "wine" in Class 33, and "historical figure licensing services" in Class 35. | 55. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 56. A true and correct copy of the registration certificate for the 1,889,730 mark is annexed as Exhibit D to the Clarke Decl. Clarke Decl. at ¶15. | 56. Undisputed. | |
| 57. Another of the MONROE Marks is Registration No. 2,180,950 for the word mark MARILYN MONROE, in International Class 16. | 57. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 58. That 2,180,950 mark has a first use in commerce date of June 1, 1995. | 58. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 59. The 2,180,950 mark covers "stamps and philatelic goods, namely, commemorative stamp panels" in Class 16. | 59. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |

| | | |
|---|---|---|
| 60. A true and correct copy of the registration certificate for the 2,180,950 mark is annexed as Exhibit E to the Clarke Decl. Clarke Decl. ¶16. | 60. Undisputed. | |
| 61. Another of the MONROE Marks is Registration No. 2,223,599 for the word mark MARILYN MONROE, in International Class 25. | 61. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 62. That 2,223,599 mark has a first use in commerce date of October 15, 1995. | 62. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 63. The 2,223,599 mark covers "clothing, namely, bath robes, belts, berets, brassieres, camisoles, caps, coats, corselets, corsets, dressing gowns, pajamas, pants, sandals, scarves, shirts, skirts, slips, socks, sweaters, teddies, T-shirts, underclothing, underpants, and underwear" in Class 25. | 63. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 64. A true and correct copy of the registration certificate for the 2,223,599 mark is annexed as Exhibit F to the Clarke Decl. Clarke Decl. ¶17. | 64. Undisputed. | |
| 65. Another of the MONROE Marks is Registration No. 2,985,935 for the word mark MARILYN MONROE, in International Class 18. | 65. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 66. That 2,985,935 mark has a first use in commerce date of January 1, 2005. | 66. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 67. The 2,985,935 mark covers "Leather and imitations of leather, and | 67. Respondents do not dispute that this mark exists but dispute that this | See evidence cited in SOF ¶ 48 |

| | | |
|---|---|---|
| goods made of these materials and not included in other classes, namely hand luggage, suitcases, trunks, hat boxes, wardrobe cases, hand bags, wallets; travel ware, namely attaché cases, briefcase-type portfolios, key cases, travel kit bags sold empty, shopping bags made of leather, pocketbooks and purses" in Class 18. | is a valid mark. | demonstrating this Registration is invalid and subject to cancellation. |
| 68. A true and correct copy of the registration certificate for the 2,985,935 mark is annexed as Exhibit G to the Clarke Decl. Clarke Decl. at ¶18. | 68. Undisputed. | |
| 69. Another of the MONROE Marks is Registration No. 4,040,943 for the word mark MARILYN, in International Class 33. | 69. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 70. That 4,040,943 mark has a first use in commerce date of 1987. | 70. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 71. The 4,040,943 mark covers "wines" in Class 33. | 71. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 72. A true and correct copy of the registration certificate for the 4,040,943 mark is annexed as Exhibit H to the Clarke Decl. Clarke Decl. at ¶19. | 72. Undisputed. | |
| 73. Another of the MONROE Marks is Registration No. 4,419,275 for the word mark MARILYN MONROE, in International Class 14. | 73. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 74. That 4,419,275 mark has a first use | 74. Respondents do not dispute that | See evidence |

| | | |
|---|---|---|
| in commerce date of October 10, 2012. | this mark exists but dispute that this is a valid mark. | cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 75. The 4,419,275 mark covers "Jewelry; clocks; lapel pins; and rubber or silicon bracelets" in Class 14. | 75. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 76. A true and correct copy of the registration certificate for the 4,419,275 mark is annexed as Exhibit I to the Clarke Decl. Clarke Decl. ¶20. | 76. Undisputed. | |
| 77. Another of the MONROE Marks is Registration No. 4,336,364 for the word mark MARILYN MONROE, in International Class 14. | 77. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 78. That 4,336,364 mark has a first use in commerce date of January 1983. | 78. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 79. The 4,336,364 mark covers "Bracelets; Broaches; Bronze jewelry; Charms; Charms for collar jewelry and bracelet; Costume jewelry; Diamond jewelry; Gemstone jewelry; Gold thread jewelry; Hair jewelry in the nature of jewelry for use in the hair; Inexpensive non- jewelry watches; Jewelry; Jewelry and imitation jewelry; Jewelry boxes; Jewelry cases; Jewelry watches; Lapel pins; Rings; Watches and jewelry; Watches, clocks, jewelry and imitation jewelry" in Class 14. | 79. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 80. A true and correct copy of the registration certificate for the 4,336,364 mark is annexed as Exhibit | 80. Undisputed. | |

| | | |
|---|---|---|
| J to the Clarke Decl. Clarke Decl. at ¶21. | | |
| 81. Another of the MONROE Marks is Registration No. 4,487,210 for the word mark MARILYN MONROE, in International Class 41. | 81. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 82. That 4,487,210 mark has a first use in commerce date of November 18, 2009. | 82. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 83. The 4,487,210 mark covers "Arranging of contests and sweepstakes; Electronic games services provided by means of the internet; Entertainment services in the nature of on-line competitions in the field of entertainment, culture, and other non-business and non-commercial fields; Entertainment information services, namely, providing information and news releases about a historical figure; Entertainment services, namely, providing online electronic games, online casino gaming, conducting contests and competitions for giveaways, providing a website featuring non-downloadable photographs, providing information by means of a global computer network in the fields of celebrities, entertainment, and popular culture; Gaming and gambling services in the nature of casino gaming; Providing a web site featuring information on historic figures; Providing entertainment information and updates via a website; Providing information, news and commentary in the field of current events relating to historical figures; Providing online newsletters in the field of entertainment, historical | 83. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |

| | | |
|---|---|---|
| figures and pop culture via e-mail; Publication of printed matter, namely, newsletters" in Class 41. | | |
| 84. A true and correct copy of the registration certificate for the 4,487,210 mark is annexed as Exhibit K to the Clarke Decl. Clarke Decl. at ¶22. | 84. Undisputed. | |
| 85. Another of the MONROE Marks is Registration No. 4,487,208 for the word mark MARILYN MONROE, in International Class 35. | 85. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 86. That 4,487,208 mark has a first use in commerce date of July 14, 1998. | 86. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 87. The 4,487,208 mark covers "Advertising and marketing services, namely, promoting the goods and services of others; Advertising and publicity services, namely, promoting the goods, services, brand identity and commercial information and news of third parties through print, digital and on-line medium; Advertising, including promotion of products and services of third parties through license agreements; Affiliate marketing; Concept and brand development in the icon and luxury industries; Development of marketing strategies, concepts and tactics, namely, brand development; Promoting the goods and services of others by arranging for businesses to affiliate their goods and services with a famous historical figure; Promoting the goods and services of others by means of distributing advertising on the Internet; Promoting the goods and services of others by providing a website featuring links to the retail | 87. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |

| | | |
|---|---|---|
| websites of others; Promoting the goods and services of others via an e-newsletter; Promoting visual events by means of providing information about art, artists and arts events via an internet web site, all for promotional purposes; Providing business information via electronic newsletter; Providing home shopping services in the field of jewelry by means of television and the internet" in Class 35. | | |
| 88. A true and correct copy of the registration certificate for the 4,487,208 mark is annexed as Exhibit L to the Clarke Decl. Clarke Decl. at ¶23. | 88. Undisputed. | |
| 89. Another of the MONROE Marks is Registration No. 4,511,420 for the word mark MARILYN MONROE, in International Class 44. | 89. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 90. That 4,511,420 mark has a first use in commerce date of October 4, 2013. | 90. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 91. The 4,511,420 mark covers "Health spa services, namely, massage, facial, hair and body treatments; manicure and pedicure services; day spa services featuring massage, skin care, hair care, spa treatments, body wraps, baths, manicures, pedicures and nail enhancements; cosmetic skin care services; cosmetic body care services; providing information about beauty" in Class 44. | 91. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 92. A true and correct copy of the registration certificate for the 4,511,420 mark is annexed as Exhibit M to the Clarke Decl. Clarke Decl. at ¶24. | 92. Undisputed. | |

| | | |
|---|---|---|
| 93. Another of the MONROE Marks is Registration No. 4,743,834 for the word mark MARILYN MONROE, in International Class 21. | 93. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 94. That 4,743,834 mark has a first use in commerce date of January 1, 2012. | 94. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 95. The 4,743,834 mark covers "porcelain mugs" in Class 16. | 95. Respondents do not dispute that this mark exists but dispute that this is a valid mark. | See evidence cited in SOF ¶ 48 demonstrating this Registration is invalid and subject to cancellation. |
| 96. A true and correct copy of the registration certificate for the 4,743,834 mark is annexed as Exhibit N to the Clarke Decl. Clarke Decl. at ¶25.Registration Nos. 1,509,758; 1,889,730; 2,180,950; and 2,223,599 are incontestable. Clarke Decl. at ¶26. | 96. Respondents do not dispute that this mark exists but dispute that these are valid marks. | See evidence cited in SOF ¶ 48 demonstrating these Registrations are invalid and subject to cancellation. |
| 97. Pursuant to 15 U.S.C. §1115(b), such incontestable registrations provide conclusive evidence of the validity of the MONROE Marks and of the registrations for those MONROE Marks, of the Estate's ownership of those MONROE Marks, and of the Estate's exclusive rights to use those MONROE Marks in commerce on or in connection with the goods or services specified within such registrations. 15 U.S.C. §1115(b) | 97. Disputed. This fact amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. Respondents dispute that the "MONROE Marks" are valid, that EMMLLC owns these marks, and that EMMLLC has exclusive rights to use these marks in commerce. | See evidence cited in SOF ¶ 48 demonstrating these Registrations are invalid and subject to cancellation. |
| 98. The AVELA Parties did not challenge Registration Nos. 1,509,758; 1,889,730; 2,180,950; and 2,223,599 before they became incontestable. Clarke Decl. at ¶ 27. | 98. Respondents dispute that Registration Nos. 1,509,758; 1,889,730; 2,180,950; and 2,223,599 are valid marks as these marks are subject to cancellation. | See evidence cited in SOF ¶ 48 demonstrating these Registrations are invalid and subject to |

| | | cancellation. |
|---|---|---|
| 99. The Estate also holds substantial common law rights in the MARILYN, MARILYN MONROE word marks, Marilyn Monroe signature design marks Clarke Decl. at ¶28. | 99. Disputed. This fact amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. Respondents dispute that EMMLLC holds common law rights in the MARILYN, MARILYN MONROE word marks, and Marilyn Monroe signature design marks. The evidence cited does not support the fact asserted. A conclusory statement by EMMLLC's own employee does not amount to a legal basis for common law rights in a mark. Respondents further object that the evidence cited lacks foundation and amounts to mere opinion testimony from one of EMMLLC's own employees. | See evidence cited in SOF ¶¶ 33, 48 demonstrating these "marks" are invalid and subject to cancellation. |
| 100. The AVELA Parties are not and never have (i) been owners of the Marilyn Trademarks, (ii) licensees of the Marilyn Trademarks, or (iii) ever sought or obtained permission from the Estate to use the Marilyn Trademarks. Clarke Decl. at ¶¶30, 31. | 100. Undisputed. Respondents do not concede that the "Marilyn Trademarks" are valid or that permission from EMMLLC is required to use Monroe's name and image on products. | See evidence cited in SOF ¶¶ 33, 48 demonstrating these "trademarks" are invalid and subject to cancellation. |
| **VALENCIA, AVELA, VIFA, XOX, AND IPL: AVELA** | | |
| 101. AVELA is a Nevada corporation with a primary place of business in California. (Dkt. No. 168, ¶3). | 101. Undisputed. | |
| 102. Leo Valencia holds the position of President, Secretary, Treasurer, and Director of AVELA and is AVELA's sole employee. See Durham Decl., Ex. EE at AVELA 6322-3; see also Durham Decl., Ex. C ("Leo Valencia Depo. 9/30/2013") at 14-25. | 102. Undisputed. | |
| 103. AVELA has never had another employee besides Leo Valencia. See Durham Decl., Ex. D ("Leo Valencia Depo. 10/1/2013") at 155:12-18. | 103. Undisputed. | |
| 104. AVELA receives mail at 2647 | 104. Undisputed. | |

| | | |
|---|---|---|
| Gateway Road, Carlsbad, CA 92009. Leo Valencia Depo. 9/30/2013 at 12:5 to 13:3. | | |
| 105. When the Estate's counsel confronted Leo Valencia with the fact that there is no office space at 2647 Gateway Road, Carlsbad, CA 92009, Mr. Valencia refused to provide an address, claiming that it would impair his personal safety because of all the lawsuits he is involved in. Durham Decl., Ex. Y ("Leo Valencia Depo. 8/9/2017") at 145:10 to 147:15. | 105. Undisputed. | |
| 106. AVELA maintains two bank accounts - one with Citibank and another with Bank of America. See Leo Valencia Depo. 9/30/2013 at 10:20 to 24:25. | 106. Undisputed. Respondents note that the relevant testimony is actually on Page 24:5-25. | |
| 107. However, AVELA does not maintain a general ledger and has not filed a tax return since 2004-2005. See Leo Valencia Depo. 9/30/2013 at 140:5-25. | 107. Undisputed. | |
| 108. AVELA keeps its receipts in Ziplocs and boxes at Leo Valencia's home. See Leo Valencia Depo. 9/30/2013 at 144:9-22. | 108. Undisputed. | |
| 109. AVELA also does not use accounting software. See Leo Valencia Depo. 9/30/2013 at 145:20-22. | 109. Undisputed. | |
| 110. Leo Valencia has used personal credits cards to pay AVELA's expenses. See Leo Valencia Depo. 9/30/2013 at 144:3-8. | 110. Undisputed. | |
| 111. As AVELA's sole employee, Leo Valencia "crunches the numbers" and prepares financial statements for AVELA. See Leo Valencia Depo. 9/30/2013 at 134:23 to 135:25, 139:23 to 140:1; Leo Valencia Depo. 8/9/2017 at 184:4-16. | 111. Undisputed. | |
| 112. Furthermore, AVELA's business telephone number is also Leo Valencia's cell phone number, and Leo Valencia conducts business for AVELA out of his home in San Diego, CA. See Leo Valencia Depo. 9/30/2013 at 14:9-19; Leo Valencia | 112. Disputed. Mischaracterizes testimony. Mr. Valencia testified that his business number is a cell phone but testified that it was not the same cell phone he used for personal communications. Respondents do not dispute that | Leo Valencia Depo. 9/30/2013 at 14:9-19. |

