**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC.,<br><br>Plaintiff,<br><br>-against-<br><br>THE ESTATE OF MARILYN MONROE LLC; and DOES 1 THROUGH 10,<br><br>Defendants | Case No.:  12 Civ. 4828 (KPF)(JCF)<br>ECF Case |
| THE ESTATE OF MARILYN MONROE LLC,<br><br>Defendant/Counter-Plaintiff,<br><br>-against-<br><br>A.V.E.L.A., INC., LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V. INTERNATIONAL FINE ARTS PUBLISHING, INC.,<br><br>Counter-Defendants | |
| V. INTERNATIONAL FINE ARTS PUBLISHING, INC.<br><br>Counter-Defendant/Counter-Plaintiff<br><br>-against-<br><br>THE ESTATE OF MARILYN MONROE, LLC,<br><br>Defendant/Counter-Plaintiff<br><br>And | |

AUTHENTIC BRANDS GROUP, LLC, and
JAMES SALTER

Third Party Defendants

X ONE X MOVIE ARCHIVE, INC.

Third Party Plaintiff/Counter-
Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE,
LLC,

Counter-Defendant

and

AUTHENTIC BRANDS GROUP, LLC,
JAMES SALTER, and LEONARD GREEN &
PARTNERS, L.P.

Third Party Defendants

**MEMORANDUM OF LAW IN SUPPORT OF THE ESTATE OF MARILYN MONROE LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES SALTER'S OMNIBUS RESPONSE IN OPPOSITION TO X ONE X MOVIE ARCHIVES, INC., A.V.E.L.A., INC., LEO VALENCIA, AND V. INTERNATIONAL FINE ARTS PUBLISHING, INC.'S MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT .................................................................................1

II.    RESPONSE TO STATEMENT OF UNDISPUTED FACTS ...........................5

III.   ARGUMENT ....................................................................................................5

    A.    Movants' Summary Judgment Motions Fail .........................................5

    B.    The Movants Are Not Entitled To Summary Judgment On The Estate's False Endorsement Claim; Rather, The Estate's Motion For Summary Judgment On That Claim Should Be Granted. ........................................6

        1.    Section 43(a) Is Not Equivalent To Federal Right Of Publicity.................6

        2.    Secondary Meaning Is Not Required For False Endorsement. ...................8

        3.    The Estate Owns The Rights Asserted....................................................10

        4.    The Estate's § 43(A) Claim Does Not Overextend The Lanham Act.........................................................................................................13

        5.    Movants Cannot Avoid A Likelihood Of Confusion Finding. .................14

            a.    Strength Of The "Mark" ................................................15

            b.    Similarity Of The Marks................................................18

            c.    Proximity Of The Products ...........................................19

            d.    Evidence Of Actual Consumer Confusion....................19

            e.    Evidence Of Bad Faith..................................................22

            f.    Sophistication Of Consumers In The Relevant Market .................23

            g.    Balancing The Factors ..................................................24

    C.    Movants Are Not Entitled To Summary Judgment On The Estate's Trademark Infringement Claim; Rather, The Estate's Motion For Summary Judgment On That Claim Should Be Granted.....................................25

    D.    On The Estate's New York Unfair Competition Claim, Summary Judgment Should Be Entered In Favor Of The Estate.............................28

    E.    Movants Are Not Entitled To Summary Judgment On The Estate's Federal Trademark Dilution Claim. .....................................................................29

    F.    VIFA Is Not Entitled To Summary Judgment On The Estate's Tortious Interference Claim. .....................................................................29

    G.    Movants Are Not Entitled To Summary Judgment On Affirmative Defenses.............................................................................................30

        1.    Laches ..................................................................................................30

        2.    Copyright Law .....................................................................................32

        3.    First Amendment .................................................................................33

        4.    Fair Use ...............................................................................................34

IV.    CONCLUSION................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A, Inc. v. Estate of Marilyn Monroe*,
 131 F. Supp. 3d. 196 (S.D.N.Y. 2015)........................................................................2, 3, 7, 33

*Affiliated Records Inc. v. Taylor*,
 No. 09 Civ. 9938 KBF, 2012 WL 1675589 (S.D.N.Y. May 14, 2012) ...................................16

*Allen v. Nat'l Video, Inc.*,
 610 F. Supp. 612 (S.D.N.Y. 1985) ..............................................................................7, 8, 24

*Anheuser-Busch, Inc. v. Balducci Publications*,
 28 F.3d 769 (8th Cir. 1994) ...................................................................................................33

*Arista Records LLC v. Lime Grp. LLC*,
 No. 06 Civ. 5936 KMW, 2011 WL 1642434 (S.D.N.Y. Apr. 20, 2011)................................23

*Arrow Fastener Co., Inc. v. Stanley Works*,
 59 F.3d 384 (2d Cir. 1995).....................................................................................................27

*Avalos v. IAC/Interactivecorp.*,
 No. 13 Civ. 8351 (JMF), 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) ......................7, 10, 14

*Bach v. Forever Living Products, Inc.*,
 473 F. Supp.2d (W.D. Wash. 2007)........................................................................................32

*Beastie Boys v. Monster Energy Co.*,
 66 F. Supp. 3d 424 (S.D.N.Y. 2014)........................................................................................7

*Bi-Rite Enterprises, Inc. v. Button Master*,
 555 F. Supp. 1188 (S.D.N.Y. 1983), *supplemented sub nom.* 578 F. Supp. 59
 (S.D.N.Y. 1983) .....................................................................................................................34

*Bogart LLC v. Ashley Furniture Indus. Inc.*,
 No. 10 Civ. 39, 2012 WL 3745833 (M.D. Ga. Aug. 28, 2012) ..............................................25

*Branca v. Mann*,
 No. 11 Civ. 00584, 2012 WL 3263610 (C.D. Cal. Aug. 10, 2012) ...................................11, 12

*Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*,
 No. 10 Civ. 2333 (LTS), 2011 WL 1327137 (S.D.N.Y. Mar. 31, 2011)......................... *passim*

**Page**

*Cairns v. Franklin Mint Co.*,
    107 F. Supp. 2d 1212 (C.D. Cal. 2000) ...........................................................................14, 17

*Cairns v. Franklin Mint Co.*,
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ..............................................................................9, 17

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*,
    433 F.2d 686 (2d Cir. 1970)...............................................................................................30

*Cheever v. Academy Chicago, Ltd.*,
    690 F. Supp. 281 (S.D.N.Y. 1988) .....................................................................................11

*Comedy III Productions, Inc. v. Saderup, Inc.*,
    21 P.3d 797 (Cal. 2001) .....................................................................................................33

*Coty Inc. v. Excell Brands, LLC*,
    277 F. Supp. 3d 425 (S.D.N.Y. 2017)..................................................................................17

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
    539 U.S. 23 (2003)..............................................................................................................32

*Dew v. 39th Street Realty*,
    No. 99 Civ. 12343(WHP) (JCF), 2001 WL 388053 (S.D.N.Y. Apr. 16, 2001) ....................13

*Douglas v. New York State Adirondack Park Agency*,
    895 F. Supp. 2d 321, 391 (N.D.N.Y. 2012), *on reconsideration in part*, 2012
    WL 5364344 (N.D.N.Y. Oct. 30, 2012) ...............................................................................5

*Experience Hendrix, LLC v. Electric Hendrix, LLC*,
    90 U.S.P.Q. 2d 1883 (W.D. Wash. 2008).......................................................................25, 26

*Experience Hendrix, LLC v. Electric Hendrix, LLC*
    No. 05-36029, 2008 WL 3243896 (W.D. Wash. Aug. 7, 2008)............................................26

*Experience Hendrix LLC v. James Marshall Hendrix Found.*,
    240 F. App'x 739 (9th Cir. 2007) .......................................................................................26

*Ferrer v. Maychick*,
    69 F. Supp. 2d 495 (S.D.N.Y. 1999)...................................................................................10

*Fifty-Six Hope Rd. Music, Ltd. v. Kokob Printing*,
    No. 05 Civ. 1226-L (CAB), 2007 WL 433195 (S.D. Cal. Jan. 26, 2007) .............................25

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 410 (2015)........................................24

**Page**

*Geisel v. Poynter Products, Inc.*,
   283 F. Supp. 261 (S.D.N.Y.1968) ..................................................................8, 13

*Gucci Am., Inc. v. Guess?, Inc.*,
   843 F. Supp. 2d 412, 422 (S.D.N.Y. 2012), *opinion clarified* (Feb. 21, 2012) ................24, 35

*Hearst Holdings Inc. v. AVELA Inc.*,
   2014 WL 640415 ...............................................................................................20

*Hicks v. Casablanca Records*,
   464 F. Supp. 426 (S.D.N.Y. 1978) ..................................................................10

*Int'l Order of Job's Daughters v. Lindeburg & Co.*,
   633 F.2d 912 (9th Cir. 1980) ..........................................................................34

*Jackson v. Odenat*,
   9 F. Supp. 3d 342 (S.D.N.Y. 2014) .......................................................6, 9, 14, 21

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
   No. 04 Civ. 7203 (DLC), 2006 WL 1012939 (S.D.N.Y. 2006) ............................33

*Kaplan, Inc. v. Yun*,
   16 F. Supp. 3d 341 (S.D.N.Y. 2014)..............................................................28, 29

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998)..............................................................................5

*Kregos v. Associates Press*,
   937 F.2d 700 (2d Cir. 1991)..............................................................................8

*Lang v. Ret. Living Pub. Co.*,
   949 F.2d 576 (2d Cir. 1991)............................................................................24

*Lon Tai Shing Co. v. Koch+Lowy*,
   No. 90 Civ. 4464, 1992 WL 18806 (S.D.N.Y. Jan. 28, 1992)..........................21, 23

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
   692 F.3d 983 (9th Cir. 2012) .........................................................................7, 8

*Museum Boutique Intercontinental, Ltd. v. Picasso*,
   880 F. Supp. 153 (S.D.N.Y. 1995) ..................................................................11

*Mutual of Omaha Ins. Co. v. Novak*,
   836 F.2d 397 (8th Cir. 1987) ..........................................................................33

