**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | **REPLY TO X ONE X MOVIE ARCHIVES, INC., A.V.E.L.A., INC., AND LEO VALENCIA'S STATEMENT OF MATERIAL UNDISPUTED FOR PURPOSES OF THIS MOTION FACTS PURSUANT TO LOCAL RULE 56.1** |
| Plaintiff, | |
| -against- | |
| THE ESTATE OF MARILYN MONROE LLC; and DOES 1 THROUGH 10, | Case No.:  12 Civ. 4828 (KPF) (JCF) ECF Case |
| Defendants | |

THE ESTATE OF MARILYN
MONROE LLC,


Defendant/Counter-Plaintiff,


-against-

A.V.E.L.A., INC., LEO VALENCIA, IPL,
INC., X ONE X MOVIE ARCHIVES INC.,
and V. INTERNATIONAL FINE ARTS
PUBLISHING, INC.,

Counter-Defendants

V. INTERNATIONAL FINE ARTS
PUBLISHING, INC.

Counter-Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE, LLC,

Defendant/Counter-Plaintiff

And

AUTHENTIC BRANDS GROUP, LLC, and JAMES SALTER

Third Party Defendants

---

X ONE X MOVIE ARCHIVE, INC.

Third Party Plaintiff/Counter-Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE, LLC,

Counter-Defendant

and

AUTHENTIC BRANDS GROUP, LLC, JAMES SALTER, and LEONARD GREEN & PARTNERS, L.P.

Third Party Defendants

Pursuant to Local Rule 56.1, the Estate of Marilyn Monroe LLC (the "Estate"), Authentic Brands Group LLC ("ABG"), and James Salter ("Mr. Salter") (the Estate, ABG, and Mr. Salter, collectively, the "Estate") hereby submit their responses to X One X Movie Archives, Inc., A.V.E.L.A., Inc., and Leo Valencia (collectively, "AVELA") Statement of Material Undisputed Facts. The paragraphs below are numbered to correspond to the numbered paragraphs in AVELA'S Rule 56.1 Statement. The Estate's responses are based on information known to the Estate at this time. The responses also are based on the Estate's understanding of the statement.

| UNDISPUTED FOR PURPOSES OF THIS MOTION FACTS | EVIDENCE |
|---|---|
| **THE PARTIES** | |
| 1.  AVELA is a corporation duly organized and existing under the laws of the State of Nevada with its principal place of business at 1135 Terminal Way, #209, Reno, Nevada 85902. | Harley Decl. ¶ 48, Exhibit A |
| **The Estate's Response:** <br> Undisputed to the extent AVELA is incorporated under the laws of the State of Nevada; however, this statement is made without waiver of the Estate's alter ego claims against AVELA. | |
| 2.  X One X is a corporation duly organized and existing under the laws of the State of Nevada with its principal place of business at 1135 Terminal Way, #209, Reno, Nevada 85902. | Harley Decl. ¶ 49, Exhibit A |
| **The Estate's Response:** <br> Undisputed to the extent X One X is incorporated under the laws of the State of Nevada; | |

however, this statement is made without waiver of the Estate's alter ego claims against X One X.

| | |
|---|---|
| 3.  V International is a corporation duly organized and existing under the laws of the State of California with its principal place of business at 2647 Gateway Road, #105-550, Carlsbad, California 92009. | Dkt. 282, Page 3 at ¶ 6 |

**The Estate's Response:**

Undisputed to the extent V. International is incorporated under the laws of the State of California; however, this statement is made without waiver of the Estate's alter ego claims against V. International.

| | |
|---|---|
| 4.  Leo Valencia is an individual residing in San Diego, California. | Exhibit B, Decl. of Leo Valencia at ¶ 2. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 5.  Mr. Valencia is the Owner of AVELA and X One X. | Exhibit B, Decl. of Leo Valencia at ¶ 1. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 6.  EMMLLC is a Delaware limited liability company with its principal place of business at 100 West 33rd Street, Suite 1007, New York, New York 10001. | Dkt. 133 at ¶ 1. |

**The Estate's Response:**

Undisputed for purposes of this motion.

**MONROE-RELATED BACKGROUND 1926-2010**

| | |
|---|---|
| 7.  Marilyn Monroe was a famous American actress, singer, and model. | Harley Decl. ¶¶ 17, 18, *See* Exhibits D and E. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 8.  Marilyn Monroe died on August 5, 1962. | Harley Decl. ¶ 4, Exhibit C at 1. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 9.  Marilyn Monroe did not apply for or receive any registered trademarks during her lifetime. | Harley Decl. ¶¶ 8, 47, 53 Exhibit F, Page 23 EMMLLC's Responses to X One X's First Set of Requests for Admission at No. 30.; Exhibit T, Woodhouse Depo. at 32:19-22. |

**The Estate's Response:**

Disputed to the extent that the evidence cited in Exhibit F does not support this statement as there is no page 23; but uncontroverted for purposes of this motion.

| | |
|---|---|
| 10. Monroe's will bequeathed her personal effects and small sums of money to various friends and family members. | Harley Decl. ¶ 2, Exhibit C, Marilyn Monroe's Last Will and Testament at 5-7. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| 11. Monroe's will does not explicitly refer to any intellectual property rights. | Harley Decl. ¶ 3, Exhibit C, Marilyn Monroe's Last Will and Testament at 5-7. |
|---|---|

**The Estate's Response:**

Undisputed to the extent the will does not specifically contain the phrase "intellectual property rights," but disputed to the extent that this fact leads to the conclusion that Ms. Monroe did not pass down intellectual property rights (this Court has held that trademark rights not explicitly identified in a will, will pass as personal property through the residuary clause to the residuary beneficiary. *See Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *5 n. 7 (S.D.N.Y. Mar. 31, 2009), aff'd sub nom 400 F. App'x 572 (2d Cir. 2010)).

| 12. Monroe's will left a trust to be paid out to her mother and a Mrs. Michael Chekhov with any remaining income to be paid to Dr. Marianne Kris for the furtherance of Dr. Kris' psychiatric institutions. | Harley Decl. ¶ 2, Exhibit C at 5-6. |
|---|---|

**The Estate's Response:**

Disputed to the extent this presents an incomplete statement of Monroe's will; Exhibit C cited by XOX speaks for itself.

| | |
|---|---|
| 13. Monroe left the "rest, residue and remainder" of her estate as follows: (a) the lesser of $40,000 or 25% of the total remainder of her estate to a May Reis; (b) 25% of the balance of her estate to her psychiatrist, Dr. Marianne Kris, to be used for the furtherance of Dr. Kris' psychiatric institutions; and (c) the remaining balance to Lee Strasberg, her acting coach. | Harley Decl. ¶ 2, Exhibit C at 6-7. |
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 14. When Monroe's estate was appraised in 1964, the executor of Monroe's estate did not list any intellectual property rights as assets of her estate. | Harley Decl. ¶ 5-6, Exhibit C at 26-34. |
| **The Estate's Response:** | |
| Disputed. While the document speaks for itself, the appraisal is an incomplete statement of Marilyn Monroe's last will and testament. | |
| 15. Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe from 1962 to 1983. | Harley Decl. ¶¶ 8, 53, Exhibit T, Woodhouse Depo. at 32:19-33:2 |
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 16. No individual or entity registered any trademarks in Monroe's name or stylized signature from 1926 to 1982. | Harley Decl. ¶¶ 8, 53, Exhibit T, Woodhouse Depo. at 32:19-33:2 |

