**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC.,<br><br>Plaintiff,<br><br>-against-<br><br>THE ESTATE OF MARILYN MONROE LLC; and DOES 1 THROUGH 10,<br><br>Defendants | Case No.:  12 Civ. 4828 (KPF)(JCF)<br>ECF Case |
| THE ESTATE OF MARILYN MONROE LLC,<br><br>Defendant/Counter-Plaintiff,<br><br>-against-<br><br>A.V.E.L.A., INC., LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V. INTERNATIONAL FINE ARTS PUBLISHING, INC.,<br><br>Counter-Defendants | |
| V. INTERNATIONAL FINE ARTS PUBLISHING, INC.<br><br>Counter-Defendant/Counter-Plaintiff<br><br>-against-<br><br>THE ESTATE OF MARILYN MONROE, LLC,<br><br>Defendant/Counter-Plaintiff<br><br>And | |

AUTHENTIC BRANDS GROUP, LLC, and
JAMES SALTER

Third Party Defendants

X ONE X MOVIE ARCHIVE, INC.

Third Party Plaintiff/Counter-
Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE,
LLC,

Counter-Defendant

and

AUTHENTIC BRANDS GROUP, LLC,
JAMES SALTER, and LEONARD GREEN &
PARTNERS, L.P.

Third Party Defendants

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE ESTATE OF
MARILYN MONROE LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES
SALTER'S OMNIBUS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   ARGUMENT ........................................................................................................4

    A.    The AVELA Parties' Arguments Fail To Raise An Issue Of Fact As To
        The Estate's Standing..............................................................................4

    B.    Likelihood Of Confusion Is Established, And The Estate Is Entitled To
        Judgment On Its False Endorsement Claim ................................................8

    C.    Summary Judgment Should Be Granted On The Estate's Unfair
        Competition Claim................................................................................11

    D.    The Estate Parties' Motion For Summary Judgment Should Be Granted
        On The Estate's Trademark Infringement Claim ................................................11

    E.    The Estate Parties' Motion For Summary Judgment Should Be Granted
        On The Estate's Dilution Claim ...............................................................13

    F.    The Estate Parties Are Entitled To A Permanent Injunction And Damages........13

    G.    There Is No Genuine Issue As To Alter Ego Liability ......................................13

    H.    There Is No Genuine Issue Preventing Dismissal Of The Interference
        Claims ...............................................................................................14

    I.    The AVELA Parties Cannot Prevail On Their Cancellation Claims ...................14

    J.    The AVELA Parties' Affirmative Defenses Fail...............................................15

III.  CONCLUSION ....................................................................................................15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Nat'l Video, Inc.*,
  610 F. Supp. 612 (S.D.N.Y. 1985)......................................................................5, 6

*Avalos v. IAC/Interactivecorp.*,
  No. 13 Civ. 8351, 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014) ...........................5

*A.V.E.L.A., Inc. v. Estates of Marilyn Monrone, LLC*,
  131 F. Supp. 3d 196 (S.D.N.Y. 2015)...............................................................4, 13

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*,
  No. 10 Civ. 2333 (LTS) 2011 WL 1327137 (S.D.N.Y. Mar. 31, 2011) ...................6, 7, 8, 15

*Cairns v. Franklin Mint Co.*,
  107 F. Supp. 2d 1212 (C.D. Cal. 2000).................................................................8

*Cairns v. Franklin Mint Co.*,
  24 F. Supp. 2d 1013 (C.D. Cal. 1998)..................................................................13

*Chanel, Inc. v. Veronique Idea Corp.*,
  795 F. Supp. 2d 262 (S.D.N.Y. 2011)..................................................................13

*DeClemente v. Columbia Pictures Indus., Inc.*,
  860 F. Supp. 30 (E.D.N.Y. 1994)........................................................................13

*Dowd v. City of New York*,
  No. 11 CIV. 9333 KBF, 2012 WL 5462666 (S.D.N.Y. Nov. 5, 2012)....................1

*Eclipse Associates v. Data General Corp.*,
  894 F.2d 1114 (9th Cir. 1990) ..............................................................................6

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*,
  778 F.3d 1059 (9th Cir. 2015) ...........................................................................5, 7

*Frito-Lay, Inc. v. Bachman Co.*,
  704 F. Supp. 432 (S.D.N.Y. 1989)......................................................................15

*Geisel v. Poynter Products, Inc.*,
  283 F. Supp. 261 (S.D.N.Y. 1968)........................................................................5

*Jackson v. Odenat*,
  9 F. Supp. 3d 342 (S.D.N.Y. 2014)......................................................................9

**Page**

*Kregos v. Associates Press,*
    937 F.2d 700 (2d Cir. 1991) ........................................................................5

