**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC., | Case No: 12 Civ. 4828 (ALC) (JCF) |
| Plaintiff, | ECF Case |
| v. | |
| THE ESTATE OF MARILYN MONROE, LLC, And DOES 1 THROUGH 10, | |
| Defendants. | |
| | |
| THE ESTATE OF MARILYN MONROE, LLC | |
| Counterclaimant, | |
| v. | |
| A.V.E.L.A., INC., | |
| Counter-Defendant, and | |
| LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V INTERNATIONAL FINE ARTS PUBLISHING, INC. | |
| Third-Party Defendants. | |
| X ONE X MOVIE ARCHIVES INC., V INTERNATIONAL FINE ARTS PUBLISHING, INC., | |
| Counterclaimants, | |
| **v.** | |
| THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC JAMES SALTER, | |
| Counter-Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT REPLY TO THE ESTATE OF
MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES
SALTER'S OMNIBUS RESPONSE IN OPPOSITION TO A.V.E.L.A., INC., X ONE X
MOVIE ARCHIVES, INC., LEO VALENCIA, AND V INTERNATIONAL FINE ARTS
PUBLISHING, INC.'S MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................1

II.  ARGUMENT .........................................................................................................1

   A.   Movants are Entitled to Summary Judgment on EMMLLC's § 43(a) Claim ..............1

     1.   Scope of § 43(a) ..........................................................................................1

     2.   Secondary Meaning is Required for a False Endorsement Claim .............................2

     3.   EMMLLC Does Not Own § 43(a) Rights in Monroe ....................................4

     4.   Likelihood of Confusion ...............................................................................5

       a)   Strength of the "Mark" and Association with Monroe ...................................5

       b)   Similarity of the "Marks" .......................................................................7

       c)   Proximity of the Products .......................................................................7

       d)   Actual Consumer Confusion ....................................................................7

       e)   Good Faith .........................................................................................9

       f)   Balancing the Factors ..........................................................................10

     5.   No Impact on Purchasing Decisions ............................................................10

   B.   Movants are Entitled to Summary Judgment on EMMLLC's § 32 Claim ................10

   C.   EMMLLC's Dilution Claims ...................................................................................12

   D.   Movants are Entitled to Summary Judgment on Affirmative Defenses ...................13

     1.   Laches .........................................................................................................13

     2.   Copyright Law ...........................................................................................13

     3.   First Amendment .......................................................................................14

     4.   Fair Use .....................................................................................................15

## TABLE OF AUTHORITIES

**CASES**

*20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81 (2d Cir.1984) ..........................11

*Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324 (S.D.N.Y. 2013) .........................12

*Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y. 1985) ..................................10

*Ass 'n Pour La Defense et la Promotion de L 'Oeuvre de Marc Chagall Dite Comite Marc Chagall v. Bondarchuk*, 82 U.S.P.Q.2d 1838, 2007 WL 749714 (T.T.A.B. 2007...................11

*Astaire v. McKenzie*, No. 10 CIV. 4305 (MGC), 2010 WL 2331524 (S.D.N.Y. June 9, 2010) .....2

*Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351 JMF, 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014).................................................................................................5

*Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424 (S.D.N.Y. 2014) ..................................2

*Brooks ex rel. Estate of Bell v. Topps Co.,* No. 06 CIV. 2359 (DLC), 2007 WL 4547585 (S.D.N.Y. Dec. 21, 2007)   .......................................................................2, 3

*Brown v. Elec. Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013).........................................................14, 15

Bruce Lee Enters., LLC v. A. V.E.L.A., Inc., No. 10–CV–2333 (KMW), 2013 WL 822173 (S.D.N.Y. Mar. 6, 2013).........................................................................................5

*Buffett v. Chi-Chi's, Inc.* 226 U.S.P.Q. 428 (T.T.A.B. 1985).......................................................11

*Cairns v. Franklin Mint Co.*, 107 F.Supp. 2d 1212 (C.D. Cal 2000) ("*Cairns II*") ..............4, 8, 12

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) .......................................................15

*CMG Worldwide, Inc. v. Bradford Licensing Assocs.*, No. 105CV-00423-DFH-TAB, 2006 WL 3248423 (S.D. Ind. Mar. 23, 2006)…………………………………………………………..7

*CMG Worldwide, Inc. v. Upper Deck Co.*, No. 1:08-CV-761-RLY-JMS, 2008 WL 4690983 (S.D. Ind. Oct. 22, 2008) .............................................................................................7

*Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797 (Cal. 2001).....................................14

*DeClemente v. Columbia Pictures Indus., Inc.,* 860 F.Supp. 30 (E.D.N.Y.1994) .......................11

*Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39 (2d Cir. 1994) .......................................................13

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).............15

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924–927 ...............................................................14

*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) .................10

Girl Scouts of USA v. Personality Posters Manufacturing Co., 304 F.Supp. 1228 (S.D.N.Y.1969) ..................................................................................................................................................13

*Hart v. World Wrestling Entm't, Inc.*, No. 3:10CV0975 SRU, 2012 WL 1233022 (D. Conn. Apr. 10, 2012) ....................................................................................................................................2

*Info. Clearing House, Inc. v. Find Magazine,* 492 F. Supp. 147 (S.D.N.Y. 1980) ......................9

*Jack Schwartz Shoes v. Skechers U.S.A.*, 2002 U.S. Dist. LEXIS 25699 (S.D.N.Y. 2002 ............9

*Jackson v. Odenat,* 9 F. Supp. 3d 342 (S.D.N.Y. 2014).............................................................3

*Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991)    …………………………10

*LG.Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133 (D. Del. 2007) ...........................................10

