**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| A.V.E.L.A., INC.,<br><br>Plaintiff,<br><br>-against-<br><br>THE ESTATE OF MARILYN MONROE LLC; and DOES 1 THROUGH 10,<br><br>Defendants | **RESPONSE TO THE ESTATE OF MARILYN MONROE, LLC, AUTHENTIC BRANDS GROUP, LLC, AND JAMES SALTER'S REPLY TO X ONE X MOVIE ARCHIVES, INC., A.V.E.L.A., INC., AND LEO VALENCIA'S STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**<br><br>Case No.: 12 Civ. 4828 (KPF) (JCF)<br>ECF Case |
| THE ESTATE OF MARILYN MONROE LLC,<br><br><br>Defendant/Counter-Plaintiff,<br><br><br>-against-<br><br>A.V.E.L.A., INC., LEO VALENCIA, IPL, INC., X ONE X MOVIE ARCHIVES INC., and V. INTERNATIONAL FINE ARTS PUBLISHING, INC.,<br><br>Counter-Defendants | |
| V. INTERNATIONAL FINE ARTS PUBLISHING, INC.<br><br>Counter-Defendant/Counter-Plaintiff<br><br>-against- | |

THE ESTATE OF MARILYN MONROE, LLC,

Defendant/Counter-Plaintiff

And

AUTHENTIC BRANDS GROUP, LLC, and JAMES SALTER

Third Party Defendants

X ONE X MOVIE ARCHIVE, INC.

Third Party Plaintiff/Counter-Defendant/Counter-Plaintiff

-against-

THE ESTATE OF MARILYN MONROE, LLC,

Counter-Defendant

and

AUTHENTIC BRANDS GROUP, LLC, JAMES SALTER, and LEONARD GREEN & PARTNERS, L.P.

Third Party Defendants

Pursuant to Local Rule 56.1, X One X Movie Archives, Inc. ("X One X"), A.V.E.L.A., Inc. ("AVELA"), and Leo Valencia submit the following in reply to the Estate of Marilyn Monroe LLC ("EMMLLC"), Authentic Brands Group LLC ("ABG"), and James Salter ("Mr. Salter")'s responses to X One X, AVELA, and Leo Valencia's Statement of Material Undisputed Facts.

Generally, EMMLLC's Counterstatement violates Local Rule 56.1 by consistently failing to "specifically" controvert the material facts set forth in Movants' 56.1 Statement. Local Rule 56.1(c). "[T]he non-moving party must identify controverting evidence for the court." *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, No. 00 Civ. 4763 RMB JCF, 2006 WL 2136249, at *3 (S.D.N.Y. Aug. 1, 2006). By failing to respond directly to the undisputed material facts set forth in Movants' 56.1 Statement, and by citations to nonresponsive evidence, EMMLLC seeks to create the appearance of a factual dispute solely by virtue of the documents and/or declarations they cite. EMMLLC's Counterstatement is also improper to the extent that EMMLLC improperly uses its Counterstatement as a vehicle for presenting additional legal argument. *See id.* ("Rule 56.1 statements are not argument. They should contain factual assertions with citation to the record. They should not contain conclusions.")

### REPLIES TO SPECIFIC COUNTERSTATEMENTS:

| UNDISPUTED FACTS | EVIDENCE |
|---|---|
| **THE PARTIES** | |
| 1. AVELA is a corporation duly organized and existing under the laws of the State of Nevada with its principal place of business at 1135 Terminal Way, #209, Reno, Nevada 85902. | Harley Decl. ¶ 48, Exhibit A |
| **EMMLLC's Response:**<br>Undisputed to the extent AVELA is incorporated under the laws of the State of Nevada; however, this statement is made without waiver of the Estate's alter ego claims against AVELA. | |

| | |
|---|---|
| 2. X One X is a corporation duly organized and existing under the laws of the State of Nevada with its principal place of business at 1135 Terminal Way, #209, Reno, Nevada 85902. | Harley Decl. ¶ 49, Exhibit A |

**EMMLLC's Response:**

Undisputed to the extent X One X is incorporated under the laws of the State of Nevada; however, this statement is made without waiver of the Estate's alter ego claims against X One X.

| | |
|---|---|
| 3. V International is a corporation duly organized and existing under the laws of the State of California with its principal place of business at 2647 Gateway Road, #105-550, Carlsbad, California 92009. | Dkt. 282, Page 3 at ¶ 6 |

**EMMLLC's Response:**

Undisputed to the extent V. International is incorporated under the laws of the State of California; however, this statement is made without waiver of the Estate's alter ego claims against V. International.

**Movants' Response:**

EMMLLC's response is improper to the extent that this Court has already rejected EMMLLC's attempt to assert an alter ego claim regarding V International. (Dkt. 215 at 41-42.) EMMLLC has no alter ego claim against V International.

| | |
|---|---|
| 4. Leo Valencia is an individual residing in San Diego, California. | Exhibit B, Decl. of Leo Valencia at ¶ 2. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 5. Mr. Valencia is the Owner of AVELA and X One X. | Exhibit B, Decl. of Leo Valencia at ¶ 1. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 6. EMMLLC is a Delaware limited liability company with its principal place of business at 100 West 33rd Street, Suite 1007, New York, New York 10001. | Dkt. 133 at ¶ 1. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

**MONROE-RELATED BACKGROUND 1926-2010**

| | |
|---|---|
| 7. Marilyn Monroe was a famous American actress, singer, and model. | Harley Decl. ¶¶ 17, 18, *See* Exhibits D and E. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 8. Marilyn Monroe died on August 5, 1962. | Harley Decl. ¶ 4, Exhibit C at 2. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 9. Marilyn Monroe did not apply for or receive any registered trademarks during her lifetime. | Harley Decl. ¶¶ 8, 47, 53 Exhibit F, Page 8 EMMLLC's Responses to X One X's First Set of Requests for Admission at No. 30.; Exhibit T, Woodhouse Depo. at 32:19-22. |

**EMMLLC's Response:**

Disputed to the extent that the evidence cited in Exhibit F does not support this statement as there is no page 23; but uncontroverted for purposes of this motion.

**Movants' Response:**

Movants note that the cited evidence can be found on Page 8 of Exhibit F to Mr. Harley's Declaration, as Movants stated in their Statement of Facts. *See* Dkt. 372 ¶ 9; Harley Decl. ¶¶ 8, 47, 53; Exhibit F, Page 8 EMMLLC's Responses to X One X's First Set of Requests for Admission at No. 30.

| | |
|---|---|
| 10. Monroe's will bequeathed her personal effects and small sums of money to various friends and family members. | Harley Decl. ¶ 2, Exhibit C, Marilyn Monroe's Last Will and Testament at 6-8. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 11. Monroe's will does not explicitly refer to any intellectual property rights. | Harley Decl. ¶ 3, Exhibit C, Marilyn Monroe's Last Will and Testament at 6-8. |

**EMMLLC's Response:**

Undisputed to the extent the will does not specifically contain the phrase "intellectual property rights," but disputed to the extent that this fact leads to the conclusion that Ms. Monroe did not pass down intellectual property rights (this Court has held that trademark rights not explicitly identified in a will, will pass as personal property through the residuary clause to the residuary beneficiary. *See Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *5 n. 7 (S.D.N.Y. Mar. 31, 2009), aff'd sub nom 400 F. App'x 572 (2d Cir. 2010)).

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. Ms. Monroe's will speaks for itself and clearly does not mention any intellectual property rights.

| | |
|---|---|
| 12. Monroe's will left a trust to be paid out to her mother and a Mrs. Michael Chekhov with any remaining income to be paid to Dr. Marianne Kris for the furtherance of Dr. Kris' psychiatric institutions. | Harley Decl. ¶ 2, Exhibit C at 6-7. |

**EMMLLC's Response:**

Disputed to the extent this presents an incomplete statement of Monroe's will; Exhibit C cited by XOX speaks for itself.

| | |
|---|---|
| 13. Monroe left the "rest, residue and remainder" of her estate as follows: (a) the lesser of $40,000 or 25% of the total remainder of her estate to a May Reis; (b) 25% of the balance of her estate to her psychiatrist, Dr. Marianne Kris, to be used for the furtherance of Dr. Kris' psychiatric institutions; and (c) the remaining balance to Lee Strasberg, her acting coach. | Harley Decl. ¶ 2, Exhibit C at 7-8. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 14. When Monroe's estate was appraised in 1964, the executor of Monroe's estate did not list any intellectual property rights as assets of her estate. | Harley Decl. ¶ 5-6, Exhibit C at 27-35. |

**EMMLLC's Response:**

Disputed. While the document speaks for itself, the appraisal is an incomplete statement of Marilyn Monroe's last will and testament.

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence indicating that the appraisal is somehow incomplete.

| 15. Neither Dr. Kris nor Lee Strasberg registered any trademarks related to Monroe from 1962 to 1983. | Harley Decl. ¶¶ 8, 53, Exhibit T, Woodhouse Depo. at 32:19-33:2 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 16. No individual or entity registered any trademarks in Monroe's name or stylized signature from 1926 to 1982. | Harley Decl. ¶¶ 8, 53, Exhibit T, Woodhouse Depo. at 32:19-33:2 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 17. Neither Dr. Kris nor Lee Strasberg ever sold any Monroe-related products from 1962 to 1983. | Harley Decl. ¶¶ 10, 53, 54, Exhibit T, Woodhouse Depo at 92:1-24; Exhibit U, Jones July 19, 2017 Depo. at 126:24-127:5 |
|---|---|

**EMMLLC's Response:**

Disputed. The testimony XOX cites does not support this conclusory statement. Mr. Woodhouse was asked if he was aware of Lee Strasberg or Marianne Kris using Marilyn Monroe's image on t-shirts, to which he replied that he did not know. Likewise, Ms. Jones was questioned about Lee Strasberg's commercial use of Marilyn Monroe; in response she indicated only that she did not know.

**<u>Movants' Response:</u>**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that Dr. Kris or Lee Strasberg ever sold any Monroe-related products from 1962 to 1983.

| 18. No beneficiaries of Monroe's will made trademark use of Monroe's image, persona, likeness, or name from 1962-1983. | Harley Decl. ¶¶ 10, 53, 54, Exhibit T, Woodhouse Depo at 92:1-24; Exhibit U, Jones July 19, 2017 Depo. at 126:24-127:5. |
|---|---|

**EMMLLC's Response:**

Disputed. *See* response to ¶ 17.

