UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

A.V.E.L.A., INC.,

                                    Plaintiff,

            v.

THE ESTATE OF MARILYN MONROE, LLC, *et al.*,

                                    Defendants.

------------------------------------------------------------X

THE ESTATE OF MARILYN MONROE, LLC,

                                    Counterclaimant,

            v.

A.V.E.L.A., INC.,

                                    Counter-Defendant,

LEO VALENCIA, IPL, INC.,
X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

                                    Third-Party Defendants.

------------------------------------------------------------X

X ONE X MOVIE ARCHIVES INC.,
V. INTERNATIONAL FINE ARTS PUBLISHING,
INC.,

                                    Counterclaimants,

            v.

THE ESTATE OF MARILYN MONROE, LLC,
AUTHENTIC BRANDS GROUP, LLC,
JAMES SALTER,

                                    Counter-Defendants.

------------------------------------------------------------X

12 Civ. 4828 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

In what is becoming an annual tradition, the Court here resolves the latest claims in the long-running battle among multiple parties asserting multiple claims to the intellectual property rights of Marilyn Monroe. After a trilogy of decisions resolved the parties' various motions to dismiss, this litigation progressed to discovery and, now, to cross-motions for summary judgment. Additionally, the Court has been asked to resolve the parties' disputes as to the admissibility of expert testimony provided by the Estate of Marilyn Monroe, LLC (the "Monroe Estate" or the "Estate").

In its first opinion, *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196 (S.D.N.Y. 2015) ("*AVELA I*"), this Court granted in part and denied in part the motions of X One X Movie Archives, Inc. ("X One X") and V. International Fine Arts Publishing, Inc. ("VIFA," and together with X One X, Leo Valencia, IPL, Inc., and A.V.E.L.A., INC., the "AVELA Parties") to dismiss the First Amended Counterclaim filed by the Monroe Estate. After the Court issued *AVELA I*, the AVELA Parties filed their respective answers to the First Amended Counterclaim. They also brought counterclaims of their own against the Monroe Estate and related parties Authentic Brands Group LLC ("ABG"), and James Salter ("Salter," and together with the Monroe Estate and ABG, the "Estate Parties").

In response, the Estate Parties moved to dismiss X One X's and VIFA's counterclaims. In *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461 (S.D.N.Y. 2017) ("*AVELA II*"), the Court dismissed without

prejudice several of X One X's and VIFA's claims. X One X and VIFA then elected to replead several of their dismissed counterclaims. These efforts begat *A.V.E.L.A., Inc.* v. *Estate of Marilyn Monroe, LLC*, No. 12 Civ. 4828 (KPF), 2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) (*"AVELA III"*), where the Court dismissed the amended counterclaims with prejudice.

The upshot of the three decisions is that all parties to this action have some claims remaining. The Estate Parties' remaining claims are Counts I, II, III, IV, and VII of the Estate's First Amended Counterclaim, which encompass claims for trademark infringement, trademark dilution, and intentional interference with prospective economic advantage. The AVELA Parties' remaining claims are Counts II, III, V, and VI of A.V.E.L.A.'s Complaint; Counts I, II, and V of VIFA's Answer to the First Amended Counterclaim and First Amended Counterclaims; and Counts I and II of X One X's Answer to the First Amended Counterclaim and Related Second Amended Counterclaims, which in the aggregate encompass requests for a declaration of non-infringement as well as claims for trademark cancellation, tortious interference with a contractual relationship, and intentional interference with a prospective economic advantage.

As detailed in the remainder of this Opinion, the Estate Parties are successful in part in their motion, and the AVELA Parties are unsuccessful. The Court concludes easily that genuine disputes of material fact remain as to the Estate Parties' federal and state trademark claims, as well as their claim for intentional interference with prospective economic advantage. However,

the Court finds that the Estate Parties are entitled to summary judgment on their claim that two of the AVELA Parties are in fact alter egos. Further, the Court finds that the Estate Parties are entitled to summary judgment as to the AVELA Parties' claims for trademark cancellation, tortious interference with contract, and intentional interference with prospective economic advantage. Conversely, the Court finds that the AVELA Parties are not entitled to summary judgment as to the remaining claims of laches, copyright law, the First Amendment, or the fair use doctrine. Finally, the Court denies the AVELA Parties' motion to exclude expert testimony.

## BACKGROUND[1]

The Court discusses the underlying facts only to the extent necessary to resolve the instant motions, as the Court has engaged in a disquisition of this

---

[1] The facts alleged herein are largely drawn from the Estate Parties' Local Rule 56.1 Statement of Undisputed Facts ("Estate 56.1") (Dkt. #340), and the AVELA Parties' Local Rule 56.1 Statement of Undisputed Facts (AVELA 56.1) (Dkt. #372). Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein. Where a fact stated in Defendant's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by Plaintiff, the Court finds such fact to be true. *See* Local Civil Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be submitted by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

For convenience, the parties' briefs in connection with the Estate Parties' Motion for Summary Judgment are referred to as "Estate Br. (Dkt. #335); "AVELA Opp." (Dkt. #373); and "Estate Reply" (Dkt. #390). The parties' briefs in connection with VIFA's and AVELA's motions for summary judgement are referred to as "AVELA Br." (Dkt. #357); "VIFA Br." (Dkt. #362); "Estate Opp." (Dkt. #383); and "AVELA Reply" (Dkt. #391). The parties' briefs in connection with AVELA's motion to exclude expert testimony are referred to as "AVELA Expert Br." (Dkt. #355) and "Estate Expert Opp." (Dkt. #358).

case's history in its prior opinions.  *See AVELA III,* 2018 WL 1273343, at *1-3,

*AVELA II,* 241 F. Supp. 3d at 468-70; *AVELA I,* 131 F. Supp. 3d at 200-02.

## A.    Factual Background

### 1.    The Parties

#### a.    The AVELA Parties

Leo Valencia is in the business of licensing images and other indicia of

celebrities, including Marilyn Monroe, to entities for use in connection with

merchandise such as apparel and glassware.  *AVELA I,* 131 F. Supp. 3d at

201-03.  Valencia owns a collection of entities, including two Nevada-based

companies, A.V.E.L.A., Inc. ("AVELA") and X One X.  (AVELA 56.1 ¶ 5).  The

Estate Parties claim that he also has an interest in IPL, Inc. ("IPL"), a Delaware

limited liability company ("LLC").  (Estate 56.1 ¶ 142).

VIFA is "a corporation duly organized and existing under the laws of

the State of California with its principal place of business … [in] Carlsbad,

California[.]"  (AVELA 56.1 ¶ 3).  It operates as a licensing agent for AVELA.

(Estate 56.1 ¶¶ 133-34).

#### b.    The Estate Parties

The Monroe Estate is a Delaware LLC with its principal place of

business in New York City.  (AVELA 56.1 ¶ 6).  The Monroe Estate is a brand

development and licensing company that maintains what it claims to be an

exclusive portfolio of intellectual property rights related to Marilyn Monroe

and, more specifically, a number of federal trademark registrations that are

claimed to be valid and subsisting in full force, incorporating the words

"Marilyn" or "Marilyn Monroe" (collectively, the "Monroe Marks"). *AVELA I,* 131 F. Supp. 3d at 201. ABG is a separate Delaware LLC, and Salter is the Chief Executive Officer of both ABG and the Monroe Estate. *AVELA II,* 241 F. Supp. 3d at 469.

### 2.    The Estate's Marks

In its prior opinions, the Court has provided an exhaustive list of the trademarks, including some that the Monroe Estate alleges have become statutorily incontestable (the "Incontestable Marks"). *AVELA I,* 131 F. Supp. 3d at 201 (internal citations omitted). The Estate owns twelve separate trademark registrations, including design marks for stylized versions of Monroe's signature in perfume; watches; posters and greeting cards; clothing; eyewear; collector plates; towels; porcelain dolls; and wine. (Estate 56.1 ¶¶ 48-56). The Estate owns wordmarks in "Marilyn Monroe" that apply to a broader class of goods including all clothing items. (*Id.* at ¶¶ 61-65). The Estate also owns a wordmark to "Marilyn" for wine. (*Id.* at ¶¶ 69-73).

As this Court previously observed:

> Aside from the registered marks, the Monroe Estate has applied for a number of trademarks and service marks incorporating the words "Marilyn Monroe" or the design of a lip print. The Monroe Estate also claims substantial common law rights in the "Marilyn," "Marilyn Monroe," and lip print design marks (together with the registered marks, the "MONROE Marks"). Separately, the Monroe Estate asserts that it is "the exclusive owner of those rights in and to Marilyn Monroe's identity, persona, name and likeness arising under common law and/or statute[.]" The First Amended Counterclaim collectively refers to the MONROE Marks and the Monroe Estate's interests in Monroe's identity, persona, name, and likeness as the

"Marilyn Monroe Intellectual Property," a convention
the Court adopts for purposes of this Opinion.

*AVELA I,* 131 F. Supp. 3d at 201.

### 3.    The Alleged Infringement

While the procedural background of this case evokes the most abstruse
law school examinations, the core factual dispute is quite simple:  The parties
contest the validity of the Estate's claim to the Marilyn Monroe Intellectual
Property.  In their amended pleadings, the Estate Parties claim that the AVELA
Parties have no rights to any of the Marilyn Monroe Intellectual Property, and
yet continue to license, design, manufacture, and distribute merchandise,
including t-shirts, glassware, and posters, that incorporates said Intellectual
Property.  (Estate Br. 2-3).  These products compete with the products
designed and distributed by the Monroe Estate and its licensees.  (*Id.*).  Thus,
in the Monroe Estate's telling, the case is a simple story of a legitimate
trademark holder forced to defend its rights against an intellectual property
pirate and his armada of sham companies.  The Monroe Estate asks the Court
to recognize its trademarks and to hold the AVELA Parties responsible for
stealing its intellectual property.