| | | |
|---|---|---|
| Depo. 10/1/2013 at 11:10-13. | Mr. Valencia conducts business for AVELA out of his home in San Diego, CA. | |
| 113. Leo Valencia also attends trade shows such as Art Expo in New York and Los Angeles, Licensing Show, and Magic on AVELA's behalf. See Leo Valencia Depo. 9/30/2013 at 45:7-20; Leo Valencia Depo. 8/9/2017 at 53:13-19. | 113. Undisputed. | |
| 114. AVELA is in the business of licensing images—which are grouped into various "brands"—to other companies that manufacture garments and other merchandise for specialty and mass retailers. See Leo Valencia Depo. 9/30/2013 at 10:20 to 11:3 (describing AVELA's business as "design restoration and product merchandising, consumer product merchandising"); see also Durham Decl., Ex. FF at AVELA002228, at 2232 (license agreement dated June 31, 2011 between Avenue LA (alias of AVELA) and American Classics, which identifies Marilyn as a brand category in Section O of the agreement) | 114. Disputed. This evidence does not support the fact asserted and mischaracterizes evidence. AVELA 2232 merely shows that AVELA licensed Monroe artwork under its own brand, the American classics agreement does not identify Marilyn as a brand category. | *See* Durham Decl., Exhibit FF at 4 (AVELA 2230-AVELA's License Agreement with American Classics) which defines the "brand" as AVELA's "RADIO DAYS" brand that is referred to on Page 6 of the exhibit (AVELA 2232). |
| 115. Mr. Valencia testified that AVELA makes money by purchasing physical copies of images in the public domain which only have "one or two sheets [of the image] in the world … exist[ing]," "restores" the image, and then charges licensees for use of that "restored" image. See Leo Valencia Depo. 8/9/2017 at 198:6 to 201:2. | 115. Undisputed. | |
| 116. AVELA licenses images under collections named Radio Days, Hollywood Legends, and Red Carpet Noir. See Leo Valencia Depo. 9/30/2013 at 40:10-18; 41:1-11; 328:23 to 329:4. | 116. Disputed. Mr. Valencia's testimony specifically states that AVELA uses these names as *brand names* that it markets its products under. The evidence establishes that AVELA licenses images under the Radio Days, Hollywood Legends, and Red Carpet Noir *brands*, not as "collections." | Leo Valencia Depo. 9/30/2013 at 40:10-18; 41:1-11; 328:23 to 329:4 |
| 117. As such, AVELA places its RADIO DAYS mark in its products | 117. Disputed to the extent that Mr. Croce stated he did not know | |

| | | |
|---|---|---|
| label and packaging, see Leo Valencia Depo. 9/30/2013 at 40:8-12, and instructs licensees to place "endorsed by Radio Days" on labels, see Durham Decl., Ex. E ("Nick Croce Depo.") at 212:8 to 216:3. | whether AVELA instructed him to use the phrase "Endorsed by Radio Days." Nick Croce Depo. at 213:10-18. | |
| 118. Despite Leo Valencia's testimony that Radio Days is a "significant brand," Patricia Timsawat testified that she does not believe that using the logo of Radio Days or Red Carpet Noir helped sell Mighty Fine's products bearing AVELA-licensed images. Leo Valencia Depo. 9/30/2013 at 210:14 to 212:11; Durham Decl., Ex. K ("Patricia Timsawat Depo.") at 79:13 to 80:21. | 118. Respondents dispute this testimony to the extent that it does not establish Mighty Fine ever had a license to sell AVELA's Monroe artwork. | Nick Croce testified that using AVELA's Radio Days brand did help sell merchandise. Croce Depo. at 213:25-214:20.<br><br>See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 119. AVELA still maintains and operates, to this day, the domain name <www.radiodays.info>, which still features prominently images of Marilyn Monroe. Clarke Decl. at ¶32; Durham Decl., Ex. LL. | 119. Undisputed. | |
| 120. In its licensing business, AVELA maintains approval rights for the designs that its licensees create. See Leo Valencia Depo. 9/30/2013 at 91:4-17. | 120. Undisputed. | |
| 121. David Brown of American Classics testified that American Classics ensured that AVELA approved all of its products bearing Marilyn Monroe images before manufacture. See Durham Decl., Ex. J ("David Brown Depo.") at 126:10-12, 154:5-8. | 121. Undisputed. | |
| 122. AVELA's licensees include Freeze (a division of Central Mills, Inc.), Silver Buffalo, LLC, JEM Sportswear Company, American Classics, Ata-Boy, Duke Imports, C&D Visionary, Rowdy Sprouts, | 122. Respondents do not dispute that these entities were licensees of AVELA at one time, with the exception of Mighty Fine. The testimony cited does not establish Mighty Fine was ever an AVELA | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's |

| | | |
|---|---|---|
| Metal Science, Mighty Fine, and Pyramid America. See Leo Valencia Depo. 9/30/2013 at 167:6-7, 146:7-10, 175:21-24; Leo Valencia Depo. 8/9/2017 at 13:21-25; see also Patricia Timsawat Depo. at 54:22-24; see also Durham Decl., Ex. Q ("Jeffrey Marine Depo.") at 33:4-13. | licensee. | Monroe artwork. |
| 123. AVELA's licensees sell their products in multiple retailers including Hollywood Boulevard, Universal, Spencer's, Target, Walmart, Kohl's, Wet Seal, Macy's, Claire's Icing, Shopko, Forever 21, Nordstrom, JC Penney, Saks Fifth Avenue, Urban Outfitters, Aeropostale, Rue 21, Kirkland, Ross, Old Navy, and TJ Maxx. See Leo Valencia Depo. 9/30/2013 at 170:11- 16, 183:6-9, 190:7-25; 328:17-22, 333:11-14, 334:22 to 336:1; Durham Decl., Ex. A ("Liza Acuna Depo. 9/13/2013") at 138:24 to 139:17; see also Patricia Timsawat Depo. at 131:12-17; see also Durham Decl., Ex. N ("Kimberly Mileski Depo.") at 129:12-14. | 123. Undisputed. | |
| **XOX** | | |
| 124. XOX is a Nevada Corporation. (Dkt. No. 257, ¶5). | 124. Undisputed. | |
| 125. Leo Valencia is the sole employee and shareholder of XOX and also holds the title of President, Secretary, Treasurer, and Director of XOX. See Durham Decl., Ex. HH at X One X 0403 and Durham Decl., Ex. II at 0406; see also Leo Valencia Depo. 8/9/2017 at 106:21-23. | 125. Undisputed. | |
| 126. XOX is a "[a] corporation that carries copyrights." Durham Decl., Ex. B ("Liza Acuna Depo. 9/26/2013") at 79:4-5. | 126. Undisputed. | |
| 127. Leo Valencia directs the creation and design of artwork for XOX. See Leo Valencia Depo. 9/30/2013 at 29:22 to 30:9. a. Leo Valencia testified that he is the true artist of the works licensed from XOX: "I directed the works, and we | 127. Undisputed. | |

| | | |
|---|---|---|
| do have artist contracts that would provide us to have any of the derivative of any work that they create, but in general and in whole, I design, I create, and it's my eye that allows the design sense and the flavor of the artwork to be created. I'm really the artist; otherwise, we would have artist signatures on our paintings or on any of our artwork, which we do not." See Leo Valencia Depo. 9/30/2013 at 36:8-16; 38:14-16. | | |
| **VIFA** | | |
| 128. VIFA is a California corporation. (Dkt. No. 282, ¶6). | 128. Undisputed. | |
| 129. VIFA allegedly has an office address of 2647 Gateway Road. See Liza Acuna Depo. 9/13/2013 at 9:12-19. | 129. Undisputed. | |
| 130. Liza Acuna is the sole officer of VIFA. See Liza Acuna Depo. 9/13/2013 at 39:25 to 40:4. | 130. Undisputed. | |
| 131. Liza Acuna and Leo Valencia have previously dated and have one child together. See Liza Acuna Depo. 9/13/2013 at 44:15 to 46:11. | 131. Undisputed. | |
| 132. VIFA does not have a board of directors or hold board meetings. See Liza Acuna Depo. 9/13/2013 at 58:1-7. | 132. Undisputed. | |
| 133. VIFA is an agent for the license of intellectual properties, namely by selling the rights to use vintage artworks on various products. See Durham Decl., Ex. W ("Teresa Acuna Depo.") at 10:7-12, 11:16-22. | 133. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. This testimony shows that Teresa Acuna worked for VIFA, and that VIFA is a licensing agent for vintage artwork, not that VIFA itself sells any rights to use artwork. | VIFA is a licensing agent and its clients own vintage artwork, however, VIFA itself does not license or sell any rights to use artwork. VIFA does not own any artwork or the rights to any artwork. See Liza Acuna Depo. 9/13/2013 at 10:6-20; 14:17-16:7 |

| | | |
|---|---|---|
| 134. Leo Valencia testified that VIFA acts as an agent for AVELA. See Leo Valencia Depo. 9/30/2013 at 61: 6-12. | 134. Undisputed. | |
| 135. VIFA has worked with AVELA since the 1990s. See Liza Acuna Depo. 9/13/2013 at 10:25 to 11:3. | 135. Undisputed. | |
| 136. VIFA attends trade shows on behalf of AVELA. See Liza Acuna Depo. 9/13/2013 at 28:18-25; Teresa Acuna Depo. at 26:1-21.. | 136. Undisputed, though Respondents note that Teresa Acuna's testimony states that she represented VIFA, not AVELA, at trade shows. | |
| 137. VIFA has worked with Freeze, Jem, Ata-Boy, Pyramid America, Silver Buffalo, Mighty Fine, NJ Croce, and American Classics. See Liza Acuna Depo. 9/13/2013 at 102:20 to 103:5; 167:14-19. | 137. Undisputed but Respondents note that Mighty Fine never had a license to sell AVELA's Monroe artwork. | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 138. Liza Acuna testified on behalf of VIFA that Mighty Fine was not a licensee of AVELA Marilyn Monroe products. Liza Acuna Depo 9/26/2013 at 102:3-18. | 138. Undisputed. | |
| 139. Leo Valencia also stated that Mighty Fine was not one of AVELA's licensees. Leo Valencia Depo. 10/1/2013 at 130:25-131:2. | 139. Undisputed. | |
| 140. However, in response to a subpoena sent by the Estate, Mighty Fine produced its license agreement with IPL (which Mighty Fine's COO, Patricia Timsawat, admitted is the same as AVELA) to produce Marilyn Monroe products. See Patricia Timsawat Depo. Ex. 121, 55:7-9. | 140. Disputed. This evidence does not support the fact asserted. Respondents object to this "fact" as irrelevant as it has no bearing on whether or not IPL is "the same" as AVELA or whether or not Mighty Fine was an AVELA licensee for Monroe products. Respondents dispute this testimony to the extent that it does not establish that IPL is "the same" as AVELA. Mighty Fine never produced any license agreement with AVELA and was not an AVELA licensee for Monroe products. | Liza Acuna testified on behalf of VIFA that Mighty Fine was not a licensee of AVELA Marilyn Monroe products. Liza Acuna Depo 9/26/2013 at 102:3-18.<br><br>Leo Valencia also stated that Mighty Fine was not one of AVELA's licensees. Leo Valencia Depo. |

| | | 10/1/2013 at 130:25-131:2. |
|---|---|---|
| 141. Ms. Timsawat also indicated that Mighty Fine sold nearly _____ units of AVELA Marilyn Monroe products, booked over _____ in revenue for Marilyn Monroe products in 2013, and had plans to ship another _____ units of Marilyn Monroe product to retailers for 2014. See Patricia Timsawat Depo., 100:4-111:23; Dkt. No. 45, pp. 9-10. | 141. Disputed. This evidence does not support the fact asserted. Respondents do not dispute Ms. Timsawat's testimony but dispute this fact to the extent that it does not establish that Mighty Fine had any license from AVELA to sell Monroe products or that the products mentioned are AVELA products. | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| **IPL** | | |
| 142. I.P.L., LLC is a Delaware limited liability company. See Durham Decl., Ex. MM ("Creative Advisors, LLC's State Delaware Limited Liability Company Certificate of Formation"); Durham Decl., Ex. NN ("Creative Advisors, LLC's State of Delaware Certificate of Amendment to change the name Creative Advisors, LLC to I.P.L. LLC"). | 142. Disputed to the extent that this fact is cited in the MSJ to purportedly demonstrate that Leo Valencia "set up" I.P.L. (MSJ at 5.) The evidence cited does not support that conclusion. Respondents are without information sufficient to form a belief as to the truth of the remainder of the facts as contained in Paragraph 142 of Movants' Rule 56.1 Statement. | |
| 143. Creative Advisors, LLC was incorporated in the state of Delaware on June 21, 2012. See Creative Advisors, LLC's State Delaware Limited Liability Company Certificate of Formation. | 143. Disputed to the extent that this fact is cited in the MSJ to purportedly demonstrate that Leo Valencia "set up" I.P.L. (MSJ at 5.) The evidence cited does not support that conclusion. Respondents are without information sufficient to form a belief as to the truth of the remainder of the facts as contained in Paragraph 143 of Movants' Rule 56.1 Statement. | |
| 144. On July 23, 2012, Creative Advisors, LLC filed a Certificate of Amendment to legally change its name to I.P.L. LLC. See Creative Advisors, LLC's State of Delaware Certificate of Amendment to change the name Creative Advisors, LLC to I.P.L. LLC. | 144. Disputed to the extent that this fact is cited in the MSJ to purportedly demonstrate that Leo Valencia "set up" I.P.L. (MSJ at 5.) The evidence cited does not support that conclusion. Respondents are without information sufficient to form a belief as to the truth of the remainder of the facts as contained in Paragraph 144 of Movants' Rule 56.1 Statement. | |