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
   590 F. Supp. 2d 500 (S.D.N.Y. 2008)..............................................................24

iv

*Parks v. LaFace Records*,
    329 F.3d 437 (6th Cir. 2003) ...............................................................9

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*,
    887 F. Supp. 2d 519 (S.D.N.Y. 2012)..................................................30

*Estate of Presley v. Russen*,
    513 F. Supp. 1339 (D.N.J. 1981) ........................................................10

*Rogers v. Grimaldi*
    875 F.2d 994 (2d Cir. 1989)................................................................33

*Saratoga Vichy Spring Co. v. Lehman*,
    625 F.2d 1037 (2d Cir.1980)...............................................................30

*Sea Tow Servs. Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*,
    211 F. Supp. 3d 528 (E.D.N.Y. 2016), *aff'd*, 699 F. App'x 70 (2d Cir. 2017)........................5

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*,
    486 F. Supp. 2d 309 (S.D.N.Y. 2008)..............................................7, 8

*SLY Magazine, LLC v. Weider Publications L.L.C.*,
    529 F. Supp. 2d 425 (S.D.N.Y. 2007), *aff'd*, 346 F. App'x 721 (2d Cir. 2009)....................24

*Smith v. Wal-Mart Stores, Inc.*,
    537 F. Supp. 2d 1302 (N.D. Ga. 2008) ...............................................33

*Steinbeck v. McIntosh & Otis, Inc.*,
    No. 04 Civ. 5497 (GBD), 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009), *aff'd*
    *sub nom.* 400 F. App'x 572 (2d Cir. 2010)....................................12, 13

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.*,
    244 F.3d 88 (2d Cir. 2001).................................................................34

*Trouble v. Wet Seal*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001)..................................................22

*Trump v. Pavion, Ltd.*,
    No. 89 Civ. 5453 (TPG), 1991 WL 167964 (S.D.N.Y. Aug. 22, 1991) ...............................8, 9

*Vicinanzo v. Brunschwig & Fils, Inc.*,
    739 F. Supp. 891 (S.D.N.Y. 1990) ......................................................23

*Victorinox AG v. B&F Sys., Inc.*,
    709 F. App'x 44 (2d Cir. 2017), *as amended* (Oct. 4, 2017).................................30

**Page**

**Statutes**

15 U.S.C. § 1115.............................................................................................27

15 U.S.C. §1115(4)...........................................................................................34

15 U.S.C. § 1127.............................................................................................17

Lanham Act..................................................................................... *passim*

N.Y. GEN. BUS. LAW § 360-l ...........................................................................29

**Other Authorities**

First Amendment .......................................................................................4, 33

Fed. R. Civ. P. 34 .........................................................................................13

FED. R. CIV. P. 56(a) ......................................................................................5

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 ...........................22

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:20 ..........................28

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:35 ..........................27

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11 ..........................34

The Estate of Marilyn Monroe LLC (the "Estate") respectfully submits this memorandum of law in opposition (the "Opposition") to the motions of X One X Movie Archives, Inc., A.V.E.L.A., Inc., and Leo Valencia (collectively, the "AVELA Parties") and of V International Fine Arts Publishing, Inc. ("VIFA") (the AVELA Parties and VIFA, collectively, "Movants") that seek summary disposition of the Estate's First Amended Counterclaims ( the "FAC").

## I.    PRELIMINARY STATEMENT

The Estate, as the successor-in-interest of rights flowing from Marilyn Monroe's will, and the owner of intellectual property rights relating to Marilyn Monroe, has sought to enjoin Movants' licensing of products that incorporate the name and image of Marilyn Monroe in competition with the Estate's licensed products.  The FAC forwards a false endorsement claim under § 43(a) of the Lanham Act as well as federal and state trademark infringement claims.  The Estate seeks relief through these vehicles because consumers are likely to confuse Movants' licensed products as being approved or permitted by the Estate.

Movants' summary judgment motions challenge the validity of the Estate's rights, and then proceed to argue that even if the Estate does have the rights it claims, it cannot establish that Movants' products create a likelihood of confusion.  Movants' arguments fail.

In order to construct their faulty summary judgment arguments on validity, Movants conflate four distinct legal concepts: (1) state right of publicity, (2) federal false endorsement under § 43(a), (3) trademark rights, and (4) copyrights.  Concisely put:

- Movants argue that the Estate cannot maintain a § 43(a) claim because Marilyn Monroe does not have a state right of publicity claim under New York law;

- Movants argue that the Estate cannot maintain a trademark infringement claim because Marilyn Monroe did not register trademarks during her lifetime to expressly bequeath in

her will, thereby allowing AVELA (rather than the Estate) to establish prior trademark rights in Marilyn Monroe, purportedly through its prior use; and

- Movants argue that AVELA's copyrights allow Movants to ignore the Estate's rights.

The ability of the Estate to pursue a false endorsement claim under § 43(a) of the Lanham Act, however, cannot be disputed. The Estate is the official estate of Ms. Monroe in the sense that it purchased all of the assets of Marilyn Monroe, LLC, the entity formed by the Administratrix of Ms. Monroe's estate specifically to hold and manage the intellectual property assets of Marilyn Monroe, pursuant to the authorization of the New York Surrogate's Court in 2001. Movants' argument that Ms. Monroe's right of publicity could not have been passed down through Ms. Monroe's will because a prior court determined Ms. Monroe to have been domiciled in New York at the time of her death, thereby foreclosing the possibility of a state right of publicity passing to her estate, is inapposite. This Court (just like many others) has already ruled that a § 43(a) claim is not dependent on the existence of state right of publicity surviving the death of an individual. *See Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (LTS), 2011 WL 1327137, at *5 (S.D.N.Y. Mar. 31, 2011). A state statutory right of publicity is distinct from the trademark-like right recognized under a § 43(a) false endorsement claim. *A.V.E.L.A, Inc. v. Estate of Marilyn Monroe,* 131 F. Supp. 3d. 196, 205 (S.D.N.Y. 2015) ("*AVELA I*"). Any residuary property rights in Ms. Monroe's estate – of which trademarks and trademark-like rights qualify – passed through the estate to Marilyn Monroe, LLC before the estate was closed.

The Estate's trademark infringement claims, based largely on incontestable registered trademarks, also cannot be disputed. Further, a number of these trademark registrations were obtained while Ms. Monroe's estate remained opened, and were part of the intellectual property

assets transferred to Marilyn Monroe, LLC by authorization of the Surrogate's Court prior to closing the estate in 2001. Movants' attempt to manufacture a requirement that Ms. Monroe was required to register trademarks during her lifetime in order to entitle her estate beneficiary to own trademarks has no basis in law. U.S. law does not require that trademarks be registered, and it is common for estate beneficiaries of deceased celebrities to claim and register rights as those rights ripen through use of a mark, as was done here.

Movants' claim that any trademarks related to Ms. Monroe have been abandoned through a period of non-use, thereby allowing Mr. Valencia's companies to establish rights, is without merit. Movants have no credible evidence of use of any Monroe-related trademarks by AVELA that predates the decades of use by the Estate and its predecessors, which has been meticulously cataloged through specimens of use lodged with the United States Patent & Trademark Office ("USPTO"). Movant's claimed first use of 1985 is preposterous not only because it does not predate the Estate's first use, but because it appears to be based on a copyright notice Mr. Valencia has self-servingly added to materials, which has already been determined to be bogus by another court.

Movants' purported copyrights do nothing to diminish the validity the Estate's rights or its ability to assert them. First, Movants' claims that they create copyrighted works simply are not credible.[1] Even if they were, ownership of copyrights does not foreclose the Estate's ability to assert a § 43(a) or trademark infringement claim. *See e.g. AVELA I*, 131 F. Supp. 3d at 207.

As to likelihood of confusion, the record does not support Movants' position. In fact, ample evidence confirms not only the likelihood of confusion, but actual confusion, caused by

---

[1] Valencia purportedly purchases tangible artwork depicting Marilyn Monroe (often in the form of old movie posters) but does not acquire any intellectual property rights associated with the images. (Dkt. 338-3 at 29:22 to 30:9; 31:11-13). He then slightly modifies the purchased images and registers copyrights in the "new" works. (Dkt. 340 ¶¶115, 220).

Movants' conduct.  Movants create merchandise that looks almost identical to the Estate's products, and then illicitly cover their tracks to make it more difficult for the Estate to ascertain the extent of their conduct.  Movants are therefore left with no credible argument in their favor under the *Polaroid* factors.  Instead, Movants rely heavily on the unsupported contention that there can be no confusion because of alleged widespread third party use of Monroe images and trademarks not controlled by the Estate.  Fatal to Movants' contention is their inability to provide this Court with any admissible evidence of widespread uncontrolled use.  More damning is Mr. Valencia's own admission that it is not any widespread third party use that is threatening the Estate's ability to protect its rights – but rather Movants' plan to violate those rights and shake down the Estate.  During his most recent deposition, Mr. Valencia testified as follows:

> *Q.  Do think Mr. Salter [CEO of the Estate] should pay you tens of millions of dollars?*
> *A.  If he wants to be the only Marilyn Monroe licensee, yes.*
> *Q.  Do you think he could get that benefit from you if he paid you tens of millions of dollars?*
> *A.  Of course.*
> *Q.  And how would that work?*
> *A.  Well, if he was clearly the only legitimate licensor in the universe or in the world, he would have the whole entire Marilyn Monroe market to himself, so then he could control it on all levels.  He wouldn't have to have other people diluting his market which he has now.*
> *….Q.  So you believe if Mr. Salter pays you off to make this lawsuit go away then he won't have any further threats to his licensing business?*
> *A.  Correct.*

(Dkt. 340 ¶260).  Movants also conjure up half-formed defenses of laches, fair use, and/or First Amendment, which can all be rejected as a matter of law.  Neither the AVELA Parties nor VIFA are entitled to prevail on their respective Motions, but neither do their Motions create an issue of material fact as to Movants' liability for the claims with respect to which the Estate Parties have moved for summary judgment.  (Dkt. 335).