| | |
|---|---|
| **The Estate's Response:**<br><br>Undisputed for purposes of this motion. | |
| 17. Neither Dr. Kris nor Lee Strasberg ever sold any Monroe-related products from 1962 to 1983. | Harley Decl. ¶¶ 10, 53, 54, Exhibit T, Woodhouse Depo at 92:1-24; Exhibit U, Jones July 19, 2017 Depo. at 126:24-127:5 |
| **The Estate's Response:**<br><br>Disputed. The testimony XOX cites does not support this conclusory statement. Mr. Woodhouse was asked if he was aware of Lee Strasberg or Marianne Kris using Marilyn Monroe's image on t-shirts, to which he replied that he did not know. Likewise, Ms. Jones was questioned about Lee Strasberg's commercial use of Marilyn Monroe; in response she indicated only that she did not know. | |
| 18. No beneficiaries of Monroe's will made trademark use of Monroe's image, persona, likeness, or name from 1962-1983. | Harley Decl. ¶¶ 10, 53, 54, Exhibit T, Woodhouse Depo at 92:1-24; Exhibit U, Jones July 19, 2017 Depo. at 126:24-127:5 |
| **The Estate's Response:**<br><br>Disputed. *See* response to ¶ 17. | |
| 19. No individual or entity had any intention of making trademark use of Monroe's image, persona, likeness, or name from 1962-1983. | Harley Decl. ¶ 11 |
| **The Estate's Response:**<br><br>Disputed. *See* Response to ¶17. | |

| 20. Neither Dr. Kris nor Lee Strasberg policed any purported rights in Monroe from 1962 to 1983. | Harley Decl. ¶¶ 9, 53, Exhibit T, Woodhouse Depo. at 33:3-10 |
|---|---|

**The Estate's Response:**

Disputed. The testimony XOX cites does not support this conclusory statement. Mr. Woodhouse was asked if he knew whether or not Lee Strasberg ever sent cease and desist letters relating to Marilyn Monroe. His response indicating his lack of knowledge on this subject does not prove that Dr. Kris and Lee Strasberg did not police Marilyn Monroe's rights.

| 21. No individual or entity policed any purported rights in Monroe's image, persona, likeness, or name from 1962 to 1983. | Harley Decl. ¶¶ 9, 53, Exhibit T, Woodhouse Depo. at 33:3-10 |
|---|---|

**The Estate's Response:**

Disputed. *See* response to ¶20.

| 22. EMMLLC has brought no evidence documenting Monroe's use of her image or name on merchandise during her lifetime. | Harley Decl. ¶ 12 |
|---|---|

**The Estate's Response:**

Disputed. *See* Supp. Clarke Decl. at ¶3 for evidence of use of Monroe's use of her image and name on merchandise during her lifetime.

| 23. EMMLLC has brought no evidence documenting Monroe's enforcement of uses of her image, persona, likeness, or name during her lifetime. | Harley Decl. ¶¶ 13, 46, Exhibit F, EMMLLC's Responses to AVELA's First Set of Requests for Production at No. 46. |
|---|---|

**The Estate's Response:**

Disputed that this statement is material and relevant, and to the extent that VIFA, XOX, and AVELA have failed to demonstrate that there were unauthorized uses of Monroe's image, persona, likeness, or name during her lifetime.

| | |
|---|---|
| 24. Monroe has no financial or ownership interest in EMMLLC's goods and/or services. | Harley Decl. ¶¶ 8, 12, 54, Exhibit U, Jones July 19, 2017 Depo. at 128:17-129:10 |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 25. EMMLLC has not presented any evidence concerning Monroe's intent as to trademark rights. | Harley Decl. ¶ 44 |

**The Estate's Response:**

Disputed that this statement is material and relevant, and to the extent that Monroe commercialized her name and persona during her lifetime. *See* Supp. Clarke Decl. at ¶3.,

| | |
|---|---|
| 26. Lee Strasberg died in 1982. | Harley Decl. ¶ 4, Exhibit C at 2. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 27. Lee Strasberg's will did not explicitly mention any Monroe-related intellectual property rights. | Harley Decl. ¶ 7, Exhibit C at 9-20. |

**The Estate's Response:**

Undisputed to the extent the will does not specifically contain the phrase "intellectual property rights," but disputed to the extent that this fact leads to the conclusion that Ms. Monroe did not pass down intellectual property rights (this Court has held that trademark rights not explicitly

identified in a will, will pass as personal property through the residuary clause to the residuary beneficiary. *See Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *5 n. 7 (S.D.N.Y. Mar. 31, 2009), aff'd sub nom., 400 F. App'x 572 (2d Cir. 2010)).

| | |
|---|---|
| 28. EMMLLC has not brought any evidence that Dr. Marianne Kris explicitly passed down any Monroe-related intellectual property rights to anyone. | Harley Decl. ¶ 14 |

**The Estate's Response:**

Disputed; *see* Dkt. 340 at ¶¶ 27-31.

| | |
|---|---|
| 29. The Anna Freud Center inherited Dr. Kris' interest in Monroe's residuary estate upon her death. | Harley Decl. ¶ 15, Exhibit C at 23. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 30. In 2001, Monroe's estate closed. | Harley Decl. ¶ 15, Exhibit C at 23. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 31. The Central District of California issued a declaration that Marilyn Monroe, LLC (EMMLLC's predecessor) did *not* own any rights of "association, sponsorship, and/or endorsement, in and to the name and likeness of Marilyn Monroe." | Harley Decl. ¶ 16, Exhibit C, Pages 35-40. |

**The Estate's Response:**

Disputed to the extent this statement mischaracterizes the Court's declaration. *Milton H. Greene*

*Archives, Inc. v. CMG Worldwide, Inc.*, was a case involving Marilyn Monroe's right of

publicity, which is distinct from Marilyn Monroe's trademark rights. *See Milton H. Greene*

*Archives, Inc. v. CMG Worldwide, Inc.*, No. CV 0502200 MMMMCX, 2008 WL 655604, at *1

(C.D. Cal. Jan. 7, 2008), *on reconsideration*, 568 F. Supp. 2d 1152 (C.D. Cal. 2008), *aff'd sub*

*nom. Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012;

| 32. Countless third parties used Monroe's image, persona, likeness, or name in commerce from the 1950s to 1982. | Harley Decl. ¶ 17, Exhibit D |
|---|---|

**The Estate's Response:**

Disputed. The web page print-outs in Exhibit D do not establish third party use of Marilyn

Monroe's persona, likeness or name in commerce from the 1950s to 1982. Furthermore, the

purported evidence presented in Exhibit D is inadmissible in violation of Local Rule 56.1(d). *See*

Supplemental Declaration of Gina L. Durham in Support of The Estate of Marilyn Monroe LLC,

Authentic Brands Group, LLC , and James Salter's Response in Opposition To X One X Movie

Archives, Inc., A.V.E.L.A., Inc., Leo Valencia, and V. International Fine Arts Publishing, Inc.'s

Motions for Summary Judgment ("Supp. Durham Decl.") at ¶2, Ex. A, ("XOX Exhibit D/VIFA

Exhibit C Objections") for a full discussion of the evidentiary objections to the materials in this

Exhibit D.

| 33. Countless third parties have used Monroe's image, persona, likeness, or name in commerce from the 1982 to the present. | Harley Decl. ¶ 18, Exhibit E |
|---|---|