*Mobil Oil Corp. v. Pegasus Petroleum Corp.,*
    818 F.2d 254 (2d Cir. 1987) ......................................................................12

*Palm Bay Imports v. Veuve Clicquot Ponsardin,*
    396 F.3d 1369 (Fed. Cir. 2005)....................................................................6

*Radiancy, Inc. v. Viatek Consumer Prod. Grp.,* Inc.,
    138 F. Supp. 3d 303 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014) ......................................14

*Rogers v. Grimaldi,*
    875 F.2d 994 (2d Cir. 1989) ........................................................................5

*Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.),*
    544 F.2d 1167 (2d Cir. 1976).......................................................................6

*Sly Magazine LLC v. Weider Publications LLC,*
    529 F. Supp. 2d 425 (S.D.N.Y. 2007) .........................................................12

*THOIP v. Walt Disney Co.,*
    736 F. Supp. 2d 689 (S.D.N.Y. 2010) .........................................................11

*Trump v. Pavion, Ltd.,*
    No. 89 Civ. 5453 (TPG), 1991 WL 167964 (S.D.N.Y. Aug. 22, 1991) ...........................5, 6

**Other Authorities**

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 (5th ed.) .............................10

3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:15 (5th ed.) .............................8

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:95 (5th ed.) ...........................11

The Estate of Marilyn Monroe LLC (the "Estate"), Authentic Brands Group LLC ("ABG"), and James Salter ("Mr. Salter") (the Estate, ABG, and Mr. Salter, collectively, the "Estate Parties") respectfully submit this reply memorandum of law (this "Reply") in further support of their partial motion for summary judgment (the "Motion") against X One X Movie Archives, Inc. ("XOX"), A.V.E.L.A., Inc. ("AVELA"), Leo Valencia ("Valencia"), and V International Fine Arts Publishing, Inc. ("VIFA") (collectively the "AVELA Parties").

## I.   PRELIMINARY STATEMENT

The AVELA Parties paint a picture of their business that differs radically from reality in an attempt to survive summary judgment.  Their Opposition is a tangle of incorrect legal arguments and last-ditch efforts to add evidence through self-serving declarations, which contradict prior sworn testimony and attach inadmissible evidence.  The law does not allow a party to avoid summary judgment through such tactics.  *Dowd v. City of New York*, No. 11 CIV. 9333 KBF, 2012 WL 5462666, at *1 (S.D.N.Y. Nov. 5, 2012); Local Civil Rule 56.1(d).

Valencia does not license "retro-themed artwork"; he purchases physical copies of images of Marilyn Monroe that are in the public domain, registers the copies with the U.S. Copyright Office in the name of XOX, and mispresents to unsuspecting licensees that he owns intellectual property rights in such images.  (*See* Estate's Statement of Facts, Dkt. 340; Dkt. 338-3, Valencia Depo. 9/30/2013 at 27:20-39:20).  A licensee, Mighty Fine[1], was subpoenaed by the Estate and testified as follows:

> **Q.** Did you ever consider seeking a license from The Estate of Marilyn Monroe?
> **A.** I didn't know there was a difference. ·
> **Q.** You didn't know there was a difference between The Estate of Marilyn Monroe and A.V.E.L.A.?
> **A.** Yes.

---

[1] The AVELA Parties attempted to hide Mighty Fine's existence from the Estate.  Dkt. 335 at 5-8, 27-28.

(Dkt. 338-11, Timsawat Depo. 11/14/2013 at 72:20-25).  All of the AVELA Parties then profit

from their licensees' sale of products – products approved by the AVELA Parties which bear

prominently the image of Marilyn Monroe – and often a signature of "Marilyn."  (Dkt. 340 ¶210-

217).  The AVELA Parties' characterization of the accused products as artwork or aesthetic

expression in order to defend their actions to this Court is disingenuous.  The accused products

actually consist of a whole line of products that are intentionally designed to appear as if they are

branded products linked to Ms. Monroe and authorized as genuine:

| The Estate's Products | The AVELA Parties' Products |
|---|---|
|  |  |
|  |  |
|  |  |

(Dkt. 335 at 13-15). This activity is called merchandising – not an art sale.  Today's consumers

simply do not believe that such products can be put out without being licensed by the official

source – in this case, the Estate.  This explains why the Estate encounters instances of actual

confusion, and consumers surveyed by the Estate's expert (and consumers surveyed by

AVELA's expert)[2] believe that AVELA's infringing shirt comes from or is approved by Monroe

or Monroe's representatives, such as her estate, her lawyers, or her family.  (Dkt. 338-15 ("Poret

---

[2] The raw data from the Marylander Survey demonstrates that the net confusion level is actually in the range of 10%
or as high as 13% to 14% for the shirt that shows the name MARILYN.  *See* Section II.B *infra*.