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012) ...........1, 7

*Miss Universe, L.P., LLLP v. Villegas*, 672 F. Supp. 2d 575 (S.D.N.Y. 2009) ............................3

*Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759 (S.D.N.Y. 2013)......................................12

*Pirone v. MacMillan, Inc.,* 894 F.2d 579 (2d Cir.1990)........................................................2, 4, 12

*Pom Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228 (2014). ..................................................10

*Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F. Supp. 1128  (S.D.N.Y. 1977) ....................10

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) ......................................................................14

*Savin Corp. v. Savin Grp.*, 391 F.3d 439 (2d Cir. 2004)..............................................................8

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008) ..................................................................................................................................1, 2, 5, 7

*Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, No. 05 CIV. 3939 (CM), 2008 WL 4298548 (S.D.N.Y. Sept. 11, 2008) ....................................................................................................14

*Steinbeck v. McIntosh & Otis, Inc.,* No. 04 Civ. 5497 (GBD), 2009 WL 928189 (S.D.N.Y. Mar. 31, 2009)....................................................................................................................................5

*Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001) ...................................................9

*Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192 (9th Cir. 2017) ....................................................................14

**STATUTES**

15 U.S.C. § 1052(a) ................................................................................................................... 11

15 U.S.C. § 1064(3)    …………………………………………………………….. 11

15 U.S.C. § 1065    ……………………………………………………………. 11

**OTHER AUTHORITIES**

Stacey L. Dogan & Mark A. Lemley, The Merchandising Right: Fragile Theory or Fait
   Accompli, 54 Emory L.J. 461 (2005) ........................................................................... 15

A.V.E.L.A., Inc. ("AVELA"), X One X Movie Archives, Inc. ("XOX"), Leo Valencia, and V International Fine Arts Publishing, Inc. ("VIFA") (collectively, "Movants") respectfully submit this joint reply to The Estate of Marilyn Monroe, LLC ("EMMLLC"), Authentic Brands Group, LLC ("ABG"), and James Salter (collectively, "EMMLLC")'s Opposition (Dkt. 383) to Movants' Respective Motions for Summary Judgment ("MSJ"). (Dkts. 361, 369.)

## I.   INTRODUCTION

Each of EMMLLC's claims fails as a matter of law and EMMLLC does not own exclusive common law rights in Monroe's image, despite EMMLLC's blatant misrepresentations of the law and the record. EMMLLC unlawfully attempts to use Monroe's boilerplate residuary clause for a purpose Monroe could have never contemplated: to grant EMMLLC, a random entity with no connection to Monroe, sweeping rights to her name, image, and persona in commerce. In order to rule in EMMLLC's favor and find that it owns rights in Monroe under 15 U.S.C. §1125(a) (hereinafter, § 43(a)), this Court would have to create new law by disregarding the principles of public domain and secondary meaning and disregarding every other deceased celebrity § 43(a) case.

## II.   ARGUMENT
### A.   Movants are Entitled to Summary Judgment on EMMLLC's § 43(a) Claim
#### 1.   Scope of § 43(a)

Movants do not conflate § 43(a) and the right of publicity. Rather, Movants cite *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008) for the proposition that Monroe could not have passed down an intellectual property right that did not exist in 1962. Basic logic supports the analogy that if Monroe could not have passed down postmortem publicity rights that did not exist at the time of her death, she also could not have passed down §43(a) rights where such rights did not exist at the time of her death. Not a single court recognized a §43(a) claim

for a celebrity's image, name, likeness, or persona prior to 1962.[1] Monroe's will does not reveal any intent to devise postmortem §43(a) rights whose existence she could not have contemplated. As this Court has recognized, "The countervailing consideration that MMLLC refuses to recognize is Ms. Monroe's legal incapacity to devise what she did not own." *Shaw*, 486 F. Supp. 2d at 318-319. If the testator did not actually have an interest in the property, *recognized in law or in equity at the time of death*, postmortem disposition of the property cannot be exercised. *Id.* The law did not recognize §43(a) celebrity rights in 1962 and EMMLLC cannot assert these purported rights in Monroe.

### 2.  Secondary Meaning is Required for a False Endorsement Claim

Secondary meaning is an "essential element" of a deceased celebrity false endorsement claim. *See Astaire v. McKenzie*, No. 10 CIV. 4305 (MGC), 2010 WL 2331524, at *1 (S.D.N.Y. June 9, 2010). For an unregistered "trademark-like" right in a deceased celebrity to be protected under §43(a), it "must either be inherently distinctive, i.e., intrinsically capable of identifying its source, or have acquired secondary meaning." *Brooks ex rel. Estate of Bell v. Topps Co.,* No. 06 CIV. 2359 (DLC), 2007 WL 4547585, at *6 (S.D.N.Y. Dec. 21, 2007) (granting summary judgment on a false endorsement claim because the plaintiff failed to demonstrate secondary meaning regarding the use of her deceased father's image on baseball cards; the claim failed where plaintiff presented no evidence at all regarding four of the secondary meaning factors[2] and had only licensed the particular image at issue once)*; see also Pirone v. MacMillan, Inc.,* 894 F.2d 579, 584 (2d Cir.1990); *Hart v. World Wrestling Entm't, Inc.*, No. 3:10CV0975 SRU, 2012 WL 1233022, at *10 (D. Conn. Apr. 10, 2012) (dismissing a claim where plaintiff failed to allege that photographs of the deceased celebrity acquired a secondary meaning identifying them with his estate "*[b]ecause this is a necessary*

---

[1] Courts did not apply §43(a) to unregistered marks until the 1970s or recognize false endorsement claims until the 1980s. *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 446 (S.D.N.Y. 2014).

[2] This Court analyzed the relevant Second Circuit factors: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark's use. *Id*.