**<u>Movants' Response:</u>**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that any beneficiaries of Monroe's will made trademark use of Monroe's image, persona, likeness, or name from 1962-1983.

| 19. No individual or entity had any intention of making trademark use of Monroe's image, persona, likeness, or name from 1962-1983. | Harley Decl. ¶ 11 |
|---|---|

**EMMLLC's Response:**

Disputed. *See* Response to ¶17.

| **Movants' Response:** |
|---|

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that any individual or entity had any intention of making trademark use of Monroe's image, persona, likeness, or name from 1962-1983.

| 20. Neither Dr. Kris nor Lee Strasberg policed any purported rights in Monroe from 1962 to 1983. | Harley Decl. ¶¶ 9, 53, Exhibit T, Woodhouse Depo. at 33:3-10 |
|---|---|

**EMMLLC's Response:**

Disputed. The testimony XOX cites does not support this conclusory statement. Mr. Woodhouse was asked if he knew whether or not Lee Strasberg ever sent cease and desist letters relating to Marilyn Monroe. His response indicating his lack of knowledge on this subject does not prove that Dr. Kris and Lee Strasberg did not police Marilyn Monroe's rights.

| **Movants' Response:** |
|---|

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that Dr. Kris or Lee Strasberg policed any purported rights in Monroe from 1962 to 1983.

| 21. No individual or entity policed any purported rights in Monroe's image, persona, likeness, or name from 1962 to 1983. | Harley Decl. ¶¶ 9, 53, Exhibit T, Woodhouse Depo. at 33:3-10 |
|---|---|

**EMMLLC's Response:**

Disputed. *See* response to ¶20.

| **Movants' Response:** |
|---|

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that any individual or entity policed any purported rights in Monroe's image, persona, likeness, or name from 1962 to 1983.

| 22. EMMLLC has brought no evidence documenting Monroe's use of her image or name on merchandise during her lifetime. | Harley Decl. ¶ 12 |
|---|---|

**EMMLLC's Response:**

Disputed. *See* Supp. Clarke Decl. at ¶3 for evidence of use of Monroe's use of her image and name on merchandise during her lifetime.

**Movants' Response:**

This response fails to raise a genuine issue of material fact where EMMLLC fails to authenticate these purported advertisements. There is no evidence regarding the dates these products were sold or created. There is no evidence regarding who produced or approved this purported merchandise. There is no evidence Monroe approved or had any connection at all to this purported merchandise. Further, Mr. Clarke's declaration lacks foundation as Mr. Clarke does not have the requisite personal knowledge to testify as to whether or not Monroe actually approved the use of her name or image on merchandise or in advertisements during her lifetime. This response is not supported by admissible evidence.

| 23. EMMLLC has brought no evidence documenting Monroe's enforcement of uses of her image, persona, likeness, or name during her lifetime. | Harley Decl. ¶¶ 13, 46, Exhibit F at 8, EMMLLC's Responses to AVELA's First Set of Requests for Production at No. 46. |
|---|---|

**EMMLLC's Response:**

Disputed that this statement is material and relevant, and to the extent that VIFA, XOX, and AVELA have failed to demonstrate that there were unauthorized uses of Monroe's image, persona, likeness, or name during her lifetime.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC's response contradicts its verbatim discovery response that EMMLLC has no evidence documenting Monroe's enforcement of uses of her image, persona, likeness, or name during her lifetime. Further, EMMLLC fails to controvert this fact with any evidence documenting Monroe's enforcement of uses of her image, persona, likeness, or name during her lifetime.

| 24. Monroe has no financial or ownership interest in EMMLLC's goods and/or services. | Harley Decl. ¶¶ 8, 12, 54, Exhibit U, Jones July 19, 2017 Depo. at 128:17-129:10 |
|---|---|

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| 25. EMMLLC has not presented any evidence concerning Monroe's intent as to trademark rights. | Harley Decl. ¶ 44 |
|---|---|

**EMMLLC's Response:**

Disputed that this statement is material and relevant, and to the extent that Monroe commercialized her name and persona during her lifetime. *See* Supp. Clarke Decl. at ¶3.,

**Movants' Response:**

This response fails to raise a genuine issue of material fact where EMMLLC fails to authenticate these purported advertisements. There is no evidence regarding the dates these products were sold or created. There is no evidence regarding who produced or approved these purported advertisements. There is no evidence Monroe approved or had any connection at all to these purported advertisements.  Further, EMMLLC fails to controvert this fact with any evidence concerning Monroe's intent as to trademark rights.  Further, Mr. Clarke's declaration lacks foundation as Mr. Clarke does not have the requisite personal knowledge to testify as to whether or not Monroe actually approved the use of her name or image on merchandise during her lifetime. This response is not supported by admissible evidence.

| 26. Lee Strasberg died in 1982. | Harley Decl. ¶ 4, Exhibit C at 3. |
| --- | --- |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 27. Lee Strasberg's will did not explicitly mention any Monroe-related intellectual property rights. | Harley Decl. ¶ 7, Exhibit C at 10-21. |
| --- | --- |

**EMMLLC's Response:**

Undisputed to the extent the will does not specifically contain the phrase "intellectual property rights," but disputed to the extent that this fact leads to the conclusion that Ms. Monroe did not pass down intellectual property rights (this Court has held that trademark rights not explicitly identified in a will, will pass as personal property through the residuary clause to the residuary beneficiary. *See Steinbeck v. McIntosh & Otis, Inc.*, No. 04 CV 5497 (GBD), 2009 WL 928189, at *5 n. 7 (S.D.N.Y. Mar. 31, 2009), aff'd sub nom., 400 F. App'x 572 (2d Cir. 2010)).

|  |  |
|---|---|

| **Movants' Response:** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact. Mr. Strasberg's will speaks for itself and clearly does not mention any intellectual property rights. | |

| 28. EMMLLC has not brought any evidence that Dr. Marianne Kris explicitly passed down any Monroe-related intellectual property rights to anyone. | Harley Decl. ¶ 14 |
|---|---|

| **EMMLLC's Response:** |
|---|
| Disputed; *see* Dkt. 340 at¶¶ 27-31. |

| **Movants' Response:** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with Ms. Kris' last will and testament or any document wherein Ms. Kris passed any Monroe-related intellectual property rights to anyone. | |

| 29. The Anna Freud Center inherited Dr. Kris' interest in Monroe's residuary estate upon her death. | Harley Decl. ¶ 15, Exhibit C at 24. |
|---|---|

| **EMMLLC's Response:** |
|---|
| Undisputed for purposes of this motion. |

| 30. In 2001, Monroe's estate closed. | Harley Decl. ¶ 15, Exhibit C at 24. |
|---|---|

| **EMMLLC's Response:** |
|---|
| Undisputed for purposes of this motion. |

| | |
|---|---|
| 31. The Central District of California issued a declaration that Marilyn Monroe, LLC (EMMLLC's predecessor) did *not* own any rights of "association, sponsorship, and/or endorsement, in and to the name and likeness of Marilyn Monroe." | Harley Decl. ¶ 16, Exhibit C, Pages 36-41. |

**EMMLLC's Response:**

Disputed to the extent this statement mischaracterizes the Court's declaration. *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, was a case involving Marilyn Monroe's right of publicity, which is distinct from Marilyn Monroe's trademark rights. *See Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, No. CV 0502200 MMMMCX, 2008 WL 655604, at *1 (C.D. Cal. Jan. 7, 2008), on reconsideration, 568 F. Supp. 2d 1152 (C.D. Cal. 2008), *aff'd sub nom. Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012;

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC attempts to dispute the verbatim findings of the Central District of California. Further, that case did involve trademark rights relating to Marilyn Monroe. The court recognized the dismissal of EMMLLC's predecessor's Lanham Act claims on Page 36.

| | |
|---|---|
| 32. Countless third parties used Monroe's image, persona, likeness, or name in commerce from the 1950s to 1982. | Harley Decl. ¶ 17, Exhibit D |

**EMMLLC's Response:**

Disputed. The web page print-outs in Exhibit D do not establish third party use of Marilyn Monroe's persona, likeness or name in commerce from the 1950s to 1982. Furthermore, the purported evidence presented in Exhibit D is inadmissible in violation of Local Rule 56.1(d). See Supplemental Declaration of Gina L. Durham in Support of The Estate of Marilyn Monroe LLC, Authentic Brands Group, LLC , and James Salter's Response in Opposition To X One X Movie Archives, Inc., A.V.E.L.A., Inc., Leo Valencia, and V. International Fine Arts Publishing, Inc.'s Motions for Summary Judgment ("Supp. Durham Decl.") at ¶2, Ex. A, ("XOX Exhibit D/VIFA Exhibit C Objections") for a full discussion of the evidentiary objections to the materials in this Exhibit D.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. First, the evidence cited fails to address each of the products and exhibits cited in Harley Decl. ¶ 17, Exhibit D. Second, these materials are admissible. Each of these documents can be authenticated. Each of these materials represents either a printout or screenshot of a webpage visited by AVELA or AVELA's counsel, or a product that was found in retail stores. *See* Valencia Supp. Decl. ¶¶ 7-32, Harley Supp. Decl. ¶¶ 12-13, and the Goodheart Supp. Decl. ¶¶ 9-34 for specific authentications of these materials.

| | |
|---|---|
| 33. Countless third parties have used Monroe's image, persona, likeness, or name in commerce from the 1982 to the present. | Harley Decl. ¶ 18, Exhibit E |

**EMMLLC's Response:**

Disputed. The magazine excerpts and web page print-outs in Exhibit E do not establish third party use of Marilyn Monroe's persona, likeness or name in commerce from 1982 to present. Furthermore, the purported evidence presented in Exhibit E is inadmissible in violation of Local Rule 56.1(d). *See* Supp. Durham Decl. at ¶3, Ex. B ("XOX Exhibit E/VIFA Exhibit D Objections"), for a full discussion of the evidentiary objections to the materials in this Exhibit E.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. First, the evidence cited fails to address each of the products and exhibits cited in Harley Decl. ¶ 18, Exhibit E. Second, these materials are admissible. Each of these documents can be authenticated. Each of these materials represents either a printout or screenshot of a webpage visited by AVELA or AVELA's counsel, or a product that was found in retail stores by AVELA. *See* Valencia Supp. Decl. ¶¶ 7-32, Harley Supp. Decl. ¶¶ 12-13, and the Goodheart Supp. Decl. ¶¶ 9-34 for specific authentications of these materials. Further, AVELA purchased many of these products and AVELA turned over receipts evidencing the purchase of these products in stores in this matter as AVELA 4510-4541.

| | |
|---|---|
| 34. Various photographers and/or entities own copyrights in images of Monroe. | Harley Decl. ¶¶ 19, 47, Exhibit F at 5, EMMLLC's Responses to X One X's First Set of Requests for Admission at No. 11. |

**EMMLLC's Response:**
Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 35. Photographers and various entities sell and license their images of Monroe. | Harley Decl. ¶ 20, Exhibit H |

**EMMLLC's Response:**
Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 36. Dozens of individuals market themselves as Marilyn Monroe impersonators. | Harley Decl. ¶ 18, Exhibit E |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. *See* Supp. Durham Decl., XOX Exhibit E/VIFA Exhibit D Objections, for a full discussion of the evidentiary objections to the materials in this Exhibit E.

| 37. Monroe appeared on many magazine covers during her lifetime. | Harley Decl. ¶ 21, Exhibit H at 2-4 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 38. Publications have licensed their images of Monroe. | Harley Decl. ¶ 21, Exhibit E |
|---|---|

**EMMLLC's Response:**

Disputed to the extent Exhibit E does not support this statement. *See* Supp. Durham Decl., XOX Exhibit E/VIFA Exhibit D Objections, for a full discussion of the evidentiary objections to the materials in this Exhibit E.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. First, the evidence cited fails to address each of the products and exhibits cited in Harley Decl. ¶ 21, Exhibit E. Second, these materials are admissible. Each of these documents can be authenticated. Each of these materials represents a printout or screenshot of a webpage visited by VIFA's counsel. *See* Dkt. 371-4 at 10, 14; Dkt. 371-5 at 48; *see also* Goodheart Supp. Decl. for specific authentications of these materials.

| 39. Other entities own and/or have owned trademark and copyright rights in Monroe's films and characters. | Harley Decl. ¶ 22, Exhibit G |
|---|---|

**EMMLLC's Response:**

Disputed that this statement is material and relevant and disputed to the extent that Exhibit G does not support this statement. *See* Supp. Durham Decl. ¶¶4-28.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The evidence cited fails to account for each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7). For example, EMMLLC fails to provide any evidence addressing or refuting the following registrations:

1. the trademark for "MARILYN FOREVER BLONDE" (SN 78853982), Page 5—this mark is still live. See Goodheart Supp. Decl. ¶ 5.
2. the trademark for "HEPBURN MONROE" (SN 85822044), Page 2—this mark is still live. See Goodheart Supp. Decl. ¶ 6.
3. the trademark for "DIAMONDS ARE A GIRLS BEST FRIEND" (SN 78366026), Page 12—this mark is still live. See Goodheart Supp. Decl. ¶ 7.