The AVELA Parties tell a different story:  They allege that the Monroe
Estate's trademarks are invalid; that the claims to the Marilyn Monroe
Intellectual Property are frivolous; and that Estate has interfered with their
business relationships through the strategic use of litigation.  In particular,
the AVELA Parties allege that the Estate has no connection to the actual
person of Marilyn Monroe (AVELA 56.1 ¶¶ 7-30), and that the trademarks are

7

mere litigation stratagems designed to prevent competing businesses from entering the market for Marilyn Monroe products. (AVELA Br. 1-2). Rather than a trademark holder fighting to protect its property, the AVELA Parties portray the Monroe Estate as a pretender to the throne that has hoodwinked companies, consumers, and the Court. The Court is left to determine whether a reasonable jury would credit either of these accounts on the record developed during discovery.

### 4. The Expert Reports

Though the parties' expert reports are the subject of a separate motion to exclude, the results of the reports are also relevant to the issues implicated by the cross-motions for summary judgment. Each side commissioned expert reports to test the possibility of consumer confusion. The Estate Parties hired Hal Poret, a survey expert, to examine whether consumers believed that Marilyn Monroe or the Estate endorsed a shirt made by AVELA. (Estate 56.1 ¶¶ 248-49). The resulting Poret Report analyzes survey responses from consumers in a mall about one of three shirts: an AVELA shirt depicting Marilyn Monroe, a shirt depicting a non-famous woman, and a shirt depicting Benjamin Franklin. (*Id.* at ¶ 249). Respondents were asked to assess who produced the shirt and whether permission was required. (*Id.* at ¶ 250).

Those respondents who were asked about the shirts with a non-famous woman and with Benjamin Franklin were considered control groups. (Dkt. #338-15 (Poret Report) at 9). These control groups measured how many respondents wrongly believed that the non-Monroe shirt implied Monroe's

endorsement, and how many respondents wrongly believed that the Franklin shirt had been endorsed by Franklin or his successors. (*Id.* at 9-12). The Poret Report concluded that when the former control group was taken into account the level of confusion was 23.4%, and when both control groups were taken into account the level of confusion was 20.5%.

The AVELA Parties hired their own survey expert, Howard Marylander, to produce a report on the subject of consumer confusion. (AVELA 56.1 ¶ 108). The resulting Marylander Report uses a similar survey method to examine the likelihood of consumer confusion. (Dkt. #371-17 (Marylander Report)). However, Marylander used a different garment for the control group, a shirt with a picture of a woman posed in a similar position to Monroe with the name "Nichole" written near her photo. (*Id.* at 7). The shirts also contained tags (called "hangtags" throughout the Report) with the brand name "Radio Days," which AVELA claims licensees are required to place on their shirts. (*Id.*, Ex. F).

The Marylander Report found that 8% of respondents believed the Monroe shirts carried an endorsement or were affiliated with the holders of her rights, and 8% of the control group respondents believed the same about "Nichole" for the Nichole shirts. (Marylander Report 11-12). From this, Marylander concluded that total consumer confusion was accurately measured as zero. (*Id.* at 11-12).

Each side has also produced a rebuttal report, in which it has identified purported flaws and errors in the other side's survey methodology. (*See* Dkt.

#338-18 (Rebuttal Expert Report of Hal Poret); Dkt. #355-2 (Rebuttal Expert Report of Howard Marylander)).

### 5.  Procedural Developments After *AVELA III*

On March 13, 2018, the Court issued *AVELA III*, which recounts the case's procedural history through that date.  *See* 2018 WL 1273343, at *2-3. In it, this Court granted the Estate Parties' motion to dismiss VIFA's and X One X's alter ego, attempted monopolization, fraud, and tortious interference claims.  *Id.* at *1.  The Court then instructed both sides to proceed with their contemplated motions for summary judgment.  *Id.* at *12.

The Estate Parties filed their motion for summary judgment on May 31, 2018.  (Dkt. #333, 337).  Among other things, they asked for summary judgment on the following claims that they have made against one or more of the AVELA Parties:

(i)    <u>False Association and Unfair Competition Under 15 U.S.C. § 1125(a)</u>:  The Estate Parties allege that the AVELA Parties have used Marilyn Monroe's persona without permission to suggest false endorsement or association, violating § 43(a) of the Lanham Act.

(ii)   <u>Trademark Infringement under 15 U.S.C. § 1114 and Common Law</u>: The Estate Parties allege that their trademarks are entitled to protection, and the AVELA Parties' use of the marks is likely to cause consumers confusion

(iii)  <u>Trademark Dilution under N.Y. Gen. Bus. Law § 360-1[2]</u>: The Estate Parties allege that their marks are famous and distinctive, and the AVELA Parties' use of the mark is likely to dilute their marks quality by blurring or tarnishing it in the eyes of consumers

---

[2]    The Estate Parties move for summary judgment on their dilution clam under New York law, but not under the Lanham Act.  (Estate Br. 23-24).

       (iv)    <u>Unfair Competition under New York Law</u>: The Estate Parties allege that the AVELA Parties' violation of the Lanham Act, as alleged in Count One, was done in bad faith in violation of New York's unfair competition law.

(Estate 56.1 ¶ 22).  Separately, the Estate Parties request summary judgment in their favor as to the AVELA Parties' claims for tortious interference with a contractual relationship and intentional interference with a prospective economic advantage; a finding that IPL and AVELA are alter egos; and summary judgment with respect to AVELA's affirmative defenses and cancellation claims.  (Estate Br. 27-33).  The AVELA Parties filed their joint opposition to the motion on June 29, 2018 (Dkt. #373), and the Estate Parties filed their reply on July 20, 2018 (Dkt. #387).

On June 26, 2018, and June 29, 2018, the AVELA Parties filed their cross-motions for summary judgment.  (Dkt. #361, 362, 369, 370).[3]  While the AVELA Parties have several counterclaims that remain as to the Estate Parties, their briefing does not focus on their claims for tortious interference, but rather is largely limited to requests for declarations that they have not infringed and for trademark cancellation.  (AVELA Br. 5-25; VIFA Br. 6-24).  The AVELA Parties also request summary judgment in their favor on the four claims that are the subject of the Estate Parties' briefing, as well as the Estate Parties' claim for intentional interference with prospective economic advantage.  (*Id.*).  The Estate Parties filed their opposition on July 13, 2018

---

[3]     While the Court has received two motions, one from all the AVELA Parties excluding VIFA and one from VIFA, the briefs complement each other by focusing on different areas and adopting each other's arguments as to the areas on which they do not focus. Therefore, the Court will examine the AVELA Parties' briefing collectively.

(Dkt. #383), and the AVELA Parties filed their reply on August 3, 2018 (Dkt. #390).

## DISCUSSION

### A.    Motions for Summary Judgment Under Rule 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing Anderson).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711

---

[4]    The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. See Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) ... chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party failed to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts*," Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342

(S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d

1295, 1318 (2d Cir. 1990)).

**B.     The Cross-Motions for Summary Judgment**

   **1.     Genuine Disputes of Material Fact Exist as to the AVELA
           Parties' Lanham Act Claims**

      **a.     Applicable Law**

   The Estate Parties bring trademark claims under federal and state law,

and both parties have moved for summary judgment on these claims.  To

begin, the Estate Parties bring a claim for false endorsement under Section 43

of the Lanham Act, which prohibits the use of

> any word, term, name, symbol or any combination
> thereof, or any false designation of origin, false or
> misleading description of fact, or false or misleading
> representation of fact, which — is likely to cause
> confusion, or to cause mistake, or to deceive as to the
> affiliation, connection, or association of such person
> with another person, or as to the origin, sponsorship,
> or approval of his or her goods, services, or commercial
> activities by another person[.]

15 U.S.C. § 1125(a).

   A claim for false endorsement under § 43(a) requires a plaintiff to

demonstrate that the defendant has used the celebrity's "persona without

permission to suggest false endorsement or association." *Bruce Lee Enter.,

LLC* v. *A.V.E.L.A., Inc.* ("*Bruce Lee II* "), No. 10 Civ. 2333 (KMW), 2013 WL

822173, at *19 (S.D.N.Y. Mar. 6, 2013); *see also Beastie Boys* v. *Monster

Energy Co.*, 66 F. Supp. 3d 424, 448-49 (S.D.N.Y. 2014) (discussing the

contours of false endorsement claims); *Burck* v. *Mars, Inc.*, 571 F. Supp. 2d

446, 454 (S.D.N.Y. 2008) (recognizing that § 1125(a) is an "appropriate vehicle

for the assertion of claims of falsely implying the endorsement of a product or service by a real person").  To succeed on a claim for false endorsement, the plaintiff must show that the defendant "'[i] made a false or misleading representation of fact; [ii] in commerce; [iii] in connection with goods or services; [iv] that is likely to cause consumer confusion as to the origin, sponsorship, or approval of the goods or services.'"  *Beastie Boys*, 66 F. Supp. 3d at 448 (quoting *Burck*, 571 F. Supp. 2d at 455).

### b.  Analysis

#### i.  The Estate Parties Are the Rightful Owners of Intellectual Property Rights in the Monroe Persona

Before considering the elements listed in *Burck*, the Court must first decide whether the Estate Parties actually own any rights to Monroe's name, likeness, and persona (the "Monroe persona").  The Court held in *AVELA I* that the Estate Parties had adequately alleged ownership of rights to the Monroe persona.  *AVELA I*, 131 F. Supp. 3d at 206-08.  Given the procedural context, however, the Court made no findings as a matter of law.  The Court now concludes on this record that the Estate has established that it owns the rights to the Monroe persona.  In so doing, the Court rejects the AVELA Parties' arguments that (i) the rights do not exist and (ii) the Estate's decades of removal from Ms. Monroe prevents it from bringing these claims.