| | | |
|---|---|---|
| 145. IPL also maintains an address of 2647 Gateway Road, Ste 105-550, Carlsbad, CA 92009. See A.V.E.L.A., Inc. v. Central Mills, Inc. et al., Case No. 2:15-cv-03918-JAK-AGR (C.D. May 22, 2015) (Dkt. 93-2, ¶236). | 145. Respondents are without information sufficient to form a belief as to the truth of the facts as contained in Paragraph 145 of Movants' Rule 56.1 Statement. | |
| 146. IPL has worked with Mighty Fine, Silver Buffalo, and Freeze. See Eric Silver Depo. at 223:14-225:13; Patricia Timsawat Depo. at 140:1-7; A.V.E.L.A., Inc. v. Central Mills, Inc. et al., Case No. 2:15-cv-03918-JAK-AGR (C.D. May 22, 2015) (Dkt. 93-2, ¶185); see also Durham Decl., Ex. JJ at MF000001-MF000022; Durham Decl., Ex. AA, Liza Acuna Depo. 8/10/2017 Ex. 2. | 146. Disputed to the extent that this fact is cited in the MSJ to purportedly demonstrate that Leo Valencia "entered into new license agreements" in the name of I.P.L. (MSJ at 5.) The evidence cited does not support that conclusion or that Mr. Valencia entered into any of these agreements. Respondents are without information sufficient to form a belief as to the truth of the remainder of the facts as contained in Paragraph 146 of Movants' Rule 56.1 Statement. | |
| 147. The Estate only learned of IPL's existence through third party subpoenas. (Dkt. No. 45, p. 3). | 147. Respondents are without information sufficient to form a belief as to the truth of the facts as contained in Paragraph 147 of Movants' Rule 56.1 Statement. | |
| 148. Ruby Batts and Hermie Aquino were served with the Estate's First Amended Counterclaim on behalf of IPL on August 15, 2014 and August 20, 2014 respectively. (Dkt. No. 148). | 148. Respondents are without information sufficient to form a belief as to the truth of the facts as contained in Paragraph 148 of Movants' Rule 56.1 Statement. | |
| 149. When IPL failed to respond to the First Amended Counterclaim more than twenty-one days after service, the Court entered a notice of IPL's default, upon the Estate's request. (Dkt. Nos. 167, 169). | 149. Undisputed. | |
| **AVELA's Relationship with XOX** | | |
| 150. Leo Valencia owns XOX, and the shares of AVELA that are held by XOX are in Leo Valencia's name. Leo Valencia Depo. 9/30/2013 at 10:2-4, 19:3-11. | 150. Undisputed. | |
| 151. XOX owns the copyrights to the artwork that AVELA licenses to its licensees. Liza Acuna Depo. 9/26/2013 at 79:13-25. | 151. Undisputed. | |
| 152. XOX claims to acquire rights to images and licenses these images to | 152. Undisputed. | |

| | | |
|---|---|---|
| AVELA; in return AVELA pays a licensing agent fee to XOX. See Leo Valencia Depo. 9/30/2013 at 19:16 to 20:12. | | |
| 153. The Master Agreement between AVELA and XOX has not been produced and, according to Valencia, cannot be located. See Leo Valencia Depo. 9/30/2013 at 34:17 to 35:7. | 153. Undisputed. | |
| **AVELA's Relationship with VIFA** | | |
| 154. VIFA maintains contracts, follows-up on contracts, filters through licensing leads, and maintains client relationships for AVELA. See Leo Valencia Depo. 10/1/2013 at 157:3 to 158:9. | 154. Undisputed. | |
| 155. According to Leo Valencia, Liza Acuna - on behalf of VIFA - has the power to filter through deals, investigate companies, and pass them along to AVELA. See Leo Valencia Depo. 10/1/2013 at 162: 2-7. | 155. Undisputed. | |
| 156. Liza Acuna, on behalf of VIFA, negotiates license agreements on behalf of AVELA. See Durham Decl., Ex. GG at AVELA 006196-006218 (license agreement between AVELA and Duke Imports) and Liza Acuna Depo 8/10/2017 at 39:9 to 43:22, 142:3-7 (discussing her negotiations with Duke Imports); David Brown Depo. at 199:9-19, 203:20 to 204:7; Nick Croce Depo. at 30:19 to 31:5, 122:4-10, 176:10 to 178:16; Nick Croce Depo. at 246:20 to 247:5 Patricia Timaswalt Depo. at 71:1-3; Kimberly Mileski Depo. at 50:23 to 51:11; Nick Croce Depo. at 30:23 to 31:5, 177:2-18. | 156. Undisputed. | |
| 157. Licensees send concept layout and submission forms for AVELA/Radio Days designs directly to Teresa and Liza Acuna at VIFA for review and approval. See Durham Decl., Ex X, Teresa Acuna Depo. Ex. 1, see also Kimberly Mileski Depo. at 49:9-21; Nick Croce Depo. at 66:2-14, 111:19 to 112:16, 113:6-20, 177:11 to | 157. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. The evidence indicates that licensees send submission forms to VIFA on behalf of AVELA or to forward on to AVELA, but does not show that VIFA actually reviews or approves any product. | Liza Acuna Depo. 9/13/2013 at 245:11-246:13; 239:21-240:17. Ms. Acuna testified that AVELA handles reviews and approvals |

| | | |
|---|---|---|
| 178:16.. | | and that VIFA gets approval from AVELA and passes along the information to the licensees. |
| 158. VIFA follows up with AVELA's licensees to make sure they pay royalties. See Leo Valencia Depo. 9/30/2013 at 153:3-6; 154:2-9. | 158. Undisputed. | |
| 159. AVELA pays VIFA a royalty equal to 40% of AVELA's licensing revenues. See Leo Valencia Depo. 9/30/2013 at 61:9-12; Leo Valencia Depo. 10/1/2013 at 156:9-12; Liza Acuna Depo. 9/13/2013 at 70:4-10. a. A 40% royalty is not common and considered remarkably high in the licensing industry. Clarke Decl. at ¶ 48. | 159. Disputed. Respondents further object that the evidence cited lacks foundation and amounts to mere opinion testimony from one of EMMLLC's own employees. Relevant treatises demonstrate that 40 percent is an average commission for a licensing agent. | Gregory J. Battersby and Charles W. Grimes, The Law of Merchandise and Character Licensing, § 6:17 "Typical commissions for licensing agents vary widely, generally from a low of about 10 percent to a high of about 50 percent. The average commission for a licensing agent would seem to fall in the 30 to 40 percent range, based on gross revenue received from the third party licensee." |
| 160. VIFA does not charge AVELA rent for AVELA's use of VIFA's office space, and VIFA pays AVELA's legal fees. See Leo Valencia Depo. 10/1/2013 at 72:1-17, 73:1 to 80:9. | 160. Disputed. Ms. Acuna testified AVELA has reimbursed VIFA for rent and VIFA produced invoices from VIFA to AVELA for rent. | Liza Acuna Depo. 8/10/2017 at 192:6-25; 193:1-25. |
| 161. Liza Acuna has spoken of AVELA and VIFA as a collective business unit. See Liza Acuna Depo. 9/13/2013 at 246:15-24. | 161. Disputed. This evidence does not support the fact asserted, mischaracterizes testimony, and purports to assert a legal conclusion inappropriate for inclusion in a statement of facts. Respondents | |

| | object to this "fact" as irrelevant as this court has already rejected EMMLLC's alter ego claims as to VIFA and AVELA. | |
|---|---|---|
| 162. Likewise, AVELA's licensees understand that Liza Acuna and Teresa Acuna work for AVELA. See Patricia Timsawat Depo. at 36:19-23; 86:24 – 87:6 Kimberly Mileski Depo. at 49:9 to 51:11; Durham Decl., Ex. L ("Judith Albright Depo.") at 30:5-14; Nick Croce Depo. at 30:19 to 31:5, 122:4-10, 176:10 to 178:16;246:20 to 247:5; David Brown Depo. At 203:12-14, Eric Silver Depo. at 162:21-24, 209:9-12. | 162. Respondents object to this "fact" as irrelevant as it has no bearing on whether or not Liza Acuna or Teresa Acuna are actually employed by AVELA and this court has already rejected EMMLLC's alter ego claims as to VIFA and AVELA. | 162. Durham Decl., Exhibit W, Teresa Acuna Depo. at 10:5-10, Theresa Acuna testified she worked for VIFA.<br><br>Liza Acuna testified she owns VIFA and works as a licensing agent for AVELA on behalf of VIFA. Liza Acuna Depo. 8/10/2017 at 7:10-21. |
| 163. Freeze's main contacts at AVELA are Liza and Teresa Acuna. See Kimberly Mileski Depo. at 49:9 to 51:11. | 163. Respondents object to this "fact" as irrelevant as it has no bearing on whether or not Liza Acuna or Teresa Acuna are actually employed by AVELA and this court has already rejected EMMLLC's alter ego claims as to VIFA and AVELA. | See evidence cited in SOF ¶ 162. |
| 164. Judith Albright of Ata-Boy also testified that Teresa Acuna would respond to her approval requests sent to AVELA. See Judith Albright Depo. at 30:5-14. | 164. Disputed. The evidence cited does not establish that Teresa Acuna actually approved any products. | Liza Acuna Depo. 9/13/2013 at 245:11-246:13; 239:21-240:17. Ms. Acuna testified that VIFA would get approval from AVELA and pass along the information to the licensees. |
| 165. Moreover, Nick Croce of NJ Croce Co. negotiated with Liza Acuna prior to executing a license agreement with AVELA, and continued to work primarily with Liza after entering into | 165. Undisputed, but respondents object to this "fact" as irrelevant. | |

| | | |
|---|---|---|
| the agreement. See Nick Croce Depo. at 30:19 to 31:5, 122:4-10, 176:10 to 178:16. | | |
| 166. Nick Croce also testified that he assumed Liza Acuna worked for Leo Valencia at AVELA because she took all of his phone calls, negotiated on his behalf, and worked in his office. See Nick Croce Depo. at 246:20 to 247:5. | 166. Undisputed as to Mr. Croce's assumptions. Respondents object to this "fact" as irrelevant. | |
| 167. Likewise, David Brown of American Classics dealt primarily with Liza Acuna when negotiating American Classics' license agreements with AVELA. See David Brown Depo. at 199:9-19, 203:20 to 204:7. | 167. Undisputed. | |
| 168. David Brown also testified that he also assumed Liza Acuna worked for AVELA. See David Brown Depo. at 203:12-14. | 168. Respondents do not dispute this testimony but object to this "fact" as irrelevant as it has no bearing on whether or not Liza Acuna actually worked for AVELA. | Liza Acuna testified she owns VIFA and works as a licensing agent for AVELA on behalf of VIFA. Liza Acuna Depo. 8/10/2017 at 7:10-21. |
| 169. Moreover, Teresa Acuna provided AVELA licensees with passwords to access images on the Radio Days website. See Liza Acuna 9/13/2013 Depo. at 239:9 to 240:7 | 169. Disputed. This evidence does not support the fact asserted. Respondents further dispute this fact to the extent that it is cited in the MSJ to purportedly demonstrate that VIFA provides AVELA's licensees with access to Monroe images. (MSJ at 6-7.) | Liza Acuna testified that Theresa Acuna does not give out passwords for licensees and that the images and website are provided by and through AVELA. Liza Acuna Depo. 9/13/2013 at 239:9-24. |
| 170. Liza Acuna has used the email address lizaa@avela.net. Liza Acuna Depo. 9/13/2013 at 188:16-22. | 170. Respondents object to this "fact" as irrelevant. This testimony demonstrates that Liza Acuna worked for VIFA in connection with VIFA's licensing agent activities for AVELA. | Liza Acuna testified she owns VIFA and works as a licensing agent for AVELA on behalf of VIFA. Liza Acuna Depo. 8/10/2017 at 7:10-21. |

| | | |
|---|---|---|
| 171. And Teresa Acuna, who was a project coordinator at VIFA, used the email address Teresaa@avela.net. See Teresa Acuna Depo. at 52:11 to 53:23, 61:2-5, 67:16-25. | 171. Respondents object to this "fact" as irrelevant. This testimony demonstrates that Teresa worked for VIFA in connection with VIFA's licensing agent activities for AVELA. | Durham Decl., Exhibit W, Teresa Acuna Depo. at 10:5-10, Theresa Acuna testified she worked for VIFA. |
| 172. VIFA assembled AVELA's documents that were sent to the Estate Parties during the discovery stage of this litigation. See Leo Valencia Depo 10/1/2013 at 68:21-25. | 172. Respondents object to this "fact" as irrelevant. | |
| **AVELA's Relationship with IPL** | | |
| 173. AVELA's licensees understand that IPL and AVELA are the same entity. See Patricia Timsawat Depo. at 55:4-9. | 173. Disputed. This evidence does not support the fact asserted. The understanding of one licensee cannot be extrapolated to all of AVELA's licensees. The evidence cited is irrelevant as to whether or not IPL and AVELA are actually the same entity. Respondents dispute this evidence to the extent that it does not establish that Mighty Fine was ever an AVELA licensee for Monroe artwork. | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 174. In fact, Mighty Fine sent royalty reports for AVELA to IPL. See Patricia Timsawat Depo. at 140:1-7. | 174. Disputed. This evidence does not support the fact asserted. The testimony does not establish that the checks mentioned were for AVELA or that Mighty Fine ever had a license agreement with AVELA for Monroe artwork. | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 175. Likewise, AVELA instructed Freeze to make all royalty checks out to IPL for licensed sales after September 30, 2012. See A.V.E.L.A., Inc. v. Central Mills, Inc. et al Case No. 2:15-cv-03918-JAK-AGR (C.D. May 22, 2015) (Dkt. 93-2, ¶¶ 233-237, 239). | 175. Disputed. This evidence does not support the fact asserted. The evidence cited amounts to an unsubstantiated claim set forth by a third party. The plain language cited reflects that IPL had some agreement with Freeze and that IPL instructed Freeze to make checks out to IPL for payments that were owed to IPL, but Respondents are without information sufficient to form a belief as to the truth of the facts as contained in Paragraph 175 of Movants' Rule 56.1 Statement regarding any statements IPL made. | |

| | Respondents dispute that AVELA made any such instruction. | |
|---|---|---|
| 176. Valencia testified that he does not know of or work for IPL. See Durham Decl., Ex. U ("Leo Valencia Depo. 5/30/2014") at 356:17-19; Leo Valencia 8/9/2017 Depo. at 12: 8, 23, 25; 13:1-2. | 176. Undisputed. | |
| 177. However, Valencia has signed checks on behalf of IPL. See Durham Decl., Ex. OO, A.V.E.L.A., Inc. v. Central Mills, Inc. et al Case No. 2:15-cv-03918-JAK-AGR (C.D. May 22, 2015) (Dkt. 97-14). | 177. Undisputed. | |
| 178. Valencia's discovery responses in this matter also contradict his testimony regarding his ignorance of IPL. See Durham Decl., Ex. F, Cross-Defendant Leo Valencia's Amended Response to Defendant Estate of Marilyn Monroe, LLC's Interrogatories to Cross-Defendant Leo Valencia, p. 3 (admitting that he is an "officer, employee, director, shareholder, authorized agent, member, manager, consultant, and/or alter-ego" of IPL). | 178. Disputed to the extent that the evidence cited does not establish that Mr. Valencia is a "Director," owner, or employee of IPL. The evidence indicates that at some point Mr. Valencia served as a licensing consultant for IPL. | |
| 179. In the past 3 years, IPL has filed complaints against 3 of its own licensees. I.P.L., LLC., v. Central Mills, Inc., et al., Docket No. 2:18-cv-02967 (C.D. Cal. Apr 9, 2018); I.P.L., LLC v. S.S. Sarna, Inc. et al., Docket No. 2:16-cv-03532 (C.D. Cal. May 20, 2016); I.P.L., LLC v. Silver Buffalo, LLC et al., Docket No. 2:16-cv-03928 (C.D. Cal. Jun 3, 2016). | 179. Respondents are without information sufficient to form a belief as to the truth of the facts as contained in Paragraph 179 of Movants' Rule 56.1 Statement regarding IPL's purported licensees. Respondents further object to this evidence as irrelevant where IPL's litigation against its own licensees has no bearing on the facts of this case. | |
| **Valencia, AVELA, VIFA, and XOX Litigation History** | | |
| 180. On February 16, 2006, Nene Thomas Inc., sued AVELA in the Western District of Oklahoma for trademark infringement. Nene Thomas Inc. v. AVELA Inc., Case No. 5:06-cv-00169 (W.D. Okla. Feb 16, 2006). | 180. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 181. On March 6, 2006, Toho Co Ltd. filed sued against AVELA in the | 181. Respondents do not dispute this litigation but object to this | |