## II.     RESPONSE TO STATEMENT OF UNDISPUTED FACTS

The relevant factual background is detailed in the Estate Parties' Memorandum of Law in Support of Partial Summary Judgment (Dkt. 335) and Statement of Undisputed Facts (Dkt. 340). With respect to the AVELA Parties' and VIFA's respective recitations of purported facts, the Estate has set forth its reply to each in its accompanying (1) Response to the AVELA Parties' Rule 56.1 Statement and (2) Response to VIFA's Rule 56.1 Statement.   To the extent those purported facts pertain to Movants' legal contentions, they are also addressed below.

## III.     ARGUMENT

### A.     Movants' Summary Judgment Motions Fail.[2]

Summary judgment is only appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  Movants do not carry their burden.

---

[2] The AVELA Parties appear to have agreed with VIFA to split a 50-page brief in order to "comply" with the Court's page limitations.  VIFA's Memorandum (Dkt. 362) mainly addresses the Estate's § 43(a) claims, then spends less than 2 pages "joining" the AVELA Parties' trademark infringement, unfair competition, dilution, tortious interference arguments and affirmative defenses.  The AVELA Parties' Memorandum (Dkt. 370)  glazes over the Estate's § 43(a) claims in approximately 3 pages (conveniently "joining" VIFA), and devotes the rest to trademark infringement, unfair competition, dilution, tortious interference claims, and affirmative defenses. Permitting the incorporation attempted balloons the effective length of each memorandum to 50 pages.  The Court should reject this improper attempt to circumvent the page limits established by Local Rule 7.1(b)(1) and Rule 4(B) of your Honor's Individual Rules Of Practice.  *See, e.g. Douglas v. New York State Adirondack Park Agency*, 895 F. Supp. 2d 321, 391 (N.D.N.Y. 2012), *on reconsideration in part*, 2012 WL 5364344 (N.D.N.Y. Oct. 30, 2012) (rejecting Defendant's attempt to incorporate by reference all of the grounds for dismissal asserted by other defendant parties in their memoranda of law as violative of page limitation established by Local Rules); *Sea Tow Servs. Int'l, Inc. v. St. Paul Fire & Marine Ins. Co.*, 211 F. Supp. 3d 528, 534 n.3 (E.D.N.Y. 2016), *aff'd*, 699 F. App'x 70 (2d Cir. 2017).

**B.** **The Movants Are Not Entitled To Summary Judgment On The Estate's False Endorsement Claim; Rather, The Estate's Motion For Summary Judgment On That Claim Should Be Granted.**

Movants offer a barrage of theories as to why the Estate's false endorsement claim might fail, but ignore the actual elements of the claim under § 43(a):  "that the defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to origin, sponsorship, or approval of the goods or services."  *Jackson v. Odenat*, 9 F. Supp. 3d 342, 354-55 (S.D.N.Y. 2014) (citation omitted).

In the context of a celebrity, the thrust of a 43(a) claim is to allow the plaintiff to enforce a "trademark-like" right.  *Jackson*, 9 F. Supp. 3d at 355 (collecting cases); *Bruce Lee*, 2011 WL 1327137 at *4 (same).  This is not a technical trademark in the sense that rights are not acquired through use on specific products sold in commerce.  Rather—

> Courts hold that in the context of [§43(a)(1)(A)] a human persona or identity is a kind of 'trademark' which is infringed by a false endorsement.  But of course, that is merely an analogy to traditional "trademark" law. Lanham Act § 43(a)(1)(A) does not require that the plaintiff's identity have all the traditional indicia of a "trademark" for a false endorsement to occur. What § 43(a)(1)(A) does prohibit is the use of a false or misleading representation that is likely to cause confusion as to either the plaintiff's connection with the defendant's goods or services or as to the sponsorship or approval by plaintiff of the defendant's goods, services, or commercial activities.

5 McCarthy on Trademarks and Unfair Competition § 28:15.

### 1.    Section 43(a) Is Not Equivalent To Federal Right Of Publicity.

Movants' lead argument is that "§ 43(a) 'persona' rights did not exist at the time of Monroe's death." (Dkt. 362 at 7-8; Dkt. 370 at 6).   This argument illustrates Movants' fundamental misunderstanding of the claim, and is premised on a combination of two incorrect legal arguments: (1) § 43(a) creates a "federal" right of publicity that must rise or fall with a state right of publicity, and (2) § 43(a) was not around at the time of Ms. Monroe's death.

Movants misleadingly citing to *Shaw* and *Greene* to argue that the Estate has no "standing" to assert a claim under § 43(a) because it cannot simultaneously assert a claim for violation of Marilyn Monroe's right of publicity under New York law.  (Dkt. 362 at 7, 16-17; Dkt. 370 at 1); *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012); *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008).  This identical argument was previously raised by Movants and rejected in *AVELA I*, noting that "it disregards the distinction between right of publicity and false endorsement claims … and is contrary to existing case law."  *AVELA I*, 131 F. Supp. 3d at 205 (holding, *inter alia*, that the Estate alleged ownership of the necessary interest to prosecute a false endorsement claim, and that false endorsement claims based on deceased celebrity are cognizable).

*Shaw* and *Greene* were decided under an entirely separate legal framework, and their holdings were far more limited than Movants portray to this Court.  For example, VIFA incorrectly cites to *Shaw* to argue that the Estate's claim is doomed because "the law in effect at the time of Ms. Monroe's death did not recognize descendible postmortem publicity rights." (Dkt. 362 at 7).  This is irrelevant to the Estate's claim under the Lanham Act § 43(a), which was of course in full effect at the time of Ms. Monroe's untimely demise.  *See e.g.*, *Beastie Boys v. Monster Energy Co.*,  66 F. Supp. 3d 424, 445-447 (S.D.N.Y. 2014) (discussing legislative and jurisprudential history of Lanham Act § 43(a) which was passed in 1946).  Curiously, Movants claim § 43(a) rights in a celebrity did not exist until 1985 when this district decided the Woody Allen case, *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 626 (S.D.N.Y. 1985), wherein the court recognized that "the unauthorized use of a [celebrity]'s name or photograph in a manner that creates the false impression that the party has endorsed a product or service in interstate commerce violates the Lanham Act."  But *Allen* plainly cites to a 1968 case involving Theodor

Seuss Geisel for the proposition of false endorsement by celebrity, *Geisel v. Poynter Products, Inc.*, 283 F. Supp. 261 (S.D.N.Y.1968), and *Geisel* itself discusses the intended breadth of § 43(a), enacted well before Ms. Monroe's death. *Id.* at 266-268.

Movants' argument that § 43(a) rights did not exist before 1985, and thus could not have been passed via Ms. Monroe's will, is flat wrong, and exposes Movants' feeble attempt to falsely analogize the Estate's § 43(a) claim to the statutory state right of publicity dealt with in *Shaw* and *Greene*.

### 2. Secondary Meaning Is Not Required For False Endorsement.

Movants argue at length that the Estate's § 43(a) rights do not exist because "Monroe's persona has no secondary meaning." (Dkt. 362 at 14-21). Movants' argument is again flawed as a matter of law. The Estate need not show secondary meaning before turning to the likelihood of confusion evaluation. *Trump v. Pavion, Ltd.*, No. 89 Civ. 5453 (TPG), 1991 WL 167964, at *4 (S.D.N.Y. Aug. 22, 1991) (*citing Kregos v. Associates Press*, 937 F.2d 700 (2d Cir. 1991)). A § 43(a) claim derives from the "the extent to which plaintiff has developed a favorable association for his mark in the public's mind," the mark in this context meaning the celebrity's persona, and whether it is "well-known to the public," and the extent to which the plaintiff has built up investment in his public image. *Allen*, 610 F. Supp. at 627. The Second Circuit does not require that the celebrity have specifically engaged in commercial activities in order to recognize a § 43(a) claim. *Trump*, 1991 WL 167964 at *4 (recognizing that "[t]here is authority for the proposition that the Lanham Act extends to a claim that consumers would be confused about whether a specific person endorsed or otherwise approved a certain product even when that person did not currently sell another product under his name.") (citing *Allen*, 610 F. Supp. at 626).

Secondary meaning is a concept relevant only to technical trademarks, and technical trademark rights are not relevant to the Estate's claim under § 43(a). *Trump*, 1991 WL 167964 at *4 ("Plaintiff need not show secondary meaning before turning to the likelihood of confusion evaluation"); *Parks v. LaFace Records*, 329 F.3d 437, 446-47 (6th Cir. 2003) ("[E]ven though Rosa Parks' name might not be eligible for registration as a trademark … a viable cause of action also exists under § 43(a) if consumers falsely believed that Rosa Parks had sponsored or approved the song, or was somehow affiliated with the song or the album."); *Jackson*, 9 F. Supp. 3d, at 342  (defendant's motion for summary judgment denied; a trademark is not required for a successful § 43(a) claim); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1032–33 (C.D. Cal. 1998) ("*Cairns I*"). Neither does § 43(a) require that the Estate establish trademark rights in a specific image of Marilyn Monroe in order to prevail on its claim for false endorsement, because the "mark" in this context is her identity and persona. *See Bruce Lee*, 2011 WL 1327137, at *16-17 ("Plaintiff need not allege trademark rights in a particular image of Lee because the mark at issue is Lee's persona.").

Notwithstanding, even if secondary meaning were a requirement, there is no question that Marilyn Monroe commercialized her name, image, and persona during her lifetime, and that her successors continued to do so. The Marilyn Monroe persona was created *expressly* for commercial purposes – Norma Jean Mortenson created the Marilyn Monroe persona and adopted it as her glitzy, glamorous brand for the duration of her career as a model and film star. Supp. Clarke Decl. ¶2. During her lifetime, Marilyn Monroe was famously a celebrity endorser for Tru-Glo cosmetics, Lustre-Crème shampoo, Lux soap, Hiltone hair color, and many others. Supp. Clarke Decl. ¶3. Ms. Monroe's commercial power endures to this day, nearly 60 years after her death. *Forbes Magazine* routinely ranks her as one of the top earning deceased

celebrities.  Supp. Clarke Decl. ¶4.  And, it is precisely the commercial value of her identity that motivated Movants to begin their competing and unauthorized licensing of Marilyn Monroe's image and name.  (Dkt. 340 ¶¶219-220, 225).  Ms. Monroe has nearly unparalleled commercially renown, as each of the Movants have admitted.  (Dkt. 340 ¶¶219-220, 222).