**The Estate's Response:**

Disputed. The magazine excerpts and web page print-outs in Exhibit E do not establish third

party use of Marilyn Monroe's persona, likeness or name in commerce from 1982 to present. Furthermore, the purported evidence presented in Exhibit E is inadmissible in violation of Local Rule 56.1(d). *See* Supp. Durham Decl. at ¶3, Ex. B ("XOX Exhibit E/VIFA Exhibit D Objections"), for a full discussion of the evidentiary objections to the materials in this Exhibit E.

| | |
|---|---|
| 34. Various photographers and/or entities own copyrights in images of Monroe. | Harley Decl. ¶¶ 19, 47, Exhibit F, EMMLLC's Responses to X One X's First Set of Requests for Admission at No. 11. |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 35. Photographers and various entities sell and license their images of Monroe. | Harley Decl. ¶ 20, Exhibit H |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 36. Dozens of individuals market themselves as Marilyn Monroe impersonators. | Harley Decl. ¶ 18, Exhibit E |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. *See* Supp. Durham Decl., XOX Exhibit E/VIFA Exhibit D Objections, for a full discussion of the evidentiary objections to the materials in this Exhibit E.

| | |
|---|---|
| 37. Monroe appeared on many magazine covers during | Harley Decl. ¶ 21, Exhibit H at |

| her lifetime. | 1-3 |
|---|---|

**The Estate's Response:**

Undisputed for purposes of this motion.

| 38. Publications have licensed their images of Monroe. | Harley Decl. ¶ 21, Exhibit E |
|---|---|

**The Estate's Response:**

Disputed to the extent Exhibit E does not support this statement. *See* Supp. Durham Decl., XOX

Exhibit E/VIFA Exhibit D Objections, for a full discussion of the evidentiary objections to the

materials in this Exhibit E.

| 39. Other entities own and/or have owned trademark and copyright rights in Monroe's films and characters. | Harley Decl. ¶ 22, Exhibit G |
|---|---|

**The Estate's Response:**

Disputed that this statement is material and relevant and disputed to the extent that Exhibit G

does not support this statement. *See* Supp. Durham Decl. ¶¶4-28.

| 40. Other entities and individuals own registered trademarks related to Marilyn Monroe. | Harley Decl. ¶ 23, Exhibit G. |
|---|---|

**The Estate's Response:**

Disputed. *See* Supp. Durham Decl. ¶¶5-28.

| 41. EMMLLC has not turned over any cease and desist letters sent between 1926 and 2011. | Harley Decl. ¶ 24 |
|---|---|

**The Estate's Response:**

Disputed that this statement is material and relevant.

| 42. EMMLLC's predecessors purportedly first used indicia of Monroe in commerce in 1983. | Harley Decl. ¶ 25, Exhibit I at 10. |
|---|---|

**The Estate's Response:**

Disputed to the extent EMMLLC's predecessors include Marilyn Monroe herself and Monroe commercialized her image during her lifetime. *See*. Supp. Clarke Decl. at ¶3 for evidence of use of Monroe's use of her image and name on merchandise during her lifetime.

| | |
|---|---|
| 43. EMMLLC has not submitted any evidence of any Monroe-related advertising expenditures from 1962-2010. | Harley Decl. ¶¶ 26, 53, Exhibit T, Woodhouse Depo 121:12-20. |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 44. EMMLLC has not submitted any evidence regarding sales numbers in connection with Monroe from 1962-2011. | Harley Decl. ¶ 27 |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 45. CMG Worldwide was EMMLLC's predecessor in licensing Monroe's purported intellectual property rights. | Harley Decl. ¶¶ 54, 56, Exhibit J at 1-2; Exhibit U, Jones July 19, 2017 Depo. at 169:18-170:25 |

**The Estate's Response:**

Disputed; CMG Worldwide was merely a licensing agent for the Marilyn Monroe properties while the Estate continued to hold the rights to the Marilyn Monroe intellectual property assets; and therefore maintained its status as licensor of Marilyn Monroe intellectual properties. *See*

Dkt. 371-24, Exhibit U, Jones July 19, 2017 Depo. at 169:24-25. ("They don't own the brand.").

| 46. CMG Worldwide learned of AVELA licensee Dave Grossman's products with Monroe artwork in February 2006 and sent a cease and desist letter. | Harley Decl. ¶ 56, Exhibit J at 1-2. |
|---|---|

**The Estate's Response:**

The Estate admits that Exhibit J contains the cease and desist sent by CMG Worldwide to Dave Grossman; however, it is disputed that CMG knew that Dave Grossman was an AVELA licensee as there is no reference to AVELA in the cited letter.

**MOVANT'S BUSINESS**

| 47. AVELA is in the business of, inter alia, creating new artistic retro-themed works in print, graphic and lithographic mediums. | Exhibit C, Decl. of Leo Valencia at ¶ 3; Harley Decl. ¶ 28, Exhibit K |
|---|---|

**The Estate's Response:**

Disputed; *see* Dkt. 340 ¶¶ 115, 200.

| 48. AVELA creates new derivative artistic works based off of materials in the public domain. | Exhibit C, Decl. of Leo Valencia at ¶ 4. |
|---|---|

**The Estate's Response:**

Disputed; *see* response to ¶ 47.

| 49. Beginning in the 1980s, Valencia began to expand his collection of artwork by acquiring, restoring, and revitalizing old movie posters, promotional materials, and vintage artwork. | Exhibit C, Decl. of Leo Valencia at ¶ 7. |
|---|---|

**The Estate's Response:**

16

| | |
|---|---|
| Disputed. AVELA has failed to produce documentary evidence of its activities beginning in the 1980s. | |
| 50. Leo Valencia has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Marilyn Monroe, since the 1980s. | Exhibit C, Decl. of Leo Valencia at ¶ 8, Exhibit L |

**The Estate's Response:**

Disputed. AVELA has not provided any documentary evidence of its distribution of Monroe artwork in the marketplace since 1985.

| | |
|---|---|
| 51. AVELA and Valencia's products with Monroe artwork have been in the marketplace since 1985. | Exhibit C, Decl. of Leo Valencia at ¶ 9; Exhibit L |

**The Estate's Response:**

Disputed. AVELA has not provided any documentary evidence of its distribution of Monroe artwork in the marketplace since 1985. Furthermore, the oldest document in Exhibit L is a product approval form dated 5/17/2005 for t-shirts purportedly manufactured by Dragonfly Clothing bearing an image of Marilyn Monroe and the mark THE ASPHALT JUNGLE; moreover, the product approval form does not confirm that the t-shirt was ever manufactured or sold in the United States.

| | |
|---|---|
| 52. AVELA does not use the mark "Marilyn Monroe" on its products. | Exhibit C, Decl. of Leo Valencia at ¶ 14; Harley Decl. ¶ 28, Exhibit K |

**The Estate's Response:**

Disputed. Exhibit K is not an exhaustive compilation of AVELA-licensed Marilyn Monroe artwork and therefore does not provide uncontroverted proof of this statement.

| | |
|---|---|
| 53. AVELA does not use Monroe's stylized signature as a mark on its products. | Exhibit C, Decl. of Leo Valencia at ¶ 15; Harley Decl. ¶ 28, Exhibit K |