Report") at 22-23).   Moreover, the AVELA Parties' licensees know that consumers want Marilyn Monroe branded products, not products branded with "Radio Days," which the AVELA Parties claim is required to be added to their products.   Indeed, the record tells a different story –

> **Q.** Has your – have your licensees ever asked you to use the name "Marilyn Monroe" together?
> **A.** I believe they've asked if they can use just the name without Radio Days, the brand, or – you know, they've asked all kinds of questions.  (Dkt. 338-3, Valencia Depo. 9/30/2013 at 294:3-7).
>
> **Q.** Are your licensees selling products that bear the name "Monroe" or "Marilyn"?
> **A.** Either/or?
> **Q.** Either/or.
> **A.** Yes.
> **Q.** Is it "Marilyn"?
> **A.** Yes. (Dkt. 338-3, Valencia Depo. 9/30/2013 at 292:16-22).

Sworn declarations from the Spencer's retailer and a private investigator who visited many retailers suggest that the "Radio Days" hang tag does not actually appear on the products at the point of sale.  But MARILYN, in name and image, does appear on the AVELA Parties' products. The images speak for themselves.  The *Polaroid* factors also overwhelmingly favor the Estate.

The AVELA Parties attempt to divert by challenging the Estate's ownership of valid rights, largely recycling previously unsuccessful arguments.  The Estate's Lanham Act claims are not tethered to a state right of publicity claim, and the Estate traces an unbroken chain of title to those rights and assets subject to probate of Ms. Monroe's will.  (Dkt. 340 ¶¶27-31; *see also* Dkt. 383 at 10-13).  The Estate and its predecessors have diligently controlled and licensed these rights, as documented through decades of USPTO filings, production of historic license agreements, and numerous cease and desist letters sent by the Estate and its predecessors (one 2006 example of which the AVELA Parties submit in support of their own summary judgment motion, *see* Dkt. 371-14, Ex. N at 2-8).  (*See also* Supp. Durham Decl., Dkt. 385 ¶53).

There is no longstanding, uncontrolled third party use of Ms. Monroe's name or image on products. There is no admissible evidence of any sales of such products in the United States, ever. And, Valencia has not licensed Marilyn Monroe products since 1985. There are no financial records supporting this allegation (despite having been compelled to supplement its financial discovery by this Court). Another court concluded that Mr. Valencia just started adding a "©1985" notice to his images to make it appear as though his use is longstanding. (Dkt. 383 at 20-21; *see also* Dkt. 338-21,Valencia Depo. 5/30/2014 at 543:13-547:24).

After years of discovery, the AVELA Parties have no evidence to impugn the Estate's rights or to support their vague accusations of tortious interference. The Estate's evidence, however, establishes the AVELA Parties' penchant to lie about everything from their addresses to the scope of their license activities – including the creation of new shell entity (IPL) the day after AVELA filed this declaratory action, to which it attempted to shift licensing relationships to shield royalties from this litigation. (Dkt. 340 ¶¶143, 173-179). This conduct is that of a party who knows it is infringing the Estate's rights.

## II.   ARGUMENT

### A.   The AVELA Parties' Arguments Fail To Raise An Issue Of Fact As To The Estate's Standing.

The AVELA Parties misunderstand (or deliberately mischaracterize) the rights asserted by the Estate:

*First*, § 43(a) is not equivalent to a federal right of publicity. The AVELA Parties attempt to challenge the Estate's "standing" to assert rights under § 43(a) on the basis that the Estate cannot simultaneously assert a claim for violation of Marilyn Monroe's right of publicity under New York law. This identical argument was raised and rejected in *AVELA I. A.V.E.L.A., Inc. v. Estates of Marilyn Monrone, LLC,* 131 F. Supp. 3d 196, 205 (S.D.N.Y. 2015) ("*AVELA*

*I"*).  A false endorsement claim premised on a celebrity's person is legally distinct from a state right of publicity claim – a § 43(a) claim hinges on establishing that one's personality was used without authorization <u>in a manner likely to result in consumer confusion</u>.  *See Rogers v. Grimaldi*, 875 F.2d 994, 1004 (2d Cir. 1989); *see also Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1071 (9th Cir. 2015).  The AVELA Parties' argument that § 43(a) rights did not exist before 1985, and thus could not have been associated with the rights passed via Ms. Monroe's will, is flat wrong.[3]  They try to analogize the Estate's § 43(a) claim to the statutory state right of publicity dealt with in *Shaw*, without success.  (Dkt. 362 at 7).  *Shaw* is irrelevant here.  The Lanham Act was passed in 1946, long before Ms. Monroe's death.  The AVELA Parties also inappropriately rely on *Avalos v. IAC/Interactivecorp.*, No. 13 Civ. 8351, 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014)., which <u>did not</u> hold that a § 43(a) claim may not exist where the claimant does not own a right of publicity and has never been so cited.  Plaintiff owned only rights to photographs of a non-party model Harrington, and did not plead false endorsement, but a "reverse-passing off" claim.  The court found that the claim was invalid, and opined that to the extent that claim *could* be read as one for false endorsement, it failed because Plaintiff made no allegation whatsoever as to *Plaintiff's* ownership of any rights that *Harrington* may have had under § 43(a).  *Avalos* is inapposite.