*element for a false endorsement claim....*") (*emphasis added*).[3] Personal names and photographs are

only protected if they have acquired secondary meaning. *Id.* (*citing Pirone,* 894 F.2d at 583).

EMMLLC ignores the relevant secondary meaning factors. EMMLLC has admittedly not

presented any relevant evidence as to advertising expenditures, unsolicited media coverage of its

Monroe products, or sales success prior to 2010.[4] (AVELA's Rule 56.1 Reply (hereinafter, "SOF" ¶¶

43, 44, 84.)[5] EMMLLC's likelihood of confusion survey does not amount to a "consumer survey"

linking its purported marks to any source. (*See* SOF ¶ 83.) EMMLLC's survey does not even

establish any confusion as to EMMLLC, let alone that consumers care whether or not a Monroe t-

shirt is endorsed by Monroe, her "estate," or by any unknown source. (SOF ¶¶ 121, 138.) There is no

evidence that AVELA intended to associate its mark with EMMLLC. *See Miss Universe, L.P., LLLP*

*v. Villegas*, 672 F. Supp. 2d 575, 594 (S.D.N.Y. 2009). There is significant admissible evidence of

third party use of Monroe's name and image for over five decades. (SOF ¶¶ 32-33.) EMMLLC does

not argue that it has licensed any of AVELA's Monroe images. *See Brooks*, 2007 WL 4547585 at *6

(plaintiff only licensed the image the defendant used once and plaintiff could not establish secondary

meaning in the images of the celebrity at issue as a result). No reasonable juror could find that the

public is moved in any degree to buy an article displaying Monroe's name or image based on the

belief that it implies endorsement by EMMLLC, Monroe, or by any unknown source. *See id.*

EMMLLC must prove Monroe's image, persona, and name are distinctive as to source and

there must be some connection between the plaintiff and the "mark" at issue. *See id*. There is no such

---

[3] The secondary meaning requirement in a deceased celebrity's "image" should also apply to a claim to a deceased celebrity's "persona" where the two are synonymous. *See Jackson v. Odenat*, 9 F. Supp. 3d 342, 355 (S.D.N.Y. 2014). EMMLLC claims to assert rights in Monroe's "persona" in an attempt to avoid demonstrating secondary meaning, but actually seeks to prohibit AVELA's use of Monroe's image on products.

[4] EMMLLC admits it has not submitted any evidence of secondary meaning prior to AVELA's sales of Monroe products. EMMLLC admits AVELA's Monroe-related products have been sold in the market since 2007. Dkt. 383 at 20; *see also* Dkt. 338 Exhibit S at Page 5 (seeking damages for AVELA's products sold beginning in 2008.)

[5] "SOF" as used herein shall refer to AVELA, X One X, and Mr. Valencia's reply to EMMLLC's counterstatement to AVELA, X One X, and Mr. Valencia's 56.1 Statement, filed in connection with this memorandum.

evidence in the record or that Monroe's image functions as an indicator of source or endorsement of merchandise sufficient to confer standing on EMMLLC. *Id.* at *7.

There is no evidence that Monroe ever endorsed products during her lifetime or that Monroe ever approved the use of her image or name advertisements.[6] (*See* SOF ¶ 22.) Regardless, EMMLLC's §43(a) claim still fails where EMMLLC admits it has not established any specific arbitrary symbol used over time that has become associated in the public mind with EMMLLC. (SOF ¶ 106.) *See Pirone*, 894 F.2d at 581. EMMLLC's § 43(a) claim also fails where it admits no one used any Monroe trademarks in the two decades after her death and any such purported rights were abandoned. (SOF ¶¶ 16-19.) Further, countless entities have sold Monroe products for decades, demonstrating that consumers do not care about purchasing Monroe products from only purportedly "official" sources. (*See* Dkt. 362 at 10-12.) EMMLLC also admits its purported rights in Monroe were fractured for decades until at least 2001. (SOF ¶ 81.)

EMMLLC fails to demonstrate secondary meaning or any source identification, and Movants are entitled to summary judgment on EMMLLC's §43(a) claim on this basis alone.

### 3.  EMMLLC Does Not Own § 43(a) Rights in Monroe

EMMLLC is not Monroe's family, heir, estate, or assignee (SOF ¶¶ 90-95)—the only entities courts have ever allowed to bring a §43(a) claim on behalf of a deceased celebrity. (Dkt. 362 at 18-19.) No one related to Monroe nor anyone mentioned in Monroe's will has anything to do with EMMLLC. (SOF ¶¶ 90-91.) There is no evidence Monroe or anyone in her will ever registered, used, or assigned any trademarks. (SOF ¶¶ 15-23.) Monroe could not have owned any §43(a) rights. A will speaks of the testator's estate at the time of her death, and "rights that vested in devisees under

---

[6] This unauthenticated "evidence" just as likely supports the argument that Monroe did not object to unauthorized uses of her name and image on products. Monroe's failure to object to unauthorized uses of her name or image weighs against a finding of false endorsement. *See Cairns v. Franklin Mint Co.*, 107 F.Supp. 2d 1212, 1221 (C.D. Cal 2000) ("*Cairns II*"). Indeed, there is evidence Monroe did not object to such unauthorized uses of her image in commerce. *See* Dkt. 371-4 at 3, 18-19 (products were sold bearing Monroe's image during the 1950s that she never approved).

a will at the moment of the testator's death cannot be altered by events occurring thereafter." *Shaw*, 486 F. Supp. 2d at 317. EMMLLC's purported marks have no actual connection to the late actress.[7]