4. the trademark for "NORMA JEANE" (SN 78136401), Page 13
5. the trademark for "NORMA JEANE" (SN 77956962), Page 14—this mark is still live. See Goodheart Supp. Decl. ¶ 8.
6. the trademark for "NORMA JEANE" (SN 77676913), Page 15
7. the trademark for "SOME LIKE IT HOT" (No. 005799879), Page 19
8. the trademark for "ALL ABOUT EVE" (SN 77907093), Page 23
9. the trademark for "ASPHALT JUNGLE" (SN 78483943), Page 24
10. the trademark for Monroe's stylized signature (SN 73468582), Page 25

Regardless of whether or not each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7) are currently live, these registrations still demonstrate that third parties have used trademarks relating to Monroe in commerce.

| 40. Other entities and individuals own registered trademarks related to Marilyn Monroe. | Harley Decl. ¶ 23, Exhibit G. |

**EMMLLC's Response:**

Disputed. *See* Supp. Durham Decl. ¶¶5-28.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The evidence cited fails to account for each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7). For example, EMMLLC fails to provide any evidence addressing or refuting the following registrations:

1. the trademark for "MARILYN FOREVER BLONDE" (SN 78853982), Page 5—this mark is still live. See Goodheart Supp. Decl. ¶ 5.
2. the trademark for "HEPBURN MONROE" (SN 85822044), Page 2—this mark is still live. See Goodheart Supp. Decl. ¶ 6.
3. the trademark for "DIAMONDS ARE A GIRLS BEST FRIEND" (SN 78366026), Page 12—this mark is still live. See Goodheart Supp. Decl. ¶ 7.
4. the trademark for "NORMA JEANE" (SN 78136401), Page 13
5. the trademark for "NORMA JEANE" (SN 77956962), Page 14—this mark is still live. See Goodheart Supp. Decl. ¶ 8.
6. the trademark for "NORMA JEANE" (SN 77676913), Page 15
7. the trademark for "SOME LIKE IT HOT" (No. 005799879), Page 19
8. the trademark for "ALL ABOUT EVE" (SN 77907093), Page 23
9. the trademark for "ASPHALT JUNGLE" (SN 78483943), Page 24
10. the trademark for Monroe's stylized signature (SN 73468582), Page 25

Regardless of whether or not each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7) are currently live, these registrations still demonstrate that third parties have used trademarks relating to Monroe in commerce.

| 41. EMMLLC has not turned over any cease and desist letters sent between 1926 and 2011. | Harley Decl. ¶ 24 |

**EMMLLC's Response:**

Disputed that this statement is material and relevant.

| 42. EMMLLC's predecessors purportedly first used indicia of Monroe in commerce in 1983. | Harley Decl. ¶ 25, Exhibit I at 11. |

**EMMLLC's Response:**

Disputed to the extent EMMLLC's predecessors include Marilyn Monroe herself and Monroe commercialized her image during her lifetime. *See*. Supp. Clarke Decl. at ¶3 for evidence of use of Monroe's use of her image and name on merchandise during her lifetime.

**Movants' Response:**

This response fails to raise a genuine issue of material fact where EMMLLC fails to authenticate these purported advertisements. There is no evidence regarding the dates these products were sold or created. There is no evidence regarding who produced or approved these purported advertisements. There is no evidence Monroe approved or had any connection at all to these purported advertisements.  Further, EMMLLC fails to controvert this fact where even if these advertisements were admissible and even if Monroe did approve the use of her name and image in these advertisements, these documents are purportedly advertisements, not evidence of Monroe's use of her image or name *on merchandise* during her lifetime. Further, Mr. Clarke's declaration lacks foundation as Mr. Clarke does not have the requisite personal knowledge to testify as to whether or not Monroe actually approved the use of her name or image on merchandise during her lifetime. This response is not supported by admissible evidence.

| | |
|---|---|
| 43. EMMLLC has not submitted any evidence of any Monroe-related advertising expenditures from 1962-2010. | Harley Decl. ¶¶ 26, 53, Exhibit T, Woodhouse Depo 121:12-20. |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 44. EMMLLC has not submitted any evidence regarding sales numbers in connection with Monroe from 1962-2011. | Harley Decl. ¶ 27 |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 45. CMG Worldwide was EMMLLC's predecessor in licensing Monroe's purported intellectual property rights. | Harley Decl. ¶¶ 54, 56, Exhibit J at 2; Exhibit U, Jones July 19, 2017 Depo. at 169:18-170:25 |

**EMMLLC's Response:**

Disputed; CMG Worldwide was merely a licensing agent for the Marilyn Monroe properties while the Estate continued to hold the rights to the Marilyn Monroe intellectual property assets; and therefore maintained its status as licensor of Marilyn Monroe intellectual properties. *See* Dkt. 371-24, Exhibit U, Jones July 19, 2017 Depo. at 169:24-25. ("They don't own the brand.").

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC admits that CMG licensed "the Marilyn Monroe properties."

| | |
|---|---|
| 46. CMG Worldwide learned of AVELA licensee Dave Grossman's products with Monroe artwork in February 2006 and sent a cease and desist letter. | Harley Decl. ¶ 56, Exhibit J at 2-3. |

**EMMLLC's Response:**

The Estate admits that Exhibit J contains the cease and desist sent by CMG Worldwide to Dave Grossman; however, it is disputed that CMG knew that Dave Grossman was an AVELA licensee as there is no reference to AVELA in the cited letter.

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to cite to any evidence that the products referenced were licensed from anyone other than AVELA, particularly where AVELA has turned over its license agreement with Grossman. The fact that the license agreement does not explicitly refer to Monroe artwork does not preclude this fact. AVELA's initial license agreements do not list every artwork property that a licensee ultimately licenses from AVELA.

Further, products currently available for resale on the internet display products that are advertised as Dave Grossman products. Harley Supp. Decl. ¶¶ 6-7, Exhibit D. These products match AVELA's copyrighted artwork and demonstrate that Dave Grossman was in fact selling AVELA products. Harley Supp. Decl. ¶ 8, Exhibit F.

**MOVANT'S BUSINESS**

| | |
|---|---|
| 47. AVELA is in the business of, inter alia, creating new artistic retro-themed works in print, graphic and lithographic mediums. | Exhibit B, Decl. of Leo Valencia at ¶ 3; Harley Decl. ¶ 28, Exhibit K |

**EMMLLC's Response:**

Disputed; *see* Dkt. 340 ¶¶ 115, 200.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact and mischaracterizes testimony. Mr. Valencia testified extensively as to the work that goes into AVELA's artwork. *See* Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5- 547:8 (Dkt. 338- 21, Durham Decl., Ex. U). *See also* Harley Supp. Decl. ¶ 10, Exhibit G (attaching this deposition transcript).

Mr. Valencia acquired various public domain images of Ms. Monroe, enhanced them, and began licensing these enhanced images in 1985 – at which point he had copyright notices affixed to his enhanced images. Valencia Depo., 543:3 – 544:9; 547:1-8. The enhanced images were overlayed (or layered) with additional art work, reconfigured and re-digitized with new information, and often had effects added – such as a "splattered urban style." Valencia Depo., 544:22 – 545:16. The images often come from old damaged pieces of paper, with creases, holes and other defects, all of which need to be corrected before the image could have any real commercial value or be otherwise usable with any type of product. Valencia Depo., 545:20 – 546:11. In essence, old public domain artwork that was unusable in its present form was first shot, then "drum scanned, and then digitally photo shopped again so that the information can be converted from lithography, you know, CYMK into digital RGB format. And at that point then tons of imperfections and so forth are then created into a file that then can be extracted into an illustrator file or into other formats to use it for artistic purposes… So at that point the illustrator files or the PSD files then can be layered and taken apart, backgrounds can be put in, and design elements can then be built onto the images so that the licensees now can actually use them in product form. Valencia Depo., 546:12-25.

| | |
|---|---|
| 48. AVELA creates new derivative artistic works based off of materials in the public domain. | Exhibit B, Decl. of Leo Valencia at ¶ 4. |

**EMMLLC's Response:**

Disputed; *see* response to ¶ 47.

EMMLLC fails to raise a genuine issue of material fact and mischaracterizes testimony. Mr. Valencia testified extensively as to the work that goes into AVELA's artwork. See Leo Valencia Depo. 5/30/2014 at 537:6-540:16; 543:5- 547:8 (Dkt. 338- 21, Durham Decl., Ex. U); *see* response to ¶ 47.

| | |
|---|---|
| 49. Beginning in the 1980s, Valencia began to expand his collection of artwork by acquiring, restoring, and revitalizing old movie posters, promotional materials, and vintage artwork. | Exhibit B, Decl. of Leo Valencia at ¶ 7. |

**EMMLLC's Response:**

Disputed. AVELA has failed to produce documentary evidence of its activities beginning in the 1980s.

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The fact that AVELA does not have documents from thirty years ago does not preclude its other evidence demonstrating that it has in fact been licensing its Monroe artwork for decades.

Mr. Valencia has testified extensively regarding his creation of AVELA's Monroe artwork and his licensing business since the 1980s. *See* Harley Supp. Decl. ¶ 10, Exhibit G, Leo Valencia Depo. May 30, 2014 at 537:6-540:16; 543:5-547:8; *see, e.g.*:

"Q: Are these images that you keep in your repository to license to others?
A: Yes.
Q; Why do many of them bear the copyright 1985 all rights reserved? …
A. That's when we – or that's when I started selling Monroe." 543:18-544:1.

AVELA has also turned over sales records from as early as 2005. Harley Supp. Decl. ¶ 3, Exhibit A. AVELA also produced copyright registrations from 2002 in Monroe artwork. Harley Supp. Decl. ¶ 8, Exhibit E. AVELA also produced advertisements from as early as 2005 advertising its Monroe artwork. Harley Supp. Decl. ¶ 4, Exhibit B.

| | |
|---|---|
| 50. Leo Valencia has licensed his retro-themed artwork featuring retro-themed movie and film characters, including Marilyn Monroe, since the 1980s. | Exhibit B, Decl. of Leo Valencia at ¶ 8, Exhibit L |

**EMMLLC's Response:**
Disputed. AVELA has not provided any documentary evidence of its distribution of Monroe artwork in the marketplace since 1985.

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The fact that AVELA does not have documents from thirty years ago does not preclude its other evidence demonstrating that it has in fact been licensing its Monroe artwork for decades.