The Court begins with a discussion of why these rights exist.  The AVELA Parties claim first that the Estate Parties cannot own rights to Ms. Monroe's persona under the Lanham Act, because "§ 43(a) 'persona' rights did

not exist at the time of Monroe's death." (VIFA Br. 7). As the Estate Parties point out, this claim makes little sense, given that the Lanham Act came into existence in 1946. (Estate Opp. 7). *See also Beastie Boys*, 66 F. Supp. 3d at 445-47. The AVELA Parties counter with several cases suggesting the inability of deceased celebrities to pass on unrecognized rights of publicity, including two involving Ms. Monroe herself. *See Milton H. Greene Archives, Inc.* v. *Marilyn Monroe LLC,* 692 F.3d 983 (9th Cir. 2012); *Shaw Family Archives, Ltd.* v. *CMG Worldwide, Inc.*, 486 F. Supp. 2d 309 (S.D.N.Y. 2008). Much of their discussion, however, covers the same path the Court traversed in *AVELA I*, where it held that a false endorsement claim under the Lanham Act was distinct from a claim for violation of a right of publicity. 131 F. Supp. 3d at 204-05.

In *AVELA I*, the Court rejected the notion that the viability of a false endorsement claim on behalf of a deceased celebrity is "questionable,'" and followed the precedent of *Bruce Lee Enterprises, LLC* v. *A.V.E.L.A., Inc.* ("*Bruce Lee I*"), and its predecessors in determining that the Lanham Act could cover claims regarding false endorsement involving deceased celebrities. No. 10 Civ. 2333 (LTS), 2011 WL 1327137, at *5 (S.D.N.Y. Mar. 31, 2011) (collecting cases). The Court reaffirms its prior holding that the Lanham Act covers false endorsement claims and the owner of rights can assert them against infringing parties.

The AVELA Parties next suggest that the lack of a secondary meaning associated with the Monroe persona forecloses the possibility that the Estate

Parties could hold rights under the Lanham Act.  (VIFA Br. 8-15).  This argument again misperceives the underlying issue:  Secondary meaning concerns whether a mark has acquired meaning that is primarily identified with the maker of the product rather than its use.  *See*, *e.g.*, *LeSportsac, Inc.* v. *Kmart Corp.,* 754 F.2d 71, 78 (2d Cir. 1985) (holding that secondary meaning exists "when the purchasing public associates a [product's design] with a single producer or source rather than just with the product itself").  A plaintiff must demonstrate secondary meaning to prove trademark infringement in certain contexts, but such proof is not necessary for a false endorsement claim.  *See Kregos* v. *Associated Press*, 937 F.2d 700, 710 (2d Cir. 1991) ("The fact that a proprietor fails to show sufficient secondary meaning in a mark to establish an infringement claim does not preclude his assertion of some other Lanham Act claim such as false designation of origin or false description.").

Notably, a false endorsement claim is an argument that the specific products in question falsely indicate endorsement by, or association with, an individual who has not granted this permission.  *See, e.g., Trump* v. *Pavion, Ltd.*, No. 89 Civ. 5453 (TPG), 1991 WL 167964, at *5 (S.D.N.Y. Aug. 22, 1991) ("[T]he specific question is whether consumers will be confused into believing that a lipstick labelled IVANA is endorsed by, or otherwise associated with, Ivana Trump.").  The secondary meaning analysis is inapt.  The AVELA Parties raise arguments related to the widespread use of Monroe's image during her lifetime and after her death, and the correlative absence of false endorsement claims during those periods.  (VIFA Br. 10-15).  But while it is true that third-

party usage may have relevance in determining whether a consumer is likely to be confused as to whether a product depicting Marilyn Monroe suggests endorsement by or association with Ms. Monroe or the Estate, such usage does not foreclose the possibility that such rights exist or that the Estate owns them.

In the alternative, the AVELA Parties suggest that, even if trademark rights to the Monroe persona could exist, the Estate does not own them. Here, the AVELA Parties argue that the Estate "is not Monroe's family, heir, estate, or assignee — the only entities courts have ever allowed to bring a § 43(a) claim on behalf of a deceased celebrity." (AVELA Reply 4 (internal citations omitted)). They argue that because there is no evidence that Ms. Monroe's will explicitly passed any intellectual property rights to anyone, the Estate cannot claim ownership now.

The AVELA Parties cite heavily to the *Shaw* and *Greene* decisions, which held that the Estate's predecessor, Marilyn Monroe LLC, held no state-law right of publicity. *See Greene,* 692 F.3d 983; *Shaw*, 486 F. Supp. 2d 309. But the Court has already addressed these issues, along with the broader issue of the distinction between a right of publicity and a claim for false endorsement, in *AVELA I.* 131 F. Supp. 3d at 206-09. Seeking a different answer than the one this Court previously gave, the AVELA Parties recount that a sister court has held that an action for false endorsement cannot succeed absent a right of publicity. (AVELA Opp. 7 (citing *Avalos* v. *IAC/Interactivecorp.*, No. 13 Civ. 8351 (JMF), 2014 WL 5493242 (S.D.N.Y. Oct. 30, 2014))). However, in *Avalos,*

the plaintiff raised not a false endorsement claim, but rather a "reverse passing off" claim related to the plaintiff's photos of a model who was not a party to the litigation. 2014 WL 5493242, at *4. The court there held that even if the complaint in *Avalos* were "read to plead a claim for false endorsement," such a claim could not succeed, as the plaintiff did not make a claim to any ownership of the model's rights to her image and persona. *Id.* While some language in the opinion suggests there is a connection between rights of publicity and a false endorsement claim, *Avalos* nowhere holds that the false endorsement claim requires a right of publicity. The Court will not revisit its holding in *AVELA I* that a false endorsement claim is distinct from a right of publicity claim and can survive in the absence of one.

The Estate's argument for ownership is straightforward. The rights to Marilyn Monroe's persona began with her. At her death, 75% of the residue of her estate was passed down to her acting teacher, Lee Strasberg, which then passed to his wife, Anna Strasberg, upon his death. (Estate 56.1 ¶¶ 27-28). The remaining 25% went to Marianna Kris, the late actress's psychiatrist, who passed her portion to the Anna Freud Center when she died in 1980. *(Id.* at ¶¶ 29-31). Ms. Strasberg became the administrator of the Monroe estate in 1989, and the estate closed in 2001. (*Id.*). At that point, the New York Surrogate Court authorized the transfer of all remaining assets of the estate to Marilyn Monroe LLC, a company formed to manage the intellectual property belonging to Ms. Monroe that divided ownership between Ms. Strasberg and the Freud Center in accordance with the divisions in Ms. Monroe's will. (Dkt.

#355-6 (Declaration of Anna Strasberg), Ex. C). The Estate Plaintiff here

acquired a controlling interest in Marilyn Monroe LLC, including Ms. Monroe's

name, likeness, voice, and rights of publicity, in an Asset Purchase Agreement

dated December 30, 2010. (Estate 56.1 ¶ 24). Therefore, an unbroken chain

of title extends from the decedent to the Estate. There is no genuine factual

dispute as to these events.

The AVELA Parties argue that prior cases involving the persona rights of

deceased celebrities have

> always been brought by that celebrity's family, direct
> heirs, or actual estate. See [*Pirone* v. *MacMillan, Inc.*,
> 894 F.2d 579, 584 (2d Cir. 1990)] (Babe Ruth's heirs —
> his daughters — brought a § 43(a) claim); *see also*
> *Erickson Beamon Ltd.* v. *CMG Worldwide, Inc.*, No. 12
> Civ. 5105 NRB, 2013 WL, at *1 (S.D.N.Y. Sept. 25,
> 2013) (Bette Davis's adopted son brought a § 43(a)
> claim as the co-executor of her estate); [*Astaire* v.
> *McKenzie*, No. 10 Civ. 4305 (MGC), 2010 WL 2331524,
> at *1 (S.D.N.Y. June 9, 2010)] (Fred Astaire's widow
> brought a § 43(a) claim); *Bruce Lee [II]*, 2013 WL
> 822173, at *22 (finding a genuine issue of material of
> fact existed on a § 43(a) claim brought by an entity
> wholly owned and set up by Bruce Lee's wife and
> daughter); *Brooks ex rel. Estate of Bell* v. *The Topps Co.*,
> No. 06 Civ. 2359, 2007 WL 4547585, at *1 (S.D.N.Y.
> Dec. 21, 2007) (James Brooks' daughter brought a
> § 43(a) claim); *Ferrer* v. *Maychick*, 69 F. Supp. 2d 495,
> 98 (S.D.N.Y. 1999) (Audrey Hepburn's son brought a
> § 43(a) claim).

(VIFA Br. 18-19). While this list demonstrates that the claims of deceased

celebrities for false endorsement are perhaps less "questionable" than the

AVELA Parties suggest (*see id.*), it does not offer any compelling justification

for finding that the Estate Parties do not own Ms. Monroe's persona. Indeed,

in *Bruce Lee I*, it was not Bruce Lee's nuclear family, but a corporation formed

by his heirs, that was permitted to pursue the claims. 2011 WL 1327137, at *1. The Court sees no reason why, if that corporation had been purchased by others, the claims would disappear, and the AVELA Parties offer none. Here, the Estate Parties can similarly trace their ownership to the deceased celebrity. The Court finds no genuine dispute of material fact as to whether any intellectual property rights that belonged to Ms. Monroe at the time of her death now belong to the Estate.

### ii. Genuine Disputes of Material Fact Remain as to the Likelihood of Confusion

The Court can now proceed to analyze the factors set forth in *Burck*. To determine infringement, the Court must examine whether "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." *Naked Cowboy* v. *CBS*, 844 F. Supp. 2d 510, 516 (S.D.N.Y. 2012). This question is usually reserved for a jury, as it requires a fact intensive examination of "the probable reactions of prospective purchasers of the parties' goods." *Pirone*, 894 F.2d at 584. However, a court may resolve the issue "as a matter of law where 'the court is satisfied that the products or marks are so dissimilar that no question of fact is presented.'" *Id.*

To prevail on their motion, the Estate Parties must demonstrate that a reasonable jury would always find that AVELA's products mislead or confuse consumers into believing that Ms. Monroe or her Estate endorsed the products. *See Bruce Lee II,* 2013 WL 822173, at *19. To prevail on their

cross-motion, the AVELA Parties must demonstrate that no reasonable jury could find that consumers believe Ms. Monroe, or the holders of the rights to Ms. Monroe's persona, endorsed the product. Neither side has made the required demonstration. Viewing the evidence in the light most favorable to the Estate, the marks on the AVELA Parties' products suggest to consumers that individuals holding the rights to Ms. Monroe have approved the goods. Viewing the evidence in the light most favorable to AVELA, consumers merely consider the products as goods carrying the depiction of a famous actress.