| | | |
|---|---|---|
| Central District of California for copyright infringement. Toho Co Ltd v. A.V.E.L.A. Inc. et al., Case No. 2:06-cv-01385 (C.D. Cal. Mar 6, 2006). | evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 182. On March 31, 2006, Warner Bros. Entertainment, Inc. filed suit against AVELA,Leo Valencia, and XOX in the Eastern District of Missouri for trademark infringement, copyright infringement, federal dilution, federal and state unfair competition, and violation of the right of publicity. Warner Bros. Entm't v. Dave Grossman Creations, Inc. et al., Case No. 4:06-cv-00546 (E.D. Mo. Mar 31, 2006). <br> a. The Court found the AVELA defendants guilty of copyright and trademark infringement as well as unfair competition. The Court ultimately determined that such infringement was willful, meriting an award of plaintiff's attorneys' fees. Warner Bros. Entm't v. Dave Grossman Creations, No. 4:06CV546 HEA, 2015 WL 5786087, at *2 (E.D. Mo. Sept. 30, 2015) ("Defendants willfully and deliberately used Plaintiffs' marks. As Plaintiffs correctly observe, Defendants have been on notice since this action was first filed in 2006 that they were infringing Plaintiffs' marks and refused to cease their activities. Defendants have attempted to avoid production of documents throughout the course of this litigation, which tends to demonstrate Defendants' deliberateness. The totality of the circumstances in this action gives rise to the conclusion that this case is indeed exceptional. Accordingly, Plaintiffs are entitled to an attorneys' fee award under the Lanham Act.") | 182. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. Respondents further dispute Movants' mischaracterization of the court's findings. | |
| 183. On August 25, 2006, King Features Syndicate, Inc. sued AVELA, | 183. Respondents do not dispute this litigation but object to this | |

| | | |
|---|---|---|
| XOX and Leo Valencia in the Southern District of New York for copyright infringement, unfair competition and trademark infringement under the Lanham Act, New York unfair competition. King Features Syndicate, Inc. et al v. A.V.E.L.A. Inc. et al., Case No. 1:06-cv-06464 (S.D.N.Y. Aug 25, 2006). | evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 184. On September 29, 2006, Fleischer Studios Inc. sued AVELA, XOX and Leo Valencia for copyright infringement and trademark infringement. Fleischer Studios Inc. v. A V E L A Inc. et al., Docket No. 2:06-cv-06229 (C.D. Cal. Sept 29, 2006). | 184. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 185. On February 14, 2007, Fifty-Six Hope Road Music, Ltd. sued AVELA and Leo Valencia in the District of Nevada for unfair competition and trademark infringement. Fifty-Six Hope Road Music, Ltd. et al v. Fame Jeans et al., Case No. 2:07-cv-00194 (D. Nev. Feb 14, 2007). | 185. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 186. On January 23, 2008, Fifty-Six Hope Road Music, Ltd. filed suit against AVELA and Leo Valencia in the District of Nevada for unfair competition and trademark infringement under the Lanham Act as well as common law trademark infringement and unauthorized commercial use of statutory right of publicity. Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc. et al., Docket No. 2:08-cv-00105 (D. Nev. Jan 23, 2008). | 186. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 187. This case was appealed to the Ninth Circuit, which ultimately found that AVELA, Leo Valencia, and XOX willfully violated the Marley Estate's intellectual property rights. See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1078–79 (9th Cir. 2015) ("There was significant evidence that AVELA Defendants were aware their | 187. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |

| | | |
|---|---|---|
| conduct conflicted with Plaintiffs' rights. [One such piece of evidence was that] Rohan Marley testified that Valencia (president and CEO of both AVELA and X One X) approached him seeking a license to sell Marley merchandise, which neither Rohan nor Hope Road granted."). | | |
| 188. The Court found that the AVELA Defendants intentionally created confusingly similar merchandise in order lead consumers to believe that their products were associated with the Marley Estate. Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc., 778 F.3d 1059, 1071 (9th Cir. 2015) ("To that end, Plaintiffs showed the jury photographs comparing an A.V.E.L.A.- licensed t-shirt to a t-shirt Zion had been selling for ten years. Both t-shirts featured a single, soft-focus image of Marley's face with his mouth open slightly, as if speaking. Both t-shirts are black, and overlay Rastifarian green, yellow, and red in dithered stripes across Marley's face. Viewed in the light most favorable to Plaintiffs, one would infer that A.V.E.L.A. Defendants sought to associate their product with Plaintiffs by intentionally creating similar merchandise."). | 188. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 189. On April 1, 2009, Bruce Lee Enterprises, LLC sued AVELA and Leo Valencia in the Southern District of Indiana for unfair competition and trademark infringement under the Lanham Act as well as common law trademark infringement and unauthorized commercial use of statutory and common law rights of publicity. Bruce Lee Enterprises, LLC v. ECKO Complex, LLC et al., Case No. 1:09-cv-00398 (S.D. Ind. Apr 1, 2009); transferred to S.D.N.Y. Bruce Lee Enterprises, LLC v. ECKO Complex, LLC, et al., Case No. 10-cv-2333 (S.D.N.Y. Mar 16, 2010). | 189. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |

| | | |
|---|---|---|
| 190. On July 30, 2012, Susan Nicholson Hofheinz filed suit against AVELA, XOX, and Leo Valencia for copyright infringement, unfair competition and trademark infringement under the Lanham Act, state California trade dress infringement and trademark infringement, California unfair competition. Susan Nicholson Hofheinz v. A.V.E.L.A. Inc. et al., Case No. 2:12-cv-06546 (C.D. Cal. Jul 30, 2012). | 190. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 191. On December 20, 2013, The Richard Avedon Foundation sued AVELA and Leo Valencia in the Central District of California for copyright infringement. The Richard Avedon Foundation v. Forever 21 Inc. et al., Docket No. 2:13-cv-09408 (C.D. Cal. Dec 20, 2013). | 191. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 192. On January 9, 2015, Karl Ferris and Optive Marketing, Inc. sued AVELA and Leo Valencia in the Central District of California for copyright infringement, unfair competition, and intentional interference with prospective economic advantage. Karl Ferris et al v. Central Mills, Inc. et al., Case No. 2:15-cv-00186 (C.D. Cal. Jan 9,2015). | 192. Respondents do not dispute this litigation but object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| 193. Leo Valencia testified that he has not paid the judgments that have been entered against him and that he does not intend to. Leo Valencia Depo. 8/9/2017 at 147:16-19. | 193. Disputed. Respondents object to this evidence as irrelevant, immaterial, and inappropriate for inclusion in a statement of undisputed facts as this litigation has no bearing on the facts of this case. | |
| **The Dispute: The "AVELA Parties'" use of "Marilyn Monroe Intellectual Property"** | | |
| 194. AVELA designs and licenses images with the name "Marilyn." See Leo Valencia Depo. 9/30/2013 292:16-22; Leo Valencia Depo. 10/1/2013 at 25:8 to 26:7, 27:16-25; see also Judith Albright Depo. at 54:24 to 55:9, 94:17 to 95:2; Durham Decl. at ¶38. | 194. Undisputed. | |
| 195. In its license agreements, | 195. Disputed. This fact | Durham Decl., |

| | | |
|---|---|---|
| AVELA purports to grant rights to use Marilyn Monroe images, her likeness, and the terms "Marilyn Monroe." See David Brown Depo. at 231:7-22. | mischaracterizes testimony. The deponent explicitly states on the next page of testimony that the AVELA agreement does not permit him to use the term "Marilyn Monroe." | Exhibit J, David Brown Depo. at 231:23-232:3.<br><br>See also Durham Decl., Exhibit FF: Nowhere in AVELA's license agreement does it grant the rights to use the terms "Marilyn Monroe." See also Durham Decl, Exhibit A, Liza Acuna Depo. 9/13/2013 at 97:2-9. |
| 196. In 2008, 2009, 2010, 2011, and 2012, 10%, 10%-15%, 20-30%, 30%-40%, and 90% of AVELA's sales respectively could be attributed to Marilyn Monroe products. See Leo Valencia Depo. 9/30/2013 at 123:9-14; 137:1: to 138:9. | 196. Undisputed as to Mr. Valencia's testimony. | |
| 197. Through his licensing business, Leo Valencia purports to license Marilyn as a brand. AVELA 2232; see also Liza Acuna Depo. 9/26/2013 at 97:14-22, 98:3-5. | 197. Disputed. This evidence does not support the fact asserted and this fact mischaracterizes evidence. AVELA 2232 merely shows that AVELA licensed Monroe artwork under its own brand. Ms. Acuna's testimony also merely shows that AVELA licensed Monroe artwork to Freeze under *AVELA's own brand* called "Hollywood Legends." There is no evidence Monroe is the only artwork licensed under AVELA's brands. | *See* Durham Decl., Exhibit FF at 4 (AVELA 2230-AVELA's License Agreement with American Classics) which defines the "brand" as AVELA's "RADIO DAYS' brand that is referred to on Page 6 of the exhibit (AVELA 2232); see also Exhibit A, Liza Acuna Depo. 9/13/2013 at 168:3-169:8. |
| 198. XOX claims to own copyrights that include images of Marilyn Monroe. Leo Valencia Depo. 9/30/2013 at 27:20-23. | 198. Undisputed. | |
| 199. One such alleged copyright registration held by XOX is for a work entitled "Gentlemen Prefer Blondes Collection," which includes "inspired | 199. Undisputed. | |

| | | |
|---|---|---|
| or restored or re-altered movie posters" and photographs of Marilyn Monroe. Leo Valencia Depo. 9/30/2013 at 28:11 to 31:4. | | |
| 200. XOX's purported copyrightable images are physical prints taken from the public domain with additional material added by "painting over it." Leo Valencia Depo. 8/9/2017 at 197:20 to 199:1. | 200. Disputed. This evidence does not support the fact asserted. Respondents do not dispute that XOX's copyrightable artwork is created using underlying formerly public domain materials. | Mr. Valencia has provided testimony on the substantial time and effort that has gone into creating XOX and AVELA's copyrighted artwork. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5-547:8. |
| 201. On behalf of AVELA, Leo Valencia has spoken with Spencer's Gifts, Target, Walmart, Macy's, Boscov's, Zara, JC Penney's, Sears, the Gap, Hot Topic's, Torrid, Journeys, Burlington, T.J. Maxx, Walmart, and The Meyer Group about providing Marilyn Monroe products. Leo Valencia Depo. 8/9/2017 at 19:24 to 20:11. | 201. Undisputed. | |
| 202. AVELA's licensees sell products in Urban Outfitters, Nordstrom, Macy's, Kohls,Target, Kirkland, Home Goods, Old Navy, Spencer's Gifts, Ross, TJ Maxx, Bloomingdales, Kitson, Wet Seal, Forever 21. Liza Acuna Depo 9/13/2013 at 62:6-25 to 63:1-20, 138:9-13, 138:24 to 139:2, 139:12-20, 167:23 to 168:1; Leo Valencia Depo. 9/30/2013 at 189:25 to 191:11, 325:8-19, 334:20-22. | 202. Undisputed. | |
| 203. Freeze, American Classics, Silver Buffalo, Ata-Boy, and Croce sell Marilyn Monroe products licensed from AVELA. See Leo Valencia Depo. 9/30/2013 at 189:4-24, 228:20-23. | 203. Respondents do not dispute that these entities were former AVELA licensees and sold products bearing AVELA's Monroe artwork, but dispute that they currently hold licenses to sell products bearing AVELA's artwork. | |
| 204. Liza Acuna testified that the | 204. Undisputed. | |

| | | |
|---|---|---|
| "general population" is the target market for AVELA's Marilyn Monroe products. See Liza Acuna 9/13/2013 Depo. at 132: 4-8. | | |
| 205. The AVELA Parties have sold, or authorized or facilitated the sale of, the following Marilyn Monroe products: <br> a. Men's t-shirts (Liza Acuna Depo. 9/13/13 at 158:13-15) <br> b. Women's t-shirts (Liza Acuna Depo. 9/13/13 at 158:13-15) <br> c. Glassware (Liza Acuna Depo. 9/13/13 at 61:2-6) <br> d. Home goods (Liza Acuna Depo. 9/13/13 at 61:2-6) <br> e. Gift novelty (Liza Acuna Depo. 9/13/13 at 61:2-6) <br> f. Apparel (Liza Acuna Depo. 9/13/13 at 61:2-6) <br> g. Posters (Liza Acuna Depo. 9/13/13 at 138:17-21) <br> h. Canvas prints (Liza Acuna Depo. 9/13/13 at 138:17-21) <br> i. Pens (Liza Acuna Depo. 9/13/13 at 160:7-11) <br> j. Throws (Liza Acuna Depo. 9/13/13 at 183:1-2) <br> k. Stickers (Liza Acuna Depo. 9/13/13 at 191:14-17) <br> l. Magnets (Liza Acuna Depo. 9/13/13 at 191:14-17) <br> m. Key Chains (Liza Acuna Depo. 9/13/13 at 191:14-17) <br> n. Buttons (Liza Acuna Depo. 9/13/13 at 191:14-17) <br> o. Handbags (Liza Acuna Depo. 9/13/13 at 198:9-10) <br> p. Lanyards ((Liza Acuna Depo. 9/13/13 at 223:3-9) <br> q. Wallets ((Liza Acuna Depo. 9/13/13 at 225:12-14) <br> r. Mugs (Liza Acuna Depo. 9/13/13 at 229:12-13) <br> s. Junior clothing and apparel (Liza Acuna Depo. 9/13/13 at 231:10-17) <br> t. Bedding (Durham Decl., Ex. Z ("Liza Acuna Depo. 8/10/2017") at 39:10) | 205. Undisputed. | |