### 3. The Estate Owns The Rights Asserted.

Movants next argue that even if § 43(a) rights exist, the Estate cannot assert them because it does not own them.  The arguments seem to boil down to couple of theories, none of which are legally viable, including that Ms. Monroe did not expressly bequeath her 43(a) rights to the Estate and that the Estate is not Ms. Monroe or her "actual estate."

Movants should know better.  This Court has already ruled that that it need not be the live celebrity herself asserting a § 43(a) claim, and it "rejects the [Movants'] contention that there is a blanket prohibition against false endorsement claims involving deceased celebrities."  *AVELA I*, at 208.  In terms of Movants' reference to the "actual estate," Movants cite to no legal authority for its definition of an "actual estate," and deposition testimony from Mr. Valencia suggests that he would define an actual estate as only family members of the decedent.  Supp. Durham Decl. ¶51, Ex. XX at 75:18 to 76:6.  Of course, Mr. Valencia does not have the power of the New York Surrogate's Court.  Many courts have recognized valid § 43(a) claims brought by a deceased celebrity's heirs, estate, family members, and other assignees.  *See Bruce Lee*, 2011 WL 1327137 at *4–5; *Ferrer v. Maychick*, 69 F. Supp. 2d 495, 501 (S.D.N.Y. 1999) (defendant's motion for summary judgment denied as to § 43(a) claims where plaintiffs, Audrey Hepburn's son and executor of her estate, sufficiently alleged a reasonable commercial interest and a reasonable basis for believing such interest is likely to be damaged); *Estate of Presley v. Russen*, 513 F. Supp. 1339, 1376 (D.N.J. 1981) (concluding facts supported § 43(a) claims brought by Elvis Presley's estate); *Hicks v. Casablanca Records*, 464 F. Supp. 426, 433 (S.D.N.Y. 1978)

(assuming without comment that estate and assignees of Agatha Christie could bring § 43(a) claim but dismissing the false endorsement claim because there was no likelihood of confusion); *Cheever v. Academy Chicago, Ltd.*, 690 F. Supp. 281, 288 (S.D.N.Y. 1988) (noting no apparent impediment to author John Cheever's survivors' § 43(a) claims and commenting that potential financial motive would not undermine claim based on literary reputation of deceased); *Museum Boutique Intercontinental, Ltd. v. Picasso*, 880 F. Supp. 153, 166 (S.D.N.Y. 1995) (referring to unpublished related case involving Lanham Act false endorsement claims brought by Picasso heirs and estate); *Branca v. Mann*, No. 11 Civ. 00584, 2012 WL 3263610, at *5–6 (C.D. Cal. Aug. 10, 2012) (it was not relevant to the false endorsement analysis that Michael Jackson was deceased and that his estate was asserting his rights).

The Estate has never claimed to be made up of Ms. Monroe's family members, nor is it required to do so.  The Estate acquired all of the assets of Marilyn Monroe, LLC, the entity formed by Anna Strasberg, the Administratrix of Ms. Monroe's estate, specifically to hold and manage the intellectual property assets of Marilyn Monroe.  (Dkt. 340 ¶31).  Marilyn Monroe, LLC was formed while Ms. Monroe's estate was being probated, and the New York Surrogate's Court authorized Ms. Strasberg's transfer of the intellectual property to Marilyn Monroe, LLC. *Id*.  Movants' argument that there can be no intellectual property rights associated with Marilyn Monroe's estate is a self-serving personal opinion concocted for purposes of this case.

In her will, Marilyn Monroe bequeathed 75% of the "rest, residue and remainder of [her] estate, both real and personal" to Lee Strasberg, her close friend and long-time acting teacher, which passed to Mr. Strasberg at Ms. Monroe's death in 1962.  The remaining 25% "rest, residue and remainder" was bequeathed in her Will to Marianna Kris, the late actress' psychiatrist who passed her portion to the Anna Freud Center when she died in 1980.  When Mr. Strasberg died in

11

1982, his 75% rights and interest in Marilyn Monroe's intangible personal property were passed to his wife, Anna Strasberg, through his will.  In 1989, the New York Surrogate's Court appointed Anna Strasberg as Administratrix of the Monroe estate.  In June 2001, the Surrogate's Court authorized Anna Strasberg to transfer all remaining assets of the Estate of the late actress to Marilyn Monroe LLC, a company specifically formed to hold and manage the intellectual property assets of Marilyn Monroe.   Ownership interests in Marilyn Monroe, LLC were assigned, 75% to Anna Strasberg, and 25% to the Anna Freud Center.  *Id.*

Movants now ask this Court to ignore that the New York Surrogate's Court expressly dealt with transference of intellectual property rights prior to closing Ms. Monroe's estate. (Dkt. 339-1 (Strasberg Decl. ¶8, affirming Surrogate's Court's authorization "to transfer all assets of the estate" to Marilyn Monroe LLC (*see In re Anna Strasberg*, No. P2781/1962, Dkt. 339-1 at 23-26), an entity specifically "formed to hold and manage the intellectual property assets of the residuary beneficiaries of Marilyn Monroe's will").  Movants' argument that Ms. Monroe's will did not expressly state "intellectual property" is a red-herring.  The residuary clause of Ms. Monroe's will passed the remainder of her property (*e.g.*, the "rest, residue and remainder of [her] estate, both real and personal").  There is no dispute in the law that intellectual property rights are in fact property rights that can be passed down at death.  *See e.g. Steinbeck v. McIntosh & Otis, Inc.*, No. 04 Civ. 5497 (GBD), 2009 WL 928189, at *5 n.7 (S.D.N.Y. Mar. 31, 2009), *aff'd sub nom.* 400 F. App'x 572 (2d Cir. 2010) ("Because Elaine inherited the remainder of the Estate, she would necessarily have acquired the personal property right to use, or grant permission for others to use John Steinbeck's name as a trademark, in the absence of existing valid trademarks using his name.").

It is undisputed that the Estate has the right to those intellectual property assets transferred to Marilyn Monroe LLC.  On December 30, 2010, the Estate acquired a controlling interest of Marilyn Monroe LLC pursuant to an asset purchase agreement, which included Marilyn Monroe's name, likeness, and voice, among other things.[3]  (Estate's Reply to AVELA Parties' SOF ¶80; Estate's Reply to VIFA's SOF ¶65).  Movants' claim that some rights were "retroactively assigned" to the Estate is false – the document at page 34 of Exhibit B to the Goodheart Decl. is a *confirmatory* assignment; it does not retroactively assign any rights but merely confirms the assignment already made.  *Id.*[4]

### 4.  The Estate's § 43(A) Claim Does Not Overextend The Lanham Act.

As established above, Movants are flatly wrong in their characterization of the Estate as "not a celebrities' [*sic*] beneficiary, actual estate, family or assignee," (Dkt. 362 at 20), because the Estate is precisely that, and has taken seriously its responsibility to safeguard legacy of, and its rights to commercialize the intellectual property rights related to, Marilyn Monroe.  It is therefore the party injured by Movants' conduct.  Protection from this injury is exactly what is contemplated by § 43(a).  *Geisel v. Poynter Products, Inc.*, 283 F. Supp. 261, 266-268 (S.D.N.Y. 1968); *Cairns I, at* 1031 (noting that the expansive nature of § 43(a) and holding that a person may assert a claim under § 43(a) "where the interest asserted by the plaintiff is a commercial

---

[3] The AVELA Parties' allegation that the Estate "refused to turn over the documents to [the AVELA Parties'] counsel evidencing this acquisition" is patently false.  As noted in the Estate Parties' Statement of Undisputed Facts (Dkt. 340 ¶24, fn. 7), copies of these documents were not  circulated due to their sensitive nature, but they were made available to counsel for review throughout discovery.  Fed. R. Civ. P. 34; *see also Dew v. 39th Street Realty*, No. 99 Civ. 12343(WHP) (JCF), 2001 WL 388053, at *1 (S.D.N.Y. Apr. 16, 2001) (responding party is only required to produce original documents for the requesting party's inspection, to be copied at the requesting party's cost).  And, counsel did in fact review them – never raising a dispute with this court that they needed more access than they had already been given.  In fact, the documents were even presented and used at deposition by Movants.  *See* Supp. Durham Decl. ¶29, Ex. BB ("Woodhouse Depo.") at 47:20-23.

[4] "Assignor wishes to confirm that any and all property or interests in property to which it may have been entitled from the Estate of Marilyn Monroe, Deceased, was transferred to the Assignee effective as of the date on which Assignee was formed, July 5, 2001."  *Id.*

interest protected by the Lanham Act.").[5]   Far from seeking to "impermissibly control every indicia of Marilyn Monroe," as Movants contend, here, the Estate is pursuing claims *only* with respect to merchandise that utilizes that persona in a manner that causes a likelihood of confusion.

### 5.      Movants Cannot Avoid A Likelihood Of Confusion Finding.

To analyze a § 43(a) false endorsement claim, this Court uses a modified version of the *Polaroid* test to assess likelihood of confusion, which examines: (1) strength of the mark and level of recognition; (2) similarity of the marks; (3) proximity of the products and their competitiveness with each other; (4) evidence of actual consumer confusion; (5) evidence of bad faith; (6) sophistication of consumers in the relevant market.  *Jackson*, 9 F. Supp. 3d at 355-56. As Movants note, courts recognize that where plaintiff is not the celebrity herself, an additional factor becomes relevant:  the strength of association between the "mark" and the plaintiff.  (Dkt. 370 at 10, citing *Cairns v. Franklin Mint Co.,* 107 F. Supp. 2d 1212 (C.D. Cal. 2000) ("*Cairns II*")).

VIFA does not address these factors in its Memorandum, likely because it would rather ignore that all factors favor the Estate.  The AVELA Parties' discussion of these factors is undercut by their false factual assertions and misstatements of law.  Accordingly, Movants' motions for summary judgment must both be denied, and instead this Court should enter summary judgment  in favor of the Estate Parties.  (*See generally* Dkt. 335).