**The Estate's Response:**

Disputed. AVELA has approved its licensees' products that have used Monroe's stylized signature. *See* Dkt. 340 Estate's Statement of Facts ¶214 ; Dkt. 338-14, Ex. N, Kimberly Mileski Depo. at 59:5-11, 154:23 to 155:22.

| | |
|---|---|
| 54. AVELA's images transform old photographs of Monroe through extensive graphic design and restoration processes to create completely new artwork. | Exhibit C, Decl. of Leo Valencia at ¶ 11 |

**The Estate's Response:**

Disputed; *see* response to ¶47.

| | |
|---|---|
| 55. AVELA's artwork uses novel elements and contemporary designs to modernize old Hollywood memorabilia and appeal to a new generation of consumers. | Exhibit C, Decl. of Leo Valencia at ¶ 16 |

**The Estate's Response:**

Disputed; *see* response to ¶ 47.

| | |
|---|---|
| 56. The work that goes into AVELA's artwork includes the following: The original images often have defects that need to be corrected before they can have any real commercial value. The images are repaired, | Exhibit C, Decl. of Leo Valencia at ¶ 10. |

| | |
|---|---|
| scanned, photo shopped, converted into digital format, and extracted into illustrator files to use for artistic purposes. The files are then layered with additional artwork, reconfigured, and have effects added such as backgrounds and design elements. | |

**The Estate's Response:**

Disputed; *see* response to ¶47.

| | |
|---|---|
| 57. AVELA's images are continuously renovated to keep up with current trends. | Exhibit C, Decl. of Leo Valencia at ¶ 13. |

**The Estate's Response:**

Disputed that this statement is material and relevant.

| | |
|---|---|
| 58. Valencia has attended numerous tradeshows over the decades to promote his enhanced images with Monroe artwork. | Exhibit C, Decl. of Leo Valencia at ¶ 12; Exhibit L |

**The Estate's Response:**

Undisputed that Mr. Valencia attends tradeshows to promote AVELA's images; disputed to the extent that Exhibit L does not establish that Mr. Valencia promotes Marilyn Monroe related images/artwork at these tradeshows for decades.

| | |
|---|---|
| 59. AVELA sometimes includes the word "MARILYN" on its artwork. | Harley Decl. ¶ 28, Exhibit K. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 60. AVELA has never licensed artwork for use in | Exhibit C, Decl. of Leo Valencia |

| | |
|---|---|
| connection with any wine or alcoholic liquor. | at ¶ 17 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 61. AVELA uses Monroe's image in artwork on products. | Harley Decl. ¶ 28, Exhibit K |

**The Estate's Response:**

Undisputed that AVELA uses Monroe's image on products.

| | |
|---|---|
| 62. AVELA sells posters with its Monroe artwork. | Harley Decl. ¶ 28, Exhibit K |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 63. X One X conducts searches with the US Copyright Office regarding the use of its underlying public domain images of Monroe. | Exhibit C, Decl. of Leo Valencia at ¶ 18; Harley Decl. ¶ 58, Exhibit M at 36, 41-42, 50. |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 64. X One X obtains copyrights registered with the United States Copyright Office for its artistic works developed using formerly public domain images of Monroe. | Exhibit C, Decl. of Leo Valencia at ¶ 5; Harley Decl. ¶ 59, Exhibit M, Pages 1-33. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 65. X One X owns copyright registrations in artwork with | Harley Decl. ¶¶ 46, 59, Exhibit |

| | |
|---|---|
| Monroe's image. | M Pages 1-33; Exhibit F, EMMLLC's Responses to X One X's First Requests for Admission at No. 28. |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 66. Valencia created the entity X One X to manage and acquire various catalogs of vintage artwork. | Exhibit C, Decl. of Leo Valencia at ¶ 6. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 67. AVELA identifies its own brand, Radio Days, on its products and product packaging through the use of its trademarks "RADIO DAYS," "RED CARPET NOIR," or "HOLLYWOOD LEGENDS." | Harley Decl. ¶¶ 28, 64, Exhibit K; Exhibit W. |

**The Estate's Response:**

Disputed. AVELA does not consistently sell products with hang tags or product packaging displaying its trademarks "RADIO DAYS," "RED CARPET NOIR," or "HOLLYWOOD LEGENDS." *See* Dkt. 359, Decl. of Sandon Berg at ¶21.

| | |
|---|---|
| 68. AVELA's license agreements require that its licensees prominently display AVELA's trademark and copyright information on all licensed products and related advertising, promotional, and packaging | Harley Decl. ¶ 60, Exhibit N at 10-11, 14. |

| | |
|---|---|
| material. | |
| **The Estate's Response:** Disputed to the extent this fact is offered to prove that AVELA's licensees acted in accordance with this provision. | |
| 69. AVELA's t-shirts display AVELA's brand name on neck labels and also frequently on the front of the shirts. | Harley Decl. ¶¶ 28, 64, Exhibit K; Exhibit W. |
| **The Estate's Response:** Disputed; *see* response to ¶67. | |
| 70. AVELA does not permit its licensees to use the name "MARILYN MONROE" or a stylized signature for Monroe on its licensed products. | Exhibit C, Decl. of Leo Valencia at ¶ 19; Harley Decl. ¶ 60, Exhibit N at 8. |
| **The Estate's Response:** Disputed. *See* response to ¶53. | |
| 71. AVELA's license agreements do not allow its licensees to use artwork as a trademark to identify the source of merchandise. | Harley Decl. ¶ 60, Exhibit N at 15. |
| **The Estate's Response:** Disputed. Page 15 of Exhibit N does not provide support for this contention. Furthermore, AVELA cannot control the source-identifying function of a trademark in its licensing agreements, as what functions as a source identifier is determined in part by consumer perception. *See Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 515 | |

(S.D.N.Y. 1993)(internal citations omitted ) ("Ultimately, the strength of a mark is a function 'of its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public.'"). More importantly, Mr. Poret's survey establishes that consumers mistakenly believe products bearing AVELA-licensed images are endorsed by the Estate, thereby proving that AVELA's license agreements do not in fact prohibit "licensees to use artwork as a trademark." *See* Dkt. 338-15, Ex. O ("Poret Report").

| 72. AVELA has an approval process for its licensed products. | Harley Decl. ¶ 60, Exhibit N at 22. |
|---|---|
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 73. AVELA's licensees sometimes produce infringing and unapproved products. | Exhibit C, Decl. of Leo Valencia at ¶ 20 |
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 74. AVELA does not have a license agreement with EMMLLC. | Harley Decl. ¶ 29; Exhibit C, Decl. of Leo Valencia at ¶ 21 |
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 75. Movants are not aware of any consumer confusion in the marketplace as to the source, origin, or sponsorship of any of AVELA's licensed products bearing Monroe's image. | Exhibit C, Decl. of Leo Valencia at ¶ 22 |
| **The Estate's Response:** | |

| Disputed; *See* Dkt. 340 Estate's Statement of Facts ¶¶244, 249-252, 254. | |
| --- | --- |
| 76. AVELA's counsel has previously informed AVELA that it may lawfully use Monroe's image in its artwork. | Harley Decl. ¶ 62; Exhibit N at 1-7. |

**The Estate's Response:**

Disputed to the extent this if offered as proof of the legality of AVELA's use of Monroe's images.

| 77. Dave Grossman Creations, a previous licensee of AVELA, sold products bearing AVELA's Monroe artwork. | Exhibit C, Decl. of Leo Valencia at ¶ 23; Harley Decl. ¶ 57, Exhibit J, Pages 1-2 |
| --- | --- |