*Second*, secondary meaning is not required.  For its § 43(a) claim, the Estate need not show secondary meaning before turning to likelihood of confusion.  *Trump v. Pavion, Ltd.*, No. 89 Civ. 5453 (TPG), 1991 WL 167964, at *4 (S.D.N.Y. Aug. 22, 1991) (*citing Kregos v.*

---

[3] The AVELA Parties apparently base the 1985 date on the Woody Allen case, *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 626 (S.D.N.Y. 1985).  But *Allen* plainly cites to a 1968 case involving Theodor Seuss Geisel for the proposition of false endorsement by celebrity, *Geisel v. Poynter Products, Inc.*, 283 F. Supp. 261 (S.D.N.Y. 1968), and *Geisel* itself discusses the intended breadth of § 43(a).  *Id.* at 266-268.

*Associates Press*, 937 F.2d 700 (2d Cir. 1991)).   The celebrity need not have specifically engaged in commercial activities.  *Trump*, 1991 WL 167964 at *4 (citing *Allen*, 610 F. Supp. at 626).   Neither is the Estate required to establish trademark rights in a specific image of Marilyn Monroe – the trademark is her persona.  *Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.*, No. 10 Civ. 2333 (LTS) 2011 WL 1327137, at *16-17 (S.D.N.Y. Mar. 31, 2011).   Even if secondary meaning were a requirement, Marilyn Monroe commercialized her name, image, and persona during her lifetime, and her successors continued to do so.  (Dkt. 383 at 9-10).   The AVELA Parties' arguments are premised entirely on alleged "extensive use" of Marilyn Monroe's images by "countless third parties."   But, no competent, admissible evidence cited by the AVELA Parties supports this premise.[4]

*Third*, the Estate owns all asserted rights.   As detailed in the Estate Parties' Memorandum (Dkt. 335) and in its Opposition (Dkt. 383), the Estate acquired all of the assets of Marilyn Monroe, LLC, the entity formed by Anna Strasberg, the Administratrix of Ms. Monroe's estate, specifically to hold and manage the intellectual property assets of Marilyn Monroe.   The AVELA Parties falsely state that "Anna Strasberg still retains certain rights to Monroe in commerce."   She does not.   (See Dkt. 383 at 11-13; *see also* Dkt. 338-7, Clarke Depo. 11/7/2013 at 149:24-156:19).   The AVELA Parties attempt to fabricate an issue of fact where there is none.

*Finally*, the AVELA Parties' use is indeed misleading.   They facilitate and encourage their licensees to use images of Marilyn Monroe on products, and to prominently display "MARILYN" and other indicia of Ms. Monroe's persona to further evoke association among

---

[4] To prove third party use, the AVELA Parties must establish current use and the scope and nature of that use, including that the products or services with which the infringing uses are used are well promoted or recognized by consumers; and the products or services offered under the third party uses are similar to or related to the products offered under the Estate's rights in Marilyn Monroe's persona.  *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173-74 (2d Cir. 1976); *Eclipse Associates v. Data General Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990); *Palm Bay Imports v. Veuve Clicquot Ponsardin*, 396 F.3d 1369, 1373-74 (Fed. Cir. 2005).  The AVELA Parties have done none of this.

consumers.  (Dkt. 335 at 10; Dkt. 340 ¶¶194-217; Dkt. 372 ¶61).  They use prominently Marilyn Monroe's image and name in a manner that is substantially identical to the Estate's use, and in association with substantially identical products.  (Dkt. 335 at 13-15, 17-18).  The AVELA Parties each admit prior knowledge of the Estate's rights and manifested an intent to hide their activities from the Estate.  *Id.* at 19.  If their activities were not misleading, they would have no need to hide, or to create a new shell company, IPL, to secretly siphon off the profits from their activities.  (Dkt. 335 at 27-28; Dkt. 340 ¶¶139-149, 173-179).  The AVELA Parties' Opposition is curiously silent in response to the IPL—likely because there is nothing they can say in the face of testimony from their own licensees:

> **Q.** But in this license agreement, it appears that the parties to it are Mighty Fine, your company, as licensee; but the licensor listed is I.P.L. LLC.  What's your understanding of who I.P.L. LLC is?
> **A.** My understanding is I.P.L. and A.V.E.L.A. and Radio Days are one and the same.