The Surrogate's Court never authorized any transfer of any intellectual property related to Monroe, and certainly did not recognize any §43(a) "persona" rights--the Surrogate Court's Decree does not even mention any intellectual property rights. (Dkt. 339-1 at 3; 23-26.) EMMLLC asks this Court to disregard the Central District of California's verbatim determination that EMMLLC's predecessors did **not** own any endorsement rights in Monroe in favor of this unsubstantiated purported "decree." *See* Dkt. 368, Exhibit B at Page 38.[8]

The facts and reasoning of *Avalos* are directly on point, where this Court explicitly stated that any claim for false endorsement under §43(a) must be dismissed because the plaintiff did not own the celebrity's right of publicity. *Avalos v. IAC/Interactivecorp.*, No. 13-CV-8351 JMF, 2014 WL 5493242, at *4 (S.D.N.Y. Oct. 30, 2014).[9] EMMLLC does not even exclusively own its purported rights in Monroe.[10] Under EMMLLC's "asset purchase agreement," Anna Strasberg still retains certain rights in Monroe in commerce. (Dkt. 375, Exhibit B at 49:22-54:5.)

    **4.**    **Likelihood of Confusion**
        **a)**    **Strength of the "Mark" and Association with Monroe**

EMMLLC has not established that Monroe is recognized as an "endorser" of merchandise to the consuming public or any association between Monroe and EMMLLC. EMMLLC cites to virtually no relevant evidence on point. Regarding purported "decades of investment," EMMLLC

---

[7] *Steinbeck v. McIntosh & Otis, Inc.*, No. 04 Civ. 5497 (GBD), 2009 WL 928189, at *5 (S.D.N.Y. Mar. 31, 2009) is distinguishable where John Steinbeck's will did reveal his intent as to intellectual property rights where he explicitly devised copyrights and this Court did not grant or deny rights in Steinbeck's likeness or persona to any party.

[8] The court also recognized the dismissal of EMMLLC's predecessor's Lanham Act claims on Page 36, despite EMMLLC's false claim that that case did not involve Lanham Act claims. (AVELA SOF ¶ 31.)

[9] *Avalos* also can be read to apply to deceased celebrity false endorsement claims where this Court cited *Bruce Lee Enters., LLC v. A. V.E.L.A., Inc.*, No. 10–CV–2333 (KMW), 2013 WL 822173 (S.D.N.Y. Mar. 6, 2013). *Id.*

[10] To the extent EMMLLC claims it owns Monroe's right of publicity under Indiana and Washington law (AVELA SOF ¶ 85) or any other intellectual property right not devised in Monroe's will, this Court has already refuted such a claim. *See Shaw*, 486 F. Supp. 2d at 319 (finding Ms. Monroe's legatees under her will were not her statutory heirs for intestacy purposes; EMMLLC's predecessor could not own Monroe's right of publicity under Indiana law).

solely cites to a statement from James Salter (Dkt. 340 ¶ 32) claiming EMMLLC promotes Monroe as she would have marketed herself, despite the fact that Monroe never authorized EMMLLC, or anyone for that matter, to do so.[11] EMMLLC's relationship with its licensees and cease and desist letters sent since 2011 (based on nonexistent rights in Monroe) do not establish that *the consuming public* recognizes Monroe as a source of goods or anything regarding the status of EMMLLC's purported marks prior to 2010. (*See*, *e.g.*, Dkt. 373 at 12-13.)

Countless unauthorized third-party Monroe products have been sold in the marketplace for decades both before and after Monroe's death. (SOF ¶¶ 32-33.) Evidence of these products is admissible (*See* Mr. Harley, Mr. Goodheart, and Mr. Valencia's Supplemental Declarations filed concurrently with this reply), despite EMMLLC's attempt to bury its head in the sand and ignore this flood of third-party Monroe merchandise sold since the 1950s.[12] The widespread and uncontrolled use of Monroe on products for decades is simply undisputable.[13] This evidence cannot be ignored or discredited in its entirety, as EMMLLC begs this Court to do. Countless entities have registered or utilized Monroe-related trademarks over the decades, whether or not these registrations are live. Some of these third party registrations are active to this day. (SOF ¶ 39.)

There is literally no evidence that Monroe ever approved the use of her image, name, or signature on a product or as an endorsement for a product. (SOF ¶ 22.) EMMLLC also provides zero evidence that anyone policed the use of Monroe's name or image in commerce from 1926-2005. (SOF ¶¶ 20-21, 23, 41, 46.) EMMLLC cites "numerous lawsuits" beginning in 2005 but in most of these cases courts found that EMMLLC's predecessors did not even own the rights they sought to

---

[11] Mr. Salter also lacks the requisite foundation to testify about Monroe's desires regarding marketing her image or name.
[12] Movants' exhibits are just a representative sample of the hundreds of pages of third party use of Monroe on merchandise over the decades produced in this litigation. (Goodheart Supp. Decl. ¶ 3; Harley Supp. Decl. ¶ 11.)
[13] EMMLLC "addressed" only two of the uses out of the dozens of examples Movant submitted. (*See* Dkt. 384 at ¶¶ 7, 9.) EMMLLC also claims some products were "addressed" by EMMLLC's predecessors, despite the undisputed fact that EMMLLC has failed to turn over a single cease and desist letter sent before 2011. (SOF ¶ 41.)

enforce. (*See* Dkt. 385 at ¶ 53.)[14]

### b)     Similarity of the "Marks"

EMMLLC admits AVELA requires its licensees to display AVELA's marks on product labels and hangtags. (SOF ¶ 68.) Further, EMMLLC fails to refute the undisputed facts that AVELA's t-shirts consistently display AVELA's own marks on neck labels and that AVELA's products are in fact sold prominently displaying its brand name. (SOF ¶¶ 67, 69.)