Mr. Valencia has testified extensively regarding his creation of AVELA's Monroe artwork and his licensing business since the 1980s. *See* Harley Supp. Decl. ¶ 10, Exhibit G, Leo Valencia Depo. May 30, 2014 at 537:6-540:16; 543:5-547:8; *see, e.g.*:

"Q: Are these images that you keep in your repository to license to others?
A: Yes.
Q; Why do many of them bear the copyright 1985 all rights reserved? …
A. That's when we – or that's when I started selling Monroe." 543:18-544:1.

AVELA has also turned over sales records from as early as 2005. Harley Supp. Decl. ¶ 3, Exhibit A. AVELA also produced copyright registrations from 2002 in Monroe artwork. Harley Supp. Decl. ¶ 8, Exhibit E. AVELA also produced advertisements from as early as 2005 advertising its Monroe artwork. Harley Supp. Decl. ¶ 4, Exhibit B.

| 51. AVELA and Valencia's products with Monroe artwork have been in the marketplace since 1985. | Exhibit B, Decl. of Leo Valencia at ¶ 9; Exhibit L |
| --- | --- |

**EMMLLC's Response:**

Disputed. AVELA has not provided any documentary evidence of its distribution of Monroe artwork in the marketplace since 1985. Furthermore, the oldest document in Exhibit L is a product approval form dated 5/17/2005 for t-shirts purportedly manufactured by Dragonfly Clothing bearing an image of Marilyn Monroe and the mark THE ASPHALT JUNGLE; moreover, the product approval form does not confirm that the t-shirt was ever manufactured or sold in the United States.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The fact that AVELA does not have documents from thirty years ago does not preclude its other evidence demonstrating that it has in fact been licensing its Monroe artwork for decades.

Mr. Valencia has testified extensively regarding his creation of AVELA's Monroe artwork and his licensing business since the 1980s. *See* Harley Supp. Decl. ¶ 10, Exhibit G, Leo Valencia Depo. May 30, 2014 at 537:6-540:16; 543:5-547:8.

AVELA has also turned over sales records from as early as 2005. Harley Supp. Decl. ¶ 3, Exhibit A. These sales records demonstrate that Dragonfly's AVELA products were in fact sold in the United States as early as 2005.

AVELA also produced copyright registrations from 2002 in Monroe artwork. Harley Supp. Decl. ¶ 8, Exhibit E. AVELA also produced advertisements from as early as 2005 advertising its Monroe artwork. Harley Supp. Decl. ¶ 4, Exhibit B.

| 52. AVELA does not use the mark "Marilyn Monroe" on its products. | Exhibit B, Decl. of Leo Valencia at ¶ 14; Harley Decl. ¶ 28, Exhibit K |
| --- | --- |

**EMMLLC's Response:**

Disputed. Exhibit K is not an exhaustive compilation of AVELA-licensed Marilyn Monroe artwork and therefore does not provide uncontroverted proof of this statement.

<table>
<tr><td colspan="2" align="center"><b><u>Movant's Response:</u></b><br><br>EMMLLC's response fails to create a genuine issue of material fact. EMMLLC fails to cite to any evidence controverting this fact.</td></tr>
</table>

| 53. AVELA does not use Monroe's stylized signature as a mark on its products. | Exhibit B, Decl. of Leo Valencia at ¶ 15; Harley Decl. ¶ 28, Exhibit K |
|---|---|

**EMMLLC's Response:**

Disputed. AVELA has approved its licensees' products that have used Monroe's stylized signature. *See* Dkt. 340 Estate's Statement of Facts ¶214 ; Dkt. 338-14, Ex. N, Kimberly Mileski Depo. at 59:5-11, 154:23 to 155:22.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The deponent states that she does not know whether or not the font used is Monroe's actual signature. The testimony does not establish that the licensee used Monroe's actual signature or that AVELA ever approved the t-shirt at issue.

Additionally, AVELA has a four-stage approval process and there is no evidence the product discussed ever passed AVELA's four-stage approval requirements. *See* Dkt. 338 Durham Decl., Exhibit FF at 11 (6.A.)

Further, litigation between AVELA and Freeze indicates Freeze sold many unauthorized and unapproved products. *See A.V.E.L.A., Inc. v. Central Mills, Inc. et. al,* Case No. 2:15-cv-03918-JAK-AGR (Dkt. 1.)

| 54. AVELA's images transform old photographs of Monroe through extensive graphic design and restoration processes to create completely new artwork. | Exhibit B, Decl. of Leo Valencia at ¶ 11 |
|---|---|

**EMMLLC's Response:**

Disputed; *see* response to ¶47.

| **_Movants' Response:_** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact and mischaracterizes testimony. *See* response to ¶47. | |
| 55. AVELA's artwork uses novel elements and contemporary designs to modernize old Hollywood memorabilia and appeal to a new generation of consumers. | Exhibit B, Decl. of Leo Valencia at ¶ 16 |

**EMMLLC's Response:**

Disputed; *see* response to ¶ 47.

| **_Movants' Response:_** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact and mischaracterizes testimony. *See* response to ¶47. | |
| 56. The work that goes into AVELA's artwork includes the following: The original images often have defects that need to be corrected before they can have any real commercial value. The images are repaired, scanned, photo shopped, converted into digital format, and extracted into illustrator files to use for artistic purposes. The files are then layered with additional artwork, reconfigured, and have effects added such as backgrounds and design elements. | Exhibit B, Decl. of Leo Valencia at ¶ 10. |

**EMMLLC's Response:**

Disputed; see response to ¶47.

| **_Movants' Response:_** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact and mischaracterizes testimony. *See* response to ¶47. | |

| | |
|---|---|
| 57. AVELA's images are continuously renovated to keep up with current trends. | Exhibit B, Decl. of Leo Valencia at ¶ 13. |
| **EMMLLC's Response:**<br><br>Disputed that this statement is material and relevant. | |
| 58. Valencia has attended numerous tradeshows over the decades to promote his enhanced images with Monroe artwork. | Exhibit B, Decl. of Leo Valencia at ¶ 12; Exhibit L |
| **EMMLLC's Response:**<br><br>Undisputed that Mr. Valencia attends tradeshows to promote AVELA's images; disputed to the extent that Exhibit L does not establish that Mr. Valencia promotes Marilyn Monroe related images/artwork at these tradeshows for decades. | |
| 59. AVELA sometimes includes the word "MARILYN" on its artwork. | Harley Decl. ¶ 28, Exhibit K. |
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. | |
| 60. AVELA has never licensed artwork for use in connection with any wine or alcoholic liquor. | Exhibit B, Decl. of Leo Valencia at ¶ 17 |

| | |
|---|---|
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. | |
| 61. AVELA uses Monroe's image in artwork on products. | Harley Decl. ¶ 28, Exhibit K |
| **EMMLLC's Response:**<br><br>Undisputed that AVELA uses Monroe's image on products. | |
| 62. AVELA sells posters with its Monroe artwork. | Harley Decl. ¶ 28, Exhibit K |
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. | |
| 63. X One X conducts searches with the US Copyright Office regarding the use of its underlying public domain images of Monroe. | Exhibit B, Decl. of Leo Valencia at ¶ 18; Harley Decl. ¶ 58, Exhibit M at 25-33. |
| **EMMLLC's Response:**<br><br>Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. | |
| 64. X One X obtains copyrights registered with the United States Copyright Office for its artistic works developed using formerly public domain images of Monroe. | Exhibit B, Decl. of Leo Valencia at ¶ 5; Harley Decl. ¶ 59, Exhibit M, Pages 2-24. |
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. | |
| 65. X One X owns copyright registrations in artwork with Monroe's image. | Harley Decl. ¶¶ 46, 59, Exhibit M Pages 2-24; Exhibit F at 8, EMMLLC's Responses to X One X's First Requests for Admission at No. 28. |

| **EMMLLC's Response:** | |
|---|---|
| Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. | |
| 66. Valencia created the entity X One X to manage and acquire various catalogs of vintage artwork. | Exhibit B, Decl. of Leo Valencia at ¶ 6. |
| **EMMLLC's Response:** | |
| Undisputed for purposes of this motion. | |
| 67. AVELA identifies its own brand, Radio Days, on its products and product packaging through the use of its trademarks "RADIO DAYS," "RED CARPET NOIR," or "HOLLYWOOD LEGENDS." | Harley Decl. ¶¶ 28, 64, Exhibit K; Exhibit W. |
| **EMMLLC's Response:** | |
| Disputed. AVELA does not consistently sell products with hang tags or product packaging displaying its trademarks "RADIO DAYS," "RED CARPET NOIR," or "HOLLYWOOD LEGENDS." *See* Dkt. 359, Decl. of Sandon Berg at ¶21. | |
| **Movants' Response:** | |
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC's evidence shows that AVELA consistently identifies its brand on t-shirt neck labels. Other evidence demonstrates that AVELA requires its licensees to identify the AVELA brand on all licensed products and related promotional and packaging material. *See* ¶¶ 68-69. *See also* Valencia Supp. Decl. at 4-5. | |
| 68. AVELA's license agreements require that its licensees prominently display AVELA's trademark and copyright information on all licensed products and related advertising, promotional, and packaging material. | Harley Decl. ¶ 60, Exhibit N at 11-12, 15. |
| **EMMLLC's Response:** | |
| Disputed to the extent this fact is offered to prove that AVELA's licensees acted in accordance with this provision. | |
| 69. AVELA's t-shirts display AVELA's brand name on neck labels and also frequently on the front of the shirts. | Harley Decl. ¶¶ 28, 64, Exhibit K; Exhibit W. |

**EMMLLC's Response:**

Disputed; *see* response to ¶67.

---

**Movants' Response:**

EMMLLC fails to raise a genuine dispute of material fact. The evidence cited makes zero reference to AVELA's neck labels or AVELA's display of its brand name on the front of t-shirts. EMMLLC fails to cite a single AVELA t-shirt that does not display AVELA's brand name on the neck label. Each of the products cited displays AVELA's brand on the neck label of the product.

| | |
|---|---|
| 70. AVELA does not permit its licensees to use the name "MARILYN MONROE" or a stylized signature for Monroe on its licensed products. | Exhibit B, Decl. of Leo Valencia at ¶ 19; Harley Decl. ¶ 60, Exhibit N at 9. |

**EMMLLC's Response:**

Disputed. *See* response to ¶53.

---

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The deponent cited states that she does not know whether or not the font used is Monroe's actual signature. The testimony does not establish that the licensee used Monroe's actual signature or that AVELA ever approved the t-shirt at issue.

Additionally, AVELA has a four-stage approval process and there is no evidence the product discussed ever passed AVELA's four-stage approval requirements. *See* Dkt. 338 Durham Decl., Exhibit FF at 11 (6.A.)