In trademark cases, the Second Circuit has laid out an eight-part test for determining consumer confusion (known as the "*Polaroid* factors"): (i) the strength of plaintiff's mark; (ii) the similarity of the parties' marks; (iii) the proximity of the parties' products in the marketplace; (iv) the likelihood that the plaintiff will "bridge the gap" between the products; (v) actual consumer confusion between the two marks; (vi) the defendant's intent in adopting its mark; (vii) the quality of the defendant's product; and (viii) the sophistication of the relevant consumer group. *Playtex Prods., Inc.* v. *Georgia-Pac. Corp.*, 390 F.3d 158, 162 (2d Cir. 2004) (citing *Polaroid Corp.* v. *Polaroid Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)). However, the Court finds persuasive the observation in *Bruce Lee II* that "many of the Polaroid factors are inapplicable in a celebrity endorsement case." 2013 WL 822173, at *20. The Court thus modifies its analysis of the *Polaroid* factors to focus on

> the level of recognition [Marilyn Monroe] has among purchasers of AVELA's t-shirts, the similarity between [Marilyn Monroe's] likeness and the likeness used by AVELA, the level of actual consumer confusion

> regarding who endorsed the t-shirts, AVELA's intention in selecting [Marilyn Monroe's] image, the quality of AVELA's products, and the sophistication of t-shirt purchasers.

*Id.*

The Estate Parties offer several pieces of evidence to demonstrate that there is genuine consumer confusion as to whether Ms. Monroe or the Estate has endorsed their product. They cite complaints from consumers to the Estate regarding products that the Estate Parties believe were created by AVELA. (Estate 56.1 ¶ 244). They point to the Poret Report, which found consumer confusion in excess of 20%. (*Id.* at ¶ 251). They point out that a number of the allegedly infringing images also include the name Marilyn. (*Id.* at ¶ 213). These factors strongly suggest that the AVELA shirts are using a very similar likeness of Ms. Monroe and selected her image with the intention of profiting from her celebrity. Moreover, the Estate Parties argue that the quality of the AVELA products is inferior, as they contain images of Ms. Monroe with tattoos, deceased, or with sexually suggestive slogans, images of which the Estate would not have approved. (*Id.* at ¶ 258). Finally, they argue that the t-shirt market is a casual one, where customers are unlikely to be particularly discerning in examining the shirts to determine whether the AVELA shirts have the Estate's endorsement. (Estate Br. 20).

The AVELA Parties proffer their own expert report, the Marylander Report, which, they argue, better simulated market conditions by using hangtags on the t-shirts with the term "Radio Days." (AVELA 56.1 ¶¶ 67, 111). The AVELA Parties state that they require licensees selling their shirts

to use these tags prominently.  (*Id.* at ¶ 68).  The Marylander Survey found that a baseline of about 8% of individuals think that any shirt with an image is endorsed by the depicted person, and that only 8% of the Monroe respondents thought AVELA's shirts carried an endorsement from Monroe or her estate.  (*Id.* at ¶¶ 113-17).  Therefore, they argue, there was *no* consumer confusion as to whether AVELA's shirts were falsely suggesting Monroe's endorsement, let alone the Estate's.

The AVELA Parties' discussion of secondary meaning is more relevant here.  The AVELA Parties point to precedents, including a much-discussed case involving Princess Diana, where a court rejected the idea that the unlicensed use of a celebrity's name and image could, on its own, violate the Lanham Act.  (AVELA Opp. 5 (citing *Cairns* v. *Franklin Mint Co.*, 107 F. Supp. 2d 1212 (C.D. Cal. 2000))).  In the *Cairns* case, the court relied in part on the extensive use of Princess Diana's image during her lifetime in rejecting a § 43(a) claim.  *See* 107 F. Supp. 2d at 1217 ("It is clear that Princess Diana knew of the vast commercial uses of her image….  Although Princess Diana was selective in choosing charities to endorse, there is no evidence to suggest that she attempted to curb the sale of consumer products bearing her likeness.").  The court reasoned that the ubiquity of Princess Diana's image in her lifetime suggested that customers could not reasonably believe that images of her could serve a source-identifying function.  The AVELA Parties raise similar claims regarding the extensive publication of Monroe's image during her lifetime and after her death to suggest that it is unreasonable for the

Estate to claim that her image implies her endorsement. (AVELA 56.1 ¶¶ 32-40). As for the Estate Parties' other claims, the AVELA Parties contend that the quality differences are a matter of opinion: "Arguing that such artwork diminishes a product's quality is merely a judgment that people who have tattoos or smoke are inferior." (AVELA Opp. 19).

The Estate Parties reply with criticism of the Marylander Report, noting, among other points, that evidence produced by the Estate shows that the hangtags were not prominently affixed to the shirts. (Estate 56.1 ¶ 254.d). The Estate Parties also suggest that *Cairns* is not relevant, as they have more vigorously pursued claims regarding the unlicensed use of Ms. Monroe's image than Diana's estate. (Estate Opp. 17-18).

The parties' debates over expert reports, the ubiquity of Ms. Monroe's image, and the relative merits of tattoos, hammer home the point that the reasonable consumer standard is a fact-intensive one. The Court cannot wholly credit the facts as either side presents them. Viewing both the surveys and the products that each side has identified, the Court concludes that a reasonable jury could find that AVELA's products confuse consumers into believing they were endorsed by Ms. Monroe or the Estate, and that it could find that Ms. Monroe's ubiquity and the passage of time would lead consumers to conclude that neither Monroe nor the Estate were in any way connected to the items. Summary judgment is thus not appropriate.

## 2. Genuine Disputes of Material Fact Remain Regarding the Estate Parties' Claim for Unfair Competition Under New York Law

### a. Applicable Law

As the Court discussed in *AVELA I*, the standard for unfair competition under New York law is the same as the standard for a false endorsement claim under the Lanham Act, but it contains an additional requirement that a plaintiff demonstrate bad faith on the part of the defendant. *See* 131 F. Supp. 3d at 209.

### b. Discussion

Just as summary judgment is not appropriate on the Estate Parties' false endorsement claim because of the disputes over customer confusion, so too is summary judgment inappropriate on their claim for unfair competition under New York law. To be clear, the Estate Parties provide ample evidence of bad faith, pointing to the web of companies that Mr. Valencia has created to evade scrutiny, the judicial sanctions against Mr. Valencia, and the awareness by Mr. Valencia and those around him of the Estate's claim to rights in Monroe. (Estate 56.1 ¶¶ 218-34). And the AVELA Parties response rings hollow: They argue principally that Mr. Valencia and AVELA began using Ms. Monroe's image before the creation of the Estate, with products dating back to 1985. (AVELA Opp. 18). As the Estate Parties note, the AVELA Parties have produced no support for Mr. Valencia's statement that his companies' sales go that far back. (Estate Reply 4). Indeed, a court in the United Kingdom examining AVELA's filings in similar infringement litigation regarding the

image of Betty Boop, addressed this issue and found: "The 1985 date is untrue, and Mr. Valencia knows he cannot justify it." *Hearst Holdings Inc* v. *AVELA Inc,* [2014] EWHC (Ch) 439, 2014 WL 640415.

The bad-faith behavior of the AVELA Parties is clear from their conduct throughout the litigation, extending to the present filings that repeat the unsupported statements regarding a 1985 commencement date. However, absent a showing that the products actually infringe on the Estate Parties' rights by creating consumer confusion as to the sponsorship of AVELA's products, AVELA's actions cannot constitute unfair competition. The Estate Parties' motion is denied.

### 3. The Estate Parties Are Entitled to Summary Judgment on the AVELA Parties' Trademark Cancellation Claims

#### a. Applicable Law

The Estate Parties fare better with their challenges to certain counterclaims and affirmative defenses raised by the AVELA Parties. In their amended pleadings, VIFA and X One X raise claims for cancellation of the Estate's trademark registrations. They claim the marks should be cancelled due to either "lack of distinctiveness" or "functionality." In *AVELA II*, this Court determined it would interpret the lack of distinctiveness claim as a claim that the marks were generic. 241 F. Supp. 3d at 476-79. It then set forth the standard for determining if a mark had become generic:

> Generic marks ... 'consist[] of words that identify the type or species of goods or services to which they apply, [and that] are totally lacking in distinctive quality.'" *KatiRoll Co.* v. *Kati Junction*, Inc., No. 14 Civ. 1750 (SAS), 2015 WL 5671881, at *3 (S.D.N.Y. Sept. 25,

2015) (quoting *TCPIP Holding Co.* v. *Haar Commc'ns, Inc.*, 244 F.3d 88, 93 (2d Cir. 2001)). "Generic marks tend to be nouns that refer to an entire class of products." *Thoip* v. *Walt Disney Co.*, 736 F. Supp. 2d 689, 703 (S.D.N.Y. 2010). Examples of generic marks include: "Shampoo," "automobile," and "[a]spirin." *Classic Liquor Importers, Ltd.* v. *Spirits Int'l B.V.*, 201 F. Supp. 3d 428, 442-43 (S.D.N.Y. 2016); *KatiRoll*, 2015 WL 5671881, at *3. Because generic trademarks "are not at all distinctive," they "are not protectable under any circumstances." *Star Indus., Inc.* v. *Bacardi & Co.*, 412 F.3d 373, 385 (2d Cir. 2005); *accord Genesee Brewing Co.* v. *Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) ("Generic marks are never entitled to trademark protection.").