| | | |
|---|---|---|
| u. Clocks (Leo Valencia Depo. 9/30/2013 at 179:4-23)<br>v. Cups (Leo Valencia Depo. 10/1/2013 at 34:9-11)<br>w. iPhone covers (Leo Valencia Depo. 10/1/2013 at 39:14-20)<br>x. Towels (Leo Valencia Depo. 10/1/2013 at 35:14-21)<br>y. Pajamas (Leo Valencia Depo. 8/9/2017 at 222:4-8)<br>z. Knit tops (Kimberly Mileski Depo. at 65:6)<br>aa. Knit bottoms (Kimberly Mileski Depo. at 65:6-7) | | |
| 206. Kohl's has sold coffee cups featuring images of Marilyn Monroe licensed from AVELA at a price point of $9.95 to $12.95. See Leo Valencia Depo. 9/30/2013 at 236:8-11. | 206. Undisputed. | |
| 207. In Target, AVELA's licensees' products are sold at a price point of $8.99 to $22.99. See Leo Valencia Depo. 9/30/2013 at 330:15-20. | 207. Undisputed, but Respondents note that the testimony cited refers specifically to t-shirts, not AVELA's products generally. | |
| 208. Walmart sells t-shirts obtained from Freeze under license from AVELA at a price of $14.99 to $19.99. See Leo Valencia Depo. 9/30/2013 at 235:20 to 236:3. | 208. Undisputed. | |
| 209. AVELA has told its licensees not to use the full name "Marilyn Monroe" on its products without further explanation. See Patricia Timsawat Depo. at 76:4-24; Nick Croce Depo. 63:11 to 67:15; David Brown Depo. at 88:13-17, 119:2 to 120:9. | 209. Undisputed. | |
| 210. However, AVELA instructed its licensees that they could use "Marilyn" without the "Monroe" surname. See Patricia Timsawat Depo. at 76:4-24; Nick Croce Depo. 63:11 to 67:15. | 210. Undisputed but Respondents do not concede that the use of Marilyn on artwork is a trademark use or that "Marilyn" is EMMLLC's intellectual property. | |
| 211. AVELA's licensees have testified that when an image of Marilyn Monroe appears with the name "Marilyn," it cannot refer to anyone else but Marilyn Monroe. See David | 211. Respondents do not dispute that the name "Marilyn" refers to the iconic actress, but dispute this fact to the extent that it purports to assert a legal | |

| | | |
|---|---|---|
| Brown Depo. at 262:8 to 263:11. | conclusion and is cited in the MSJ to purportedly demonstrate that AVELA's use of "Marilyn" on artwork is "functionally equivalent" to using "MARILYN MONROE." (MSJ at 23.) | |
| 212. Kimberly Mileski of Freeze also testified that when the name "Marilyn" is used on products bearing the image of Marilyn Monroe it acts as an identifier. See Kimberly Mileski Depo at. 127:18 to 128:13. | 212. Disputed. Ms. Mileski testified that the name "Marilyn on products" is a design element and merely identifies the famous actress. Kimberly Mileski Depo. 127:18-128:13. Respondents object to this evidence to the extent that it purports to assert a legal conclusion about source-identification. | |
| 213. Nick Croce testified that he understands that Marilyn Monroe Estate holds the rights to use Marilyn Monroe's signature. See Nick Croce Depo. at 210:11-24. | 213. Disputed. The evidence cited does not support the fact asserted. When asked who he believed had the rights to Monroe's signature, Mr. Croce answered, "Well, whoever says they do. I think it's the Marilyn Monroe estate." Nick Croce Depo. at 210:21-24. EMMLLC is not Monroe's actual estate. The testimony does not establish that Mr. Croce was referring to the entity EMMLLC. Respondents further object to this testimony to the extent that it asserts a legal conclusion inappropriate for inclusion in a statement of facts. | |
| 214. Despite telling licensees it does not maintain rights to use the Marilyn Monroe signature, AVELA has approved images that incorporate Marilyn Monroe's signature. See Kimberly Mileski Depo. at 59:5-11, 154:23 to 155:22. | 214. Disputed. This evidence does not support the fact asserted. The deponent states that she does not know whether or not the font used is Monroe's actual signature. The testimony does not establish that the licensee used Monroe's actual signature or that AVELA ever approved the t-shirt at issue.<br><br>AVELA has a four-stage | Durham Decl., Exhibit FF at 11 (6.A.)<br><br>A.V.E.L.A., Inc. v. Central Mills, Inc. et al Case No. 2:15-cv-03918-JAK-AGR (Dkt. 1.) |

| | approval process and there is no evidence the product discussed ever passed AVELA's four-stage approval requirements.<br><br>Litigation between AVELA and Freeze indicates Freeze sold many unauthorized and unapproved products. | |
|---|---|---|
| 215. AVELA cannot establish ownership of any Marilyn Monroe intellectual property and has not produced documents that establish such rights. See Leo Valencia Depo. 9/30/2013 at 115:25 to 116:7. | 215. Disputed. Respondents have produced copyright deposits and registrations for X One X and AVELA's artwork. Mr. Valencia's testimony reflects that he purchased underlying images for his Marilyn Monroe artwork beginning in the early 1980s and has been licensing his Monroe artwork since then. | Dkt. 371, Exhibit M<br><br>Leo Valencia Depo. 9/30/2013 at 112:20-117:15<br><br>Leo Valencia Depo. 5/30/2014 at 543:5-544:9<br><br>Mr. Valencia has provided testimony on the substantial time and effort that has gone into creating XOX and AVELA's copyrighted artwork. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5-547:8. |
| 216. VIFA has also provided artwork to AVELA's licensees that included images of Marilyn Monroe. See Teresa Acuna Depo. at 18:3-12. | 216. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. VIFA sent AVELA's artwork to AVELA's licensees, including Monroe artwork, on behalf of AVELA. However, VIFA does not own or license any artwork. | Liza Acuna Depo. 9/13/2013 at 10:6-20; 126:6-10 |
| 217. Teresa Acuna testified that Liza Acuna approved all Marilyn Monroe product proposals at VIFA submitted by AVELA's licensees. See Teresa Acuna Depo. at 42:9-19. | 217. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. Immediately after the cited testimony, Teresa Acuna states that VIFA was not | Durham Decl., Exhibit W, Teresa Acuna Depo., 42:20-25<br><br>Liza Acuna Depo. |

| | | |
|---|---|---|
| | approving artwork, and that she would forward proposals to Liza Acuna for Liza Acuna to get approval from Leo Valencia at AVELA. | 9/13/2013 at 126:6-10; 245:11-246:13; 239:21-240:17 Ms. Acuna testifies that VIFA would get approval from AVELA and pass along the information to the licensees. |
| **Awareness of the Marilyn Monroe "Brand"** | | |
| 218. Leo Valencia has acknowledged that deceased celebrities have persona rights that can be exploited for value. See Leo Valencia Depo. 9/30/2013 at 108:13 to 109:16. | 218. Disputed. This fact amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 219. Leo Valencia testified that Marilyn Monroe is iconic and a famous celebrity by virtue of her films and affairs. See Leo Valencia Depo. 9/30/2013 at 93:4-19. | 219. Undisputed. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 220. Liza Acuna also testified that "Marilyn Monroe" is a famous brand and a "Hollywood Icon." See Liza Acuna Depo. 9/13/13 127:15- to 128:2; Liza Acuna Depo. 9/26/2013 at 98:3-5. | 220. Respondents do not dispute that Marilyn Monroe is an iconic actress, but dispute this fact to the extent that it purports to assert a legal conclusion and is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |

| | Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. | |
|---|---|---|
| 221. Even the AVELA Parties' survey expert, Howard Marylander, admitted in his report that an Eveready likelihood of confusion survey is most appropriately used when dealing with a well-known or "leading brand," and he used this approach for his survey in this case. See Howard Marylander Depo. at 26:8-25; see also Durham Decl., Ex. P ("Marylander Report") at pp. 4-5 (noting that the Eveready methodology "is generally considered the most realistic method for measuring likelihood of confusion as to source for well-known brands.") | 221. Disputed. The evidence cited merely demonstrates that the Eveready method *can* be used with a famous brand, it does not establish that Monroe is a famous "brand" or that Mr. Marylander believes Monroe is a famous "brand." These conclusions do not logically follow. Respondents note that Movants have not submitted Mr. Marylander's deposition in connection with their MSJ. Respondents further dispute this evidence to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 222. Licensees have also testified that Marilyn Monroe is famous, iconic and/or a celebrity. See Patricia Timsawat Depo. at 17:19-22, 160:4-5; Judith Albright Depo. at 121:7-10; Kimberly Mileski Depo. at 78:17-21; Nick Croce Depo. at 34:10-23; David Brown Depo. At 72:16-18, 217:14-19. | 222. Respondents do not dispute that Monroe is an iconic celebrity but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.)<br><br>*See, e.g.,* Judith Albright Depo. at 121:7-10; Nick Croce Depo. at 34:10-12 "Q: Would you say that Marilyn Monroe is famous? A: Yes." | |
| 223. Likewise, licensees have stated that when the name "Marilyn" appears with an image of Marilyn Monroe it cannot refer to any other person | 223. Respondents do not dispute that the name "Marilyn" refers to the iconic actress, but dispute this fact to the extent | |

| | | |
|---|---|---|
| besides Marilyn Monroe. See David Brown Depo. at 262:8 to 263:11. | that it purports to assert a legal conclusion and is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 224. AVELA's licensee, Mighty Fine, testified that it chose to license Marilyn Monroe images from AVELA because it believed products bearing those images would sell because Marilyn Monroe is "iconic." See Patricia Timsawat Depo. at 53:9-12. | 224. Respondents do not dispute that Marilyn Monroe is an iconic actress, but dispute this fact to the extent that it purports to assert a legal conclusion and is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) Respondents dispute this evidence to the extent that it does not establish that Mighty Fine was ever an AVELA licensee for Monroe artwork. | See evidence cited in SOF ¶ 140-Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 225. AVELA's Marilyn Monroe materials have also sold well; in fact, Teresa Acuna testified that Marilyn Monroe materials were very popular amongst licensees. See; Teresa Acuna Depo. at 18:16-25; Durham Decl., Ex X, Teresa Acuna Depo. Exs. 2, 3, 9, 12, 13, 16, and 17 (emails from licensees requesting additional Marilyn Monroe images); see also Durham Decl., Ex. S ("Green Damages Report") at p. 8 ("Both the First Summary and the Second Summary show overall net profit margins for Marilyn Monroe related revenues of over 71.5%."); Durham Decl., Ex. DD at AVELA002484 and AVELA3557; see also Leo Valencia Depo. 9/30/2013 at 203:7-9. | 225. Respondents do not dispute that AVELA's Monroe artwork is popular, or that this "evidence" demonstrates that AVELA's artwork and designs are desirable. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 226. Nick Croce testified that Marilyn Monroe has "a recognizable persona and face that people love" and "she's widely recognizable...[p]eople like her." See Nick Croce Depo. At 34:8-9, 73:7-16. | 226. Respondents do not dispute this testimony but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is | |

| | cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
|---|---|---|
| 227. As such, Mighty Fine licenses a larger number of Marilyn Monroe images from AVELA's Hollywood Siren collection than any other celebrity or actress. See Patricia Timsawat Depo. at 129:8 to 131:11. | 227. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) Respondents dispute this evidence to the extent that it does not establish that Mighty Fine was ever an AVELA licensee for Monroe images. | See evidence cited in SOF ¶ 140 indicating Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 228. Patricia Timsawat testified that Marilyn Monroe branded products sell well to retailers. Patricia Timsawat Depo. at 161:18-21. | 228. Respondents do not dispute that AVELA's Monroe artwork is desirable, but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) Respondents dispute this evidence to the extent that it does not establish that Mighty Fine was ever an AVELA licensee for Monroe images. | See evidence cited in SOF ¶ 140 indicating Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 229. David Brown also stated that that selling Marilyn Monroe merchandise was profitable for American Classics; and retailers, specifically Spencer's, have requested Marilyn Monroe products. David Brown Depo. at 31:1-3, 39:1-9, 164:9-22. | 229. Respondents do not dispute that AVELA's Monroe artwork is desirable, but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is | |

| | cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
|---|---|---|
| 230. Nick Croce likewise indicated that NJ Croce licensed Marilyn Monroe images from AVELA because it believed there was a demand in the market for Marilyn Monroe products. See Nick Croce Depo. at 33:12-20, 74:2-11. | 230. Respondents do not dispute that AVELA's Monroe artwork is desirable, but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | Nick Croce Depo. at 74:2-6: "Q: When you initially started – I guess can you tell me what triggered the desire to sell Marilyn Monroe products in the first place? A: We believed there was a demand in the marketplace with our customers for these designs." |
| 231. Kimberly Mileski of Freeze testified that Marilyn Monroe has commercial value. Kimberly Mileski Depo. at 205:17-19. | 231. Respondents do not dispute that AVELA's artwork has commercial value or that AVELA's Monroe artwork is desireable, but dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| 232. Moreover, Nick Croce stated that he believes that "Marilyn Monroe" is a trademarked name. Nick Croce Depo. at 69:6-10. | 232. This "fact" amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services or that *consumers* recognize Monroe as a source of goods or services. | |
| 233. David Brown testified that he understands Marilyn Monroe to be a trademark as well. See David Brown | 233. This "fact" amounts to a legal conclusion inappropriate for inclusion in a statement of | |

| | | |
|---|---|---|
| Depo. at 214:8-10. | undisputed facts. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services or that *consumers* recognize Monroe as a source of goods or services. | |
| 234. Leo Valencia acknowledged that the Estate owns trademark registrations for the name "Marilyn Monroe," see Leo Valencia Depo. 9/30/2013 at 294:15-21, 295:10-12; and Liza Acuna testified that she knew that there are trademark rights in "Marilyn Monroe," and understood that the Estate was associated with ABG. See Liza Acuna Depo. 9/13/2013 at 92:23: to 95:7, 96:3-6. | 234. Respondents dispute this fact to the extent it purports to assert EMMLLC's trademarks are valid and asserts a legal conclusion. Respondents dispute that the evidence cited demonstrates that Monroe is a famous "brand" indicating a source of goods or services. Respondents further dispute this testimony to the extent that it is cited in the MSJ to purportedly demonstrate that AVELA's artwork uses "Marilyn" as an identification of source. (MSJ at 22.) | |
| **Interaction Between the Estate Movants and the AVELA Parties and the AVELA Parties' Licensees** | | |
| 235. Leo Valencia testified that Eric Silver of Silver Buffalo informed him that Jamie Salter contacted Spencer's, at some point between 2011 and 2012, to notify Spencer's that AVELA's Marilyn Monroe products were not properly licensed and, therefore, to cease purchasing these items from AVELA and Silver Buffalo. See Leo Valencia Depo. 9/30/2013 at 252:20 to 253:9, 254:14 to 260:19; see also Liza Acuna Depo. 9/13/2013 at 118:16 to 119:19; Jamie Salter Depo.11/8/2013 at 46:13 to 49:5. | 235. Disputed. Mr. Valencia's testimony states that Jamie Salter said AVELA's products were not legitimate and infringing, not that these products were "not properly licensed." | Leo Valencia Depo. 9/30/2013 at 252:20-253:1 |
| 236. Leo Valencia could not identify any lost sales or any damaged relationships with licensees that resulted from the Estate Movants' alleged interference; and furthermore, Silver Buffalo continued to produce products using images licensed from AVELA. See Leo Valencia Depo. | 236. Disputed. Mr. Valencia testified that Mr. Salter's actions have caused damage to AVELA's good will and caused AVELA time and expense to repair this damage and file the instant lawsuit to establish that EMMLLC does not in fact own | Leo Valencia Depo. 9/30/2013 at 262:1-15, 264:14 to 265:10 |