---

[5] VIFA misleadingly cites *Avalos*, a case decided prior to and not cited by this Court in *AVELA I*.  *Avalos v. IAC/Interactivecorp.*, No. 13 Civ. 8351 (JMF), 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014).  *Avalos* did not hold that a 43(a) claim may not exist where claimant does not own a state law based right of publicity – there, plaintiff did not plead false endorsement, but a "reverse-passing off" claim related to the defendants' unauthorized use of photographs, which the court determined was an invalid attempt to make an end-run around copyright law.  The court opined that to the extent that claim *could* be read as false endorsement, it failed because plaintiff made no allegation whatsoever as to an ownership interest in any rights that the non-party subject of the photographs at issue may have had under 43(a).  *Avalos* has never been cited for the proposition argued by VIFA.

### a.      Strength Of The "Mark"

Because the "mark" in a § 43(a) claim is the celebrity's persona, the strength inquiry asks about the level of recognition the celebrity has among the segment of the public to whom the goods are advertised is directed. *Bruce Lee*, 2011 WL 1327137 at *20 (citation omitted).  The tremendous strength associated with Ms. Monroe, and now the Estate, is due not only to Ms. Monroe's fame and former high-profile endorser during her life, but also to the decades of investment made by the Estate and its predecessors to protect and build the recognition of Ms. Monroe as an endorser of products.  (Dkt. 340 ¶32).  The Estate safeguards and bolsters the reputation of the Marilyn Monroe brand, both by maintaining strict quality controls, as well as by its synergistic relationships with some of the most well-regarded companies in the world, such as Chanel, Sexy Hair Concepts, Christian Dior, Nike, Macy's, Uniqlo, Dolce & Gabbana, Max Factor, Li & Fung, Citibank, Amazon, Calvin Klein, Mars, Inc., Apple, Salvatore Ferragamo, Judith Leiber, the Metropolitan Museum of Art, Jeep, New Era, America's Next Top Model, Chrysler, Three Olives Vodka, Burton, Comic Relief, and Coca-Cola.  (Dkt. 340 ¶¶34-39).  The licenses extend to products like clothing, accessories, perfume, posters, wine, collectibles, and other novelty items, and include the right to use images of Marilyn Monroe as well as trademarks including the words MARILYN MONROE and/or MARILYN.  (Dkt. 340 ¶41; Supp. Clarke Decl. ¶8).  The Estate also regularly enforces its rights by sending cease and desist letters to unauthorized users.  (Dkt. 340 ¶37).  It is commonly known in the licensing industry – including by the AVELA Parties, VIFA, and their licensees – that the Estate owns and controls the Marilyn Monroe rights.  (Dkt. 340 ¶234).

Perhaps most persuasive evidence of the strength of the association among consumers between the use of indicia of Marilyn Monroe's persona and the Estate is from consumers themselves.  The Estate receives complaints from consumers regarding the quality of *Movants'*

infringing Marilyn Monroe merchandise.  (Dkt. 340 ¶244).  In addition, Mr. Poret's survey found

that 25.4% of surveyed consumers believed Marilyn Monroe or the people who represent her put

out or approve AVELA's infringing shirt bearing *just the image* of Marilyn Monroe.  In addition,

18.4% of surveyed consumers specifically answered that the shirt comes from or is approved by

Monroe or Monroe's representatives, such as her estate, her lawyers, or her family.  (Dkt. 338-15

("Poret Report") at 22).  Examples of such responses include:  "Whoever owns Marylin Monroes

[sic] estate and likeness"; "Marlyn Monroes [sic] estate"; "The Marylin [sic] Monroe Estate";

and "maryln monroe [sic] estate because her face is on it."  (*Id*. at 23).  Such responses clearly

indicate that consumers associate the use of elements of Marilyn Monroe's persona when applied

to such products specifically with the Estate.

Movants argue that the Estate's rights are invalid due to "extensive use" by third parties.

But no admissible evidence cited supports extensive unauthorized use of Marilyn Monroe's

name and image.  As noted in detail in the Estate's 56.1 SOF Replies, Movants rely on attorney

declarations – attorneys who have no personal knowledge of any actual sales in the U.S. market

–who point solely to unauthenticated print-outs of what appear to be websites purporting to offer

products or services bearing an image of Marilyn Monroe.  There is insufficient foundation as to

source and date of these print-outs, and they should be completely disregarded because there is

no way to determine who is offering these products, or where or when they were sold if at all,

and in what quantities.  *See* Supp. Durham Decl. ¶¶2, 3, Ex. A and B; *Affiliated Records Inc. v.

Taylor*, No. 09 Civ. 9938 KBF, 2012 WL 1675589, at *2,4 (S.D.N.Y. May 14, 2012) (plaintiff's

summary judgment motion granted where defendants' unauthenticated screenshots and

accompanying affidavit were not competent evidence to create triable issue of fact).  Many of the

print-outs appear to be one-off items on a personal page of an auction website (which clearly do

not demonstrate "widespread" uncontrolled use).  *See e.g. Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 439 (S.D.N.Y. 2017) (a few instances of infringement cannot negate longstanding rights).  Others appear to be products from outside the U.S., which have no relevance in this action.  15 U.S.C. § 1127 (defining "commerce" as "all commerce which may lawfully be regulated by Congress").  For many, it is difficult to determine what is even being displayed, but in some cases, Movants apparently refer to use that *has been addressed* by the Estate or its predecessors, and thus are, in fact, the opposite of evidence of "uncontrolled" third party use.  Supp. Clarke Decl. ¶¶7, 9.  Further, Mr. Valencia directly contradicted Movants' position when he testified that the Estate would be the only Marilyn Monroe licensor, but for Mr. Valencia.  (Dkt. 340 ¶¶259-60).

Movants' argument under *Cairns II* is meritless.  In *Cairns II*, the court held that plaintiffs failed to establish a likelihood of confusion where Princess Diana's image was only weakly associated with the plaintiffs, largely because her image had not served a source-identifying function during her life *or* after her death.  *Cairns II*, 107 F. Supp. 2d at 1217.  The *Cairns* defendants had been selling products bearing Princess Diana's image since before her death, and other parties had been doing the same.  *Id.*  Critically, Princess Diana "knew of the vast commercial uses of her image" and "did nothing to prevent others from using her image while she was alive."  *Id*.  Here, Marilyn Monroe was a persona created by Norma Jean Mortenson *for her commercial endeavors*, and "Marilyn Monroe" was used as a celebrity endorser for a variety of products during her lifetime, for which she was compensated.  Her successors-in-interest have continued to do so.

Even accepting, *arguendo*, that there have been instances of unauthorized use of Marilyn Monroe's image and name, such use is not uncontested as it was in Princess Diana's situation.

The Estate Parties introduced uncontroverted evidence that they and their predecessors have regularly and continuously sent cease and desist letters in respect of unauthorized uses (including to Movants), and have enforced these rights in numerous lawsuits.  (Dkt. 339 ¶11; Supp. Durham Decl. ¶53).  Movants even submitted in their supporting exhibits a cease and desist letter sent by the Estate's predecessor to an unauthorized user of Marilyn Monroe's persona on merchandise dated February 2006.  (Dkt. 372 ¶46; *see also* Dkt. 370 at 20).

### b.    Similarity Of The Marks

Movants do not deny that they facilitate and encourage their licensees to use images of Marilyn Monroe on products, and to prominently display "MARILYN" and other indicia of Ms. Monroe's persona to further evoke association among consumers.  (Dkt. 335 at 10; Dkt. 372 ¶61).  They are not merely selling products featuring images in which Marilyn Monroe incidentally appears – they are using exclusively and prominently her image and name, where Marilyn Monroe is the sole identifiable figure on the product, in a manner that is substantially identical to the Estate's use, and in association with substantially identical products to the Estate's authorized products.  (Dkt. 335 at 13-15).  Movants argue that the uses are dissimilar because the "Radio Days" mark appears on their hangtags and neck labels.  First, Movants offer no evidence that consumers recognize "Radio Days" as an alternative source of genuine Marilyn Monroe merchandise – accordingly, the presence of "Radio Days" does nothing to negate the impression that Movants' products emanate from the same source of Marilyn Monroe merchandise with which they are familiar (*i.e.*, the Estate).  Second, there is evidence that such hangtags/labels do not consistently appear on their products – if at all.  (Dkt. 340 ¶¶254.d., 255).  In fact, the Estate's private investigator visited many stores where the accused product was sold and could locate no use of this hang tag in the marketplace.  (Dkt. 352 ¶21).  Moreover, a sworn affidavit of a retailer of the accused products states that products were not sold with the hang

tags.  (Dkt. 340 ¶255).  Movants want to hide this fact from the Court as they hid it from the very expert who conducted Movants' consumer survey.  *See* Supp. Durham Decl. ¶50, Ex. WW ("Marylander Depo.") at 70:22 to 71:4.

Even if Movants used such hangtags/labels, a reasonable jury could conclude that there exists a likelihood of confusion.  The hangtags are unlikely to be noticed by most consumers as they encounter the much more prominent Monroe indicia, and the neck labels on shirts or other apparel items are not visible to the consumer without closely inspecting the interior of the product.  Moreover, the hangtags submitted by Movants plainly state "OFFICIALLY LICENSED," which significantly enhances the assumption by a purchaser that these are official Marilyn Monroe merchandise, that is, from the source with which the public is familiar (*i.e.*, the Estate).  (Dkt. 371-14, Ex. N at 12; Dkt. 371-25, Ex. W a 6,8; Dkt. 368-13, Ex. M at 6, 8).

### c.      Proximity Of The Products

Movants do not dispute that they set themselves up in direct competition with the Estate, seek out the same licensees, produce similar merchandise, sell goods in the same stores, and target the same customers.  (Dkt. 362 at 15).