**The Estate's Response:**

Disputed that material does not support the fact stated.   In fact, on page 9 of the license agreement (Bates AVELA06439), Section 7(b) indicates that the licensed artwork "shall be limited only to the  noted artwork on 'Schedule A' of this Agreement;" yet Schedule A only identifies artwork related to "It's a Wonderful Life," "Gone With the Wind," "Wizard of Oz," "Breakfast at Tiffany's," "Hard Days Night//Yellow Submarine," "Blue Hawaii//Viva Las Vegas," "Casa Blanca," and "My Fair Lady." AVELA06450-6451. Noticeably absent is any reference a license of Marilyn Monroe-related artwork. *See* Supp. Clarke Decl. at ¶5. Moreover, although cited in Mr. Harley's Declaration, Mr. Harley has no personal knowledge of the license agreement in violation of FRE 602.

| **EMMLLC'S ACTIVITIES** | |
| --- | --- |
| 78. In December 2010, Authentic Brands Group, LLC ("ABG") purchased registered trademarks in | Harley Decl. ¶¶ 30, 55, Exhibit I at 1-7; Exhibit V, Clarke Depo at |

| Monroe's name and stylized signature from an entity called Marilyn Monroe LLC. | 151:10-152:11. |
|---|---|

**The Estate's Response:**

Disputed to the extent that this provides an incomplete statement of the assets acquired and to the extent that it was MM-ABG, LLC not Authentic Brands Group, LLC that acquired the rights to the registered trademarks then-owned by Marilyn Monroe LLC.

| 79. ABG formed a subsidiary and named it "The Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 33, Exhibit I at 8-9; Exhibit T, Woodhouse Depo. at 11:7-12. |
|---|---|

**The Estate's Response:**

Disputed to the extent that it was MM-ABG, LLC not Authentic Brands Group, LLC that formed The Estate of Marilyn Monroe, LLC.

| 80. EMMLLC has refused to turn over a copy of the acquisition document from its purchase of assets from the entity Marilyn Monroe, LLC. | Harley Decl. ¶ 31 |
|---|---|

**The Estate's Response:**

Disputed.  The Estate has produced the December 30, 2010 Asset Purchase Agreement between MM-ABG, LLC and Marilyn Monroe, LLC, and made the document available to AVELA for viewing on multiple occasions, starting in 2014 and most recently at the deposition of Nick Woodhouse on August 22, 2017 during which Mr. Harley's co-counsel used the agreement and questioned the witness about it. *See* Supp. Durham Decl. at ¶ 29, Ex. BB ("Nick Woodhouse Depo.") at 47:20-23.

| | |
|---|---|
| 81. On July 25, 2013, a representative of the Anna Freud Center signed a document purporting to retroactively assign the Anna Freud Center's 25% share of Monroe's residuary estate to the entity "RALS-MM LLC f/k/a Marilyn Monroe, LLC" effective as of June 19, 2001. | Harley Decl. ¶ 32, Exhibit C at 34. |

**The Estate's Response:**

Disputed. The document at page 34 of Exhibit C is a confirmatory assignment; it does not retroactively assign any rights but merely confirms the assignment already made. "Assignor wishes to confirm that any and all property or interests in property to which it may have been entitled from the Estate of Marilyn Monroe, Deceased, was transferred to the Assignee effective as of the date on which Assignee was formed, July 5, 2001."

| | |
|---|---|
| 82. EMMLLC sent cease and desist letters from 2011 to the present. | Harley Decl. ¶ 33 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 83. EMMLLC has not presented any consumer studies linking its purported marks to a source. | Harley Decl. ¶ 34 |

**The Estate's Response:**

Disputed to the extent the term "marks" is undefined and ambiguous. Furthermore, the Estate has conducted consumer studies linking Marilyn Monroe's persona to a source, *see* Dkt. 338-15, Ex. O ("Poret Report"), and the 2nd Circuit recognizes that celebrity persona is a trademark-like right.

*Bondar v. LASplash Cosmetics*, No. 12 CIV. 1417 SAS, 2012 WL 6150859, at *5 (S.D.N.Y. Dec. 11, 2012) ("Courts in this Circuit have recognized that celebrities have a trademark-like interest in their name, likeness, and persona that may be vindicated through a false endorsement claim under the Lanham Act.").

| | |
|---|---|
| 84. EMMLLC has not turned over any discovery evidencing media coverage of EMMLLC, EMMLLC's predecessor, or its products prior to 2011. | Harley Decl. ¶ 35 |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 85. The Ninth Circuit, Central District of California, and this Court previously ruled that Monroe's right of publicity did not survive her because Monroe died domiciled in the State of New York, which does not recognize postmortem rights of publicity. *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal. 2008) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008). | Harley Decl. ¶ 36 |

**The Estate's Response:**

Disputed that this statement is material and relevant and to the extent this statement implies that the Estate does maintain Marilyn Monroe's publicity rights in any state. As right of publicity laws vary across states, the Estate holds a right of publicity with respect to Marilyn Monroe in states that do not consider an individual's domicile at death, including Washington and Indiana.

*See* Supp. Durham Decl. at ¶30, Ex. CC, The Estate of Marilyn Monroe LLC's Responses to

Counter-Defendant X One X Movie Archive, Inc.'s First Set of Requests for Admission No. 9.

| | |
|---|---|
| 86. EMMLLC states on its website www.marilynmonroe.com that "RIGHTS OF THE PUBLICITY AND PERSONA RIGHTS ARE USED WITH THE PERMISSION OF THE ESTATE OF MARILYN MONROE, LLC." | Harley Decl. ¶ 37, Exhibit O at 1. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 87. EMMLLC states on its products and advertising that "RIGHTS OF THE PUBLICITY AND PERSONA RIGHTS ARE USED WITH THE PERMISSION OF THE ESTATE OF MARILYN MONROE, LLC." | Harley Decl. ¶ 37, Exhibit O at 2-6. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 88. EMMLLC does not own any registered trademark in AVELA's artwork. | Harley Decl. ¶ 38 |

**The Estate's Response:**

Disputed to the extent that AVELA has used EMMLC's registered MARILYN MONROE

trademarks and registered Marilyn signature in its artwork.

| | |
|---|---|
| 89. EMMLLC is not Marilyn Monroe. | Harley Decl. ¶ 39, Exhibit F, EMMLLC's Responses to V International's First Set of |

| | Requests for Admission at No. 6 |
|---|---|
| Disputed to the extent this statement improperly implies that the Estate is not the successor in interest to the rights of the woman Marilyn Monroe. | |
| 90. EMMLLC is not Marilyn Monroe's family. | Harley Decl. ¶ 39, Exhibit F, EMMLLC's Responses to V International's First Set of Requests for Admission at No. 7 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| 91. EMMLLC is not Marilyn Monroe's beneficiary. | Harley Decl. ¶ 5, Exhibit C at 33. |
|---|---|

**The Estate's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| 92. EMMLLC is not Marilyn Monroe's actual estate. | Harley Decl. ¶¶ 5, 15, 55, Exhibit C at 22; Exhibit V, Clarke Depo at 153:12-154:10 |
|---|---|

**The Estate's Response:**

Disputed to the extent the phrase "actual estate" is ambiguous. *See also* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| 93. EMMLLC is not composed of or owned by Marilyn Monroe's family. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |
|---|---|