(Dkt. 338-11, Timsawat Depo. at 55:4-9).  The AVELA Parties' attempt to distinguish between use on products and "advertising" use of a celebrity's image has been consistently rejected.  *See e.g. Fifty-Six Hope Rd.*, 778 F.3d at 1072; *Bruce Lee*, 2011 WL 1327137 at \*20.  Neither is the AVELA Parties' use of Marilyn Monroe merely "ornamental."  They deliberately seek to associate their products with the Estate by intentionally creating similar merchandise.  (Dkt. 335 at 12-15).  At points of sale, the AVELA Parties refer to products as "OFFICIALLY LICENSED," strongly suggesting that the appeal of the merchandise is its connection to a licensor, *i.e.*, the Estate.  (*See e.g.* Dkt. 371-14, Ex. N at 12).  It also shows that the public and the trade regard the designation "OFFICIAL" as important, *i.e.*, that many purchasers want official goods, and understand the term to refer to original genuine source.  It is clear that the AVELA Parties use Monroe for more than purely aesthetic reasons.

**B.      Likelihood Of Confusion Is Established, And The Estate Is Entitled To Judgment On Its False Endorsement Claim.**

The AVELA Parties fail to create an issue of fact as to the Estate's § 43(a) claim. The Estate owns rights in Marilyn Monroe's identity, and use of her identity acts as a source-identifier of the Estate.[5] There is abundant evidence of how the AVELA Parties' activities are likely to confuse consumers.[6] (Dkt. 335 at 13-15; Dkt. 340 ¶¶209-217; Dkt. 383 at 19, 35). The *Polaroid* factors overwhelmingly favor the Estate. (Dkt. 335 at 10-21).

*First*, as to strength of the mark, each assertion advanced to argue against this factor is false: (1) Anna Strasberg does not retain rights to Monroe's persona, as noted *supra*; (2) the Estate owns all intellectual property rights related to Marilyn Monroe as successor-in-interests to all testamentary assets; (3) the AVELA Parties cite no admissible, competent evidence to support that there has ever been "extensive, unauthorized use" by "countless third parties" (and indeed Valencia testified that the Estate would be the <u>only</u> Marilyn Monroe licensor, but for Valencia) (Dkt. 383 at 16-18); and (4) their products do not "predate" the Estate's, and that the Estate was organized in 2010 is irrelevant as it steps into the shoes of its predecessors in interest (*see e.g.* 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:15 (5th ed.)). Nothing contradicts the substantial evidence of strength of the Estate's rights. (Dkt. 335 at 12; Dkt. 383 at 15-17). Indeed, consumers' responses reflected in the Poret Report show that they specifically associate use of Marilyn Monroe's image *alone* on a t-shirt with *the Estate*. *Id*.

---

[5] This is, again, in stark contrast to the plaintiffs in *Cairns* whose lack of exploitation and policing of Princess Diana's identity compromised their claimed rights in her identity. *Cairns v. Franklin Mint Co.*, 107 F. Supp. 2d 1212, 1220-21 (C.D. Cal. 2000).

[6] *Bruce Lee* is distinguishable from the present case. There, the court denied plaintiff's motion for summary judgment on its 43(a) claim because, unlike here, plaintiff presented no evidence, only conclusory statements, to support a finding of consumer confusion. *Bruce Lee*, 2011 WL 1327137 at *21. By contrast, there is no issue of fact here, as the Estate presents overwhelming evidence to support likely consumer confusion, including substantial evidence of actual confusion.

*Second*, as to similarity, there is overwhelming evidence that the AVELA Parties intentionally sought to associate their products with the Estate by creating similar products. (Dkt. 335 at 13-15). Citing no evidence, they concoct an argument that actually, the Estate copied AVELA's products! And, they now argue for the first time, AVELA's product actually predate the Estate's products, since the Estate is an entity formed in 2010, ignoring the basic principle of successor rights. The AVELA Parties also point to their hangtags that say "Radio Days," which fails for the reasons noted above, and because there is no evidence that consumers recognize "Radio Days" as an alternative source of genuine Marilyn Monroe merchandise. (Dkt. 383 at 19, 35). "Radio Days" does nothing to negate the impression that AVELA's products originate from the Estate. It only *enhances* the assumption by a purchaser that these are official Marilyn Monroe merchandise, that is, officially licensed by the Estate.