AVELA's artwork is officially created and licensed under AVELA's Radio Days brand. (SOF ¶ 67.) EMMLLC cites to zero evidence or authority that the phrase "Officially licensed by Radio Days" creates the assumption that a product is endorsed by Monroe or EMMLLC. EMMLLC argues that, "Even if Movants used such hangtags/labels, a reasonable jury could conclude that there exists a likelihood of confusion." This is not the case: AVELA's expert found "literally zero" confusion using such hangtags/labels. (SOF ¶ 109.)

### c)     Proximity of the Products

Movants did not set themselves up in competition with EMMLLC. (Dkt. 373 at 15.)

### d)     Actual Consumer Confusion

Even taking 2007 as AVELA's earliest date of licensing Monroe artwork[15], which EMMLLC concedes, this still means that AVELA's products have been in the marketplace for *eleven years*, at a minimum, without a single instance of actual consumer confusion. There is literally zero evidence in

---

[14] *See Milton H. Greene Archives, Inc.*, 692 F.3d 983; *Shaw,* 486 F. Supp. 2d 309 (finding "Marilyn Monroe, LLC" did not own the right of publicity in Monroe CMG Worldwide, Inc. sought to enforce in the transferred case *CMG Worldwide, Inc. v. Bradford Licensing Assocs.*, No. 105CV-00423- DFH-TAB). EMMLLC cites to *CMG Worldwide, Inc. v. Upper Deck Co.*, No. 1:08-CV-761-RLY-JMS, 2008 WL 4690983 (S.D. Ind. Oct. 22, 2008) as purported evidence of its predecessor's "enforcement" efforts but this case involved baseball players, not Monroe.
[15] Deposition testimony nonetheless confirms that Mr. Valencia and AVELA have been selling Monroe artwork since the 1980s. (SOF ¶¶ 49-51.) AVELA has also turned over sales records from as early as 2005. (Harley Supp. Decl. ¶ 3.) AVELA also produced copyright registrations from 2002 in Monroe artwork. (Harley Supp. Decl. ¶ 8.)

the record that any consumer has ever actually been confused about an AVELA product.[16] (*See* Dkt. 373 at 15-16.) Even if EMMLLC's "evidence" demonstrated confusion regarding AVELA, which it does not, a single anecdote about one product cannot demonstrate actual confusion. *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 459 (2d Cir. 2004).

The countless flaws in Mr. Poret's unreliable and irrelevant report have been extensively briefed. *See* Dkt. 355. The conclusion of EMMLLC's survey does not demonstrate any confusion as to EMMLLC. (SOF ¶ 121.) There is no evidence survey respondents can identify EMMLLC as a single anonymous source. Even if the survey could demonstrate any confusion,[17] it is not probative of actual confusion where respondents likely only indicated someone holding Monroe's rights or her "estate" approved the shirts because of an incorrect lay legal assumption. *See Cairns II*, 107 F.Supp.2d at 1213-1214 ("[a] customer's assumption that large corporations get permission from families or estates before producing products is not evidence of actual confusion.") To the extent that any responses identified Monroe's "estate," these responses do not indicate consumers have any awareness of EMMLLC or its products just because EMMLLC has deceptively named itself Monroe's "estate." Even if EMMLLC could be considered Monroe's "estate" or "representatives,"[18] net confusion still amounts to zero percent.[19] (SOF ¶¶ 108-09.)

EMMLLC's strategy seems to be to falsely claim documents that are not in their favor were never produced. AVELA did in fact produce royalty reports for Monroe products sold as early as 2005.[20] (Harley Supp. Decl. ¶ 3.) AVELA also did in fact produce advertisements from 2005 promoting its Monroe artwork. (Harley Supp. Decl. ¶ 4.)

---

[16] Ms. Jones testified that she was unaware of any consumer being confused about an AVELA product specifically. (*See* Dkt. 373 at 15-16.) Ms. Jones' testimony also constitutes inadmissible hearsay.
[17] A contention Movants vehemently oppose and unsupported by relevant authority or the record.
[18] A contention Movants vehemently oppose and unsupported by relevant authority or the record.
[19] If Mr. Poret had accurately analyzed responses, net confusion amounts to 0%. *See* Dkt. 355 at 18-22.
[20] *See also* Dkt. 371-12, Exhibit L, at 8-19.

AVELA's expert, Mr. Howard Marylander, found 0% likelihood of confusion. (SOF ¶ 109.) No survey can construct a perfect replica of "real world" buying patterns, but a survey must at least roughly simulate marketplace conditions. *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). AVELA's products are in fact sold with a "Radio Days" hangtag. (SOF ¶ 67.) Mr. Marylander's survey roughly simulated marketplace conditions.[21] EMMLLC fails to cite any case law to support its claim that AVELA's expert purportedly inaccurately analyzed survey results. EMMLLC further admits that Mr. Marylander used actual AVELA t-shirts with actual AVELA hangtags and necktags. (SOF ¶ 111.)

### e)      Good Faith

There is no evidence AVELA ever approved any product using any portion of Monroe's signature. (Dkt. 374 at ¶ 214.) EMMLLC cites literally zero authority or evidence that consumers view the name "Marilyn" in any font as an endorsement rather than a mere decorative element identifying the famous actress. AVELA has been licensing its products long before EMMLLC ever existed and places its own logos on its products. (SOF ¶¶ 51, 67.) *See Jack Schwartz Shoes v. Skechers U.S.A.,* 2002 U.S. Dist. LEXIS 25699, at *80 (S.D.N.Y. 2002) (this factor favors defendant where the defendant attempts to make clear the product's source by placing its own logo on the product). Movants' purported "prior knowledge" of EMMLLC's registrations is not alone evidence of bad faith. *See Info. Clearing House, Inc. v. Find Magazine,* 492 F. Supp. 147, 161 (S.D.N.Y. 1980). There is insufficient evidence from which any reasonable juror could find bad faith.