Further, litigation between AVELA and Freeze indicates Freeze sold many unauthorized and unapproved products. *See A.V.E.L.A., Inc. v. Central Mills, Inc. et. al,* Case No. 2:15-cv-03918-JAK-AGR (Dkt. 1.)

| | |
|---|---|
| 71. AVELA's license agreements do not allow its licensees to use artwork as a trademark to identify the source of merchandise. | Harley Decl. ¶ 60, Exhibit N at 15. |

**EMMLLC's Response:**

Disputed. Page 15 of Exhibit N does not provide support for this contention. Furthermore, AVELA cannot control the source-identifying function of a trademark in its licensing agreements, as what functions as a source identifier is determined in part by consumer perception. *See Jordache Enterprises, Inc. v. Levi Strauss & Co.,* 841 F. Supp. 506, 515 S.D.N.Y. 1993)(internal citations omitted ) ("Ultimately, the strength of a mark is a function 'of its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public.'"). More importantly, Mr. Poret's survey establishes that consumers mistakenly believe products bearing AVELA-licensed images are endorsed by the Estate, thereby proving that AVELA's license agreements do not in fact prohibit "licensees to use artwork as a trademark." *See* Dkt. 338-15, Ex. O ("Poret Report").

| | |
|---|---|
| 72. AVELA has an approval process for its licensed products. | Harley Decl. ¶ 60, Exhibit N at 22. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 73. AVELA's licensees sometimes produce infringing and unapproved products. | Exhibit B, Decl. of Leo Valencia at ¶ 20 |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 74. AVELA does not have a license agreement with EMMLLC. | Harley Decl. ¶ 29; Exhibit B, Decl. of Leo Valencia at ¶ 21 |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 75. Movants are not aware of any consumer confusion in the marketplace as to the source, origin, or sponsorship of any of AVELA's licensed products bearing Monroe's image. | Exhibit B, Decl. of Leo Valencia at ¶ 22 |

**EMMLLC's Response:**

Disputed; *See* Dkt. 340 Estate's Statement of Facts ¶¶244, 249-252, 254.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. Ms. Jones did not testify that any such products are AVELA products or that any shirt from Mighty Fine was one of these products. There is no evidence any consumer complained about Mighty Fine's shirt. Numerous other entitles sell t-shirts featuring Marilyn Monroe with tattoos. Movants also object to this evidence on the grounds that these emails are inadmissible hearsay. The testimony does not establish that Mighty Fine was ever an AVELA licensee for Monroe artwork or that AVELA actually approved the t-shirt. *See* Dkt. 374 ¶ 244. Further, Mr. Poret's substantially flawed, unreliable, and irrelevant survey does not establish confusion. *See id.* at 249-252, 254.

| | |
|---|---|
| 76. AVELA's counsel has previously informed AVELA that it may lawfully use Monroe's image in its artwork. | Harley Decl. ¶ 62; Exhibit N at 2-8. |

**EMMLLC's Response:**

Disputed to the extent this if offered as proof of the legality of AVELA's use of Monroe's images.

| | |
|---|---|
| 77. Dave Grossman Creations, a previous licensee of AVELA, sold products bearing AVELA's Monroe artwork. | Exhibit B, Decl. of Leo Valencia at ¶ 23; Harley Decl. ¶ 57, Exhibit J, Pages 2-3 |

**EMMLLC's Response:**

Disputed that material does not support the fact stated. In fact, on page 9 of the license agreement (Bates AVELA06439), Section 7(b) indicates that the licensed artwork "shall be limited only to the noted artwork on 'Schedule A' of this Agreement;" yet Schedule A only identifies artwork related to "It's a Wonderful Life," "Gone With the Wind," "Wizard of Oz," "Breakfast at Tiffany's," "Hard Days Night//Yellow Submarine," "Blue Hawaii//Viva Las Vegas," "Casa Blanca," and "My Fair Lady." AVELA06450-6451. Noticeably absent is any reference a license of Marilyn Monroe-related artwork. *See* Supp. Clarke Decl. at ¶5. Moreover, although cited in Mr. Harley's Declaration, Mr. Harley has no personal knowledge of the license agreement in violation of FRE 602.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to cite to any evidence that the products referenced were licensed from anyone other than AVELA, particularly where AVELA has turned over its license agreement with Grossman. The fact that the license agreement does not explicitly refer to Monroe artwork does not preclude this fact. AVELA's initial license agreements do not list every artwork property that a licensee ultimately licenses from AVELA. *See* Valencia Supp. Decl. ¶ 2. Dave Grossman Creations did in fact sell AVELA-licensed Monroe products. *See* Valencia Supp. Decl. ¶ 3.

Further, products currently available for resale on the internet display products that are advertised as Dave Grossman products. Harley Supp. Decl. ¶¶ 6-7, Exhibit D. These products match AVELA's copyrighted artwork and demonstrate that Dave Grossman was in fact selling AVELA products. Harley Supp. Decl. ¶ 8, Exhibit F.

**EMMLLC'S ACTIVITIES**

| | |
|---|---|
| 78. In December 2010, Authentic Brands Group, LLC ("ABG") purchased registered trademarks in Monroe's name and stylized signature from an entity called Marilyn Monroe LLC. | Harley Decl. ¶¶ 30, 55, Exhibit I at 2-8; Exhibit V, Clarke Depo at 151:10-152:11. |

**EMMLLC's Response:**

Disputed to the extent that this provides an incomplete statement of the assets acquired and to the extent that it was MM-ABG, LLC not Authentic Brands Group, LLC that acquired the rights to the registered trademarks then-owned by Marilyn Monroe LLC.

| | |
|---|---|
| 79. ABG formed a subsidiary and named it "The Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 33, Exhibit I at 9-10; Exhibit T, Woodhouse Depo. at 11:7-12. |

**EMMLLC's Response:**

Disputed to the extent that it was MM-ABG, LLC not Authentic Brands Group, LLC that formed The Estate of Marilyn Monroe, LLC.

| | |
|---|---|
| 80. EMMLLC has refused to turn over a copy of the acquisition document from its purchase of assets from the entity Marilyn Monroe, LLC. | Harley Decl. ¶ 31 |

**EMMLLC's Response:**

Disputed. The Estate has produced the December 30, 2010 Asset Purchase Agreement between MM-ABG, LLC and Marilyn Monroe, LLC, and made the document available to AVELA for viewing on multiple occasions, starting in 2014 and most recently at the deposition of Nick Woodhouse on August 22, 2017 during which Mr. Harley's co-counsel used the agreement and questioned the witness about it. *See* Supp. Durham Decl. at ¶ 29, Ex. BB ("Nick Woodhouse Depo.") at 47:20-23.

**Movants' Response:**

EMMLLC has never sent a copy of this agreement to AVELA's counsel. EMMLLC will not allow AVELA's counsel to retain possession of a copy of this agreement. It is accurate that EMMLLC has refused to turn over this document.

| 81. On July 25, 2013, a representative of the Anna Freud Center signed a document purporting to retroactively assign the Anna Freud Center's 25% share of Monroe's residuary estate to the entity "RALS-MM LLC f/k/a Marilyn Monroe, LLC" effective as of June 19, 2001. | Harley Decl. ¶ 32, Exhibit C at 35. |
|---|---|

**EMMLLC's Response:**

Disputed. The document at page 34 of Exhibit C is a confirmatory assignment; it does not retroactively assign any rights but merely confirms the assignment already made. "Assignor wishes to confirm that any and all property or interests in property to which it may have been entitled from the Estate of Marilyn Monroe, Deceased, was transferred to the Assignee effective as of the date on which Assignee was formed, July 5, 2001."

| 82. EMMLLC sent cease and desist letters from 2011 to the present. | Harley Decl. ¶ 33 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 83. EMMLLC has not presented any consumer studies linking its purported marks to a source. | Harley Decl. ¶ 34 |
|---|---|

**EMMLLC's Response:**

Disputed to the extent the term "marks" is undefined and ambiguous. Furthermore, the Estate has conducted consumer studies linking Marilyn Monroe's persona to a source, *see* Dkt. 338-15, Ex. O ("Poret Report"), and the 2nd Circuit recognizes that celebrity persona is a trademark-like right.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. Mr. Poret's substantially flawed, unreliable, and irrelevant survey does not establish confusion and certainly does not establish any like between Monroe's persona and EMMLLC. *See* Dkt. 355. Mr. Poret also admitted his survey's conclusion is not specific to EMMLLC. Harley Decl. ¶ 52, Exhibit S, Poret Depo at 186:15-24.

| 84. EMMLLC has not turned over any discovery evidencing media coverage of EMMLLC, EMMLLC's predecessor, or its products prior to 2011. | Harley Decl. ¶ 35 |
|---|---|

| | |
|---|---|
| **EMMLLC's Response:**<br>Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. | |
| 85. The Ninth Circuit, Central District of California, and this Court previously ruled that Monroe's right of publicity did not survive her because Monroe died domiciled in the State of New York, which does not recognize postmortem rights of publicity. *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 1000 (9th Cir. 2012); *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152 (C. D. Cal. 2008) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008). | Harley Decl. ¶ 36 |

**EMMLLC's Response:**

Disputed that this statement is material and relevant and to the extent this statement implies that the Estate does maintain Marilyn Monroe's publicity rights in any state. As right of publicity laws vary across states, the Estate holds a right of publicity with respect to Marilyn Monroe in states that do not consider an individual's domicile at death, including Washington and Indiana. *See* Supp. Durham Decl. at ¶30, Ex. CC, The Estate of Marilyn Monroe LLC's Responses to Counter-Defendant X One X Movie Archive, Inc.'s First Set of Requests for Admission No. 9.

**Movants' Response:**

EMMLLC fails to raise a genuine dispute of material fact. This Court has already determined that even if Monroe could have possibly passed down a right of publicity under Indiana law, EMMLLC's predecessors would not have owned it. *See Shaw Family Archives Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309, 319 (S.D.N.Y. 2007) ("The Indiana statute likewise provides that if a personality has not transferred her right of publicity by "contract," "license," "gift," "trust," or "testamentary document," the right will "vest" in those individuals entitled to her property through the "[o]peration of the laws of intestate succession applicable to the state administering the estate and property of the intestate deceased personality, regardless of whether the state recognizes the property rights set forth under this chapter." *See* Ind. Code §§ 32-36-1-16 to -18. Ms. Monroe's legatees under her will are not her statutory heirs for intestacy purposes."); *see also* Wash. Rev. Code § 63.60.030(1)(a) (similar to the Indiana statute, if a celebrity has not transferred her right of publicity by any contract, trust, or testamentary document the Washington right of publicity passes to the celebrity's heirs for intestacy purposes). EMMLLC cannot own any right of publicity in Monroe under Indiana or Washington law.

| | |
|---|---|
| 86. EMMLLC states on its website www.marilynmonroe.com that "RIGHTS OF THE PUBLICITY AND PERSONA RIGHTS ARE USED WITH THE PERMISSION OF THE ESTATE OF MARILYN MONROE, LLC." | Harley Decl. ¶ 37, Exhibit O at 2. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 87. EMMLLC states on its products and advertising that "RIGHTS OF THE PUBLICITY AND PERSONA RIGHTS ARE USED WITH THE PERMISSION OF THE ESTATE OF MARILYN MONROE, LLC." | Harley Decl. ¶ 37, Exhibit O at 3-7. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 88. EMMLLC does not own any registered trademark in AVELA's artwork. | Harley Decl. ¶ 38 |

**EMMLLC's Response:**

Disputed to the extent that AVELA has used EMMLC's registered MARILYN MONROE trademarks and registered Marilyn signature in its artwork.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence.

| | |
|---|---|
| 89. EMMLLC is not Marilyn Monroe. | Harley Decl. ¶ 39, Exhibit F at 4, EMMLLC's Responses to V International's First Set of Requests for Admission at No. 6 |