*Id.* at 477. And on the related issue of trademark functionality, the Court identified the two versions of functionality, utilitarian and aesthetic.

15 U.S.C. § 1064(3) provides that a trademark may be cancelled "[a]t any time if" it "is functional." *See Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 218-19 (2d Cir. 2012) ("[A]spects of a product that are 'functional' generally 'cannot serve as a trademark.'" (quoting *Qualitex Co.* v. *Jacobson Prod. Co.*, 514 U.S. 159, 165 (1995))). There are two types of trademark functionality: "[i] "'traditional' or 'utilitarian' functionality, and [ii] 'aesthetic' functionality." *Christian Louboutin,* 696 F.3d at 219. "[A] product feature is considered to be 'functional' in a utilitarian sense if it is [i] 'essential to the use or purpose of the article,' or if it [ii] 'affects the cost or quality of the article.'" *Id.* (footnote omitted) (quoting *Inwood Labs., Inc.* v. *Ives Labs., Inc.*, 456 U.S. 844, 850 n.10 (1982)). In contrast, "when the aesthetic design of a product is itself the mark for which protection is sought," courts will deem "a mark ... aesthetically functional, and therefore ineligible for protection under the Lanham Act, [if] protection of the mark significantly undermines competitors' ability to compete in the relevant market." *Id.* at 219-20, 222.

*AVELA II*, 241 F. Supp. 3d at 478-79.

### b.     Analysis

As this Court noted in *AVELA II*, the facts offered by AVELA on this point are minimal.  The cited examples of generic marks — shampoo, automobile, and aspirin — are terms that clearly indicate a type of item rather than a source or producer.  There is no indication in the evidence presented by AVELA that the marks at issue here "identify the type or species of goods or services to which they apply, [or] are totally lacking in distinctive quality." *KatiRoll*, 2015 WL 5671881, at *3.  Indeed, the image and likeness of Monroe quite clearly refers not to a type of good (e.g., t-shirts, shot glasses, etc.), but to the woman depicted on the good.  The AVELA Parties' response is a feeble assertion that, "[i]f a customer walks into a store and asks for a 'Marilyn Monroe t-shirt,' it is likely they want a t-shirt with a picture of Monroe on it, not a t-shirt manufactured or endorsed by the legal fiction which is [the Estate]."  (AVELA Opp. 31).  However, this point goes to the question of consumer confusion, as it addresses what a purchaser of a Marilyn Monroe t-shirt might understand that mark to suggest.  It does not demonstrate that the mark is generic.

The Court noted in *AVELA II* that it held "serious doubts that [the AVELA Parties] will be able to establish that the Contested Marks are generic." 241 F. Supp. 3d at 478.  As the Estate Parties note, where trademarks are registered, the defendant bears the burden of demonstrating the marks are not protectable.  (Estate Reply 14-15).  Here, the AVELA Parties offer no evidence to demonstrate that consumers consider Marilyn Monroe's signature

or likeness to be a generic mark that refers to a class of products. With discovery now closed and a factual record established, the Court finds nothing to suggest that the AVELA Parties can establish that the marks are generic.

As for functionality, the Court offered a similar warning in *AVELA II* that, absent further factual support, it was not inclined to find the marks were functional. *See* 241 F. Supp. 3d at 479. Again, the AVELA Parties present nothing that alters the Court's opinion. The AVELA Parties suggest that they have a claim for aesthetic functionality, as allowing the trademarks would undermine competitors' ability to compete in the relevant marketplace. (AVELA Opp. 32). For this, they cite the Federal Circuit's decision in *International Order of Job's Daughters* v. *Lindeburg and Company*, 727 F.2d 1087 (Fed. Cir. 1984), which found the Job's Daughters' organization's name and emblem were "functional aesthetic components of the product, not trademarks," and were subject to cancellation because of the widespread use of the name and emblem by third parties. (*Id.*). However, the titular organization had only minimally policed the use of the name and emblem, and had provided no evidence that consumers complained about third-party use or believed any connection existed between the organization and jewelry bearing the name and emblem. *Id.* at 1090.

Here, by contrast, the Estate Parties point to significant activity in protecting the name and image of Monroe (Estate 56.1 ¶¶ 32-47), and have presented evidence of both consumer complaints and consumer confusion (*id.* at ¶¶ 242-45). Furthermore, at other points the AVELA Parties have

suggested that other commercial actors make use of Marilyn Monroe's image, name, and likeness; those arguments undercut their present argument that no competitors to the Estate exist. (*See* AVELA 56.1 ¶ 33). The Court finds that the AVELA Parties have failed to identify a genuine dispute of material fact as to whether the marks are generic or functional and thus denies the claims for trademark cancellation.

### 4. Genuine Disputes of Material Fact Remain as to Trademark Infringement Under 15 U.S.C. § 1114 and the Common Law

#### a. Applicable Law

The standard for trademark infringement is presented in *AVELA I:*

> Claims for trademark infringement under Section 32 of the Lanham Act are analyzed "'under a familiar two-prong test. The test looks first to whether the plaintiff's mark is entitled to protection, and second to whether the defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods.'" *Tiffany (NJ) Inc.* v. *eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010) (quoting *Savin Corp.* v. *Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004)). The elements for trademark infringement under New York law mirror those for the Lanham Act, and as a result these claims can be analyzed together. *See Smith* v. *Mikki More*, LLC, 59 F. Supp. 3d 595, 616 (S.D.N.Y. 2014).

131 F. Supp. 3d at 209.

#### b. Discussion

##### i. The Estate's Marks Are Entitled to Protection

Here as well, the AVELA Parties' arguments for cancellation of the marks are predicated on the argument that the Estate cannot possibly own the marks, because the Estate is not the creation of Ms. Monroe herself. (*See*

VIFA Br. 22 ("[The Estate's] registered trademarks are invalid where they unlawfully and falsely suggest a connection between [the Estate] and Monroe.")). As the Court has already noted, the connection between the Estate and Monroe is not false or fraudulent, and the AVELA Parties' incantations that Ms. Monroe did not register these trademarks herself, however frequently repeated, are not relevant. As the Estate Parties note, the Lanham Act provides that the registration of the marks constitutes prima facie evidence of validity. (Estate Reply 8).

In an attempt to contest the validity of the marks, the AVELA Parties cite to a decision of the U.S. Patent and Trademark Office that a restaurant could not trademark the term Margaritaville. (VIFA Br. 22 (citing *Buffett* v. *Chi-Chi's, Inc.*, 226 U.S.P.Q. 428, 429 (T.T.A.B. 1985))). In that decision, Jimmy Buffet, the composer of the famous song by that name, successfully challenged the registration, as he believed it would falsely imply a connection with him. *Id.* It is difficult for the Court to understand what relevance this decision has to a case where there is no dispute as to whom Marilyn Monroe's name refers, and the Estate is not attempting to trademark the claim in the face of a challenge from Ms. Monroe. Throughout their extensive briefing, the AVELA Parties offer no clear evidence to suggest that there are any issues with the trademarks that would warrant their cancelation. Accordingly, the Court concludes that the Estate holds a valid trademark in the Marilyn Monroe name and signature.

### ii. Genuine Disputes of Material Fact Remain as to Consumer Confusion

While the Estate has established that it owns the rights to Ms. Monroe's signature and holds a wordmark in the name "Marilyn Monroe," the issue of consumer confusion forecloses the Estate Parties' application for summary judgment for largely the same reasons the Court discussed in its analysis of § 43(a) of the Lanham Act. The AVELA Parties' use of the name "Marilyn" may cause confusion as to whether it is endorsed by Ms. Monroe or her estate, but the evidence presented does not foreclose the possibility that a reasonable juror could find differently. The Estate Parties insist that the use of Marilyn Monroe's first name "in a signature-style font does not evoke a random artist — it clearly evokes the signature of Marilyn Monroe in a way that suggests endorsement." (Estate Reply 12). However, the AVELA Parties suggest that the name is merely intended to describe the actress depicted. (AVELA Opp. 21). Neither interpretation of the usage is so obviously unreasonable as to indicate a lack of genuine dispute as to material fact.

While the Estate has demonstrated that AVELA's use of the word "Marilyn" in a signature style font is suggestive of the Estate's protected marks, the Second Circuit's *Pirone* decision makes clear the difficulty of establishing consumer confusion with regards to trademarks in celebrities' names. As the AVELA Parties point out, *Pirone* recognized that the use of a deceased celebrity's name, even where trademarked, does not necessarily indicate trademark infringement. *See Pirone*, 894 F.2d at 583 ("Whatever rights Pirone may have in the mark 'Babe Ruth,' MacMillan's use of Ruth's

name … can infringe those rights only if that use was a 'trademark use,' that is, one indicating source or origin.").  The distinction drawn by the Second Circuit in *Pirone* is between situations where the words are used to identify a business or in their "primary, descriptive sense."  *Id.* at 584.

AVELA offers an interpretation of the use of the name, where it is merely a descriptive definition of the woman depicted.  This argument is undercut by the signature style font, which does not aid in description, but *Pirone* provides further support for AVELA's argument by holding that even if a plaintiff could establish trademark use, this alone would not prove consumer confusion.  *See Pirone*, 894 F.2d at 584 ("[E]ven if Pirone could demonstrate that the photographs indicated origin or made a representation of sponsorship, its trademark claims would founder on the critical issue under the Lanham Act: likelihood of confusion.").  The Court has already examined the numerous factual disputes related to the question of consumer confusion in discussing the false endorsement claim and found substantial factual questions remain. The Court cannot determine that a reasonable consumer would assume the Monroe signature indicates sponsorship and approval rather than merely description.

While the Court recognizes the Estate's rights in the mark "Marilyn Monroe," it cannot determine that any reasonable juror would believe that the AVELA Parties' use of Ms. Monroe's name indicates that their goods originated with or were sponsored by Ms. Monroe or the Estate.