| | | |
|---|---|---|
| 9/30/2013 at 262:1-15, 264:14 to 265:10. | rights to Monroe's image and persona and AVELA's products do not infringe EMMLLC's rights. | |
| 237. Liza Acuna also testified that the relationship with Silver Buffalo remained unchanged after the incident with Spencer's. See Liza Acuna Depo. at 123:13 to 124:4. | 237. Disputed. Respondents note that Pages 123-124 of Ms. Acuna's Deposition are not included in Exhibit A to Gina Durham's Declaration. | Liza Acuna testified on August 10, 2017 that the Silver Buffalo agreement ended two years prior as a result of the instant litigation and Jamie Salter's actions. Liza Acuna Depo 8/10/2017 at 45:17-47:24 |
| 238. VIFA contends that it engaged in licensing discussions and drafted a deal memorandum with Duke Imports, Inc. ("Duke Imports") between 2014 and 2014, but has never produced this deal memo. Liza Acuna 8/10/2017 at 41:6-42:7; | 238. Undisputed, but Respondents note that Ms. Acuna testified she had contractual discussions and negotiations with Duke Imports beginning in 2013 and it took three years to enter into an agreement as a result of Movants' interference. | Liza Acuna Depo. 8/10/2017 at 39:20-41:11 |
| 239. Liza Acuna testified that the Estate's alleged "interference" consisted of ABG telling Duke not to do business with VIFA. Liza Acuna 8/10/17 at 39:9-42:21, 44:1 to 45:15, 139:23 to 142:1. | 239. Disputed. The fact asserted mischaracterizes testimony.<br><br>Ms. Acuna testified that Duke was "intimidated and threatened" by Movants' actions. She also testified that Movants threatened to sue Duke and eliminate Duke's only licensing property, his "bread and butter" and livelihood." | Liza Acuna Depo. 8/10/2017 at 138:23-139:1; 139:24-140:24 |
| 240. Liza Acuna testified that the Estate never made a threat to sue Duke if it conducted business with the VIFA. Liza Acuna 8/10/2017 at 140:10-12. | 240. Disputed. The fact asserted mischaracterizes testimony.<br><br>Ms. Acuna testified that Duke was "intimidated and threatened" by Movants' actions. She also testified that Movants threatened to sue Duke and eliminate Duke's only licensing property, his "bread and butter" and livelihood." | Liza Acuna Depo. 8/10/2017 at 138:23-139:1; 139:24-140:24 |

| | | |
|---|---|---|
| 241. When asked about the financial loss that resulted of ABG's alleged interference, Liza Acuna stated "I don't know." Liza Acuna 8/10/2017 at 42:8-21. | 241. Disputed. This evidence does not support the fact asserted. | Ms. Acuna testified that the loss of three years of business caused financial loss, but that she was not certain of the calculation. Acuna Depo. 42:8-21.

AVELA turned over its license agreement with Duke Imports, entered into on January 1, 2015. (Durham Decl. Exhibit GG).

Goodheart Decl. ¶ 8, Exhibit D: AVELA turned over royalty reports showing Duke Imports generated royalties of $1,039 in the third quarter of 2016, royalties of $3350 in the fourth quarter of 2016, and $881 in the first quarter of 2017. AVELA was deprived of at least $14,048 in royalties from 2013-2014. |
| **Confusion** | | |
| 242. Patricia Timsawat testified that she did not know there was a difference between AVELA and the Estate. See Patricia Timsawat Depo. at 72:23-25. | 242. Respondents object to this testimony as irrelevant as it has no bearing as to consumer confusion. | |
| 243. The Estate Movants and AVELA appear at the same licensing trade shows. See David Brown Depo. at 75:23 to 79:7. | 243. Undisputed to the extent that the testimony cited demonstrates AVELA and someone from a company representing Marilyn Monroe were both at a licensing trade show. | |
| 244. Katie Jones testified that she receives emails from individuals who | 244. Disputed. This evidence does not support the fact | Goodheart Decl. ¶ 9, Exhibit E. |

| | | |
|---|---|---|
| are confused as to whether certain products are endorsed by the Estate or another company as they do not appear to conform with the Estate's stylistic guidelines. One such item was a t-shirt that depicted Marilyn Monroe with tattoos—a shirt which was manufactured by Mighty Fine and preapproved by AVELA. See Katie Jones Depo. 4/29/2014 at 26:2-25; see also Patricia Timsawat Depo. at 122:14 to 123:17. | asserted. Ms. Jones did not testify that any such products are AVELA products or that any shirt from Mighty Fine was one of these products. There is no evidence any consumer complained about Mighty Fine's shirt. Numerous other entitles sell t-shirts featuring Marilyn Monroe with tattoos. Respondents also object to this evidence on the grounds that these emails are inadmissible hearsay. The testimony does not establish that Mighty Fine was ever an AVELA licensee for Monroe artwork or that AVELA actually approved the t-shirt. | Liza Acuna testified on behalf of VIFA that Mighty Fine was not a licensee of AVELA Marilyn Monroe products. Liza Acuna Depo 9/26/2013 at 102:3-18.<br><br>Leo Valencia also stated that Mighty Fine was not one of AVELA's licensees. Leo Valencia Depo. 10/1/2013 at 130:25-131:2. |
| 245. VIFA approved a Marilyn tattoo fleece for Silver Buffalo. See Durham Decl., Ex X, Teresa Acuna Depo. Ex. 14. | 245. Disputed. This evidence does not support the fact asserted. This exhibit demonstrates that Silver Buffalo sold a product that did not pass AVELA's four-stage approval process. This exhibit demonstrates that VIFA did not receive an approval to send to AVELA and does not demonstrate that VIFA itself actually approved any product. Respondents note that the evidence cited is not included in Exhibit X to Ms. Durham's Declaration. | Durham Decl., Exhibit FF at 11 (6.A.)<br><br>Liza Acuna Depo. 9/13/2013 at 245:11-246:13; 239:21-240:17 Ms. Acuna testified that AVELA handles reviews and approvals and that VIFA gets approval from AVELA and passes along the information to the licensees. |
| 246. When phrases or quotations appear on t-shirts with Marilyn Monroe's image, AVELA's licensees testified that it gives the impression that it is something she said in life or in film. See Patricia Timsawat Depo. at 121:12 to 122:11; see also Nick Croce Depo. at 113:3 to 116:23, 119:12-18. | 246. Disputed. The evidence cited does not support the fact asserted. Mr. Croce did not testify that quotes used with Monroe's image give the impression that it is something Marilyn said in life or in film. Respondents object to this testimony as irrelevant as it has no bearing as to consumer confusion. Respondents dispute | See evidence cited in SOF ¶ 140 indicating Mighty Fine never had a license to sell AVELA's Monroe artwork. |

| | | |
|---|---|---|
| | this evidence to the extent that it is cited in the MSJ to stand for the proposition that Marilyn Monroe quotes evoke consumer confusion regarding EMMLLC or Monroe. (MSJ at 15.) The opinion testimony of AVELA licensees does not evidence *consumer* confusion. EMMLLC presents no evidence of consumer confusion regarding Monroe quotes, particularly where its expert survey does not utilize any Monroe quotes. | |
| 247: Sometimes AVELA's licensees create phrases or quotations to add to AVELA's images. See Kimberly Mileski Depo. at 157:17 to 159:8. Examples include:<br>a. "I don't know who invented high heels, but all women owe him a lot." Kimberly Mileski Depo. at 157:19-21<br>b. "Give a girl the right shoes and she can conquer the world –Marilyn." Patricia Timsawat Depo. at 121:12-14.<br>c. "Beneath the makeup and behind the smile, I'm just a girl who wishes for the world." Nick Croce Depo. at 113:16-18.<br>d. "I'd hit that." Patricia Timsawat Depo. at 122:15. | 247. Respondents dispute this evidence to the extent that it does not establish Mighty Fine was ever an AVELA licensee for Monroe artwork. Respondents object to this testimony as irrelevant as it has no bearing as to consumer confusion. Respondents dispute this evidence to the extent that it is cited in the MSJ to stand for the proposition that Marilyn Monroe quotes evoke consumer confusion regarding EMMLLC or Monroe. (MSJ at 15.) The opinion testimony of AVELA licensees does not evidence *consumer* confusion. EMMLLC presents no evidence of consumer confusion regarding Monroe quotes, particularly where its expert survey does not utilize any Monroe quotes. | See evidence cited in SOF ¶ 140 indicating Mighty Fine never had a license to sell AVELA's Monroe artwork. |
| 248. To measure confusion, both the Estate Movants and AVELA Parties retained survey experts to conduct a likelihood of confusion survey. Durham Decl., Ex. O ("Poret Report") at p. 4. | 248. Undisputed. | |
| 249. The Estate Movants' survey expert, Hal Poret, conducted an Eveready survey to measure likelihood of confusion. The survey showed respondents an AVELA Marilyn | 249. Undisputed. | |

| | | |
|---|---|---|
| Monroe t-shirt and one of two control t-shirts - either a t-shirt featuring an image of a non-famous woman or a t-shirt displaying Ben Franklin. Images of these t-shirts are below. Id. at pp. 5, 11-9. | | |
| 250. Respondents in the Poret survey were asked who they thought made or put out the t-shirt and if permission was needed to make or put out the shirt. See id. at pp. 7-8. | 250. Disputed. The evidence cited does not support the fact asserted where it does not demonstrate respondents were asked if permission was needed to make or put out the shirt. Further, whether permission was needed to make or put out the shirt is irrelevant. | |
| 251. After accounting for noise from the control groups, the Poret survey found that there was a net confusion level between 20.5% to 23.4%. Id. at p. 13. | 251. Disputed. Respondents object to this evidence where Mr. Poret's survey was based on flawed methodology, is irrelevant and unreliable, and Mr. Poret failed to accurately categorize responses. Mr. Poret also admitted that these conclusion levels do not apply to EMMLLC. | Dkt. 355 (Motion in Limine to Exclude Mr. Poret's testimony and survey); Goodheart Decl. ¶ 10, Exhibit F, Poret Depo. at 186:15-24. |
| 252. Mr. Poret concluded that "there is a significant level of confusion among consumers as to the source or approval of the t-shirt featuring the image of Marilyn Monroe." Id. | 252. Disputed. Respondents object to this evidence where Mr. Poret's survey was based on flawed methodology, is irrelevant and unreliable, and Mr. Poret failed to accurately categorize responses. Mr. Poret also admitted that these conclusion levels do not apply to EMMLLC. | Dkt. 355 (Motion in Limine to Exclude Mr. Poret's testimony and survey); Goodheart Decl. ¶ 10, Exhibit F, Poret Depo. at 186:15-24. |
| 253. The AVELA Parties' survey expert, Howard Marylander, also conducted an Eveready survey to "a study to measure whether consumers are likely to believe that Marilyn Monroe or her heirs, estate or other related entity make or are associated, connected, licensors or sponsors of the Marilyn Monroe t-shirts licensed by [AVELA]." See Marylander Report at pp. 3-5. | 253. Undisputed. | |
| 254. However, Mr. Poret stated that | 254. Disputed. This "fact" | Goodheart Decl. ¶ |

| | | |
|---|---|---|
| the Marylander survey was improperly executed for the following reasons:<br>a. In his survey, Marylander posed the following question: "Which of the three statements on this card do you think is correct? Do you think the company that made and put out this t-shirt is associated, connected, licensed, or sponsored by someone or some organization or it is not associated, connected, licensed, or sponsored by someone or some organization or do you not know or have no opinion?" This question combines four different concepts—association, connection, license, and sponsorship—into a single question and therefore, not only likely confused the respondents, but also directed attention away from the likely form of confusion that should have been the subject of the survey—the potential that the shirt is authorized or approved by Monroe. See Durham Decl., Ex. R ("Poret Rebuttal") at pp. 17-18.<br>b. The control in this survey should have measured how many individuals incorrectly believe that an image that clearly requires no permission to use is indeed licensed. Therefore the control in the Marylander survey, which were tshirts bearing an image of—what appeared to be another celebrity with the name "Nichole"—did not properly function as a control because it simply measured confusion with respect to another celebrity, rather than confusion with respect to Marilyn Monroe. Id. at pp. 3, 5, 12.<br>c. Marylander inappropriately arranged his survey specimen such that the Radio Days hang tag clearly faced the respondent as shown below (Id. at p. 5):<br>d. This placement of the Radio Days hang tag did not replicate marketplace conditions. Mr. Poret stated that "[f]irst, online purchasers of the | amounts to legal conclusions inappropriate for inclusion in a statement of facts.<br><br>a. Association, connection, license, and sponsorship all relate to authorization or approval. Inclusion of various terms likely could have *increased* confusion where it gave respondents several options to choose from.<br><br>b. This argument is nonsensical. A control should share as many characteristics with the test product as possible, "with the key exception of the characteristic whose influence is being assessed." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010). There is no indication the "Nichole" control was a celebrity, but even if she were, EMMLLC's own expert used a famous person as a control and did not count responses that thought an image of Benjamin Franklin was approved by Marilyn Monroe.<br><br>c. Products sold in stores have hang tags. *See THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 239 (S.D.N.Y. 2010) (an expert's failure to use hang tags on t-shirts clearly deviated from actual marketplace conditions because "Labels are not unnoticed by consumers; rather, they serve as important sources of information, including brand identification."). The Survey tested participants in a mall setting, not online shoppers. AVELA's products sold in | 11, Exhibit G;<br>Exhibit G at 10. |