### d.      Evidence Of Actual Consumer Confusion

First, Movants falsely assert that the parties have co-existed for 25 years with no confusion.  This is curious, since A.V.E.L.A., Inc. was only incorporated in 2001.  (Dkt. 371-1). Moreover, Movants produce no competent evidence to support such alleged longstanding use. The evidence cited by Movants does not reflect a single document dated prior to 2005.  (Dkts. 368-11 and 371-12).  The AVELA Parties' Exhibit L (Dkt. 371-12) and VIFA's Exhibit K (Dkt. 368-11) (which are identical) contain only three purported print-outs of advertisements, dated 2005, that feature compilations of at least 20 images of various old movie posters, two of which incidentally appears to be a poster featuring an image of Marilyn Monroe in her film *The Asphalt*

19

*Jungle*, the other a poster with an image of Ms. Monroe in her film *Some Like It Hot* alongside the other actors.  None of these purported advertisements were produced during discovery and none demonstrate that there were any sales of any product in competition with the Estate at any given time.  These exhibits also contain a few "Product Approval Forms" for products allegedly featuring Marilyn Monroe, but none are dated prior to May 17, 2005, nor do they reflect a licensee name for which Movants produced evidence of having received royalties. *See* Supp. Durham Decl. ¶52.  The AVELA Parties' Exhibit K (Dkt. 371-11) and VIFA's Exhibit J (Dkt. 368-10) (also identical) similarly consist solely of print-outs of unauthenticated and undated mock-ups of Marilyn Monroe products.  Thus, there is no evidence that such products were ever actually sold.

Movants cannot offer a single product sample or document a single sale from 1985 or for many years thereafter.  In fact, there are no financial records dated before July 2007.  Movants had ample opportunity to provide evidence to support this, and even were compelled by this Court to supplement their financial production, but they offer nothing – no sales records, no evidence of what the licensed products looked like, no records indicating where purported products were sold, or in what volume.

Movants merely point to a copyright notice listing the year 1985, which they allegedly place on the "art" they provide licensees.  The AVELA Parties raised this identical argument in an infringement case before a U.K. court in *Hearst Holdings Inc. v. AVELA Inc.*, 2014 WL 640415, wherein the court plainly stated:

> Even if Mr. Valencia or AVELA or another company associated with Mr. Valencia called Sci Fi Productions Inc. (doing business as X One X Movie Archive) does indeed own any copyright in the works in question, it did not date from 1985. **The 1985 date is untrue and Mr Valencia knows he cannot justify it.**  When pressed in cross-examination Mr Valencia sought to play this down on the basis that a copyright notice was unnecessary.  That will not do.  **In my**

20

> judgment the claimants are correct in that the 1985 date is deployed to make
> it look as though AVELA has been licensing these images for years. It has
> not.

*Id.* at ¶29 (emphasis added). Movants also incorrectly assert that the Estate has no evidence of

actual confusion. While evidence of actual confusion is not required (*Jackson*, 9 F. Supp. 3d at

359), here, there is substantial evidence of actual confusion in the record. The Estate has

received complaints from consumers regarding the quality of Movants' products, mistakenly

believing those products to emanate from the Estate. (Dkt. 335 at 16). AVELA's own licensee

was deceived, and testified that it "didn't know there was a difference" between the Movants and

the Estate. *Id.* As noted, Mr. Poret's report found that 25.4% of surveyed consumers see

Movants' Marilyn Monroe products and believe they are approved or permitted by the Estate, a

rate well beyond what normally satisfies the necessary threshold for determining actual

confusion in the Second Circuit. *Lon Tai Shing Co. v. Koch+Lowy*, No. 90 Civ. 4464, 1992 WL

18806, at *3 (S.D.N.Y. Jan. 28, 1992).

In their Memorandum discussing Mr. Poret's report and survey, Movants' arguments fall

apart. They end up conceding that the survey results "demonstrate that respondents recognized

Monroe, the famous actress, and may have had the (incorrect) lay legal opinion that Monroe, or

someone connected with her, had to approve the t-shirts; this amounts to an (incorrect) legal

conclusion, not evidence of confusion as to origin, approval, or sponsorship." (Dkt. 370 at 17-

18). But indeed, confusion is precisely what is reflected in the survey responses – 25.4% of

surveyed consumers, when viewing AVELA's t-shirt bearing solely the image of Marilyn

Monroe, indicated that they believed Marilyn Monroe or the people who represent her put out or

approved the t-shirts, when that was not the case. Movants also criticize the Estate's survey for

not requiring consumers to know the precise name of the source from whom they believed the

product to emanate – *i.e.*, the Estate – but this argument is just wrong. The law does not require

that consumers know the precise name of the source, it is sufficient that they recognize that the mark (here, Marilyn Monroe's persona) signifies a source. *See* 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 ("All courts agree that secondary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source.). Moreover, as noted above, many of the surveyed consumers *specifically identified the Estate* in their responses. *See* Section II.B(5)(A) *supra*.

Movants cannot rely on Mr. Marylander's survey to achieve summary judgment or create an issue of fact because the survey failed the most fundamental rule of survey methodology – that of accurately replicating marketplace conditions. *Trouble v. Wet Seal*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). Movants purposefully manipulated the stimulus product used in the survey, so that it appeared in a manner inconsistent with how the product appears at retail. (Dkt. 340 ¶254). Specifically, the stimulus had affixed to it a large hang tag that said "Radio Days" when shown to survey respondents. *Id*. However, a sworn declaration from Spencer's Gifts, the retailer of the product, establishes that the product used in the survey does not actually appear at retail with this large hang tag affixed. (*Id*. ¶255). Movants' expert also did not accurately analyze the survey results. (*Id*. ¶254).

### e. Evidence Of Bad Faith

Evidence of Movants' bad faith is overwhelming, and an attempt to belatedly rely on an "advice of counsel" defense should not be well-taken.

Movants clearly sought to associate the accused products with the persona of Marilyn Monroe by the prominent use of her actual image. (Dkt. 335 at 13-15, 17-18). Many of Movants' products display the name "Marilyn" in a signature-like font, an even more egregious suggestion of endorsement. *Id*. A signature is literally an endorsement. Each of Movants has admitted prior knowledge of the Estate's rights and manifested an intent to hide their association

with the accused product from the Estate. *Id.* at 19. Movants even created a new shell company and lied about it in order to secretly siphon off the profits from their infringing activities. (Dkt. 335 at 27-28; Dkt. 340 ¶¶139-149, 173-179).

Movants, for the first time, now seek to rely on an advice of counsel defense. They not only fail to plead this defense in their responsive pleadings (Dkts. 168, 282, 284), none of them made any disclosure during discovery in this regard. Movants therefore denied the Estate access to the advice purportedly given by counsel and the opportunity to pursue discovery and evaluate the merits of such an assertion. *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, 894 (S.D.N.Y. 1990) ("A party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense."); *see also Arista Records LLC v. Lime Grp. LLC*, No. 06 Civ. 5936 KMW, 2011 WL 1642434, at *2 (S.D.N.Y. Apr. 20, 2011). Movants' only cited evidence are copies of two letters sent by prior counsel, Christopher Serbagi and Melissa Woo-Allen, in 2011 and 2013, respectively, in response to the Estate's cease and desist letters. It is worth noting that Ms. Woo-Allen was an employee of VIFA at the time she wrote this letter, and was later outside counsel of record in this case. (Dkt. 38). Reliance on her advice as a defense would ostensibly have waived privilege as to all attorney-client communications relating to such advice, as well as their litigation strategy, and would have entitled the Estate to discovery of the same, including a deposition of Ms. Woo-Allen. This did not happen. At its core, Movant's "advice of counsel" defense is yet another bad faith maneuver.

### f. Sophistication Of Consumers In The Relevant Market

Movants concede "there is no evidence one or the other regarding this factor." (Dkt. 370 at 15).

#### g.    Balancing The Factors

All *Polaroid* factors clearly favor the Estate.   In an attempt to countervail this straightforward application, Movants concoct additional considerations which they wrongly claim establish a lack of confusion.

First, Movants argue that there can be no false endorsement claim due to the nature of Movants' "mere use of Monroe's image" on its products, which they summarily contend "does not falsely suggest that Marilyn Monroe somehow endorsed its products."  (Dkt. 370 at 7).  But § 43(a) claims are not limited to false endorsements that consist of words.  AVELA made this exact argument before the Ninth Circuit, and it was rejected.  *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1072, (9th Cir. 2015), *cert. denied*, 136 S. Ct. 410 (2015) (unauthorized use of an image of deceased performer Bob Marley on wearing apparel constituted a false endorsement: injunction, profits and attorney fees were affirmed).  This district concurs. *Allen*, 610 F. Supp. 612 (granting summary judgment to celebrity Woody Allen against defendant National who used an Allen-lookalike in a pictorial advertisement).

Second, Movants argue that the Estate's evidence of confusion is not relevant because it does not establish that Movants' infringing activities "misled consumers or impacted consumers' purchasing decisions."  (Dkt. 370 at 16).  But the cases cited by Movants are inapposite.  They are a collection of reverse confusion and post-sale confusion cases, which analyze actual confusion instances in circumstances that are not relevant here.  *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (reverse confusion); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500 (S.D.N.Y. 2008) (reverse confusion); *SLY Magazine, LLC v. Weider Publications L.L.C.*, 529 F. Supp. 2d 425, 440 (S.D.N.Y. 2007) (reverse confusion), *aff'd*, 346 F. App'x 721 (2d Cir. 2009);. *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 422 (S.D.N.Y. 2012) (post-sale confusion), *opinion clarified* (Feb. 21, 2012).  To the contrary, the Estate's

survey replicates conditions specific to the sale of the accused product in this case, and the evidence establishes precisely the type of confusion that the Lanham Act is intended to protect against in §43(a) cases.  Mr. Poret's survey establishes that a significant number of prospective purchasers of AVELA's apparel product bearing the image of Marilyn Monroe were misled because they believed that this product was sponsored or approved by, or associated with the Estate.  (Dkt. 340 ¶252).  This is the gravamen of the Estate's claim.  There is no additional element as concocted by Movants.