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 94. EMMLLC is not composed of or owned by Marilyn Monroe's heir. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 95. EMMLLC is not composed of or owned by Marilyn Monroe's actual estate. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |

**The Estate's Response:**

Disputed. This statement misrepresents Ms. Jones's testimony. Ms. Jones states that there is no one at the Estate who is a blood relative of Marilyn Monroe. It is not necessary that such a relative be attached to the Estate for the Estate to own Marilyn Monroe's actual estate. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| | |
|---|---|
| 96. Marilyn Monroe did not assign any intellectual property rights to EMMLLC. | Harley Decl. ¶ 40 |

**The Estate's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| | |
|---|---|
| 97. Monroe did not authorize EMMLLC to license her intellectual property rights. | Harley Decl. ¶ 41 |

**The Estate's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| | |
|---|---|
| 98. Monroe did not authorize EMMLLC to police her | Harley Decl. ¶ 42 |

| | |
|---|---|
| intellectual property rights. | |

**The Estate's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| | |
|---|---|
| 99. No beneficiaries mentioned in Marilyn Monroe's will authorized EMMLLC to police Monroe's intellectual property rights. | Harley Decl. ¶¶ 3, 5, 43, Exhibit C at 5-7. 33. |

**The Estate's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

| | |
|---|---|
| 100.        EMMLLC claims it received rights in Monroe from the residuary clause in her will. | Harley Decl. ¶ 39, Exhibit F, EMMLLC's Responses to V International's First Set of Requests for Admission at No. 1 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 101.  EMMLLC owns trademark registrations in the word mark "MARILYN MONROE." | Harley Decl. ¶ 25, Exhibit I at 15-16. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 102.  EMMLLC owns trademark registrations in Monroe's stylized signature. | Harley Decl. ¶ 25, Exhibit I at 13-14. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 103.  EMMLLC owns trademark registrations in the | Harley Decl. ¶ 25, Exhibit I at |

| | |
|---|---|
| word mark "MARILYN" for two classes of goods: US Class 47 (wines) and US Class 49 (Distilled alcoholic liquors) | 11-12. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 104. EMMLLC typically uses the Marilyn Monroe stylized signature and/or "MARILYN MONROE TM" on its products or advertising. | Harley Decl. ¶¶ 37, 53, Exhibit P, Exhibit T, Woodhouse Depo. at 84: 5-17 |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 105. EMMLLC seeks to control any use of Monroe's image in commerce. | Harley Decl. ¶ 53, Exhibit T, Woodhouse Depo. at Exhibit 37:11-19; 40:14-25; 41:16-42:2; 118:25-119:24. |

**The Estate's Response:**

Disputed. This statement misrepresents Mr. Woodhouse's testimony, which represents that the Estate has the "right to oversee all uses of the Marilyn Monroe name, image and likeness in any *commercial manner.*" Dkt. 371-20, Woodhouse Depo. at 7:18-19 (emphasis added). The enforcement of the Estate's Marilyn Monroe related intellectual property rights against unauthorized *commercial* use of Marilyn Monroe's name, image, and persona, is distinct from controlling all use of her image in commerce—the former includes only uses that attempt to profit from Monroe's image

| | |
|---|---|
| 106. EMMLLC has not presented any evidence it | Harley Decl. ¶ 45 |

| | |
|---|---|
| acquired secondary meaning in any particular image of Monroe. | |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | | |
|---|---|---|
| 107. | Katie Jones testified that EMMLLC was unaware of any specific instance of actual confusion by consumers between AVELA's goods and EMMLLC or EMMLLC's goods. | Harley Decl. ¶ 53, Exhibit U, Jones Depo. on April 29, 2014 at 25:5-14; Jones Depo. on July 19, 2017 at 88:10-16. |

**The Estate's Response:**

Disputed. Ms. Jones testified that testified that she receives emails from individuals who are confused as to whether certain products are endorsed by the Estate as they do not appear to conform with the Estate's stylistic guidelines, identifying a particular instance in which she was contacted about a t-shirt that depicted Marilyn Monroe with tattoos—a shirt which was manufactured by Mighty Fine and pre-approved by AVELA. *See* Dkt. 338-8, Ex. H, Katie Jones Depo. 4/29/2014 at 26:2-25; Dkt. 340 Estate's Statement of Facts ¶244.

**AVELA'S SURVEY EVIDENCE**

| | | |
|---|---|---|
| 108. | AVELA's expert, Mr. Howard Marylander, conducted a study "to measure whether consumers are likely to believe that Marilyn Monroe or her heirs, estate, or other related entity make or are associated, connected, licensors or sponsors of the Marilyn Monroe t-shirts licensed by A.V.E.L.A., | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 3. |

| | |
|---|---|
| Inc." | |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 109. Mr. Marylander determined there was 0% likelihood that consumers are likely to believe that Marilyn Monroe or her heirs, estate, or other related entity make or are associated with, connected to, or licensors or sponsors of AVELA's shirts. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |

**The Estate's Response:**

Undisputed that Mr. Marylander determined there was a 0% likelihood of confusion; however, disputed to the extent that this statement implies that this result is accurate. *See* Dkt. 340 Estate's Statement of Facts ¶254.

| | |
|---|---|
| 110. The AVELA Survey was conducted according to accepted principles. It featured 251 participants in a test panel and 248 in a control panel who were identified through a screening process as potential buyers of a graphic t-shirt. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 8. |

**The Estate's Response:**

Undisputed that the survey used a recognized methodology, namely the Eveready survey design, but the survey was deeply flawed in several respects. *See* Dkt. 340 Estate's Statement of Facts ¶254.

| | |
|---|---|
| 111. The Test group was asked about one of three actual AVELA t-shirts with Monroe artwork and AVELA | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 37. |

| | |
|---|---|
| hangtags and necktags. The name "Marilyn" appeared on two of the test shirts. The control group was asked about a shirt identical in all relevant parts to the test group except that they used an anonymous blonde woman, the name "Nichole," and different jewelry. | |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 112.  Respondents were given an opportunity to examine the shirts and then the shirts were removed from the respondents' view prior to questioning. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 9. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 113.  Respondents were first asked "Who do you think made or put out this t-shirt." Respondents were then asked: "Do you think the company that made and put out this t-shirt is associated, connected, licensed, or sponsored by someone or some organization or it is not associated, connected, licensed, or sponsored by someone or some organization or do you not know or have no opinion? | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 9. |

**The Estate's Response:**

| | |
|---|---|
| Undisputed for purposes of this motion. | |
| 114. In response to the question regarding who made or put out the shirt, 2% of the test group answered "Person on the t-shirt/Marilyn Monroe/Marilyn Monroe Estate/Others with Rights." This is compared to 4% for the control group. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 11-12. |

**The Estate's Response:** Disputed to the extent that Marylander miscalculated the control group results. *See* Dkt. 338-18, Ex. R ("Poret Rebuttal") at pp. 10-14.

| | |
|---|---|
| 115. In response to the question regarding association, connection, license, or approval, 6% of the test group answered "Person on the t-shirt/Marilyn Monroe/Marilyn Monroe Estate/Others with Rights." This is compared to 4% for the control group. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |

**The Estate's Response:**

Disputed. *See* response to ¶ 114.

| | |
|---|---|
| 116. Overall, the net confusion rate was 0% because the control group's 8% confusion is subtracted from the test group's 8% confusion rate to eliminate guessing or other "noise." | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |

**The Estate's Response:**

Disputed to the extent that Marylander miscalculated the net confusion rate. *See* Dkt. 338-1, Ex. R ("Poret Rebuttal") at pp. 11.

| 117. Respondents were also asked open-ended additional questions to determine why they held the opinions they did about who put out and who was associated with the t-shirts. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 19, 21. |
|---|---|

**The Estate's Response:**

Undisputed for purposes of this motion.

| 118. The AVELA Survey's statistical tests were conducted at the 95% confidence level. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 10. |
|---|---|

**The Estate's Response:**

Disputed that this statement is material and relevant, as this statistical measure does not mean that Marylander's results are 95% accurate, only that he would obtain results within the margin of error reported 95% of the time he conducted his [flawed] survey. However, it is undisputed that the AVELA Survey indicates that the statistical tests were conducted at the 95% confidence level.

| 119. The Survey undisputedly supports the conclusion that there is "literally no confusion at all" as to source or association for AVELA's shirts with Monroe's image and first name. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 22. |
|---|---|

**The Estate's Response:**

Disputed. This statement assumes the AVELA Survey was conducted properly and to the extent its characterization of the "undisputed" nature of its conclusions calls for a legal conclusion. *See* Dkt. 340 Estate's Statement of Facts ¶254.

**EMMLLC'S SURVEY EVIDENCE**

| | |
|---|---|
| 120. EMMLLC's expert, Mr. Hal Poret, designed and conduct a survey to determine whether there is a likelihood that consumers will be confused into mistakenly believing an AVELA t-shirt bearing the likeness of Marilyn Monroe originates or is put out with the permission or approval of EMMLLC. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 3. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 121. Mr. Poret admitted that the conclusion of his EMMLLC Survey "is not so specific as to the Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 186:15-24. |

**The Estate's Response:**

Disputed to the extent that it is well accepted that consumers need not be able to identify the name of the source for actionable confusion to be found. *See* § 15:8. Association with a single, though anonymous, source, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 (5th ed.) ("Care must be taken in reading the judicial opinions that state that secondary meaning denotes the buyer's mental association between the designation and a single source. This does not mean that the buyer must know the identity of that "single source" in the sense that she knows the corporate name of the producer or seller. In fact, few buyers know, or care about, the corporate identity of the seller of a trademarked product. ...All Courts Follow the 'Single, Albeit Anonymous' Rule. All courts agree that secondary meaning exists when the ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source.")

| | |
|---|---|
| 122. Mr. Poret had no idea whether respondents had ever | Harley Decl. ¶ 52, Exhibit S, |

| | |
|---|---|
| heard of EMMLLC or had any idea what products or services were offered under EMMLLC's purported trademarks. | Poret Depo at 67:7 – 67:20; 82:7-18. |

| **The Estate's Response:** | |
|---|---|
| Disputed. *See* Response to ¶121. | |

| | |
|---|---|
| 123.  The EMMLLC Survey questioned 201 respondents regarding an AVELA t-shirt with an image of Marilyn Monroe on it, 102 respondents in Control Group 1 regarding a t-shirt with an image of anonymous red-lipped woman, and 102 respondents in Control Group 2 regarding a t-shirt with an image of Benjamin Franklin on it. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 10-11. |

| **The Estate's Response:** | |
|---|---|
| Undisputed for purposes of this motion. | |

| | |
|---|---|
| 124.  All respondents were asked: "Who do you think made or put out this particular t-shirt? … What makes you think this? … Any other reasons?" and "With respect to the makers of this particular t-shirt, do you think: a) That they <u>did</u> receive permission or approval from someone to make or put out this particular t-shirt; b) That they did not receive permission or approval from someone to make or put out this particular t-shirt; | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 7. |

| | |
|---|---|
| c) Or, do you have no opinion?" | |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 125.  Respondents were pre-screened into those that thought permission or approval was given, and they were then asked:<br><br>"Who do you think gave their permission or approval for this particular t-shirt to be made or put out?"<br><br>Respondents that gave an answer for who they thought gave permission or approval were asked: "What makes you think this? … Any other reasons?" | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 7-8. |

**The Estate's Response:**

Disputed as to the characterization of Mr. Poret's process as pre-screening.

| | |
|---|---|
| 126.  When asked, "Who do you think gave their permission or approval for this particular t-shirt to be made or put out?" Respondents gave responses such as "Marilyn Monroe," "the family of Marilyn Monroe," and "Marilyn Monroe is on the shirt." | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 23. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 127.  Respondents that answered that the makers of the t-shirt did have permission or approval but did not know or had no opinion about who gave permission | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 24. |

| | |
|---|---|
| were then asked: "What made you answer that you think the makers of this particular t-shirt did receive permission or approval from someone to make or put out the t-shirt? Please be as specific as possible." | |

**The Estate's Response:**

Disputed to the extent that page 24 of the EMMLLC Survey does not support this statement.

| | |
|---|---|
| 128. When asked why respondents thought approval was given, EMMLLC's Survey garnered responses such as "because she's famous," "it has Marilyn Monroe on it," "Because i [sic] know the family should recieve [sic] royalties," and "That would be the right thing to do before printing a t shirt with her on it." | Harley Decl. ¶ 51, *See* Exhibit R, EMMLLC Survey at 24. |

**The Estate's Response:**

Disputed to the extent the quotes presented in this statement are not accurate representations of the quotes in the EMMLLC Survey on page 24.

| | |
|---|---|
| 129. Mr. Poret counted responses citing Monroe's family, heirs, relatives, lawyers, estate, the movie company Monroe worked for, copyright, foundation, attorney and Monroe herself as confused regarding the entity EMMLLC. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 22-24. |

**The Estate's Response:**

| | |
|---|---|
| Undisputed for purposes of this motion. | |
| 130. Mr. Poret conducted the EMMLLC Survey with no knowledge of any distinction between EMMLLC and Monroe's actual estate, family, or heirs. | Harley Decl. ¶ 52, Exhibit S, Poret Depo. at 74:16-19; 63:4-64:9. |

**The Estate's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. *See also* response to ¶ 121.

| | |
|---|---|
| 131. The EMMLLC Survey evaluated artwork with Monroe's image on a t-shirt. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 5. |

**The Estate's Response:**

Disputed. The purpose of the EMMLLC Survey was not to evaluate artwork but "to determine whether there is a likelihood that consumers will be confused into mistakenly believing that an AVELA t-shirt bearing the likeness of Marilyn Monroe originates from or is put out with the permission or approval of Monroe." Dkt. 338-15, Ex. O ("Poret Report") at p. 3.

| | |
|---|---|
| 132. The EMMLLC Survey did not evaluate use of the name "Marilyn," the name "Marilyn Monroe," or Marilyn Monroe's stylized signature. | Harley Decl. ¶ 52, Exhibit S, Poret Depo. at 81:11-21. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 133. Mr. Poret counted any responses identifying Monroe or her representatives as confused. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 22-24. |

**The Estate's Response:**

Disputed to the extent that "respondents [who] gave answers that refer[ed] in general to approval

or copyrights or trademarks and could suggest a belief that the shirt [was] approved by Monroe's estate" were not included in the final confusion rate calculation. *See* EMMLLC Survey at 25.

| | |
|---|---|
| 134.  For Control Group 1, Mr. Poret did not count responses identifying the anonymous woman on the shirt or her representatives in calculating noise. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 27. |