*Third*, the AVELA Parties fail to establish an issue of fact with respect to the Estate Parties' powerful evidence of actual confusion (and even if they could, actual confusion is not required for a finding of likelihood of confusion, *Jackson v. Odenat*, 9 F. Supp. 3d 342, 359 (S.D.N.Y. 2014)). As to the Marilyn Monroe "tattoo" products, they unquestionably emanate from AVELA – Valencia <u>admitted</u> during deposition that he created and licensed images of Marilyn Monroe with tattoos. (Dkt 338-25, Valencia Depo. 8/9/2017 at 128:18-25). There is no evidence that "[v]arious entities license and manufacture t-shirts depicting Monroe with tattoos" – the AVELA Parties rely solely on the declaration of an attorney with no personal knowledge who points solely to unauthenticated print-outs.

The AVELA Parties' attacks on the Poret Report are baseless. (*See* Dkt. 358). The AVELA Parties take issue with the Poret Report's omission of "hangtags" – but the product used by Mr. Poret was an actual AVELA-licensed product purchased at retail from Spencer's, without

a hangtag. (Dkt. 340 ¶255). The AVELA Parties identify a single quote from Mr. Poret's deposition taken out of context to argue the Survey was "not specific to [the Estate]," but even if the survey was not designed to be specific to the Estate,[7] many responses of consumers themselves specifically identify the Estate by name as the source of the product. (Dkt. 383 at 15-16). Marylander's survey ("Marylander Survey") fails to create an issue fact. First, AVELA purposefully manipulated the stimulus product, so that it appeared in a manner inconsistent with how the product appears at retail. (Dkt. 340 ¶254). The stimulus product had affixed to it a large hang tag that said "Radio Days", which does not actually appear on the product at retail. (*Id*. ¶255).[8] Moreover, Marylander did not accurately analyze the survey results. The assertion that the "statistical tests were conducted at a 95% confidence level" says literally nothing about the actual survey results or its relevance to the likelihood of confusion analysis.[9] And, by his own analysis of the raw data, Mr. Poret concludes the net confusion level is actually in the range of 10%, or as high as 13% to 14% for the shirt that shows the name MARILYN. (Dk. 338-18, Poret Rebuttal at 6). Marylander's analysis that leads to a Control Group result of 8% (and thus, no "net" confusion) is improper – those responses are not noise and were improperly deducted. *Id*. The Marylander Survey in fact supports the Poret Report's conclusion that there is a

---

[7] It is not *required* to be – the law does not require that consumers know the precise name of the source, it is sufficient that they recognize that the mark (here, Marilyn Monroe's persona) signifies a source. See 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 (5th ed.).

[8] There is no evidence to support the consistent and prominent use of "Radio Days" hangtags on its products. Page 11 of Exhibit G to the Goodheart Decl., cited by the AVELA Parties, consists solely of images of unknown origin. There is nothing here that would allow this Court to determine the authenticity of these images, whether these are AVELA-licensed products, whether they were sold in the U.S. or in what quantities, or whether these are a fair representation of the way AVELA's products are displayed at retail. Moreover, "Radio Days" is not prominent – in two of the three products actually pictured, "Radio Days" appears only on the inside of the shirt below the back neck line. "Radio Days" is not visible to the consumer without closely inspecting the product.

[9] Saying that one conducted a test at a 95% confidence level means that if you report a margin of error, one would expect that if the survey were to be re-run 100 times, you would expect the result to fall within the margin of error 95% of the time. For instance, if one were to report a 30% confusion result and say that the margin of error is +/-7% at a 95% confidence level, that would mean that you would expect that 95% of the time the result would fall within the range of 23% to 37%. A simpler way of thinking of it is that you could be 95% confident that the result falls within that range (i.e., within the margin of error reported).

significant percentage of actual confusion created by AVELA's product. In addition, the idea that the Estate's confusion evidence is *de minimis* is untenable – there is no credible evidence that the AVELA Parties have been licensing Marilyn Monroe products for 25 years (in fact, it strains credulity given the financial numbers they reported – *see* Dkt. 335 at 26).

*Finally*, as to customer sophistication, the AVELA Parties miss entirely the Estate Parties' point. The Estate Parties cite *THOIP v. Walt Disney Co.*, 736 F. Supp. 2d 689, 714–15 (S.D.N.Y. 2010) precisely for the point that there is no heightened level of consumer sophistication – the consumers of the parties' respective products (who in this case are identical) are held to a *lesser* standard of purchasing care and therefore are *more likely* to be confused as to source or affiliation. *See* 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:95 (5th ed.). This factor favors the Estate Parties.

**C.    Summary Judgment Should Be Granted On The Estate's Unfair Competition Claim.**

The AVELA Parties' defensive assertion that their licensing activities predate the Estate's is factually untenable (as noted *supra*), and fails to create a genuine dispute as to the Estate's entitlement to summary judgment on this claim. The AVELA Parties have not put forward a single supporting financial record, license, or testimony of a single licensee.