Reliance on the competent advice of counsel as a means of showing a party's good faith is but one factor relevant to willful infringement and thus it is not a "true" affirmative defense that

---

[21] EMMLLC misleadingly claims that Mr. Marylander's survey t-shirt was not sold with a "Radio Days" hangtag (Dkt. 340 ¶ 254), however, the cited representative from Spencer's Gifts *never testified* that Spencer's Gifts ever actually sold the shirt in question.

must be pled in a defendant's answer. *LG.Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 136–37 (D. Del. 2007). EMMLLC has in fact conducted discovery as to an advice of counsel defense, despite EMMLLC's disingenuous claim that it has been "denied" the opportunity to pursue discovery as to this factor. (Harley Suppl. Decl. ¶ 9.)

### f)     Balancing the Factors

EMMLLC cannot establish likelihood of confusion. EMMLLC's case law is inapposite.[22]

### 5.     No Impact on Purchasing Decisions

EMMLLC admits its survey "did not consider anyone's reason for buying a shirt." (SOF ¶ 138.) EMMLLC presents zero evidence that any consumer has ever been tricked into buying an AVELA product. EMMLLC cites no authority stating that the Lanham Act's purpose, to prevent consumers from being misled or tricked into making purchases,[23] applies only to reverse or post-sale confusion claims. On the contrary, the requirement that confusion must have affected the potential customer's determination to purchase a product applies to Lanham Act claims across the board. *See Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F. Supp. 1128, 1132 (S.D.N.Y. 1977); *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (citing *Restatement (Third) of Unfair Competition* § 20 reporter's note at 179).

### B.     Movants are Entitled to Summary Judgment on EMMLLC's § 32 Claim

There is indeed something very unusual and downright misleading about EMMLLC's registered marks. Neither Monroe nor any of her beneficiaries ever registered or used any Monroe-related trademarks during her lifetime or for decades after her death until Lee Strasberg passed away

---

[22] *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059 (9th Cir. 2015) is distinguishable from the instant case and from *Cairns II* where Marley sold t-shirts bearing his image during his lifetime, making an association between Marley's image on a t-shirtand his children's company more likely). *Allen v. National Video, Inc.*, 610 F.Supp. 612 (S.D.N.Y. 1985) is also distinguishable where it considered the use of the living Woody Allen's image on an ad for a product, not on merchandise.
[23] *Pom Wonderful LLC v. Coca-Cola Co.*, 134 S.Ct. 2228, 2233 (2014).

and his second wife purportedly began attempting to cash in on her late husband's relationship to Monroe.[24] (SOF ¶¶ 9, 15-18.) EMMLLC's registered marks unlawfully suggest a connection with Monroe. The elements outlined in *Buffett v. Chi-Chi's, Inc*. 226 U.S.P.Q. 428, 429 (T.T.A.B. 1985) are readily established here. There is no evidence Monroe used her name or signature in promoting the goods or services sold by EMMLLC or its predecessors or that Monroe had any connection with the type of goods or services offered by EMMLLC.[25] EMMLLC admits Monroe has no financial or ownership interest in its goods or services.[26] (*See* SOF ¶ 24.) EMMLLC's registered marks, including its incontestable marks, are invalid under 15 U.S.C. §1052(a), §1064(3), and §1065.

EMMLLC cites to its survey as purported "evidence" its registered marks have acquired secondary meaning and that consumers connect its registered marks with EMMLLC, but EMMLLC admits its survey did not consider EMMLLC's marks in Monroe's name or signature. (SOF ¶ 132.)

EMMLLC provides no evidence of any secondary meaning in its registered trademarks, and instead attempts to rely on the registrations themselves as evidence of their validity. However, a mark's incontestability or registration does not conclusively demonstrate secondary meaning where the USPTO did not review evidence of a mark's secondary meaning at the time of registration. *DeClemente v. Columbia Pictures Indus., Inc.,* 860 F.Supp. 30, 42–43 (E.D.N.Y.1994); *see also 20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 89 n. 8 (2d Cir.1984). EMMLLC cites no evidence that the USPTO reviewed any evidence of secondary meaning at registration. Further,

---

[24] Movants do not concede that Lee Strasberg ever owned or passed down any Monroe intellectual property rights.

[25] A party asserting a claim that a mark falsely suggests a connection with a deceased person must demonstrate "(i) that [the] mark is the same or a close approximation of [a person's] previously used name or identity; (ii) that the mark would be recognized as such; (iii) that the [person] is not connected with the activities performed by the [registrant] under the mark; and (iv) that the [person's] name or identity is of sufficient fame or reputation that when the [registrant's] mark is used on the goods or services, a connection with the plaintiff would be presumed." *Ass 'n Pour La Defense et la Promotion de L 'Oeuvre de Marc Chagall Dite Comite Marc Chagall v. Bondarchuk*, 82 U.S.P.Q.2d 1838, 2007 WL 749714, *4 (T.T.A.B. 2007) ((quoting *Buffett*, 226 U.S.P.Q. 428, 429 (T.T.A.B. 1985)).

[26] EMMLLC's registered marks are not only subject to cancellation as a result of their unlawful connection with Monroe, they are also subject to cancellation where they are generic and functional. (*See* Dkt. 373 at 30-32.)