**EMMLLC's Response:**

Disputed to the extent this statement improperly implies that the Estate is not the successor in interest to the rights of the woman Marilyn Monroe.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence, and EMMLLC blatantly disregards its discovery responses where EMMLLC admitted this fact.

| | |
|---|---|
| 90. EMMLLC is not Marilyn Monroe's family. | Harley Decl. ¶ 39, Exhibit F at 4, EMMLLC's Responses to V International's First Set of Requests for Admission at No. 7 |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 91. EMMLLC is not Marilyn Monroe's beneficiary. | Harley Decl. ¶ 5, Exhibit C at 34. |

**EMMLLC's Response:**

Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. Harley Decl. ¶ 5, Exhibit C at 34 lists Marilyn Monroe's beneficiaries. EMMLLC fails to controvert this fact with any evidence that any of Monroe's beneficiaries are involved with EMMLLC. EMMLLC's designated witness has testified that no one mentioned in Monroe's will is involved with EMMLLC in any way. Dkt. 368, Exhibit O at 128:17-129:10.

| | |
|---|---|
| 92. EMMLLC is not Marilyn Monroe's actual estate. | Harley Decl. ¶¶ 5, 15, 55, Exhibit C at 23; Exhibit V, Clarke Depo at 153:12-154:10 |

**EMMLLC's Response:**

Disputed to the extent the phrase "actual estate" is ambiguous. *See also* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. Harley Decl. ¶ 5, Exhibit C at 34 lists Marilyn Monroe's beneficiaries. EMMLLC fails to controvert this fact with any evidence that any of Monroe's beneficiaries are involved with EMMLLC. EMMLLC's designated witness has testified that no one mentioned in Monroe's will is involved with EMMLLC in any way. Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. at 128:17-129:10.

EMMLLC admits Monroe's actual estate closed decades ago. See response to ¶ 30. Further, the assets of Monroe's actual estate have been delineated and no intellectual property rights were included. Dkt. 371-3 (Exhibit C), Pages 27-34.

| | |
|---|---|
| 93. EMMLLC is not composed of or owned by Marilyn Monroe's family. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |

| **EMMLLC's Response:** |
| --- |
| Undisputed for purposes of this motion. |

| 94. EMMLLC is not composed of or owned by Marilyn Monroe's heir. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |
| --- | --- |

| **EMMLLC's Response:** |
| --- |
| Undisputed for purposes of this motion. |

| 95. EMMLLC is not composed of or owned by Marilyn Monroe's actual estate. | Harley Decl. ¶ 54, Exhibit U, Jones July 19, 2017 Depo. 128:17-129:10 |
| --- | --- |

| **EMMLLC's Response:** |
| --- |
| Disputed. This statement misrepresents Ms. Jones's testimony. Ms. Jones states that there is no one at the Estate who is a blood relative of Marilyn Monroe. It is not necessary that such a relative be attached to the Estate for the Estate to own Marilyn Monroe's actual estate. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31. |

| **Movants' Response:** |
| --- |
| EMMLLC fails to raise a genuine issue of material fact. Harley Decl. ¶ 5, Exhibit C at 34 lists Marilyn Monroe's beneficiaries. EMMLLC fails to controvert this fact with any evidence that any of Monroe's beneficiaries are involved with EMMLLC. EMMLLC's designated witness has testified that no one mentioned in Monroe's will is involved with EMMLLC in any way. Exhibit U at 128:17-129:10.<br><br>EMMLLC admits Monroe's actual estate closed decades ago. See response to ¶ 30. Further, the assets of Monroe's actual estate have been delineated and no intellectual property rights were included. Dkt. 371-3 (Exhibit C), Pages 27-34. |

| 96. Marilyn Monroe did not assign any intellectual property rights to EMMLLC. | Harley Decl. ¶ 40 |
| --- | --- |

| **EMMLLC's Response:** |
| --- |
| Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31. |

| | |
|---|---|
| **Movants' Response:** | |
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that Monroe actually made any assignment of intellectual property rights to EMMLLC, or anyone for that matter. Monroe's will does not refer to any intellectual property rights. | |
| 97. Monroe did not authorize EMMLLC to license her intellectual property rights. | Harley Decl. ¶ 41 |
| **EMMLLC's Response:** | |
| Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31. | |
| **Movants' Response:** | |
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that Monroe actually authorized EMMLLC, or anyone for that matter, to license her intellectual property rights. | |
| 98. Monroe did not authorize EMMLLC to police her intellectual property rights. | Harley Decl. ¶ 42 |
| **EMMLLC's Response:** | |
| Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31. | |
| **Movants' Response:** | |
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that Monroe actually authorized EMMLLC, or anyone for that matter, to police her intellectual property rights. | |
| 99. No beneficiaries mentioned in Marilyn Monroe's will authorized EMMLLC to police Monroe's intellectual property rights. | Harley Decl. ¶¶ 3, 5, 43, Exhibit C at 6-8. 34. |
| **EMMLLC's Response:** | |
| Disputed. *See* Dkt. 340 Estate's Statement of Facts ¶¶ 27-31. | |
| **Movants' Response:** | |
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC fails to controvert this fact with any evidence that anyone mentioned in Monroe's will actually authorized EMMLLC, or anyone for that matter, to police her intellectual property rights. Harley Decl. ¶ 5, Exhibit C at 34 lists Marilyn Monroe's beneficiaries. EMMLLC fails to cite to any evidence that any of these individuals authorized EMMLLC to police Monroe's intellectual property rights. | |

| 100. EMMLLC claims it received rights in Monroe from the residuary clause in her will. | Harley Decl. ¶ 39, Exhibit F at 2, EMMLLC's Responses to V International's First Set of Requests for Admission at No. 1 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 101. EMMLLC owns trademark registrations in the word mark "MARILYN MONROE." | Harley Decl. ¶ 25, Exhibit I at 16-17. |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 102. EMMLLC owns trademark registrations in Monroe's stylized signature. | Harley Decl. ¶ 25, Exhibit I at 14-15. |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 103. EMMLLC owns trademark registrations in the word mark "MARILYN" for two classes of goods: US Class 47 (wines) and US Class 49 (Distilled alcoholic liquors) | Harley Decl. ¶ 25, Exhibit I at 12-13. |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 104. EMMLLC typically uses the Marilyn Monroe stylized signature and/or "MARILYN MONROE TM" on its products or advertising. | Harley Decl. ¶¶ 37, 53, Exhibit P, Exhibit T, Woodhouse Depo. at 84: 5-17 |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 105. EMMLLC seeks to control any use of Monroe's image in commerce. | Harley Decl. ¶ 53, Exhibit T, Woodhouse Depo. at Exhibit 37:11-19; 40:14-25; 41:16-42:2; 118:25-119:24. |

**EMMLLC's Response:**

Disputed. This statement misrepresents Mr. Woodhouse's testimony, which represents that the Estate has the "right to oversee all uses of the Marilyn Monroe name, image and likeness in any *commercial manner*." Dkt. 371-20, Woodhouse Depo. at 7:18-19 (emphasis added). The enforcement of the Estate's Marilyn Monroe related intellectual property rights against unauthorized *commercial* use of Marilyn Monroe's name, image, and persona, is distinct from controlling all use of her image in commerce—the former includes only uses that attempt to profit from Monroe's image.

| | |
|---|---|
| 106. EMMLLC has not presented any evidence it acquired secondary meaning in any particular image of Monroe. | Harley Decl. ¶ 45 |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 107. Katie Jones testified that EMMLLC was unaware of any specific instance of actual confusion by consumers between AVELA's goods and EMMLLC or EMMLLC's goods. | Harley Decl. ¶ 54, Exhibit U, Jones Depo. on April 29, 2014 at 25:5-14; Jones Depo. on July 19, 2017 at 88:10-16. |

**EMMLLC's Response:**

Disputed. Ms. Jones testified that testified that she receives emails from individuals who are confused as to whether certain products are endorsed by the Estate as they do not appear to conform with the Estate's stylistic guidelines, identifying a particular instance in which she was contacted about a t-shirt that depicted Marilyn Monroe with tattoos—a shirt which was manufactured by Mighty Fine and pre-approved by AVELA. *See* Dkt. 338-8, Ex. H, Katie Jones Depo. 4/29/2014 at 26:2-25; Dkt. 340 Estate's Statement of Facts ¶244.

| **Movants' Response:** | |
|---|---|
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC mischaracterizes testimony in its response. Ms. Jones never testified that she received any complaint about a Mighty Fine t-shirt specifically. Ms. Jones never testified that she received any complaint about any AVELA t-shirt specifically. Ms. Jones was unable to identify any specific source of any product a consumer purportedly complained about. Further, there is no evidence AVELA ever approved any t-shirt manufactured by Mighty Fine. There is no evidence Mighty Fine ever held any license from AVELA to manufacture products. EMMLLC also fails to cite to any of these purported emails, and any testimony regarding these emails amounts to inadmissible hearsay. | |

| **AVELA'S SURVEY EVIDENCE** | |
|---|---|
| 108. AVELA's expert, Mr. Howard Marylander, conducted a study "to measure whether consumers are likely to believe that Marilyn Monroe or her heirs, estate, or other related entity make or are associated, connected, licensors or sponsors of the Marilyn Monroe t-shirts licensed by A.V.E.L.A., Inc." | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 3. |

| **EMMLLC's Response:** |
|---|
| Undisputed for purposes of this motion. |

| 109. Mr. Marylander determined there was 0% likelihood that consumers are likely to believe that Marilyn Monroe or her heirs, estate, or other related entity make or are associated with, connected to, or licensors or sponsors of AVELA's shirts. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |
|---|---|

| **EMMLLC's Response:** |
|---|
| Undisputed that Mr. Marylander determined there was a 0% likelihood of confusion; however, disputed to the extent that this statement implies that this result is accurate. *See* Dkt. 340 Estate's Statement of Facts ¶254. |

| **Movants' Response:** |
|---|
| EMMLLC fails to raise a genuine issue of material fact. EMMLLC's responses amounts to a legal conclusion inappropriate for inclusion in a statement of facts. |

| | |
|---|---|
| 110. The AVELA Survey was conducted according to accepted principles. It featured 251 participants in a test panel and 248 in a control panel who were identified through a screening process as potential buyers of a graphic t-shirt. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 8. |

**EMMLLC's Response:**

Undisputed that the survey used a recognized methodology, namely the Eveready survey design, but the survey was deeply flawed in several respects. *See* Dkt. 340 Estate's Statement of Facts ¶254.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. *See* Dkt. 374 ¶ 254 (Movants' response to EMMLLC's Statement of Facts).

| | |
|---|---|
| 111. The Test group was asked about one of three actual AVELA t-shirts with Monroe artwork and AVELA hangtags and necktags. The name "Marilyn" appeared on two of the test shirts. The control group was asked about a shirt identical in all relevant parts to the test group except that they used an anonymous blonde woman, the name "Nichole," and different jewelry. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 37. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 112. Respondents were given an opportunity to examine the shirts and then the shirts were removed from the respondents' view prior to questioning. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 9. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 113. Respondents were first asked "Who do you think made or put out this t-shirt." Respondents were then asked: "Do you think the company that made and put out this t-shirt is associated, connected, licensed, or sponsored by someone or some organization or it is not associated, connected, licensed, or sponsored by someone or some organization or do you not know or have no opinion? | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 9. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 114. In response to the question regarding who made or put out the shirt, 2% of the test group answered "Person on the t-shirt/Marilyn Monroe/Marilyn Monroe Estate/Others with Rights." This is compared to 4% for the control group. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 11-12. |

**EMMLLC's Response:** Disputed to the extent that Marylander miscalculated the control group results. *See* Dkt. 338-18, Ex. R ("Poret Rebuttal") at pp. 10-14.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. EMMLLC's cited evidence is nonsensical. A control should share as many characteristics with the test product as possible, "with the key exception of the characteristic whose influence is being assessed." *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010). There is no indication the "Nichole" control was improper or that Mr. Marylander miscalculated control responses.