### 5. Genuine Disputes of Material Fact Remain as to Trademark Dilution Under N.Y.G.B.L. § 360-l.

#### a. Applicable Law

As with prior issues, the Court draws its statement of trademark dilution law from its decision in *AVELA I*:

> To [prove] dilution under New York law, the plaintiff must [establish] the existence of [i] a distinctive mark capable of being diluted, and [ii] a likelihood of dilution. Notably, unlike federal law, New York does not require a mark to be famous for protection against dilution to apply. Moreover, New York law does not recognize a dilution claim unless the marks at issue are substantially similar.

131 F. Supp. 3d at 211-12 (internal citations omitted).

#### b. Discussion

The Estate Parties recite the standards for trademark dilution under New York law and assert that the standards are substantially similar to the *Polaroid* factors. (Estate Br. 23). Given the discussion above, the Court has already concluded that consideration of the *Polaroid* factors does not entitle either party to summary judgment.

The Estate Parties attempt to differentiate this claim by pointing to *Savin Corp.* v. *Savin Group*, which held that "an identity of marks creates a presumption of actual dilution." 391 F.3d 439, 453 (2d Cir. 2004). However, demonstrating the identity of marks requires more than a substantial similarity: "It cannot be overstated, however, that for the presumption of dilution to apply, the marks must be identical. In other words, a mere similarity in the marks — even a close similarity — will not suffice to establish

per se evidence of actual dilution." *Id.* Put simply, the Estate Parties overstate the holding of the *Savin* case when they state that "replication of the functional equivalent of the MONROE Marks establishes a *per se* claim for trademark dilution." (Estate Br. 24). Rather, *Savin* makes clear that the standard for whether a given mark is identical is a fact-intensive inquiry requiring close examination of the products at issue and the context of the use. *Id.* at 453-54 ("Where the senior and junior 'Savin' marks both are used in website addresses, the marks may be identical. On the other hand, where the 'Savin' marks at issue appear in stylized graphics on webpages, the competing marks may be found merely to be very similar."). The Estate Parties fail to demonstrate that the use of the word "Marilyn" in AVELA's shirts is *identical* to their claimed marks in the signature or words Marilyn Monroe, rather than merely "very similar."[5]

The AVELA Parties also move for summary judgment on the dilution claims, citing the lack of secondary meaning in the Monroe marks. Again, they rely on *Cairns* and its discussion of how Princess Diana's name was unlikely to serve a source-identifying function. *See* 107 F. Supp. 2d at 1222. However, as the Court has previously (and repeatedly) explained, *Cairns* involved far less evidence that Princess Diana had engaged in efforts to protect her image and name as a brand identity. *Id.* The Court again rejects the argument that the Marilyn Monroe Intellectual Property could not serve a

---

[5] The Estate's rights in the wordmark Marilyn for wine will not resolve the issue, as the challenged uses are not for wine.

source-identifying function. It concludes that a trial is necessary to determine whether the marks have developed a source-identifying function, and whether the "Marilyn" on the shirts produced by AVELA is identical to the marks in Marilyn Monroe's signature and name owned by the estate.

### 6. Genuine Disputes of Material Fact Remain as to Trademark Dilution Under the Lanham Act

#### a. Applicable Law

Trademark dilution under the Lanham Act requires a plaintiff to prove that:

> [i] its mark is famous; [ii] the defendant's use of the mark is made in commerce; [iii] the defendant used the mark after the mark was famous; and [iv] the defendant's use of the mark is likely to dilute the quality of the mark by blurring or tarnishment." *Estate of Ellington ex rel. Ellington* v. *Harbrew Imports Ltd.,* 812 F. Supp. 2d 186, 193 (E.D.N.Y. 2011); *see also Schutte Bagclosures Inc.* v. *Kwik Lok Corp.,* 48 F. Supp. 3d 675, 702 (S.D.N.Y. 2014) (four elements of dilution claim are "[i] the mark is famous, [ii] the defendant is making use of the mark in commerce, [iii] the defendant's use of the mark began after the mark became famous, and [iv] the likelihood of dilution").

*AVELA I*, 131 F. Supp. 3d at 211.

#### b. Analysis

The Estate Parties do not move for summary judgment on their Lanham Act dilution claim, while the AVELA Parties move for summary judgment that there is no dilution. The parties' briefings on these points cover largely the same ground as other aspects of the case. The AVELA Parties return to the point that the marks held by the Estate do not hold a meaning beyond

identifying Marilyn Monroe as the person depicted, and they suggest that there is no evidence that the AVELA products are of inferior quality. (VIFA Br. 23-24). The Estate Parties point to their federally registered marks and state that they have received complaints regarding shirts depicting Ms. Monroe with tattoos. (Estate Opp. 29).

As the Court has observed throughout, the parties' intellectual property claims are fact-intensive, and neither party has demonstrated the absence of a genuine dispute of fact. The AVELA Parties are entitled to present evidence that consumers will not find their products inferior or that the marks themselves are not famous. The Estate Parties are entitled to present evidence that customers expect the products to carry the Estate's endorsement and that the products produced by AVELA risk damaging the Estate's brand by tarnishing the Monroe persona in which they hold ownership.

### 7. The Estate Parties Are Entitled to Summary Judgment on Their Claim That IPL and AVELA Are Alter Egos

#### a. Applicable Law

Delaware law permits a court to disregard the corporate form of an LLC and hold shareholders accountable for corporate liabilities in one of two circumstances: (i) "where there is fraud" or (ii) "where [the LLC] is in fact a mere instrumentality or alter ego of its owner." *NetJets Aviation, Inc.* v. *LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (internal citations omitted). To prove that an LLC exists as an alter ego of another entity, a plaintiff must demonstrate "(i) that 'the entities in question operated as a single economic

entity,' and (ii) that 'there [is] an overall element of injustice or unfairness'" in the use of the shield of limited liability. *Id.* at 177.

The factors relevant to the single economic unit inquiry include:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

*NetJets*, 537 F.3d at 176-77 (quoting *United States* v. *Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988)). In addition, to satisfy the requirement of an element of injustice or unfairness, a plaintiff must demonstrate some abuse of the corporate form. This injustice "must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit." *Id.* (internal quotation marks and citation omitted).

### b. Analysis

While the Estate Parties argue that each of the AVELA Parties is an alter ego of each of the other AVELA Parties, they move for summary judgment only with respect to AVELA and IPL. (Estate Br. 27-28). The Estate Parties offer a number of factors that, they claim, reflect IPL's status as AVELA's alter ego, including:

- IPL and AVELA share a director, officer, and shareholder in Mr. Valencia. (Estate 56.1 ¶ 178).

- Mr. Valencia signs checks on behalf of IPL and AVELA. (*Id.* at ¶ 177).

- Mr. Valencia directed licensees of AVELA to write their checks to IPL, and licensees understood IPL and AVELA to be a single entity. (*Id.* at ¶¶ 173-75).

The AVELA Parties dispute none of these facts, but argue that they do not satisfy the alter ego determination, because other *NetJets* factors are not discussed. (AVELA Opp. 27-28). Such a defense, however, overlooks the fact that the most relevant factor in the *NetJets* inquiry is whether the entity simply functioned as a facade for the dominant shareholder. *See NetJets*, 537 F.3d at 177 ("Stated generally, the inquiry initially focuses on whether 'those in control of a corporation' did not 'treat[] the corporation as a distinct entity.'"). From the facts presented, it is quite clear that Mr. Valencia and his business partners treated IPL and AVELA as a single unit. AVELA has offered no suggestion that IPL has any independent existence outside its role receiving payments for Valencia.

The Estate Parties allege that the injustice occasioned by the involvement of IPL is the deliberate hiding of money to escape court judgments. The Estate Parties point out that Mr. Valencia attempted to hide the existence of IPL, which was only discovered through third-party subpoenas. (Estate 56.1 ¶ 147). Furthermore, Mr. Valencia denied any knowledge of IPL or connection to it in sworn deposition testimony. (*Id.* at ¶ 176). The AVELA Parties suggest that these arguments are merely variations on the theme of the Estate Parties' underlying claims. (AVELA Opp. 28). The Court disagrees. The Estate Parties have clearly demonstrated that AVELA and Mr. Valencia have attempted to hide the existence of IPL,

despite using it to receive money from their licensees.  These unrebutted facts demonstrate that IPL exists as a mechanism to evade judicial process.  The Court finds as a matter of law that IPL is an alter ego of AVELA.

### 8. The Estate Parties Are Entitled to Summary Judgment as to AVELA's Claim for Tortious Interference with Contract

#### a. Applicable Law

To demonstrate tortious interference with contract, a plaintiff must prove [i] "the existence of a valid contract between the plaintiff and a third party'; [ii] the 'defendant's knowledge of the contract'; [iii] the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; [iv] 'actual breach of the contract'; and [v] 'damages resulting therefrom.'"  *Kirch* v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co.* v. *Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)).

#### b. Analysis

The AVELA Parties' claim falters on the element of "actual breach."  That is, the AVELA Parties state that one of their contractual relationships suffered "damages," and the contractual agreement "ended," as a result of the Estate Parties' actions.  (AVELA Opp. 29).  However, the AVELA Parties nowhere suggest that their counterparty actually breached the contract.  To the contrary, the Estate Parties point to unrebutted statements from Mr. Valencia that the contractual relationship continued.  (Estate 56.1 ¶ 236).

A naked allegation that a contractual relationship ended is not enough to demonstrate tortious interference with contract.  *See Kirch,* 449 F.3d at 402 ("The inference we draw from the plaintiffs' allegation that JP Morgan 'walked

away' from Project Galaxy is that the investment bank decided not to proceed with the project. This does not amount to an allegation that JP Morgan violated the terms of a contract[.]"). The AVELA Parties offer no evidence that there was any violation of the terms of a contract, and the time to produce such evidence has passed. The Court finds no genuine dispute as to whether a breach even occurred, let alone that the Estate solicited a breach without justification. Summary judgment in favor of the Estate Parties is warranted.