| | | |
|---|---|---|
| AVELA shirts would see an image of the shirt containing all. Second, it is my understanding that AVELA does not require that licensees who sell the shirts in stores use the Radio Days hang tag and that some, possibly most, of the t-shirts sold in stores do not have a Radio Days tag. For instance, the AVELA shirt that was purchased at Spencer's for use in my survey did not have a Radio Days tag." Moreover, "[a]s anyone who has purchased a t-shirt hanging on a rack in a store is aware, tags hang off t-shirts in a manner that may or may not face the consumer or be easily viewable, and many consumers do not grab a hang tag and turn it to face them so they can read it. It appears, however, that the interviewers were instructed to arrange the shirt and tag so that the Radio Days tag squarely faced every respondent, unlike how shirts naturally hanging in a store would appear. Accordingly, the survey did not properly simulate how actual consumers would encounter the AVELA shirt in a large percentage of scenarios (online purchases and purchases from stores that don't use the tag) and significantly overemphasized the Radio Days name Monroe's likeness (and sometimes name) but would not see a Radio Days hang tag." Id. at pp. 15-16. | stores have used Radio Days hangtags. | |
| 255. Eric Rellosa, Divisional Vice President-Merchandise Manager at Spencer Gifts, LLC attested that "Spencer's has never displayed the hang tags shown in Exhibit A, which says RADIO DAYS, on any of the Monroe Shirt Spencer's previously sold." Durham Decl., Ex. PP ("Declaration of Eric Rellosa") at ¶3. | 255. Disputed. AVELA requires its licensees to display AVELA's brand information on labels, hang tags, and packaging. AVELA's Monroe t-shirts have been sold with Radio Days hang tags. | Goodheart Decl. ¶ 11, Exhibit G; Exhibit G at 10. |
| **"Dilution"** | | |
| 256. Licensees have testified to the superior quality of the Estate's services and products. For instance, | 256. Disputed. The evidence does not support the fact asserted. The fact asserted | Kimberly Mileski Depo. at 233:7-234:12; 234:24- |

| | | |
|---|---|---|
| Kimberly Mileski stated that Freeze chose to sign a license agreement with ABG as opposed to renewing a license agreement with AVELA because the quality of service and the images ABG would provide were superior: "what led [Freeze] to finally do or enter into the agreement was the images provided, and the marketing support that [Freeze] thought [it was] going to get from ABG." See Kimberly Mileski Depo. at 233:7 to 234:23. | mischaracterizes testimony. The testimony does not establish or state that EMMLLC's services or products are "superior." Ms. Mileski testified that Freeze got cease and desist letters from EMMLLC's counsel regarding AVELA's images and that the only reason Freeze ever decided to meet with Movants was because ABG insinuated Freeze should sign with ABG because AVELA's images were in jeopardy.<br><br>If EMMLLC's services or products were indeed "superior," EMMLLC would not need to send baseless cease and desist letters or make false claims regarding AVELA's images in order to secure licensing meetings. | 235:10. |
| 257. AVELA's use of Marilyn Monroe's name and likeness damages the Estate's reputation when it approves products that do not conform to the Estate's brand guidelines, which are intended to preserve Marilyn Monroe's persona: | 258. Disputed. Movants do not cite to any evidence to support this fact. The fact cited lacks any foundation and amounts to a legal conclusion inappropriate for inclusion in a statement of facts. Movants do not cite to any evidence that Monroe established any guidelines for how EMMLLC, or anyone, should use her "persona" or that Monroe or authorized EMMLLC, or anyone, to police the use of her "persona." | See evidence cited in SOF ¶ 33 |
| 258. David Brown testified that he believed that a t-shirt approved by AVELA bearing a "nasty looking" zombie depiction of Marilyn Monroe but only using the name "Marilyn" did not refer to any other Marilyn besides Marilyn Monroe. See David Brown Depo. at 262:8 to 263:11.<br>a. AVELA, under its Radio Days brand, has sold t-shirts that depict Marilyn Monroe | 258. Disputed. Respondents dispute that the evidence cited demonstrates that these products tarnish EMMLLC's "brand." The evidence cited does not establish that consumers associate these products with EMMLLC or that consumers ever complained about these products to EMMLLC. | Durham Decl. Exhibit P-finding 0% confusion for AVELA's products<br><br>See evidence cited in SOF ¶ 140 indicating Mighty Fine never had a license to sell AVELA's Monroe |

| | | |
|---|---|---|
| smoking a cigarette. See David Brown Depo. at 268:9-16, Ex. 111.<br>b. AVELA's licensees have sought and AVELA provides "sexier/racier" photos of Marilyn Monroe. See Patricia Timsawat Depo. at 90:2 to 91:13.<br>c. AVELA approved a design of Marilyn Monroe with a mustache drawn on her face. See Patricia Timsawat Depo. at 107:23 to 108:1.<br>d. Mighty Fine has produced, and AVELA has approved, t-shirts of Marilyn Monroe with the phrase "I'd hit that" and t-shirts bearing images of Marilyn Monroe with tattoos. See Patricia Timsawat Depo. at 122:14 to 123:17.<br>e. See Clarke Decl. at ¶¶ 34-47. | a. The testimony does not establish that the shirts depicting Monroe as a zombie or Monroe smoking a cigarette were ever actually approved by AVELA or sold.<br><br>b. The testimony cited does not establish that AVELA ever provided sexier/racier photos of Monroe to anyone. Q: Okay. And did you ultimately obtain sexier or racier images of Marilyn Monroe from A.V.E.L.A.? A. Oh, I don't know." Patricia Timsawat Depo. at 90:12-14.)<br><br>c. The testimony cited does not establish that AVELA actually approved this design.<br><br>d. The testimony cited does not establish that AVELA actually approved the design or that the product was ever actually sold. | artwork |
| **Alleged Damage** | | |
| 259. In addition to requesting actual and punitive damages to compensate for the Estate Movants' alleged acts of tortious interference, Leo Valencia, on behalf of the AVELA Parties, testified that he believes the Estate's trademark registrations will cause the AVELA Parties harm because it prevents the AVELA Parties from registering Marilyn Monroe as a trademark, and he stated that he believes that he has the right to register Marilyn Monroe with the United States Patent and Trademark Office ("USPTO") but the Estate does not. Mr. Valencia also stated that MARILYN MONROE can be used as trademark and that he has plans to register MARILYN MONROE at the USPTO. See Leo Valencia Depo. 8/9/2017 at 152:22 to | 259. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. The fact also amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. Mr. Valencia stated that he would theoretically register a trademark with the words "Radio Days" along with an image of Monroe if he had products enabling him to do so. Mr. Valencia testified that his products do not make trademark use of Monroe's image.<br><br>Respondents note that Pages 159-160 are not included in Exhibit Y. | Leo Valencia Depo. 8/9/2017 at 154:25-155:9, 156:1-21. |

| | | |
|---|---|---|
| 155:6, 156:17 to 157:2, 158:24 to 160:2; see also Dkt. Nos. 1, 282, 284. | | |
| 260. Leo Valencia testified that he believes that Jamie Salter "should just pay [him] to go away." Leo Valencia Depo. 8/9/2017 at 231:21 to 232:9, 233:15 to 234:2 ("Q. Do think Mr. Salter [CEO of the Estate] should pay you tens of millions of dollars? A. If he wants to be the only Marilyn Monroe licensee, yes. Q. Do you think he could get that benefit from you if he paid you tens of millions of dollars? A. Of course. Q. And how would that work? A. Well, if he was clearly the only legitimate licensor in the universe or in the world, he would have the whole entire Marilyn Monroe market to himself, so then he could control it on all levels. He wouldn't have to have other people diluting his market which he has now. ….Q. So you believe if Mr. Salter pays you off to make this lawsuit go away then he won't have any further threats to his licensing business? A. Correct. That no one will invest millions of dollars in legal fees and fight the fights I have fought. There will not be another Leo Valencia to come around again, period. There will not be. There just won't be period. It's not going to happen. Q. So you believe Mr. Salter should just pay you to go away. A. Yes.). | 260. Disputed. This evidence does not support the fact asserted and mischaracterizes testimony. The fact also amounts to a legal conclusion inappropriate for inclusion in a statement of undisputed facts. | |
| 261. The Estate is entitled to damages in the amount of actual damages from the Estate's lost revenues stemming from the licensing of the Marilyn Monroe rights as well as damages from AVELA's wrongful conduct, as measured by AVELA's unjust enrichment. See Green Damages Report at p. 7.<br>a. The Estate's damages expert, Philip Green, estimated that the Estate is entitled to at least $ to prevent unjust enrichment. Mr. Green calculated this | 261. Disputed. AVELA's expert, Mr. Fernando Torres found Mr. Green's report uses unsupported, misleading, and unreliable methodology and that Mr. Green's report does not accurately establish EMMLLC's damages.<br><br>Mr. Green's report is based on the false assumption that EMMLLC owns rights in Monroe's image or persona. | Goodheart Decl. ¶ 3, Exhibit A |

| | | |
|---|---|---|
| value based on the royalty reports (through September 2013) produced by the AVELA Parties, and estimated that the amount may be larger since there are additional AVELA licensees who have not produced royalty reports in this matter. Moreover, Mr. Green stated in his report that "AVELA's accounting records are not sufficient to reliably evidence any deductions to offset its unjust enrichment." Id.; see also Leo Valencia Depo. 10/1/2013 at 171:24-183:5. (stating that he had not produced royalty statements from licensees who sell AVELA products abroad). | Mr. Green failed to make any connection between AVELA's royalties and any purported infringement.<br><br>Mr. Green improperly failed to consider AVELA's deductible expenses and Mr. Green failed to consider a proper apportionment of AVELA's profits.<br><br>Movants mischaracterize Mr. Valencia's testimony. The testimony cited refers to an entity called "Poetic Gem" but does not establish that Poetic Gem was ever an AVELA licensee or that AVELA failed to produce royalty statements from licensees. | |
| 262. In addition to monetary damage, the Estate believes the AVELA Parties' use of the Marilyn Monroe name and image has hurt the Estate because such use has "impact[ed] the status of the brand and the estate." Katie Jones Depo. 7/19/2017 at 164:7 to 165:10. | 262. Disputed. The evidence cited does not support the fact asserted. Respondents object to this evidence as it amounts to a legal conclusion inappropriate for inclusion in a statement of facts. Respondents further object that the evidence cited lacks foundation and amounts to mere opinion testimony from one of EMMLLC's own employees. | |
| **RESPONDENTS' UNDISPUTED MATERIAL FACTS** | | |
| 263. Leo Valencia has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Marilyn Monroe, since as early as 1985. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 543:5-544:9 | | |
| 264. AVELA uses Monroe's image and, occasionally, the name Marilyn as decorative content on its products. Some of AVELA's products feature "Marilyn" on them and some do not. See Dkt. 371 Exhibit K; Goodheart Decl Exhibit G | | |

| | | |
|---|---|---|
| 265. AVELA is in the business of creating new derivative artistic works in print, graphic, and lithographic media based off of retro-themed materials previously in the public domain. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5-547:8. | | |
| 266. Valencia adds his own personality and creative flair to his restored artwork and built AVELA's business licensing this artwork. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5-547:8. | | |
| 267. Valencia created the entity XOX to manage and acquire various catalogs of vintage artwork. Durham Decl., Ex. B ("Liza Acuna Depo. 9/26/2013") at 79:4-5. | | |
| 268. AVELA's images transform old photographs of Monroe through extensive graphic design and restoration processes to create completely new artwork and reinvent and modernize Monroe. Durham Decl, Exhibit U, Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5-547:8. | | |
| 269. Mr. Valencia's designs are desirable for their "vintage feel" and aesthetically pleasing artwork. Valencia Depo. 9/30/2013 at 94:2-18 | | |
| 270. AVELA uses its own brand mark to clearly identify its own brand, RADIO DAYS or HOLLYWOOD LEGENDS on all product labels, hangtags, advertising, and packaging. AVELA requires its licensees to display AVELA's brand on labels and packaging, and AVELA's t-shirts have in fact utilized tags prominently displaying AVELA's "RADIO DAYS" mark. Goodheart Decl. ¶ 11, Exhibit G, Exhibit G at Page 11 | | |
| 271. VIFA facilitates the licensing of artwork between its clients, including AVELA, and various manufacturers, | | |

| | | |
|---|---|---|
| distributors, and retailers in exchange for a commission fee. Dkt 368, Exhibit A (Liza Acuna Declaration at ¶ 3) | | |
| 272. VIFA does not own or license any artwork. Dkt 368, Exhibit A (Liza Acuna Declaration at ¶ 5) | | |
| 273. VIFA does not license, manufacture, sell, or advertise any products. Dkt 368, Exhibit A (Liza Acuna Declaration at ¶ 6, 7) | | |
| 274. VIFA has never owned or licensed any Monroe artwork. Dkt 368, Exhibit A (Liza Acuna Declaration at ¶ 5) | | |
| 275. EMMLLC does not present evidence of Monroe's intent as to trademark rights. Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8 | | |
| 276. Monroe's will does not mention any intellectual property rights.  Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8 | | |
| 277. Marilyn Monroe did not register any trademarks during her lifetime. Goodheart Decl. ¶ 22 | | |
| 278. Monroe did not make trademark use of her persona, image, name or likeness in connection with goods or services. Goodheart Decl. ¶ 22 | | |
| 279. Monroe did not police the use of her persona, image, name or likeness during her lifetime. Exhibit J at 6-7. | | |
| 280. Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe. Goodheart Decl. ¶ 19-21 | | |
| 281. Neither Dr. Kris nor Lee Strasberg sold any Monroe-related products. Goodheart Decl. ¶ 19-21 | | |
| 282. Neither Dr. Kris nor Lee Strasberg policed any purported rights in Monroe in the two decades following Monroe's death. Goodheart Decl. ¶ 19-21 | | |
| 283. Lee Strasberg's will does not mention any intellectual property rights. Clarke Decl. Exhibit A | | |