C.  **Movants Are Not Entitled To Summary Judgment On The Estate's Trademark Infringement Claim; Rather, The Estate's Motion For Summary Judgment On That Claim Should Be Granted.**

In addition to its § 43(a) claim, the Estate pursues separate trademark infringement claims against Movants under § 32.  There is nothing unusual about the Estate and its predecessor's registration of trademark rights in Marilyn Monroe's name subsequent to her passing – indeed, it is common for celebrities and/or their estates register trademarks as trademark rights are created, and to enforce common law and registered trademarks in a celebrity name when another uses the same or similar names in a manner that creates confusion with the celebrity.  *See e.g., Bogart LLC v. Ashley Furniture Indus. Inc*., No. 10 Civ. 39, 2012 WL 3745833, at *11 (M.D. Ga. Aug. 28, 2012) (denying the defendant's motion for summary judgment in a trademark infringement case based on its use of the plaintiff's BOGART trademark); *Experience Hendrix, LLC v. Electric Hendrix, LL*C, 90 U.S.P.Q. 2d 1883, 1897 (W.D. Wash. 2008) (granting summary judgment to the owner of the trademark JIMI HENDRIX for the defendant's infringement); *Fifty-Six Hope Rd. Music, Ltd. v. Kokob Printing*, No. 05 Civ. 1226-L (CAB), 2007 WL 433195, at *1 (S.D. Cal. Jan. 26, 2007) (granting judgment to the owner of the BOB MARLEY trademark in an infringement claim).  The Estate did not "pull these rights from nothing" (Dkt. 362 at 1) – many of the Estate's registrations were filed by its predecessors-in-interest as early as 1983 and

have been scrupulously maintained ever since, including through demonstration of continuous use to the USPTO.  Supp. Durham Decl. ¶¶31-49, Exs. DD-VV.

As in the context of a § 43(a) claim, the absence of a concurrent state claim for violation of right of publicity does not preclude a § 32 trademark infringement claim.  The court's decision in *Experience Hendrix, LLC v. Electric Hendrix, LLC* is instructive.  No. 05-36029, 2008 WL 3243896 (W.D. Wash. Aug. 7, 2008).   In *Hendrix*, Experience Hendrix, LLC and Authentic Hendrix, LLC (both operated by the step-sister of the deceased celebrity Jimi Hendrix) alleged trademark infringement, unfair competition, and dilution claims against a competing entity in connection with defendant's unauthorized selling and marketing of vodka as "Hendrix Electric," "Jimi Hendrix Electric" or "Jimi Hendrix Electric Vodka."   In a prior litigation involving the same parties, the court had held (and the Ninth Circuit affirmed) that because Jimi Hendrix was domiciled in New York at the time of his death, "no right of publicity descended to [his heir] in 1970."  *Id.* (*citing Experience Hendrix LLC v. James Marshall Hendrix Found.*, 240 F. App'x 739 (9th Cir. 2007) (unpublished opinion)).  Despite there being no cognizable right of publicity in Jimi Hendrix, the court in *Hendrix* held that "trademark rights and publicity rights are distinct rights that are analyzed under different standards," and that plaintiffs' trademark rights in certain marks incorporating the name and likeness of Jimi Hendrix remained valid and enforceable.  *Id.* at 3-4.  Accordingly, defendants infringed plaintiffs' various "HENDRIX" trademarks.  *Id.* at 13.

Movants seem not to want to acknowledge the Estate's federal registrations, and offer no evidence to rebut the strong presumption of validity to which these marks are entitled. Registration is not necessary to establish trademark rights, but the Estate's registrations constitute prima facie evidence of the validity of the registered mark and, for the incontestable marks, the registrations provide conclusive evidence of their validity.  15 U.S.C. § 1115.  The

Estate has provided ample evidence of the strength of its trademark rights, by virtue of, *inter alia*, its prominent commercialization of these rights and its steadfast enforcement and policing efforts. (Dkt. 335 at 12). The Estate's registrations cover a wide range of goods and services, including shirts and other apparel items in Class 25, leather goods in Class 18, porcelain mugs in Class 21, jewelry in Class 14, and stationary items in Class 16. They also cover "historical figure licensing services" in Class 35. But Movants ignore entirely the Estate's federally registered trademark rights in their respective Memoranda, instead arguing that the marks have not achieved secondary meaning, or even if they have, Movants only used the name "Marilyn" alongside images of Marilyn Monroe, not her entire name.

The secondary meaning argument fails because the Estate's incontestable marks are conclusively valid, and the federal registrations are presumed valid on their face. 2 MCCARTHY § 15:35 ("Defendant faced with an incontestable registered mark cannot defend by claiming that the mark is invalid because it is descriptive and lacks secondary meaning."). With respect to the Estate's other registrations, Movants fail to rebut the strong presumption of validity to which they are entitled as a matter of law, as a result of the USPTO having granted registration without proof of secondary meaning. *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 393 (2d Cir. 1995) ("[A] decision by the USPTO to register a mark without proof of secondary meaning 'affords a rebuttable presumption that the mark is more than merely descriptive.'"). Moreover, the Estate has substantial evidence of secondary meaning, as discussed *supra*. (*See* Dkt. 335 at 12; *see also* Dkt. 338-15 at 22-24).

The "nature of the use" argument also fails. The assertion that Movants do not use the entirety of Marilyn Monroe's name, and therefore cannot possibly infringe, is both factually and legally wrong. Movants encourage their licensees to use MARILYN, for which the Estate owns

a federal trademark registration, and to the use of the term "Marilyn" in a stylized, signature-like font, similar to the Estate's federally registered trademark, on products identical to those offered by the Estate and its licensees, which products are offered for sale in commerce. These are textbook examples of trademark infringement. That Movants did not use the full registered mark MARILYN MONROE provides no safe harbor. The test of infringement is not whether the defendant uses an identical mark. 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:20 ("exact similitude is not required"). The test is whether the defendant has used a mark in commerce that creates a likelihood of confusion with plaintiff's mark. *Id.* at § 23:20.50 ("As the degree of similarity of the goods of the parties increases, the degree of similarity of the marks necessarily to support a conclusion of likely confusion declines."). It is hard to imagine two marks more similar than Marilyn and Marilyn Monroe in this context.

This intentional use of a near identical or functionally equivalent mark on the same types of merchandise, sold through the same channels to the same consumers, is likely to cause confusion among consumers for all of the reasons discussed in the *Polaroid* factor analysis above and in the Estate Parties' Memorandum. (Dkt. 335 at 10-21). Accordingly, the Court should deny Movants' motion and grant the Estate's motion as to the § 32 claim and equivalent state claim.

**D.**     **On The Estate's New York Unfair Competition Claim, Summary Judgment Should Be Entered In Favor Of The Estate.**

For the reasons stated above, and the reasons discussed in the Estate's Memorandum (Dkt. 335), Movants' respective motions for summary judgment on the Estate's claim for unfair competition under New York law should be denied, and instead, summary judgment should be entered in favor of the Estate. *See Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 351 (S.D.N.Y. 2014).

### E.     Movants Are Not Entitled To Summary Judgment On The Estate's Federal Trademark Dilution Claim.

Again ignoring the Estate's federally registered trademarks, Movants argue that the Estate's asserted marks have no secondary meaning.  Further, Movants argue that the Estate has not produced any evidence that Movants' activities are likely to dilute the quality of the Estate's marks.  This simply ignores the evidence of record.  Movants license products that fall outside of the Estate's product quality standards and brand identity of Marilyn Monroe, including products that feature images of Marilyn Monroe portrayed as deceased or as a "zombie," with tattoos superimposed on her body, and smoking cigarettes.  (Dkt. 335 at 19-20).  The Estate has received complaints from consumers regarding the tattoo products.  *Id.*

Movants do not address the Estate's state trademark dilution claim under N.Y. GEN. BUS. LAW § 360-l, and accordingly concedes that it is not entitled to summary judgment on this claim. The Court could enter summary judgment in favor of the Estate on this claim for the reasons stated in its Memorandum.  (Dkt. 335 at 23-24).

### F.     VIFA[6] Is Not Entitled To Summary Judgment On The Estate's Tortious Interference Claim.

Contrary to VIFA's summary conclusion, the Estate has conclusively established valid intellectual property rights related to Marilyn Monroe, not the least of which include incontestable federally registered trademarks.  VIFA offers no further explanation as to why it is entitled to summary judgment on this claim, and it has therefore not come remotely close to meeting its burden.  The Court should deny summary judgment on this claim.

---

[6] The AVELA Parties do not move for summary judgment on this claim, and do not address it in their Memorandum.

### G.   Movants Are Not Entitled To Summary Judgment On Affirmative Defenses.

### 1.   Laches

To establish a defense of laches to a Lanham Act action, the defendant must establish that: (1) plaintiff knew of defendant's use of the marks, (2) plaintiff' inexcusably delayed in taking action with respect to this use, and (3) defendant will be prejudiced by permitting plaintiff to assert its rights at this time. *Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*, 887 F. Supp. 2d 519, 545 (S.D.N.Y. 2012) (denying defendant's motion for summary judgment as to its laches defense) (*citing Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040 (2d Cir.1980)).

As a preliminary matter, the Estate has established that Movants' infringement was both knowing and willful, and as such, they are not entitled to assert the defense of laches because they lack clean hands. *Victorinox AG v. B&F Sys., Inc.*, 709 F. App'x 44, n. 5 (2d Cir. 2017), *as amended* (Oct. 4, 2017). Moreover, Movants' argument is based solely on the fact that their infringing activities allegedly began in 1985, and that the Estate did not object until 2011. (Dkt. 370 at 19-21). Even if Movants could establish use over this period of time (which they cannot), "[i]t is clear that 'mere passage of time cannot constitute laches.' A district court in its discretion, however, may find laches if the passing of time can be shown to have lulled the defendant into a false sense of security, and the defendant acts in reliance thereon." *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir. 1970) (internal citation omitted).