**The Estate's Response:**

Disputed to the extent that this statement implies that this exclusion was improper. As Mr. Poret, explained in his rebuttal report, only responses referring to specific individual should be counted as noise. Dkt. 338-18, Ex. R ("Poret Rebuttal") at p. 14.

| | |
|---|---|
| 135.  For Control Group 2, Mr. Poret did not count all responses identifying Benjamin Franklin or his representatives in calculating noise. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 27-28. |

**The Estate's Response:**

Disputed. Mr. Poret counted all the responses that "might indicate a belief that approval was given by someone who is in some way connected to Ben Franklin" because "no one…gave answers indicating that Ben Franklin or his representatives either put out or approved the t-shirt." Dkt. 338-15, Ex. O ("Poret Report") at p. 27.

| | |
|---|---|
| 136.  Mr. Poret did not use any hangtags on the shirts he used. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 5, 9, 11. |

**The Estate's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 137.  The shirts were continuously displayed in front of respondents while they were questioned. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 6. |

| | |
|---|---|
| **The Estate's Response:** | |
| Undisputed for purposes of this motion. | |
| 138.  The EMMLLC Survey did not consider anyone's reason for buying a shirt. | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 79:15-19. |
| **The Estate's Response:** | |
| Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. | |
| 139.  The EMMLLC Survey does not support the conclusion that there is any "likelihood of confusion" as to "The Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 54, Exhibit S, Poret Depo at 186:15-24. |
| **The Estate's Response:** | |
| Disputed. *See* response to ¶ 121; *see also* Dkt. 338-15, Ex. O ("Poret Report"). | |

## THE ESTATE'S ADDITIONAL MATERIAL FACTS

| ADDITIONAL FACTS | EVIDENCE |
|---|---|
| 140.      Norma Jean Mortenson, nee Dougherty, created the Marilyn Monroe persona and adopted it as her glitzy, glamorous brand for the duration of her career. | Supp. Clarke Decl. at ¶ 2. |
| 141.      During her lifetime, Marilyn Monroe Marilyn Monroe was famously a celebrity endorser for Tru-Glo cosmetics, Lustre-Crème shampoo, | Supp. Clarke Decl. at ¶ 3. |

| | |
|---|---|
| Lux soap, Rayve shampoo, Hiltone hair color, and many others. | |
| 142.      Forbes Magazine has listed Marilyn Monroe as one of the top earning deceased celebrities year after year. | Supp. Clarke Decl. at ¶ 4. |
| 143.      To the knowledge of the Estate, Marilyn Monroe did not appear in any of the films "It's a Wonderful Life," "Gone With the Wind," "Wizard of Oz," "Breakfast at Tiffany's," "Hard Days Night//Yellow Submarine," "Blue Hawaii//Viva Las Vegas," "Casa Blanca," and "My Fair Lady." | Supp. Clarke Decl. at ¶ 5. |
| 144.      Twentieth Century Fox Film Corporation dba 20th Century Fox, does not use the MARILYN MONROE mark alone or prominently on products not authorized by the Estate. | Supp. Clarke Decl. at ¶6. |
| 145.      When the Estate discovered at one point that 20th Century Fox had licensed or attempted to license products bearing the Marilyn Monroe name and image without the permission of the Estate, the Estate sent Fox a cease and desist letter. A true and correct copy of the letter sent on October 28, 2016. | Supp. Clarke Decl. at ¶7. |
| 146.      Legends Licensing, LLC d/b/a/ Licensing Group, LLC was formed in 2008 to represent | Supp. Clarke Decl. at ¶8. |

| | |
|---|---|
| several photographers, including Milton Greene and Tom Kelley. The corporation was dissolved shortly thereafter. Subsequently, the Estate entered into and still maintains an exclusive licensing arrangement with Joshua Greene in his capacity as representative for the Milton H. Greene Archives, Inc. as well as an exclusive licensing agreement with Shaw Family Archives, Ltd. for certain well-known Marilyn Monroe photographs. The Estate knows of no unauthorized use of Mr. Greene's photographs on merchandise. | |
| 147.    On February 28, 2018, the Estate sent a cease and desist letter to Avec Vous LLC dba Norma Jean Pilates. The matter was resolved through a settlement agreement and Avec Vous agreed to cease use of images of Marilyn Monroe. | Supp. Clarke Decl. at ¶9. |
| 148.    In instances where third parties have attempted to register trademarks which incorporate the Marilyn Monroe name, variations thereof, or other indicia of her persona, those applications and/or registrations have been challenged either by the United States Patent & Trademark Office ("USPTO") or by the Estate or its predecessors.  As | *See* Exhibit G to the Goodheart Declaration (Dkt. 368-7); Exhibit G to the Harley Declaration (Dkt. 371-7); *see also* Supp. Durham Decl. at ¶¶5-7, 9, 11-28. |

| | |
|---|---|
| such, applications and/or registrations which incorporate the Marilyn Monroe, variations thereof, or other indicia of her persona filed by an entity other than the Estate are regularly canceled or lapsed. | |
| 149.    The Estate and its predecessors have meticulously maintained its trademark registrations for the Marilyn Monroe name, variations thereof, or other indicia of her persona by filing regular affidavits of use with accompanying specimens of products with the USPTO. | Supp. Durham Decl. at ¶¶31-50. |
| 150.    The Estate and its predecessors and have regularly enforced its rights against unauthorized uses of the Marilyn Monroe's name and image. | Supp. Durham Decl. at ¶54. |
| 151.    Leo Valencia has testified that he understands that an "estate" can only include blood relatives of the decedent. | Supp. Durham Decl. at ¶52, Ex. YY at 75:18 to 76:6. |
| 152.    AVELA, XOX, Leo Valencia, nor VIFA have produced royalty reports from its purported licensee, Dragonfly Clothing. | *See* Supp. Durham Decl. at ¶53. |

Dated: New York, New York
　　　　July 13, 2018

　　　　　　　　　　　　　　　　　　　　/S/ Gina L. Durham

　　　　　　　　　　　　　　　　　　　　Gina L. Durham (*pro hac vice)*
　　　　　　　　　　　　　　　　　　　　DLA PIPER LLP (US)
　　　　　　　　　　　　　　　　　　　　P.O. Box 64807
　　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60664-0807
　　　　　　　　　　　　　　　　　　　　Telephone: (415) 368-4000
　　　　　　　　　　　　　　　　　　　　Facsimile: (415) 659-7333
　　　　　　　　　　　　　　　　　　　　gina.durham@dlapiper.com

　　　　　　　　　　　　　　　　　　　　Tamar Duvdevani
　　　　　　　　　　　　　　　　　　　　DLA PIPER LLP (US)
　　　　　　　　　　　　　　　　　　　　1251 Avenue of the Americas
　　　　　　　　　　　　　　　　　　　　New York, New York 10020-1104
　　　　　　　　　　　　　　　　　　　　Telephone: (212) 335-4500
　　　　　　　　　　　　　　　　　　　　Facsimile:  (212) 335-4501
　　　　　　　　　　　　　　　　　　　　tamar.duvdevani@dlapiper.com

　　　　　　　　　　　　　　　　　　　　*Attorneys for The Estate of Marilyn Monroe,*
　　　　　　　　　　　　　　　　　　　　*LLC, Authentic Brands Group, LLC and James*
　　　　　　　　　　　　　　　　　　　　*Salter*