**D.    The Estate Parties' Motion For Summary Judgment Should Be Granted On The Estate's Trademark Infringement Claim.**

The AVELA Parties fail to rebut the strong presumption of validity to which the Estate's registered marks are entitled, and the Estate's evidence of the strength of trademark rights, by virtue of, *inter alia*, its prominent commercialization of these rights and its steadfast enforcement and policing efforts. (Dkt. 335 at 12).[10] The AVELA Parties continue to misconstrue *Pirone*.[11]

---

[10] The AVELA Parties incorrectly argue that the Estate Parties have failed to establish that "AVELA impacted consumers' purchasing decisions." (Dkt. 383 at 24-25). The AVELA Parties cite only inapposite cases involving

The assertion that the AVELA Parties do not use the entirety of Marilyn Monroe's name, and therefore cannot possibly infringe misses the mark. They encourage their licensees to use MARILYN, which is confusingly similar to the Estate's registered marks, on products identical to those offered by the Estate and its licensees, which products are offered for sale in commerce. These are textbook examples of trademark infringement. The AVELA Parties cannot recast this use as a signature on "artwork," when "MARILYN" is plastered repeatedly and prominently on the front of their products, which is indicative of trademark use. And "MARILYN" in a signature-style font does not evoke a random artist – it clearly evokes the signature *of Marilyn Monroe* in a way that suggests endorsement.

That the Estate's federal registration for MARILYN is "limited to wine" is of no import – the Estate's registered trademarks are enforceable not only with respect to the goods/services for which it is registered, but also for those goods/services which a reasonable consumer would believe the owner had ventured into. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir. 1987). The Estate's Marilyn Monroe trademarks have been highly sought-after by major companies for licensing opportunities in connection with a wide variety of products, and the specimens of use in the Estate's registrations demonstrate the breadth of goods with which the marks are used.

---

reverse confusion, which analyze confusion in circumstances not relevant here. *See e.g.*, *Sly Magazine LLC v. Weider Publications LLC*, 529 F. Supp. 2d 425 (S.D.N.Y. 2007). The Estate Parties' evidence establishes precisely the type of confusion that the Lanham Act is intended to protect against in § 43(a) cases and § 32 cases.

[11] *Pirone* involved the interesting yet inapplicable issue of whether the pictorial representation of a registered trademark can be enforced under § 1114(1), and then analyzed plaintiff's § 43(a) claim for false endorsement under circumstances factually distinct than are present here. The AVELA Parties do not operate a website that publishes photographs of historical photos generally, they sell merchandise. And there are not numerous and prominent displays, separate and apart from photos at issue, of third parties or the owner of the website like there was in the product in *Pirone*. It is notable that the Court clearly assumes without that Babe Ruth has protectable rights in his image and launches into an analysis of whether the use at issue constitutes a commercial endorsement.

**E.      The Estate Parties' Motion For Summary Judgment Should Be Granted On The Estate's Dilution Claim.**

The AVELA Parties argue only that the Estate Parties fail to establish secondary meaning.[12]  As noted in *AVELA I*, secondary meaning as to such marks is conclusively presumed (131 F. Supp. 3d at 214), but even if it were not, the Estate Parties have established secondary meaning as a matter of law by virtue of their proffered substantial evidence thereof discussed *supra*.  There is no issue as to the distinctiveness of the Estate's trademarks, nor as to the obvious similarity of the parties' respective products.  *See supra*.

**F.      The Estate Parties Are Entitled To A Permanent Injunction And Damages.**

The AVELA Parties fail to rebut that every factor favors the Estate Parties as to their entitlement to a permanent injunction, and fail to meet their statutory burden of establishing any element of cost or deduction claimed for damages.  (Dkt. 383 at 25-26).  AVELA was "unable to locate" and therefore did not produce any invoices, receipts, checks, bank statements, credit card statements, etc. that would have provided a reliable basis for which to determine any expenses allocable to AVELA's Marilyn Monroe-related revenues.  (Dkt. 338-19, Green Report at 7-9).  The Estate is, thus, entitled to recover the gross revenue.  *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 270–71 (S.D.N.Y. 2011).