EMMLLC does not bring any evidence that Movants use any of EMMLLC's registered marks.[27]
EMMLLC does not argue it uses "Marilyn" as a trademark for apparel or that it owns a trademark in
"Marilyn" for any particular font.[28] There is zero evidence that AVELA's use of "Marilyn" on
artwork is likely to cause consumer confusion.[29] AVELA's expert found 0% confusion regarding t-
shirts with artwork featuring the word "Marilyn." (SOF ¶ 109.)

###    C.    EMMLLC's Dilution Claims

EMMLLC appears to concede there is no secondary meaning here, as EMMLLC fails to
argue or establish that in the minds of the public, the primary significance of Monroe's name or
image is to identify EMMLLC's products rather than Monroe the individual. *See Cairns II*, 107 F.
Supp. 2d at 1222. Accordingly, EMMLLC's federal dilution claim must be dismissed. *See id*.

EMMLLC's state law dilution claim also must be dismissed as a matter of law.[30] EMMLLC
must show a distinctive mark, a likelihood of dilution, and that a substantial segment of targeted
customers sees the two marks as essentially the same. *Akiro LLC v. House of Cheatham, Inc.*, 946 F.
Supp. 2d 324, 342 (S.D.N.Y. 2013). The mark must be "extremely strong" as a result of acquired
secondary meaning. *Mobileye, Inc. v. Picitup Corp.*, 928 F. Supp. 2d 759, 782 (S.D.N.Y. 2013).
EMMLLC does not establish distinctive marks, secondary meaning, or any likelihood of dilution.[31]

EMMLLC cites to zero evidence that products bearing Monroe as a "zombie" or with tattoos
are likely to dilute its purported marks or that such products have actually damaged EMMLLC in

---

[27] There is no evidence AVELA ever approved or sold any product bearing Monroe's stylized signature or the mark
"MARILYN MONROE" and EMMLLC does not argue Movants ever used either mark.
[28] Even if the name "Marilyn" in a cursive font could be found to infringe EMMLLC's registered marks, EMMLLC's
damages would only amount to $880. *See* Dkt. 373 at 25.
[29] This claim is particularly unsubstantiated where EMMLLC's survey expert undisputedly did not even analyze
AVELA's use of the name "Marilyn" on a t-shirt. (SOF ¶ 132.)
[30] Movants do not concede they are not entitled to summary judgment on EMMLLC's state dilution claim. Movants
establish that this claim fails where EMMLLC fails to demonstrate any of its marks are distinctive.
[31] EMMLLC's marks are not inherently distinctive. *See Pirone*, 894 F.2d at 583.

any way.[32] To the extent that EMMLLC owns any distinctive marks, which Movants contest, these

marks do not entitle EMMLLC to prohibit any use of those marks EMMLLC prefers not be made.

*See Deere & Co. v. MTD Prod., Inc.*, 41 F.3d 39, 44 (2d Cir. 1994) (some uses may risk some

dilution, "but that risk is generally tolerated in the interest of maintaining broad opportunities for

expression); *see also Girl Scouts of USA v. Personality Posters Manufacturing Co.,* 304 F.Supp.

1228, 1233 (S.D.N.Y.1969). AVELA uses its own brand name as a mark to identify the source of its

products. (SOF ¶¶ 67-69.) There is no evidence here the marks are substantially similar or that a

substantial segment of the target group of customers sees the two marks as essentially the same.

### D. Movants are Entitled to Summary Judgment on Affirmative Defenses
#### 1. Laches

The evidence clearly demonstrates that EMMLLC and its predecessors sat on their purported

rights for over six years.[33] In reliance on this failure to act, AVELA has continued to spend

substantial time and money creating its artwork and building its licensing business, and EMMLLC

now seeks to recover the exact profits it and its predecessors allowed AVELA to reap where

EMMLLC seeks AVELA's profits from 2008 to 2012. (*See* Dkt. 338 Exhibit S at Page 5.)

EMMLLC first admits its predecessors sent a cease and desist letter to Movants (Dkt. 383 at

18.) but then falsely claims this letter was never disclosed in discovery, though it was in fact

produced. (Harley Supp. Decl. ¶ 5.) Dave Grossman Creations, AVELA's licensee, was in fact

selling AVELA's Monroe products.[34] (Harley Supp. Decl. ¶¶ 6-8.)

#### 2. Copyright Law

EMMLLC admits Movants own copyrights in their Monroe artwork. (SOF ¶¶ 64-65.) The

Copyright Office has afforded AVELA's artwork copyright protections as a result of AVELA's

---

[32] EMMLLC's sole "evidence" on point amounts to mere conclusory statements from an EMMLLC employee stating that the image "tarnishes" EMMLLC's brand without any supporting evidence. (*See* Dkt. 339 ¶¶ 43-47.)
[33] To the extent such rights even exist--a contention Movants vehemently oppose.
[34] Products available for resale online demonstrate Grossman's products displaying AVELA's copyrighted artwork.

creative additions to the derivative works based on underlying public domain materials. (SOF ¶¶ 63-64.) Here, EMMLLC has no right of publicity, no valid trademark rights in Monroe's image under § 43(a), no trademark in any particular image of Monroe, and has not established any likelihood of confusion. EMMLLC cannot preclude Movants' lawful licensing of the copyrighted artwork under the guise of the Lanham Act. *See Shaw*, 2008 WL 4298548, at \*3 (S.D.N.Y. Sept. 11, 2008). Exactly as in *Shaw*, AVELA should be entitled to license its copyrighted artwork on t-shirts. *See id.*