The purpose of the control groups should have been to see whether respondents believed the images on the control t-shirts were sponsored by the individual on that t-shirt or his/her estate or representatives (i.e. respondents that are generally confused as to a connection between a person's image on a t-shirt and that person or his/her representative's approval of the image's use. See Dkt. 355-2 at 6.

| | |
|---|---|
| 115. In response to the question regarding association, connection, license, or approval, 6% of the test group answered "Person on the t-shirt/Marilyn Monroe/Marilyn Monroe Estate/Others with Rights." This is compared to 4% for the control group. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |

**EMMLLC's Response:**

Disputed. *See* response to ¶ 114.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. See response to ¶ 114.

| | |
|---|---|
| 116. Overall, the net confusion rate was 0% because the control group's 8% confusion is subtracted from the test group's 8% confusion rate to eliminate guessing or other "noise." | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 12. |

**EMMLLC's Response:**

Disputed to the extent that Marylander miscalculated the net confusion rate. *See* Dkt. 338-1, Ex. R ("Poret Rebuttal") at pp. 11.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. See response to ¶ 114.

| | |
|---|---|
| 117. Respondents were also asked open-ended additional questions to determine why they held the opinions they did about who put out and who was associated with the t-shirts. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 19, 21. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 118. The AVELA Survey's statistical tests were conducted at the 95% confidence level. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 10. |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, as this statistical measure does not mean that Marylander's results are 95% accurate, only that he would obtain results within the margin of error reported 95% of the time he conducted his [flawed] survey. However, it is undisputed that the AVELA Survey indicates that the statistical tests were conducted at the 95% confidence level.

| | |
|---|---|
| 119. The Survey undisputedly supports the conclusion that there is "literally no confusion at all" as to source or association for AVELA's shirts with Monroe's image and first name. | Harley Decl. ¶ 50, Exhibit Q, AVELA Survey at 22. |

**EMMLLC's Response:**

Disputed. This statement assumes the AVELA Survey was conducted properly and to the extent its characterization of the "undisputed" nature of its conclusions calls for a legal conclusion. *See* Dkt. 340 Estate's Statement of Facts ¶254.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. *See* Dkt. 374 ¶ 254 (Movants' response to EMMLLC's Statement of Facts).

**EMMLLC'S SURVEY EVIDENCE**

| | |
|---|---|
| 120. EMMLLC's expert, Mr. Hal Poret, designed and conduct a survey to determine whether there is a likelihood that consumers will be confused into mistakenly believing an AVELA t-shirt bearing the likeness of Marilyn Monroe originates or is put out with the permission or approval of EMMLLC. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 3. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 121. Mr. Poret admitted that the conclusion of his EMMLLC Survey "is not so specific as to the Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 186:15-24. |

**EMMLLC's Response:**

Disputed to the extent that it is well accepted that consumers need not be able to identify the name of the source for actionable confusion to be found. *See* § 15:8. Association with a single, though anonymous, source, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 15:8 (5th ed.) ("Care must be taken in reading the judicial opinions that state that secondary meaning denotes the buyer's mental association between the designation and a single source. This does not mean that the buyer must know the identity of that "single source" in the sense that she knows the corporate name of the producer or seller. In fact, few buyers know, or care about, the corporate identity of the seller of a trademarked product. …All Courts Follow the 'Single, Albeit Anonymous' Rule. All courts agree that secondary meaning exists when the +ordinary buyer of these goods or services associates the designation with a single, albeit anonymous, source.")

**Movants' Response:**

EMMLLC fails to raise a genuine dispute of material fact. EMMLLC improperly asserts a legal conclusion and fails to controvert this fact with any evidence. Mr. Poret testimony establishes this fact.

| | |
|---|---|
| 122. Mr. Poret had no idea whether respondents had ever heard of EMMLLC or had any idea what products or services were offered under EMMLLC's purported trademarks. | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 67:7 – 67:20; 82:7-18. |

**EMMLLC's Response:**

Disputed. *See* Response to ¶121.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. See response to ¶ 121.

| | |
|---|---|
| 123. The EMMLLC Survey questioned 201 respondents regarding an AVELA t-shirt with an image of Marilyn Monroe on it, 102 respondents in Control Group 1 regarding a t-shirt with an image of anonymous red-lipped woman, and 102 respondents in Control Group 2 regarding a t-shirt with an image of Benjamin Franklin on it. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 10-11. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 124. All respondents were asked:<br><br>"Who do you think made or put out this particular t-shirt? … What makes you think this? … Any other reasons?" and "With respect to the makers of this particular t-shirt, do you think:<br>a) That they <u>did</u> receive permission or approval from someone to make or put out this particular t-shirt;<br>b) That they did not receive permission or approval from someone to make or put out this particular t-shirt;<br>c) Or, do you have no opinion?" | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 7. |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 125. Respondents were pre-screened into those that thought permission or approval was given, and they were then asked:<br>"Who do you think gave their permission or approval for this particular t-shirt to be made or put out?"<br>Respondents that gave an answer for who they thought gave permission or approval were asked: "What makes you think this? … Any other reasons?" | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 7-8. |
|---|---|

**EMMLLC's Response:**

Disputed as to the characterization of Mr. Poret's process as pre-screening.

| 126. When asked, "Who do you think gave their permission or approval for this particular t-shirt to be made or put out?" Respondents gave responses such as "Marilyn Monroe," "the family of Marilyn Monroe," and "Marilyn Monroe is on the shirt." | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 23. |
|---|---|

| | |
|---|---|
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. | |
| 127. Respondents that answered that the makers of the t-shirt did have permission or approval but did not know or had no opinion about who gave permission were then asked:<br>"What made you answer that you think the makers of this particular t-shirt did receive permission or approval from someone to make or put out the t-shirt? Please be as specific as possible." | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 24. |

| |
|---|
| **EMMLLC's Response:**<br><br>Disputed to the extent that page 24 of the EMMLLC Survey does not support this statement. |

| |
|---|
| **Movants' Response:** <br><br>EMMLLC fails to raise a genuine issue of material fact and fails to controvert this fact with any evidence. The evidence cited literally supports this fact verbatim. |

| | |
|---|---|
| 128. When asked why respondents thought approval was given, EMMLLC's Survey garnered responses such as "because she's famous," "it has Marilyn Monroe on it," "Because i [sic] know the family should recieve [sic] royalties," and "That would be the right thing to do before printing a t shirt with her on it." | Harley Decl. ¶ 51, *See* Exhibit R, EMMLLC Survey at 24. |

| |
|---|
| **EMMLLC's Response:**<br>Disputed to the extent the quotes presented in this statement are not accurate representations of the quotes in the EMMLLC Survey on page 24. |

| | |
|---|---|
| 129. Mr. Poret counted responses citing Monroe's family, heirs, relatives, lawyers, estate, the movie company Monroe worked for, copyright, foundation, attorney and Monroe herself as confused regarding the entity EMMLLC. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 22-24. |

| |
|---|
| **EMMLLC's Response:**<br><br>Undisputed for purposes of this motion. |

| | |
|---|---|
| 130. Mr. Poret conducted the EMMLLC Survey with no knowledge of any distinction between EMMLLC and Monroe's actual estate, family, or heirs. | Harley Decl. ¶ 52, Exhibit S, Poret Depo. at 74:16-19; 63:4-64:9. |

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. *See also* response to ¶ 121.

| | |
|---|---|
| 131. The EMMLLC Survey evaluated artwork with Monroe's image on a t-shirt. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 5. |

**EMMLLC's Response:**

Disputed. The purpose of the EMMLLC Survey was not to evaluate artwork but "to determine whether there is a likelihood that consumers will be confused into mistakenly believing that an AVELA t-shirt bearing the likeness of Marilyn Monroe originates from or is put out with the permission or approval of Monroe." Dkt. 338-15, Ex. O ("Poret Report") at p. 3.

| | |
|---|---|
| 132. The EMMLLC Survey did not evaluate use of the name "Marilyn," the name "Marilyn Monroe," or Marilyn Monroe's stylized signature. | Harley Decl. ¶ 52, Exhibit S, Poret Depo. at 81:11-21. |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| | |
|---|---|
| 133. Mr. Poret counted any responses identifying Monroe or her representatives as confused. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 22-24. |

**EMMLLC's Response:**

Disputed to the extent that "respondents [who] gave answers that refer[ed] in general to approval or copyrights or trademarks and could suggest a belief that the shirt [was] approved by Monroe's estate" were not included in the final confusion rate calculation. *See* EMMLLC Survey at 25.

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. The Survey did count several responses that referred in general to approval or copyrights or trademarks:

"Because they are using the maryln Monore trade mark so they would have to use premision to use her face." (Respondent ID 131) on Page 23; "the copyright of maryland Monroe" (Respondent ID 364) on Page 23; and each of the responses on Page 24 that generally indicated approval had to be given for the use of Monroe's image on a shirt.

| 134. For Control Group 1, Mr. Poret did not count responses identifying the anonymous woman on the shirt or her representatives in calculating noise. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 27. |
| --- | --- |

**EMMLLC's Response:**

Disputed to the extent that this statement implies that this exclusion was improper. As Mr. Poret, explained in his rebuttal report, only responses referring to specific individual should be counted as noise. Dkt. 338-18, Ex. R ("Poret Rebuttal") at p. 14.

**Movants' Response:**

EMMLLC's response is improper to the extent that Mr. Poret failed to accurately calculate control group responses (Dkt. 355 at 19.) and the purpose of the control groups should here have been to see whether respondents believed the images on the control t-shirts were sponsored by the individual on that t-shirt or his/her estate or representatives (i.e. respondents that are generally confused as to a connection between a person's image on a t-shirt and that person or his/her representative's approval of the image's use. See Dkt. 355-2 at 6.

| 135. For Control Group 2, Mr. Poret did not count all responses identifying Benjamin Franklin or his representatives in calculating noise. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 27-28. |
| --- | --- |

**EMMLLC's Response:**

Disputed. Mr. Poret counted all the responses that "might indicate a belief that approval was given by someone who is in some way connected to Ben Franklin" because "no one…gave answers indicating that Ben Franklin or his representatives either put out or approved the t-shirt." Dkt. 338-15, Ex. O ("Poret Report") at p. 27.