9. **The Estate Parties Are Entitled to Summary Judgment as to VIFA's Claim for Intentional Interference with Prospective Economic Advantage**

a. **Applicable Law**

To establish intentional interference with a prospective economic advantage, a plaintiff must demonstrate that: "(i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *AVELA I*, 131 F. Supp. 3d at 217 (quoting *Lombard* v. *Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002)).

Unlike in tortious interference with contracts claims, a prospective-economic-advantage plaintiff must show that "the defendant's conduct ... amount[s] to a crime or an independent tort," or that the defendant has "engage[d] in conduct for the sole purpose of inflicting intentional harm on" the plaintiff. *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 189-90 (2004) (internal quotation marks and citation omitted); *see also Sidney Frank Importing Co.* v.

*Beam Inc.*, 998 F. Supp. 2d 193, 211 (S.D.N.Y. 2014) (noting that the mental state requirement for prospective-economic-advantage claim "is more exacting" than that for a contract-interference claim, "because courts must balance a plaintiff's expectation in establishing a contractual relationship against the competing interest of the interferer ... and the broader interest of fostering healthy competition" (internal quotation marks and citations omitted)).

### b.    Analysis

VIFA brought a claim for intentional interference with economic advantage stemming from the Estate Parties' alleged interference in the relationship between VIFA and a potential licensee, Duke Imports ("Duke"). (Estate 56.1 ¶¶ 238-39).  The Estate Parties claim that VIFA has offered no factual support for its contention that an economic relationship between VIFA and Duke ever existed; that VIFA has demonstrated no injury; and that VIFA has presented no evidence that any actions taken by the Estate Parties were taken for the sole purpose of inflicting harm on VIFA.  (Estate Br. 30-31).  The AVELA Parties state that factual disputes exist, because VIFA's sole officer, Liza Acuna (Estate 56.1 ¶ 129), stated that the Estate Parties "intimidated and threatened" Duke to prevent it from doing business with VIFA (AVELA Opp. 29).  Having examined the deposition of Ms. Acuna, the Court notes that the "intimidation" and "threats" identified by Ms. Acuna consisted of the Estate Parties' refusal to do business with Duke if it did business with AVELA. (*See* Dkt. 338-26 (Deposition of Liza Acuna of August 10, 2017) at 140:17-21 ("[I]f your livelihood is only Elvis Presley [licensing] and that person says if you

go in business with this person I'm going to stop your Elvis Presley license or you're not going to be able to renew it, that's a threat.")).  Ms. Acuna also acknowledges that she was uncertain whether the Estate Parties ever suggested they would sue Duke for contracting with AVELA.  (Estate 56.1 ¶ 240).

The Court does not consider the Estate Parties' "pressure" on prospective licensees not to do business with AVELA to be the sort of wrongful conduct that could satisfy the requirement for an intentional interference claim.  *See Carvel*, 3 N.Y.3d at 192 ("Most … 'wrongful means' are acts that would be criminal or independently tortious, and most are obviously absent here: [the Estate Parties] did not drive [VIFA's] customers away by physical violence, or lure them by fraud or misrepresentation, or harass them with meritless litigation.").  And there is no evidence that the Estate Parties took any action with the intent to harm VIFA, since the Estate Parties took this action to protect their purported rights to the Marilyn Monroe Intellectual Property.  In short, the Court finds no genuine issue of material fact remain regarding VIFA's claim for intentional interference and grants summary judgment to the Estate Parties on this claim.

**10.  Genuine Disputes of Material Fact Remain as to the Estate Parties' Claim for Intentional Interference with Prospective Economic Advantage**

The Court previously warned the Estate that its claims for intentional interference might "not survive a motion for summary judgment," *see AVELA I*, 131 F. Supp. 3d at 217-18, but the AVELA Parties' briefing on the subject is

so cursory that, perhaps unwittingly, they have proven the Court wrong. The AVELA Parties' argument in its entirety consists of two sentences: "[The Estate] has no valid rights in its purported 'Marilyn Monroe Intellectual Property.' As a result, [the Estate's] claims for tortious interference with existing contractual relationships and intentional interference with prospective economic advantage also fail as a matter of law[.]" (VIFA Br. 24). The fact remains that the Estate Parties' claim is grounded in arguments that this Court has concluded require factual determinations. There are genuine disputes of material fact, among other things, with respect to the Estate's claims regarding interference with its potential relationship with Spencer's. (Estate 56.1 ¶¶ 201, 202, 240). The AVELA Parties' motion for summary judgment on this claim is denied.

### 11. Laches Does Not Bar the Estate Parties' Claims

#### a. Applicable Law

Laches is an equitable defense that bars a plaintiff's claim when the plaintiff "is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp.* v. *City of N.Y.*, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks omitted). A defendant asserting laches must show that "[i] the plaintiff knew of the defendant's misconduct; [ii] the plaintiff inexcusably delayed in taking action; and [iii] the defendant was prejudiced by the delay." *Ikelionwu* v. *United States*, 150 F.3d 233, 237 (2d Cir. 1998).

### b.    Analysis

The AVELA Parties' claim for laches rests on a precarious factual foundation, namely, a cease and desist letter that the Estate's predecessor sent to Dave Grossman Creations, a prior licensee of AVELA, in 2006 regarding Monroe merchandise.  (AVELA 56.1 ¶ 77).  As the Estate points out, the cease and desist letter contains no mention of AVELA, and no indication that the Estate was aware of AVELA's role as a supplier to Dave Grossman Creations.  (Estate Opp. 30-31).  If anything, this cease and desist letter suggests that AVELA should have become aware of the Estate or its predecessors in 2006, rather than the reverse.  It does not substantiate the affirmative defense of laches.

### 12.    Copyright Law Does Not Bar the Estate Parties' Claims

The AVELA Parties' briefing with respect to copyright law is not a model of clarity.  (AVELA Br. 21-22).  As best the Court can discern, the AVELA Parties suggest that the copyrights that X One X and AVELA hold in certain Monroe-related artwork entitle them to the use of Ms. Monroe's image.  (*Id.*).  The Court already largely rejected the argument that copyrights could protect AVELA from infringement claims in *AVELA I.  See* 131 F. Supp. 3d at 207 ("[T]he existence of a copyright does not automatically invalidate a trademark, just as the existence of a trademark does not automatically vitiate a copyright.").  *AVELA I* also referred to the decision in *Bruce Lee II*, which explained the limited utility of copyrights in this space:

> Plaintiff's complaint is that the t-shirts use Bruce Lee's persona — his likeness and presence as a martial

46

> artist, not his films or the characters he portrayed
> therein — without authorization from BLE. The rights
> in Lee's persona and likeness are not fixed in a tangible
> medium, and do not fall within the subject matter of
> copyright.

*Bruce Lee II*, 2013 WL 822173, at *14 (citations omitted).

At bottom, the Estate Parties argue that the AVELA Parties have made illicit use of Marilyn Monroe's persona, and not any fixed depiction of her. Copyright law provides no protection for the AVELA Parties on this argument.

### 13. The First Amendment Does Not Bar the Estate Parties' Claims

#### a. Applicable Law

Concerns about the First Amendment have led the Second Circuit to read the Lanham Act narrowly for certain expressive works. *See Rogers* v. *Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989) ("[O]verextension of Lanham Act restrictions … might intrude on First Amendment values, we must construe the Act narrowly to avoid such a conflict."). The Second Circuit's context-dependent reading of the Lanham Act has been widely adopted. *See, e.g.*, *Brown* v. *Elec. Arts, Inc.*, 724 F.3d 1235, 1239 (9th Cir. 2013) ("Under the *Rogers* test, § 43(a) will not be applied to expressive works 'unless the [use of the trademark or other identifying material] has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the [use of trademark or other identifying material] explicitly misleads as to the source … of the work.'" (citing *Rogers*, 875 F.2d at 999)).

That said, the *Rogers* test is usually not the appropriate mechanism for examining an ordinary commercial product. *See Rogers*, 875 F.2d at 1000

("[C]onsumers … do not regard titles of artistic works in the same way as the names of ordinary commercial products.  Since consumers expect an ordinary product to be what the name says it is, we apply the Lanham Act with some rigor to prohibit names that misdescribe such goods."); *see also Parks* v. *LaFace Records*, 329 F.3d 437, 449-50 (6th Cir. 2003) (differentiating between artistic works and "ordinary commercial products").

### b.    Analysis

The AVELA Parties argue that because t-shirts have been recognized as an expressive medium, their products enjoy First Amendment protection that outweighs any risk of consumer confusion and that requires summary judgment in their favor.  (AVELA Br. 22-23).  The Estate Parties respond that the *Rogers* test is not designed to protect commercial products and, further, that any First Amendment concerns are already addressed by the consumer confusion test applicable to commercial products.  (Estate Opp. 33-34).  The Court agrees with the Estate Parties and notes that the AVELA Parties' arguments elsewhere suggest that their products are commercial goods that make use of Ms. Monroe to draw customer attention.  (*See* AVELA Opp. 31 ("If a customer walks into a store and asks for a 'Marilyn Monroe t-shirt,' it is likely they want a t-shirt with a picture of Monroe on it.")).

Furthermore, even if AVELA's artwork had some artistic value, it is not clear that such value could save it from an infringement claim.  The Estate Parties argue that AVELA tricks licensees into a belief that its products are officially endorsed by the individuals holding the rights to the Monroe persona.

(Estate 56.1 ¶ 242 ("Patricia Timsawat [an AVELA licensee] testified that she did not know there was a difference between AVELA and the Estate.")).  Even in *Rogers*, the Second Circuit made plain that "[p]oetic license is not without limits.  The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product."  875 F.2d at 997.

The crux of this dispute is the Estate Parties' claim that AVELA tricks consumers into believing AVELA's products are genuine, and AVELA's response that it is merely providing shirts that depict a famous celebrity and that no customer would think conveys her endorsement.  The Court has already ruled that a trial on this question is necessary; the First Amendment, despite all its power, does not resolve this question.  The Court denies summary judgment for the AVELA Parties on this affirmative defense.