| | | |
|---|---|---|
| 284. In 2001, Monroe's estate closed. Clarke Decl. Exhibit A at 23 | | |
| 285. In 2010, ABG created EMMLLC as its subsidiary and named it "The Estate of Marilyn Monroe, LLC." ("Clarke Decl.") at ¶ 4. | | |
| 286. Anna Strasberg is not a part of EMMLLC. Goodheart Decl. ¶ 32 | | |
| 287. Anna Strasberg retains certain rights to Marilyn Monroe's name, image, likeness, and persona.<br><br>Goodheart Decl., Exhibit B, Woodhouse Depo. at 49:22-54:5. | | |
| 288. EMMLLC continues to claim it owns a right of publicity in Monroe on its products and advertising. Goodheart Decl. ¶ 12, Exhibit H. | | |
| 289. Marilyn Monroe has no financial or ownership interest in EMMLLC's goods and/or services. Dkt. 339-1; Exhibit A to Clarke Decl. at 6-8; Goodheart Decl. ¶ 5, Exhibit C at 26-33 (listing the assets of Monroe's estate and not listing any intellectual property rights) | | |
| 290. On July 25, 2013, a representative of the Anna Freud Center signed a document retroactively assigning the Anna Freud Center's 25% share of Monroe's residuary estate to the entity "RALS-MM LLC f/k/a Marilyn Monroe, LLC" effective as of June 19, 2001. Goodheart Decl., Exhibit C at 10. | | |
| 291. The Central District of California issued a declaration that EMMLLC's predecessor did *not* own any rights of "association, sponsorship, and/or endorsement, in and to the name and likeness of Marilyn Monroe." Goodheart Decl., Exhibit C at 11-16. | | |
| 292. Movie studios, photographers, artists, and countless entities and members of the public have used Marilyn Monroe's name, image, persona, and likeness in commerce and on products from the 1950s to the | | |

| | | |
|---|---|---|
| present. See Dkt. 371, Exhibits D and E | | |
| 293. Photographers, artists, and entities own copyrights in Monroe images. See Dkt. 371, Exhibit F at 5 and Exhibit H | | |
| 294. Other entities own or have owned trademark and copyright rights in Monroe's films and characters. See Dkt. 371, Exhibit G | | |
| 295. Other entities own registered trademarks related to Monroe. See Dkt. 371, Exhibit G | | |
| 296. EMMLLC has not turned over cease and desist letters sent prior to 2011. Goodheart Decl. ¶ 14 | | |
| 297. AVELA does not use the mark "MARILYN MONROE" on its products. See Dkt. 371, Exhibit K; Goodheart Decl. Exhibit G | | |
| 298. AVELA has never licensed artwork for use in connection with any wine or alcoholic liquor. See Dkt. 371, Exhibit K; Goodheart Decl. Exhibit G | | |
| 299. AVELA does not use or allow its licensees to use Monroe's signature on products. Durham Decl., Exhibit N, Mileski Depo. at 59:5-11; Durham Decl, Exhibit A, Liza Acuna Depo. 9/13/2013 at 97:2-9. | | |
| 300. In *Shaw*, the heirs of photographer Sam Shaw sought to sell his copyrighted photographs of Marilyn Monroe in connection with the sale of t-shirts. *Shaw*, No. 05 CIV. 3939 (CM), 2008 WL 4127830, at *2 (S.D.N.Y. Sept. 2, 2008). The shirts bore a picture of Monroe and a "Shaw Family Archives" inscription on the inside neck label and tag. *Id* | | |
| 301. Movants claim to own rights to every image of Monroe. Goodheart Decl. Exhibit B Woodhouse Depo. 79:13-80:5. | | |
| 302. EMMLLC claims to distinguish its products through the use of Monroe's signature and the trademark "MARILYN MONROE." | | |

| | | |
|---|---|---|
| Goodheart Decl. ¶ 13, Exhibit I, *see also* ¶ G Page 11. | | |
| 303. Hal Poret admitted his expert report for EMMLLC did not address any consumer's reasons for buying AVELA's Monroe t-shirts. "Q. Did your survey test whether or not consumers are buying shirts for the brand as opposed to picture on the shirt? …A. No, it did not address anyone's reason for buying a shirt." Goodheart Decl. ¶ 10, Exhibit F, Poret Depo at 79:15-19. Mr. Poret also admitted the conclusion of his survey is not specific to EMMLLC. Poret Depo at 186:15-24. | | |
| 304. The EMMLLC Survey did not evaluate use of the name "Marilyn," the name "Marilyn Monroe," or Marilyn Monroe's stylized signature. Goodheart Decl. ¶ 10, Exhibit F, Poret Depo. at 81:11-21. | | |
| 305. The products in Hal Poret's Survey do not have any hang tags. Durham Decl. Exhibit O, EMMLLC Survey at 5, 9, 11. | | |
| 306. EMMLLC is not Monroe's family. Exhibit J at 4. | | |
| 307. EMMLLC is not Monroe's heirs. Exhibit A to Clarke Decl. at 6-8 | | |
| 308. EMMLLC is not Monroe's actual estate. Exhibit A to Clarke Decl. | | |
| 309. Katie Jones, EMMLLC's brand manager and person designated by EMMLLC as its person most knowledgeable about instances of actual confusion regarding AVELA products, testified that EMMLLC gets "a lot of products . . . where people are confused whether they are from the Estate or whether they are from another person," but that EMMLLC was unaware whether any of those products were from AVELA or not. Katie Jones Depo., 4/29/14, 25:21 – 26:8. | | |
| 310. Various third parties license and | | |

| | | |
|---|---|---|
| manufacture t-shirts depicting Monroe with tattoos. Goodheart Decl. Exhibit E | | |
| 311. EMMLLC has not provided any emails from consumers demonstrating confusion or explained why such emails cannot be produced. Goodheart Decl. ¶ 15. | | |
| 312. AVELA's expert, Mr. Howard Marylander, found zero likelihood of confusion at a 95% confidence level. Durham Decl. Exhibit P. | | |
| 313. Mr. Marylander's survey used AVELA t-shirts with the name "Marilyn" on them. Durham Decl. Exhibit P. | | |
| 314. AVELA's counsel has informed AVELA that may lawfully license Monroe artwork. Dkt. 371 Exhibit N at 2-8. | | |
| 315. Monroe posed for nude photos. Goodheart Decl, Exhibit L | | |
| 316. Monroe smoked cigarettes. Goodheart Decl, Exhibit L | | |
| 317. Monroe's nude photos were used in the first issue of Playboy. Goodheart Decl, Exhibit L | | |
| 318. These nude photos were then merchandized on products during Monroe's lifetime without Monroe's consent. Goodheart Decl, Exhibit L | | |
| 319. AVELA's expert, Fernando Torres found that Mr. Green failed to accurately establish damages. Goodheart Decl. Exhibit A | | |
| 320. AVELA's expert, Fernando Torres, found that Mr. Green failed to make any connection between AVELA's royalties and any purported infringement, Mr. Green failed to consider AVELA's deductible expenses and Mr. Green failed to consider a proper apportionment of AVELA's profits. Goodheart Decl. Exhibit A | | |
| 321. Mr. Torres determined AVELA's revenues for products bearing the | | |

| | | |
|---|---|---|
| name "Marilyn" in a cursive font amounted to $880. Goodheart Decl. Exhibit A at 16-18. | | |
| 322. AVELA turned over its license agreement with Duke Imports. Durham Decl. Exhibit GG | | |
| 323. Silver Buffalo breached its agreement with AVELA. Liza Acuna Depo 8/10/2017 at 45:17-47:24 | | |
| 324. EMMLLC has made false and fraudulent claims to expansive intellectual property rights it does not own for years, to Respondents' detriment. Movants have interfered with VIFA's business by purporting to own fictional rights to Monroe's image and persona, misrepresenting that it is Monroe's estate and that EMMLLC's trademarks have any connection to Monroe, fraudulently claiming that EMMLLC owns Monroe's right of publicity, and misrepresentating that AVELA's products are unlawful. Liza Acuna Depo. 151:12-25; 178:17-22; 186:3-15. | | |
| 325. AVELA turned over royalty reports showing Duke Imports generated royalties of $1,039 in the third quarter of 2016, royalties of $3350 in the fourth quarter of 2016 (AVELA 6259.), and $881 in the first quarter of 2017. On average, Duke Imports generated $1,756 per quarter. Goodheart Decl. Exhibit D. | | |
| 326. Ms. Acuna further testified James Salter told several companies, that they could not do business with AVELA, that business for Marilyn Monroe artwork licensing has decreased as a result of ABG and/or EMMLLC's interference, that ABG directed customs in Europe to seize AVELA's Monroe products from retail stores and the products were in fact seized, causing financial losses, and that AVELA had an agreement with Sutton Group to produce pajamas | | |

| | | |
|---|---|---|
| with Monroe artwork but Sutton Group pulled out after someone from EMMLLC or ABG told them they could not sell the products. Liza Acuna Depo. 8/10/2017 19:23-20:13, 26:10-25, 27:7-28:21; 32:4-17; 36:15-37:23. | | |
| 327. To the public, the primary significance of a "MARILYN MONROE" t-shirt is of a t-shirt with a picture of Monroe on it. Goodheart Decl. Exhibit K. | | |
| 328. "MARILYN MONROE" is used to refer to with products with Monroe's image on them. Consumers desire these products for the artwork on the product, not because Monroe's name suggests the product originated with EMMLLC. Goodheart Decl. Exhibit K. | | |
| 329. James Salter has claimed that EMMLLC must approve all t-shirts with an image of Marilyn Monroe on them. James Salter Depo 8/23/2017 32:15-33:7. ("Q. You said earlier that the photographers couldn't use Marilyn Monroe…What if they want to make a T-shirt? … A: Can't do it. … If the salesman walks up to you and said 'Would you like to buy a Marilyn Monroe T-shirt,' that's passing off rights.") | | |
| 330. EMMLLC seeks to control any use of Monroe in commerce. James Salter Depo 8/23/2017 32:15-33:7 | | |
| 331. EMMLLC is not aware of any actual fans of EMMLLC the entity. Goodheart Decl. Exhibit B Woodhouse Depo. 63:3-16 ("I'm not specifically aware of fans of our business, but there are many, many fans of Marilyn Monroe.") | | |
| 332. Dave Grossman Creations, a previous licensee of AVELA, sold products bearing AVELA's Marilyn Monroe artwork. Dkt. 371 Exhibit J | | |
| 333. CMG was ABG's predecessor in licensing purported Marilyn Monroe | | |

| | | |
|---|---|---|
| intellectual property rights. Dkt. 371 Exhibit J | | |
| 334. CMG sent Dave Grossman Creations a cease and desist letter in February 2006 regarding AVELA's Monroe products. Dkt. 371 Exhibit J | | |
| 335. Ms. Acuna testified she has been licensing AVELA's Monroe artwork since as early as 2001, and did not receive any threats or objection until 2012 when ABG began threatening her. Liza Acuna Depo. 8/10/2017 at 181:4-182:6 | | |
| 336. Movants specifically target AVELA and its licensees using EMMLLC's registered marks as a basis for its false claim that it has exclusive rights to use Monroe in commerce and that AVELA may not license its Monroe artwork. Liza Acuna Depo. 8/10/2017 at 155:6-15. | | |
| 337. EMMLLC claims its rights exist because it purchased them. Goodheart Decl. Exhibit B Nick Woodhouse Depo. 29:11-30:21. | | |
| 338. EMMLLC's Product:  The creation date for this EMMLLC product is unknown. On this product, Monroe is laughing, wearing a printed top, and in front of a zebra-print background. Clarke Decl. Exhibit O | | |
| 339. AVELA's product:  | | |

| | | |
|---|---|---|
| This image was created on 10/22/2010 (AVELA 336). In this image, Monroe is not smiling, has jewelry, and is staring at the camera with her arms folded. Durham Decl. Exhibit KK | | |
| 340. EMMLLC's Product:<br><br>The creation date for this EMMLLC product is unknown. On this product, Monroe is wearing a black bathing suit, with one hand to her face and one hand on her hip, and a red bar is superimposed over the image with the name "Marilyn." Clarke Decl. Exhibit O | | |
| 341. AVELA's Product<br><br>This product was created on 9/28/2012 (AVELA 306-307). In AVELA's artwork, Monroe is wearing a different outfit, posing differently, and AVELA added black heart graphic and its own "HOLLYWOOD LEGENDS" brand label on the front of the shirts inside a heart. Durham Decl. Exhibit KK | | |
| 342. EMMLLC's Product | | |

| | | |
|---|---|---|
| <br><br>The creation date for this EMMLLC product is unknown. EMMLLC's product features "MARILYN MONROE" in prominent letters, and a black and white photo of Monroe posing in a white dress. Clarke Decl. Exhibit O | | |
| 343. AVELA's Product<br><br><br><br>This image was created 9/12/2011 (AVELA 329). AVELA's product features a illustrated image of Monroe staring into the camera in vivid colors. Durham Decl. Exhibit KK | | |
| 344. EMMLLC's Product<br><br><br><br>The creation date for this EMMLLC product is unknown. EMMLLC's products feature full-body images of Monroe in front of blue backgrounds. Clarke Decl. Exhibit O | | |
| 245. AVELA's Product | | |

|  This product was created 9/28/2011 (AVELA 350). AVELA's products feature various close-up artwork of Monroe. Durham Decl. Exhibit KK | | |
| --- | --- | --- |
| 346. EMMLLC's Product  The creation date for this EMMLLC product is unknown. EMMLLC's product features a black and white image of Monroe with nearly closed eyes. Clarke Decl. Exhibit O | | |
| 347. AVELA's Product  This product was created 10/3/2012 (AVELA 353). AVELA's product features a colorful image of Monroe laughing. Durham Decl. Exhibit KK | | |
| 346. EMMLLC's Product  The creation date for this EMMLLC product is unknown. EMMLLC's product features a laughing Monroe over a striped background. Clarke Decl. Exhibit O | | |

| | | |
|---|---|---|
| 348. AVELA's Product<br><br><br><br>This product was created on 8/11/2011 (AVELA 349). AVELA's product features Monroe staring straight into the camera, with a closed mouth, no background, and only Monroe's face is visible. Durham Decl. Exhibit KK | | |
| 349. EMMLLC's Product<br><br><br><br>The creation date for this EMMLLC product is unknown. EMMLLC's product features Monroe's signature in bold pink lettering, and a picture of Monroe looking into the camera. Clarke Decl. Exhibit O | | |
| 350. AVELA's Product<br><br><br><br>AVELA's product was created on 9/6/2012 (AVELA 333). AVELA's product features the words "Some Like it Hot" and shows Monroe with a white dress folded at the top, half-closed eyes, and her head tilted back. Durham Decl. Exhibit KK | | |
| 351. EMMLLC's Product | | |

The creation date for this EMMLLC product is unknown. EMMLLC's product features a lone image of Monroe wearing a spotted pink and purpole dress and a zebra background. Clarke Decl. Exhibit O

352. AVELA's Product



This product was created on 11/28/2012 (AVELA 342). AVELA's product features a collage of Monroe photos designed with a green colored background. Durham Decl. Exhibit KK

Dated: June 29, 2018

Respectfully Submitted,
By: /s/ Gregory J. Goodheart

Gregory J. Goodheart
GOODHEART LAW
OFFICES
*Attorneys for V International*

By: /s/ Duane Harley
D HARLEY, P.C.

*Attorneys for A.V.E.L.A., Inc.,*
*X One X Movie Archive, Inc.,*
*and  Leo Valencia*