Movants have no evidence that they sold or licensed products bearing the image of Marilyn Monroe since 1985. Apart from Valencia's self-serving statements in his Declaration, Movants offer a cease and desist letter apparently sent by CMG (former licensing agent to the Estate's predecessor-in-interest to the Marilyn Monroe rights) to David Grossman Creations in 2006, never previously disclosed in discovery, and a license agreement between AVELA and David Grossman Creations. (Dkt. 371-14, Ex. N at 2-8). Neither document establishes that

David Grossman Creations ever sold or continues to sell products bearing <u>AVELA-licensed</u> Marilyn Monroe images.  First, Section 7(b) of the purported license agreement indicates that the licensed artwork "shall be limited only to the   noted artwork on 'Schedule A' of this Agreement," but Schedule A only identifies artwork related to "It's a Wonderful Life," "Gone With the Wind," "Wizard of Oz,"   "Breakfast at Tiffany's," "Hard Days Night//Yellow Submarine," "Blue Hawaii//Viva Las Vegas," "Casa Blanca," and "My Fair Lady."   Marilyn Monroe did not appear in any of these films.  Supp. Clarke Decl. ¶5.  The cease and desist letter does not mention AVELA or any of the AVELA Parties.  And, Movants have no evidence of royalties earned by Grossman for sale of products bearing indicia of Marilyn Monroe, even though they were specifically ordered by this Court to produce such financial information if it existed.  (Dkt. 79).  Accordingly, Movants have no evidence that David Grossman was licensed by AVELA to produce Marilyn Monroe products, or that the Estate or the Estate's predecessors knew of AVELA's purported involvement.  The only thing established by this record is that the Estate's predecessors did historically police its rights, and sent a cease and desist letter when an entity called David Grossman Creations *was identified as selling infringing Marilyn Monroe products* at least as early as 2006.  (Dkt. 370 at 20).

The Estate was neither sleeping on its rights nor leading Movants to believe that no action would be taken.  Indeed, Movants admit that the Estate specifically objected to Movants' infringing products at least as early as 2011, and this suit ensued shortly thereafter.  (Dkt. 371-14, Ex. N at 2-8).  Movants cannot credibly argue that they have been prejudiced or lulled into a false sense of security about the legality of their conduct, when they went to great lengths to hide the extent of their conduct, including forming a new shell company, which they lied about it in

order to secretly siphon off the profits from the accused activities.  (Dkt. 335 at 27-28; Dkt. 340 ¶¶139-149, 173-179).

### 2.     Copyright Law

Movants' purported affirmative defense based on the Copyright Act fails.  It is unclear precisely what Movants argue in this regard, because they simultaneously allege that they "hold valid copyright protections in their Monroe artwork" (Dkt. 370 at 22) and argue under *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), which held that once a copyright work has fallen into the public domain it should stay there.

Unlike in *Dastar*,[7] the Estate is not claiming that Movants are marketing the Estate's creative works without proper attribution.  The claim is, that by appropriating the Estate's trademark-like rights in Marilyn Monroe's identity and persona, Movants' use is likely to result (and indeed, has resulted) in consumer confusion as to the Estate's sponsorship or approval of, or affiliation or association with, Movants' goods.  It is irrelevant that one of the means by which Movants are using Marilyn Monroe's identity is by reproducing her image as embodied in certain creative works.  By Movants' logic, Derek Jeter would be barred from recourse against a wine manufacturer who adorns its bottles with photos of Derek Jeter if someone else owns the copyright in the photograph.  Movants cannot leverage any alleged right to reproduce creative works into a right to unfairly compete with the Estate by capitalizing on consumer confusion.

---

[7] In *Dastar*, the defendant copied and edited a television series produced by the plaintiff that had passed into the public domain and marketed it to the public as its own product without any reference to the plaintiff.  *Id.* at 27-28. The plaintiff filed suit, claiming, under Section 43(a), that the defendant's lack of attribution misrepresented the "origin" of the underlying work.  *Id.*  The Court held that the term "origin," as used in the Lanham Act, "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id*. at 37.  The plaintiff's claim, at its core, was a copyright claim, which the Court ruled cannot be vindicated through the Lanham Act's prohibition on false claims of origin, sponsorship, or approval by claiming a failure to properly attribute.  Such a requirement would undermine the policy goal of copyright by, in effect, creating a perpetual copyright in the creative work.  *Id*.  In *Dastar*, "the plaintiffs were attempting to use trademark law to prosecute plagiarism of their creative work."  *Bach v. Forever Living Products, Inc.*, 473 F. Supp.2d at 1118 (W.D. Wash. 2007).

This Court should reject as a matter of law this affirmative defense, as it rejected Movants' nearly identical argument in *AVELA I*.  *AVELA I*, at 207-208.

### 3.   First Amendment

Movants' use is not subject to *Rogers v. Grimaldi* scrutiny.  *Rogers* by its very terms and in all of its subsequent applications is reserved for "artistic works."  875 F.2d 994, 999 (2d Cir. 1989); *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 776 (8th Cir. 1994) (expressive work "contained in an obvious editorial context is less likely to confuse, and thus more deserving of protection than those displayed on product.").  Defendants have not cited one case where *Rogers* has been applied to apparel or merchandise bearing allegedly First Amendment-protected content.  *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC), 2006 WL 1012939 (S.D.N.Y. 2006) did not involve a First Amendment defense and did not apply *Rogers*.  *Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797 (Cal. 2001) was a decision from the Supreme Court of California that did not apply *Rogers*, but nonetheless rejected the defendant's First Amendment defense to a claim based on rights of publicity where the Court could "discern no significant transformative or creative contribution" in his t-shirts, and where his goal was merely to "create a conventional portrait of a celebrity so as to commercially exploit his or her fame."  *Id*. at 810-811.  The Estate agrees that this case is similar, and on this basis that the Court should reject Movants' weak argument under the First Amendment.

In product cases, courts apply the likelihood of confusion test to balance any interest in free expression.  *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1317 (N.D. Ga. 2008) (vocal critic of Wal-Mart created and sold "Walocaust" merchandise, including t-shirts; ruled non-infringing based on likelihood of confusion analysis, not *Rogers* scrutiny); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987) (likelihood of confusion analysis applied to

t-shirts bearing logos allegedly parodying plaintiff's logos.).  The record here leads to no other conclusion that Movants' products are simply Marilyn Monroe merchandise.

### 4.    Fair Use

Movants' use of the Estate's registered trademark MARILYN, or Marilyn Monroe's persona, in no way constitutes good-faith, "non-trademark" use, for descriptive purposes.  *See* 15 U.S.C. §1115(4); *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 103-104 (2d Cir. 2001) (trademark "fair use doctrine" only applies to use of mark in good faith in its descriptive sense, and not as a trademark).  First, as noted above, there is ample evidence of Movants' *bad faith* in adopting and using these items.  *See* Section II.B(5)(E) *supra*.

Movants' use is also not merely "descriptive."  Movants' products prominently bear Marilyn Monroe's name and image in a manner meant to attract consumers' attention and sell the product.  *See e.g.*, 4 McCarthy § 23:11 ("the junior user may step over the line into a likelihood of confusion by using the senior user's mark too prominently" or with too much "emphasis").  Indeed, Movants' products derive their entire commercial value from the incorporation of Marilyn Monroe's image and name.  (Dkt. 340 ¶¶224-231).  The cases cited by Movants are entirely inapplicable.  Movants completely misrepresent *Bi-Rite Enterprises, Inc.*, which did <u>not</u> find that the use of performers' likenesses on novelty items was not actionable under 43(a), but in fact permitted the plaintiff's 43(a) claim to proceed, noting that plaintiff would be required to establish a likelihood of consumer confusion in order to prevail, as the Estate has done in this case.  *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F. Supp. 1188, 1196 (S.D.N.Y. 1983), *supplemented sub nom.* 578 F. Supp. 59 (S.D.N.Y. 1983).  Movants appear to invoke the "aesthetic functionality" doctrine by citing to an out-of-circuit and largely since-limited opinion *Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 917 (9th Cir. 1980).  The doctrine of aesthetic functionality holds that if "an ornamental feature is claimed as a

trademark and trademark protection would significantly hinder competition by limiting the range of adequate alternative designs, the aesthetic functionality doctrine denies such protection."  A feature is ornamental if it is added purely for aesthetic reasons and serves no source-identifying purpose.  *Gucci*, 868 F. Supp. 2d at 245–46 (internal citations omitted).

Movants' infringement was not commenced for purely aesthetic purposes, but to capitalize on Marilyn Monroe's and her successors' brand equity.   Indeed, their license agreements reference "Marilyn" as a brand. Dkt. 338-32 at 1-5.   The evidence of record establishes that the use of Marilyn Monroe's image and name in connection with merchandise is a well-known source identifier of the Estate, and that Movants and their licensees had knowledge of this at all relevant times.  Section II.B(5)(A) *supra*.  Movants deliberately seek to associate their products with the Estate by intentionally creating similar merchandise.  (Dkt. 335 at 12-15).  At points of sale, Movants referred to unauthorized t-shirts as "OFFICIALLY LICENSED," strongly suggesting that the appeal of the merchandise was its connection to a licensor, *i.e.*, the Estate.  (Dkt. 371-14, Ex. N at 12; Dkt. 371-25, Ex. W at 6,8; Dkt. 368-13, Ex. M at 6, 8).  It also shows that the public and the trade regard the designation "OFFICIAL" as important, *i.e.*, that many purchasers want official goods, and understand the term to refer to original genuine source with which they are familiar.  This leads to the conclusion that Movants used Monroe's image and name for more than purely aesthetic reasons, and it is therefore not merely ornamental.

## IV.    CONCLUSION

Movants do not carry their burden on summary judgment to dispose of the Estates' § 43(a) and trademark claims.   Nor do Movants' arguments create an issue of fact that merits denial of the Estate's cross motion for summary judgment.  The Estate respectfully requests that the Court deny Movants' motions and grant the Estate's Motion for Summary Judgment.

Dated: New York, New York
     July 13, 2018

                          /S/ *Gina L. Durham*_____

                          Gina L. Durham (*pro hac vice*)
                          DLA PIPER LLP (US)
                          P.O. Box 64807
                          Chicago, Illinois 60664-0807
                          Telephone: (415) 368-4000
                          Facsimile: (415) 659-7333
                          gina.durham@dlapiper.com

                          Tamar Duvdevani
                          DLA PIPER LLP (US)
                          1251 Avenue of the Americas
                          New York, New York 10020-1104
                          Telephone: (212) 335-4500
                          Facsimile:  (212) 335-4501
                          tamar.duvdevani@dlapiper.com

                          *Attorneys for The Estate of Marilyn Monroe,*
                          *LLC, Authentic Brands Group, LLC and James*
                          *Salter*