**G.      There Is No Genuine Issue As To Alter Ego Liability.**

The Estate Parties do indeed "allege facts that Valencia sanctioned a fraud or promoted an injustice."  Valencia creates sham shell companies as a matter of course in order to deliberately avoid enforcement of monetary judgments awarded against him in favor of proper intellectual property rights holders (as with IPL); maintains no corporate formalities and pays no

---

[12] The AVELA Parties recycle the same arguments under *DeClemente v. Columbia Pictures Indus., Inc.*, 860 F. Supp. 30, 42-43 (E.D.N.Y. 1994) and *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1021 (C.D. Cal. 1998) rejected by this Court in *AVELA I*.

taxes, thereby defrauding the various states in which his corporate entities are formed; frequently perjures himself, and deliberately withholds documents in contempt of judicial process; and exploits the guise of corporate form to abuse the judicial system to perpetuate his systematic infringement of the rights of others.[13]

### H. There Is No Genuine Issue Preventing Dismissal Of The Interference Claims.

The AVELA Parties fail to establish any element of an interference claim, but manufacture facts to try to survive on a meritless claim. Bona fide enforcement activities do not equate to tortious interference. *Radiancy, Inc. v. Viatek Consumer Prod. Grp.*, Inc., 138 F. Supp. 3d 303, 328 (S.D.N.Y. 2014), *as amended* (Apr. 1, 2014). The AVELA Parties rely solely upon the testimony Liza Acuna, who testified in 2013 that the relationship with Silver Buffalo remained unchanged, then later testified that their agreement ended 3 years after the commencement of this action.[14] Her and Valencia's solitary, self-serving statements as to harm do not create an issue of fact in light of their lack of credibility and the evidence of record. As to Duke, the $14,048 number was pulled out of absolutely nowhere. The AVELA Parties' purported evidence of royalties from 2016-17 also looks entirely fabricated, and was never produced during discovery.

### I. The AVELA Parties Cannot Prevail On Their Cancellation Claims.

The AVELA Parties merely state a legal conclusion as to their claim of "genericness." Carrying this extremely high burden given the statutory presumption accorded to registered

---

[13] The AVELA Parties misrepresent this Court's holding as to VIFA. (Dkt. 215). The Court <u>did not</u> determine that VIFA is not an alter ego, but decided that addition facts needed to be plead for alter ego, and also found that sufficient facts were plead for V to be individually liable. There is no need to establish alter ego liability for VIFA, because the Estate Parties have already demonstrated that VIFA is liable for false endorsement, trademark infringement, and related claims as a matter of law, as noted above and in the Estate Parties' Memorandum.

[14] The AVELA Parties note that pages 123-124 to Ms. Acuna's deposition are not included in Exhibit A to the Durham Decl. Per Your Honor's Individual Rules, the Estate Parties have provided full copies of all cited deposition transcripts, including the pages cited as missing here.

marks.[15]  But they cite no evidence, and indeed they cannot, as discovery is closed.  There is no evidence to go to the jury.  The same can be said for their functionality argument.  Their use of Marilyn Monroe indicia was not commenced for purely aesthetic purposes, but to capitalize on Marilyn Monroe's and her successors' brand equity.

### J.      The AVELA Parties' Affirmative Defenses Fail

First, laches is unavailable because the AVELA Parties lack clean hands and because they cannot establish that the Estate slept on its rights or that the AVELA Parties suffered any prejudice.  (Dkt. 383 at 30-32).  Second,  none of the AVELA Parties' arguments in respect of their undeveloped theories of fair use, aesthetic functionality, First Amendment, copyright, unclean hands, lack of standing/fractured ownership, no valid trademarks/cancellation of trademarks have any merit.  (*Id*. at 32-35).  They raise the same recycled theories that have been repeatedly rejected by this and other courts.  *Bruce Lee*, 2011 WL 1327137 at *22.

## III.    CONCLUSION

Summary judgment should be granted as requested by the Estate Parties.  (Dkt. 335).  Further, this Court should enter a damage award against each and every one of the AVELA Parties as well as reasonable attorneys' fees and costs.  Finally, this Court should also enjoin each and every one of the AVELA Parties from further violations of the Estate's rights and order the immediate surrender of all offending unauthorized property, wherever situated.

---

[15] Carrying this burden generally requires such evidence as consumer surveys, dictionary definitions, newspapers and other publications, generic use by competitors, testimony of lexicographers, generic use of the term by mark's owner, and use of the term by third parties in trademark registrations. *Frito-Lay, Inc. v. Bachman Co.*, 704 F. Supp. 432, 440 (S.D.N.Y. 1989).

Dated: New York, New York
      July 20, 2018

/S/ *Gina L. Durham*           

Gina L. Durham (*pro hac vice*)
DLA PIPER LLP (US)
P.O. Box 64807
Chicago, Illinois 60664-0807
Telephone: (415) 368-4000
Facsimile: (415) 659-7333
gina.durham@dlapiper.com

Tamar Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
tamar.duvdevani@dlapiper.com

*Attorneys for The Estate of Marilyn Monroe,*
*LLC, Authentic Brands Group, LLC and James*
*Salter*