### 3.     First Amendment

EMMLLC misstates the law on point—courts only apply the "transformative use" test in right of publicity cases.[35] Courts consistently apply the *Rogers* test in §43(a) cases involving expressive works, including where a mark was used in the body of a work, and *Rogers* is the only relevant legal framework for balancing a defendant's First Amendment rights in the context of a Lanham Act claim.[36] *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241-42 (9th Cir. 2013). Under *Rogers*, the level of artistic relevance merely must be above zero. *Id.* at 1100. *Rogers* applies here where AVELA's Monroe artwork is sold on t-shirts, posters, and other products (SOF ¶¶ 61-62.) that courts have found are expressive works. *See ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 924–927 (Speech is protected even if it is carried in a form that is sold for profit); *Twentieth Century Fox Television a division of Twentieth Century Fox Film Corp. v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196-97 (9th Cir. 2017) (applying *Rogers* to the sale and licensing of consumer goods such as shirts); *Comedy III*, 25 Cal. 4th at 399 (the fact that art appears on a less conventional avenue of communication, T-shirts, does not result in reduced First Amendment protection; celebrities' images

---

[35] The overall outcome of *Comedy III* does not apply where that court considered the "transformative" use (i.e. whether the work "contains significant transformative elements or that the value of the work does not derive primarily from the celebrity's fame"). *Comedy III Productions, Inc. v. Saderup, Inc.*, 21 P.3d 797, 810 (Cal. 2001)

[36] § 43(a) will not be applied to expressive works unless the use of the mark has "no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use of trademark or other identifying material] explicitly misleads as to the source or the content of the work." *Brown*, 724 F.3d at 1239 (citing *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989).

are important expressive resources). Even if EMMLLC's marks were valid[37], there is no evidence

AVELA misleads consumers. *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095,

1099 (9th Cir. 2008) ("the mere use of a trademark alone cannot suffice to make such use explicitly

misleading.") AVELA makes no claim that Monroe or EMMLLC endorsed AVELA's products. *See*

*Brown*, 724 F.3d at 1245 (the explicitly misleading analysis should look to an "explicit indication"

or "overt claim" regarding endorsement, not merely consumer confusion.)

### 4.    Fair Use

AVELA undisputedly requires that its licensees prominently cite AVELA as the source of its

products. (SOF ¶ 68.) EMMLLC makes no trademark use of any particular image of Monroe. (SOF

¶ 106). AVELA's use of "Marilyn" and Monroe's image is permissible fair use. *See Cairns v.*

*Franklin Mint Co.*, 292 F.3d 1139, 1153 (9th Cir. 2002) (Princess Diana was not readily identifiable

without use of her name and there was no substitute for her likeness on defendant's Diana-related

products). EMMLLC cites to zero evidence that the purchasing public wants "official" Monroe

goods connected to EMMLLC or that AVELA uses Monroe's name or image for anything other than

aesthetic reasons.[38] *See* Stacey L. Dogan & Mark A. Lemley, The Merchandising Right: Fragile

Theory or Fait Accompli, 54 Emory L.J. 461, 488 (2005) (If consumers don't care whether the

trademark holder endorses products or whether the products are officially licensed, then the

competitive process certainly does not suffer from any assumption that the use required a license).

EMMLLC admits its survey did not consider anyone's reasons for buying a Monroe t-shirt. (SOF ¶

138.) There is zero evidence consumers care if EMMLLC endorses a product.

---

[37] A contention Movants vehemently oppose.

[38] EMMLLC misleads this Court and mischaracterizes evidence. None of AVELA's license agreements reference Marilyn Monroe as a brand. *See* Dkt. 374 at ¶ 114; Dkt. 338 Durham Decl., Exhibit FF at 4—the AVELA's License Agreement in question explicitly defines the "brand" as AVELA's "RADIO DAYS' brand.

Dated: August 3, 2018

Respectfully Submitted,

By: /s/Gregory J. Goodheart

Gregory J. Goodheart
Alison M. Pringle
GOODHEART LAW OFFICES
*Attorneys for V International*
*Fine Arts Publishing, Inc.*

By: /s/ Duane M. Harley

Duane Harley

D HARLEY, P.C.
*Attorneys for A.V.E.L.A., Inc.,*
*X One X Movie Archive, Inc., and*
*Leo Valencia*

## CERTIFICATE OF SERVICE

I, Gregory J. Goodheart, hereby certify that on August 3, 2018, I caused copies of

**A.V.E.L.A., INC., X ONE X MOVIE ARCHIVES, INC., LEO VALENCIA, AND V INTERNATIONAL FINE ARTS PUBLISHING, INC'S**

**JOINT REPLY TO THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES SALTER'S OPPOSITION TO A.V.E.L.A., INC., X ONE X MOVIE ARCHIVES, INC., LEO VALENCIA, AND V INTERNATIONAL FINE ARTS PUBLISHING, INC'S MOTIONS FOR SUMMARY JUDGMENT,**

**THE SUPPLEMENTAL DECLARATION OF GREGORY J. GOODHEART IN SUPPORT OF THE REPLY,**

**THE SUPPLEMENTAL DECLARATION OF LEO VALENCIA IN SUPPORT OF THE REPLY, AND**

**THE SUPPLEMENTAL DECLARATION OF DUANE HARLEY IN SUPPORT OF THE REPLY, ALONG WITH ALL ATTACHED EXHIBITS**, to be served via email upon the following individuals:

Gina L. Durham (*pro hac vice*)
DLA PIPER LLP (US)
P.O. Box 64807
Chicago, Illinois 60664-0807
Telephone: (415) 368-4000
Facsimile: (415) 659-7333
Gina.durham@dlapiper.com

Tamar Duvdevani
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Tamar.duvdevani@dlapiper.com

*Attorneys for Defendant/Counter-Plaintiff The Estate of Marilyn Monroe, LLC*

I certify under the penalty of perjury that the foregoing statements are true and correct. Executed in West Hills, CA on this 3rd day of August, 2018.

/s/ Gregory Goodheart