**Movants' Response:**

EMMLLC's response is improper to the extent that Mr. Poret failed to accurately calculate control group responses (Dkt. 355 at 19.)

| 136. Mr. Poret did not use any hangtags on the shirts he used. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 5, 9, 11. |
| --- | --- |

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 137. The shirts were continuously displayed in front of respondents while they were questioned. | Harley Decl. ¶ 51, Exhibit R, EMMLLC Survey at 6. |
|---|---|

**EMMLLC's Response:**

Undisputed for purposes of this motion.

| 138. The EMMLLC Survey did not consider anyone's reason for buying a shirt. | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 79:15-19. |
|---|---|

**EMMLLC's Response:**

Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion.

| 139. The EMMLLC Survey does not support the conclusion that there is any "likelihood of confusion" as to "The Estate of Marilyn Monroe, LLC." | Harley Decl. ¶ 52, Exhibit S, Poret Depo at 186:15-24. |
|---|---|

**EMMLLC's Response:**

Disputed. *See* response to ¶ 121; *see also* Dkt. 338-15, Ex. O ("Poret Report").

**Movants' Response:**

EMMLLC fails to raise a genuine issue of material fact. See response to ¶ 121; *see also* Dkt. 355.


### EMMLLC'S ADDITIONAL MATERIAL FACTS

| ADDITIONAL FACTS | EVIDENCE |
|---|---|
| 140.    Norma Jean Mortenson, nee Dougherty, created the Marilyn Monroe persona and adopted it as her glitzy, glamorous brand for the duration of her career. | Supp. Clarke Decl. at ¶ 2. |

**Movants' Response:**

Disputed. The evidence cited does not support the fact asserted and Movants dispute the fact to the extent that it purports to be a basis for EMMLLC's claim that it owns a trademark in Monroe's "persona." Mr. Clarke's declaration does not cite any evidence and this fact is not supported by admissible evidence. Further, Mr. Clarke's declaration lacks foundation as Mr. Clarke does not have the requisite personal knowledge to testify as to why Norma Jean Mortenson

changed her name to "Marilyn Monroe" or how or why she adopted that name for her career.

| 141. | During her lifetime, Marilyn Monroe Marilyn Monroe was famously a celebrity endorser for Tru-Glo cosmetics, Lustre-Crème shampoo, Lux soap, Rayve shampoo, Hiltone hair color, and many others | Supp. Clarke Decl. at ¶ 3. |

**Movants' Response:**

Disputed. EMMLLC fails to authenticate these purported advertisements. There is no evidence regarding the dates these products were sold or created. There is no evidence regarding who produced or approved this purported merchandise. There is no evidence Monroe approved or had any connection at all to these purported advertisements. This fact is not supported by admissible evidence. Further, Mr. Clarke's declaration lacks foundation as Mr. Clarke does not have the requisite personal knowledge to testify as to whether or not Monroe actually approved the use of her name or image on merchandise during her lifetime. This response is not supported by admissible evidence.

| 142. | Forbes Magazine has listed Marilyn Monroe as one of the top earning deceased celebrities year after year. | Supp. Clarke Decl. at ¶ 4. |

**Movants' Response:**

Disputed to the extent that it purports to be a basis for EMMLLC's purported intellectual property rights related to Monroe. There is no evidence consumers care about purchasing Monroe merchandise from EMMLLC as opposed to any of the other third parties that have sold Monroe merchandise for decades. *See* Harley Decl. ¶¶ 17, 18, Exhibits D and E

| 143. | To the knowledge of the Estate, Marilyn Monroe did not appear in any of the films "It's a Wonderful Life," "Gone With the Wind," "Wizard of Oz," "Breakfast at Tiffany's," "Hard Days Night//Yellow Submarine," "Blue Hawaii//Viva Las Vegas," "Casa Blanca," and "My Fair Lady." | Supp. Clarke Decl. at ¶ 5. |

**Movants' Response:** Undisputed.

| 144. | Twentieth Century Fox Film Corporation dba 20th Century Fox, does not use the MARILYN MONROE mark alone or prominently on products not authorized by the Estate. | Supp. Clarke Decl. at ¶6. |

**Movants' Response:**

Disputed. The evidence cited does not support the fact asserted and lacks foundation. Mr. Clarke lacks the requisite personal knowledge regarding what Twentieth Century Fox Film Corporation licenses or uses regarding Marilyn Monroe. Movants' evidence demonstrates that Twentieth Century Fox has in fact licensed Monroe's name and image on products. *See* Harley Decl. ¶ 18, Exhibit E at 2-3.

| | |
|---|---|
| 145.　　　When the Estate discovered at one point that 20th Century Fox had licensed or attempted to license products bearing the Marilyn Monroe name and image without the permission of the Estate, the Estate sent Fox a cease and desist letter. A true and correct copy of the letter sent on October 28, 2016. | Supp. Clarke Decl. at ¶7. |

**Movants' Response:** Undisputed.

| | |
|---|---|
| 146. Legends Licensing, LLC d/b/a/ Licensing Group, LLC was formed in 2008 to represent several photographers, including Milton Greene and Tom Kelley. The corporation was dissolved shortly thereafter. Subsequently, the Estate entered into and still maintains an exclusive licensing arrangement with Joshua Greene in his capacity as representative for the Milton H. Greene Archives, Inc. as well as an exclusive licensing agreement with Shaw Family Archives, Ltd. for certain well-known Marilyn Monroe photographs. The Estate knows of no unauthorized use of Mr. Greene's photographs on merchandise. | Supp. Clarke Decl. at ¶8. |

**Movants' Response:**

Disputed to the extent that the evidence cited fails to account for uses of Monroe photographs on merchandise from 2008 until this purported agreement was entered into. Further, courts have already determined that photographers and entities that own Monroe photographs, including Shaw Family Archives, Ltd. and Milton H. Greene Archives, Inc. may lawfully license their Monroe photographs for use on merchandise without a license from EMMLLC's predecessors. *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012) and *Shaw Family Archives, Ltd. v. CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008). Further, a license plate bearing Monroe's image was in fact sold by this entity. *See* Dkt. 371-5 at 59.

| | |
|---|---|
| 147.       On February 28, 2018, the Estate sent a cease and desist letter to Avec Vous LLC dba Norma Jean Pilates. The matter was resolved through a settlement agreement and Avec Vous agreed to cease use of images of Marilyn Monroe. | Supp. Clarke Decl. at ¶9. |

**Movants' Response:**

Disputed to the extent that the fact cited does not establish that any of EMMLLC's purported rights in Monroe are valid, but uncontroverted for purposes of this motion.

| | |
|---|---|
| 148.       In instances where third parties have attempted to register trademarks which incorporate the Marilyn Monroe name, variations thereof, or other indicia of her persona, those applications and/or registrations have been challenged either by the United States Patent & Trademark Office ("USPTO") or by the Estate or its predecessors. As such, applications and/or registrations which incorporate the Marilyn Monroe, variations thereof, or other indicia of her persona filed by an entity other than the Estate are regularly canceled or lapsed. | *See* Exhibit G to the Goodheart Declaration (Dkt. 368-7); Exhibit G to the Harley Declaration (Dkt. 371-7); *see also* Supp. Durham Decl. at ¶¶5-7, 9, 11-28. |

**Movants' Response:**

Disputed. The evidence cited fails to account for each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7). For example, EMMLLC fails to provide any evidence addressing or refuting the following registrations:

1. the trademark for "MARILYN FOREVER BLONDE" (SN 78853982), Page 5—this mark is still live. See Goodheart Supp. Decl. ¶ 5.
2. the trademark for "HEPBURN MONROE" (SN 85822044), Page 2—this mark is still live. See Goodheart Supp. Decl. ¶ 6.
3. the trademark for "DIAMONDS ARE A GIRLS BEST FRIEND" (SN 78366026), Page 12—this mark is still live. See Goodheart Supp. Decl. ¶ 7.
4. the trademark for "NORMA JEANE" (SN 78136401), Page 13
5. the trademark for "NORMA JEANE" (SN 77956962), Page 14—this mark is still live. See Goodheart Supp. Decl. ¶ 8.
6. the trademark for "NORMA JEANE" (SN 77676913), Page 15
7. the trademark for "SOME LIKE IT HOT" (No. 005799879), Page 19
8. the trademark for "ALL ABOUT EVE" (SN 77907093), Page 23
9. the trademark for "ASPHALT JUNGLE" (SN 78483943), Page 24
10. the trademark for Monroe's stylized signature (SN 73468582), Page 25

Regardless of whether or not each of the registrations cited in Exhibit G to the Goodheart Declaration (Dkt. 368-7) and Exhibit G to the Harley Declaration (Dkt. 371-7) are currently live, these registrations still demonstrate that third parties have used trademarks relating to Monroe in commerce.

| | |
|---|---|
| 149.    The Estate and its predecessors have meticulously maintained its trademark registrations for the Marilyn Monroe name, variations thereof, or other indicia of her persona by filing regular affidavits of use with accompanying specimens of products with the USPTO. | Supp. Durham Decl. at ¶¶31-50. |

**Movants' Response:**

Disputed. The evidence cited does not support the fact asserted to the extent that it fails to establish that EMMLLC owns any registered trademark in Monroe's persona or that any of EMMLLC's registered marks are valid.

| | |
|---|---|
| 150.    The Estate and its predecessors and have regularly enforced its rights against unauthorized uses of the Marilyn Monroe's name and image. | Supp. Durham Decl. at ¶54. |

**Movants' Response:**

Disputed. EMMLLC has failed to turn over a single cease and desist letter sent prior to 2011. *See* ¶ 41. The only evidence of any cease and desist letters sent by EMMLLC's predecessors is the one that they sent to AVELA's licensee in 2006. *See* ¶ 46. EMMLLC cites to four "numerous" lawsuits beginning in 2005, but in most of these cases courts found that EMMLLC's predecessors did not even own the rights they sought to enforce. *See Milton H. Greene Archives, Inc.*, 692 F.3d 983; *Shaw,* 486 F. Supp. 2d 309 (finding "Marilyn Monroe, LLC" did not own the right of publicity in Monroe CMG Worldwide, Inc. sought to enforce in the transferred case *CMG Worldwide, Inc. v. Bradford Licensing Assocs.*, No. 105CV-00423- DFH-TAB). EMMLLC cites to *CMG Worldwide, Inc. v. Upper Deck Co.*, No. 1:08-CV-761-RLY-JMS, 2008 WL 4690983 (S.D. Ind. Oct. 22, 2008) as purported evidence of its predecessor's "enforcement" efforts but this case involved baseball players, not Monroe.

| | |
|---|---|
| 151.    Leo Valencia has testified that he understands that an "estate" can only include blood relatives of the decedent. | Supp. Durham Decl.    at ¶52, Ex. YY at 75:18 to 76:6. |

| **Movants' Response:** | |
|---|---|
| Disputed that this statement is material and relevant, but uncontroverted for purposes of this motion. | |
| 152.　　AVELA, XOX, Leo Valencia, nor VIFA have produced royalty reports from its purported licensee, Dragonfly Clothing. | *See* Supp. Durham Decl. at ¶53. |

| **Movants' Response:** |
|---|
| Disputed. AVELA produced royalty reports from Dragonfly Clothing in this litigation. *See Harley Supp Decl.* ¶ 3, Exhibit A. These royalty reports demonstrate Dragonfly was selling AVELA's Monroe products beginning in 2005. |

Dated: August 3, 2018

Respectfully Submitted,
By: /s/ Duane M. Harley
Duane Harley
D HARLEY, P.C.

*Attorneys for A.V.E.L.A., Inc., X One X Movie Archive, Inc., and Leo Valencia*