### 14.  A Defense of Fair Use Does Not Bar the Estate Parties' Claims

#### a.  Applicable Law

Under § 33(b)(4) of the Lanham Act, a defendant can invoke an affirmative defense to liability for infringement of trademark by claiming "a use, otherwise than as a mark, ... which is descriptive of and used fairly and in good faith only to describe the goods ... of such party."  15 U.S.C. § 1115(b)(4).  Determining whether the proposed use qualifies as fair requires an assessment of "whether the term is used [i] descriptively, [ii] other than as a mark, and [iii] in good faith."  *Bruce Lee II*, 2013 WL 822173, at *22 (quoting *JA Apparel Corp.* v. *Abboud,* 682 F. Supp. 2d 294, 309-10 (S.D.N.Y. 2010)).

### b.    Analysis

The AVELA Parties argue that their use of facets of the Monroe persona is merely descriptive, because the use of Ms. Monroe's image and likeness is merely to inform the consumer as to what the product is, an item depicting Ms. Monroe.  (AVELA Br. 23-25).  The remainder of the AVELA Parties' fair use discussion seems to cover the same ground as previous arguments, such as an argument that use of depictions of Ms. Monroe should be considered functional.  (*Id.*).  The Court can dispense with these fair use arguments quickly, as the AVELA Parties have used the likeness of Monroe to *sell* their shirts, not to describe them.  The image of Marilyn Monroe does not describe a t-shirt; rather, the product being sold is a "Marilyn Monroe t-shirt."  *See Bruce Lee II*, 2013 WL 822173, at *22.  This fact is both obvious and sufficient to foreclose a defense of fair use.

### 15.    Summary of the Court's Resolution of the Cross-Motions

Having examined the parties' respective claims for summary judgment, the Court grants the Estate Parties' motion in part and denies it in part.  The Court grants the Estate's motion for summary judgment on all remaining claims of interference brought by the AVELA Parties, the trademark cancellation claims brought by the AVELA Parties, and the alter ego claim that the Estate Parties brought against IPL.  The Court denies in full AVELA's motion for summary judgment.  As the Court has not determined that AVELA is liable for infringement on summary judgment, it does not reach the issue of damages or the availability of injunctive relief.

**B.** **The Court Denies the AVELA Parties' Motion to Exclude Expert Testimony**

The Court now turns to the AVELA Parties' motion to exclude the Estate Parties' expert report. For the reasons detailed in this section, the Court denies the motion.

**1.** **Applicable Law**

**a.** **The Court's Role as Gatekeeper**

The Supreme Court has tasked district courts with a "gatekeeping" role with respect to expert opinion testimony. *Daubert* v. *Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993) (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand"). This "gatekeeping" function applies whether the expert testimony is based on scientific, or on technical or "other specialized" knowledge. *Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999). "It is well-established that the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence[.]" *Boucher* v. *United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citation and quotation marks omitted).

Federal Rule of Evidence 702 grants an expert witness testimonial latitude unavailable to other witnesses, as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A court's inquiry thus focuses on three issues: (i) whether the witness is qualified to be an expert; (ii) whether the opinion is based upon reliable data and methodology; and (iii) whether the expert's testimony on a particular issue will assist the trier of fact. *Nimely* v. *City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied[.]" *United States* v. *Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

In the instant case, items one and two are obviated by the lack of challenge to Mr. Poret's qualifications or larger methodology. Thus, the Court need only focus on the reliability of the data and the value of the testimony.

### b. Reliability of Expert Testimony

Once a court has determined that a witness is qualified as an expert, it must ensure that the expert's testimony both "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.[6] In order to be

---

[6] In *Daubert* v. *Merrell Dow Pharmaceuticals*, the Supreme Court identified factors that may bear upon the reliability of proposed scientific testimony, including: (i) whether the theory or technique can be, and has been, tested; (ii) whether it has been subjected to peer review and publication; (iii) the known or potential error rate of the technique; (iv) the existence and maintenance of standards controlling the technique's operation; and (v) whether the technique or theory has gained widespread acceptance in the relevant scientific community. 509 U.S. 579, 593-94 (1993) (noting that these factors do not constitute "a definitive checklist or test"). In *Kumho Tire Co. Ltd.* v. *Carmichael*, the Supreme Court held that a court may apply the *Daubert* factors, as appropriate, in

admissible, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel* v. *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008).

Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 543 (S.D.N.Y. 2004) (quoting *Daubert*, 509 U.S. at 590); *see also In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 284 (finding that "[s]ubjective methodology, as well as testimony that is insufficiently connected to the facts of the case," can serve as "grounds for rejection of expert testimony"). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp.* v. *Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation and quotation marks omitted). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (alteration in original) (citation omitted).

"A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d

---

cases dealing with technical or "other specialized," but non-scientific, testimony. 526 U.S. 137, 141 (1999).

256, 267 (2d Cir. 2002) (citation and quotation marks omitted).  This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony."  *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* (quoting *Daubert*, 509 U.S. at 596).

While a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function."  *Williams*, 506 F.3d at 160-61 (citation omitted).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."  *Kumho Tire*, 526 U.S. at 157 (citation omitted).  Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

### c.  Helpfulness or Relevance of Testimony

Finally, the Court must determine whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  This inquiry looks primarily to whether the testimony is relevant.  *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 283.  Under the Federal Rules of Evidence, evidence is relevant if

it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

A court should not admit expert testimony that is "'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" *United States* v. *Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (quoting *United States* v. *Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Atlantic Specialty Ins.* v. *AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially that "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert").

Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397; *see also Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite

misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))).

## 2.    Analysis

The AVELA Parties' motion to exclude the Poret Report does not suggest that Mr. Poret is unqualified, nor does it suggest that his general methodology was unsound.  (AVELA Expert Br. 4-25).  Indeed, the AVELA Parties' rebuttal expert report relied on the same methodology in his survey.  (*See* Estate Expert Opp. 2 (the Motion [does not] challenge Mr. Poret's fundamental use of the *Eveready* survey format....  Indeed, the AVELA Parties' own expert, Howard Marylander, adopted the *Eveready* methodology in designing his study[.]")).  Instead, the AVELA Parties attack the specific questions asked, the items used, the sample sizes, and the manner in which various respondents were categorized.  Ordinarily, these objections would be understood to attack the weight of the expert report rather than its admissibility.  *See Schering Corp.* v. *Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (holding that "errors in methodology ... properly go only to the weight of the evidence").  Here, however, the AVELA Parties argue that this is the rare case where errors in methodology make the Report more prejudicial than probative and therefore inadmissible under Rule 403.  *See Starter Corp.* v. *Converse, Inc*, 170 F.3d

286, 296-97 (2d Cir. 1999) (finding survey evidence inadmissible on Rule 403 grounds).  The Court does not agree.

The AVELA Parties' arguments for exclusion focus on disputes that are better addressed through cross-examination.  And at least one of the AVELA Parties' arguments is flatly incorrect:  The AVELA Parties state that the "[s]urvey here fail[ed] to instruct respondents against guessing."  (AVELA Expert Br. 11).  And yet the Poret Report's survey contained the explicit instruction, "Please do not guess."  (Poret Report 7).  What is more, a great deal of the AVELA Parties' briefing argues that the Estate's survey is irrelevant, because respondents did not identify the Estate by name, but rather made statements suggesting Ms. Monroe or people around her endorsed the shirts.  (AVELA Expert Br. 18-21).  Similar criticism was offered by AVELA in a case involving products that allegedly infringed on the rights of the estate of Bob Marley.  Ultimately, the Ninth Circuit rejected the argument that a survey needed to screen explicitly for recognition of the entity claiming the rights to be probative.  *Fifty-Six Hope Rd. Music, Ltd.* v. *A.V.E.L.A., Inc.*, 778 F.3d 1059, 1070 (9th Cir. 2015) ("[I]dentifying Marley or whoever holds the rights to his persona in the alternative does not render the survey data useless or irrelevant.").  This Court agrees with that reasoning.

The AVELA Parties further argue that the survey is flawed because the shirt in Mr. Poret's survey did not include the Radio Days hangtag.  (AVELA Expert Br. 5-6).  The Estate counters that Mr. Poret used an AVELA shirt that was purchased at a Spencer's store.  (Estate 56.1 ¶ 254.d).  As with many of

the disputes related to dueling expert reports, the question of hangtags is an appropriate subject for the jury, and it provides scant support for an argument that the Poret Report must be excluded.

The parties also clash on the appropriate control group, the sample size, and the mechanism for categorizing responses, but the Court does not believe it is necessary to examine each of these disputes in detail when the Second Circuit has admonished courts that these disputes go to weight rather than admissibility. *See, e.g., Friesland Brands, B.V.* v. *Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 459 (S.D.N.Y. 2002) ("The Second Circuit in *Schering* made clear that ... a survey's errors in methodology ... properly go only to the weight of the evidence — not to its admissibility." (internal quotations omitted)). The AVELA Parties can vigorously cross-examine Mr. Poret about his purportedly small sample sizes, his choice of control groups, and his manner of categorizing consumer confusion, but the Court will not prevent the jury from hearing his testimony. The AVELA Parties' motion to exclude is denied.

## CONCLUSION

For the reasons set forth above, the Estate Parties' motion for summary judgment is GRANTED in part and DENIED in part. The AVELA Parties' motion for summary judgment is DENIED. The AVELA Parties' motion to exclude expert testimony is DENIED. What remains for trial by jury are the Estate Parties' federal and state trademark claims, as well as their claim for intentional interference with prospective economic advantage; certain alter ego claims; and certain defenses raised by the AVELA Parties.

The Clerk of Court is directed to terminate the motions at docket entries 334, 337, 354, 361, 364, and 369. The parties are hereby ORDERED to file a joint letter on or before **March 1, 2019**, advising the Court of the parties' availability for trial in the second half of 2019.

SO ORDERED.

Dated:      January 30, 2019
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge